## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

| | | |
|---|---|---|
| **TERRY PITCHFORD**, | : | |
| *Petitioner*, | : | |
| | : | |
| v. | : | NO. 4:18-cv-0002-MPM |
| | : | |
| **PELICIA HALL**, Commissioner, | : | **Capital Habeas Corpus** |
| Mississippi Dep't of Corrections, and | : | |
| JIM HOOD, Attorney General of the | : | Hon. Michael P. Mills |
| State of Mississippi, | : | |
| *Respondents.* | : | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY[1]

<div style="margin-left:40%">

Joseph J. Perkovich
Phillips Black, Inc.
PO Box 4544
New York, NY 10163-4544
(212) 400-1660

J. Scott Gilbert
Watkins & Eager PLLC
The Emporium Building
400 East Capitol Street
Jackson, MS 39201
(601) 965-1922

Counsel for Petitioner

</div>

---

[1] This petition substantially follows the form dictated by the model form contained in the Appendix of Forms accompanying the Rules Governing Section 2254 Cases in the United States District Courts, as amended effective December 1, 2004. See Rule 2(d), Rules Governing Section 2254 Cases. Paragraphs 1 through 11 state the history of prior court proceedings; paragraph 12 states the federal constitutional grounds upon which petitioner claims that the judgments and sentences upon him are unlawful; and paragraphs 13 through 18 contain required technical information.

TABLE OF CONTENTS

I. PROSECUTORIAL MISCONDUCT DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION. ............................................................................27

    1.    The State Exercised Peremptory Strikes in a Racially Discriminatory Manner, Violating the Sixth and Fourteenth Amendments to the Constitution .. 27

    2.    The State Improperly Failed to Disclose Mandated Discovery. ......... 37

    3.    Prosecutorial Misconduct at Guilt Phase Presentation of Evidence Deprived Mr. Pitchford of a Fair Trial. ................................................... 50

    4.    The State Deprived Mr. Pitchford of a Fair Trial by Making Numerous Misrepresentations and Prejudicially Improper Statements at Guilt Phase Opening and Closing Arguments................................................... 60

    5.    The State Improperly Questioned Mitigation Witnesses at Penalty Phase and Made Improper Comments at Penalty Phase Closing Arguments. ..... 70

    6.    The State Coerced Mr. Pitchford into Making a False Confession, Violating the Fifth, Sixth, and Fourteenth Amendments to the Constitution...... 79

    7.    The State's Cumulative Misconduct Deprived Mr. Pitchford of a Fair Trial……….................................................................................................... 82

II. THE TRIAL COURT VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS BY FAILING TO GRANT A CONTINUANCE OF THE TRIAL TO ALLOW TRIAL COUNSEL TO PREPARE A DEFENSE. ..................................................................................83

III. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE CONCERNING ALLEGED PRIOR BAD ACTS OR OTHER CRIMES BY THE DEFENDANT. ....................................................88

IV. THE TRIAL COURT ERRED IN FAILING TO GRANT A MISTRIAL WHEN JAILHOUSE INFORMANT JAMES HATHCOCK TESTIFIED TO INADMISSIBLE AND PREJUDICIAL MATTERS. ................................................................................................92

V. THE TRIAL COURT ERRED IN PERMITTING THE JURY TO HEAR TESTIMONY FROM DR. STEVEN HAYNE. ...........................................................................................94

VI. THE TRIAL COURT ERRED IN PERMITTING THE JURY TO CONSIDER INHERENTLY UNRELIABLE TESTIMONY OF JAILHOUSE INFORMANTS OR IN FAILING TO GIVE THE REQUESTED REQUIRED CAUTIONARY INSTRUCTION CONCERNING IT. ...........................96

VII. THE TRIAL COURT ERRED BY ALLOWING THE JURY TO SEE IMPROPER DISPLAYS OF EMOTION FROM NON-TESTIFYING AUDIENCE MEMBERS IN THE COURSE OF BOTH PHASES OF THE PROCEEDINGS. ...................................................................99

VIII. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUESTED CULPABILITY PHASE JURY INSTRUCTIONS D-9, 10, 18, 30, AND 34 AND IN GRANTING THE STATE'S CULPABILITY PHASE INSTRUCTIONS S-1, 2A, AND 3. ................................102

IX. THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY FAILING TO DELAY THE SENTENCING PROCEEDING TO PERMIT TRIAL COUNSEL'S MENTAL HEALTH EXPERT TO TESTIFY. ......................................................................107

X. THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE TO PRESENT IMPROPER MATTERS TO THE JURY DURING THE PENALTY PHASE PROCEEDINGS. .......................114

XI. THE TRIAL COURT ERRED IN REFUSING A NUMBER OF PROFFERED SENTENCING PHASE INSTRUCTIONS, AND IN REMOVING A RELEVANT NON-STATUTORY MITIGATING FACTOR FROM A SUBMITTED INSTRUCTION. ................................................118

XII. THE TRIAL COURT UNREASONABLY LIMITED PETITIONER'S ABILITY TO PRESENT MITIGATION THROUGH PENALTY-PHASE WITNESSES. .........................................122

XIII. PETITIONER DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION ...............................................................127

    1.    Trial Counsel Failed to Adequately Investigate and Present Evidence of Petitioner's Reduced Culpability and Failed to Adversarially Test the State's Weak Case. ..........................................................................................128

    2.    Petitioner Was Denied the Effective Assistance of Counsel at the Guilt Phase of Trial Because Trial Counsel Failed to Consult with a Forensic Expert Who Could Have Rebutted the State's Dubious Forensic Evidence. .......146

3.      Trial Counsel Unreasonably Failed to Impeach Jailhouse Informants Dantron Mitchell and James Hathcock.................................................................. 156

4.      Trial Counsel Unreasonably Failed to impeach State's witness Stephanie Gray with Her Prior Inconsistent Statements.................................... 161

5.      Trial Counsel Unreasonably Failed to Object to the Prosecutor's Leading Questions.............................................................................................. 164

6.      Trial Counsel Unreasonably Failed to Object to the Admission of Steven Hayne's Testimony........................................................................................ 164

**XIV. PETITIONER DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS CAPITAL TRIAL BECAUSE TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP AND PRESENT READILY AVAILABLE MITIGATING EVIDENCE.. 165**

1.      Trial Counsel Was Ineffective for Failing to Investigate, Develop and Present Mitigating Evidence. ................................................................................ 166

2.      Trial counsel failed to procure the attendance and testimony of a mental health expert in mitigation, which is an essential component of a reliable sentencing hearing. ............................................................................................... 209

3.      Trial Counsel Failed to Investigate Mr. Pitchford's Expulsion from School and Present Readily Available Evidence to Challenge the State's Introduction of Prior Bad Act Evidence. ............................................................ 212

**XV. PETITIONER'S TRIAL COUNSEL FAILED TO PRESENT READILY AVAILABLE EVIDENCE TO CHALLENGE THE STATE'S STATUTORY AGGRAVATING FACTORS, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS ............................................. 214**

1.      Trial counsel failed to present readily available evidence to challenge pecuniary motive. ................................................................................................ 214

2.   Trial Counsel Failed to Present Readily Available Evidence to

Challenge the Statutory Aggravator that Mr. Britt Was Killed to Avoid

Arrest............................................................................................................ 216

XVI. PETITIONER WAS INCOMPETENT TO WAIVE THE RIGHT TO REMAIN SILENT, INCOMPETENT TO EXERCISE THE RIGHT TO COUNSEL IN PRE-INDICTMENT CUSTODY, INCOMPETENT TO CONDUCT PLEA BARGAINING, AND INCOMPETENT TO STAND TRIAL FOR CAPITAL MURDER, VIOLATING THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION ...................................................................... 219

XVII. PETITIONER'S DIRECT APPEAL COUNSEL FAILED TO RAISE THE VIOLATION OF HIS RIGHT TO A COMPETENCY HEARING, VIOLATING PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE ON APPEAL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION ............................................................... 248

XVIII. THE JURY'S CONSIDERATION OF THE INVALID PECUNIARY GAIN AGGRAVATING CIRCUMSTANCE VIOLATED MR. PITCHFORD'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS............................................................................................................. 253

1.   The pecuniary gain aggravator is unconstitutionally vague. .......... 253

2.   The pecuniary gain aggravator does not sufficiently narrow the class

of death-eligible defendants ...................................................................... 255

XIX. MR. PITCHFORD'S DEATH SENTENCE MUST BE VACATED BECAUSE IT WAS IMPOSED IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES. ................................ 256

XX. THE DEATH PENALTY IS DISPROPORTIONATE FOR AN EIGHTEEN-YEAR-OLD LIKE TERRY PITCHFORD, WHO DID NOT KILL, ATTEMPT TO KILL, OR INTEND TO KILL. ....... 263

XXI. MR. PITCHFORD WAS DENIED A FAIR TRIAL BY A JUROR THAT CONCEALED MATERIAL FACTS THAT DEMONSTRATE BIAS DURING VOIR DIRE. ............................. 267

XXII. MR. PITCHFORD IS INNOCENT OF CAPITAL MURDER AND HIS CONVICTION AND SENTENCE VIOLATE THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARE MANIFEST MISCARRIAGE OF JUSTICE. ............................................................. 274

XXIII. MISS. CODE ANN. § 97-3-19(2) DOES NOT ADEQUATELY LIMIT PROSECUTORIAL DISCRETION TO ENSURE THAT ONLY A MEANINGFULLY NARROWED CLASS OF OFFENDERS ARE ELIGIBLE FOR THE DEATH PENALTY, VIOLATING THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION ................................................. 276

XXIV. PETITIONER WAS DENIED DUE PROCESS, RELIABLE SENTENCING AND THE EFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF THE PREJUDICIAL EFFECTS OF THE CUMULATIVE ERRORS IN THIS CASE, WHICH UNDERMINE CONFIDENCE IN THE OUTCOME AT BOTH STAGES OF TRIAL ...................................................................... 278

## PRELIMINARY STATEMENT & CASE BACKGROUND

Petitioner Terry Pitchford was sentenced to death in the Grenada County Circuit Court on February 9, 2006, for the murder of 67-year-old Rueben Britt in a botched robbery. On the morning of Sunday, November 7, 2004, Mr. Britt, the proprietor of the Crossroads Grocery & Bait Store in rural Coffeeville, located a few hundred yards from the Yalobusha County line, was shot five times with a .22 caliber revolver, suffering, according to the State's forensic pathologist, four lethal wounds, including one through his aorta ensuring immediate death. In addition, Mr. Britt was shot with a .38 caliber revolver loaded with #9 rat shot—cartridges dedicated to pest control, containing approximately 2,000 pellets. The rat shot pellets from a single discharge of the .38 struck Mr. Britt's body in the upper arm and across the upper abdomen, causing superficial injuries to his body at, or after, the time he had expired from the various mortal wounds inflicted by the .22 caliber rounds.

According to reports, investigators from the Grenada County Sheriff's Office arrived at the crime scene at 7:42 a.m., followed minutes later by E.M.T. personnel. The Sheriff's Office worked the crime scene while Mr. Britt's body was prepared for transportation for an autopsy. Investigators Carver Conley and Adam Eubanks were first to arrive on the scene.

Hours later, Sheriff's Office Investigator Greg Conley arrested 18-year-old Terry Pitchford at his mother's home, where he still lived, a half mile up the road from Mr. Britt's store. At that time, Greg Conley searched Mr. Pitchford's vehicle and purportedly retrieved a black-handled .38 caliber revolver from under a seat.

6

This firearm was later documented, belatedly, in evidence as Greg Conley supplied it to state authorities, misidentifying its serial number in the process. In addition to this black-handled .38, the crime scene initially possessed a second .38 caliber firearm—a brown-handled weapon.

At trial, Greg Conley authenticated a photograph of the crime scene depicting this brown-handled .38 caliber revolver placed on the counter in front of where the victim had been standing when he was gunned down. State's Exhibit 45; Tr. 516. Investigator Conley testified that he personally observed the photographed revolver on the store counter when he arrived at the crime scene. Tr. 516-17. The time of Greg Conley's arrival is not specified in the record nor is it found in any law enforcement discovery supplied to date. He testified that Carver Conley, Adam Eubanks, and Jamie Miller from the Sheriff's Office were already present when he arrived at the store. *Id.* Discovery provided to Mr. Pitchford's current and prior counsel is devoid of any record taking into inventory the second .38 revolver. Further, records manifest its disappearance in the hours immediately after Mr. Britt's murder.

Meanwhile on November 7, 2004, the Sheriff's Office arrested Eric Bullins,[2] who would become Mr. Pitchford's co-defendant. Eric Bullins had turned 16 years old the night before. He was a resident of the Tie Plant neighborhood, an African-American community inside the city limits of Grenada. By January 2005, both Mr.

---

[2] This case concerns several members of the Bullins family. The recording of their surname varies throughout the records involved in the case. Eric appears to write and sign his name "Bullin." His Mississippi Department of Corrections record reflects "Bullin." Elsewhere, and with regard to brothers and cousins of his, the name is written "Bullins." Both spellings may appear in this pleading.

Pitchford and Eric Bullins would be charged with capital murder, MCA § 97-3-19(2)(3). *State v. Pitchford*, 2005-009CR; *State v. Bullin*, 2005-010CR.

In the hours after Mr. Pitchford's arrest, Investigator Greg Conley proceeded to lead Terry's repeated interrogation spanning the course of about 20 hours. By the next morning, at 10:20 a.m., Conley handed Terry Pitchford over to Robert Jennings, the District Attorney's Investigator, for questioning that resulted in a confession. Investigator Jennings's interview, however, did not take place until after Investigator Conley had recorded at least four custodial interviews—three during the evening/night of November 7 and a fourth in the morning of November 8, just prior to Jennings's questioning of Mr. Pitchford.[3] In the course of this series of Sheriff's Office interrogations, Mr. Pitchford ceased formally waiving his *Miranda* rights. To date, law enforcement have provided no audio or video recording of this critical span in Mr. Pitchford's capital case, where, after invoking his Fifth Amendment rights to counsel, he gave the above-mentioned statement to Investigator Jennings.

In addition to the arrests of Mr. Pitchford and Mr. Eric Bullins hours after the murder, the Sheriff's Office brought in two other young men for questioning: Quincy Bullins (aged 19, Eric's cousin), and Demarquis Westmoreland (aged 18). A week or two before Mr. Britt's murder, witnesses identified Quincy Bullins and Mr. Westmoreland outside Crossroads Grocery, holding firearms wrapped up in towels. A few workers from a construction business next door discouraged them from

---

[3] Transcriptions of Greg Conley's interrogations have been supplied to Mr. Pitchford over the years but no actual recordings from those interviews have been made available to date.

entering the store. While in custody, Quincy Bullins and Westmoreland denied involvement in Mr. Britt's killing.

Mr. Pitchford's statement to Investigator Jennings, with Greg Conley present, at 10:20 a.m. (*supra*), provided this account: Eric Bullins had spent the night at Terry's home and in the morning they went to Crossroads Grocery to get food. Quincy Bullins was parked at the store when they arrived and expressed that he was preparing to rob the store. At least Eric and Terry entered the store but it is unclear whether, at least initially, Quincy joined them inside. After a short time in the store, Terry said that he conveyed to Eric—who is nicknamed "Thang"—that he did not want to go through with robbing the store:

> … so he walked off in there, Thang was like, ah, put your hands up, stick your hands up or whatever, you know what I'm saying, I was standing behind him, I was standing over there on the side or whatever, then he was like, ah, put your hands up, ah, and I turned, I turned around like this, and I looked at the, and when I looked, I saw out the window, 'cause you know, I look at most things, I didn't want to be seen or whatever, and I was like, man, I turned back around, and as soon as I was turning around, I heard the gun go off, pow, pow, pow, like that, ah, I looked at'em and I said man, what, and he was like, ah, you gone shoot him, you want a shot, I said hell, naw, man, and he was like you gone have to do something, you gone have to do something, said I ain't supposed to be in here by myself, and I was like, you know, he was holding the gun at me, and, uh, I was like, ah, you know what I'm saying, I had shot, but I wasn't trying, I, I didn't try to shoot the dude or nothing, I was shooting dead at the ground, I was just, you know what I mean, and it was like, ah, while I was shooting down at the ground, he was grabbing the cash register, and he ran outside.

Before this fragmented account of Eric Bullins opening fire on Mr. Britt and then holding Terry Pitchford at gun point and insisting that he fire his gun at Mr. Britt's body, Mr. Pitchford spoke in reference to, it appears, Eric's cousin, Shawn

Bullins, a powerful member of the influential Gangster Disciples street gang in Tie Plant.[4]

The foregoing confession from the 18-year-old subject was given under duress and, it would emerge, had been coerced, in tandem, by Greg Conley and Mr. Jennings.

In the midst of interviewing Mr. Pitchford and securing a statement, Investigator Jennings pressured him to submit to a polygraph test. Mr. Pitchford capitulated. Then, by an unclear turn of events, unidentified law enforcement personnel brought to Mr. Jennings's attention that Eric Bullins would submit to polygraph testing. Jennings conducted the test and Mr. Bullins abjectly failed, betraying his culpability for shooting Mr. Britt to death. Afterward, there is no indication that law enforcement revisited conducting a polygraph on Mr. Pitchford.

The State's evidence at Mr. Pitchford's trial reflected that Eric Bullins fired the .22, which was never recovered, lethally injuring Mr. Britt four times.[5] Autopsy and certain crime scene photos depict the victim's superficial wounds from #9 rat shot fired by a .38 caliber revolver. As described above, the pattern of this rat shot across the back of Mr. Britt's upper right arm and across a swath of his upper abdomen indicate that these injuries were caused by a single shot. 2018-09-17 R.

---

[4] In this regard, Mr. Pitchford was recorded as saying:

> And, ah, me and Bullins had a little, you know what I'm saying? A little thing, you know what I'm saying? (Unintelligible) and, uh, Thang must know that, I mean, 'cause he's like, I'm gone tell Bullins, I'm gone tell Bullins, so I had to do it, man, 'cause, I really didn't want Bullins to, you know, find out about it, 'cause if he finds out, I said we ain't gone kill nobody, you know what I'm saying, I didn't try to shoot nobody, so he was like … (Unintelligible)

[5] Dr. Hayne testified that three of the wounds were lethal, while a fourth from the .22 was potentially lethal.

Robert Tressel Declaration, 20. Based on the placement of the wounds from the rat shot, Mr. Britt was first shot by the .22 and was likely falling to the floor or already on the floor by the time he was shot with a .38 revolver. *Id.* The State's evidence at trial, however, advanced the theory that the .38 used to shoot Mr. Britt was his own weapon, which Mr. Pitchford wrested from him and then repeatedly fired at him.

### Crime Scene Spoliation and Disappearance of the Second .38 Special

As the Sheriff's Office interrogated Mr. Pitchford and Eric Bullins, others from the department attempted to handle the crime scene that they had secured at or around 7:42 a.m. After more than ten hours in control of the scene, the Sheriff's Office requested assistance from state authorities, placing a call fielded at 6:00 p.m. by the Mississippi Crime Laboratory ("MCL") Section Chief David Zeliff. Local law enforcement "request[ed] full service crime scene processing of a convenience store where a homicide had occurred earlier in the day." The Sheriff's Office had been unable to recover all of the apparent projectiles from the discharge of the .22 caliber revolver during the crime.

By approximately 8:40 p.m., Mr. Zeliff and his colleague, Claire Nethery of the MCL, arrived at Crossroads Grocery, at which time local law enforcement acquiesced control of the scene. By then, a considerable amount of evidence had been destroyed—*e.g.*, all blood spatter, and pellets discharged from the .38 caliber weapon. In any event, Investigator Eubanks reportedly briefed the MCL personnel about the crime and the scene, as it was understood at that point. Conspicuously, there is not a single mention in any reporting or evidence logs maintained by MCL

or the Sheriff's Office of the second .38 caliber revolver—the brown-handled revolver depicted in State's Exhibit 45, the firearm that Investigator Greg Conley confirmed was in the middle of the store counter when he arrived there at some point prior to the MCL taking control of the crime scene at 8:40 p.m. on the date of the murder.

### Movement Toward Mr. Pitchford's Capital Trial

On February 1, 2005, just weeks after the court appointed Mr. Pitchford an attorney, the defendant's signs of incompetency precipitated a motion to obtain a mental evaluation. The Honorable Joseph H. Loper, Jr. never ruled on that motion despite extensive turmoil surrounding Mr. Pitchford's capacity as his case careened toward a trial date in February 2006. By September 8, 2005, upon joint oral motion of the parties, the court ordered Mr. Pitchford to undergo a psychiatric evaluation by the Mississippi State Hospital. The state hospital did not complete an evaluation of Mr. Pitchford until late January 2006, a few weeks before trial. Ultimately, the Mississippi Supreme Court, in post-conviction proceedings in 2013, would adjudge that Judge Loper violated Mr. Pitchford's right to a competency hearing, reflecting *sub silentio*, the establishment in the trial court of "*bona fide* doubt" of his competency pursuant to *Pate v. Robinson*, 383 U.S. 375, 386 (1966). *Pitchford v. State*, 240 So.3d 1061, 1063 (Miss. 2017).

On March 1, 2005, the United States Supreme Court decided *Roper v. Simmons*, 543 U.S. 551 (2005), extending the Eighth Amendment prohibition against the death penalty for individuals under the age of 18 years at the time of their crime, overturning *Stanford v. Kentucky*, 492 U.S. 361 (1989), which had set

the baseline at 16 years of age. In an instant, the nature of the prosecution for Mr. Britt's murder changed. Eric Bullins was no longer eligible for a death sentence under his capital murder charge while Terry Pitchford remained just on the other side of the *Simmons* dividing line.

The geography of Mr. Britt's store is fateful for Mr. Pitchford. Mr. Doug Evans, the District Attorney for the Fifth Circuit Court of Mississippi since 1992, prosecuted Mr. Bullins and Mr. Pitchford. Had the Crossroads Store been just a few hundred yards down the highway, and thus in Yalobusha County, any prosecution would have fallen to the District Attorney for the Seventeenth Circuit Court, a jurisdiction that has rarely prosecuted capitally to verdict. Instead, Mr. Pitchford's case was one of over 20 death penalty prosecutions Mr. Evans has tried to verdict.

Three weeks after the Supreme Court handed down *Simmons* and only a few months after murdering Mr. Britt, Eric Bullins and a co-defendant (Antonio Conley), stomped a fellow inmate to death in the Grenada County Jail. Mr. Bullins's murder of Kenneth Kendall by blunt force trauma on March 21, 2005—nearly a year *before* Mr. Pitchford's capital trial—led to his second murder charge within a half-year for the 16-year-old. It was swiftly disposed of on July 29, 2005, via a guilty plea to manslaughter in exchange for a twenty years' sentence.

However, Eric Bullins's nominal capital charge for the murder of Mr. Britt remained pending as Mr. Pitchford's prosecution drifted toward a trial date without the meaningful engagement of his appointed lead defense attorney, Ray C. Carter, Esq., of Jackson. In the end, the District Attorney's Office maintained Eric Bullins's

13

jeopardy, ensuring that his Fifth Amendment safeguard against self-incrimination would keep him from being a witness at Mr. Pitchford's trial. Nearly one year after Mr. Pitchford's February 9, 2006, judgment in the circuit court, Eric Bullins accepted his second manslaughter conviction, this time for Mr. Britt's murder. He received a 20-year sentence (ten to run concurrently and ten to run consecutively to sentences previously imposed).

### *Overburdened, Unprepared Defense Counsel Pressed Incompetent Client Toward Guilty Plea*

In June 2005, the court appointed Ray Carter as first chair for Mr. Pitchford. At that time, Mr. Carter had nine additional pretrial capital cases; he picked up a tenth capital case that September. Mtn. Feb. 2, 2006. One of those cases was scheduled for trial on January 23, 2006, a few days before Mr. Pitchford's trial was scheduled to begin. 2011-09-15 Ray Charles Carter Aff., 1-2. This caseload would preclude any meaningful preparation for Mr. Pitchford's trial. As 2005 wound down, the issues of competency to stand trial and the negotiation of a guilty plea in order to avoid the death penalty came to a head.

As the February 6, 2006, trial date approached, Mr. Carter was able to give only limited attention to Mr. Pitchford's representation. Counsel's energy was dedicated to securing a plea from his cognitively and psychiatrically impaired client. The Grenada schools had held Terry Pitchford back twice during his elementary years before expelling him during ninth grade, in December 2003. Throughout his

14

entire childhood, he struggled in school and developmentally.[6] By late 2005, the obvious, extreme stressors of facing a capital trial, let alone one under these calamitous circumstances, exacerbated Terry's generally precarious mental condition, rendering him incompetent to stand trial and, crucially, to accept a guilty plea to resolve his prosecution by a sentence of life without parole.

Leading up to a January 19, 2006, plea hearing before Judge Loper, counsel for the parties had understood that the defendant would agree to allocute and accept guilt under his capital murder charge. The proceedings, however, displayed the profound impairment and lack of capacity afflicting Terry Pitchford.

Just eight days prior, Mr. Pitchford was subject to a three-doctor evaluation at the Mississippi State Hospital ("MSH") at Whitfield on January 11, 2006. A transcription of a tape recording of that evaluation reflects, as a matter of psychiatric professional standards, a highly compromised exercise. While "Mr. Pitchford presented very concerning symptoms in this examination," especially in relation to likely auditory hallucinations, "the MSH doctors repeatedly attempted to normalize the symptoms, steering Mr. Pitchford away from his expressed answers and toward competent response to the questions." 2018.09.15 Bushan S. Agharkar, M.D. Declaration, ¶ 19. Further, the manner by which the three doctors conducted themselves in the evaluation simply advanced the cause of bolstering the lead

---

[6] In contrast, his fraternal twin, Perry, advanced easily through school as he prepared for life beyond Grenada. Perry would go on to become a Chief Mechanic for Boeing Aviation in Charleston, South Carolina, where he resides today.

psychiatrist's determination rather than provide the courts with multiple opinions concerning Mr. Pitchford's competency.[7]

On January 19, 2006, when Judge Loper asked him whether he understood the rights he would be waiving if he entered a plea, Mr. Pitchford replied, "Yes, sir, I do." Tr. at 12. But when he was asked, "Is it your desire at this time to waive or give up those constitutional rights and enter a plea of guilty at this time to the crime of capital murder?" he replied, "No, sir." *Id.* at 12-13. Mr. Pitchford elaborated:

> I mean, I—I want to take the plea. Sir, I want to take the plea because they're telling me that if I take it to trial that they're going to give me the death penalty, the way it goes. You see what I'm saying?
> …
> They tell me that there's no way I can win. That's what they're telling me now. I want to take the plea for life without parole. You see? But I mean, I ain't talked to my folks. I ain't did none of this. You know—

*Id.* at 13. Judge Loper interrupted to add further pressure to the situation by observing that "Mr. Britt didn't get to talk to his family, either." *Id.* at 14. Judge Loper continued:

> And you're getting a whole lot more mercy and a whole lot more understanding than he got. He didn't get to say goodbye to anybody. He didn't get to talk to anybody. So I really don't much care to see your crocodile tears here today. Now, you can go forward, and you can plead guilty. You can waive these rights or we can go to trial. I get paid the same either way. I'll go home, and I won't be getting a lethal injection. So, I mean, it just does not make one bit of difference to me. But you better make up your mind right now what you want to do, because this is the second time that we've gone through this.

---

[7] One of the three doctors, a Dr. Lott, "clearly took the lead, asking nearly all of the questions with one or both of the other doctors only chiming in on occasion, identified in the transcript, from time to time, as an 'unidentified male speaker.' Agharkar Dec. at 3. As Dr. Agharkar has observed, "The only time it is valid for multiple psychiatric professionals to be present at an evaluation is the context of a trainee with a supervisor present." *Id.*

> Now, do you wish to give those constitutional rights up and plead
> guilty to this charge?

*Id.* at 14-15. Mr. Pitchford, who had just expressed a desire to plead guilty, replied,

"No, sir." *Id.* at 15. Mr. Pitchford begged for more time, again stating that he had

not understood that his plea would be accepted that very day. *Id.*

After a recess, Mr. Pitchford told the court he decided to plead guilty after all.

*Id.* at 17. The court resumed the plea colloquy, which had plainly become a sham, as

Mr. Pitchford struggled, after the State, the court, and the defense had all

pressured him to accept guilt, to say that no one pressured him to plead. *Id.* at 18.

In the end, the hearing concluded without resolution and court adjourned until a

motions hearing set for February 2, 2006.

On February 2, 2006, four days before the start of trial, the court heard

defense counsel's request for a continuance, wherein Mr. Carter stated that "if we

had this trial on February 6, we would have to try it without really being ready." Tr.

33, 35-36. Mr. Carter explained that "we have not done all that we could do. We

have not done all that we know we should do based on the point we are at now,

based on having finally been able to talk to Mr. Pitchford's family. We know we

haven't done all that we need to do. And to force us to go to court on this particular

date would require me to not be as effective as I know I could be." Tr. 46. Counsel

continued, explaining his working relationship with the initially appointed co-

counsel, Mr. Baum:

> I don't know what Mr. Baum, Ray Baum as the co-counsel, has done on
> this case. Once we got appointed on this case, quite frankly, I don't
> know anything that Mr. Baum has done. This case was -- like all of

them, once we get involved, they get dumped on us. And for whatever
reason, the other attorney does nothing.

Tr. 49.

The trial court discarded this stark record of constitutionally deficient

preparation, denying counsel's motion while reasoning that "there is not much

chance of [Mr. Pitchford] being found innocent and that it's a strong likelihood of

him being found guilty" and that counsel had had plenty of time to develop

mitigation. Tr. 51. Further, in response to trial counsel's statement that he had not

had time to fully gather the private and sensitive information from family members

that would be relevant to mitigation, the trial court accused Mr. Pitchford and his

family of purposefully withholding mitigating information for the specific purpose of

trying to get a continuance. *Id.* The trial court reasoned that Mr. Pitchford "has got

no one but himself to blame if this information has not been provided to defense

counsel earlier." *Id.*

### *After Race-Driven Jury Selection, State Presents Case Built on Snitch Testimony and Unchallenged Forensic Evidence*

On February 6, 2006, the parties picked Mr. Pitchford's capital jury. In

keeping with District Attorney Doug Evans's extensively evidenced practice,[8] the

---

[8] A recent empirical study introduced in post-conviction litigation on behalf of Mr. Curtis
Flowers in the Mississippi Supreme Court has evidenced a racially biased practice. Out of a total
461 venire members examined across 13 death penalty trials conducted by the District Attorney
(out of at least 21 such prosecutions under Mr. Evans's auspices), 69.8% of the pool of venire
members were white and 30.2% were black. Affidavit of Prof. Barbara O'Brien at 2, (2016.03.16
submitted in *Flowers v. State*, No. 2015-DR-00591-SC. "Across all strike-eligible venire
members in the study, prosecutors struck 65.2% (90/138) of eligible black venire members,
compared to only 8.2% (26/316) of eligible white venire members. This disparity reflects a
difference of 57 percentage points in the strike rates (65.2 – 8.2) and a ratio between strikes rates
of 7.95 (65.2/8.2)." The *Flowers* researchers concluded that "**there is less than a one in one
thousand chance that we would observe a disparity of this magnitude merely by chance**."

18

State exercised four peremptory strikes to unconstitutionally eliminate 80% of Mr. Pitchford's African-American venire while offering thinly veiled pretext sufficient to obtain the trial court's imprimatur over defense counsel's *Batson* challenges. The disparate treatment between the white cross-section of Mr. Pitchford's venire and the five blacks in question was clear and had been demonstrated on direct appeal, despite the Mississippi Supreme Court's denial of relief. *State v. Pitchford*, 45 So.3d 216 (Miss. 2010. In the end, Mr. Evans seated 11 white jurors plus alternate jurors who also were white. The State achieved this result by accepting 16 of the first 18 white venire members tendered to the District Attorney while using four consecutive strikes in order to eliminate four of the five black venire members. Tr. 321-22.

At the guilt phase, the State established a case built upon non-creditable jailhouse snitch testimony that went unchallenged by the defense. A competent investigation into the State's case would have produced evidence that Eric Bullins, and not Terry Pitchford, was the leader of the whole enterprise and the one who fired the fatal shots; that the .38 caliber weapon loaded with rat shot pellets was Mr. Pitchford's own gun, not Mr. Britt's gun; that it was Quincy Bullins and Demarquis Westmoreland, not Mr. Pitchford, who planned the prior robbery attempt; that Mr. Pitchford was a follower seeking favor from the Bullins boys and Demarquis Westmoreland; and that Mr. Pitchford had been threatened numerous times by the Bullins.

---

*Id.*, *citing* David H. Kaye and David A. Freedman, *Reference Guide on Statistics*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE: THIRD EDITION 251-52 (National Research Council, The National Academies Press, 2011).

Perhaps more damaging was the defense's absence of preparation and adversarial testing of the State's crime scene and forensic examination testimony— evidence, as set forth herein, that presented flatly incorrect and distorted accounts of Mr. Britt's killing. Had the defense engaged an expert and forced the State to prove its case, it would be reasonably expected that exposure of the "gross mishandling of the crime scene and, at the same time, the Sheriff's Office's mysterious handling of the evidence" would have convinced at least one juror to arrive at a different result. 2018-09-17 R. Robert Tressel Declaration, ¶ 102.

On February 8, 2006, the jury returned a verdict convicting Mr. Pitchford. As the case headed to the penalty phase, trial counsel became aware that their single expert, Dr. Rahn K. Bailey, M.D., whom Mr. Carter had secured just days earlier to evaluate Mr. Pitchford and then testify at trial about a range of psychiatric issues in advancement of the defendant's mitigation case, would be unable to travel to Mississippi. A trial court in Texas was enforcing a subpoena against Dr. Bailey, thus prohibiting his exit from the jurisdiction. Mr. Carter immediately alerted the trial court to this problem, holding an impromptu *ex parte* discussion in chambers the evening of February 8, during which Judge Loper confirmed the unavailability of the witness by a phone call with the Texas trial court proscribing Dr. Bailey's departure. From this unusual turn of events in judge's chambers, Mr. Carter understood that the court, as it had done with counsel's previous such requests, would grant no continuance and the penalty phase would commence, as scheduled, the next morning. Mr. Carter failed to make a record of the need for a continuance,

20

however, and the facts of what transpired in Judge Loper's chambers after court on February 8, 2006, would later became the subject of extraordinary proceedings to supplement the record.[9]

On February 9, 2006, the court held Mr. Pitchford's penalty phase and heard from no experts and a smattering of family and teacher witnesses of Mr. Pitchford who were not prepared meaningfully—or, in some cases, at all—to testify in Mr. Pitchford's behalf. Mr. Pitchford's attorneys had no mitigation theory, beyond arguing that Mr. Pitchford was affected by the death of his father, and presented almost no information about Mr. Pitchford's background. The jury returned a death sentence.

Had trial counsel conducted a reasonable investigation, a wealth of information would have been available for presentation to the jury, bringing to life compelling grounds for punishing Mr. Pitchford with life without the possibility of parole rather than execution. Evidence introduced in these federal proceedings manifests this vast gulf between the information presented to the jury and the underlying story of Mr. Pitchford's young life beset by profound mental, emotional, and neurodevelopmental impairments, likely caused in part and exacerbated by his severe history of physical and mental abuse and neglect.

As indicated above, the Mississippi Supreme Court affirmed this judgment on direct review on June 24, 2010. *State v. Pitchford*, 45 So.3d 216 (Miss. 2010). The Mississippi Office of Capital Post-Conviction Counsel represented Mr. Pitchford in

---

[9] In post-trial litigation of Mr. Pitchford's motion to supplement the record, Judge Loper and his law clerk, Adam Hopper, misrepresented that Mr. Carter told him the witness was available and counsel simply chose not to call him.

collateral review before the state high court. After submitting a state petition consisting of four claims, the Supreme Court of Mississippi entered an order summarily dismissing three without a hearing and, on the question of competency to stand trial, remanded the matter to the trial court to conduct a retrospective competency hearing, recognizing a trial court's requirement to conduct a competency hearing upon establishment of the requisite doubt as to the defendant's condition. 2013.02.14 Order at 2, *Pitchford v. State*, No. 2010-DR-01032-SCT.

The order thus correctly applied the constitutional entitlement to a competency hearing upon a genuine doubt as to the defendant's competency to stand trial. *See Pate*, 383 U.S. at 386. However, the Mississippi Supreme Court received this clear constitutional violation from a challenging procedural position due to appellate counsel's failure to raise this point—*viz.*, that the trial court violated Mr. Pitchford's right to a competency hearing—on direct review.

Flowing from appellate counsel's deficient performance on this decisive issue is the prejudice that, on direct appeal, the issue would have required reversal of Mr. Pitchford's conviction and sentence. Instead, on post-conviction review the Mississippi Supreme Court set the case on a course that only demonstrated the impossibility of achieving a defensible *nunc pro tunc* determination *nine years after the fact* and under the complexities of the circumstances at bar.

As set forth above and, in greater depth, hereafter, the State's prosecution of this case presents extremely disturbing questions. Further, its frustration of federal counsel's current effort to obtain the fundamental discovery to which Mr. Pitchford's

representation has been entitled since his capital murder indictment in January 2005 will warrant the exercise of this Court's process to bring obscured and even suppressed information to light.

## CAPITAL HABEAS PETITION

1.   (a)   Petitioner, Terry Pitchford, was convicted in the Circuit Court of Grenada County, Mississippi in Grenada, Mississippi.

     (b)   Case number 2005-009-CR.

2.   (a)   The judgment of conviction was entered by the court on February 9, 2006.

     (b)   The sentence was entered on February 9, 2006.

3.   Petitioner was sentenced to death.

4.   In this case, Petitioner was convicted of only one count.

5.   Petitioner was convicted of capital murder, for which he was sentenced to death.

6.   (a)   Petitioner pled not guilty.

     (b)   Not applicable.

     (c)   Petitioner was tried by jury in a trial that lasted just days, including jury selection; guilt phase trial, deliberations, and verdict; and sentencing phase trial, deliberations, and verdict.

7.   Petitioner did not testify at a pre-trial hearing, trial, or at a post-trial hearing.

8.   Petitioner appealed his conviction and sentence.

9.   (a)   Petitioner appealed directly to the Mississippi Supreme Court.

     (b)   Mississippi Supreme Court Case Number 2006-DP-00441-SCT.

     (c)   The Mississippi Supreme Court affirmed Petitioner's conviction and sentence.

(d)     The Mississippi Supreme Court's decision affirming the conviction and sentence issued on June 24, 2010, and that court denied rehearing on October 14, 2010.

(e)     The Mississippi Supreme Court's decision denying relief on direct appeal is reported as *Pitchford v. State*, 45 So.3d 216 (Miss. 2010).

(f)     Petitioner raised the following grounds in his direct appeal:

   (i)     The jury selection process was constitutionally infirm and requires reversal of Mr. Pitchford's conviction and sentence of death because the State discriminated on the basis of race in its peremptory strikes in violation of *Batson v. Kentucky*; the trial court otherwise deprived defendant of a jury comprised as required by the Sixth and Fourteenth Amendments; and the trial court erred in precluding the defense from questioning prospective jurors concerning their ability to consider mitigation.

   (ii)    The trial court denied defendant his constitutional rights to present a full, complete and adequately developed defense and/or to have his counsel render constitutionally effective assistance in doing so because the trial court erred in failing to grant a continuance of the trial and in failing to grant a delay of the sentencing proceedings to permit a necessary mitigation witness to be present to testify.

   (iii)   Prosecutorial misconduct and the trial court's failure to curb it deprived the defendant of his constitutional rights.

   (iv)    The trial court erred by allowing the jury to see improper displays of emotion from non-testifying audience members in the course of both phases of the proceedings.

   (v)     The trial court erred in permitting the jury to consider inherently unreliable testimony of a jailhouse informant or in failing to give the requested required cautionary instruction concerning it.

   (vi)    The trial court erred in failing to grant mistrial when jailhouse informant James Hathcock testified to inadmissible and prejudicial matters.

   (vii)   The trial court erred in failing to suppress the evidence obtained through a warrantless search of Defendant's automobile and the fruits of the poisonous tree thereof.

24

     (viii)   The trial court erred in failing to suppress the statements given by Defendant to law enforcement officers after his arrest.

     (ix)   The trial court erred in admitting evidence concerning alleged prior bad acts or other crimes by the Defendant.

     (x)   The trial court erred in permitting the jury to hear testimony from Dr. Steven Hayne.

     (xi)   The trial court erred in denying Defendant's requested culpability phase jury instructions D-9,10,18, 30, and 34 and in granting the State's culpability phase instructions S-1, 2a, and 3 in their absence.

     (xii)   The trial court erroneously limited the mitigation evidence and arguments thereon that Defendant was permitted to present during the penalty phase proceedings.

     (xiii)   The trial court erroneously permitted the State to present improper matters to the jury during the penalty phase proceedings.

     (xiv)   Sentencing phase Instruction 1 violates *Marsh v. Kansas* and/or is deficient because of the refusal of Defendant's requested sentencing phase instructions DS-7, 8, 13, 15, and mitigating factor (h) from DS-17.

     (xv)   The death sentence in this case must be vacated because it was imposed in violation of the Constitution of the United States.

     (xvi)   The death sentence in this matter is constitutionally or statutorily disproportionate.

     (xvii)   The cumulative effect of the errors in the trial court mandates reversal of either the verdict of guilt or the sentence of death.

(g)   Petitioner did not seek further review of the direct appeal by a higher state court because no such higher state court exists.

(h)   Petitioner filed a petition for writ of certiori in the United States Supreme Court.

     (i)   United States Supreme Court Case Number 10-8439.

     (ii)   The United States Supreme Court denied the petition for writ of certiori.

(iii)     The United States Supreme Court denied the petition for writ of certiori on April 18, 2011.

(iv)     The United States Supreme Court's decision denying the petition for writ of certiori is reported as *Pitchford v. Mississippi*, 131 S. Ct. 2098 (2011).

10.     In addition to his direct appeal, Petitioner also sought collateral relief in Mississippi state court.

11.     (a)     (i)     Petitioner sought collateral relief in the Mississippi Supreme Court.

(ii)     Mississippi Supreme Court Case Number 2010-CR-01032-SCT.

(iii)     Petitioner filed his collateral challenge on September 23, 2011.

(iv)     Petitioner sought collateral relief through a petition for post-conviction relief.

(v)     Petitioner raised the following grounds in his initial petition for post-conviction relief:

I.     Mr. Pitchford's Constitutional Rights were violated because he was not afforded a mandated competency hearing.

II.     Mr. Pitchford's constitutional right to a fair trial was violated by the State's racial discrimination during voir dire.

III.     Trial Counsel's myriad deficiencies deprived Mr. Pitchford of his constitutionally required right to the effective assistance of counsel and caused him undeniable prejudice.

IV.     The sentencing phase.

(b)     Petitioner did not file any second petition for post-conviction relief in Mississippi state court.

(c)     Petitioner did not file any subsequent petitions for post-conviction relief in Mississippi state court.

(d)     Pursuant to Mississippi Code §§ 99-39-7 and 99-39-27, Petitioner was required to file his petition for post-conviction relief with the Mississippi Supreme Court in the first instance. On February 7, 2013,

the Mississippi Supreme Court summarily denied relief on all claims other than Claim I. It also remanded to the trial court for an evidentiary hearing to retrospectively determine whether Mr. Pitchford was competent to stand trial in 2006, because nothing in the record shows that Mr. Pitchford was given reasonable prior notice of the hearing to determine competency which is required by Rule 9.06 of the Uniform Rules of Circuit and County Court Practice. The trial court found he was competent to stand trial in 2006, and on October 19, 2017, the Mississippi Supreme Court, treating the post-conviction petition as an appeal of the trial court's competency determination, affirmed that finding treating that finding as a denial of post-conviction relief by the trial court.

(e)     Not applicable.

12.     GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF:

# I.   Prosecutorial Misconduct Deprived Petitioner of Due Process and a Fair Trial, in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

## 1.   The State Exercised Peremptory Strikes in a Racially Discriminatory Manner, Violating the Sixth and Fourteenth Amendments to the Constitution

### A. Supporting Facts

The State's race-based exercise of peremptory strikes violated the Equal Protection Clause pursuant to *Batson v. Kentucky*, 476 U.S. 79, 97 (1986).

#### i. District Attorney Evans's Extraordinary Pattern and Practice of Batson Violations Has Perpetuated, for Decades, Grave Equal Protection Violations in Capital Cases

Since taking office in 1992, District Attorney Doug Evans has taken to verdict over 20 death penalty prosecutions. Affidavit of Prof. Barbara O'Brien at 2-3 (2016.03.16 submitted in *Flowers v. State*, No. 2015-DR-00591-SCT; Circuit Court of Montgomery County, Cause No. 2003-0071-CR). Attorneys for Mr. Curtis Flowers, whom Mr. Evans is currently prosecuting capitally for the seventh time

since 1996, have submitted empirical data in support of state post-conviction litigation that statistically analyzes 13 of 21 known capital cases in which District Attorney Evans had been responsible for selecting the jury. Four of these were prosecutions of Mr. Flowers and an additional nine, including Mr. Pitchford's case *sub judice*, were analyzed for the District Attorney's use of peremptories. *Id.* at 1. Two professors on the Michigan State University School of Law faculty, Barbara O'Brien and Catherine Grosso, have analyzed data constituting this pool of cases and reflecting the demographic details of the "461 potential jurors who were either seated on the jury (including alternates) or struck by the prosecution or defense." *Id.* at 3. The analysis determined that of those 461, 69.8% were white and 30.2% were black. *Id.* "Across all strike-eligible venire members in the study, prosecutors struck 65.2% (90/138) of eligible black venire members, compared to only 8.2% (26/316) of eligible white venire members. This disparity reflects a difference of 57 percentage points in the strike rates (65.2 – 8.2) and a ratio between strikes rates of 7.95 (65.2/8.2)."

The *Flowers* researchers concluded that "there is less than a one in one thousand chance that we would observe a disparity of this magnitude merely by chance."[10] *Id.* This heavily documents and nearly perennially litigated pattern of abuse in jury selection must inform this Court's evaluation of the purported rationale District Attorney Evans submitted in connection with the four discrete *Batson* challenges in Mr. Pitchford's record.

---

[10] *Citing* David H. Kaye and David A. Freedman, *Reference Guide on Statistics*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE: THIRD EDITION 251-52 (National Research Council, The National Academies Press, 2011).

### ii. Batson *Violations Eliminated 80% of African-American Venire in the Empanelment of Mr. Pitchford's Jury*

Grenada County summoned a special venire of approximately 350 registered voters for Mr. Pitchford's February 2006 trial. African-Americans comprised forty of the 122 individuals—*viz.*, 33% of the venire—returning jury questionnaires and appearing upon their summonses. Following excusals and cause-related strikes, 35 of the remaining 96 venire members—*viz.*, 36% of the venire—were African-American. R. 349-862, R. 1107. By the end of the selection process, one of the fourteen empaneled jurors was African-American.

The State achieved this composition of the jury by accepting 16 of the first 18 white venire members tendered to the District Attorney while using four consecutive strikes in order to eliminate four of the five black venire members in this process, citing reasons that did not apply to the white venire members. Tr. 321-22. The State then accepted nine of the next ten whites on the panel. Tr. 326-29; R. 1104-09; R. 395-401, 471-74, 479-80, 515-18, 631-34, and 715-18.

Throughout, defense counsel objected as the State exercised these strikes, and renewed them prior to the jury's seating and in counsel's motion for new trial. At every turn, the trial court failed to conduct the requisite third step inquiry under *Batson*. Tr. 322-32; R. 1250, 1262. The pretextual quality of the reasons the State advanced for each of the foregoing four discriminatory strikes substantiate individual *Batson* violations and, in totality, further violate *Batson*.

### *Five Unused Peremptories Betray the Purpose of the State's Use of Strikes*

As set forth below, District Attorney Evans exercised four peremptories in order to eliminate all but one African-American from the venire who were subject to the State's decision to keep or strike.[11] This 80% strike rate for black venire members is juxtaposed with the State's use of three strikes across 35 white venire members, or an 8.5% strike rate for whites. Tr. 321-29.

### Mr. Ward, Venire Member 48

The State sought to justify its use of a peremptory on Carlos F. Ward (No. 48), with a facially discriminatory reason. Tr. 322. The record here provides:

> MR. EVANS: Juror number 5 is juror number 48 on the list, a black male, Carlos Ward. We have several reasons. One, he had no opinion on the death penalty. He has a two year old child. He has never been married. He has numerous speeding violations that we are aware of. The reason that I do not want him as a juror is he is too closely related to the defendant. He is approximately the age of the defendant. They both have children about the same age. They both have never been married. In my opinion he will not be able to not be thinking about these issues, especially on the second phase. And I don't think he would be a good juror because of that.
> THE COURT: The Court finds that to be race neutral as well. So now we will go back and have the defense starting at 37.

Tr. 325-26.

The District Attorney Evans's reasoning behind striking Mr. Ward was facially demographic—the espoused rationale was that Mr. Ward was "too closely related to" Mr. Pitchford. This relation, of course, was not familial, as there is no suggestion of there being any such relationship between the two men. Further, the pretextual quality of the stated reasons is plain when assessed with reference to numerous white venire members who possessed at least one of the characteristics the State invoked in justifying his strike of Mr. Ward. Direct comparisons with 11

---

[11] *See Pitchford v. State*, 45 So.3d 216, 225 n.10 (Miss. 2010).

white venire members accepted by the State illuminates District Attorney Evans's

pretext here.[12]

      The District Attorney's use of Mr. Ward's speeding traffic violations and

expression of no opinion on the death penalty were spurious. The juror

questionnaire inquired about criminal charges and convictions but specifically

excluded, with the State's assent, traffic violations. R. 352-53, Tr. 4. If the State

researched Mr. Ward's driving record, the record suggests it was not interested in

---

[12]     *Whites with young children*:
Sherman, Michael (tendered by State, Tr. 321), daughter 2½ years old, son 3 months; R. 763;
Wilbourn, Lisa (Alternate 2, R. 1104), son 23 months old, R. 837;
Parker, Lisa (tendered by State, Tr. 321), 6-year-old child, R. 701;
Tramel, Nathalie Drake (Alternate 1, R. 1104), 4-year-old daughter, 5-year-old son, R. 808;
Ward, Laura Candida (Juror 5, R. 1104), 6-year-old daughter, R. 817;
Marter, Stephen Abel, Jr. (tendered by State, Tr. 321), 4-year-old daughter, 5-year-old son, R. 808;
Curry, Michael (tendered by State, Tr. 328), 5-year-old son, R. 497.

     *Unmarried whites*:
Eskridge, Chad (Juror 2, R. 1104), never married, R. 527;
Denham, Kenton (tendered by State, Tr. 322), divorced, R. 525;
Counts, Jeffrey S. (Juror 12, R. 1104), divorced, R. 481;
Brewer, Mary W. (Juror 6, R. 1104), widowed, R. 421.

     *Whites of similar age*:
Clark, Brantley (tendered by State, Tr. 321), age 22, R. 417;
Eskrdige, Chad (Juror 2, R. 1104), age 25, R. 527;
Sherman, Michael (tendered by State, Tr. 321), age 27, R. 761;
Wilbourn, Lisa (Alternate 2, R. 1104), age 28, R. 835;
Parker, Lisa (tendered by State, Tr. 321), age 29, R. 699.

     *Whites sharing more than one of the D.A.'s posited traits*:
Eskridge, Chad (Juror 2, R. 1104), age, unmarried, R. 527-29;
Ward, Laura C. (Juror 5, R. 1104), young children, no opinion on D.P., R. 817-18;
Tramel, Nathalie D. (Alt. 1, R. 1104), young children, no opinion on D.P., R. 805-06, Tr. 255;
Parker, Lisa (tendered by State, Tr. 321), age, young children, R. 699-701;
Wilbourn, Lisa (Alt. 2, R. 1104), age, young children, R. 835-37;
Sherman, Michael (tendered by State, Tr. 321), age, young children, R. 761-63.

the entire panel in that regard. Further, there is no indication at all of any record establishing the existence of such driving violations. Concerning the absence of opinion on capital punishment, the State used this attitude to justify striking Mr. Ward despite failing to employ the criterion in striking whites with a commensurable view on the question. The State accepted two white venire members despite indistinguishable questionnaire answers from Mr. Ward's.[13]

### *Linda Ruth Lee, Venire Member 30*

District Attorney Evans struck Linda Ruth Lee, a 27-year-old African-American woman and the first black venire member presented to the State. R. 635, Tr. 324-25. In her questionnaire, Ms. Lee answered that she "generally" though not "strongly" favored the death penalty. R. 638. Among the white venire members the State found acceptable, half gave that same response. But in striking Ms. Lee, Mr. Evans could offer only these reasons:

> MR. EVANS: Yes, sir. S-2 is black female, juror number 30. She is the one that was 15 minutes late. She also, according to police officer, police captain, Carver Conley, has mental problems. They have had numerous calls to her house and said she obviously has mental problems. Juror Number S-3—
> THE COURT: That would be race neutral as to – as to that juror.

Tr. 324-25. As with Mr. Ward (*supra*), the trial court conducted no further inquiry and thus failed to expose the pretextual nature of that purported rationale.

The District Attorney's conjecture that Ms. Lee had a history of mental problems purportedly came from Carver Conley, a Sheriff's Department

---

[13]   *Whites lacking opinion on death penalty*:
Ward, Laura C. (Juror 5, R. 1104), R. 818;
Tramel, Nathalie D. (Alt. 1, R. 1104), R. 806, Tr. 255.

Investigator and one of the officers who investigated the Britt murder. This basis remained entirely unsubstantiated, untested, and would have been, were it not for the legal nature of the proceedings, libelous. This was so, even though Investigator Conley happened to be under subpoena on that same and thus could have been made to answer to questions concerning District Attorney Evans's attribution to him about Ms. Lee. R. 215. In this instance, the State's election not to attempt to make a record of the factual premise for striking Ms. Lee taken from the factual claim the State attributed to Investigator Conley betrays the fact that that rationale was a mere pretext—and a thinly disguised one, at that.

Neither Ms. Lee's juror questionnaire responses nor answers to voir dire suggested any mental health issues. Yet the State did not opt to question, nor did the court instruct the District Attorney to voir dire, the panel collectively or Ms. Lee, or any other venire member, individually with regard to mental illness or health issues. Tr. 239-62.

The record does reflect that Ms. Lee was late in returning from lunch. It also reflects disparate treatment on lateness. Several other jurors apparently failed to return from lunch on time, thus delaying resumption of the proceedings. Tr. 238-39. However, the District Attorney made no attempt to remove any venire member for that reason other than Ms. Lee. Tr. 307-18. The initial thrust of the State's defense of its facially pretextual basis for striking Ms. Lee hinged on her innocuous and explained lateness in returning to the courthouse. Initially, while seeking to strike her for cause, District Attorney Evans did not even mention Ms. Lee's purported,

and never substantiated, mental problems. Tr. 318. After the court rejected her lateness as an acceptable reason for striking Ms. Lee, District Attorney Evans secured additional time for preparation of his peremptory challenge. Tr. 319. About a half-hour later, Mr. Evans then injected the specter of Ms. Lee's mental instability into the record in his effort to justify this plainly race-based strike. *Id.*

### Christopher L. Tillmon, Venire Member 31

Mr. Tillmon's questionnaire reflected he was 27 years old a "strongly favor[ed]" the death penalty. R. 799-802. The State accepted two similarly situated white males from the venire.[14] It also reflected he had worked in law enforcement, *id.*, another highly coveted characteristic in the prosecution's typical selection of a capital jury. Nonetheless, District Attorney Evans used a peremptory strike against him:

> MR. EVANS: S-3 is a black male, number 31, Christopher Lamont Tillmon. He has a brother that has been convicted of manslaughter. And considering that this is a murder case, I don't want anyone on the jury that has relatives convicted of similar offenses.
> THE COURT: What was his brother's name?
> MR. EVANS: I don't even remember his brother. He said that he had a brother convicted of manslaughter.
> THE COURT: On that jury questionnaire?
> MR. EVANS: Yes, sir.
> THE COURT: I find that to be race neutral. And you can go forward.

Tr. 325.

The State's disparate treatment of two similarly situated white venire members betrays the illegitimate reasons for striking Mr. Tillmon. Mr. Jeffrey Counts, Venire Member 74, 37 years old, was seated as Juror 12 despite disclosure

---

[14] Brantley Clark, Venire Member 19, R. 417-20; Michael Sherman, Venire Member 17, R. 761-64.

in his questionnaire that his uncle was a convicted felon. Tr. 328, R. 479-90, 1104. Also, the State accepted Henry Bernreuter, Venire Member 65, despite disclosure that his son and his stepson had been convicted of serious felonies (burglary and forgery, respectively). Tr. 326, R. 399-400. The State failed to question Messrs. Tillmon, Counts, and Bernreuter about the convictions of certain family members that each had identified in his questionnaire. In striking Mr. Tillmon, and not striking the others, the State conducted no voir dire on the topic of this purported reason. The lack of questioning betrayed District Attorney Evans's lack of familiarity with the venire member's brother, much less any particulars concerning the underlying issue prextextually relied on in striking Mr. Tillmon.

### *Patricia Anne Tidwell, Venire Member 18*

Ms. Patricia Tidwell generally favored the death penalty. R. 787-90. A 37-year-old African-American woman, District Attorney Evans used his fourth strike against her:

> MR. EVANS: S-4 is juror number 43, a black female, Patricia Anne Tidwell. Her brother, David Tidwell, was convicted in this court of sexual battery. And her brother is now charged in a shooting case that is a pending case here in Grenada. And also, according to police officers, she is a known drug user.

> THE COURT: During voir dire, in fact, I made a notation on my notes about her being kin to this individual. I find that to be race neutral."
Tr. 325.

The State failed to make any record substantiating that Ms. Tidwell was "a known drug user." A large segment of the Sheriff's Department were under subpoena at that time and thus were available to make an actual record of this drug

35

use, which was belied by the lack of any indication of arrests, let alone convictions, of Ms. Tidwell for such behavior. Even a specific assertion concerning such purported grounds for striking someone should precipitate a third step hearing, but the court failed to proceed in that manner despite the vague quality of this claimed reason for striking Ms. Tidwell.

Further, the State's invocation of Ms. Tidwell's brother's conviction also suffered from the aforementioned disparate treatment, whereas District Attorney Evans did not question the panel nor voir dire other venire members individually concerning any criminal prosecutions of family members. Mr. Evans seems to consolidate into one person issues relating two separate people (David Tidwell and an unnamed brother), betraying no familiarity with cases that his office would have prosecuted, calling into question the actual impetus for his use of a strike and underscoring the four strikes made in succession against African-Americans.

### B. Exhaustion

Petitioner presented this issue during direct appeal and post-conviction proceedings. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

36

## C. Direct Appeal

Petitioner presented this issue concerning Carlos Ward, Linda Lee, Christopher Tillmon, and Patricia Tidwell on direct appeal in 2006-DP-00441-SCT. The Mississippi Supreme Court rejected Petitioner's argument on the merits. *Pitchford v. State,* 45 So.3d 216, 228. (Miss. 2010).

## D. Post-Conviction

Petitioner presented this issue concerning Carlos Ward, Christopher Tillmon, and Linda Lee during post-conviction proceedings in 2010-CR-01032-SCT. The Mississippi Supreme Court determined the issue lacked sufficient merit to warrant a hearing. *Pitchford v. State,* Order No. 2010-DR-01032-SCT (Miss. Feb. 7, 2013).

## 2. THE STATE IMPROPERLY FAILED TO DISCLOSE MANDATED DISCOVERY.
### A. Supporting Facts.

### *i. The State Failed to Disclose Numerous Witness Statements.*

The State failed to disclose statements of witnesses in its possession, some of them exculpatory or impeaching, and some them unfairly introduced for the first time at trial.

### *Statements from Eric Bullins' Cases.*

The State failed to disclose statements that Mr. Pitchford's co-defendant Eric Bullins made in connection with the investigation of Mr. Britt's death. Investigator Conley testified that he spoke with Eric Bullins while investigating the case, Tr. 512; and Investigator Jennings states in an undated report that he spoke with Eric

Bullins in connection with Mr. Britt's death. The State never disclosed these statements to trial counsel.

Further, the State failed to disclose relevant statements and related materials from Eric Bullins' separate cases, including his guilty pleas in the killing of Mr. Britt and his jailhouse killing of Kenneth Kendall. An account of Eric Bullins' overlapping criminal cases and their dispositions is necessary to understand the discovery violations.

On September 2, 2004, Eric sold drugs to an undercover agent, resulting in three charges. While this case, which would eventually be disposed as case number 2005-198-CR, was transferred back and forth between Youth Court and the Circuit Court, Bullins was released on bond on September 18, 2004. Less than two months later, Eric killed Mr. Britt while robbing the grocery store on November 7, 2004. He was charged with capital murder in case number 2005-010-CR. The drug case ended up in Circuit Court in January of 2005. On March 20, 2005, Eric and another Grenada County Jail inmate brutally murdered inmate Kenneth Kendall by beating and stomping him to death, apparently over a cigarette.

The timing of the disposition of Mr. Bullins's cases, especially in light of Mr. Pitchford's trial, is telling. On July 29, 2005, Eric pled guilty to manslaughter for the murder of Mr. Kendall and was sentenced to 20 years.[15] In January 2006, Eric entered an open plea in the three drug charges case, and was sentenced to an aggregate of 30 years consecutive to the 20 year sentence. Mr. Pitchford's trial took

---

[15] His co-defendant Antonio Conley went to trial and was convicted of simple murder and sentenced to life.

place from February 6 through 9, 2006. Mr. Pitchford was sentenced to death under a theory of felony murder where the State argued it did not have to prove that Mr. Pitchford killed, attempted to kill, or intended to kill Mr. Britt. Tr. 649. Nearly a year later, on January 4, 2007, Eric Bullins pled guilty to manslaughter for killing Mr. Britt. He effectively received a ten year sentence.

Refraining from resolving the State's case against Eric for Mr. Britt's murder thereby sustained the Fifth Amendment privilege against self-incrimination and ensured that he could not testify in Mr. Pitchford's trial.

### Statements of Lewis Brooks and Gerald Gatlin.

The State failed to disclose any notes, transcripts, or descriptions of the substance of Investigator Greg Conley's interviews of Lewis Brooks and Gerald Gatlin during his investigation in the Britt case. In his offense report, Carver Conley states that he spoke with Gerald Gatlin, the owner of G&W Steel, a business located just behind the grocery store where Paul Hubbard, Henry Ross, and Lewis Brooks were employees. App. 0396. In Greg Conley's underlying facts sheet, he states that he spoke to all three employees, including Lewis Brooks. 2004-11-08 Underlying Facts Sheet.

The State disclosed the transcript of a joint statement given to Conley at the Sheriff's Department by Paul Hubbard and Henry Ross, Jr. on the day of the crime. The two were interviewed in each other's presence. They recounted an incident from about ten days before the crime when they saw Quincy Bullins and another person, later identified as Demarquis Westmoreland, walking across the parking lot toward

the grocery store. 2006-11-07 Hubbard Ross, 1-2, 6-7. They reported the two were each carrying something wrapped in towels, which they later saw were guns, and that when they spoke with them, the two said they were intending to rob the store. *Id.*, 2-3, 10. Hubbard and Ross also both said they saw a grey Chevrolet Caprice parked with its hood up on the side of the road some distance from the store. *Id.*, 5. The State would use this story, as told by Quincy Bullins and Demarquis Westmoreland, to argue that Mr. Pitchford had a plan to rob the store. Tr. 522-31.

While Greg and Carver Conley said they spoke with Brooks and Gatlin, the State disclosed nothing about the content of the interviews that Greg and Carver Conley had with Brooks and Gatlin, two key witnesses with information about the prior attempt. The State disclosed no audio or transcript of these interviews, nor even a description of them.

The testimony of Quincy Bullins and Demarquis Westmoreland was unreliable, untrustworthy and inconsistent, and there was evidence that Eric Bullins was also involved in the prior attempt. The accounts from Brooks or Gatlin could therefore be critical to undermining the State's largely unsupported theory that Mr. Pitchford intended to rob the store. While Gatlin may only have had second hand knowledge of the incident, he may have had information relating to an earlier incident in which Eric Bullins and Demarquis Westmoreland were kicked out of Mr. Britt's store for stealing. Brooks was present during the prior attempt, and his account was especially important. The undisclosed material could have been used to

40

further impeach the self-serving accounts given by Quincy Bullins and Demarquis Westmoreland.

## *Statement of Shawn Bullins to Investigator Conley.*

On December 2, 2004, Investigators Gregory Conley and Robert Jennings interviewed Dantron Mitchell. During the course of this interview, Mitchell told them he had spoken to Eddie and Shawn Bullins. Conley indicated that he had spoken to Shawn; "Ah, I think I talked to Shawn, too." 2004-12-02 Dantron Mitchell Tr., 9. Mitchell told them that Eric Bullins' brother Shawn Bullins had told him about Eric Bullins being involved in borrowing tools from Mr. Seals to open the cash register the day of the crime. *Id.*, 9-10.

The State disclosed nothing more about Conley's interview of Shawn Bullins. Shawn's name never came up during trial, despite his presence and alleged participation in key events. Shawn was at least aware of the dynamics among Mr. Pitchford and the Bullinses. The State would have been aware that Mr. Pitchford was a follower and not a leader in the group. He felt like an outsider among the people in Tie Plant, and winning their approval was important to him. This was at odds with the State's theory of Mr. Pitchford as the mastermind behind a conspiracy to rob the store.

## *James Hathcock's statements made to Sheriff Strider and District Attorney Evans.*

At trial, James Hathcock testified that he was released from jail a short time after making a statement to Sheriff Alton Strider. Tr. 445. He specified that his statement was audio recorded and typed out, though he could not recall whether he

41

signed it. *Id.* 435-36, 442, 445.The summer prior to the trial, he also made a statement or statements to Mr. Doug Evans and/or Clyde Hill. *Id.* at 446. Trial counsel specifically requested the transcript or audio recording of these statements. But the only discovery provided was a one paragraph, third-person summary of Hathcock's likely testimony. State's Supplemental Discovery Disclosure Oct. 20, 2005.

This disclosure was inadequate because it contains no reference to discussions about the charges Hathcock was facing and his release shortly after making the statement to Mr. Strider. These discussions very likely involved a deal to dismiss the charges against him in exchange for his statement. If so, failure to disclose such impeaching information is a *Brady* violation. The snitch evidence was central to the State's case against Mr. Pitchford. Disclosure of impeachment evidence was reasonably likely to have yielded a different outcome at guilt phase.

### Statements by Grenada County Jail staff to Mississippi State Hospital to bolster the State's case for competence to stand trial.

The State failed to disclose statements made on September 20, 2005 by Grenada County Jail staff about the mental status of Mr. Pitchford while in their custody. A handwritten statement by Major Edna M. Stewart offers her un-expert opinion that Mr. Pitchford exhibited no mental impairments. She also stated he had "no prior medical history and has taken no meds since his incarceration." In fact, Mr. Pitchford was routinely given medication because he was unable to sleep. Maj. Stewart's statements were given to MSH and relied on in their mental evaluation. They were not disclosed to trial counsel. They were released to post-conviction

42

counsel in response to a request of MSH's records, along with other materials showing MSH relied on these statements in preparing its report concluding Mr. Pitchford was competent to stand trial and waive rights. Failure to disclose these statements impaired Mr. Pitchford's adversarial testing of the State's case that he was competent to waive rights and to stand trial.

Had the State disclosed Maj. Stewart's statement to trial counsel, they could have investigated her account of Mr. Pitchford's behavior. They would have discovered that, in fact, Maj. Stewart's statement was inconsistent with the accounts of several other Grenada County Jail staff—and inmates—who reported that Mr. Pitchford did not seem to understand what he was facing and displayed strange behavior, like having conversations with himself, while he was awaiting trial. App.0679; App. 0680.

### ii. The State Failed to Disclose Other Impeaching and Exculpatory Evidence. Evidence of a deal made in exchange for Demarquis Westmoreland's testimony.

Demarquis Westmoreland testified against Mr. Pitchford at trial. He related his version of the events some ten days before Mr. Britt was shot. Tr. 449-464. His version of the story was at odds with accounts from other witnesses, in that he claimed he was not walking toward the grocery store with Quincy Bullins, and that only Quincy, not he, was armed. Tr. 451. In the accounts given by Paul Hubbard and Henry Ross, Quincy was not walking toward the store alone, but with some "other dude" who was tall and "mean looking," later identified as Demarquis Westmoreland, and both were carrying something "wrapped up" in towels. App.

0370-71; 75. Demarquis's self-serving trial testimony was also contradicted by his own earlier statement, in which he claimed he was not there at all. Tr. 458-59.

On cross examination, Mr. Carter attempted to impeach his testimony by inquiring into his motive, asking whether he gave statements to help himself (not specifically inquiring into his motives for his trial testimony), but Westmoreland was unresponsive. Tr. 460.

The State failed to disclose that Demarquis Westmoreland in fact did get a plea deal in exchange for his cooperation and testimony in Mr. Pitchford's case. At Westmoreland's plea colloquy, prosecutor Clyde Hill acknowledged that "in our plea negotiations, Mr. Westmoreland agreed to cooperate with the State in the prosecution of Mr. Pitchford," and that he did so by testifying in Mr. Pitchford's trial. In exchange, his entire sentence of five years was suspended with probation. *Id.*

Not only did the State fail to disclose the existence of this deal, District Attorney Evans repeatedly denied the existence of any deals. In the context of discussions about deals with the jailhouse snitch evidence, Evans said:

> I know of no exculpatory information in this case. As far as promises or agreements in this case, Your Honor, so that -- because I know the Court is not familiar with it. We have two people that are charged with the conspiracy, the initial plan to rob this place that are going to testify for the State. There have been no promises made to either one of them.

Tr. 82. Even assuming there was no specific promise to recommend a suspended sentence in place at the time of Mr. Pitchford's trial, Westmoreland's cooperation in the form of testifying at the trial was part of his plea negotiations, and was given in an exchange for favorable treatment by prosecutors. Clyde Hill made this clear at

44

Westmoreland's plea colloquy. The fact that Westmoreland testified under this arrangement was not disclosed and was baldly denied in court.

### *Relationship between James Hathcock and the victim Mr. Britt.*

The State failed to disclose that one of its snitch witnesses, James Hatchcock, is a distant relative of the victim, Mr. Britt. Upon information and belief, Mr. Hathcock believed he was related to the victim in the case and believed the victim to be an important person. Hathcock's connection with the victim—or at least his belief in his connection—implies bias and gives him a motive to testify and is therefore impeaching.

### *Evidence impeaching State's witness Stephanie Gray.*

The State failed to disclose evidence of witness Stephanie Gray's prior crimes of dishonesty. The State provided two separate sets of disclosure. The first disclosure included her own handwritten notes, a description of Greg Conley's interview of her on the day of the crime in the November 7, 2006, Offense Report, and a description of another interview with her on November 17. In all three of these disclosures, her statement was limited to the car with dark windows she said she observed pulling in and out of the grocery store parking lot the morning of the crime. The second disclosure reflected multiple subsequent statements made by Ms. Gray to unidentified people, and described in general terms that she was taken to Mr. Pitchford's home and asked to identify his car, that she knew the cash register was present in the store before the crime, and that she was familiar with the cash

register because she provided it to Mr. Britt. State's Supplemental Discovery Disclosure, Jan. 25, 2006.

Ms. Gray's testimony at trial was inconsistent with and contradicted the matters contained in her discovery disclosures. *See* Claim XIII.4 at 161, incorporated herein by reference. Her testimony was therefore already inherently unreliable. What trial counsel did not know—because the state failed to disclose it—was that Ms. Gray had committed crimes involving dishonesty and deceit on May 23, June 1, and September 3, 2005. Gray willfully wrote a series of bad checks on a Crossroads Grocery checking account she knew to contain insufficient funds or to be a closed account. Gray was ultimately indicted for these crimes after Mr. Pitchford's trial, on June 22, 2006, and signed an agreement to pay back the amounts plus fees in exchange for deferment of prosecution without having to admit guilt.

This violation is prejudicial because the testimony Ms. Gray offered was material and central to the State's case. Her account of the car at the crime scene and her dubious later identification of the car in Mr. Pitchford's front yard was a key part of the State's crime. Without her purported knowledge of the cash register, the evidence of borrowing John Seals' tools would have been irrelevant. Whether prosecution in this case was actually aware of this impeachment evidence is not essential because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

### *Evidence Related to DNA Testing.*

The State submitted several suspected blood samples along with known samples of blood from Mr. Britt, Mr. Pitchford, and Eric Bullins for DNA testing. The State failed to disclose the results of the DNA testing.

On December 3, 2004, the State filed a motion to appoint a court expert for DNA analysis.[16] On December 14, 2004, the court granted that motion and appointed Gina Pineda of Reliagene Technologies, Inc., as the court appointed expert. The order stated, "Upon completion of any analysis herein, copies of the findings and the written report shall be submitted to both the Attorneys for the Defendants, the District Attorney and this Court." On January 4, 2005, the District Attorney's Office directed the Mississippi Crime Lab (MCL) to submit the following samples to Reliagene: blood samples known to be from Mr. Britt, Mr. Pitchford, and Eric Bullins, swab of suspected blood from the .38 revolver, Mr. Pitchford's shoes, red shirt, and sweat pants, and Mr. Bullins' pants. The DNA Request Form states that before the State can submit this request, it must first receive "a serology report stating there is evidence available for DNA testing." The .38 revolver was submitted to the MCL Bioscience/DNA section for serological examination of the suspected blood stains. The MCL concluded, "Serological examinations for the presence of blood were negative on the 'Revolver.'" Lab Report, Jan. 7, 2005, 1. The shoes and clothing items were sent to MCL's Bioscience/DNA section for serological examination with instructions to "preserve for DNA."

---

[16] The motion contained two false statements: 1) that the .38 pistol taken from Mr. Pitchford's care was "known to have been taken from the store," and 2) that Mr. Pitchford stated that "he, Pitchford shot Mr. Brit[t] with the .38 pistol they found in the store." Mtn. at 1.

However, the State failed to discover any results of this serological analysis. If the results showed there was nothing available for DNA testing (that is, no blood on any of these items), this would be exculpatory evidence that must be disclosed. If it found there was available DNA evidence, then the samples would have been submitted to Reliagene. Nothing was disclosed to indicate whether the samples were submitted to Reliagene. Even presuming MCL serological testing came back positive, and the samples were submitted to Reliagene, the DNA results were never disclosed.

This failure to disclose prejudiced Mr. Pitchford, because it likely seriously undermined the State's theory of the case. Had the results come back showing a match between Mr. Britt's blood and samples taken from these items associated with Mr. Pitchford, the State surely would have presented this evidence. It is reasonable to assume any of these undisclosed results—either of serological or DNA analysis—failed to show such a match, and were therefore exculpatory.

### Evidence Impeaching James Hathcock.

As fully described *infra* at 65, at trial Hathcock said that shortly after he gave his statement about Mr. Pitchford to the sheriff, he was released from jail because charges against him were dropped. Tr. 447. He said he learned that charges were dropped from the son of the victim, also his co-defendant, in that crime. Tr. 448. At closing argument, Evans improperly argued that the charges were dropped by the victim, a fact not in evidence. Tr. 648.

Despite defense counsel's motion for discovery, none of this information surrounding Hathcock's release shortly after making a statement to the sheriff, including the statement he made to the sheriff, was disclosed. The State's only disclosure other than listing Hathcock as a witness was a Supplemental Discovery Disclosure providing a one paragraph description of what Hathcock would likely say Terry and Eric told him in jail. This disclosure did not mention the fact of his release or provide any reason for the release. This information is potentially impeaching evidence, therefore the State's failure to disclose it violated *Giglio v. United States*, 405 U.S. 150 (1972). The violation deprived Mr. Pitchford of a fair trial because had the material been disclosed, counsel could have prepared stronger impeachment of this snitch witness's credibility and would have resulted in a different outcome at trial.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present this claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

49

## C. Direct Appeal

The claim was not raised on direct appeal due to ineffective assistance of appellate counsel.

## D. Post-Conviction

This claim was not raised on post-conviction due to ineffective assistance of post-conviction counsel.

### 3. PROSECUTORIAL MISCONDUCT AT GUILT PHASE PRESENTATION OF EVIDENCE DEPRIVED MR. PITCHFORD OF A FAIR TRIAL.

## A. Supporting Facts

### *The State Improperly Relied on the Misleading, Unsupported, and Prejudicial Testimony of Dr. Steven Hayne.*

The State relied on Steven Hayne, M.D., to testify as an expert witness in the field of forensic pathology. Tr. 398. He performed the autopsy on Mr. Britt's body, and submitted projectiles and pellets, GSR swabs, and other samples from the body to the crime lab. Tr. 398, 397-44. The State relied extensively on his testimony. Dr. Hayne has been discredited for giving opinion unsupported by science and betraying obvious bias in favor of prosecution. For example, in the prosecution of Tyler Edmonds for capital murder, Hayne "espoused a two-shooter theory almost to the exclusion of a single-shooter theory," a theory the Mississippi Supreme Court agreed was "scientifically unfounded" because "[y]ou cannot look at a bullet wound and tell whether it was made by a bullet fired by one person pulling the trigger or by two persons pulling the trigger simultaneously." *Edmonds v. State*, 955 So. 2d 787, 791 (Miss. 2007) (quotation omitted). "Testifying that you can tell from an

50

autopsy how many hands were on the gun that fired a bullet is like saying you can tell the color of a killer's eyes from a series of stab wounds. It's absurd." Radley Balko, *CSI: Mississippi: A Case Study in Expert Testimony Gone Horribly Wrong*, REASON.COM (Oct. 8, 2007 3:20 p.m.). This was not an isolated instance. "Hayne's highly questionable practices are well-known in Mississippi, in neighboring states, and to forensic experts across the country." *Id.* For example, a former Mississippi police chief said, "There's no question in my mind that there are innocent people doing time at Parchman Penitentiary due to the testimony of Dr. Hayne….There may even be some on death row." *Id.* In another case, Hayne testified that a child died from shaking, citing a textbook that said the opposite and a study that appears not to exist. Radley Balko, *New Case Again Demonstrates Duplicity of Embattled Mississippi Medical Examiner*, WASH. POST, May 15, 2014.[17] For nearly twenty years, from the early 1990s until 2008, Hayne performed at least 80% of all autopsies in Mississippi, at a rate of "somewhere between 1,200 and 1,800 autopsies per year."[18] Radley Balko, *The Fifth Circuit Turns its Back on a Huge Forensics Scandal in Mississippi*, WASH. POST, Feb. 28, 2014. The work he did in this case came while he was cranking out autopsies at such an absurd rate.

Here, Hayne testified, with no basis in evidence, that Mr. Britt was shot as many as four times by a gun loaded with rat shot. Tr. 415. Dr. Hayne also testified

---

[17] *See also Radley Balko & Tucker Carrington*, THE CADAVER KING AND THE COUNTRY DENTIST (2018) (detailing at length the farcical nature of Hayne's testimony in numerous cases).

[18] Hayne himself claimed he had performed 25,000 to 30,000 autopsies. "This would mean that he has performed at least 1,000 autopsies per year since he was admitted to practice, which seems highly unrealistic." *Edmonds*, 955 So.2d at 802. (Diaz, P.J., specially concurring).

outside the scope of his expertise about the range of fire and whether particular wounds came from a .22 caliber firearm or a .38 caliber firearm. He offered nothing to support this opinion. He collected pellets from "the chest, abdomen, left thigh and right arm," but did not say how many there were. Tr. 414. Even had he counted the pellets, he had no training or expertise to know how many pellets are in each shot. With no evidence to support Hayne's opinion, he was merely offering evidence to support the State's unsubstantiated theory that the gun recovered from Mr. Pitchford's car was fired four times in the store at the time of the crime.

Hayne falsely testified as to his expert credentials. He stated he was "the state pathologist for the Department of Public Safety Medical Examiner's Office for the State of Mississippi." Tr. 424. Despite the massive number of autopsies Hayne was doing during this period, he held no such title because no such position exists. *See* Miss. Code Ann. Title 41, Chapter 61 (the Mississippi Medical Examiner Act of 1986, providing for the office of State Medical Examiner, but no position of "state pathologist."). His claimed credential is suggestive that he was holding himself out to the position of the State Medical Examiner, a position he neither held nor was qualified to hold. While county medical examiners are only required to be licensed physicians, the State Medical Examiner must also be "certified in forensic pathology by the American Board of Pathology." Miss. Code Ann. § 41-61-55. But Dr. Hayne does not hold this credential:

> There are serious concerns over Dr. Hayne's qualifications to provide expert testimony. First, he admitted at trial that he was not certified in forensic pathology by the American Board of Pathology because he walked out on the qualifying examination. This means he is

52

unqualified to serve as State Medical Examiner, as our law requires that "[e]ach applicant for the position of State Medical Examiner shall, as a minimum, be a physician who is eligible for a license to practice medicine in Mississippi and be certified in forensic pathology by the American Board of Pathology." Miss.Code Ann. § 41–61–55 (Rev.2005).

*Edmonds*, 955 So. 2d at 802 (Daiz, P.J., specially concurring). The three specially concurring judges in *Edmonds* concluded that Hayne should not be qualified to give expert testimony, citing the court's duty to distinguish between an "expert" and a "quack"—"between qualified expert testimony and 'quackspertise.'" *Id.* at 802-03.

Nonetheless, the State again relied on Hayne to provide unscientific opinion testimony to support a conviction and death sentence in this case.

### The State Elicited False Testimony from Investigator Jennings that Terry said He Committed the Murder.

Using a leading question with facts not in evidence, District Attorney Evans asked Investigator Jennings:

> Q. So before Greg [Conley] came in on the fourth statement [Mr. Pitchford] had already told you that they both committed the robbery and murder together.
> A. That's correct.

Tr. 571. Jennings had not testified that Terry admitted to having committed the robbery and murder. And in fact, Mr. Pitchford never did admit to Jennings that he committed the murder of Mr. Britt. In his coached fifth statement to Investigator Jennings, Mr. Pitchford stated that he fired shots into the floor when Eric pointed a gun at him demanding that he do something. Although District Attorney Evans improperly implied that Mr. Pitchford confessed to the murder at some point when the recording was turned off, that account was not in Jennings' offense report, in

which he recounted Mr. Pitchford's confession, consistent with the fifth recorded statement: he never admitted to the murder of Mr. Britt.

The prosecution elicited this false testimony, giving the jury the false impression that Mr. Pitchford had confessed to personally shooting Mr. Britt. This error was exacerbated in closing arguments when prosecutor Clyde Hill mischaracterized Jennings' false testimony, stating that Mr. Pitchford had told Jennings: "We both shot the man." Tr. 630. *See infra.*

### The State Employed Improper Leading Questions on Direct Introducing Prejudicial Facts Not in Evidence Throughout its Entire Case.

The case against Mr. Pitchford was built around the unreliable and untrustworthy testimony of co-conspirators and jailhouse snitch witnesses with a motive to lie. The bulk of their testimony was procured through the prosecutor's improper use of leading questions, to which trial counsel unreasonably failed to object. Examples in the State's case in chief are too numerous to recite exhaustively. Tr. 347-578. What follows here are some of the most egregious examples.

In order to elicit Dr. Hayne's testimony that Mr. Britt could have been hit by up to four shots fired from a gun loaded with rat shot, District Attorney Evans led the witness with evidence irrelevant to his supposed area of expertise:

> Q. Yes, sir. All right. Dr. Hayne, as an expert, I'd like for you to take into consideration we expect there to be testimony that when the 38 with the pellet shot or rat shot was recovered, four bullets had been fired from that gun. Would your conclusions be inconsistent with him being shot anywhere from one to four times –

Tr. 415. The court overruled defense's objection for leading the witness and refused to consider a renewed objection on the grounds that such testimony was outside

Hayne's area of expertise. Tr. 417. This example is especially egregious because Evans coached his expert witness into testifying to something that lacked forensic support. The evidence pointed to Mr. Britt being hit with pellets from only one shot with the .38.

In questioning the co-conspirator, Demarquis Westmoreland, Mr. Evans was able to get him to put all the blame on Mr. Pitchford through a series of leading questions that included facts not in evidence. Mr. Evan's asked Westmoreland:

> Q. Did Terry come up with any ideas?
> A. Yes, sir.
> Q. What was his idea?
> A. To go down and rob the store.

Tr. 450. And later, Demarquis had said nothing about being in a car when Mr. Evans asked him:

> Q. All right. Did anybody get out of the car and walk toward the store that day?
> A. Quincy Bullins.
> Q. Did you walk with him?
> A. No, sir.

Tr. 451. In questioning the other co-conspirator, Quincy Bullins, Mr. Evans again fed the answers he was looking for:

> Q. Quincy, I want to direct your attention to back before the robbery and the murder occurred. Did you have an occasion to go with someone there to the store for the purpose of robbing it?
> A. Yes, sir.
> Q. Who carried you to the store?
> A. Terry Pitchford (pointed).
> Q. May the record reflect that he has pointed to and identified the defendant, Your Honor?
> The Court: Let is so reflect.
> The Witness: Right there.
> Q. What did Terry Pitchford say to you to get you to be willing to go to the store to rob it?
> A. He asked me did I want to go hit a lick.

55

> Q. Okay. What did he say about who needed to go in?
> A. He said we need to go in because the dude knew him.

Tr. 523-524. Quincy had never testified that Terry had said anything to him about robbing a store. Mr. Evans then asked Quincy, "What happened to cause you to change your mind?" Tr. 524. But Quincy had not previously said either that he had changed his mind or that something happened to cause him to.

In questioning Stephanie Gray about the car she said she saw "riding up and down the road and pulling into the parking lot," Mr. Evans asked her to describe the car, which she did, but because her description was not what he was after, he then asked, "Did you notice anything about the windows?"[19] Tr. at 375.

District Attorney Evans also improperly examined Grenada County Sheriff's Department Investigator Greg Conley. For example, after discussing the crime scene, Evans turned his attention to other aspects of the investigation asking him about his conversations the morning of the crime with "some different individuals that lead [sic] you to a suspect?" Tr. 492. Evans elicited that Conley spoke with Henry Ross, Paul Hubbard, and Quincy Bullins, without testifying as to the content of those discussions. *Id.* Evans then introduced the subject of a vehicle, not previously mentioned, and simultaneously elicited hearsay evidence:

> Q. Had you at that point been given any information about a vehicle?
> A. Yes.
> Q. And what type of information had you been given about a vehicle?
> A. I had been given information that it was some type of vehicle that looks like a police car that had dark windows.

---

[19] Mr. Carter objected to the leading question, and *after* the witness answered, Evans replied, "That's not leading." Tr. 376. The court never ruled or even acknowledged the objection. *Id.*

Tr. 492-93. Evans continued to lead the testimony by introducing facts not in evidence ahead of Conley's testimony. For example, "Did you have occasion while you were [at Mr. Pitchford's home] to search a vehicle that matched the description you had been given?" Tr. 493. Conley merely answered, "Yes," "Yes, I did," and "Yes, it is" to three successive leading questions. Tr. 492-93. In other places, Evans even dropped the charade of asking for Conley's testimony, and instead made the assertions for him, only asking for his agreement to the testimony Evans provided. Several examples of this come from Evans's "questioning" about Mr. Pitchford's statements to police:

> Q. In statements one and two he denies that. In one he denies going to the store. Then he says they did go to the store. In two he says that Quincy must have robbed the store because he had a 25. That right?
> A. That's correct.
> Q. And he tells you two different versions of when he got that gun. One he got it that day. Another he had it two to three weeks.
> A. Correct.
> Q. And he also gives you misinformation on who his mother is.
> A. That's correct.

Tr. 505. And again, Evans improperly inserts his own testimony through his questioning of Investigator Conley.

> Q. So in that statement he is admitting that him and Eric went to the store to rob it, that he had a 38 in his pocket. The only 38 involved is going to be the one that came out of the store; is that correct?
> A. that's correct.
> Q. So it would have been kind of hard to have that one in his pocket when he walked in the store, wouldn't it?
> A. Yes, Sir.

Tr. At 508-509.

Yet another example is Clyde Hill's improper questioning of Sammie Seals. After the witness testified that Mr. Pitchford came to her door asking permission to

borrow a screwdriver, Hill asked, "Did y'all have anything else missing from the house after Terry left with the screwdriver that day?" Tr. 476. The courted sustained Mr. Carter's objection based on relevance, adding, "Also, it would be a leading type question." *Id*. When Hill asked essentially the same question, the witness answered, "There was a hammer missing," before the court overruled the same objection. *Id*. This manner of examining the witness suggested that Mr. Pitchford only had permission to borrow the screwdriver, but stole a hammer. However John Seals, the owner of the tools, stated that he gave him permission to use both the hammer and the screwdriver. He also said that the hammer was in fact later returned.

### *Prosecution suborned perjury of State's witness, Dantron Mitchell.*

At trial, Dantron Mitchell, one of two unreliable jailhouse snitch witnesses, testified that Terry Pitchford told him he committed the robbery and murder of Mr. Britt. Tr. 564. At trial, Mr. Evans elicited the false testimony:

> Q. (By Mr. Evans:) What did the defendant, Terry 3 Pitchford, tell you about what he had done as far as the robbery and murder at Cross Roads Grocery?
> A. All he told me was he did it and only God knows. Him and God know.
> Q. Who did he tell you was involved in it?
> A. Eric Bullins.
> Q. Who did he tell you went in the store?
> A. Him and Eric Bullins.
> Q. Okay. Did he later change that story?
> A. Yes, sir.
> Q. What did he tell you later?
> A. He told me he did it by his self. Only him and God know what happened.
> Q. This defendant, Terry Pitchford, told you he did it by his self.
> A. Yes, sir.

Q. That he robbed and killed the man at the store.

A. Yes, sir.

Tr. 564. With no eyewitnesses and not forensic link that connected Mr. Pitchford to the robbery and murder, the testimony of jailhouse snitch witnesses was the only evidence that put Mr. Pitchford inside the store. More importantly, his testimony was critical in alleging that Mr. Pitchford himself committed the robbery and the killing. The prosecution relied heavily on Mitchell's testimony. In closing, Clyde Hill argued that Mr. Pitchford "told Dantron Mitchell" that "him and Eric Bullin[s] had gone into that store to rob Mr. Britt and kill him." Tr. 630.

But Dantron's testimony was entirely false. In fact, upon information and belief, Mr. Pitchford never told Dantron that he committed a crime. Prosecution knew or should have known Dantron was offering false testimony.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented the issue of Dr. Hayne's testimony on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief largely because the issue was not preserved by objection at trial, furthering reasoning that to grant relief it would be forced to adopt a per se rule that would requiring invaliding the verdict in every case in which Dr. Hayne testified. *Pitchford v. State*, 45 So. 3d 216, 247 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### 4. THE STATE DEPRIVED MR. PITCHFORD OF A FAIR TRIAL BY MAKING NUMEROUS MISREPRESENTATIONS AND PREJUDICIALLY IMPROPER STATEMENTS AT GUILT PHASE OPENING AND CLOSING ARGUMENTS.

### A. Supporting Facts

### *During Opening Statements, the State Misrepresented that the .38 was a Murder Weapon and Tied Mr. Pitchford to the Crime.*

In opening argument, Evans stated: "Testimony will be that Mr. Britt had a 38 caliber pistol in the store loaded with what some people call rat shot. Some people call it pellet shot. That is one of the guns he was killed with." Tr. 341.

In fact, the evidence at trial established that Mr. Britt was *not* killed with the .38 caliber pistol. Dr. Steven Hayne testified that the pellets were "non-lethal" and "did not penetrate and produce any significant injury." Tr. 421. Instead, Dr. Hayne testified that the fatal wounds were caused by small caliber projectile (i.e. bullet) gunshot wounds. Tr. 401-404. Dr. Hayne referred to the

wounds caused by the bullets as "gunshot wounds." Tr. 421. "And, of course, the pellets were not actually projectiles. They were pellets." *Id.* He identified five gunshot wounds and described three of them as lethal—any one of which taken alone would certainly have caused death—one as potentially lethal, and one as a non-lethal graze wound. *Id.* Dr. Hayne was clear that the cause of death was "massive internal bleeding" caused by the three lethal projectile gunshot wounds, and equally clear that the pellets caused no such bleeding. Tr. 416, 421.

This improper statement prejudiced Mr. Pitchford by depriving him of a fair trial. The error was exacerbated by further instances of prosecutorial misconduct that together supported the State's theory that Mr. Pitchford shot Mr. Britt with Mr. Britt's .38 and that that weapon was the one recovered from Mr. Pitchford's car. These many instances of misconduct submitted facts not in evidence and contradicted by the evidence to the jury.

### The State Made Numerous Factual Misrepresentations and Improper Comments at Guilt Phase Closing Arguments.

#### *The State misrepresented that Mr. Pitchford fired the fatal shots.*

Evidence at trial established that Mr. Britt was shot five times with a .22 caliber firearm, and that three of those five shots were fatal. The only lethal shots were those fired by the .22. Mr. Britt was also hit with pellets from pellet shot fired from a .38 caliber firearm, which "did not penetrate and produce any significant injury." Tr. 421.

At closing argument, Evans opined that Mr. Pitchford "probably" possessed the .22 because it was his. Tr. 649. Evans' opinion is supported by no evidence. Law

enforcement never recovered the .22, so there was no physical evidence linking Mr. Pitchford to the murder weapon. Instead Evans relied on Quincy's self-serving testimony that some 10 days before the date of the crime Terry handed him a .22 Ruger from his glove compartment. Tr. 524.

For the State to pursue a theory of felony murder where the defendant did not cause the death, it has to prove that the defendant was a major participant in the felony and was at least reckless with regard to the murder. *Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v. Arizona*, 481 U.S. 137 (1987). Here, prosecution's attempts to argue facts not in evidence suggesting that Terry himself fatally shot Mr. Britt relieves the State of its *Enmund-Tison* burden. Thus these acts of misconduct are prejudicial despite Evans' simultaneous argument that it "doesn't matter" who fired the fatal shots from the 22. Tr. 649.

### *The State Misrepresented that Quincy Bullins Voluntarily Turned Himself in to Authorities.*

In closing argument, District Attorney Evans said that Greg Conley testified that Quincy Bullins, "went to the sheriff's department the same morning of the murder and he admitted [to planning to rob the store some 10 days before the murder]." Tr. 648. But Conley offered no such testimony. He said that he talked to Quincy that morning, but did not say where the conversation took place or whether Quincy voluntarily approached authorities. Tr. 492 ("I talked to Henry Ross and Paul Hubbard and Quincy Bullin[s]."). Conley offered nothing in his testimony about the circumstances of that conversation with Quincy. Evans' comment misrepresented Conley testimony, and also presented a false fact to the jury as

shown by Quincy's testimony. Furthermore, Quincy testified that he was unwilling to be forthcoming about his role in the incident—he originally denied any involved at all. Tr. 528-29. The purpose of misrepresenting Quincy as a willing volunteer who turned himself in was to bolster Quincy's testimony in support of Evans' misrepresentation that Terry fired the fatal shots. *Supra.*

### The State Misrepresented that the 38 Recovered from Mr. Pitchford's Car Connected Him to the Crime.

Prosecution argued that the .38 found in Terry's car was Mr. Britt's gun. Tr. 628. Prosecution relied heavily on this "fact" stating the .38 recovered from Terry's car is "the chain" that tied Terry to the crime. *Id.* But there was no evidence to sustain these "facts." The "chain" prosecution argued is not supported by evidence.

The only evidence that Mr. Britt's .38 caliber pistol was the one found in Mr. Pitchford's car was Marvin Fullwood's unfounded lay testimony that the gun recovered from Mr. Pitchford's car, State's Ex. 32, was the gun he gave Mr. Britt. "Yes, sir. That's the gun I gave him." Tr. 469. Fullwood was not competent to make that statement. The most he could have competently testified to was that the gun *looked* like the one he sold to Mr. Britt. He pointed to nothing that would allow him to uniquely identify that gun. App. 0017.

Nettie Britt testified that Mr. Britt kept two guns at the store—one on the counter by the cash register and one under the counter. Tr. 349. Mrs. Britt testified that one of those guns was a "pellet gun" that Marvin Fullwood had given Mr. Britt a few months prior. Tr. 350. But the State's theory was that Mr. Britt was shot with

a .38 caliber revolver loaded with rat shot; not a pellet gun.[20] Moreover, Mrs. Britt never affirmatively identified which gun was missing from the store, testifying only that she knew one of the guns was missing. Tr. 349-50. Mrs. Britt offered no description or identification of the other gun, or which gun was typically kept on the counter and which gun was kept under the counter. Greg Conley testified that he found a .38 pistol on the counter when he entered the scene after the crime, which severely undermines the State's theory that the .38 pistol was taken from the store in the robbery.[21] Tr. 498-99, 516-17. There is very little credible evidence that Mr. Britt even owned a .38 pistol loaded with rat shot, let alone that it was missing from the store.

The prosecutor used the testimony of its firearms expert Steven Byrd and lay witness Marvin Fullwood to mislead the jury by arguing that the .38 caliber firearm recovered from Mr. Pitchford's car was the same gun used to shoot Mr. Britt. Byrd testified that the "the four cartridge cases submitted in this case . . . at some point in time were discharged from this revolver," the .38 caliber firearm found in Mr. Pitchford's car. Tr. 551. This testimony purported to connect the gun found in Mr. Pitchford's car to the gun used to shoot Mr. Britt, and further purported to bolster Dr. Hayne's unfounded testimony that Mr. Britt could have been shot as many as four times from the .38. Tr. 415, 551. But these four cartridge cases were taken from

---

[20] Marvin Fullwood never actually testified that he gave Mr. Britt was a .38 caliber revolver; he simply identified State's Ex. 32 as the gun he gave Mr. Britt.

[21] The firearm pictured in State's Ex. 45, which is a brown-handled .38 revolver, was never inventoried by the Grenada County Sheriff's office or the Mississippi Crime Lab and seems to have disappeared from the case. 2018-09-17 R. Robert Tressel Declaration, ¶ 101.

the .38 when Investigator Conley retrieved it from Mr. Pitchford's car. Tr. 500. They were not found at the scene, and there is no evidence of when those rounds were fired. At most Byrd's testimony establishes that these four cartridges removed from the gun found in Mr. Pitchford's car could have been fired from the gun they were found in—a trivial and irrelevant conclusion.

Byrd's irrelevant and unnecessary microscopic testing was calculated to confuse the jury into believing he meant that he could conclusively show that the gun found in Mr. Pitchford's car was fired in the store. The only thing Byrd could say to relevant to the suggested link is that the plastic casing, wadding, and pellets found in the victim's clothing were *consistent* with the components of the shot capsule that was in the .38 caliber firearm found in Mr. Pitchford's car. Tr. 553.[22] Byrd testified that the capsule fragments recovered at the scene were not consistent with more than one shot. Tr. 560-61.

### District Attorney Evans improperly argued that the victim in Hathcock's case dismissed the charges against him.

The State's case in chief relied heavily on jailhouse snitch testimony, including that of James Hathcock. Tr. 426-33. Hathcock repeated an inculpating account of the crime, though he was not a witness to it, allegedly told to him by Mr. Pitchford and Eric Bullins when the three were in jail together. *Id.* The testimony presented an extremely emotional account that elicited audible sobbing or crying from Mr. Britt's family members in the courtroom. Tr. at 432-33. On cross

---

[22] Byrd's written report concluded that "Due to insufficient reproducible individual characteristics, Submission 41 [the base wad of a .38 shot capsule] could not be positively included or excluded as having been fired in Submission 1 [the .38 pistol from Mr. Pitchford's car]."

examination, defense counsel sought to impeach Hathcock by eliciting that shortly after he spoke to authorities about the alleged account of the crime, he was released from jail, suggesting he gave testimony for the State in hopes of a favorable disposition of his own case. Tr. at 446. On redirect, Evans elicited the reason why he was released from jail: "I was told it was dropped." Tr. at 447. Evans elicited Hathcock's elaboration:

> Q. Okay. Who told you that?
> A. Justin. The guy. It was him I was with. He stole $3,000 from his daddy. He gave me 500 of it to shut my mouth. So like an idiot, I took it.

Tr. at 448.

But at closing argument, Evans said Hathcock "told y'all that the reason the charges were dismissed is the person he was helping was the son of the person the property was stolen from and that victim dropped the charges. That had nothing to do with us making a deal." Tr. 648. But that statement is false. Nowhere did Hathcock say that the victim dropped the charges. He testified the victim's son informed him that charges[23] had been dropped. Accordingly, defense counsel objected: "I object, Your Honor. That is not what I heard." *Id.* Evans—apparently privy to information other than the testimony given at trial—stated, "That is exactly what he said." *Id.* The court overruled the objection, saying, "The jury heard it. They can decide." *Id.* The court provided no reasoning for its decision, and this instruction is not a remedy to prosecutorial misconduct for arguing facts not in evidence.

---

[23] This is patently untrue because he would have been informed charges were dropped by jail staff upon his release.

### *Mr. Evans Improperly Attacked Mr. Pitchford's Credibility.*

Evans stated of Mr. Pitchford, "And he is about as close to a habitual liar as anybody I have ever seen." Tr. 649. This statement is improper for three distinct reasons. First, it is improper personal opinion of the prosecutor, and not a statement of the evidence presented. Second, it attempts to use evidence of bad character even though the State argued that there was no such evidence in this case at instructions conference. Tr. 608-10. Finally, attacking Mr. Pitchford's credibility when he did not testify is tantamount to arguing an adverse inference from his decision not to testify. This violates Mr. Pitchford's Fifth Amendment rights and improperly places a burden on the defendant.

### *Evans improperly argued Mr. Pitchford would have committed hypothetical crimes.*

Evans argued that if Walter Davis and his son had arrived at the store a few minutes earlier, "We would of [sic] had two more dead people." Tr. 650. Not only is this unsupported by any evidence, it is admittedly contrary to fact. The Davises were not killed. The court overruled Mr. Carter's objection to Evans attributing these additional hypothetical crimes to Mr. Pitchford, incorrectly observing that the State is allowed "to comment on the evidence as he sees a reasonable inference to be." *Id.* This reasoning substitutes the actual objective analysis with a purely subjective one. Evans is not permitted to do whatever he believes is reasonable—he may only draw inferences that are objectively reasonable. Evans' improper argumentation merely incites prejudice and fear by arguing with no evidence that Mr. Pitchford is a danger to people who were not the victim of any crime in this

case. It is tantamount to arguing that Mr. Pitchford committed other uncharged murders except that these uncharged murders are purely fictional. One of the "two more dead people" testified in front of the jury, inviting the jury to imagine the death of a living person at the hands of Mr. Pitchford. This is especially scabrous when recalling that the State offered no proof whatsoever that Mr. Pitchford killed the only actual victim, Mr. Britt. *See supra.*

On direct appeal, the state supreme court agreed that this statement "certainly is not admissible in the prosecution of Pitchford for the murder of Reuben Britt." Pitchford, 45 So. 3d at 235. However, it concluded that due to "overwhelming evidence of guilt presented to the jury," the error was harmless. *Id.* As shown throughout this Petition, however, much of the State's evidence of guilt evaporates when scrutinized.

### *District Attorney misrepresented that Investigator Jennings testified Mr. Pitchford said he shot Mr. Britt.*

Evans claimed that Robert Jennings testified that Mr. Pitchford twice told him that both Eric and Mr. Pitchford shot Mr. Britt: "And when Robert Jennings pinned him down, in two different statements he admitted that him and Eric went in the store. They robbed Mr. Britt, and they killed him. *They both shot him.*" Tr. 649 (emphasis added). This argumentation is not supported by Jennings' testimony, nor is it supported by the documentary evidence of Mr. Pitchford's five custodial statements.

Jennings testified that it was correct that "before Greg [Conley] came in on the fourth statement [Mr. Pitchford] had already told you that they both committed

the robbery and murder together." Tr. 571. Jennings never testified that Terry said they both shot Mr. Britt. Even by Mr. Evans's own argumentation shows that saying someone committed a robbery and felony murder is not the same as saying that person necessarily shot the victim. *See* Tr. 649. This improper argumentation highlights the incremental steps from the truth that were presented to the jury as fact. As discussed *supra*, none of the transcripts of Terry's five statements to police include a statement that both he and Eric shot Britt, or even that they both committed the murder. App.0325; 0331; 0341; 0351; 0364. The misconduct of allowing this testimony in is compounded by Evans' statement whereby even the alleged and undocumented statement that they both committed the crime morphed into arguing as a fact that Terry said they both shot him. The overall effect of incremental instances of prosecutorial misconduct leads to the cumulation of prejudice. *Infra*.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Many of the issues and instances of prosecutorial misconduct in this claim were raised on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief on all the issues presented, though it found the State's comment that Mr. Pitchford would have killed the Davises if they had shown up earlier was improper argument, but it found it was harmless error because of "the overwhelming evidence of guilt." *Pitchford v. State*, 45 So. 3d 216, 235 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### 5. THE STATE IMPROPERLY QUESTIONED MITIGATION WITNESSES AT PENALTY PHASE AND MADE IMPROPER COMMENTS AT PENALTY PHASE CLOSING ARGUMENTS.

#### *In its cross examination of Dominique Hogan, the State inquired into prior violent acts.*

Similarly, the State inquired into alleged violence between Terry and Dominique when there was no reliable evidence of such violence. On direct, Dominique Hogan testified that she was his girlfriend and the mother of Terry's young son, De'Terrius. Tr. at 686. She testified that Terry was a great father to his son, that he spent time with him, and supported him financially. Tr. at 686-87. She did not testify at all as to the nature of her relationship with Terry. It was the State that inquired into the nature of their relationship, which Dominique described as

"very close." Tr. at 688. The State then asked, "Isn't it a fact that y'all were doing a lot of fighting?" *Id.* This could not have been introduced to rebut mitigation evidence about a peaceful relationship.[24] Furthermore, there was no reliable evidence otherwise in the record. Rather, as trial counsel argued in support of his objection, there was no proof to support that line of questioning which was only "damaging and inflammatory speculation without there being some kind of evidence of it." Tr. at 689. Over defense counsel's objection, the court allowed the questioning saying that Ms. Hogan "testified about the nature of the relationship she had with Mr. Pitchford to the extent that they were, you know, saw each other every day, he was supporting the child and he was visiting the child and he had a wonderful relationship with the child." *Id.* at 691. But none of her direct testimony characterized the nature of Mr. Pitchford's relationship with her, but rather with their son.

### State's questioning of Veronica by comparing Terry's loss of his father to the murder of Mr. Britt was inflammatory.

The State's questioning of Veronica also became inflammatory when Mr. Evans began to argue against Veronica's statement that the death of his father when Terry was ten years old was hard on him:

> Q. Now, you said it was hard on him because his daddy only had about a month before he died.
> A. Yeah. Yes. Yes.
> Q. Okay. At least he did have a month, didn't he? ... *That is better than somebody just being murdered and their family not –*

---

[24] Evans did not even attempt to say he was rebutting evidence in mitigation given on direct of Ms. Hogan. Instead he cited inadmissible hearsay in psychiatric reports. Tr. at 690.

Tr. 711 (emphasis added). Defense counsel objected, and after the ensuing courtroom outburst, Evans asked the same inflammatory question:

> Q. Him having about a month before his daddy died is a lot better than a family that doesn't have any time, that family member is just shot down and murdered, isn't it?

Tr. 712.

The inflammatory nature of this questioning was further evidenced by the courtroom outburst[25] it elicited. Tr. 711-12. The court admonished those present in the court room "not to make any comments. You are not to make any noise at all during this process." Tr. at 712. Such inflammatory questioning has no legal basis and does not serve to rebut the evidence in mitigation. That the death of Mr. Britt came without warning in no way rebuts the mitigating effect of the death of his father on Terry when he was a child.

### The State improperly introduced the heinous, atrocious, and cruel aggravator.

The State submitted only two aggravators at penalty phase: "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest" and "the capital offense was committed for pecuniary gain during the course of a robbery." Tr. at 725-26; Miss. Code Ann. § 99-19-101(5). But in closing argument, the State argued that this was more than a killing during a robbery: "We are dealing with somebody that would purposely plan to go in a store with a gun, rob somebody and *brutally* murder them." Tr. at 804 (emphasis added). He argued that

---

[25] Apparently because of the outburst, the court overruled the objection without hearing defense counsel's argument or providing any reasoning. Tr. 711.

he was seeking death "because the ultimate crime deserves the ultimate punishment." Tr. at 798. He repeated the theme of this being an exceptional "brutal" murder without reference to either of the submitted aggravators:

> Y'all saw the autopsy photographs. There is not much of a place that you could touch on his body that didn't have some gunshot wound on it. *Brutal.* This is the ultimate crime. This is the type of crime that the death penalty is for. This is the type of person that the death penalty is for, somebody that could commit a crime like that.

Tr. at 804 (emphasis added). Evans added, "They weren't satisfied with just shooting him down. I don't know if it was because they were having fun shooting him or if it was that they didn't want to leave any witnesses or both. But you saw what the results were." Tr. at 806. This argumentation effectively submitted a third aggravator, "The capital offense was especially heinous, atrocious or cruel." Miss. Code Ann. § 99-19-101(5)(i).

Even if the State had given proper notice of its intent to submit this aggravator, it is one that is only constitutional if it interpreted to meaningfully narrow death eligible murders. *Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980). Accordingly, Mississippi requires an instruction stating that this aggravator can only be found when "accompanied by such additional acts as to set the crime apart from the norm of capital murders" which includes "evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that were was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a

73

lingering or torturous death was suffered." *Knox v. State*, 805 So.2d. 527, 533 (Miss. 2002). This instruction was not submitted here.

Furthermore, the instruction makes clear that there must be additional facts in evidence that the defendant personally committed the acts causing serious mutilation. As shown herein, the State presented no evidence that Mr. Pitchford personally fired a lethal shot. The State's guilt phase argument that it need not prove "which one shot with which gun," Tr. at 649, is not consistent with the requirements of this aggravator. Even assuming for sake of argument that Mr. Pitchford fired the gun loaded with rat shot, the State's own expert testified that the pellets "did not penetrate and produce any significant injury, sir." Tr. 421. Therefore, these comments improperly argued facts not in evidence. Mr. Pitchford because but for the inflammatory and emotional nature of this unsubmitted and unsupported aggravator, it is reasonably probable the sentencing jury would not have imposed death.

Even assuming the State did not submit the especially heinous and cruel aggravator, these remarks about the gruesome nature of the crime were improper references to a nonstatutory aggravating factor and/or gratuitous remarks intended to inflame the passions of the jurors, both of which are improper. These inflammatory remarks are especially prejudicial when introducing facts not in the evidence at a stage where the defense has no opportunity to rebut.

### *The State incorrectly argued that the jury must find the mitigation outweighs "what he did" in order to impose life.*

At closing argument, Evans told the jury "you've got to determine for the death penalty to not be a possible penalty in this case is that [mitigating factors] outweigh what he did, that they outweigh it." Tr. at 800-01. This implies the jury must impose death if it fails to find the mitigation outweighs the facts of the crime. It also misstated the law on mitigation in capital cases. The jury must determine whether the mitigating factors outweigh any aggravating factors; not whether mitigating factors outweigh "what Terry did." The prosecution's instruction improperly suggested to the jury that there must be a nexus between any mitigation and the crime.

### *The State again argued Mr. Pitchford possessed the .22 and intentionally shot and killed the victim, facts not in evidence.*

At closing argument, the State repeated its improper guilt phase closing argument asserting a fact not in evidence: that Mr. Pitchford possessed the .22 caliber gun that fired the lethal shots during the robbery. Tr. at 773. This time, Evans expanded to make further claims: that Mr. Pitchford "had a 22 caliber pistol;" that he "actually killed him;" that he personally "attempted to kill Ruben Britt" and therefore he intended to kill him. *Id.*

As discussed *supra*, these facts are not in evidence. They were thus improper as inflammatory appeals meant to incite passions and emotionalism irrelevant to the State's case against Mr. Pitchford.

Furthermore, this improper argumentation circumvented proper *Enmund-Tison* analysis. If, as Evans claimed at guilt phase, the State need not show Mr. Pitchford himself actually killed the victim, *Enmund-Tison* requires that the State

75

prove he was a major participant in the underlying felony and acted with reckless disregard as to the death. By relying on facts not in evidence, the State failed to discharge this burden.

### *The State made improper comments stating the jurors' voir dire responses committed them to impose death.*

At penalty phase closing argument, Evans said. "Y'all know what you are here for. The law is clear in this state. The death penalty is an appropriate punishment." Tr. at 799. He began to tie the jurors' purpose at sentencing phase to their commitment at voir dire to consider death. "If you'll remember, when y'all were sitting out here, I asked everybody in the panel," but was interrupted with defense counsel's objection: "Your Honor, I object. They are not here to give death. They are here to deliberate and go back there and make a decision on life without possibility of parole or death. They are not here for death." *Id*. The court denied the objection saying, "Mr. Evans did not make that comment. So I'll allow him to proceed with his argument. Overrule the objection." *Id*. Evans then proceeded to make the improper argument that the jurors' death qualification voir dire answers committed them to imposing death:

> As I told y'all when y'all were sitting out here, the important question that I asked y'all about that was this. And if any of y'all had answered this differently, you would not be here because this is a case where the death penalty is an appropriate punishment. If the law authorizes imposition of the death penalty and the facts justify it, could you give the death penalty? And the only ones that answered that they couldn't are gone. They are not here today. The law authorizes it because the judge has instructed you that the law authorizes it.

*Id*.

But such comments violate the Eighth Amendment and due process by improperly limiting the jury's sentencing discretion. They are analogous to improperly "staking out" a juror's commitment to certain verdicts at voir dire.

Even construing Evans' remarks generously, he said their choice was death or not death. When there is no possibility the defendant will be released on parole, it violates due process when the jury is not so instructed because this risks leaving the jury with the perception of "a false choice between sentencing him to death and sentencing him to a limited period of incarceration." *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994). Defense counsel was correct that leaving life without possibility of parole out of the comment misrepresents the jury instructions.

### *The State made improper victim-to-defendant comparative worth argument.*

In penalty phase closing argument, Evans made extensive comparisons between the victim and Mr. Pitchford. Tr. at 804-05.

First, he compared the presentation of mitigation at penalty phase to the victim's alleged pleas for mercy as recounted by Hathcock's impeachable testimony: "They want mercy. Mr. Britt wanted mercy. I think the one thing that probably got to me the most out of all the testimony was when James Hathcock testified that this defendant sitting right there told him that Mr. Britt begged him not to kill him. He wanted mercy. Please don't kill me. Take my money. I've got a family. But they didn't care." Tr. at 805.

Evans then characterized mitigation, which constitutionally must be based on the particularized consideration of the defendant's background and

characteristics and the circumstances of the crime, as something that is the same in all capital cases: "[E]very case I have is like this[.] I always hear the same argument. Well, if you let him live he can talk to his family. If you let him live, he can write them letters. If you let him live, blah, blah, blah." *Id.* But Evans then went further than simply disparaging constitutionally-required sentencing process. He then made direct comparisons between the value of the victim and defendant's lives: "If he had let Mr. Britt live, he could have done all those things." *Id.*

He continued the comparison by arguing, "The biggest difference is Mr. Britt didn't do anything wrong." *Id.* This comment improperly suggested that mitigation somehow requires the victim to be blameworthy in order be relevant.

Such comparison is improper victim impact evidence. *Payne v. Tennessee*, 501 U.S. 808, 823 (1991) (victim impact evidence "is not offered to encourage comparative judgments of this kind"). It constitutes reversible error when, as here, it is coupled with the implication that death is the only appropriate penalty. Tr. 805 ("That… is what makes this the ultimate crime that deserves the ultimate punishment.").

### B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified

claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Many of the issues and instances of prosecutorial misconduct in this claim were raised on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief on all the issues presented. *Pitchford v. State*, 45 So. 3d 216, 235 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### 6. THE STATE COERCED MR. PITCHFORD INTO MAKING A FALSE CONFESSION, VIOLATING THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

#### A. Supporting Facts

A guilty plea induced by a coerced statement is not voluntary and violates due process. *Chambers v. Florida*, 309 U.S. 227 (1940). Over the course of prolonged custodial interrogation that persisted throughout the afternoon and evening of November 7, 2004, and into the following morning, punctuated by four recorded statements, investigators coerced Mr. Pitchford to state on the record what would be his fifth recorded statement given at 10:20 AM on November 8. App. 0364; *see* App.

0325, 0331, 0341, 0351. Mr. Pitchford, who was only 18 years of age,[26] was held

shirtless in an air-conditioned room, with his hands cuffed behind his back. Mr.

Pitchford repeatedly requested a lawyer, but custodial interrogation continued. *See*

State's Exh. 5, unsigned *Miranda* waiver.

At trial, Investigator Robert Jennings described the tag-team interrogation

he and Investigator Greg Conley conducted. Tr. 571. "It was obvious that he had a

communication problem with Officer Conley." *Id.* Jennings reported that after

Conley left the room, Jennings prepared to administer a polygraph test, and Mr.

Pitchford began crying. App. 0402. Jennings testified that while Conley was out of

the room and the tape recorder was off, he elicited Mr. Pitchford's confession that he

and Eric Bullins committed the robbery and murder together. *Id.* In his written

report, Jennings gave a different account of this off-record statement:

> He then stated that he and Eric returned to the store [after earlier
> buying breakfast biscuits there] and walked around the counter and
> Eric immediately shot. He stated that he fired several times and was
> saying he's got a gun. At that point the man fell and Eric turned to me
> saying you gonna do it and I then shot about three times. He further
> stated that he fired into the floor.

App. 0402. But nowhere in this report did Jennings note that Mr. Pitchford said he

shot Mr. Britt. At any rate, when Investigator Conley—who Mr. Pitchford knew

from Tie Plant—returned, and the tape recorder was on, Mr. Pitchford said that he

---

[26] The youth of a suspect is relevant in assessing voluntariness. *J.D.B. v. North Carolina*, 564
U.S. 261, 281 (2011). Whether a confession is voluntary "depends on the circumstances
surrounding the confession, such as the defendant's youth, good reputation, lack of familiarity
with the criminal justice system, and relationship with or trust in the interrogating officer(s)"
*Harden v. State*, 59 So. 3d 594, 605 (Miss. 2011).

could not go through with it—that he left the store after talking briefly with Mr. Britt. Tr. 572.

Some version of good-cop/bad-cop was at work in addition to the physically and psychologically coercive conditions in this prolonged interrogation of a developmentally retarded teenager. The result was that Mr. Pitchford was coerced into agreeing to plead guilty, Tr. 7-30, though in the end he could not go through with it, largely because the deal would require him to admit to what he had not done:

> BY THE COURT: Well, let me ask you this part: Did you go in there and did you murder Mr. Britt while in the commission of an armed robbery?
> BY THE DEFENDANT: If I -- if I say no, then I can't accept this plea, right?

Tr. 27.

Circumstances surrounding the alleged unrecorded statements—whether the confession was made at all and if so whether it was illegally induced—undermine the reliability of the conviction in this case.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present this claim. Any procedural default resulting from that presentation can be

overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to the ineffective assistance of trial counsel.

## D. Post-Conviction

Petitioner did not raise this claim in post-conviction due to the ineffective assistance of post-conviction counsel.

### 7. THE STATE'S CUMULATIVE MISCONDUCT DEPRIVED MR. PITCHFORD OF A FAIR TRIAL.

This ground incorporates all facts recited in other claims of prosecutorial misconduct. While the foregoing instances of prosecutorial misconduct taken individually deprived Mr. Pitchford of a fair trial, the State's misconduct permeated proceedings to such an extent that it caused distinct prejudice as a result of the cumulative effect. The effect of the whole is greater than the sum of the effect of each part.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified

claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner presented the claim that the cumulative effect of all claimed errors, including prosecutorial misconduct, deprived him of a fair trial on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief summarily, observing that reversal based on the cumulative effect of errors that do not individually require reversal is discretionary. *Pitchford v. State*, 45 So. 3d 216, 247 (Miss. 2010).

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## II. THE TRIAL COURT VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS BY FAILING TO GRANT A CONTINUANCE OF THE TRIAL TO ALLOW TRIAL COUNSEL TO PREPARE A DEFENSE.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

83

Trial in Mr. Pitchford's case was set for February 6, 2006. On January 19, 2006, the day the plea deal fell through, and on February 2, 2006, Mr. Pitchford's trial counsel Ray Carter filed motions to continue the trial, arguing that the delay in obtaining the Mississippi State Hospital evaluations required additional time to determine what further investigation and expert assistance was required in light of the new information gathered through the evaluations; and that he was carrying ten additional capital cases and in light of that heavy caseload had not had sufficient time to prepare. Mtn. Jan. 19, 2006; Mtn. Feb. 2, 2006. Mr. Pitchford's counsel voiced these grounds at the hearing on pretrial motions, and stated to the trial court that he would be unable to provide effective representation under constitutional standards to have to proceed on the date set for trial.

The burden of investigating and preparing Mr. Pitchford's defense effectively fell to Mr. Carter alone. Mr. Carter, of the Office of Capital Defense Counsel in Jackson, Mississippi, was appointed as counsel on June 15, 2005 to assist in Mr. Pitchford's defense. App. 0663. Prior to Mr. Carter's involvement in the case, Raymond Baum, a Grenada lawyer, had been appointed as Mr. Pitchford's counsel. *Id.* It does not appear that Mr. Baum had completed much if any investigation into Mr. Pitchford's case before Mr. Carter's appointment. Once Mr. Carter was appointed, he took control of the case as a more senior litigator in capital trials.[27] Strategic decisions related to the trial were solely Mr. Carter's responsibility, with

---

[27] As Mr. Carter explained at the continuance motion:

> I don't know what Mr. Baum, Ray Baum as the co-counsel, has done on this case. Once we got appointed on this case, quite frankly, I don't know anything that Mr. Baum has done. This case was -- like all of them, once we get involved, they get dumped on us. And for whatever reason, the other attorney does nothing.

Tr. 49.

the exception of jury selection which was the responsibility of Ms. Alison Steiner, who was also employed at the time with the Office of Capital Defense Counsel. App. 0663. However, as Mr. Carter made aware to the Court he was improperly prepared for Mr. Pitchford's trial. *Id.* When Mr. Carter was appointed on Mr. Pitchford's case in June, he had nine additional pretrial capital cases; he picked up a tenth capital case that September. Mtn. Feb. 2, 2006. One of those cases was scheduled for trial on January 23, 2006, a few days before Mr. Pitchford's trial was scheduled to begin. App. 0663-64.

At the hearing on trial counsel's continuance motion, Mr. Carter told the court that "if we had this trial on February 6, we would have to try it without really being ready." Tr. 33, 35-36. Mr. Carter recited the details of his crushing caseload, which had not permitted him to follow the requirements of the ABA Guidelines and complete the constitutionally required extensive investigation into matters relevant to mitigation of the possible sentence of death. Mr. Carter explained that Mr. Pitchford's family had only recently started talking to them. "Up until a couple weeks ago we have not been able to actually get information from Mr. Pitchford's family. For whatever reason there weren't forthcoming with us until about a couple weeks ago." Tr. 37. The Mississippi State Hospital evaluation, which had only been completed a few days earlier on January 26, "brought about other questions" that counsel needed to investigate with the assistance of their own mental health expert. Tr. 43-44.

Mr. Carter concluded:

85

> So in the end, Your Honor, in summary, we are telling the Court that we have not done all that we could do. We have not done all that we know we should do based on the point we are at now, based on having finally been able to talk to Mr. Pitchford's family. We know we haven't done all that we need to do. And to force us to go to court on this particular date would require me to not be as effective as I know I could be.

Tr. 46.

In response to Carter's statement that he had not had time to fully gather the private and sensitive information from family members that would be relevant to mitigation, the trial court then accused Mr. Pitchford and his family of purposefully withholding mitigating information for the specific purpose of trying to get a continuance. Tr. 51. The trial court reasoned that Mr. Pitchford "has got no one but himself to blame if this information has not been provided to defense counsel earlier." *Id.*

Mr. Pitchford's competency was a contested issue. At the motions hearing, Mr. Carter stated that the mental health expert he had hired, Dr. Rahn Bailey, had advised him that the Mississippi State Hospital ("MSH") evaluation raised additional questions and there were multiple ways to interpret their evaluation. Tr. 41. Dr. Bailey had further advised that Mr. Pitchford could have neurological problems and brain damage that were not explored in the MSH evaluation and that would be relevant to mitigation. Tr. 42, 44. Mr. Carter argued that if MSH had seen Mr. Pitchford earlier, the additional questions raised by their evaluation could have been independently reviewed by Dr. Bailey. Tr. 43. The trial court asked Mr. Carter to go through the MSH findings to convince him otherwise, which is something Mr.

Carter could not have been expected to do without the assistance of a mental health expert. Tr. 44.

The trial court ultimately adjudicated Mr. Pitchford's competence at the continuance motion, stating that he has "historically relied on the Mississippi State Hospital," Tr. 51, and "the thoroughness of the state hospital's evaluation is such that I don't see that there would be anybody else that would be necessary to evaluate Mr. Pitchford." Tr. 53.[28] By refusing to give trial counsel the additional time he needed to do what the Constitution requires in order to mount an effective defense, the trial court violated Mr. Pitchford's federal constitutional rights to due process, a fair trial, a fair and reliable determination of sentence, and to be free from cruel and unusual punishment. U.S. Const. amends. V, VI, VIII & XIV. The punishment of death requires heightened scrutiny and reliability.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for

---

[28] The trial court praised the State hospital doctors throughout the continuance motion. *See, e.g.*, Tr. 41 ("I don't think I have ever seen anything more thorough from the Mississippi State Hospital, who was the Court appointed expert that was neutral and detached and had no interest in the outcome of this case whatsoever."); Tr. 44 ("As I say, they have done a very thorough evaluation and I -- you know, it's like, I mean there is nobody there in that hospital that felt like there is any problems of any kind with Mr. Pitchford.")

the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented this issue to the state court on direct appeal in 2006-DP-00441-SCT. The Mississippi Supreme Court declined to address the related ineffective assistance of counsel claims but preserved them for a properly-filed petition for post-conviction relief. *Pitchford v. State,* 45 So.3d 216, 232 (Miss. 2010). The claims Mr. Pitchford raised concerning abuse of discretion by the trial court were denied. *Id.*

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## III. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE CONCERNING ALLEGED PRIOR BAD ACTS OR OTHER CRIMES BY THE DEFENDANT.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

## A. Supporting Facts

Evidence of a prior crime distinct from that which is alleged in a criminal indictment is inadmissible at trial under the Due Process Clause of the United

States Constitution. Mr. Pitchford was initially indicted for two crimes: (1) capital murder of Ruebin Britt in the course of an armed robbery, and (2) conspiracy to commit a crime arising out of an alleged previously thwarted attempt to Mr. Britt's store.[29] These charges were not consolidated. Mr. Pitchford's was tried solely on the capital murder in the course of an armed robbery charge. However, the State proceeded to introduce evidence about a separate alleged crime, in an attempt to bolster what was otherwise lacking in evidence, of Mr. Pitchford's culpability in Mr. Britt's death.

At trial before opening statements commenced, Mr. Evans made it known to the court that he was planning on talking about the alleged prior robbery attempt of Crossroads a week before Mr. Britt's death. Tr. 337. The trial court responded with the following:

> As I understand from the motions last week, approximately a week before this alleged crime occurred there was a plan where Mr. Pitchford and others were present intending to go in and rob the— Crossroads Grocery. And somehow that plan was thwarted. And a week later the exact same crime was allegedly committed. That seems to me to be under the heading of plans, preparation, motive and the— admissible as evidence. And so the Court finds that to be highly probative. And the probative value would substantially outweigh any prejudice. So that is testimony the Court will allow.

Tr. 338.

In addition to objection in a pretrial motion, trial counsel promptly objected to the court's ruling on the alleged prior bad acts evidence. Tr. 338. The court overruled and allowed the evidence. Tr. 338. This improper evidence was then

---

[29] This was a joint indictment of Mr. Pitchford, Quincy Bullins, and Demarcus Westmoreland.

admitted in the form of testimony, as well as in the State's opening and closing arguments. Tr. 582-89, 629-31, 647-48.

Evidence of a prior bad acts is inadmissible to show that a person has a character for bad acts and that he acted in accordance with that character on this occasion. Thus as propensity evidence, it was inadmissible since the conspiracy indictment was not before the court. This evidence was plainly improper.

But the court admitted the evidence to show "plan, preparation, or intent." Nevertheless, the evidence is inadmissible here because its probative value does not outweigh the unfair prejudice. The self-serving allegations that Mr. Pitchford was involved at all in the conspiracy of Quincy Bullins and Demarquis Westmoreland to rob the store do not credibly show Mr. Pitchford's involvement in any common plan, preparation, or intent. Although the State failed to disclose it, Westmoreland's testimony was given as part of a plea deal. *See* Claim I.2 at 37. Paul Hubbard said he only spoke to Quincy Bullins and a person he did not know matching Westmoreland's description. Hubbard saw a car parked on the road "very far away"—"almost by the train track"— with its hood up and an unidentified person sitting on the trunk, but never testified as to any connection between the two persons he met who told him of their plan to rob the store and that distant car. Tr. 584-86. After Hubbard dissuaded Quincy Bullins and Westmoreland from going through with their plan, Hubbard testified, they left. He testified that no one else was with the two of them; it was "[j]ust those two." Tr. 586.

90

Because the evidence of the conspiracy between Quincy and Demarquis to rob the store fails to credibly show Mr. Pitchford's involvement in the scheme, its probative worth to show Mr. Pitchford was involved with a plan, preparation, or intent to rob the store does not outweigh the substantial unfair prejudice of this evidence.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented this issue on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court held that the trial court did not abuse its discretion in admitting the evidence under Rule 404(b) and Rule 403. *Pitchford v. State,* 45 So.3d 216, 246 (Miss. 2010).

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### IV.   THE TRIAL COURT ERRED IN FAILING TO GRANT A MISTRIAL WHEN JAILHOUSE INFORMANT JAMES HATHCOCK TESTIFIED TO INADMISSIBLE AND PREJUDICIAL MATTERS.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

The trial court inexcusably failed to grant a mistrial after James Hathcock, a key State witness, testified that Mr. Pitchford had sold him dope. Tr. 439. This reference to Mr. Pitchford selling Mr. Hathcock dope was out of the realm of facts at issue in this trial, and was explicitly agreed on by the State and trial counsel to not be excluded. This statement was clearly inadmissible prior bad acts testimony and its admission violated Mr. Pitchford's due process right to a fair trial.

Immediately after Mr. Hathcock made the inadmissible statement, trial counsel moved for a mistrial out of the presence of the jury. Tr. 439. Trial counsel urged the court to grant the motion stating that this testimony "would prejudice the case of Mr. Pitchford to the point that we think a conviction would be assured even despite our best efforts." *Id.* Moreover, the State and trial counsel had agreed pretrial that the State would instruct Mr. Hathcock not to mention dope in his

testimony. Tr. 441. The trial court agreed that the testimony was improper but denied the motion. Tr. 440. Instead, the trial court told the jury to disregard the statement and asked each juror to acknowledge that they would disregard it by nodding their heads. Tr. 441. However, a simple instruction to nod did not remedy this harm. By failing to grant a mistrial, and highlighting the statement to the jury, the trial court amplified the statements prejudicial effect.

The air was already thick with sensationalism after the emotional outbursts moments before the dope comment during Mr. Hathcock's testimony. The testimony of this witness should not have been admissible in the first instance. This inadmissible statement severely harmed Mr. Pitchford's guarantee to a fair trial. The trial court's failure to grant a mistrial is reversible error.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented this issue on direct appeal. On direct appeal, the Mississippi Supreme Court concluded that Mr. Hathcock's statement was improper but determined that the trial court did not abuse its discretion in failing to grant a mistrial. *Pitchford v. State,* 45 So.3d 216, 240 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## V. THE TRIAL COURT ERRED IN PERMITTING THE JURY TO HEAR TESTIMONY FROM DR. STEVEN HAYNE.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

## A. Supporting Facts

Dr. Hayne's testimony requires reversal of Mr. Pitchford's conviction because (1) the State failed to show that Dr. Hayne was qualified as an expert by the requisite "knowledge, skill, experience, training, or education" required; and (2) his testimony in this case was outside of the scope of his expertise.

Dr. Hayne was qualified based on misrepresentation of his material experience and credentials as a forensic pathologist. Dr. Hayne claimed to be "The

pathologist for the Department of Public Safety Medical Examiner's office." Tr. 396.
But Mississippi has no such position. Dr. Hayne is not "the State Medical
Examiner"—the only similar state-level position— and he lacks a required
credential to hold that position.

Dr. Hayne also gave opinions outside his area of expertise, when he opined
about the caliber of the weapons with which each injury to Mr. Britt was inflicted,
and the number of times each weapon was discharged. He testified that Mr. Britt
was hit with a pellet shot as many as four times. Tr. 415. This was a key allegation
in the State's case because they argued the four shots corresponded to the four
spent casings in the .38 taken from Mr. Pitchford's car.

The State also invoked Dr. Hayne's testimony at closing, stating, "they didn't
go in there and shoot him. They were in there and just continued to shoot him, up to
nine times." Tr. 804. Therefore, the prejudice resulting from the admission of Dr.
Hayne's testimony was severely amplified by the State's reliance on it.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To
the extent undersigned counsel has modified this claim in a way that renders it
unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be
granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the
state court because prior counsel was ineffective for failing to present the modified
claim. Any procedural default resulting from that presentation can be overcome
under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for

95

the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner presented this issue on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court found no merit to Petitioner's challenges to Dr. Hayne's qualifications or testimony. *Pitchford v. State,* 45 So.3d 216, 247 (Miss. 2010).

### D. Post-Conviction

This issue was not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.


### VI.  THE TRIAL COURT ERRED IN PERMITTING THE JURY TO CONSIDER INHERENTLY UNRELIABLE TESTIMONY OF JAILHOUSE INFORMANTS OR IN FAILING TO GIVE THE REQUESTED REQUIRED CAUTIONARY INSTRUCTION CONCERNING IT.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

Trial counsel filed a motion to preclude the snitch testimony of Dantron Mitchell and James Hathcock. Tr. 83. The trial court denied the motion with the stated rationale that "jailhouse snitches or anybody else that a defendant tells that

he committed a crime are certainly witnesses that are allowed to come in and testify." *Id.* However, the trial court failed to make any particular findings surrounding the probative value against the prejudice. Ultimately, both Mr. Mitchell and Mr. Hathcock provided highly suspect testimony at trial.

The trial court amplified the harm of this testimony by not permitting the requested instruction D-9 concerning the reliability of government informant testimony. As discussed [infra culpability instruction claim], trial counsel attempted to put a band-aid on the injury by requesting the following: "I instruct you that the law looks with suspicion and distrust on the testimony of a witness who has acted as an informant for the government. The law requires the jury to weigh the testimony of an informant with great care and with caution and with suspicion." Instruction D-9. Trial counsel also requested D-10:

> The Court instructs the jury that the testimony of an informant who provides evidence against a defendant for pay (or other benefit), must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. You the jury must determine whether the informant's testimony has been affected by interest or prejudice against the defendant.

Instruction D-10.

Both requested Instructions were denied by the trial court. Tr. 608. The court erred in denying these instructions. Both informants denied that any promises were made by the district attorney's office in exchange for their testimony. However, both Mitchell and Hathcock testified they hoped to receive favorable treatment in their own criminal charges. Mitchell was released shortly after giving his statement to authorities. Tr. 446. Mitchell came to police eight months after Mr. Pitchford

97

purportedly confessed, but came forward only after the police came to him and he consulted his attorney who was representing him on his marijuana possession charges. Hathcock too admitted that he was released from jail after giving his statement to police and the charges against him were soon after dropped in their entirety.

The testimony of these witnesses implicating Mr. Pitchford's alleged role in the crime was unprobative and highly prejudicial. Their admission violated Mr. Pitchford's due process right to a fair trial. *Payne v. Tennessee,* 501 U.S. 808, 825 (1991). The trial court committed reversible error both in allowing the testimony to be admitted, and in failing to grant the requested cautionary instructions.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

98

## C. Direct Appeal

Petitioner presented this issue on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court did not address the merits of Mr. Pitchford's first argument that the trial court erred in allowing this testimony in the first instance. Instead, the state supreme court flatly rejected the claim as being procedurally barred. *Pitchford v. State,* 45 So.3d 216, 239 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## VII. THE TRIAL COURT ERRED BY ALLOWING THE JURY TO SEE IMPROPER DISPLAYS OF EMOTION FROM NON-TESTIFYING AUDIENCE MEMBERS IN THE COURSE OF BOTH PHASES OF THE PROCEEDINGS.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

## A. Supporting Facts

Mr. Pitchford's trial was unduly prejudiced by inflammatory displays of emotion by individuals sitting in the audience. Trial counsel acted preemptively in filing a pretrial motion seeking to control potential exposure to the jury of prejudicial displays of emotion in the courtroom. Mtn, June 6, 2005. The trial court denied the motion relating to the proposed restriction on where the victim's family

members could sit. However, the court agreed that such displays are inappropriate and would not be allowed during trial. Nonetheless, the court allowed such displays to occur uninterrupted and over the objection of counsel.

During the testimony of informant James Hathcock, counsel renewed the motion after outbursts of loud crying. Tr. 432-33. The trial court was dismissive:

> There have been no outbursts of any kind. I have heard some sniffling going on. And the type testimony that I just head, I'm not surprised. The family has a right to be here, and I am not going to order somebody to leave the courtroom . . . I think, some natural emotional reactions when people are hearing about the brutal murder of their loved one.

Tr. 433-34.

Sensitive testimony can inflame reactions that improperly influence the jury. Trial counsel acted appropriately in renewing the motion. The court had the discretion to excuse the audience members who were disruptive until they could regain their composure. The failure of the trial court to do so was a violation of Mr. Pitchford's Sixth Amendment right requiring reversal of the conviction.

During Mr. Pitchford's sister's testimony at the penalty phase, audience outbursts again disrupted proceedings in front of the jury. A member of the audience was talking during Ms. Dorsey's testimony and more than once loudly replied "no" after counsel objected. Tr. 711. It is plainly improper to here such a refutation of testimony from anyone in the audience. The only remedy implemented by the was to admonish the members of the audience not to do it again. Tr. 712. However, the damage had already been done. The improper outbursts in full view of the jury had repeatedly infected Mr. Pitchford's trial. Mr. Pitchford's right to a fair

trial and impartial jury should have been safeguarded. Instead, the jury was free to hear these inflammatory displays.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented this issue on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court rejected this claim. *Pitchford v. State,* 45 So.3d 216, 238 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## VIII. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUESTED CULPABILITY PHASE JURY INSTRUCTIONS D-9, 10, 18, 30, AND 34 AND IN GRANTING THE STATE'S CULPABILITY PHASE INSTRUCTIONS S-1, 2A, AND 3.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

At the culpability phase, the trial court gave fatally defective cautionary instructions about testimony given in expectation of receiving a benefit. It also erroneously granted a peremptory instruction on the robbery element of capital murder by failing to give the jury a requested lesser offense instruction on non-capital murder, and erroneously failed to give an instruction about inferences required by *Sandstrom v. Montana,* 442 U.S. 510 (1979). Each of the foregoing errors, individually and cumulatively, requires reversal of the conviction here.

At trial, counsel requested the following instruction as D-9: "I instruct you that the law looks with suspicion and distrust on the testimony of a witness who has acted as an informant for the government. The law requires the jury to weigh the testimony of an informant with great care and with caution and with suspicion." Instruction D-9. The State objected to D-9 and requested an alternative instruction that it did not have in hand. Tr. 608-09. Trial counsel objected to the court granting the State time to prepare one, and the court gave counsel "five minutes to go read *Bell versus State* because that is all you'll need to read." Tr. 609-10. Counsel

requested leave t proffer a substitute motion, and the court berated Mr. Carter for filing "frivolous instructions" repeating, "Now I will give you an opportunity to go downstairs or to the law library and read *Bell versus State.* And if you have got something to add or something to recommend to the Court after reading *Bell versus State* then I will certainly take it up." Tr. 611-12. After the recess, Mr. Carter stated he had nothing further on the issue. Tr. 612. The trial court ultimately adopted as the State's instructions as Instruction 6. Tr. 614.

The court erred by ignoring the favorable treatment Hathcock expected to receive for giving his statement. Failure to give the instruction Mr. Carter offered requires reversal because there was evidence the informant received a benefit in exchange for the testimony.

Furthermore the court's refusal to give D-10 was contrary to prevailing Mississippi law and the Due Process Clause of the United States Constitution. The requested instruction read:

> The Court instructs the jury that the testimony of an informant who provides evidence against a defendant for pay (or other benefit), must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. You the jury must determine whether the informant's testimony has been affected by interest or prejudice against the defendant.

The trial court refused it after reading *Bell v. State,* 725 So. 2d 836 (Miss. 1998). At the instructions conference, the State agreed:

> I think to start singling out each different type of witness to start with is—even though in some cases the Supreme Court says it's okay, I think it shouldn't be because it's trying to tell the jury how to judge. But I think if the Court wants to be cautious and give instruction I instruct you that the law looks with suspicion and distrust on an alleged accomplice or informant. And I think that would cover it all if the Court felt like it needed to give something on both of these. I think

103

to just give repetitive instructions is just over-emphasizing an issue
that shouldn't be.

Tr. at 607. The court was persuaded to reject D-10 because the same instruction

was refused in *Bell:* "[T]he [Mississippi] Supreme Court obviously affirmed the case

and said this instruction was not necessary." Tr. 608. But the court improperly

relied on *Bell* which did not involve a witness who testified expecting to receive

favorable treatment. *See Bell*, 725 So. 2d at 848. Well established Mississippi law

holds "that testimony of a state's witness who has received a reduced sentence to

testify should be regarded with caution and suspicion." *McNeal v. State,* 551 So.2d

151, 158-59 (Miss. 1989); *accord Dedeaux v. State,* 87 So. 664, 665 (Miss. 1921).

Even assuming Mississippi law permits refusal of the instruction, refusal in this

case resulted in a fundamentally unfair trial due to the unreliability of the snitch

testimony. The lumping of informant and accomplice testimony[30] in the submitted

State's instruction was unduly prejudicial to Mr. Pitchford. This is particularly

prejudicial because the requested instruction asked the jury to consider the effect of

the informant testimony. As discussed in Claim XIII at 127, the State relied heavily

on the snitch testimony.

　　　　Instruction D-30 was summarily rejected by the trial court. D-30 was a lesser

included instruction that would require the jury to consider simple murder if it

decided not to convict on capital murder.

---

[30] The court granted an edited version of trial counsel's proffered accomplice instruction, D-18:
"I instruct you that the law looks with suspicion and distrust on the testimony of an alleged
accomplice. The law requires the jury to weigh the testimony of an alleged accomplice with great
care and with caution and with suspicion." The redactions were in response to the State's
argument that there were no accomplices testifying in this case. Tr. 598-99.

The court refused the instruction because "I don't see anything that would support a lesser included instruction of just simple murder. There is not one bit of evidence, in fact, that would support this instruction. So I am going to refuse D-30." Tr. 604. The trial court's rejection of this requested instruction and failure to instruct the jury on the lesser offense of non-capital murder, was not only against the weight of facts, but was clear prejudicial error and a violation of the Due Process Clause of the Constitution.

Under the Mississippi statute, felony murder predicated on robbery is only capital murder, not simple murder. But there is evidence here of another felony that jury could find as the predicate for felony murder: conspiracy. The State argued that the robbery resulting in Mr. Britt's death was part of a conspiracy that begun some ten days earlier. The jury is free to determine that Mr. Pitchford partook of the conspiracy, but not the robbery. Thus, there was evidence to support giving the jury the simple murder instruction. In determining whether or not to grant such an instruction, the trial court may not weigh the evidence or make credibility determinations. And if any evidence exists supporting the lesser instruction, it must be given. Here, however, the trial court fatally failed to do so, requiring reversal.

Lastly, the trial court refused as repetitive Instruction D-34 which read:

Each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

This instruction was impermissibly rejected by the trial court. At the State's insistence, the trial court stated, "[b]ut the S-instructions already telling them what they must prove. And unless the State has proved all those elements then, beyond a reasonable doubt, they can't convict on—based on other instructions already given." Tr. 605-06.

But none of the submitted instructions includes language limiting inferences this way. When prosecution relies on inferences, the Fourteenth Amendment requires the jury to be properly instructed as to permissible inferences. *See Sandstrom v. Montana*, 442 U.S. 510 (1979). If this jury is misinstructed on this matter, an inference based on evidence not proven beyond a reasonable doubt can unconstitutionally place the burden of proof on the defendant.

Because these denials violated the Eighth and Fourteenth Amendments to the United States Constitution, this error requires reversal of Mr. Pitchford's conviction.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for

106

the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner presented the issue regarding requested culpability phase to the Mississippi Supreme Court on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court rejected Mr. Pitchford's arguments as to these claims. *Pitchford v. State*, 45 So.3d 216 (Miss. 2010).

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### IX. THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY FAILING TO DELAY THE SENTENCING PROCEEDING TO PERMIT TRIAL COUNSEL'S MENTAL HEALTH EXPERT TO TESTIFY.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

The trial court was fully aware that Mr. Pitchford desired to present Dr. Rahn Bailey as a mitigation witness during the penalty phase of his trial. Dr. Bailey was hired by trial counsel to perform a mental health examination of Mr. Pitchford

for competency, insanity at the time of the offense, mitigation, and mental retardation When Mr. Carter learned at the close of guilt phase that his expert mitigation witness was unexpectedly unavailable to testify the next day at penalty phase, he had ex parte discussion with Judge Loper in chambers, during which Judge Loper confirmed the unavailability of the witness. In post-trial litigation of Mr. Pitchford's motion to supplement the record, Judge Loper and his law clerk, Adam Hopper, misrepresented that Mr. Carter told him the witness was available and counsel simply chose not to call him.

Defense expert witness, Dr. Rahn Kennedy Bailey expected to testify in Mr. Pitchford's case on February 9, but could not because he was not released from a Texas subpoena (where he testified on February 8th). 2007.11.08 Bailey, ¶¶2-4. At the close of Mr. Pitchford's guilt phase on February 8, 2006, counsel learned of Dr. Bailey's status in Texas, and therefore was unavailable to testify at penalty phase the next day. Mr. Carter immediately approached Judge Loper for an ex parte conversation. Judge Loper spoke to the Texas judge by phone and attempted to persuade him to release Dr. Bailey, informing him that Dr. Bailey was needed in a death penalty case with a sequestered jury. Penalty phase proceeded on February 9, 2006 without Dr. Bailey's availability. Mr. Carter made a record of the situation: "Your Honor, as the Court knows I had Dr. [Rahn Kennedy] Bailey who I had intend to call. As the Court knows we found out he couldn't be here from another obligation in Victoria, Texas, I think." Tr. 722. Judge Loper made no indication that the record was incorrect. *See id.*

108

Mr. Pitchford's appellate counsel filed a motion to supplement the record in the state supreme court. Mtn. Mar. 2, 2007. The supreme court remanded the matter back to Judge Loper's court. *See* Order, May 14, 2007. Judge Loper denied the motion, writing, "On February 9, 2006, prior to commencement of the sentencing phase of the trial, Carter appeared in the judges' [sic] chambers and advised this court that Dr. [Bailey] was available as a witness for that day, but that he had decided not to call him." *Id.* at 2.

Mr. Pitchford's counsel filed a M.R.A.P. Rule 10(c) Statement which would eventually lead to an evidentiary hearing before Special Circuit Judge Marcus D. Gordon. *See* M.R.A.P. 10(c) Statement, May 22, 3007; Proposed Correction to Record, Nov. 3, 2007. On November 1, 2007, the State filed a notice of expected testimony of Judge Loper and his law clerk, Mr. Hopper. The two were expected to testify that on February 8,

> Carter advised Judge Loper that the expert Carter was expecting to call in mitigation was under subpoena in Texas and would not be available the following day for sentencing and that he therefore needed a continuance. Judge Loper proceeded to speak with the presiding Judge in Texas, via telephone, and was unable to convince the Texas Judge to release Dr. [Bailey] from the Texas subpoena. Both Judge Loper and Hopper are expected to testify that Carter mentioned needing a continuance ….

Expected Testimony, 1-2. It went on to say that Judge Loper and Mr. Hopper would testify that on the morning of February 9, "Carter approached Judge Loper in the Judge's Chambers and advised Judge Loper that Dr. [Bailey] was available, [that] Dr. [Bailey] could have been called to testify on this day, but that Carter had decided not to call Dr. [Bailey] as it would not help with mitigation." *Id.* at 2. Mr.

Pitchford's counsel filed a document reciting their version of events, noting that Mr. Carter presented the problem of Dr. Bailey's unavailability to Judge Loper for remedy, and stating that on the morning of February 9, "Judge Loper called a brief off the record chambers meeting with counsel at which he reaffirmed that he would be proceeding with the penalty phase hearing as stated the night before and briefly discussed housekeeping matters concerning the proceedings to be held that day not related to Dr. Bailey's unavailability." Proposed Correction, Nov. 3, 2007.

At the hearing, Mr. Carter repeated that he did not inform Judge Loper that Mr. Bailey was available to testify:

> Q. At any time after that, either on chambers or on record, did you ever represent to either the defense, Judge Loper or Mr. Hopper that Dr. Bailey was, in fact, available to testify?
> A. Absolutely not. I had talked to Dr. Bailey, I'm sure, a couple of times that night. And on each occasion he told me that he couldn't -- he couldn't be here. He had to be in court the next morning. He had no idea what time the hearing would conclude, and therefore not even any idea of how to make preparations to get here. So he certainly didn't -- he absolutely did not tell me that he could be here, and I certainly didn't represent to anybody else that he could be here.
> Q. Had he been available would you have called him as a witness in mitigation of Mr. Pitchford?
> A. Absolutely.
> Q. Did you ever represent that to the Court, to the court clerk, to the defense or anybody else connected with the trial that you did not desire to call him as a mitigation witness for Mr. Pitchford?
> A. No.

2007-11-12 Tr., 19. Sheila O'Flaherty testified in detail that Dr. Bailey did not become available. *Id.*, 8-9. Judge Loper's testimony largely agreed with the events described on February 9, acknowledging that Mr. Carter "discussed the possibility of a continuance." Tr. 36. He confirmed that he spoke with the Texas judge and that he informed him of the need for Dr. Bailey because this was a death penalty case

110

with a sequestered jury. *Id.*, 36, 40. But Judge Loper again testified that on February 9, when he called Mr. Carter to his chambers, "he was asked about this witness, whether he had him available or not. And he said well, I could have got him here, but I have chosen not to call him." *Id.*, 37.

Judge Gordon denied the motion to supplement the record, but instead *sua sponte* ordered the record supplemented to reflect that Mr. Carter never requested a continuance on February 8 or 9, and that Mr. Carter "advised Judge Loper in chambers that his expert witness was available but he would not be called to testify." Order, Nov. 12, 2007.

Dr. Bailey confirmed, "At no time after being informed that I was required to be in attendance in Texas on February 9, 2006 did I represent to anyone connected with the Pitchford matter that I was available to testify in Mississippi on February 9, 2006." App. 0636. He also confirmed, "At no time was I told by the Pitchford defense team that it did not desire to present my testimony." *Id.*

Dr. Bailey was an essential mitigation witness. The absence of his testimony was unduly prejudicial to Mr. Pitchford. Dr. Bailey was the only witness who could have testified that Mr. Pitchford suffered from cognitive impairment, as evidenced by his having to repeat second and fourth grades and likely being socially promoted after fifth grade; he exhibited mental health symptoms consistent with schizophrenia, such as thought blocking; anxiety; and depression; he struggled to maintain appropriate social relationships and was childlike and immature; he had attempted suicide at age 16; he exhibited depression symptoms after the death of

his biological father; and he witnessed his mother being constantly abused by her husband. App. 0628-33. In addition, Dr. Bailey likely would have testified that Mr. Pitchford was a follower and not a leader as portrayed by the State, and that Mr. Pitchford had been threatened numerous times by Eric and Quincy Bullins.

Dr. Bailey performed an independent examination of Mr. Pitchford a few days before the trial. His examination focused on non-statutory mitigating factors that were noted but not further examined by MSH. MSH identified several areas of non-statutory mitigation present in Mr. Pitchford including a history of head injuries, his relationship with his deceased father, and substance abuse and violence from Mr. Pitchford's stepfather. App. 0594-95. However, the State did not provide further evaluation on these mitigating factors. MSH failed to make specific findings on how these extant factors had affected Mr. Pitchford since this was outside the scope of the Order upon which they acted and relied.

Dr. Bailey's reported concluded that Mr. Pitchford suffered from cognitive and emotional impairments, and a history of depression and suicide. *Id.*, 8. It noted that he lived in an abusive home with a history of family substance abuse. *Id.*, 6. 7. His report further suggested that Mr. Pitchford was suffering from Post-traumatic Stress Disorder. *Id.*, 9.

Mr. Pitchford's mental health was relevant to the punishment he might suffer. He was therefore constitutionally entitled to a competent and available mental health expert who would conduct an appropriate examination and who would assist the defense in evaluation, preparation, and presentation of a defense.

Mr. Pitchford was denied the assistance of a mental health expert to which he was entitled, who could have helped the jury understand the long-term effects of the trauma and neglect that Mr. Pitchford experienced growing up; who could have contextualized the behavioral problems Terry had at home and in school; and who could have described Mr. Pitchford's psychiatric disorders and cognitive impairments and how they manifested in his daily life and were exacerbated by the physical and psychological abuse he faced at home. See Claim XIV.1 at 166, incorporated herein by reference.

While trial counsel should have explicitly requested a delay of sentencing, counsel presented the unavailability of Dr. Bailey to the court seeking a remedy. Judge Loper later testified that he understood Mr. Carter was seeking a continuance. Mr. Carter understood that after efforts to make Dr. Bailey available failed, a formal motion for continuance was futile because the court communicated its intent to proceed. The court's failure to provide a remedy is reversible error. By refusing to delay the penalty phase proceeding to allow trial counsel to obtain the assistance of their mental health expert to prepare and present a defense to the death penalty, the trial court violated Mr. Pitchford's federal constitutional rights to due process, a fair trial, a fair and reliable determination of sentence, and to be free from cruel and unusual punishment. U.S. Const. amends. V, VI, VIII & XIV.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it

113

unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Walker v. Martin,* 562 U.S. 307, 315 (2011), *citing Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner presented this issue regarding the trial court's failure to allow for a delay for sentencing in order to accommodate an essential mitigation witness.to the Mississippi Supreme Court on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court rejected Mr. Pitchford's arguments as to this claim. *Pitchford v. State*, 45 So.3d 216 (Miss. 2010).

### D. Post-Conviction

This narrow issue related to the trial court's failure was not raised during post-conviction proceedings.

### X. THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE TO PRESENT IMPROPER MATTERS TO THE JURY DURING THE PENALTY PHASE PROCEEDINGS.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery,

114

depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

As recited in Claim I.5 at [pros misc penalty phase] incorporated herein by reference, at penalty phase, the State conducted improper questioning of witnesses and made several misrepresentations and improper comments at closing argument. In each of these instances, the court erred in permitting the misconduct. Furthermore, the court erroneously permitted the State to present improper victim-impact evidence and to make opening arguments after the presentation of evidence.

While there is no longer a blanket prohibition of victim-impact testimony, constitutional limitations do exist. The State cannot be given free rein during the penalty phase to bring in any and all victim-impact testimony. Instead, victim-impact testimony is subject to the serious limitation that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee,* 501 U.S. 808, 825 (1991). In Mr. Pitchford's trial, the court impermissibly allowed hearsay testimony in contravention of the Due Process Clause and Confrontation Clause of the United States Constitution.

At the penalty phase, Nettie Britt provided testimony in the form of a letter from her niece, who did not testify at Mr. Pitchford's trial. Tr. 659. The trial court allowed this hearsay testimony over objection; trial counsel had not even been

shown the letter prior to its wrongful introduction at penalty. *Id.* This testimony was capable of inciting extreme emotion and passion within the jury. The State was correct to assert that "[v]ictim impact has to be relevant to the impact the death has had on the family and the community." *Id.* However, it is not true that the State is at liberty to present letters from family and community members that the defendant is not able to confront and cross-examine. Confrontation of witnesses is the hallmark of a fair trial. This fundamental right was not allowed to Mr. Pitchford at his own trial. The reading of the hearsay letter was fundamentally unfair, and requires reversal of Mr. Pitchford's sentence.

Additionally, the State impermissibly gave a closing argument to the jury at the conclusion of its case in chief at the penalty phase. Tr. 667-70. The State affirmatively chose not to give an opening statement at the beginning of the penalty phase. This decision was a waiver of the State's right to give an opening statement. However, the State changed its mind later, after it had put its witnesses on the stand during the penalty phase. Tr. 668. The defense promptly objected. Tr. 669. The trial court noted that it had "never seen opening statements at this phase of the trial . . . . So I considered it waived. But in fairness to the prosecution, if the defense wishes to make one, then I think the prosecution has a right to make one." Tr. 669. The trial court erred in allowing the State to make an opening statement after it had rested its case.[31] This statement was retrospective, inflammatory, and

---

[31] During its closing-opening statement, the State argued "if I had known we was going to have opening statements, I would have done it before I put on any witnesses." Tr. 670. However, the State's right to an opening statement during the penalty-phase of a trial should have come as no surprise. Neither should its subsequent waiver of that right.

prejudicial. The trial court committed reversible error when it allowed the hearsay letter to be read to the jury, and when it allowed the State to make an opening statement after it had rested its case.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented the issue on direct appeal in 2006-DP-00441-SCT. On direct appeal, the Mississippi Supreme Court rejected each of Mr. Pitchford's three arguments related to this issue. *Pitchford v. State*, 45 So.3d 216 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

XI.    THE TRIAL COURT ERRED IN REFUSING A NUMBER OF PROFFERED SENTENCING PHASE INSTRUCTIONS, AND IN REMOVING A RELEVANT NON-STATUTORY MITIGATING FACTOR FROM A SUBMITTED INSTRUCTION.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

## A. Supporting Facts

The trial court impermissibly refused to instruct the jury that if they were to impose a life sentence on Mr. Pitchford, he would not be eligible for parole, nor could his sentence be reduced. Tr. 754 (refusing proffered instruction DS-15). The court reasoned that another instruction "already tells them that it's either life without parole or death penalty. So they are aware of that." Tr. 754. However, *Simmons v. Carolina,* 512 U.S. 154 (1994), announced that in capital sentencing, when future dangerousness is at issue, due process requires the court to instruct the jury that release on parole is not possible. Failure to instruct gives the jury the false impression that unless it imposes death, a dangerous person may be released. It is further prejudicial in that it deprived Mr. Pitchford of the opportunity to argue against dangerousness.

The trial court erroneously refused instruction DS-7 which said the jury is free to impose life even if it does not find any evidence in mitigation. "You as a juror, always have the option to sentence Mr. Pitchford to life imprisonment, whatever findings you make." The State urged the Court to refuse the instruction,

118

stating, "for the record *Manning versus State* all the way up through *Walter versus State*, which is the March 2005 case specifically stated the defendant is not entitled to an instruction reading you do not have to find any mitigating circumstances in order to return a life sentence." Tr. 750. The court then refused the instruction over trial counsel's objection stating, "I think that they have already been instructed on what they must do in the other instructions. That is not a proper instruction." Tr. 750. However, this refusal was erroneous because failure to so instruct improperly places a burden on the defendant at penalty phase. The jury should have been instructed that it need not impose a death sentence on Mr. Pitchford even if it fails to find any mitigating circumstances present.

Counsel also requested Instruction DS-8: "The Court instructs you, the jury, that if you cannot, within a reasonable amount of time, agree as to punishment, the Court will dismiss you and impose a sentence of imprisonment for life without the benefit of parole. Miss. Code § 99-19-103." Instruction DS-8. At trial when Requested Instruction DS-8 came up for discussion, the State immediately objected, indicating he didn't want to give the jury a "certain deadline." Tr. 751. Trial counsel proposed to edit the instruction to wording directly from the statute. *Id.* The State again objected, and the court agreed, finding simultaneously that the instruction was inappropriate and that the jury had been well-instructed. *Id.* Without the instruction, the jury could reasonably believe that, as in non-capital cases in Mississippi, a hung jury result means the State is free to retry the case. But in

119

Mississippi, as in the vast majority of capital jurisdictions, a hung jury in a capital case means the court must impose life.

The court unreasonably refused to give instruction DS-13. The court incorrectly believed the instruction to be cumulative. Tr. 754. This instruction states:

> I have previously read to you the aggravating circumstance which the law permits you to consider. These are the only aggravating circumstances you may consider. However before you may consider of any these factors you must find that factor is established by the evidence beyond a reasonable doubt. Balfour v. State, 598 So.2d 731 (1992).

This instruction is sufficiently distinct from the submitted instruction which advised the jury of the two statutory aggravating factors it could consider, that instruction was insufficient under the United States Constitution to protect the defendant from having the jury improperly consider other things aggravating. The submitted instruction was inadequate because it failed to inform jurors that they may not consider any other aggravators at this step. This compounded the prejudice to Mr. Pitchford of the State's improper argument inviting the jury to find the brutality of the crime as a basis for imposing the death penalty even though the State had not sought, and the facts did not justify their finding the crime was aggravated because it was heinous, atrocious, and cruel. Tr. 804.

Finally, the trial court erroneously rejected from its listing of non-statutory mitigating factors an instructioning that the jury consider that "Mr. Pitchford had mental health problems as a child that were never treated[.]" The court refused the mitigator because "The fact is we don't have any doctor that has testified to that."

Tr. 732. But Mississippi permits the proof of mental health infirmities through the use of lay testimony concerning them. *Groseclose v. State,* 440 So.2d 297, 301 (Miss. 1983).

Mr. Pitchford's mother, brother, and sister all testified to significant emotional and behavioral changes in Mr. Pitchford as early as age ten,[32] immediately following the tragic death of his father from cancer. Mr. Pitchford's mother also testified to the lack of counseling or mental health treatment for these things. Tr. 696-97, 708-09, 717-18. Instead, as a child Mr. Pitchford was told to rebuke Satan and pray. App. 0312. This testimony alone is clearly sufficient to warrant the instruction. Yet the trial court improperly weighed his mother's testimony, rejecting it, stating this testimony was "not an indication that he had mental health problems. It may have been an indication that she spared the rod and spoiled the child." Tr. 731-32. The trial court should have allowed the jury to independently determine if the evidence supported a finding of the mitigating circumstance.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the

---

[32] While Mr. Pitchford's family members testified that he experienced significant emotional and behavioral changes at ten years-old, Mr. Pitchford himself reports hearing voices as early as seven years-old. App. 0590.

state court because prior counsel was ineffective for failing to present the modified

claim. Any procedural default resulting from that presentation can be overcome

under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for

the delay in asserting his claim in state court under prior counsel's representation

and actual prejudice resulting from the State's alleged violation of his constitutional

rights. *See Walker v. Martin,* 562 U.S. 307, 315 (2011), *citing Wainwright v. Sykes,*

433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner presented the claims concerning the errors in his sentencing-phase

instruction on direct appeal in 2006-DP-00441-SCT. The state supreme court

rejected these claims. *Pitchford v. State,* 45 So.3d 216, 251 (Miss. 2010).

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to

ineffective assistance of post-conviction counsel.

## XII.  THE TRIAL COURT UNREASONABLY LIMITED PETITIONER'S ABILITY TO PRESENT MITIGATION THROUGH PENALTY-PHASE WITNESSES.

### A. Supporting Facts

The trial court severely and unreasonably limited trial counsel's ability to

question mitigation witnesses in the penalty phase of Mr. Pitchford's trial. A capital

defendant is permitted wide latitude in presenting mitigation evidence in his

criminal trial. The Eighth and Fourteenth Amendments to the United States

Constitution require this of a death sentence. *Lockett,* 438 U.S. at 589 ("[W]e

122

conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."). Because the trial court hampered trial counsel's constitutional right to present mitigation evidence, Mr. Pitchford's conviction must be vacated.

Dominique Hogan, Mr. Pitchford's then-girlfriend and mother of his child, was the first family witness to testify. Trial counsel began to ask Ms. Hogan about the relationship Terry had with his son. Tr. 687. Trial counsel then starting asking Ms. Hogan, "Do you think it would have an effect on your child--" and was cut off by the State's objection based on relevance, which was sustained by the court. *Id.* The relationship Mr. Pitchford had with his son is admissible mitigation evidence that relates to Mr. Pitchford's character. Dominque Hogan's explanation fo Terry's relationship with his son would have been powerful mitigating evidence for the jury to hear. Dominique

> Remember[s] when I found out I was pregnant. Terry was very excited with our news. He couldn't wait to be a father. He was loving and nurturing. …
> I get sad and frustrated sometimes that I've had to raise Buddy without Terry because he was so excited about being a father. Buddy is a very good boy. He looks just like Terry, and when I look at him I am reminded of Terry. Terry has continued to provide for Buddy in whatever way he can. The two of them talk on the phone regularly and Buddy visits Terry during holidays.

2018-08-26 Dominique Hogan Declaration, ¶¶ 3-4.

The mitigation evidence barred during Terry's twin brother's testimony, Perry Pitchford, was even more damaging. During penalty, trial counsel began asking Perry Pitchford about his relationship with their father:

> Mr. Carter: How old were you when our dad died?
> Perry Pitchford: Ten years old.
> Mr. Carter: What effect—how did it make you feel?
> Perry Pitchford: I was just—I lacking somebody in my life.
> Mr. Hill: Objection, Your Honor.
> Mr. Evans: Your Honor, that has nothing to do with what we are here for today. I have tried not to object but this trial is not on what sentence their father should get. It is on what sentence this defendant should get. I would ask that any mitigation relate to this defendant and not something –
> Mr. Carter: It is going to relate, Your Honor. It is going directly toward the defendant.
> Mr. Evans: He also asked how this witness felt, which has absolutely nothing to do with the defendant.
>
> The Court: I'll sustain.

Tr. 696-97. Trial counsel then rephrased and asked a question directly relating to Mr. Pitchford's character: "As between you and Terry, who was your mother's favorite?" Tr. 698. The State again objected and merely asserted the question improper. *Id.* Instead of asking the State to elaborate on why the question was improper, the trial court instructed trial counsel to withdraw the question in order to proceed. *Id.*

The objections to questions eliciting mitigating facts about Mr. Pitchford did not end here.

> Mr. Carter: Was Terry as close to his mom as he was his daddy?
> Perry Pitchford: Kind of equal with both. Did Terry, as far as you know and was able to see, feel that there were some differences shown between—
> Mr. Evans: Object to this witness testifying to what the defendant felt, Your Honor. That is completely—

124

The Court: I sustain. He couldn't—he can't testify about what
somebody else was feeling.

Tr. 698.

The State objected two more times when trial counsel attempted to rephrase

his question. Tr. 699. The State would barely let trial counsel speak. The trial court

was unwavering and unquestioning in its agreement with the State. This constant

interruption and bar against testimony during a key mitigation witness was

particularly prejudicial to Mr. Pitchford. As Terry's twin brother, Perry Pitchford

had powerful mitigating evidence to share about the disparate treatment that he

and Terry received from their parents. According to Perry Pitchford:

> Our parents treated us differently. My mom—and when he was alive,
> my dad—paid more attention to me and praised me. Terry never got
> the attention or praise that I got from my mom and others in my
> family. Overall, my mother didn't pay attention to Terry, even though
> he was constantly seeking attention from her. Terry was more vocal
> with things and sought attention mostly by falling in line or doing
> what he wasn't supposed to do, whereas I was quieter and hid things. I
> was definitely my mother's favorite. My mother would tell Terry "you
> ain't shit" and "you're going to end up in jail."

2018-08-26 Perry Pitchford Declaration, ¶ 10.

Finally, the trial court unreasonably limited mitigation evidence during Mr.

Pitchford's mother's testimony during penalty phase. Counsel asked Shirley

Jackson about the impact of her husband's death on her son, Terry. Tr. 714.

> Shirley Jackson: They had a real close relationship. Terry's a twin.
> And he had—it was the last twin, the kids that he had. His daddy was
> 57 years old, and he was so proud of those twin boys that he had had.
> He always said that there is nowhere in the world that I can go that I
> can't take my boys. And when he was diagnosed with kidney cancer.
> Dr. Armstrong sent him to Oxford, Mississippi. And he told me—
> Mr. Evans: Your Honor, I object. What her and her husband talked
> about is not relevant on mitigation for this defendant.

125

Carter: Your Honor, we have Miss Britt, the victim's wife, lots of leeway to answer questions. We even allowed her to read a letter because she deserved to be able to do so without my jumping up and objecting frivolously every chance I had. And we simply ask that Miss Jackson be able to answer the question that's asked without Mr. Evans trying to tell her to answer it.

Tr. 714-15.

The trial court sustained the objection, ruling, "She can't---I mean she can testify about how this impacted Terry. But as far as what was going on between her and Terry's father is not relevant to any issue that we have got before us at this time." Tr. 715-16. However, Shirley Jackson was testifying to the relationship Terry had with his father and the impact of his death. This was from her own vantage point as his mother, living in the same household. This evidence was proper mitigation evidence under *Lockett v. Ohio*. The Court's rejection of individualized consideration of mitigating factors violated Mr. Pitchford's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present this claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

### C. Direct Appeal

These issues were not raised during post-conviction proceedings due to ineffective assistance of appellate counsel.

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

XIII.  PETITIONER DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION

Mr. Pitchford's convictions and sentence of death were obtained in violation of federal constitutional guarantees of due process, equal protection, effective assistance of counsel, a fair trial, a fair and impartial jury of his peers, freedom from cruel and unusual punishment, and a reliable sentence because counsel rendered ineffective assistance during the guilt phase of Petitioner's capital trial. U.S. Const. amends. V, VI, VIII & XIV. Hamstrung by ten additional capital cases and focusing only on getting Mr. Pitchford to take a plea, trial counsel spent almost no time preparing a defense. Counsel's omissions and errors rendered their performance constitutionally deficient. There is a reasonable probability that, had counsel been effective, the result of the proceeding would have been different. Separately, and cumulatively, these errors require reversal of Mr. Pitchford's convictions and sentence of death. Trial counsel's failings here are compounded by state post-conviction counsel's ineffectiveness in failing even to raise trial counsel's ineffective assistance in Mr. Pitchford's guilt phase.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing

1. TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PRESENT EVIDENCE OF PETITIONER'S REDUCED CULPABILITY AND FAILED TO ADVERSARIALLY TEST THE STATE'S WEAK CASE

### A. Supporting Facts

Mr. Pitchford's appointed lawyers did not spend time investigating the State's case or preparing a defense. They failed to follow up on the leads they did have. These failures violated Mr. Pitchford's constitutional rights. His lead counsel, Ray Carter of the Mississippi Office of Capital Defense Counsel, was appointed on June 15, 2005. Early on, at least by July 1, 2005, the State had offered Mr. Pitchford a plea to life without parole. With ten additional capital cases pending and no trial strategy for Mr. Pitchford's case, Mr. Carter focused only—albeit with fragmented and limited attention due to his amply divided loyalties to his many other capital clients—on getting Mr. Pitchford to plead guilty. Trial was set for February 6, 2006. On January 19, Mr. Pitchford entered a plea of guilty but it fell through when he did not admit guilt. It was not until the plea collapsed, less than a month before trial, that Mr. Pitchford's lawyers even began investigating the State's case.

Mr. Carter's defense investigator, Mike Wilson, conducted cursory interviews with key witnesses only a few days before trial began. These interviews provided

valuable leads that were never pursued. At a February 2, 2006, hearing on trial counsel's motion for a continuance, Mr. Carter explained that he had ten additional capital cases during the time he was representing Mr. Pitchford, and "if we had this trial on February 6, we would have to try it without really being ready." Tr. at 33, 35-36. Trial counsel expressed to the Court that the witnesses they had spoken to concerning guilt "have said the same thing that Mr. Evans or the police department have said," and they therefore had developed no independent evidence. Tr. 50. Finding that "there is not much chance of [Mr. Pitchford] being found innocent and that it's a strong likelihood of him being found guilty" and that counsel had had plenty of time to develop mitigation, the Court denied the motion for a continuance. Tr. 51. Mr. Carter was not even prepared to give opening statements on February 6, the day trial began, informing the court that he was "a little surprised that we are doing opening statements today." Tr. 337. In an affidavit submitted in post-conviction proceedings, Mr. Carter admitted, "[t]here was more fact investigation that needed to be done on Mr. Pitchford's case." 2011-09-15 Ray Charles Carter Aff., 2.

The State's theory at trial was that Mr. Pitchford had planned and orchestrated the robbery and murder of Reuben Britt at Crossroads Grocery & Bait Store in Coffeeville, Mississippi, along with a co-defendant Eric Bullins. The State introduced evidence that Mr. Britt was shot five times with a .22 caliber firearm and that he was also shot with his own firearm that the assailants had taken from him and that was later found in Terry Pitchford's car, a .38 caliber revolver loaded

with rat shot pellets. The state's forensic pathologist testified that the wounds that killed Mr. Britt were from the .22 caliber firearm, and the pellet strikes from the .38 caliber did not cause any significant injury. The .22 caliber firearm was never found.

To show that Mr. Pitchford had planned the robbery and murder, the State introduced evidence that a week or two before Mr. Britt was killed, Mr. Pitchford had enlisted the help of two co-participants, Demarquis Westmoreland and Quincy Bullins, to rob Crossroads Grocery. Quincy Bullins testified that Mr. Pitchford had given him a .22 Ruger and he took that gun and walked with Demarquis toward Crossroads Grocery with the intent to rob it. Tr. 524. The pair were stopped from going through with the robbery when three bystanders, employees at a building contractor next door, questioned them and told them to leave. Demarquis testified that Mr. Pitchford called them "a bunch of pussy" and said he would ask someone else to do the job. Tr. 451, 454.

The State also called two jailhouse informants, Dantron Mitchell and James Hathcock, who testified that while they were in the Grenada County Jail with Mr. Pitchford and Eric Bullins, both Mr. Pitchford and Eric Bullins admitted their involvement in the robbery and murder of Mr. Britt.

The State could not prove who fired what weapon or even whether two different people fired each weapon. Through Quincy Bullins' testimony, however, the State argued that the .22 belonged to Terry and that he was therefore the one who wielded it in Crossroads Grocery.

130

Had trial counsel performed as the reasonably competent advocate guaranteed by the Constitution, they would have discovered and presented readily available evidence that Eric Bullins, and not Terry Pitchford, was the leader of the whole enterprise and the one who fired the fatal shots; that the .38 caliber weapon loaded with rat shot pellets was Mr. Pitchford's own gun, not Mr. Britt's gun; that it was Quincy Bullins and Demarquis Westmoreland, not Mr. Pitchford, who planned the prior robbery attempt; that Mr. Pitchford was a follower seeking favor from the Bullins boys and Demarquis Westmoreland; and that Mr. Pitchford had been threatened numerous times by the Bullins.

### *Failure to present evidence that Eric Bullins was the more culpable actor.*

In the State's October 21 2005, supplementary discovery disclosure, James Hathcock stated that Eric Bullins admitted shooting Mr. Britt with the .22 caliber firearm. Dantron Mitchell, the jailhouse informant who testified against Mr. Pitchford, gave a statement to Greg Conley, one of the investigators at the Grenada County Sheriff's Department. Mr. Mitchell knew both Mr. Pitchford and Eric Bullins from growing up in Grenada. He told Investigator Conley that Eric Bullins and Mr. Pitchford had come by his grandfather's house a few weeks before the crime. He said Eric came to his grandfather's shed, where Mr. Mitchell was shooting pool, and told him that he and Mr. Pitchford had a gun and because Mr. Mitchell lived in the country, they wanted to practice shooting it in his back yard. Mr. Pitchford was sitting in the car when Eric approached Mr. Mitchell and he

eventually got out and joined them. Mr. Mitchell said he thought Eric Bullins was the one shooting the gun because he tried to hide it from Mr. Mitchell's grandfather.

A few months after he was arrested for Mr. Britt's murder, Eric Bullins, while in jail awaiting trial, committed another murder. In a dispute over a cigarette, the victim was beaten to death by Eric Bullins and a co-defendant. Mr. Pitchford's trial counsel knew about Eric Bullins' involvement in a murder only months after Mr. Britt's murder and knew that it was critical impeachment evidence. Yet, trial counsel did not attempt to introduce this evidence at trial.

Eric Bullins had also been kicked out of Crossroads Grocery for stealing a few days before Mr. Britt was killed. Trial counsel failed to investigate and call as a witness, Henry Ross, one of the three witnesses to the prior robbery attempt who worked at G&W Steel, a building contractor, next to Crossroads Grocery. A few days before the murder, Mr. Ross had spoken to Mr. Britt and learned that Eric Bullins and Demarquis Westmoreland had been in Crossroads Grocery, trying to steal beer. When Mr. Britt told them to put it back, they exchanged some heated words. Trial counsel was on notice of this incident at Crossroads shortly before Mr. Britt was killed, but unreasonably failed to follow up on the lead. Mr. Ross had told trial counsel's investigator Mike Wilson that he warned Mr. Britt about Eric and Quincy Bullins and Mr. Britt had told him he had put them out of the store earlier in the day for stealing.

Unlike Mr. Pitchford, Eric Bullins had a reputation for stealing and getting into trouble, as did Demarquis Westmoreland and Quincy Bullins. Specifically, Eric,

Quincy, and Demarquis were known for breaking into homes and stealing. Numerous witnesses in the community who knew Demarquis, the Bullins family and Terry, could have testified about their behaviors. Terry's brother Perry remembers "[e]veryone in the community knew about Eric Bullins and Shawn Bullins. They had a reputation for being bad. . . The whole Bullins family was known for trouble and selling drugs." 2018-08-26 Perry Pitchford Declaration, ¶19. Terry's brother-in-law Jerome Clay knew Eric Bullins and the Bullins family because they lived in a home that his family owned. Clay observed that the Bullins' were "a troubled family," and "Eric was known for stealing and being involved in illegal activity." 2018-09-08 Jerome Clay Declaration, ¶ 9. 2018-08-26. As Dominque Hogan remembers, "In Tie Plant, everybody knew the Bullins were trouble." 2018-08-26 Dominique Hogan Declaration, ¶ 12.

The State presented testimony from Sammie Seals that between 7:30 and 8:00 a.m. on the Sunday morning Mr. Britt was killed, Terry knocked on her door in the Tie Plant neighborhood, asking to borrow a screwdriver, which he was holding in his hand. Tr. 473-474. The State's theory was that Mr. Pitchford and Eric Bullins took the cash register from Mr. Britt's store and had trouble opening it, the inference being that Mr. Pitchford used the screwdriver to try to open the register. Tr. 772.

Had trial counsel adequately investigated the case, they would have learned that John Seals was a mechanic by trade and always had tools in his front yard that the kids in Tie Plant would borrow. 2018-08-06 John Seals Declaration, ¶ 2; John

133

would teach kids in the neighborhood how to use tools. Eric Bullins was a regular at John and Sammie Seals' house. 2018-08-06 Sammie Seals Declaration, ¶ 4; 2018-08-06 John Seals Declaration, ¶ 2. Terry Pitchford, however, was not one of the boys that would come by the Seals' house; and in fact he had never come to the Seals' house before that day. 2018-08-06 John Seals Declaration, ¶¶ 6-7; 2018-08-06 Sammie Seals Declaration, ¶4. Eric is the one that spent time with the Seals and the one who knew the John Seals had tools to borrow. If presented with this evidence, combined with other evidence of Eric Bullins' culpability, the jury could have inferred that Eric was the more culpable actor.

### Failure to rebut the State's theory that Mr. Britt was shot with his own .38 caliber firearm.

The State presented evidence that Mr. Britt was shot with a .38 caliber firearm that he kept in the store loaded with rat shot pellets. The State argued that this .38 caliber firearm was taken from him during the robbery. This was a particularly prejudicial and aggravating detail: that the shooter took Mr. Britt's own gun and shot him with it, not knowing that it was loaded only with rat shot pellets. It allowed the State to argue in closing that because the gun was a regular pistol and not a pellet gun, the shooter would have assumed it was loaded with lethal ammunition and not rat shot pellets:

> [W]hichever one of them picked up that 38 and started shooting him with it, they wasn't expecting it to be rat shot in it. Look at where the wounds are. Whoever was shooting that 38 meant to kill him with the 38. It just so happened that it was Mr. Britt's gun, and he had it loaded with rat shot instead of actual 38 ammunition. They didn't know that.

Tr. 649.

134

No forensic link was ever made between the firearm found in Mr. Pitchford's car and the .38 caliber firearm that Mr. Britt supposedly owned and kept in the store. The only evidence even suggesting a link was Marvin Fullwood's unfounded lay testimony that the gun purportedly recovered from Mr. Pitchford's car, State's Ex. 32, was the gun he gave Mr. Britt ("Yes, sir. That's the gun I gave him."). Tr. 469. Fullwood was not competent to make that statement. The most he could competently testify to was that the gun *looked* like the one he gave to Mr. Britt. Bob Tressel dec. Trial counsel unreasonably failed to object to Fullwood's testimony. Fullwood never actually testified that the gun he gave Mr. Britt was a .38 caliber revolver, or described the firearm in any way.

Mr. Britt's wife Nettie Britt testified that Mr. Britt kept two guns in the store, one on top of the counter next to the cash register and one under the counter. Mrs. Britt testified that one of those guns was a "pellet gun" that Marvin Fullwood had given Mr. Britt a few months prior. Tr. 350. But the State's theory was that Mr. Britt was shot with a .38 caliber revolver loaded with rat shot; not a pellet gun.[33] Moreover, Mrs. Britt never affirmatively identified which gun was missing from the store, testifying only that she knew one of the guns was missing. Tr. 349-50.

Had trial counsel conducted the constitutionally required investigation into their client's case, they would have discovered that Mr. Pitchford had access to a .38 caliber firearm and that he was known to have a firearm loaded with pellets for shooting rabbits and squirrels. In his statement to Investigator Greg Conley,

---

[33] Marvin Fullwood never actually testified that he gave Mr. Britt was a .38 caliber revolver; he simply identified State's Ex. 32 as the gun he gave Mr. Britt.

Quincy Bullins said that when he was involved with Demarquis Westmoreland and Mr. Pitchford in the prior attempt to rob Crossroads Grocery, Mr. Westmoreland used a .38 caliber firearm while Quincy carried a .22. [1/9/06 QB statement to Jennings] Mr. Pitchford's association with Demarquis would make it plausible that Mr. Pitchford could have had access to the .38 that Demarquis apparently had. Witnesses who grew up around Terry knew that he sometimes kept a gun loaded with pellets.

This evidence would have bolstered Mr. Pitchford's own statement to police that he had a .38 in his pocket when he walked into the store. The State made a point to undermine Mr. Pitchford's claim when questioning Investigator Conley:

Q. The only 38 involved is going to be the one that came out of the store; is that correct?

A. that's correct.
Q. So it would have been kind of hard to have that one in his pocket when he walked in the store, wouldn't it?
A. Yes, Sir.

Tr. At 508-509. The State was wrong. Investigator Conley identified State's Exhibit 45 as a picture of a .38 caliber firearm left on the counter in Crossroads Grocery, visible when he entered the crime scene hours after the murder. Tr. 498-99. This testimony directly contradicted the State's theory that Mr. Britt's .38 caliber firearm was missing from the store and that Mr. Pitchford couldn't have brought his own .38 caliber gun into the store as he had claimed. Yet, Investigator Conley's critical testimony was ignored despite its pivotal importance.

***Failure to rebut the State's theory that the prior robbery attempt was Mr. Pitchford's idea with readily available evidence that Quincy Bullins and Demarquis***

### *Westmoreland conspired to rob Crossroads Grocery, falsely placing all blame on Mr. Pitchford.*

Both Demarquis Westmoreland and Quincy Bullins testified that Terry had the idea to rob the Crossroads Grocery store and that Terry gave Quincy a .22 caliber automatic firearm. The testimony of these two witnesses contradicted one another and was inherently unreliable. Demarquis denied any involvement in the robbery, denied having a gun, and testified that he tried to talk Terry out of the whole thing. Quincy testified that he and Demarquis both had guns and they walked toward the store with the intent to rob it, while Terry stayed behind in his car. Tr. 524; 526. Both witnesses faced conspiracy charges and had every motive to exculpate themselves and place all blame on Mr. Pitchford.

Demarquis Westmoreland's self-serving testimony that he had no part in the robbery conspiracy, never walked with Quincy toward Crossroads, and never had a gun, was directly contracted by two neutral eye-witnesses with no incentive to lie. In his statement to law enforcement, Henry Ross, one of the employees at G&W Steel who witnessed the prior robbery attempt, said that he and Paul Hubbard, a fellow employee, saw Quincy and another person, later identified by Quincy as Demarquis, walking toward the Crossroads Grocery and that they both had towels wrapped around their hands. Ross said Quincy opened the towel and showed him and Paul Hubbard the gun he was carrying, and they saw the other guy, Demarquis, walking up and down the road "bouncing his gun." [11/7/04 Ross/Hubbard Statement at 10]. Hubbard also saw that both guys had something

wrapped up in their hands. [11/7/04 Ross/Hubbard Statement at 2-3] Quincy told Hubbard that they were planning to rob the store. 11/8/2004 Conley statement

Trial counsel failed to call as a witness Henry Ross who could have impeached Demarquis Westmoreland's credibility by testifying that he saw the person with Quincy, identified as Demarquis, with a gun in his hand that day, before Mr. Britt was killed. Trial counsel also failed to cross-examine Investigator Conley about Hubbard and Ross's statements that they had seen the two guys with guns in their hands walking toward the store and that Quincy had admitted they were planning to rob the store. Trial counsel's failure to impeach Demarquis with this critical and readily available evidence further demonstrates their complete failure to investigate Mr. Pitchford's case and prepare a defense.

Evidence from neutral witnesses would have bolstered Quincy's testimony that both he and Demarquis had guns and that they both walked toward the store with the intent to rob it. Tr. 524; 526. It would have also bolstered Quincy's testimony that he was the one who tried to talk Demarquis out of the robbery; and that Demarquis certainly did not try to talk him or Terry out of anything. Tr. 528.

### Failure to present evidence that Eric Bullins was involved in the prior attempt to rebut the State's theory that Mr. Pitchford had planned the whole thing.

The State introduced prejudicial evidence from the unreliable testimony of co-conspirator Demarquis Westmoreland that Mr. Pitchford had to find someone else to do the job after Demarquis and Quincy Bullins failed. Demarquis testified that he told Terry he did not want to be a part of the robbery and that Terry "called us a bunch of pussy" and said he would have to find someone else to do the job. Tr. 451,

454. Based on Demarquis' testimony, the State argued that Terry "wasn't going to be thwarted for good," and he convinced Eric Bullins, "his newfound accomplice in crime," to complete the job. Tr. 626. At penalty, the prosecutor emphasized again that the failed robbery attempt made Terry even more determined and that "[h]e got Quincy's cousin Eric" to complete the job. Tr. 771.

In fact, Eric Bullins was involved in the prior robbery attempt. Henry Ross, one of the employees at G&W Steel who witnessed the prior attempt, saw Eric Bullins with Quincy and Demarquis on the day they attempted to rob Crossroads grocery. Ross's account is consistent with the testimony of State's witness James Hathcock, who said that Eric Bullins was there during the prior attempt, along with Demarquis and "Nookie," which is Quincy Bullins' nickname. Tr. 431. Moreover, according to Hathcock's account, it was a boy other than Mr. Pitchford who made the comment "let's go rob something." *Id.*

Trial counsel was on notice that Eric Bullins was seen with a gun with Quincy Bullins and Demarquis around Crossroads shortly before Mr. Britt was killed, but unreasonably failed to follow up on this lead. Mr. Ross had told trial counsel's investigator Mike Wilson that he saw Eric Bullins (known as "Thang") in the road brandishing a gun. Trial counsel should have called Henry Ross to impeach Demarquis's prejudicial testimony that Mr. Pitchford told him he would find someone else to follow through with the robbery. Demarquis' testimony prejudiced Mr. Pitchford because it falsely suggested that Mr. Pitchford was the one organizing the robbery. Mr. Pitchford was prejudiced by the jury's failure to hear evidence that

the person who actually robbed and killed Mr. Britt on November 7, 2004—Eric Bullins—was also involved in the prior attempt to rob the store.

On the morning of the robbery, Terry's younger sister Jessica heard Terry and Eric arguing early in the morning. Terry was upset that Eric had forgotten to wake him up earlier to get ready for work. Jessica remembers Terry rushing around talking about how he was going to be late for work. According to Jessica, Terry always went to Crossroads to get a sausage biscuit for breakfast before heading to work at the lumber yard. 2018-09-11 Jessica Brown Declaration, ¶ 14. Terry was concerned about getting to work; he was not planning a robbery.

### Failure to investigate and present evidence that Mr. Pitchford followed the lead of Demarquis Westmoreland and Eric Bullins and was used by them because he was easily influenced and always had a car.

The central theme of the State's case was that Terry Pitchford was the mastermind and leader of both the prior robbery attempt and the robbery and murder of Mr. Britt. Supported only by the testimony of the two co-conspirators who had every motivation to shift blame away from themselves and onto Mr. Pitchford, the State argued that:

> There isn't even a question, not a scintilla, not a shadow, a doubt whatsoever that . . . Terry Pitchford . . . was the originator of the crime. He was the instigator, the leader, the one that set it all in motion.

Tr. 630-631.[34]

---

[34] The State made this argument repeatedly:
> [A]bout ten days or so before November 7, is when we first learned that Terry Pitchford wanted to rob the Cross Roads Grocery. . . Terry Pitchford, got Quincy Bullins and DeMarquis Westmoreland and tried to put them up to robbing that

Had trial counsel conducted the constitutionally required investigation into their client's case, they would have discovered and presented evidence from Mr. Pitchford's friends and family members that Terry was easily influenced and manipulated, and in particular he followed the lead of Demarquis Westmoreland and Eric Bullins, who routinely took advantage of him.

Terry Pitchford grew up with his twin Perry in a rural, mostly white section of Grenada County that was known as "the country." Kids in school would make fun of them for being "country." Terry's friends and family members describe him as a follower who was easily influenced by others and was always trying to please people. As Terry got older, he started hanging out with kids in a rougher part of Grenada known as Tie Plant, where his girlfriend Dominque Hogan lived. Terry sought acceptance and favor from a peer group in Tie Plant known for getting into trouble, and in particular from Demarquis Westmoreland ("Pooh Bear") and "Thang" (Eric Bullins).

According to Terry's family members, the death of his father, and primary caretaker, when he was ten years old was particularly hard for Terry and made him

---

store. As a matter of fact, he so nearly succeeded in doing that, that he got DeMarquis and Quincy behind the store with a gun headed toward the store.
Tr. 625
Carried two people with him the first time. Once they backed out, what does he do? He goes and gets a 16-year-old and carries him to the store with him.
Tr. 650.
But in spite of the fact that on that day they deterred him - they prevented him from using these other two guys to rob the store - he wasn't going to be thwarted for good. He told them they were just a bunch pussies, and he would get somebody else to do it.
Tr. 626.

vulnerable to being exploited by peers with whom he sought belonging. Terry's maternal cousin Roydetric Leetrell Harris remembers Terry becoming lost after his father died and seeking acceptance from a peer group that got into trouble often. Unlike his brother Perry who seemed to think things through, Terry would go along with what the peers around him were doing without thinking about the trouble he would get into.

> Ever since his dad died, Terry was looking for a father figure from basically anybody who would show him some attention. I remember gangs were very prevalent in Grenada when we were growing up and Terry was very curious about them but never managed to join one. I am glad that he didn't join one. But, he did end up picking the wrong group of people to hang around; they stood in for a father figure. Terry badly wanted to fit in and to be accepted. After James died, there was nobody to steer him away from following new friends and doing what they wanted him to do because he was trying so hard to fit in. Terry was desperate to fit in at that point and was going to go along with whatever they were saying and doing so that he could be a part of their group.

2018-08-23 Declaration of Roydetric Leetrell Harris, ¶ 3. As Terry's twin brother Perry and older half-brother DeShawn report, their family did not spend time in Tie Plant and they were always told to stay away from that area. 2018-08-26 Declaration of Perry Pitchford, ¶ 7; 2018-08-26 Declaration of DeShawn Burnett, ¶ 15.

Dominque Hogan, Terry's girlfriend at the time and the mother of his child, was perhaps the one with the most insight into Terry's relationship with Pooh Bear, Thang, and Quincy Bullins. Ms. Hogan grew up in the Tie Plant neighborhood and it is because of her that Terry became associated with the Bullins:

> Of all the guys in Tie Plant, Terry was closest with Pooh Bear. Pooh Bear was the leader between the two of them. Eric Bullins also followed Pooh Bear's lead. Terry tended to follow both of those guys. He would drop everything just to do things for them. Pooh Bear and Eric were always asking Terry for favors. I would get so frustrated. When Terry and I were spending time together, we were interrupted by Pooh Bear and Eric all the time. They'd ask Terry to drive them where they wanted to go or ask to borrow his car. Sometimes, Terry would stop hanging out with me just to make them happy. Pooh Bear really got on my nerves the way he would always call Terry to do stuff for him. Terry was very easily persuaded to do things, especially by them. Pooh Bear and Eric used him. It made me angry the way Terry would follow up behind Pooh Bear, who was usually up to no good.

2018-08-26 Declaration of Dominique Hogan, ¶9. Dantron Mitchell, who knew Terry from the neighborhood, and is Demarquis Westmoreland's cousin, stated that Terry was weak and didn't have much of a backbone. But because Terry did not want Eric and Quincy to think he was weak, he did what they told him to do and followed their lead.

Terry was known for always offering rides or even letting people borrow his car. 2018-08-26 Declaration of Perry Pitchford, ¶38. Demarquis, Quincy, and Eric were constantly using Terry for his car.

> Terry was always letting people borrow his car. One time when Terry let Pooh Bear borrow his car, Pooh Bear crashed and wrecked the car. Terry and I were at my house trying to have some time to ourselves. Pooh Bear started beating on the window of my house, asking Terry to take him somewhere. Pooh Bear kept beating on the window and harassing Terry until Terry just gave him the keys. Later, Pooh bear came back and told Terry he had wrecked the car. Terry never told his mom what happened, and she just thought Terry was the one who wrecked it.

2018-08-26 Declaration of Dominique Hogan, ¶10.Terry's generosity meant that people could take advantage of him. Often Terry would drive Eric and Quincy around town since they didn't have cars of their own.

Trial counsel was on notice that Terry was not a leader and in fact had been bullied and threatened by the Bullinses. Trial counsel's own mental health expert, Dr. Rahn Bailey, interviewed Mr. Pitchford a few days before trial. Dr. Bailey told trial counsel that Terry was not a leader and had been threatened repeatedly by the Bullinses since being in jail. Dr. Bailey suggested that trial counsel show that Eric Bullins was the leader.

Had trial counsel conducted the constitutionally required investigation and presented the foregoing evidence to challenge the State's case against their client, the Court would have granted trial counsel's request for a lesser included instruction.

### The State's case against Mr. Pitchford was thin.

No forensic evidence linked Mr. Pitchford to the crime, and there were no eyewitnesses. The .38 found in Mr. Pitchford's car was never forensically linked to the wounds sustained by Mr. Britt.[35] The only witnesses who tied Mr. Pitchford to the prior robbery attempt and the robbery of Mr. Britt were discredited co-participants and unreliable jailhouse informants with a motive to testify. None of the three neutral eye-witnesses to the prior robbery attempt identified Mr.

---

[35] The State's firearm expert, Steven Byrd, testified that the "the four cartridge cases submitted in this case . . . at some point in time were discharged from this revolver," the .38 caliber firearm found in Mr. Pitchford's car. Tr. 551. This testimony purported to connect the gun found in Mr. Pitchford's car to the gun used to shoot Mr. Britt. However, Byrd's testimony provided no such forensic link. The cartridge cases were found in the .38 when Investigator Conley retrieved it from Mr. Pitchford's car. They were not found at the scene and there is no evidence of when those rounds were fired. The only thing Byrd could say is that the plastic casing, wadding, and pellets found in the victim's clothing were *consistent* with the components of the shot capsule that were in the .38 caliber firearm found in Mr. Pitchford's car. Tr. 553. It is not surprising that there is consistency with respect to this evidence. 2018-09-17 R. Robert Tressel Declaration.

Pitchford as being present, which may be why the State never called them as witnesses.

Stephanie Grey saw a car pull in and out of the Crossroads parking lot shortly before the robbery and murder, but she never identified who she saw in the car or even how many people were in the car. Grey's credibility was highly questionable.

The case against Mr. Pitchford was built around the unreliable and untrustworthy testimony of co-conspirators and jailhouse snitch witnesses with a motive to lie. The bulk of their testimony was procured through the prosecutor's improper use of leading questions, to which trial counsel unreasonably failed to object.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented the issue of Dr. Hayne's testimony on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief largely because the issue was not preserved by objection at trial, furthering reasoning that to grant relief it would be forced to adopt a per se rule that would requiring invaliding the verdict in every case in which Dr. Hayne testified. *Pitchford v. State*, 45 So. 3d 216, 247 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### 2. PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF TRIAL BECAUSE TRIAL COUNSEL FAILED TO CONSULT WITH A FORENSIC EXPERT WHO COULD HAVE REBUTTED THE STATE'S DUBIOUS FORENSIC EVIDENCE.

## A. Supporting Facts

Mr. Pitchford's capital murder conviction and death sentence rest in large part on the misleading forensic evidence presented by the State at Mr. Pitchford's capital trial. None of the State's evidence forensically linked Mr. Pitchford or the gun found in his car to the crime. Yet, the prosecutor was able to exploit the misleading testimony of its expert witnesses, and the evidence went unchallenged by Mr. Pitchford's attorneys.

At trial, the State emphasized over and over again that it was Mr. Pitchford who orchestrated both the prior attempt and the robbery and murder of Mr. Britt; and that Mr. Britt was shot up to four times with his own weapon, taken from him

146

in the store. But the State's investigation of the crime was incomplete and left many unanswered questions about how the incident unfolded and the role of the shooter.

While the State did not prove who fired the fatal shots, it presented evidence that the victim was shot by two different firearms—lethally by a .22 caliber and with rat shot by a .38 caliber—and attempted to connect Mr. Pitchford to both of those firearms. Quincy Bullins testified that the .22 caliber firearm belonged to Mr. Pitchford; and the State's firearms expert testified that the plastic casing, wadding, and pellets found in the victim's clothing were consistent with the components of the shot capsule that were found in the .38 caliber firearm recovered from Mr. Pitchford's car. Tr. 553. In addition, Marvin Fullwood identified the gun recovered from Mr. Pitchford's car as the same one he had given Mr. Britt.

At trial, the State's forensic pathologist, Dr. Steven Hayne, testified outside the scope of his expertise about the range of fire and whether particular wounds came from a .22 caliber firearm or a .38 caliber firearm. Dr. Hayne testified that the victim could have been shot up to four times with rat shot fired from the .38 caliber firearm.

Had trial counsel performed as the reasonably competent advocate guaranteed by the Constitution, they would have consulted with a forensic expert, such as Robert Tressel,[36] and discovered that: (1) the State's mishandling of key

---

[36] R. Robert Tressel is the current Chief Criminal Investigator of the Cobb County District Attorney's Office, Marietta, Georgia since 2011. He performs this full-time role for Cobb County, which has a population of over 700,000 people, in addition to occasionally providing expert services in capital cases outside of Georgia. As Chief Criminal Investigator, he currently manages 20 criminal investigators and is responsible for directing all specially appointed cases and all death penalty cases for the Cobb County District Attorney's Office. Mr. Tressel began his career in law enforcement in 1973. In his first months on the job, he began investigation on murders that culminated in convictions and death sentences in Cobb County and concluded in Georgia executions. Specifically, those

147

evidence at the crime scene compromised the entire investigation and revealed that at least two .38 caliber revolvers have been recovered in this investigation; (2) No forensic link existed to connect the firearm recovered in Mr. Pitchford's car with the firearm used to shoot Mr. Britt.; (3) Contrary to the testimony of the State's forensic pathologist, Dr. Steven Hayne, who testified that Mr. Britt could have been shot as many as four times by pellet shots from a .38 caliber firearm, only one shot was fired from a .38. Law enforcement's serious mishandling of key evidence utterly undermines the State's case. The State has never accounted for a brown-handled .38 caliber firearm pictured at the crime scene and the different, black-handled .38 revolver purportedly seized from Mr. Pitchford's car by Investigator Greg Conley.

As Mr. Tressel, the current Chief Criminal Investigator of the Cobb County District Attorney's Office, Marietta, Georgia, has explained, review of contemporaneous reporting from the Sheriff's Office and the Mississippi Crime Laboratory ("MCL") raises extreme concerns about the integrity of the case against Mr. Pitchford.

On the morning of Mr. Britt's murder, Sheriff's Office Investigator Carver Conley completed an offense report reflecting the time of his arrival at the crime scene at 7:42 AM. It reported that a cash register had been stolen from the store. This appears to be the first reporting on the crime, and its narrative begins:

> On 7 November 2004 at 7:35 hrs a call was dispatched in reference to a shooting. Upon arrival I observed a white male lying on his right side in a pool of blood. Officer Adam Eubanks who had arrived prior to myself had checked the subject, later identified as R.L. Britt, for vitals

---

included the cases of Virgil Presnell, Jack Howard Potts (circa 1975), Fred Gilreath (1979), and Marcus Wellons (1989). The State of Georgia ultimately executed Messrs. Potts, Gilreath, and Wellons.

> and found the subject to be deceased. Upon further investigation there
> were found (4) four shell casings of .22 caliber ammunition lying on the
> floor in various area [sic]. The shell casings were marked by Officer's
> [sic] Miller and Eubanks. As evidence in the order they were found.

2018-09-17 R. Robert Tressel Declaration, ¶93. The report continues for three more pages, discussing other details of the crime scene and initial witness contacts. The report makes no reference or mention of the presence of a firearm, let alone one on the counter in the vicinity where the victim was lying in a pool of blood.

During the trial testimony of Investigator Greg Conley, the State marked as Exhibit 45 a picture of a brown-handled .38 caliber revolver resting on the middle of the counter of the Crossroads Store. Greg Conley testified that he viewed this revolver placed there when he arrived at the crime scene. Tr. 516-17. The time of Greg Conley's arrival is not specified in the record. He testified that Carver Conley, Adam Eubanks, and Jamie Miller from the Sheriff's Office were already at the scene. *Id.*

By the time MCL agents Claire Nethery, who would testify at trial, and David Zeliff arrived at the crime scene at about 20:40 on November 7, 2004 in response the Sheriff's Office call to them at 18:00—after the Sheriff's Office had handled the crime scene for the preceding more-than-ten-hour period—the scene had been irretrievably compromised.

Prior to the arrival of the MCL personnel, it appears that the Sheriff's Office took the photo that would become State's Exhibit 45. MCL notes reflecting their arrival on the scene shortly before 9:00 p.m. identify a briefing given by Sheriff's

149

Office Investigator Adam Eubanks. The notes make no mention of any gun at the crime scene.

The following day, November 8, 2004, Ms. Nethery of the MCL produced an evidence log from the crime scene and items collected from Mr. Pitchford at the time of his arrest the prior day. It includes clothes and footwear taken from Mr. Pitchford on November 7, 2004. It does not include any weapon collected from him.

The first item of Ms. Nethery's log appears to be the black-handled .38 revolver. The handwritten log reflects this entry at 9:30 a.m., noting the revolver's serial number of 78088. A certified report issued from Mr. Zeliff of the MCL on December 15, 2005—13 months later—listed the logging of this .38 revolver a day later on November 9, 2004 at 10:02 a.m. by Ms. Nethery.

At Mr. Pitchford's trial, a black-handled .38 revolver was introduced into evidence as the weapon that Investigator Greg Conley seized from Mr. Pitchford's car, midday on November 7, 2004. The State submitted that Mr. Pitchford used the black-handled .38 to shoot Mr. Britt while participating in the robbery. The firearm was marked as Exhibit 32.[37] 2018-09-17 R. Robert Tressel Declaration.

Thus, at least two .38 caliber revolvers have been recovered in this investigation. Only one .38 revolver was introduced into evidence at trial—the black-handled .38—and only one .38 revolver was inventoried by Ms. Nethery, the black-handled .38. The State never collected the brown-handled .38. These are damning facts for the State's investigation but they were not noticed by defense

---

[37] Mr. Tressel was able to inspect the black-handled .38 in the Grenada County Circuit Court days before the filing of the present petition. 2018-09-17 R. Robert Tressel Declaration.

counsel. This omission caused a total lack of adversarial testing of these irremediable flaws in the law enforcement work on this decisive element of the case.

No forensic link existed to connect the firearm recovered in Mr. Pitchford's car with the firearm used to shoot Mr. Britt. The prosecutor misled the jury with testimony of its firearms expert Steven Byrd and lay witness Marvin Fullwood by arguing that the .38 caliber firearm recovered from Mr. Pitchford's car was the same gun used to shoot Mr. Britt. Byrd testified that the "the four cartridge cases submitted in this case . . . at some point in time were discharged from this revolver," the .38 caliber firearm found in Mr. Pitchford's car. Tr. 551. This testimony purported to connect the gun found in Mr. Pitchford's car to the gun used to shoot Mr. Britt. However, Byrd's testimony provided no such forensic link. The "four cartridge cases submitted in this case" were found in the .38 when Investigator Conley retrieved it from Mr. Pitchford's car. They were not found at the scene and there is no evidence of when those rounds were fired. Marvin Fullwood testified that the gun recovered from Mr. Pitchford's car, State's Ex. 32, was the gun he had given Mr. Britt. ("Yes, sir. That's the gun I gave him." Tr. 469.). Fullwood's lay testimony was unfounded. The most Fullwood could have competently testified to was that State's Ex. 32 *looked* like the one he sold to Mr. Britt. 2018-09-17 R. Robert Tressel Declaration.  ".38 specials are mass produced and a definitive identification of any firearm based on external appearance is of limited weight." *Id.*

Dr. Hayne's conclusions about the number of possible shots from the .38 are not supported by the evidence. In fact, the evidence shows that *only one shot* was

fired from the .38 and Mr. Britt was hit with pellets from that single shot. As Mr.

Tressel states: "The totality of the evidence and, crucially, how the integrity of the

crime scene and other evidence has been compromised, cannot support a conclusion

that a .38 revolver fired more than one cartridge at Mr. Britt." Only one piece of

wadding and portions of blue plastic debris from the fired capsule were recovered

from the scene. Steven Byrd testified that the wadding and capsule fragments

recovered from the scene were insufficient to amount to one entire capsule. Tr. 560.

If more than one shot had been fired from the .38, there would be additional

wadding and plastic capsules recovered from the scene. The number of pellets

recovered also indicates that only one shot was fired. Byrd testified that "[a]ccording

to the box of ammunition that that cartridge was probably removed from they say

there is approximately 135 pellets in that particular shot capsule." Tr. 549.

However, it is not clear what box of ammunition Byrd is referencing. No such box

was in evidence. 2018-09-17 R. Robert Tressel Declaration, ¶ 75. In any case, it

appears Byrd's account of 135 pellets is off the mark. As Mr. Tressel explains, it is

more likely that each rat shot capsule contained as many as 2,000 pellets:

> CCI is the identified brand of ammunition for the cartridges retrieved
> from the .38 caliber revolver. Current research into CCI ammunition
> indicates that its .38 caliber "rat shot" consists of #9 shot. CCI's
> website indicates that each round is loaded with 100 grams of #9 shot.
> CCI is the identified brand of ammunition for the cartridges retrieved
> from the .38 caliber revolver. Current research into CCI ammunition
> indicates that its .38 caliber "rat shot" consists of #9 shot. CCI's
> website indicates that each round is loaded with 100 grams of #9 shot.
> Further research into the currently available #9 shot indicates that for
> every ounce of shot there are +/- 580 pellets. The 100 grams in each
> round of #9 shot amounts to approximately 3.5 ounces. This means
> that the currently available ammunition would project more than

152

> 2,000 pellets per shot. Mr. Byrd's trial testimony identifying a mere
> 135 pellets per cartridge calls into question what source he accessed for
> that determination. The source is not apparent from the records.

*Id.*, ¶¶ 75-76. Investigators on the scene report that there were pellets everywhere.

However, the only pellets that were entered into evidence were 21 pellets recovered

from Mr. Britt's body. If more than one pellet shot had been fired, there would have

been many more pellets than were documented at the scene.

Dr. Hayne's testimony that the victim could have been hit with as many as

four shots from the .38 caliber firearm was particularly prejudicial to Mr. Pitchford.

There was no evidence that Mr. Pitchford had the .22 in the store, and in fact,

evidence suggested that it was Eric Bullins, Mr. Pitchford's codefendant, who had

the .22 and fired the fatal shots with that weapon. As a result, the State had to

argue to the jury that if they believed Mr. Pitchford used the .38, they could find

that he intended to kill the victim. Dr. Hayne's baseless conclusions allowed the

State to do so. In closing, the State argued, "Look at where the wounds are.

Whoever was shooting that 38 meant to kill him with the 38." Tr. 649.

Dr. Hayne also testified, outside the scope of his expertise as a forensic

pathologist, that one wound was distant and that all other wounds were "either

distant or near contact." Tr. 420. Mr. Tressel's investigation has determined that

this testimony was incorrect and misleading:

> Based on my review of the materials I was provided, none of the
> gunshot wounds could be classified as near contact; they are all
> distant. Near contact gunshot wounds are caused when the firearm is
> off the surface of the skin by a few inches, and none of the shots to the
> victim could be classified as such. No gunpowder residue testing was
> done in this case, which could have provided information on the range
> of fire.

2018-09-17 R. Robert Tressel Declaration, ¶ 83. By testifying that some of the gunshot wounds from the .22 and the .38 could have been near contact, but not specifying which wounds, Dr. Hayne erroneously and prejudicially conveyed to the jury that the shooter could have been within a few inches from the victim when firing shots.

There are many unanswered questions about the movement and positioning of the victim and the shooter, which "is crucial in piecing together how the incident unfolded and the possible role of the shooter." *Id.*, ¶ 83. There are several simple tests that are routinely done during crime scene investigations but were not done in this case. Tests such as a muzzle to target test, or shot pattern analysis would give some indication of where the shooter was when he fired. The location where the victim's body was found and the location of bullets and projectile fragments are all critical pieces of information that were not properly documented or accounted for in the crime scene investigation. *Id.*

> The primary way to [determine the positioning of relative actors] is through a trajectory analysis. No trajectory analysis was done in this case. In order to complete a trajectory analysis, it is necessary to have three points of contact—the entry wound, exit wound and location of the bullet strike upon exiting (e.g., the wall, floor). In this case, two .22 caliber bullets that hit the victim are unaccounted for. The Grenada County Sheriff's Office processed the crime scene for more than ten hours before they called for assistance from the Mississippi Crime Laboratory, who took over processing the scene and found evidence that the Sheriff's Office had missed.
> In total, five .22 caliber shell casings were collected from the scene. Dr. Hayne testified that two of the gunshot wounds were "through and through" wounds, which means that the bullets did not lodge in the victim's body. Those bullets would have to be somewhere in the crime scene. Yet, despite the lengthy time processing the scene, those two bullets were not recovered or documented in the crime scene. Without

documentation of the bullet strike, it is not possible to determine the location and possible movement of the shooter and the victim. It is only possible to determine whether the bullet moved right to left; back to front; or upward, downward or level.

*Id.*, ¶¶ 85-86. In addition to the two missing bullets, the forensic scientist with the Mississippi State Crime Lab, Claire Nethery, recovered pieces of blue plastic consistent with the rat shot capsule found in the .38 revolver from a shelf behind the cashier counter in the store. In his interviews with police, Mr. Pitchford stated that he may have fired from the .38 into the ground after his co-defendant held a gun at him and pressured him to shoot. Mr. Pitchford describes a chaotic and fearful scene. At trial, Ms. Nethery testified that she "did not see any marks that would be consistent with a bullet strike," which directly contradicted Mr. Pitchford's statement. Tr. 540. However, as Mr. Tressel points out,

> [S]he said nothing about the presence of pellets or pellet strikes on the floor. Rat shot pellets are very small and would not leave much of a mark if they hit the floor. It would be necessary to review high-resolution photographs of the crime scene in order to determine whether there are pellets or pellet marks on the floor, consistent with Mr. Pitchford's statement to police that he shot into the ground, in a state of fear and panic.

2018-09-17 R. Robert Tressel Declaration.

Reasonably competent investigation would have revealed many holes and inconsistencies in the State's case and trial counsel unreasonably failed to rebut it with readily available expert testimony.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it

unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner presented the issue of Dr. Hayne's testimony on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief largely because the issue was not preserved by objection at trial, furthering reasoning that to grant relief it would be forced to adopt a per se rule that would requiring invaliding the verdict in every case in which Dr. Hayne testified. *Pitchford v. State*, 45 So. 3d 216, 247 (Miss. 2010).

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

### 3. TRIAL COUNSEL UNREASONABLY FAILED TO IMPEACH JAILHOUSE INFORMANTS DANTRON MITCHELL AND JAMES HATHCOCK

### A. Supporting Facts

The State's primary evidence connecting Terry to the robbery and murder of Mr. Britt was the dubious testimony of two jailhouse informants who said that Mr. Pitchford had admitted his involvement to them while they were incarcerated

together at the Grenada County Jail. After the court denied trial counsel's motion to exclude the testimony of both Hathcock and Mitchell as unreliable and untrustworthy snitch testimony, trial counsel did nothing to investigate these inherently biased and prejudicial witnesses.

### *Dantron Mitchell*

Dantron Mitchell testified that he had known Eric Bullins and Terry Pitchford all his life before he saw them at the Grenada County Jail in November 2004 while they were awaiting trial. Tr. 563. Mitchell testified that when he found himself in a cell with Mr. Pitchford, Mr. Pitchford "told me . . . he did it and only God knows." Tr. 564. At first, Mr. Pitchford told Mitchell he had gone into the store with Eric Bullins but then he told Mitchell that he robbed and killed the man by himself.

Had trial counsel investigated this crucial snitch witness, they would have discovered that contrary to what he testified to at trial, Mr. Pitchford had in fact *never* told Mitchell that he had committed the crime. Mitchell lied under oath and the State suborned his perjury.

In addition to Mitchell's material recantation, substantial impeachment evidence existed that could have undermined Mitchell's shaky credibility. Trial counsel failed to impeach Mitchell's credibility with evidence that the .22 caliber firearm used to kill Mr. Britt actually came from Mitchell himself. Both Quincy Bullins and James Hathcock told law enforcement that the .22 caliber firearm that was used to kill Mr. Britt had come from Dantron. Quincy Bullins told Investigator

157

Conley and Investigator Jennings that Eric Bullins had told him that he and Terry got the .22 Ruger from Dantron Mitchell and that they shot it at Mitchell's grandparent's house. [2006-01-09 Quincy Bullins Statement]. Hathcock stated that Terry reportedly "borrowed Trons' .22 caliber pistol." [Hathcock supp discovery disclosure]

Mitchell's connection to the .22 that killed Mr. Britt exposed him to accessory liability. Facing the possibility of accessory liability in Mr. Britt's murder could surely have provided a motive to cooperate with the State and testify against Mr. Pitchford. Trial counsel was ineffective for failing to impeach Mitchell with this evidence.

### James Hathcock

Like Dantron Mitchell, James Hathcock testified that he also spoke with Terry Pitchford and Eric Bullins when he was in the Grenada County Jail in November 2004. Hathcock testified that Mr. Pitchford told him that he and Eric Bullins went into the store with a .22 automatic firearm, they pointed it at the man and demanded money, and "he gave him the money and the 38." Tr. 428. Hathcock further testified that they were about to take off but Mr. Pitchford said he did not trust the man and thought he would snitch. Hathcock testified that Mr. Pitchford had told him he needed some quick money because his son had just been born. Hathcock testified that "the way I understand it, they first shot him off with a .22" and then with the .38. Tr. 429-430. Hathcock testified that Mr. Pitchford told him

that Mr. Britt had "said son, you can take the money and the gun. He said just don't hurt me. I've got a family." Tr. 430.

Had trial counsel performed as the reasonably competent advocate, they would have investigated the jailhouse informant and impeached him with prior inconsistent statements and his relation to the victim.

At trial, Hathcock could not remember who had the .22 caliber firearm, which fired the fatal shots. In the State's supplemental discovery disclosure, Hathcock said that Eric Bullin admitted to shooting Mr. Britt with the .22. Trial counsel was on notice of this crucial admission and unreasonably failed to impeach Hathcock with this prior inconsistent statement. Hathcock was also on record as having lied about the statements Mr. Pitchford and Eric Bullins allegedly made to him. In the State's supplemental discovery disclosure, Hathcock admitted that when he told the sheriff that Pitchford acted alone, that was not a correct; Hathcock stated, instead, that both Mr. Pitchford and Mr. Bullins talked about participating in the crime. In other words, Hathcock initially told the police a different story.

James Hathcock testified that Mr. Pitchford and Eric Bullins "said they took money out of the cash register and the 38." Tr. 431. This statement directly contradicted the evidence that the cash register could not be opened and had been taken from the store and opened with tools borrowed from John Seals. Hathcock's testimony is also inconsistent with the discovery disclosure in which Hathcock does not mention anyone taking money out of the cash register. Trial counsel should

have impeached Hathcock with this statement as one more piece of his story that lacked credibility.

Competent counsel also would have conducted their own independent investigation of the State's key witness. Had they done so, they would have learned that, contrary to Hathcock's prejudicial statement that Mr. Britt begged for his life, Mr. Pitchford in fact never told Hathcock that Mr. Britt had said anything when they were in the store. Hathcock's statement about the victim was particularly prejudicial to Mr. Pitchford, eliciting audible sobbing from Mr. Britt's family members in the courtroom. Tr. at 432-33. A competent investigation into Hathcock also would have revealed that Hathcock may have been related to Mr. Britt, providing crucial impeachment and *Brady* evidence.

Trial counsel knew that the jailhouse snitch testimony of Mitchell and Hathcock was inherently untrustworthy—and tried to preclude their testimony from being introduced—and yet they failed to investigate and impeach Mitchell's and Hathcock's credibility with readily available evidence.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present this claim. Any procedural default resulting from that presentation can be

overcome under *Martinez v. Ryan*, 134 S. Ct. 1309 (2012) and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner did not raise this claim on direct appeal because of the ineffective assistance of appellate counsel.

### D. Post-Conviction

Petitioner did not raise this claim on direct appeal because of the ineffective assistance of post-conviction counsel.

### 4. TRIAL COUNSEL UNREASONABLY FAILED TO IMPEACH STATE'S WITNESS STEPHANIE GRAY WITH HER PRIOR INCONSISTENT STATEMENTS

### A. Supporting Facts

Stephanie Gray lived in the trailer next to Crossroads Grocery at the time Mr. Britt was killed. She testified that on the morning of November 7, 2004, she was standing on her porch with Sandy Trusty and Danny White and saw "[a] silver Mercury kept riding up and down the road pulling into the parking lot, just in a constant phase from like 6:45 to 7:20." Tr. 375. There was a dark tint on the windows. When she first saw the car, it was sitting in the parking lot of Crossroads for a few minutes. Gray testified that she saw this car pull up, park, and leave between five and seven times that morning. Tr. 376. She testified that she couldn't see who was in the car during any of the times it came in and out because "[t]he sunshine glared down on the windshield from the front. And the tint, you just could not see in it." Tr. 379.

Later on the day that Mr. Britt was killed, Gray testified that she was "riding up toward Wrights [grocery store] and the car was in the yard." She testified that she called the sheriff's department and told them that the car they were searching in front of Mr. Pitchford's house was the car she had seen earlier that morning. Tr. 378.

Stephanie Gray's credibility was highly questionable. A year after the crime, the State submitted supplemental discovery disclosure revealing that Gray had told law enforcement that she was familiar with the car she had seen at Crossroads on the morning of November 4 because she had seen it on several occasions before, as Mr. Pitchford and his family live only a short distance from the store. State's Supplemental Discovery Disclosure, Jan. 25, 2006.] On the two occasions she spoke with law enforcement around the time of the crime, Gray never mentioned her familiarity with the car she had seen. She was unable to identify the car, providing only a general description that it looked like an unmarked police car, without specifying a color. The inconsistency in Gray's statements to law enforcement severely undermined the credibility of her trial testimony. When speaking to law enforcement soon after the crime, she had been unable to identify the car as one that was familiar to her and that she had seen before; it wasn't until she saw the sheriff's deputies searching Mr. Pitchford's car in his front yard that she recognized the car as one she had seen on several occasions before. And indeed, it would make sense that she would recognize Mr. Pitchford's car because Mr. Pitchford went to Mr. Britt's store on a regular, almost daily, basis, and Gray lived next to Crossroads

and had even worked at Crossroads Grocery in the recent past. It is not surprising that Gray might associate a car that she had seen at Crossroads on other occasions and that was being searched by police officers with the same car she had seen pulling in and out earlier that morning.

In addition, Gray made several prior statements to law enforcement that were inconsistent with her trial testimony and trial counsel unreasonably failed to impeach her with these prior inconsistent statements. When she spoke with Investigator Jennings on November 16, 2004, several days after the crime, Gray stated she saw the car pulling in for a third time when she and Sandy Trusty finally left at 7:20 am. This statement was in direct contradiction to Gray's trial testimony that she saw the car pulling in and out 5-7 times. In Gray's statement to the police on the day Mr. Britt was killed (admitted at trial as State's Ex. 14), she described the car pulling in and out no more than 2-3 times. Gray also told Jennings on November 16 that it was obvious the subjects in the car were watching her. Yet, she testified that she couldn't see people in the car because of the sun glare and tinted windows. Contrary to her trial testimony, Gray never identified the car as a Mercury to law enforcement, instead saying it looked like an unmarked police car. Finally, on at least two occasions when she spoke with law enforcement, on the day of the crime and a few days later on November 16, she said she was with her friend Sandy Trusty. She made no mention of Danny White.

Trial counsel failed to impeach Stephanie Gray's credibility with her numerous prior inconsistent statements. Her testimony that the car being searched

in Mr. Pitchford's yard was the car she had seen pulling in and out of Crossroads earlier that morning was highly prejudicial to Mr. Pitchford.

### 5. TRIAL COUNSEL UNREASONABLY FAILED TO OBJECT TO THE PROSECUTOR'S LEADING QUESTIONS

#### A. Supporting Facts

The prosecutor Doug Evans used improper leading questions during their examination of witnesses in the State's case on chief, most significantly during the examination of the two co-conspirators about their involvement in the prior robbery attempt. Trial counsel unreasonably failed to object.

### 6. TRIAL COUNSEL UNREASONABLY FAILED TO OBJECT TO THE ADMISSION OF STEVEN HAYNE'S TESTIMONY

In their case in chief, the State improperly relied on the misleading, unsupported, and prejudicial testimony of Dr. Steven Hayne. Dr. Hayne testified outside the scope of his expertise; testified with no foundation in evidence; and falsely testified to his expert credentials. Trial counsel unreasonably failed to object on numerous bases. Dr. Hayne's testimony that the victim could have been hit with as many as four shots from the .38 caliber firearm was particularly prejudicial to Mr. Pitchford.

#### B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state

court because prior counsel was ineffective for failing to present this claim. Any

procedural default resulting from that presentation can be overcome under

*Martinez v. Ryan,* 132 S. Ct. 1309 (2012).


### XIV.   PETITIONER DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS CAPITAL TRIAL BECAUSE TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP AND PRESENT READILY AVAILABLE MITIGATING EVIDENCE.

Mr. Pitchford's sentence of death was obtained in violation of federal

constitutional guarantees of due process, equal protection, effective assistance of

counsel, a fair trial, a fair and impartial jury of his peers, freedom from cruel and

unusual punishment, and a reliable sentence because counsel rendered ineffective

assistance during the penalty phase of Mr. Pitchford's capital trial. U.S. Const.

amends. V, VI, VIII & XIV. Counsel's representation during the penalty phase was

woefully deficient because counsel failed to conduct the reasonably adequate

investigation into potential mitigation circumstances that the Constitution requires.

Counsel's errors and omissions rendered their performance constitutionally

deficient. There is a reasonable probability that, had counsel not been ineffective,

the result of the proceeding would have been different. Separately, and

cumulatively, these errors require reversal of Mr. Pitchford's sentence of death.

Each of the errors and omissions of trial counsel in the guilt phase also contributed

to the jury's decision to vote for a sentence of death.

Initial post-conviction counsel was ineffective by failing to adequately

investigate and present available mitigation evidence and failing to marshal the

facts they did have in support of the claim that trial counsel was ineffective at the penalty phase of Mr. Pitchford's trial.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

1. **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT MITIGATING EVIDENCE.**

### A. Supporting Facts

***Ray Carter was not prepared to defend Mr. Pitchford from the death penalty and failed to conduct an adequate investigation into Mr. Pitchford's background and potential mitigation circumstances.***

As stated previously, Mr. Pitchford's appointed lawyers were not prepared to go to trial on February 6, 2006. Having spent all their time preparing Mr. Pitchford for a plea, trial counsel did not start interviewing mitigation witnesses until the month before trial. In an affidavit submitted in post-conviction proceedings, Mr. Carter admitted that "the mitigation investigation for Mr. Pitchford's case was incomplete, and I did not feel like the mitigation investigation that had been done was as thorough as it should have been." 2011-09-15 Ray Carter Aff., 2. At the hearing on trial counsel's continuance motion, Ray Carter stated that Mr. Pitchford's family had only recently started talking to them. "Up until a couple weeks ago we have not been able to actually get information from Mr. Pitchford's family. For whatever reason there weren't forthcoming with us until about a couple weeks ago." Tr. at 37. Carter also explained that he had hired a mental health

166

expert to conduct an independent medical examination of Mr. Pitchford but had not had time to do it yet. Tr. at 34. The Mississippi State Hospital evaluation, which was not completed until January 26, "brought about other questions" that defense counsel needed to investigate with the assistance of their own expert. Tr. 43-44. Carter concluded:

> So in the end, Your Honor, in summary, we are telling the Court that we have not done all that we could do. We have not done all that we know we should do based on the point we are at now, based on having finally been able to talk to Mr. Pitchford's family. We know we haven't done all that we need to do. And to force us to go to court on this particular date would require me to not be as effective as I know I could be.

Tr. 46.

Defense counsel's lack of preparation showed at the penalty phase. Mr. Pitchford's attorneys had no mitigation theory, beyond arguing that Mr. Pitchford was affected by the death of his father. Trial counsel presented almost no information about Mr. Pitchford's background, and what they did present was misleading.

The penalty phase of Mr. Pitchford's trial started at 9:00am on February 9, 2006, and both sides rested before lunch that same day. Tr. 723. The defense called eight witnesses in the penalty phase. Tr. 673-720. Four of the witnesses had either taught Terry in elementary school or worked at his elementary school, but none of them remembered anything of significance about Terry. When asked what they remembered about Terry, his kindergarten teacher Diane Washington replied, "not much," Tr. 674. His fifth grade teacher Laura Hoffman replied, "nothing really

noteworthy." Tr. 684. And the only thing his fourth grade teacher Janice Diebold could say about Mr. Pitchford was that he seemed, "Happy. Fun loving. Not a very hard worker." Tr. 682. Defense also called a secretary at Grenada Middle School, Sherry Taylor, who did not teach Terry but remembered that Terry's father was a good man and loved Terry and Perry. Tr. 677-678. Ms. Taylor had been asked to testify the day before her testimony. Tr. 679.

For family member witnesses, trial counsel called Mr. Pitchford's mother Shirley Ann Jackson, his twin brother Perry Pitchford, his older sister Veronica Cowins [Dorsey], and his girlfriend and mother of his child Dominique Hogan. The testimony of these witnesses who knew Mr. Pitchford his entire life, who grew up with him and lived in the same household, was sparse and superficial; they were not asked about the details of Mr. Pitchford's tragic upbringing. The testimony of these four crucial witnesses spanned only 11 transcript pages.

Dominique Hogan testified that Terry is the father of her child, De'Terrius. She testified that Terry was a good father, and that he would see his son every day. Since the crime, she has visited and called Terry many times and taken De'Terrius to visit him. Tr. 686, 693.

Terry's twin brother Perry testified that their father was "awesome." He disciplined them, loved them, and taught them. Tr. 695. They spent most of their time with their father when he was alive; he took them to school and did most of the cooking for them. Tr. 696. Perry stated that Terry was more sensitive to their father's death and that he cried for days afterward. Perry stated he was quiet and

calm and kept it all in. Perry testified that their father treated them equally and did not put extra effort into Terry. Tr. 701. According to Perry, Terry was equally close with his mother and his father. Tr. 698. After their father's death, Terry complained about not getting the same privileges as Perry and being mistreated. Tr. 700-701. In response to defense counsel's question about whether Perry saw how Terry performed in school, Perry stated "not really" because they were separated in school. Tr. 697. To the best of their abilities, they raised Perry and Terry the same.

On cross-examination, Perry started elaborating on how he and Terry were treated differently, but his answer was mischaracterized by Doug Evans and trial counsel did not follow up. Perry stated that when he messed up in school or got in trouble, he would still be able to watch T.V., stay up late, and stay on the phone late, but when Terry messed up, he was punished, most likely because their mother always found out what Terry was doing. Tr. 703. The prosecutor summarized Perry's testimony: "Basically what you're saying, y'all were treated the same and he didn't like it." Perry's testimony was left mischaracterized by Doug Evans. Because trial counsel was not prepared, he failed to draw out the vastly different ways that he and Terry were treated by their parents.

After Dominique and Perry testified, Ray Carter requested a 15-minute recess to talk to Terry's mother Shirley Jackson and his older maternal half-sister Veronica Dorsey before he determined whether he would call them as witnesses. Tr. 704-705. He ultimately decided to call them after prepping them during the 15-minute recess.

Veronica Dorsey testified that because Terry is a twin, he's a follower. Terry took his father's death harder than Perry. He couldn't let go and couldn't believe that his dad was gone. Their father died from cancer, and the death came suddenly. They did not have time to prepare. Tr. 708. After Terry's father died, Veronica would get calls from her mother to pick Terry up at school because he had gotten in trouble or forgotten something. Terry would tell her that he missed his father. Tr. 709.

Terry Pitchford's mother Shirley Jackson testified that Terry and his father had a close relationship. Terry went to his dad's bedside in the hospital when he was dying in a coma and asked his dad to please wake up and not to leave him. Tr. 717. After their dad died, the twins would sleep with his clothes. Terry started getting in trouble in school after his dad died, and Shirley never took him to any counseling.

On cross-examination, Doug Evans was able to elicit that Terry had been expelled from school for busting the lights out of a school bus because he was angry after a group of boys had ganged up on him. The prosecutor was able to question Ms. Jackson:

> Q. He got violent when he got mad, didn't he?
> A. Yes, he got upset. He got upset. He got upset.

Tr. 719.

In addition to unreasonably limiting their investigation, trial counsel's preparation of the witnesses who did testify fell well below the standard for a reasonably competent attorney. With a crushing caseload and all hopes pinned on a

170

guilty plea, Carter had not prepared the witnesses he called to testify at the penalty phase. Perry Pitchford did not think he was going to testify at his brother's trial until they called his name in court. 2018-08-26 Perry Pitchford Declaration, ¶ 42. Perry remembers meeting with trial counsel twice, once for 15 minutes in his office and once on the day of trial. *Id.* Trial counsel had not prepared him to testify.

Dominique Hogan remembers meeting with trial counsel to talk about her testimony the day before she was called to testify and did not feel prepared. 2018-08-26 Dominque Hogan Declaration, ¶ 24. She observed that trial counsel did not seem to be communicating much with Mr. Pitchford after the guilty plea fell through.

Shirley Pitchford likewise was not prepared to testify and discussed her testimony just once on the day of trial. 2018-09-08 Shirley Jackson Declaration, ¶ 38. She had met with trial counsel to discuss the possibility of Mr. Pitchford taking a plea, but she did not discuss her testimony at a possible penalty phase. She remembers him talking to her about answering questions honestly and not to be scared. On the day of trial, Carter was not even certain he would call Mr. Pitchford's sister or mother, telling the court he needed a 15-minute recess to decide. Tr. 704-705.

Not a single mental health expert testified on Terry Pitchford's behalf or effectively assisted counsel for purposes of mitigation during his 2006 trial, yet Mr. Pitchford's competency to stand trial was immediately at issue, and his mental health was clearly relevant to the punishment he might suffer.

171

*The mitigation case that competent counsel would have gathered and presented.*

In a capital case, defense counsel has an obligation to conduct a thorough investigation into their client's background to discover mitigating evidence. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362 (2000). Mr. Pitchford's counsel presented a thin and unpersuasive case for the jury because they failed to conduct the reasonably adequate investigation into potential mitigating circumstances. A reasonable investigation into Mr. Pitchford's background would have developed evidence that: (a) Terry was singled out for physical and emotional abuse and neglect from his mother; (b) Terry was exposed to sexual abuse and violence in his home; and (c) Terry suffers from numerous mental, emotional, and neurodevelopmental impairments, likely caused in part and exacerbated by his severe history of physical and mental abuse and neglect.

**Family origins**. Terry Pitchford was born in Greenwood, Mississippi, on December 30, 1985, a few minutes after his fraternal twin Perry Pitchford.[38] The twins were born to Shirley Ann Pitchford and James Pitchford, who was 27 years older than Shirley. Shirley and James married after the twins were born, in September 1986. The twins were Shirley's third and fourth children; she had two older children, each by different fathers. The twins were James' eleventh and twelfth children; he had ten additional children, with five different women.

James and Shirley grew up in neighboring rural Mississippi towns. Shirley was born on August 23, 1954, on a plantation in Itta Bena, Mississippi where her

---

[38] Because of the historical and biographical nature of this claim, Mr. Pitchford is referenced by his given name in this section.

parents lived and worked for the plantation owner, her father as a foreman and her mother as a cook and seamstress. The family eventually moved to a farm in Tchula, Mississippi, where they leased the land.

Shirley remembers her father as an abusive alcoholic. When she was very young, her father held a gun to her mother and shot her mother in the shoulder. Her father eventually died from alcoholism. 2018-09-08 Shirley Jackson Declaration, ¶ 34. The abusive relationships Shirley witnessed as a child would repeat themselves in various ways in own relationships in years to come.

James Pitchford was born 27 years before Shirley, on December 28, 1928, in Lexington, Mississippi. James and Shirley met when Shirley was home visiting from Detroit, where she had been living for the past several years. James' grandmother lived next door to Shirley's mother.

When Shirley was in her final year of high school, she got pregnant with her first daughter Veronica. Shirley was told she could not stay in school while pregnant, so she had to go back the following year to finish. Veronica was born in May 1973, and Shirley graduated from high school in 1974. After graduating, Shirley moved to Detroit to live with her sister Bessie Mae and left baby Veronica with her mother in Tchula. While in Detroit, Shirley met and married a controlling and abusive man, Sterling Burnett, and together they had one child, DeShawn Burnett. As Shirley remembers:

> Sterling refused to let me see my friends or family unless he was there with me. He told me I had to stay a certain size, and he bought all my clothes. He controlled what I did and did not do. I had to fix his lunch and bring it to him at work every day. I remember he would sit in a

173

> rocking chair, rocking back and forth and staring at me. When he
> would stop rocking, I knew he was getting ready to start something or
> accuse me of something went back the next year to finish school.

2018-09-08 Shirley Jackson Declaration, ¶ 7. Shirley soon decided to get away from

Sterling, and she moved back to Tchula in 1979 with DeShawn.

When Shirley met James, she was still married to Sterling, and James was

married to a woman in California. But they began dating. At that point, James had

ten children with five different women. Shirley could never "keep track of which

woman went with which kids." 2018-09-08 Shirley Jackson Declaration, ¶ 10. James

continued to go back and forth between Mississippi and California, where he lived

with his family. He would pay for Shirley to come visit him, and Shirley would leave

Veronica and DeShawn with her mother. Shirley remembers:

> One time, I stayed out there for six months. James paid for the
> apartment where I stayed and the bills, but I did get a part-time job
> while I was out there. I was actually living in California dating James
> when his wife gave birth to their son, Kee-Eso Pitchford.

2018-09-08 Shirley Jackson Declaration, ¶ 10. Eventually, Shirley got tired of

living as a mistress and moved back to Mississippi. James followed her, and

the two moved in together.

When Shirley gave birth to Terry and Perry, she had not wanted any more

children. A few years earlier, Shirley and James had a child Pierre who died five

hours after being born. When she was pregnant with Pierre, Shirley had been told

by her doctor in Lexington that she would need a cesarean section because of the

risk that her placenta would detach from the womb and come out before the baby.

When she went to the University of Mississippi Medical Center in Jackson, the

doctor there insisted that she could have a vaginal birth. "All I remember is there

174

was blood everywhere and I was rushed into surgery. Apparently, blood had filled Pierre's lungs. Pierre lived for about 5 hours." 2018-09-08 Shirley Jackson Declaration, ¶ 11. The death of their newborn was extremely painful to Shirley.

> I didn't want to have any more children after Pierre, and I had signed up for tubal ligation. The doctors wouldn't do it because Pierre had just died and I might want to try for another baby. But, I knew I did not want any more children.

*Id.*, ¶ 12.

**Terry's early life**. Shirley was neither equipped for nor interested in caring for her twins. She did not have names picked out after they were born. She decided on names after seeing William "Refrigerator" Perry, the football player, on the television. She named one boy "Perry" and chose "Terry" for the other boy because it rhymed. From the time they were born, Shirley has treated her son Perry as the "good twin." As a baby, Perry was quiet and played by himself. He didn't require much from Shirley. Terry, on the other hand, "was always moving, active, and trying to get people's attention. He needed to interact with people all the time. He was lively. Even as a baby, he didn't follow directions. He would get into mischief and break things. Even as a baby, I had to whup him." 2018-09-08 Shirley Jackson Declaration, ¶ 15. For a disinterested and overwhelmed mother, Terry was a challenge from the beginning.

Perry remembers how different he and Terry were. Terry was "friendly and always sought attention from other people and wanted to be around people" and Perry describes himself as "quiet, more laid back, and tended to stay to myself."

2018-08-26 Perry Pitchford Declaration, ¶ 8. Terry was also more emotional than Perry, "with extreme highs and lows." *Id.*

As if to accentuate how different Perry and Terry were in their personalities, they were also physically very different. Perry was tall, lean, and lighter skinned. Terry was short, stocky, and darker skinned. The way in which they were treated did not go unnoticed by family members and Perry himself.

> Terry never got the attention or praise that I got from my mom and others in the family. . . Overall, my mother didn't pay attention to Terry, even though he was constantly seeking attention from her. . . I was definitely my mother's favorite. My mother would tell Terry "you ain't shit" and "you're going to end up in jail."

*Id.*, ¶ 10.

Terry was known to family members as the "bad twin," the "dumb twin," and the "dark twin" because of his complexion. *Id.*, ¶ 9; 2018-08-26 DeShawn Burnett Declaration, ¶ 14.

> Terry was described by family as always being in the way. When we were young, we were taught never to interrupt an adult. Terry couldn't help himself. He would often interrupt when adults were talking. Our mom or whatever adult was around would whip him or slap him in the mouth for this.

*Id.*, ¶ 11. Terry was constantly asking questions of his mother and other adults, which was perceived as irritating. 2018-08-26 Perry Pitchford Declaration, ¶ 24. He often interjected with statements that did not make sense or were irrelevant to the topic being discussed. Shirley would get irritated and angry at Terry for jumping into the conversation.

When Terry and his siblings were dropped off at friends' houses while their mother ran errands or went to bible study, they were expected to be in a certain

176

location at a certain time to be picked up. Terry was the one who wandered off.

Terry's maternal cousin, Roydetric Harris, remembers:

> Terry was usually very respectful and polite to adults, but sometimes he would talk back to his mom, my aunt, Shirley Ann. She did not take that. I've seen her pick up something from the floor and knock Terry upside the head with it. I remember one time Terry broke something in the back room of Ms. Shirley Ann's house when he was running around. I saw her whip him with extension cords.

2018-08-23 Roydetric Leetrell Harris, ¶ 4.

When Terry and Perry were young, Shirley spent most of her time working. She held multiple jobs and was rarely home. James Pitchford, who at age 57 was collecting a disability check and wasn't working, served as the twins' primary caretaker until he died when they were barely 11 years old. Terry's older half-brother DeShawn helped care for the twins when they were babies, changing diapers and warming bottles, because Shirley and James were always busy running a burger spot when they lived in Tchula. 2018-08-26 DeShawn Burnett Declaration, ¶ 6. Shirley did not even hug the twins until James died. 2018-09-08 Shirley Jackson Declaration, ¶ 20.

When James was alive, Terry and Perry spent all their time with their father. He picked them up from school every day; he cooked their meals, and he took them with him wherever he went. He took them to church, to his friends' houses, fishing at Grenada lake, and to rehearsals for his gospel music group. 2018-09-11 Jessica Brown Declaration, ¶ 3; 2018-08-26 Perry Pitchford Declaration, ¶ 25. James would sometimes even take the twins and Jessica with him to California to visit relatives. He would wake them up early, load them in the truck, and drive off,

sometimes without Shirley even knowing. 2018-09-11 Jessica Brown Declaration, ¶ 3. The twins would sleep in the same bed with James, and when Shirley walked in, they would tell James not to let her into the bed. For a period, Shirley slept in a separate room. 2018-09-08 Shirley Jackson Declaration, ¶ 20.

Family members noticed Terry's close bond with his father. On the occasions where both Shirley and James were together with the twins, Terry was always physically close to James, while Perry would stay closer to his mother. 2018-08-23 Roydetric Leetrell Harris, ¶ 7. Despite the close bond, even Terry's father treated Terry differently than Perry. James did not give Terry the same praise as Perry got and he disciplined Terry more severely than Perry. 2018-08-26 Perry Pitchford Declaration, ¶¶ 10-12. As Perry remembers, "I would only get a couple of licks when I got in trouble, but Terry would get extreme beatings." 2018-08-26 Perry Pitchford Declaration, ¶ 12.

> When my father was alive, he was strict with Terry and severely punished him. Terry would get the 'full punishment,' which included beatings all over his body with extension cords, switches, and anything else that was lying around. I remember my father catching Terry cheating on a take-home spelling test. My dad whipped him until Terry was crying out he couldn't breathe. Terry finally ran under the coffee table to avoid more of a beating.

2018-08-26 Perry Pitchford Declaration, ¶ 11.

When the twins were around five years old, Shirley and James moved from Tchula to Grenada, Mississippi. They moved into the house where Shirley still lives today, in a rural mostly white section of Grenada. The family were treated as outsiders. They had no connections in the close-knit community where everyone had extended family ties.

The twins felt like outsiders in Grenada because I kept them sheltered and close. The boys would tell me they thought I didn't want them to have any friends because I didn't have any friends. But, I have always been a private person and more of a loner. I spent my time at home, in church, and at work. That's it.

2018-09-08 Shirley Jackson Declaration, ¶ 16.

**James was a predator**. Terry Pitchford grew up in a house consumed by sexual abuse. James repeatedly raped Terry's older half-sister Veronica starting from when she was as young as twelve. James is the likely father of Jessica Brown, the child Veronica gave birth to when she was 14 years old, and the child who grew up in the home as Terry and Perry's younger sister. 2018-08-26 DeShawn Burnett, ¶ 8.

James was known to molest young girls. A few of Veronica's young cousins who would come to visit and spend the night were also molested by James; they never returned. Veronica was deeply traumatized living in the house with James. Her mother either did not believe her or chose not to address the abuse. Veronica also remembers that James would give her, DeShawn and the twins sleeping pills when they were young, telling them that they were vitamins. 2011-09-13 Veronica Dorsey Affidavit, ¶ 9. Her mother would complain that they were all knocked out when she got home. Shirley revealed that James often had sex with people when they were asleep or trying to sleep. 2018-09-08 Shirley Jackson Declaration, ¶ 13.

Shirley knew that James did "inappropriate" things with Veronica and other girls. She had learned from James that his grandmother had sexually abused him when he was very young. He never got counseling to therapy for that abuse. 2018-09-08 Shirley Jackson Declaration, ¶ 18. James was known for being unfaithful to

179

Shirley and having relationships with different women everywhere he went. 2018-08-26 Perry Pitchford Declaration, ¶ 14; 2018-09-10 Robert Triplett Declaration, ¶ 4. When he took the twins and Jessica to California, he would tell Shirley to stay behind. 2018-08-26 Perry Pitchford Declaration, ¶ 15; 2018-09-11 Jessica Brown Declaration, ¶ 3. While in California, he saw a lot of different women. 2018-08-26 Perry Pitchford Declaration, ¶ 15.

James died on January 28, 1996, after a short battle with cancer. Terry was in the hospital room with his father when he was dying. Shirley remembers that Terry was the only one who was at his father's bedside. Terry kept calling his father's name, asking his father to respond and saying, "please don't leave me." 2018-09-08 Shirley Jackson Declaration, ¶ 26; Tr. 717. When the doctor walked in the room, Terry asked the doctor why his father's mouth was open. The doctor responded matter-of-factly, "nothing is wrong, he's just dying." 2018-09-08 Shirley Jackson Declaration, ¶ 26.

At the fragile age of eleven, the twins were without their primary caretaker. Terry took the death of his father harder than anyone else. *Id.*, ¶ 26; 2018-08-26 Perry Pitchford Declaration, ¶ 16; 2018-08-23 Roydetric Leetrell Harris, ¶ 7. For a child like Terry, the loss of his father was devastating. While Perry responded to his father's death by paying more attention to his mother, Terry had a hole that could not be filled. Terry "cried all the time." 2018-09-11 Jessica Brown Declaration, ¶ 6. He would go off in a corner and cry by himself, sometimes for no apparent reason. 2018-08-23 Roydetric Leetrell Harris, ¶ 7.

180

Terry wouldn't say why he was crying but the episodes didn't start
until after his dad died. I don't believe Terry ever got counseling after
James died and I could tell he was not moving past it in life. It seemed
that Perry was much better able to go on with things after his dad died
and kind of put it behind him somewhat.

*Id.*, ¶ 7.

Soon after James died, Shirley met and married Louis Jackson, a long-haul

truck driver. Louis Jackson was an abusive alcoholic. He and Shirley had a

tumultuous and chaotic relationship, introducing further violence and instability

into Terry's life. The twins did not know their mother had married Louis until they

came home from school one day and Shirley and Louis told them they had gotten

married. 2018-08-26 Perry Pitchford Declaration, ¶ 26. Louis Jackson came into the

boys' life at a crucial time. He had an opportunity to make a positive difference in

their lives with the loss of their father, but instead he introduced chaos, violence,

and instability in their young lives.

Everyone noticed that Terry struggled after the death of his father. He

seemed lost and always in search of belonging and acceptance. 2018-09-10 Robert

Triplett Declaration, ¶ 6; 2018-08-23 Roydetric Leetrell Harris, ¶ 11; 2018-08-26

DeShawn Burnett Declaration, ¶ 10. When he was 13-years-old, Terry met his

girlfriend Dominque Hogan at the Baptist church they both attended. Dominque

became a crucial life support system for Terry as he searched to find belonging.

Dominque lived in the Tie Plant section of Grenada, a rougher more densely

populated part of town than the secluded "country" section of Grenada where the

twins lived. 2018-08-26 Perry Pitchford Declaration, ¶ 6. Tie Plant was called "the

city."

> We didn't really mingle with anyone from "the city." And people from the city never came to the country. As churchgoing country boys, we were always told Tie Plant was a place where we needed to be careful. There was a lot of drug dealing and crime in that neighborhood. Terry didn't mingle in Tie Plant until he met his girlfriend, Dominique Hogan, when they were teenagers.

*Id.*, ¶ 7. Perry remembers that he and Terry would get teased at school for being "country" when kids heard their drawl. *Id.*, ¶ 6.

Terry started spending time in Tie Plant once he met Dominique. Most of the time they spent together was at Dominique's house or in her neighborhood. At first treated as an outsider, after several years he eventually made friends with some of the kids there. 2018-08-26 Dominique Hogan Declaration, ¶ 8. Terry's half-brother, DeShawn reported: "When Terry got older, he ran with a rough crowd at Tie Plant. He was trying to appear tougher than he really was. Terry was not used to the street-smart rough people he hung around. Our family never hung around Tie Plant." 2018-08-26 DeShawn Burnett Declaration, ¶ 15.

**Physical and emotional abuse**. While Shirley was physically abusive to all of her children, Terry bore the brunt. And the physical abuse got more severe after Terry's father died. 2018-09-11 Jessica Brown Declaration, ¶ 6. His mother detested being around him, and his efforts to seek her attention only made her angrier. Shirley was known to pick up anything she could get her hands on and throw it at her kids, especially Terry. Terry always received the most physical abuse. *Id.*, ¶ 6. Terry's maternal half-cousin saw Shirley pick things off the floor and throw them at Terry, and whip him with switches and extension cords when he accidentally broke something in the house. 2018-08-23 Roydetric Leetrell Harris, ¶ 4. Shirley herself

admits that she was particularly hard on Terry because he was in the way and would give her a hard time. She expected him as a baby to follow directions. When he unsurprisingly did not always follow directions as a baby, she would "whup" him. 2018-09-08 Shirley Jackson Declaration, ¶ 15. She remembers, "I would have to slap him around and knock him real hard against the wall when he was having a tantrum." *Id.*, ¶ 25.

When Terry was 13 years old, Shirley threw a spray starch can at him and busted his head open, leaving a 2.5 cm laceration. Med. Records Starch Can, 2-4. Perry was there. He became frantic and called Veronica, who was living in Jackson at the time. Veronica raced to meet them at the hospital. As Veronica remembers, they were all taught to protect the image that their mother projected to the outside world: a perfect hardworking mother. 2011-09-06 Veronica Dorsey ¶ 13.

Shirley's tumultuous and violent relationship with Terry's stepfather Louis Jackson introduced added stress for Shirley that she then took out on Terry. Louis was often gone during the week, driving long-haul trucks.

> He would come home drunk on the weekends and want to fight. Every weekend it was a madhouse. He would get home at around 2:00am or 3:00am on a Friday or Saturday night. He'd turn on all the lights and shake me awake, demanding that I fix him something to eat. Sometimes I was so deep in sleep that it would take me a while to wake up. I eventually got used to this and would have some food ready in the microwave. All I had to do was push a button. But he wouldn't even do that by himself. He would call me all sorts of names. With all his yelling and screaming, he woke the kids up, too. Terry would come out into the kitchen and Louis would cuss and yell, telling him to get back to bed, "I'm talking to your mama!"

2018-09-08 Shirley Jackson Declaration, ¶ 31. Terry would always try to intervene to protect this mom from being beaten by Louis Jackson. 2018-08-26 Dominque Hogan Declaration, ¶ 16; 2018-08-26 Perry Pitchford Declaration, ¶ 27. When Terry stepped in to protect her, Shirley would take out her frustration on Terry. 2011-09-06 Veronica Dorsey ¶ 18. Terry would take everything his mother dished out, while the other kids would get out of the way. *Id.*

When Terry and Perry were 16 years old, part of their house burned down in an electrical fire. The family—Shirley, Louis, Jessica, and the twins—had to move into a hotel for a few weeks until the damage was repaired. One night, Louis came back to the hotel late after a night out drinking. He woke everyone up and demanded that Shirley get him something to eat. Shirley refused, and he started being physical with her. Terry tried to stop Louis from hitting his mom, and Louis turned on Terry. Louis was bigger and taller than Terry, but Terry still tried to intervene to protect his mother. 2018-08-26 Perry Pitchford Declaration, ¶¶ 28-29.

Terry's girlfriend Dominque remembers being on the phone with Terry, and

he would be crying and very upset because Louis was drunk and fighting with his mom. I could hear Louis in the background, cussing and acting a fool. I heard him telling Shirley he was going to beat her ass. I remember Terry arguing with Ms. Shirley about how she was letting Louis mistreat her, and Shirley wanted Terry to mind his business and not get into it.

2018-08-26 Dominque Hogan Declaration, ¶ 16.

Shirley directed the majority of her emotional abuse toward Terry, calling him dumb and telling him "you ain't shit" and "you're going to end up in jail." 2018-

08-26 Perry Pitchford Declaration, ¶ 10. She constantly told Terry, "you can never do right." 2018-09-11 Jessica Brown Declaration, ¶ 8.

**Maternal neglect**. Shirley had never had to take care of children on her own before. Veronica and DeShawn were raised primarily by their grandmother when they were little; and Shirley also had the help of her sister when she was living in Detroit. 2018-08-26 DeShawn Burnett Declaration, ¶ 12. When she was left with two 11-year-old boys, she was not prepared or equipped to raise them. 2018-09-10 Robert Triplett Declaration, ¶ 9.

When Terry and Perry were about 13 years old, Shirley put them on a bus to California by themselves to stay with their father's relatives because she needed a break. 2018-08-26 Perry Pitchford Declaration, ¶ 25. As Perry remembers:

> She packed us some food and snacks, but we were on our own. We had to rely on each other. We had one cassette tape by the rapper Juvenile, and we listened to it over and over again. By the end of the trip, we had memorized every song on the tape. It was a two-day bus ride, and we would spend the night on the bus. I remember an older man on the bus accused us of stealing his belongings. We had to plead with him to defuse the situation. I was worried that he was going to try to fight us. It was a scary situation for 13 year-olds. We stayed in California for the whole summer. Our half-brothers, Jimmy and Michael Pitchford, drove us back to Mississippi. I remember Jimmy or Michael going into a store and stealing a T.V. on our way home.

2018-08-26 Perry Pitchford Declaration, ¶ 25.

When Terry got in trouble in school, usually for talking in class or not following instructions, the principal would call Shirley. She rarely went to school to get Terry, and sometimes asked her daughter Veronica to go in her place. Tr. 709. The Principal of Grenada Elementary School at the time, Robert Wade, remembers Terry as "a good kid overall with a good attitude." 2018-08-31 Robert Wade, ¶ 2.

When Terry did get into trouble, Mr. Wade remembers they would call Shirley, "[b]ut she never seemed interested in addressing Terry's behavior and she would usually brush it off. It was like she didn't want to be bothered with a call from the school." 2018-08-31 Robert Wade, ¶ 3. She did not want to be bothered with having to address the issues of her child.

Many of Terry's former elementary and middle school teachers report that despite Terry's academic struggles, they never met with his mother to discuss her son's progress. Laura Hoffman, Terry's fifth grade teacher at Grenada Elementary School states:

> When children do not get support at home and do not have a parent to push them to strive for success, they tend to just give up. I do not remember any family involvement in Terry's education. I do not remember Terry's mother coming to any parent-teacher conference or meeting with her at any time to discuss Terry's academic progress.

2018-08-28 Laura Hoffman Declaration, ¶ 7. As Terry's older sister Veronica recounts: "[O]ur mother never encouraged [us] to do well in school," telling her children that they would never amount to anything. 2011-09-13 Veronica Dorsey Affidavit, ¶ 4. Shirley likely projected her own insecurities about her learning disabilities onto her children.

Shirley also failed to get her children, especially Terry, the medical care they needed. Terry was plagued by voices in his head that berated and chastised him and told him to do violent things to himself and others. *See infra*. These voices got worse after the death of his father. 2018-09-08 Shirley Jackson, ¶ 28. His mother thought the devil had entered him, and instead of seeking professional help, she believed all she could do was pray. 2018-09-08 Shirley Jackson, ¶ 29. When Terry complained of

headaches, his mother thought it was "because of the voices he heard" and that the devil was with Terry. *Id.* For this reason she did not take him to the doctor or seek treatment for his headaches. But when Perry complained of headaches, she "took Perry to see the doctor for his headaches because he was feeling pain, but I didn't take Terry to the doctor because Terry was hearing voices and I felt the devil was with Terry." 2018-09-08 Shirley Jackson, ¶ 25.

Shirley never treated what was likely a serious injury to Terry's hand that he sustained in eighth grade when he punched the taillights out of a school bus as he was escaping a gang of kids who were bullying and trying to fight him. Terry was expelled for this. One of the teachers who was present, Albert "Benji" Britt, remembers, "Terry was scared and needed to figure out how to avoid a fight and get out of harm's way" and "seemed to channel his fear and anger at those kids into the bus taillights." 2018-08-28 Albert C. Britt Declaration, ¶ 5. There was a lot of blood on Terry's hands after he punched the bus. *Id.*, ¶ 6; 2018-08-31 Michael Jackson Declaration, ¶ 2. Terry was hysterical and agitated, "using belligerent language" and "fussing and arguing with himself." 2018-08-31 Michael Jackson Declaration, ¶ 2. Terry's mother was nearby in her school bus, and when Benji Britt and another teacher, Michael Jackson, walked Terry over to her bus, she reacted with little concern for her son, which surprised the teachers. As Mr. Jackson remembers, "I will never forget his mother's reaction. I expected her to show a level of concern or more of a response, but all she said was, 'I'll handle it.'" 2018-08-31 Michael Jackson Declaration, ¶ 3. Mr. Britt also remembers that Ms. Jackson "was very quiet and

didn't show much emotion," when they brought an injured and frantic Terry to her. 2018-08-28 Albert C. Britt Declaration, ¶ 6. Instead of comforting her traumatized son, Shirley slapped him. 2018-08-26 Perry Pitchford Declaration, ¶ 32. Terry never received any medical attention for the injury to his hand. *Id.*

When voices told Terry to jump out of a moving truck when he was 8 or 9 years old, Terry jumped. He suffered a large gash in his head and a big scar exists on his head to this day. The gash turned into a knot, and it bled a lot and filled with pus. But his mother did not take him to the doctor "because I wasn't raised to go to the doctor unless it was 'life or death.' I was raised that you should pray and be healed that way." 2018-09-08 Shirley Jackson, ¶ 21. When Shirley hit her daughter Veronica with a glass mason jar, she stitched Veronica's cut herself.

When Shirley busted Terry's head open with a can of spray starch, the injury was serious enough that Terry had to go to the hospital for stitches. Instead of relying on their mother for their safety and security, Perry called Veronica in Jackson for help. Perry was hysterical, and Veronica met them at the hospital and told them what to say to avoid their mother being investigated. 2011-09-13 Veronica Dorsey Declaration, ¶ 13.

Shirley would also leave the twins home alone for weeks or even months at a time when she went on the road with Louis Jackson during his long-haul truck drives. 2018-08-26 Dominque Hogan Declaration, ¶ 16; 2018-09-11 Jessica Brown Declaration, ¶ 10. As Jessica remembers:

> When [Shirley] and Louis left to go on the road, for weeks at a time, the twins and I were left alone in the house. Older church members

would sometimes come by to check on us. By then the twins were around 16 years old and they were responsible for me when Shirley and Louis were gone.

2018-09-11 Jessica Brown Declaration, ¶ 10.

**Terry was entitled to the assistance of a competent mental health expert to evaluate, prepare and present a mitigation defense**. Had competent counsel conducted the constitutionally required investigation and gathered the information outlined above, he would have immediately recognized the need to retain and present the testimony of various mental health experts who could have helped the jury understand the long-term effects of the trauma and neglect that Mr. Pitchford experienced growing up. Mental health experts would have contextualized the behavioral problems Terry had at home and in school and described Mr. Pitchford's psychiatric disorders and cognitive impairments exacerbated by the physical and psychological abuse he faced at home. Experts could have further explained how his impairments manifested in his daily life.

Terry suffers from numerous mental, emotional, and neurodevelopmental impairments, which were caused or exacerbated by his severe history of physical and mental abuse and neglect. In state post-conviction proceedings, Dr. Richard Dudley conducted a multi-day psychiatric evaluation of Terry Pitchford, finding several major psychiatric difficulties. 2011-09-14 Richard Dudley, Aff.; 2011-11-14 Richard Dudley Supp. Aff. Dr. Dudley observed that Terry "has evidenced clinically significant symptoms of major psychiatric difficulty for virtually all of his life." 2011-9-14 Richard Dudley Aff., 11. He concluded that Terry "suffers from multiple major psychiatric disorders that have had a significant impact on his level of

189

distress and ability to function in important areas of his life." *Id.*, 12. Dudley found symptoms associated with a variety of disorders including Post-traumatic Stress Disorder, Obsessive-Compulsive Disorder, Borderline Personality Disorder, Cannabis Abuse, and Depressive Disorder. *Id.*, 12-14, He concluded that the voices were in fact auditory hallucinations, and that the marijuana use was a failed attempt to make the voices go away. 2011-11-14 Richard Dudley Supp. Aff., 1-2. Dr. Malcolm Spica, a clinical neuropsychologist, conducted a battery of tests to determine the presence of any brain-related neurocognitive deficiencies, impairments, limitations, or dysfunction. Dr. Spica found the presence of organic brain dysfunction that is "likely long-standing and developmental." 2011-09-23 Malcolm Spica Aff., ¶ 10.

**The effects of chronic exposure to childhood trauma.** In light of Terry's traumatic upbringing, competent counsel should have retained and presented the testimony of a mental health expert with particular knowledge and expertise in the effects of chronic exposure to trauma in childhood. A competent expert in that field would have explained to the jury the significance of Terry's experiences and their effects on his development. A trauma expert, such as Dr. Barbara Hamm, could have provided the following context for the jury:

Growing up in the type of terrifying, violent and abusive environment that Terry was subjected to actually shapes the development of a child's brain and his subsequent capacities for regulating his emotions and behaviors. The wiring of the human brain is far from finished at birth; the brain undergoes major neurological

190

growth and development throughout childhood and adolescence before finally reaching maturity in the early 20s. Chronic exposure to trauma prevents the brain from developing normally, and causes structural and neurochemical changes that can have profound functional and behavioral consequences.

As Dr. Hamm explains, there are five subtypes of maltreatment: physical abuse, emotional abuse, neglect, sexual abuse, and witnessing/exposure to family/community violence. Dr. Hamm found significant evidence that Terry experienced multiple forms of chronic and ongoing traumatic events in all five subtypes, including: profound neglect, targeted physical and emotional abuse, exposure to violence in the home (including sexual) and alcohol abuse by a caretaker. As Dr. Hamm explains, neglect is often the backdrop for the other four forms of maltreatment

> The majority of childhood abuse occurs within the broader context of neglect. Neglect happens when parents or caretakers can't or won't meet a child's needs. Sometimes this is because they don't have the skills or support needed, and sometimes it's due to other problems such as mental health issues, drug and alcohol problems, cognitive impairment, poverty, housing instability and exposure to family, community /societal violence. Neglect can also occur on a societal and institutional level.
> Neglect, in of itself, can have serious and long-lasting effects: children who don't get the love, care and respect they need may find it hard to maintain healthy relationships and seek out harmful relationships; they are more likely to experience health and mental health problems including depression and complex post-traumatic stress disorder; they develop poor coping mechanisms and problem solving skills; they are at greater risk of not abiding laws, and of relying on drugs and alcohol for either self-soothing or stimulation.

2018-09-16 Declaration of Dr. Barbara Hamm, ¶¶ D.1-2.

Terry's chronic exposure to neglect and physical and psychological abuse from his primary caretakers put him at greater risk for and made him more vulnerable to medical, behavioral, and psychological problems as he developed. Because the "first years of a child's life have a significant impact on how their brain develops," neglect and abuse during that critical time frame can be particularly damaging:

> The development of emotional and verbal pathways can be shunted due to lack of healthy stimulation and opportunity for information processing. Because lack of safety and protection is the very root of neglect, neglected children are at greater risk of other forms of maltreatment. Left on their own they become easy prey for sexual predators, are at the mercy of bullies and are easily coerced or manipulated into antisocial activities. This backdrop of neglect contributes to lasting vulnerability to stress. And this vulnerability and the inherent nature of neglect create conditions in which the child is routinely having experiences that are emotionally and cognitively overwhelming. Without attentive caretakers, neglected children are left to their own devices to soothe themselves and make meaning of their environment and their place in it. This often leads to an under-evaluation of their personal authority in the world.

*Id.*, ¶ D.3 It is particularly significant that Mr. Pitchford's mother was the perpetrator of neglect and abuse. As Dr. Hamm explains, when early childhood experiences are marked by abuse, the ability to form secure attachments in which emotional and practical needs are met is disrupted, impairing the ability to form subsequent healthy relationships throughout life.

> This is particularly true if your caregivers—especially your parents— are the perpetrators of abuse. For children with histories of neglect and abuse, like that to which Mr. Pitchford was exposed, such attachment injuries often result in relationships characterized by "traumatic bonding" or the reenactment within relationships of the early abusive dynamics. These children come to expect bullying in school and by peers and irrational and/or demeaning treatment by adults. Thus their basic posture in life is one of expectation and acceptance of maltreatment.

192

*Id.,* ¶ F.5. Dr. Hamm summarized that Terry was only invisible when it came to his needs; because of his own impairments and his mother's own emotional limitations, Terry was also targeted for abuse.

> Neglected children are, more often than not, also children who are targeted for abuse. Because they are rendered as "less than," any actions that bring them into sight can be felt as irritations by others. They take the brunt of verbal and physical abuse in their homes, are bullied at school, and do not receive needed attention in schools.

*Id.,* ¶ D.5.

Growing up in a house with exposure to physical, emotional, and sexual abuse prevents a child from understanding and developing appropriate boundaries.

**Terry's symptoms**

A competent expert in the effects of chronic exposure to trauma on child development would have further demonstrated to the jury that there is abundant evidence that Terry struggled with symptoms and behaviors as a child and adolescent that were exactly what one would expect in a child who was exposed to as much neglect, violence, and abuse as Terry was. The expert, together with lay witnesses that observed Terry, would have provided the jury with critically important information which includes, but is not limited to:

**Terry heard voices in his head**. As early as age eight, Terry heard voices in his head that would tell him to do destructive things to himself and others. The voices got worse when his father died. When he was around 13 or 14 years old, his mother reports that they were in church when Terry told her that a voice was telling him to get up and hit the pastor. Shirley responded that it was the devil

talking to him. Another time, when Terry was around the same age, he drove the lawnmower into the pond near his house, reporting that a voice had told him to do it. Terry would hit his head with his hands to try to get the voices to stop.

Terry's friends and family members uniformly remember Terry having conversations with himself and talking about hearing voices in his head. Terry's long-time girlfriend Dominique remembers many times that Terry heard voices and would respond to those voices.

> Over the years, I heard Terry talking to himself, as if he were responding to someone who wasn't there, and I heard him fighting with people that weren't in the room. . . When I asked Terry about the voices, he said he felt like they were demons and they were on his shoulders. The voices told him to do things. Terry told me he felt like people were after him. One time, I walked in on him in the kitchen at Ms. Shirley's house and he was talking to himself. I asked him who he was talking to, and acted like I was crazy because I couldn't hear the voices in his head.

2018-08-26 Dominique Hogan Declaration, ¶ 18. Terry's brother Perry remembers:

> There were times that I walked by the bathroom at home, and Terry would be in there talking to himself. It was like he was having a conversation with someone who wasn't there. He would switch back and forth and respond. Terry told me about hearing voices; he described them as a male voice. After our father died, Terry said he could hear our father talking to him.

2018-08-26 Perry Pitchford Declaration, ¶ 23. Terry responded in various ways to stop the voices. He began using marijuana at an early age soon after his father died when he was visiting relatives in California. He eventually resorted to daily use of marijuana because it made him feel at ease and relaxed and helped keep the voices at bay. 2011-09-14 Richard Duldey Supp. Aff., 2.

Terry also resorted to self-harm to try to stop the voices. He would repeatedly hit himself in the head or hit his head against a wall to try to make the voices stop.

194

2018-09-08 Shirley Jackson Declaration, ¶ 28. He would also cut himself with pens or paperclips, carving into his arm and leaving scars. 2018-08-26 Dominique Hogan Declaration, ¶ 18.

> Terry often threatened to harm or kill himself.
>
> Terry threatened suicide and would harm himself. When we were kids, Terry would talk about killing himself. When he'd get into trouble with our mother, he would say that he was going to kill himself and go be with his father. One time, Terry ran out of the house and grabbed a log, threatening to kill himself. He pretended to hit himself in the head with the log. He sometimes said that he heard voices telling him to kill himself. Terry threatened to harm himself so many times, I can't remember all the different episodes.

2018-08-26 Perry Pitchford Declaration, ¶ 22. When he was 17, Dominique threatened to break up with Terry, severing the only consistent and loving relationship he had. Devastated, Terry overdosed on pills. His mother found him unconscious in the bathroom of her house and took him to the hospital. Tr. May 11-12, 2015, 26. The doctor was going to refer Terry to a mental health care facility, but Terry did not want to go and insisted he had not tried to commit suicide. Shirley did not seek treatment for Terry and allowed him to be taken home. *Id.*,. 27.

As Dr. Hamm explains, "[c]ritical 'inner voices' which berate and chastise . . . are a hallmark of exposure to emotional maltreatment." 2018-09-16 Declaration of Dr. Barbara Hamm, ¶ F.2 Hearing voices may be both a hallucination, consistent with schizophrenia, as well as the re-experiencing of traumatic events as part of PTSD. *Id.*, ¶ F.3. In state post-conviction proceedings, psychiatrist Richard Dudley evaluated Terry, who reported that he heard voices, which he described as

> thoughts that are 'messed up,' 'thoughts that can hurt him,' and thoughts that are often confusing because there are often many

different conflicting thoughts at the same time. Mr. Pitchford reported that the thoughts keep coming and won't stop until he acts on them and that as a child he used to hit his head to try to make them go away which did not work. But then when he acts on them, the thoughts and the associated tension goes away. He noted that these thoughts are very distracting and often make it very difficult for him to focus on other things, even things that he enjoys.

2011-09-14 Richard Dudley Affidavit, at 5.

Dr. Dudley concluded that the voices Terry reported

were consistent with auditory hallucinations and that Terry's hallucinations represent another symptom which is consistent with the other previously diagnosed disorders. It is also the opinion of this psychiatrist that his auditory hallucinations are an indication of the severity of his other, previously diagnosed psychiatric disorders that resulted at least in part from his very difficult and often traumatic childhood.

2011.11.14 Richard Dudley Supp. Aff., 2.

**Terry was easily overwhelmed and frustrated**. Terry was usually friendly and laid back, according to his friends and family. 2018-088-26 DeShawn Burnett Declaration, ¶ 14; 2018-08-26 Perry Pitchford Declaration, ¶ 8. But, he would easily become overwhelmed and frustrated. 2018-09-10 Robert Triplett Declaration, ¶ 9. 2018-08-26 Perry Pitchford Declaration, ¶ 8. Terry was emotional, "with extreme highs and lows." 2018-08-26 Perry Pitchford Declaration, ¶ 8. He would be "calm one minute and then in a split second, he'd switch and become very upset. It was like he was a different person." *Id.*; 2018-088-26 DeShawn Burnett Declaration, ¶ 14.

When his mother would yell at him, Perry remembers his brother having "difficulty expressing himself in response. He had problems expressing how he felt and would become upset when he couldn't get it out." 2018-08-26 Perry Pitchford

Declaration, ¶ 8. When he was frustrated and overwhelmed, he would take his frustration out physically. He would hit his fist or head against the wall; he would tear at the wallpaper off the wall; he would run outside and tear branches off trees. His cousin saw him tear the screen out of the screen door once out of frustration when Shirley was punishing him. 2018-09-10 Robert Triplett Declaration, ¶ 8.

For someone like Terry who was already disadvantaged by neurodevelopmental cognitive impairments, growing up in a home in which he was exposed to physical, emotional, and sexual abuse, prevented Terry from understanding and developing appropriate boundaries. 2018-09-16 Declaration of Dr. Barbara Hamm, ¶ G.14. As Dr. Hamm notes:

> When he was overwhelmed and frustrated, Terry lacked the language capacity—the ability to use words—to organize himself and get a positive response from others. He was forced to act out physically to express himself. Unfortunately, this resulted in the most consistent parental attention he received, which was not only negative but also perpetuated the devastating cycle of degradation and abuse.

*Id.*

Terry did not respond well to stressful situations in which he was being yelled at. The principal of Terry's elementary school, Robert Wade, remembers that "Terry was the type of kid that you could talk calmly to and he would listen." 2018-08-31 Robert Wade Declaration, ¶ 2. Principal Wade

> had to talk differently with Terry than with other kids. I needed to be firm with him but also make sure I encouraged him. He responded well to being encouraged. Terry needed to be redirected often, but he could be redirected easily with the right approach.

*Id.* ¶ 3.

Neglected children like Terry develop a lasting vulnerability to stress as they develop. This vulnerability and the inherent nature of neglect create conditions in which the child is routinely having experiences that are emotionally and cognitively overwhelming. 2018-09-16 Declaration of Dr. Barbara Hamm, ¶ D.3 For the overwhelmed neglected child, "[t]heir inner world – how they construct meaning, how they interpret and manage emotions – tends to remain child-like and developmentally immature." *Id.* ¶ D.4.

> Without attentive caretakers, neglected children are left to their own devices to soothe themselves and make meaning of their environment and their place in it. This often leads to an under-evaluation of their personal authority in the world. Life happens to them. They often find themselves in situations in which they do not understand their role and rely upon poorly developed problem-solving skills that don't anticipate consequences.

*Id.* The incident which resulted in Terry's expulsion from the Grenada County middle school in eighth grade is illustrative of how a traumatized child with Terry's impairments responds to an overwhelming and stressful situation. When Terry was in eighth grade, he was expelled after busting the taillights out of a school bus. Several teachers were present that day and would have testified on Mr. Pitchford's behalf. Albert "Benji" Britt[39] was a bus driver and vocational teacher for the Grenada County school district and witnessed Terry punching the taillights of a school bus.

> I was parked in the bus line getting ready to pick up students for my afternoon route. I noticed a group of kids outside my bus harassing Terry and trying to "jump" him. I got out of my bus to try to deescalate the situation. As several teachers were trying to talk to the other kids

---

[39] Benji Britt has no relation to the victim in this case. 2018-08-28 Albert Britt, ¶ 9.

and to Terry, one of the kids kept trying to start a fight with Terry. Someone was holding Terry back.

I think Terry was scared and needed to figure out how to avoid a fight and get out of harm's way. He needed to be removed from the very stressful situation that was unfolding in front of him and his peers. . . It appeared that Terry was avoiding physical confrontation with the other students. He was attempting to scare off the kids who were trying to fight him by using tough words and actions. He seemed to channel his fear and anger at those kids into the bus taillights.

2018-08-28 Albert Britt, ¶ 5. Mr. Britt believes "[t]he situation could have gone very differently, and with many other children than Terry, I think it would have ended in a physical assault on other students." *Id.* ¶ 3.

Dominique Hogan reported:

Terry felt very threatened and was afraid the eastside boys would attack him. People were holding him back and finally some teachers tried to intervene. Terry was trying to walk away and started backing up away from the crowd. Perry didn't stay to help Terry fight; he ran and told their mom, who was in her school bus nearby. It got very scary and Terry finally broke away and headed to where the buses were parked. He took out his frustration and anger on the bus taillights, punching them out instead of the kids.

2018-08-26 Dominique Hogan Declaration, ¶ 15. Instead of using physical force against the kids who were taunting him, Mr. Pitchford took out his frustration and fear on physical property. And Terry was dealing with more than frustration and anger at the bullying:

No child can effectively process that his parents do not love him or thinks he is worthless. In these cases, the child strives for a state of "not knowing." He is literally unable to approach these feelings nor able to understand the impact of the betrayal. Because he is unable to articulate his distress and its origins, he can't effectively seek help from others nor develop more adaptive ways of coping. Terry demonstrates this dilemma in his outburst, which resemble self-implosions more than other directed explosions. . . .
The more stressful the situation, the more disorganized Terry became. This escalation decreased his capacity for responding with language. He had difficulty using words to address such stress. These difficulties

199

were also very evident in the incident with the other children bullying
him after school, culminating in Terry acting out against inanimate
objects—bus taillights. He was unable to verbalize his feelings or
engage those responsible for the circumstances. He lashed out against
physical property in an expression of his emotional state. This may
have been to scare off the boys or it may have been an instance of self-
implosion . . ., which is all too common for children with Mr. Pitchford's
combination of adverse childhood experiences and cognitive deficits.

2018-09-16 Barbara Hamm Declaration, ¶¶ G.17-G.18.

**Terry was slow to catch on and process information**. From early on, Terry

struggled in school. He learned differently than his twin brother Perry the other

students. Terry was held back twice in elementary school, never completing a year

after eighth grade, and reportedly was easily distractible and unable to pay

attention. Terry was first held back in second grade. The year his father died, Terry

entered fourth grade and was held back for the second time. Terry's difficulties

processing even simple information was well-documented by those around him.

When he was young, Terry used to spend a lot of time with his brother-in-law

Jerome Clay, helping him with chores around the house. Jerome reported that

"Terry had difficulty following directions, especially the first time he was told to do

something. Often, he would need additional guidance." 2018-09-08 Jerome Clay

Declaration, ¶ 5.

Terry's then-girlfriend and mother of his child, Dominique Hogan, was

uniquely aware of Terry's learning impairments, especially when he was processing

that information orally. She reported:

Terry learned differently. He had trouble absorbing information when
somebody was just talking to him. He did better if he could learn by
doing. Terry would pretend to write words with his fingers on his thigh
or a table or in the air to better understand what he was being told.

> Terry could not remember oral directions very well, even if they were simple. I remember one time when Terry was given directions to McDonalds. He started driving off but he soon turned around and came back to get the directions written down. There were only two turns, but he couldn't remember them. It has always been best to write things down for him because even if you verbally tell him something to do and it is simple, he is almost always going to forget what you said as soon as you finish telling him. He could never remember phone numbers either. He had to write digits in the air and try to remember if he didn't have a pen.

2018-08-26 Dominique Hogan, ¶ 17. Terry's cousins also recount Terry's difficulty grasping relatively simple concepts. "In order for Terry to understand something, you would have to show him how to do it. Terry was slow in the sense that he did not seem to process information quickly or retain information easily." 2013-12-06 Patrick Jones, ¶ 9. Another cousin stated, "Terry was a slow learner. When I needed to explain something to him, I had to do it in an elementary way. I had to break explanations down in a very basic way for Terry to be able to process what I was trying to tell him." 2010-10-30 Robert Triplett Affidavit, ¶ 8; 2018-09-10 Robert Triplett Declaration, ¶ 5. These observations are consistent with neuropsychological testing showing that Terry has a "generalized deficit in overall information processing speed" and other "right hemisphere deficits that are likely long-standing and developmental in nature." 2011-09-23 Malcolm Spica Aff., ¶¶ 7, 10.

Terry's neurodevelopmental impairments, which were exacerbated by the trauma and neglect he experienced at home, make it difficult to process novel information and appreciate the subtle cause-effect relationships between interdependent factors, such as people. 2011-09-23 Malcolm Spica Aff., ¶ 11. These impairments led to difficulties in a school system that was not equipped to educate

him. Many of Terry's teachers report that he was a good kid,[40] but that he had trouble concentrating and did not receive the support and attention he needed, either at school or at home. Terry's seventh grade teacher reported that

> Terry struggled academically. He needed extra time to understand material and complete assignments. He would have benefited from academic support and I was not aware that he received any support when he was my student. It was clear that he needed assistance at home. Parents are a key component to academic success. I do not recall meeting with Terry's mother.

2018-08-28 Michael Miles Declaration, ¶ 3. But Terry "did not get in trouble in my class. He did talk more than Perry, but he was never rude." *Id.*, ¶ 3. Terry oscillated from being too talkative in class to being sleepy and lethargic. Terry's talkative personality got him into trouble. Terry repeatedly received infractions in school, for which he was often punished corporally, for excessive talking in class and talking back to teachers. 2001-2002 Student Discipline Report by Date, Grenada Middle School.

> The principal of Terry's elementary school remembered Terry as

> a good kid overall with a good attitude. He was a talkative kid and sometimes he would find himself in trouble with teachers for talking back or not following directions. That is usually what landed Terry in the principal's office. But Terry was not a combative child who got into fights or was at odds with other students. Terry seemed like a child looking for attention. I felt that Terry acted out in order to be noticed.

2018-08-31 Robert Wade Declaration, ¶ 2. Other teachers remember Terry as being more withdrawn, lethargic and sleepy in class. 2018-08-28 Laura Hoffman

---

[40] "Terry was a great kid. He was respectful and always wanted to please." 2018-08-31 Marshall Whittemore Declaration, ¶ 2. Terry was a "polite kid" who was "generally well liked and knew most of the kids in his class; he was like a big Teddy Bear." 2018-08-28 Laura Hoffman Declaration, ¶ 4.

Declaration, ¶ 4. To Terry's fifth grade teacher, "Terry stood out because he often slept in class and was lethargic." *Id.*, ¶ 4. This oscillation signaled that Terry had a problem regulating his mood and attention. Terry suffered from a broad impairment best understood as dysregulation of executive functioning.

> Principal Wade remembers that he
>
> had to talk differently with Terry than with other kids. I needed to be firm with him but also make sure I encouraged him. He responded well to being encouraged. Terry needed to be redirected often, but he could be redirected easily with the right approach.

2018-08-31 Robert Wade Declaration, ¶ 3. Terry "was the type of kid that you could talk calmly to and he would listen." *Id.*, ¶ 2.

Although many of Terry's teachers knew Terry's mother because she worked at the school as a bus driver and in the cafeteria for a period of time, they never met with Shirley to discuss Terry's progress or address the issues he was having. Terry's seventh grade science teacher and football coach, Marshall Whittemore, remembers that "Terry had trouble getting motivated in class," but he does not "remember ever meeting with Terry's mother about how he was doing in school." 2018-08-31 Marshall Whittemore Declaration, ¶ 2. Terry's fifth grade teacher does "not remember any family involvement in Terry's education. I do not remember Terry's mother coming to any parent teacher conference or meeting with her at any time to discuss Terry's academic progress." 2018-08-28 Laura Hoffman Declaration, ¶ 7.

Terry's struggles in school were likely a combination of many factors relating to his neurodevelopmental and trauma-based cognitive impairments. Dr. Hamm reports:

School is often a haven for neglected and abused children, but this was not so for Mr. Pitchford. He reports difficulty concentrating, following multi-stepped instructions and being distractible. It is also very early on that he first reports "hearing voices" that demean him and tell him to act impulsively and violently. The effort spent trying to mediate such voices can be considerable and certainly distract one from classroom tasks. During her testimony at his competency hearing in 2015, Mr. Pitchford's mother reported that she chose to minimize or berate him for these difficulties.

2018-09-16 Declaration of Dr. Barbara Hamm, ¶ G.9.

Terry being held back twice in elementary school should have been a red flag for trial counsel and prompted investigation into Terry's cognitive and mental health impairments as well as the conditions in his home life. Terry's fifth grade teacher, Laura Hoffman, testified at the penalty phase of Terry's trial. Had counsel spent time interviewing her, they would have learned:

Terry had been held back twice by the time he got to my class. He was older than the other kids in the fifth grade class, and he was noticeably taller and stockier. In my experience, children who are held back in school often become embarrassed and lose interest; and the problem gets worse when children are two or three grades behind. By the time he go[t] to my class, Terry had fallen so far behind in school that it would have required a lot of support to motivate him to catch up and get back on track.

When children do not get support at home and do not have a parent or caretaker to push them to strive for success, they tend to just give up. I do not remember any family involvement in Terry's education. I do not remember Terry's mother coming to any parent teacher conference or meeting with her at any time to discuss Terry's academic progress.

2018-08-28 Laura Hoffman Declaration, ¶¶ 6-7. Ms. Hoffman spoke with Terry's trial defense team only once before she was subpoenaed to testify and the attorney did not discuss her testimony with her. *Id.* ¶ 3.

204

Terry's mother knew that Terry's behavior indicated that something was wrong, but she did not address it.

> Looking back on it, I realize that maybe I should have gotten Terry some counseling or treatment after his father died. I knew his behaviors were strange, and I knew he needed help. At the time, I thought he would get over it so I kept praying for him. My answer had always been to pray it away. Terry kept telling me he was hearing voices, and it got worse and worse. I thought it was Satan that had entered him and the only thing I could do was pray. When I think about memories from the past, my mind starts spinning and I can't sleep. The devil starts blaming me for everything.

2018-09-08 Shirley Jackson Declaration, ¶ 29.

**Terry was a follower who was easily influenced and vulnerable to exploitation**. After his father died, Terry lacked a center of support. Rejected and demeaned by his mother, Terry sought belonging and acceptance elsewhere as he got older. 2018-08-26 DeShawn Burnett Declaration, ¶ 10. Terry's friends and family members describe him as a follower who was easily influenced by others and was always trying to please people. Terry's older cousin remembers Terry desperately wanted validation and acceptance from those around him and would complain that no one cared about him. 2018-09-10 Robert Triplett Declaration, ¶ 6. Robert believes that is why Terry started gravitating toward the street.

> Terry tried to act cool and be a tough guy. He saw how kids in the street would dress, and he would overdress, trying to fit in He wanted to be the life of the party. But I think Terry was actually insecure and his acting out was an attempt to get attention. Terry was very trusting of people and he never wanted to do things on his own. Because of this he was easily influenced. It was also easy for others to take advantage of Terry.

*Id.*, ¶ 6. Another of Terry's older cousins reports that

> [e]ver since his dad died, Terry was looking for a father figure from basically anybody who would show him some attention. I remember

205

> gangs were very prevalent in Grenada when we were growing up and
> Terry was very curious about them but never managed to join one. I
> am glad that he didn't join one. But, he did end up picking the wrong
> group of people to hang around; they stood in for a father figure. Terry
> badly wanted to fit in and to be accepted. Terry was a follower who
> sought acceptance from a rough peer group who took advantage of him
> . . . Terry was desperate to fit in at that point and was going to go
> along with whatever they were saying and doing so that he could be a
> part of their group.

2018-08-23 Roydetric Leetrell Harris, ¶ 11.

At bottom, Terry wanted to be loved and had a lot of love to give. Terry was

always doing things for people in an effort to gain attention and love. Dominque

recounts how excited he was when he found out he would be a father to their son,

De'Terrius.

> I remember when I found out I was pregnant. Terry was very excited
> with our news. He was more excited than I was. He couldn't wait to be
> a father. He was very loving and nurturing. We named our boy with a
> combination of my middle name and Terry's name.

2018-08-26 Dominque Hogan Declaration, ¶ 3. Terry has continued to provide for

De'Terrius, who people call "Buddy" these days, "in whatever way he can. The two

of them talk on the phone regularly and Buddy visits Terry during holidays." *Id.*,

¶ 4.

A trauma expert could have explained to the jury how chronic exposure to

traumatic events like Terry was subjected to, especially in combination with Terry's

neurodevelopmental cognitive impairments, likely results in maladaptive behavior.

When trauma is unresolved and neglect is not rectified, as happened to Terry, the

damage can endure and spiral over the course of a life.

> In light of what we know about Mr. Pitchford's exposure to neglect,
> physical and emotional abuse as well as his witnessing family violence
> we can begin to better understand Mr. Pitchford. Mr. Pitchford

appeared to have been routinely exposed to all five subtypes of maltreatment. . . . He was neglected by his mother; physically abused by his mother, father, and stepfather; emotionally abused by his mother and perhaps other family members; he witnessed family violence and alcohol abuse; and until he was 10 years old, he was under the care of his sexually abusive father. The likely consequence of this trauma was debilitating for Mr. Pitchford given the numerous types of inter-related trauma he suffered; the frequency and duration of the trauma he was exposed to during the critical developmental years; and the apparent lack of reparative opportunities that would have enabled Mr. Pitchford to heal and lead a successful life. Unresolved trauma like Mr. Pitchford experienced likely altered the way he thinks and feels as well as his brain functioning and physiology. It put him at greater risk for and more vulnerable to medical, behavioral, and psychological problems. We can also infer that he suffers from considerable anxiety. Like many severely traumatized children he is unable to offer explanations for his actions.

2018-09-16 Declaration of Dr. Barbara Hamm, ¶ G.13.

An expert who could have explained the developmental and behavioral consequences of Mr. Pitchford's exposure to chronic childhood trauma could have put the crime and evidence presented at trial in context for the jury. It would have been extremely mitigating for a jury to have learned about childhood trauma's effects on teenagers—keeping in mind Terry was 18 at the time of this crime—as they assessed the scenario and determined the appropriate punishment.

Trial counsel's failure to investigate, develop, and present evidence of Terry's background and mental health was deficient performance. Terry was prejudiced by trial counsel's deficient performance. Mental health evidence has long been held to be critical in death penalty cases. The background and mental health mitigation evidence presented above establish that Terry exhibited symptoms associated with mental health disorders, neurodevelopmental and cognitive impairments which were exacerbated by Terry's chronic exposure to childhood trauma.

207

The jury never heard Terry's compelling and tragic life history or a mental health expert's explanation for the behavioral consequence of Terry's impairments. Because trial counsel failed to present the overwhelming majority of mitigation evidence that actually existed, the jury never knew of the powerful case for life that the actual mitigation would have established.

### B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to ineffective assistance of appellate counsel.

### D. Post-Conviction

This claim was raised in part in Mississippi Supreme Court Case Number 2010-DR-01032-SCT. The Mississippi Supreme Court rejected the issues before it as lacking merit. Order, Feb. 14, 2013.

## 2. TRIAL COUNSEL FAILED TO PROCURE THE ATTENDANCE AND TESTIMONY OF A MENTAL HEALTH EXPERT IN MITIGATION, WHICH IS AN ESSENTIAL COMPONENT OF A RELIABLE SENTENCING HEARING.

### A. Supporting Facts

Not a single mental health expert testified on Terry Pitchford's behalf or effectively assisted counsel for purposes of mitigation during his 2006 trial, yet Mr. Pitchford's competency to stand trial was immediately at issue, and his mental health was clearly relevant to the punishment he might suffer. Terry Pitchford's trial attorneys knew he suffered from mental health challenges early on. Less than a month after Mr. Pitchford was indicted, appointed counsel Ray Baum filed a motion for a mental evaluation alleging that Mr. Pitchford "has a history of mental problems." Mtn., Feb. 1, 2005. Yet, it was not until a few days before trial began that counsel hired an independent mental health expert, Dr. Rahn Bailey, to evaluate their client.[41] 2011-09-15 Declaration of Ray Carter, 3.

At the February 2, 2006, hearing on his motion for a continuance, Carter explained that the court-appointed Mississippi State Hospital doctors had done their evaluation without a complete social history of Mr. Pitchford and that the report "brought about other questions" that were relevant to mitigation and that he needed time for his independent mental health expert to evaluate Mr. Pitchford. Tr. 34, 43-44. As Carter expressed during the hearing on his motion for a continuance, he was aware of the importance of having a mental health expert in mitigation who could address Mr. Pitchford's suicide attempts, self-mutilation, head injuries, and

---

[41] At the hearing on his motion for a continuance, Carter explained that the report from the court-appointed Mississippi State Hospital doctors "brought about other questions" that were relevant to mitigation. Tr. 43-44.

other issues in his background. Tr. 41. Having consulted with Dr. Bailey, Carter learned that there could be "some neurological problem" that Mr. Pitchford might suffer from. Tr. 42. The Court denied Carter's request for a continuance and the trial remained scheduled to begin on February 6, 2006.

Defense expert Dr. Bailey evaluated Mr. Pitchford on February 4, 2006, two days before trial began, and concluded that Mr. Pitchford was not competent to stand trial. Dr. Bailey conducted only an initial psychiatric assessment with a focus on competency to stand trial, and he did not conduct any formal testing. Tr. May 11-12, 2015 at 78, 150, 174; Tr. Mar. 26, 2014 at 20. Dr. Bailey was not able to complete a report until shortly before the guilt phase of trial had ended on February 8, 2005. 2011-09-15 Declaration of Ray Carter, 3.

At the close of Mr. Pitchford's guilt phase on February 8, Carter learned that Dr. Bailey would not be available to testify the next day on February 9, when the penalty phase began, because Dr. Bailey was under subpoena in another case in Texas. Carter immediately approached Judge Loper's chambers for an ex parte discussion, in which he mentioned that he would need a continuance if Dr. Bailey could not be released from the subpoena. Dr. Bailey ultimately was not released from his subpoena and was not available on February 9. Yet, Carter unreasonably failed to subpoena Dr. Bailey and request a continuance on the record to delay sentencing until his mental health expert would be available. Carter admits he had no reasonable strategy for failing to do so. *Id.*, 3.

Carter had essentially given up on securing the testimony of his mental health expert. Carter admitted that he did not even pay attention to the report that Dr. Bailey had prepared under the compressed time frame when he learned that Dr. Bailey would be unavailable to testify on February 9. *Id.*, 3. As a result, the defense rested without calling a mental health expert witness.

In light of Mr. Pitchford's numerous mental, emotional and neurodevelopmental impairments, the symptoms of which a reasonable investigation would have uncovered, reasonably competent counsel would not have waited until the last minute to engage a mental health expert. Mr. Pitchford was denied the assistance of a mental health expert to which he was entitled, who could have helped the jury understand the long-term effects of the trauma and neglect that Mr. Pitchford experienced growing up; who could have contextualized the behavioral problems Terry had at home and in school; and who could have described Mr. Pitchford's psychiatric disorders and cognitive impairments and how they manifested in his daily life and were exacerbated by the physical and psychological abuse he faced at home. Counsel had no reasonable strategy for waiting until days before trial to hire a mental health expert who had time only to conduct a preliminary evaluation focused on competency to stand trial and for ultimately failing to present any mental health evidence whatsoever in mitigation of punishment.

211

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner did not present this issue on direct appeal due to ineffective assistance of appellate counsel.

## D. Post-Conviction

This claim was raised in part in Mississippi Supreme Court Case Number 2010-DR-01032-SCT. The Mississippi Supreme Court rejected the issues before it as lacking merit. Order, Feb. 14, 2013

### 3. TRIAL COUNSEL FAILED TO INVESTIGATE MR. PITCHFORD'S EXPULSION FROM SCHOOL AND PRESENT READILY AVAILABLE EVIDENCE TO CHALLENGE THE STATE'S INTRODUCTION OF PRIOR BAD ACT EVIDENCE.

#### A. Supporting Facts

During cross examination of Mr. Pitchford's mother Shirley Jackson at penalty phase, the State elicited testimony about Mr. Pitchford's expulsion from school in the eighth grade. Tr. 718-19. The prosecutor's exchange with Mr.

212

Pitchford's mother allowed the State to introduce misleading evidence that Mr. Pitchford "got violent when he got mad," suggesting inaccurately that Mr. Pitchford was violent toward others. Ms. Jackson's account of the incident in which Mr. Pitchford was expelled was confusing, incomplete and inaccurate.

Had trial counsel conducted a reasonably adequate investigation and prepared their witnesses, he would have been able to contextualize the circumstances around Mr. Pitchford's expulsion. Trial counsel would have learned that (1) Mr. Pitchford's expulsion was the product of him being bullied at school by a gang of kids who were trying to fight him; (2) Mr. Pitchford was scared and did not want to fight the gang of kids and attempted to back away and remove himself from the situation; and (3) Mr. Pitchford was not emotionally or cognitively equipped to handle stressful and emotional situations in which he became scared and threatened, and he took out his fear and frustration on objects not people.

Trial counsel should have properly contextualized Terry's expulsion for the jury. Trial counsel's failure to present this evidence unduly prejudiced Mr. Pitchford by allowing the jury to believe the prosecutor that Mr. Pitchford was a violent person.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim due to ineffective assistance of state post-conviction counsel.

213

### C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to ineffective assistance of trial counsel.

### D. Post-Conviction

Petitioner did not raise this claim in post-conviction due to ineffective assistance of post-conviction counsel.

## XV. PETITIONER'S TRIAL COUNSEL FAILED TO PRESENT READILY AVAILABLE EVIDENCE TO CHALLENGE THE STATE'S STATUTORY AGGRAVATING FACTORS, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

### 1. TRIAL COUNSEL FAILED TO PRESENT READILY AVAILABLE EVIDENCE TO CHALLENGE PECUNIARY MOTIVE.

### A. Supporting Facts

The State presented evidence that Mr. Pitchford was motivated to rob Crossroads grocery because he had a baby on the way and needed money. They presented this evidence through James Hathcock. According to Hathcock, Mr. Pitchford told him "he wanted to make some quick money because his son was just born. And he needed some money for his baby's momma and his son to have some clothes and food." Tr. 429. Mr. Pitchford had also stated to police that he borrowed some money from his girlfriend later that day when they went to Walmart. Tr. 511. In closing, the prosecutor, Clyde Hill, argued:

> The second thing was that the capital offense was committed for pecuniary gain, that is for money, during the course of a robbery. There is no question about that. I mean that's, that's as hard as concrete on the floor. It's there.

214

Tr. 776-777. Doug Evans told the jury there was no question the capital offense was committed for pecuniary gain because of all "the stuff that was taken - the cash register, the money, the gun, money out of the coin machines." Tr. 807

Had trial counsel conducted a reasonably adequate investigation, they would have discovered that Mr. Pitchford did not need money; that he had a job and support from his family; and that Eric Bullins and Quincy Bullins were the ones that struggled financially. Dominique confirmed that Terry would take care of her financially.

> When we were dating, Terry always had money and a car, which his mother bought him. Terry would always take care of me. He bought me clothing, school supplies and other things I needed.

App. 0261. Terry did not need money, nor did he have an incentive to rob anyone. Money was not a problem. Trial counsel was ineffective for not exploring the motive of pecuniary gain alleged by the State.

By failing to present evidence that would rebut the State's dubious pecuniary gain motive, Mr. Pitchford was denied the constitutional guarantees of due process, equal protection, effective assistance of counsel, a fair trial, freedom from cruel and unusual punishment, and a reliable sentence. U.S. Const. amends. V, VI, VIII & XIV.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim due to ineffective assistance of state post-conviction counsel.

### C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to ineffective

assistance of trial counsel.

### D. Post-Conviction

Petitioner did not raise this claim in post-conviction due to ineffective

assistance of post-conviction counsel.

2. TRIAL COUNSEL FAILED TO PRESENT READILY AVAILABLE EVIDENCE TO
   CHALLENGE THE STATUTORY AGGRAVATOR THAT MR. BRITT WAS KILLED
   TO AVOID ARREST.

### A. Supporting Facts

The only evidence in support of the State's statutory aggravator that the

killing was committed for the purpose of avoiding arrest was the testimony of the

unreliable jailhouse snitch James Hathcock, who testified that Mr. Pitchford and

Mr. Bullins were about to take off but Mr. Pitchford said he did not trust the man

and thought he would snitch. During the guilt phase of Mr. Pitchford's capital trial,

Hathcock testified that Mr. Pitchford "said they were fixing to take off. And he said

for some reason, he said he didn't trust him. He said they think he'd snitch on

them." Tr. 428. Hathcock never testified explicitly that Mr. Pitchford or Eric Bullins

had told him that the reason Mr. Britt was killed was to avoid him being a witness,

but the State told the jury that it was easy to draw that inference:

> He killed him so he could get away with the crime. I mean he didn't
> plan on robbing and killing and getting caught. He planned on killing
> Mr. Britt and taking the money and not getting caught. And the reason
> he had to kill him was so he wouldn't be identified. He had tried it the
> other way already, and he saw that didn't work. His friends weren't up

> to the task. So he did it himself. And this time he made sure that Mr.
> Britt wasn't going to walk into a courtroom and identify him.

Tr. 776. Doug Evans told the jury the only evidence that was needed to prove the

statutory aggravator was the fact that Mr. Pitchford knew the storeowner Mr. Britt:

"It's clear from the fact that Mr. Britt knew him that he killed him to avoid arrest.

He didn't want to be identified." Tr. 807.

The fact that Mr. Pitchford knew Mr. Britt did not prove that Mr. Britt was

killed for the purpose of avoiding arrest. Moreover, there is evidence to suggest that

the shooting by Eric Bullins was sudden and surprising to Mr. Pitchford.

Hatchock's testimony about what Mr. Pitchford allegedly told him was

untrustworthy, unreliable, and full of contradictions and inconsistencies, which trial

counsel unreasonably failed to impeach him with. Mr. Pitchford not only knew Mr.

Britt; Mr. Britt had been a fixture in Mr. Pitchford's life and Mr. Pitchford and his

whole family cared for Mr. Britt. "I knew Mr. Britt and had always considered him a

friend." App. 0314. "We all knew and loved Mr. Britt. He remembered our birthdays

and would give us extra candy; he also gave us fireworks on Fourth of July." App.

0323-24. "The crime in Terry's case doesn't make sense to me. Terry knew Ruben

Britt well and liked him. We were in that store every day. I don't believe Terry

would go in there and intentionally hurt him." App. 0275.

Trial counsel also unreasonably failed to impeach Hathcock's testimony—and

the inferences the State drew from that testimony—with evidence that Mr.

Pitchford did not kill, attempt to kill, or intend to kill Mr. Britt; that he may not

217

have even been in the store or have known that Eric Bullins had a firearm when they went into the store.

By failing to present readily available evidence to rebut the State's unreliable evidence that Mr. Britt was killed to avoid arrest, Mr. Pitchford was denied the constitutional guarantees of due process, equal protection, effective assistance of counsel, a fair trial, freedom from cruel and unusual punishment, and a reliable sentence. U.S. Const. amends. V, VI, VIII & XIV.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim due to ineffective assistance of state post-conviction counsel.

## C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to ineffective assistance of trial counsel.

## D. Post-Conviction

Petitioner did not raise this claim in post-conviction due to ineffective assistance of post-conviction counsel.

## XVI. PETITIONER WAS INCOMPETENT TO WAIVE THE RIGHT TO REMAIN SILENT, INCOMPETENT TO EXERCISE THE RIGHT TO COUNSEL IN PRE-INDICTMENT CUSTODY, INCOMPETENT TO CONDUCT PLEA BARGAINING, AND INCOMPETENT TO STAND TRIAL FOR CAPITAL MURDER, VIOLATING THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION

### A. Supporting Facts

Despite biased findings based on highly flawed conduct and methodologies by evaluators from the Mississippi State Hospital at Whitfield ("MSH"), available evidence demonstrates that Mr. Pitchford suffered a variety of impairments at the time of his statements to law enforcement, plea negotiations, and trial, that rendered him incompetent, *viz.*, deprived him of the capability of understanding the process against him and of consulting with his attorneys to a reasonable degree of rational understanding in real world situations.

MSH further employed an improper standard of competency, *see infra* at **Error! Bookmark not defined.**, one that requires a diagnosis to overcome the presumption of competency rather than the standard announced in *Dusky v. United States*, 362 U.S. 402, 403 (1960). *Dusky* defined the test as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* This is an inquiry into real world functionality, not an exercise in diagnosis.

Mr. Pitchford's impairments all involve problems with executive function. "Executive function (EF) is a global, umbrella construct that has received considerable attention from clinicians and researchers in recent years." Ida S.

Baron, *Test Review: Delis-Kaplan Executive Function System*, 10 Child

Neuropsychology 147, 147 (2004). EFs "are neurocognitive processes that maintain

an appropriate problem solving set to attain a future goal." Erik G. Willcutt, et al.,

*Validity of the Executive Function Theory of Attention Deficit/Hyperactivity*

*Disorder: A Meta-Analytic Review*, 57 Biol. Psychiatry 1336, 1336 (2005). These

functions "involve multiple distributed neural networks that include the thalamus,

basal ganglia, and prefrontal cortex." *Id.* Thus "one area of deficit [is] associated

with so many different clinical presentations." Gerard Gioia, et al., *Profiles of*

*Everyday Executive Function in Acquired and Developmental Disorders*, 8 Child

Neuropsychology 121, 121 (2002). Because EFs involve such a broad array of

overlapping cognitive functions "whose neuroanatomical connections are

acknowledged to be within a widely distributed neural network" one of the biggest

assessment challenges is whether test results are "generalizable to a real-world

environment." Baron, at 147. For similar reasons, EFs are extremely susceptible to

developmental disturbances including abuse, physical trauma, neglect, exposure to

environmental toxins, and so on. Mr. Pitchford's impairments, especially given his

youth, are best seen as developmental disorders. For this reason, it is critical to

recognize that Mr. Pitchford was an adult on paper only. The developmental

disturbances he faced as a young child retarded his development, stunting his

ability to regulate these critical EFs.

Furthermore, Mr. Pitchford's symptoms of dysregulation of EF implicate a

number of the DSM-5 criteria for recognized diagnoses.

Mr. Pitchford's record extensively reflects that, throughout his life, he has suffered the persistence of voices in his head. Coupled with other factors, this strongly suggests a diagnosis of Schizoaffective Disorder at the relevant time of his criminal proceedings in Grenada County. See DSM-5 at 105-10. Schizoaffective Disorder requires the presence of some of the symptoms of Schizophrenia (such as delusions or hallucinations) as well as symptoms of mood instability such as depression or bipolar disorder.[42] These voices, which constantly visited Mr. Pitchford as a child and in his teen years through the time of his trial in early 2006, plainly appear to be hallucinations. Mr. Pitchford's behavior of extreme self-medication with the essentially constant consumption of marijuana only managed to dampen strong indications of depression and, potentially bipolarity. In any case, this phenomenon of voices and behavior dictated by such internal commands clearly falls under the broader category of inability to regulate internal processes.[43]

Borderline Personality Disorder (BPD) also deserves attention. A person with BPD is at risk of crossing over the border into psychosis. Mr. Pitchford has exhibited many of the diagnostic criteria: "Frantic efforts to avoid real or imagined abandonment;" "Identity disturbance: markedly and persistently unstable self-image or sense of self;" "Impulsivity in a least two areas that are potentially self-damaging;" "Recurrent suicidal behavior, gestures, or threats, or self-mutilating

---

[42] As reflected in *Panetti v. Quarterman*, 551 U.S. 931, 954-55 (2007), a case establishing the substantive standard for competency to be executed, noting that Schizoaffective Disorder is a profoundly incapacity condition capable of detaching the sufferer from a rational apprehension of his legal circumstances.

[43] The facially unreliable MSH evaluation, *infra*, is based on a transcribed interview of Mr. Pitchford at Whitfield, where the health professionals aggressively steered him to responses that they then mischaracterized as normal self-talk or his own normal thoughts.

221

behavior;" "Affective instability due to a marked reactivity of mood;" "Inappropriate, intense anger or difficulty controlling anger;" "Transient, stress-related paranoid ideation." DSM-5 at 663.

These impairments are similar to Attention Deficit/Hyperactivity Disorder (ADHD), as dysregulation of attention, but it encompasses a broader set of affected processes, including regulation of attention, mood, sleep, etc., and the impairments are more pronounced in situations offering greater degrees of cognitive or emotional complexity. Also, Mr. Pitchford does not exhibit the hyperactive component of ADHD, so while his impairments overlap this diagnosis, they do not fall squarely in line.

Dysregulation of mood means mood disorders or depression are likely diagnoses. Mr. Pitchford's well documented symptoms of depression and mood instability are significant, but it should be noted that his impairments are also a response to the emotionally challenging situations he faced at a young age. While all of us face challenges functioning under stressful or difficult situations, a person with EF dysregulation is especially susceptible to these external influences. So the functional consequences of these interrelated impairments are best seen as the overlapping of internal regulatory difficulties operating at an extremely fragile degree of functionality and thus easily overwhelmed by outside factors. Mr. Pitchford suffers from high levels of anxiety and therefore can only function normally in relatively low-stress situations where concepts are simple and concrete, which is not the real world situation of a capital prosecution, including the

circumstances between arrest and charging, when harsh custodial interrogation placing him under extreme duress would overload any functionality he might possess during simple and non-stressful conditions.

This high-anxiety state also features in Obsessive Compulsive Disorder ("OCD"). A person with OCD is easily overwhelmed and thus struggles for control (both internal and external). While Mr. Pitchford has not been detected to exhibit ritualized behaviors, he is someone whose anxiety is diminished by listening to voices—the voices in his head.

The foregoing all points to an origin in organic brain dysfunction that is "likely long-standing and developmental." App. 0640. The chronic trauma and neglect Mr. Pitchford suffered as a young child caused or exacerbated the neurobiological effects resulting from this substantial organic brain malady. 2018.09.16 Barbara Hamm, ¶¶G.13-14, 17. This trauma and neglect appears to have caused the manifestation of his acute deficits. *Id.*, ¶¶E.1-4, ¶¶G1-19. Dr. Dudley described Mr. Pitchford's "broad-based instability in important and critical areas of functioning." 2011.09.14 Richard Dudley Aff., 13. Dr. Dudley identified "multiple major psychiatric disorders" that impair his "ability to function in important areas of his life," attributing many of his symptoms to "the traumas he endured during his childhood and early adolescent years." *Id.*, 12-13. Dr. Dudley observed that Dr. Bailey's diagnosis of Mood Disorder relied on many of the symptoms of Post-traumatic Stress Disorder ("PTSD") including hypervigilance, paranoia, and over-reactivity to perceived mistreatment. *Id.*

223

The evidence that Mr. Pitchford suffered dysregulation of critical areas of executive functioning including especially attention and mood is ample and clear. The evidence also shows his impairments are greatly exacerbated by stressful situations, including when he is faced with cognitive or emotional complexity.

## *Attention.*

Dr. Bailey observed the inability to regulate attention:

> Mr. Pitchford's concentration is poor on standard testing. He is not able to perform the serial seven examinations. In addition, he was not able to perform the serial three examinations without errors. On routine occasions throughout the interview, Mr. Pitchford could not remain on task. This concern presents particular difficulty as he could not seem to adequately develop a reasonable mind set around the issue of accepting a plea bargain as offered. He would typically become somewhat confused. In addition, during these discussions he would frequently revert to very immature, limited, childlike thought process and behavior. Overall, his concentration was markedly impaired.

Bailey Report at 10.

The batteries of tests administered by MSH in 2006 and by Dr. Spica in 2011 point to a "generalized deficit in overall information processing speed." 2011-09-11 Malcolm Spica Letter. The IQ testing which showed intellectual function in the low-average to average range, above a threshold for intellectual disability. But the testing showed "a distinct disparity between his skills in verbal-linguistic processing and those in visuospatial analysis." 2011-09-11 Malcolm Spica Letter. Furthermore, while he could perform adequately, especially on untimed verbal tests, his performance plummeted on timed tasks. This indicates an inability to regulate attention.

## *Mood*

224

All the experts and evaluations acknowledged Mr. Pitchford's inability to regulate his mood. Dr. Bailey diagnosed him with a Mood Disorder, Not Otherwise Specified. Bailey Report at 12. Dr. Bailey further observed that Mr. Pitchford's suicide attempt at the age of 16 and a widely acknowledged "significant period of undiagnosed clinical depressive illness after the untimely death of his biological father when he was age ten (10)" are indicative of "a past history of psychiatric illness." *Id.,* 8. He also noted "symptoms of dysphoria, crying spells, memory loss, decreased attention span, guilt, loss of appetite and previous suicidal attempts." *Id.* He further noted that Mr. Pitchford "experiences frequent worrying and nervousness" and "occasional nausea." *Id.,* 9. This evidence points to the inability to regulate mood.

MSH noted, "Mr. Pitchford reported experiencing emotional difficulties when his father died when he was 10 or 11 years old. He reported seeing his deceased father on one occasion approximately two years after he died." 2006-01-26 MSH 19 page Eval., 6. He also experienced "emotional difficulties when his mother was married to an alcoholic man whom he witness physically abusing her." *Id.*

Dr. Dudley identified Depressive Disorder: "It is the opinion of this psychiatrist to a reasonable degree of medical certainty that Terry Pitchford's chronically depressed mood is severe enough to warrant the additional diagnosis of Depressive Disorder, Not Otherwise Specified, and that such severe and chronic depression has had a significant impact on how he views the world, his decision-making capacity, and in turn, his level of distress and ability to function." 2011-09-

225

14 Richard Dudley Aff., 14. He further found Mr. Pitchford displayed "chronic suicidality." *Id.*

People in Mr. Pitchford's life also observed his inability to control his moods. According to his mother, "Terry had a hard time controlling himself. Sometimes, I would have to slap him around and knock him real hard against the wall when he was having a tantrum." 2018-09-08 Shirley Jackson, ¶25. His twin brother Perry said, "He was also very emotional, with extreme highs and lows sometimes. Terry would be calm one minute and then in a split second, he'd switch and become very upset. It was like he was a different person." 2018-08-26 Perry Pitchford, ¶8. DeShawn echoed this observation: "Terry had extreme mood changes and sometimes didn't appear to be himself. The adults in our family would say Terry's behavior was 'nothing but the devil.'" 2018-08-26 DeShawn Burnett, ¶14.

Mr. Pitchford has suffered from an inability to control his moods normally. Throughout the criminal process—indeed, throughout Terry's childhood—this was misunderstood and misinterpreted as willfulness in *choosing* to respond emotionally. This inability to control mood impairs the ability to rationally understand what is going on and to make rational decisions, especially in emotionally challenging circumstances.

### Response to Stress and Novel Situations: Impaired Decision-Making Ability and Impulse Control.

Emotionally challenging situations are one form of stressful circumstances. Mr. Pitchford is also unable to regulate his response to stressful circumstances. As

his twin brother Perry observed, "he had difficulty expressing himself in response" to situations when he was in trouble. 2018-08-26 Perry Pitchford, ¶8.

Mr. Pitchford's difficulty in thinking clearly in stressful situations overlaps with his inability to control impulses. His half-brother DeShawn Burnett observed that Terry, unlike Perry, had difficulty making decisions and controlling impulses. 2018-08-26 DeShawn Burnett, ¶11. For example, "When we were young, we were taught never to interrupt an adult. *Terry couldn't help himself.* He would often interrupt when adults were talking. Our mom or whatever adult was around would whip him or slap him in the mouth for this." *Id.* (emphasis added). His mother also observed, "When he became upset as a young child, he would bang his head against the wall, peel paint off the walls, run outside into the woods behind the house and tear branches off trees and hit the ground with the branches. He was always hitting his head with his hands." 2018-09-08 Shirley Jackson, ¶25. According to Terry's half-brother:

> Terry was usually friendly and laid-back, but sometimes he would lose control and start hitting or kicking things, punching holes in the wall. One time, something happened with Terry when he was at Veronica's house that made him upset. I can't remember what it was. My mom brought him over to my apartment to try to calm him down. Terry was very angry and started kicking our mother's car door. He was also hitting his head with his hands, side to side. I had to physically restrain him until he calmed down. When I held him tight, he didn't resist, and he calmed down.

2018-08-26 DeShawn Burnett, ¶14.

The experts also observed that while he performed in the average to low-average range on some cognitive tests, his performance suffered when there was stress. Dr. Spica noted the effect of time limits on his test results. 2011-09-11

Malcolm Spica Letter. Dr. Bailey noted that his "psychiatric impairment … will exacerbate during the stress of trial." Bailey Report at 6.

Dr. Dudley opined "within a reasonable degree of medical certainty that [Mr. Pitchford's] decision-making capacity was … impaired from the time of his arrest through the completion of trial" due to "stressors, changes, and new and unfamiliar information presented to Terry [which] were novel stimuli which he was unable to process in a rationale [sic] manner." 2011.09.14 Richard Dudley Aff. at 15.

### Response to Cognitive Complexity

Stress taken broadly also refers to tasks involving greater cognitive complexity. The decrease in processing discussed *supra* is more pronounced, in questions involving higher complexity (such as alternating between pieces of fruit and pieces of furniture). Mr. Pitchford's ability to think abstractly—another type of cognitive complexity—is significantly impaired. Dr. Bailey noted:

> His abstracting ability is poor on standard testing. He was unable to complete the responses to the following proverbs:
> "Don't count your chickens before they hatch."
> "An eye for an eye."
> "Even monkeys fall from trees"
> "People who live in glass houses shouldn't throw stones."
> He is very concrete in describing similarities between items such as fruit, furniture, and transportation.

Bailey Report at 11. This was apparent in the January 11, 2006 session at MSH:

> Q. I'm going to give you a series of words and I want you to tell me how they are alike. If I say this apple and this orange, how are they alike?
> A. Both of them grow on trees.
> Q. Okay. An apple and an orange are both blank. Fill in the blank.
> A. Fruit.
> Q. A table and a chair?
> A. You can sit down on.
> BY DR. LOTT: Q. They're both what?

228

> BY UNIDENTIFIED MALE SPEAKER: Q. Yeah, a table and a chair
> are both what?
> A. Wood.
> Q. Wood. Sure. All right. A table and a chair, what section of a store
> would you go to?
> A. Furniture.
> Q. Okay. That's what I was looking for.

MSH Tr. Jan. 11, 2006 at 124-25. He was unable to reach the abstract similarities

without considerable coaching.[44]

Dr. Spica observed that the inability to "appreciate[e] subtle cause-effect

relationships between interdependent factors (such as people), especially under

unfamiliar circumstances" can lead to the observed impairment in "quickly

processing novel information." 2011-09-23 Malcolm Spica Aff., ¶11. Dr. Spica also

associated a number of these regulatory dysfunctions with real world impairment:

"Based on a reasonable degree of psychological certainty, these findings give me no

confidence that Terry Pitchford would be able to make important decisions under

emotional circumstances, time pressure, or when dealing with abstract concepts."

*Id.*, ¶12.

### *Sense of Self/Identity: the Voices*

The voices Mr. Pitchford had heard in his head since he was a small child

suggest symptoms of Schizoaffective Disorder. Taken more broadly, Mr. Pitchford

has many of the symptoms of Borderline Personality Disorder suggesting a poorly

developed sense of identity. These voices may very well be auditory hallucinations.

In any event, through the lens of dysregulation, the voices and Mr. Pitchford's

---

[44] Such coaching or leading examination is improper in a psychological evaluation. Such biased evaluation can lead to an incorrect conclusion that an incompetent person is competent to stand trial or waive rights. *See infra*.

lifelong struggle to control them and their influence over him, manifest the gross inability to control internal processes.

Mr. Pitchford reported he hears "voices in my head." MSH Tr. Jan. 11, 2006 at 98. "I might hear a whole bunch of things, like two different people in my head telling me what to do." *Id.* According to Dr. Dudley:

> Mr. Pitchford reported that since childhood, he has heard a male voice as clearly as he hears this psychiatrist's voice. For a long time he thought the voice was a spirit, because when he would tell his mother about it she would tell him to pray or to read the bible. Then when he was a little older, he spoke to his god-father about it. His god-father told him that it was all in his head, which at the time seemed to make sense since he never saw anyone there when he heard the voice …. Mr. Pitchford reported that the voice is usually negative - for example, when he wanted to do something, the voice would call him stupid and tell him to do something else, or the voice would tell him to hurt himself or say that he was better off dead, or it would say other negative things about him or someone else, or it would push him to fight, despite the fact that he doesn't even like to argue.

2011-11-14 Richard Dudley Supp. Aff. at 2. Mr. Pitchford's mother knew of the voices: "When Terry constantly talked about hearing voices, I thought it was Satan that had entered him and the only thing I could do was pray." 2018-09-08 Shirley Jackson, ¶29. She recounts that Terry once jumped out of a moving vehicle because the voices told him to. *Id.*, ¶21. Terry thereby sustained one of many head injuries:

> He got a huge gash in his head, which turned into a knot. It bled a lot and was full of puss. He still has a big scar on his head today. I didn't take him to the doctor because I wasn't raised to go to the doctor unless it was "life or death." I was raised that you should pray and be healed that way.

*Id.* The voices grew worse after Terry's father died:

> Terry would tell me often that he heard voices telling him to do things. He wouldn't tell me something was wrong until I saw him hitting the side of his head and asked him what he was doing. He always said someone was talking to him. This would occur regularly, and it got

worse after James died. When we were in church one day when Terry was 13 or 14, Terry whispered to me and said that a voice was telling him to go up and hit the pastor. I told him that was just the devil talking to him. Another time when he was around the same age, he rode the lawnmower into the little pond near our house. He told me that a voice told him to do it.

*Id.*, ¶28.

People around him reported hearing him carrying on conversations when he thought he was alone. His fraternal twin Perry recounts: "There were times that I walked by the bathroom at home, and Terry would be in there talking to himself. It was like he was having a conversation with someone who wasn't there. He would switch back and forth and respond." 2018-08-26 Perry Pitchford, ¶23.

The voices persisted into adulthood, even after Mr. Pitchford's incarceration. One inmate testified:

I thought him kind of strange because -- I thought he would pray a lot sometimes and I had an opportunity, I was painting for maintenance -- I was a trustee – and observed him one day. And I eased up on him just a little bit and I realized that he was talking to himself. And, you know, it kind of stood out. Man, it seemed like the next time I come in there it was the same thing so I would just kind of watch him any time I get around him. It was just hearing him having a conversation by himself.

Tr. May 11-12, 2015 at 5. Another inmate also testified to seeing Terry "mumbling and saying things to himself." *Id.,* 16.

Dominique Hogan, Terry's girlfriend at the time of the crime and the mother of his child, recounts:

Over the years, I heard Terry talking to himself, as if he were responding to someone who wasn't there, and I heard him fighting with people that weren't in the room. He was afraid of the dark, too, and always had a light on in the room when he was sleeping. When I asked Terry about the voices, he said he felt like they were demons and

they were on his shoulders. The voices told him to do things. Terry told
me he felt like people were after him. One time, I walked in on him in
the kitchen at Ms. Shirley's house and he was talking to himself I
asked him who he was talking to, and acted like I was crazy because I
couldn't hear the voices in his head.

2018-08-26 Dominique Hogan, ¶18.

Mr. Pitchford's struggle with the voices is explicitly a struggle to control or
regulate. He variously attempted control by hitting himself in the head, praying,
reading the Bible, and smoking marijuana, but none of these were successful. 2011-
11-14 Richard Dudley Supp. App. at 1-2. He later discovered he could sometimes
"outlast" the voices by simply holding out long enough until it faded away. *Id.,* 2. He
recounted to Dr. Dudley that "after he was arrested the voice was really trying to
get him to kill himself; he was trying hard to fight that; and then he discovered that
if he held out long enough the voice finally stopped or at least got weaker
again/more easy to control." *Id.*

He told MSH that by responding to the voices in certain ways he could make
them go away, but only for a short time: "There's one voice in my mind that I can
say certain things and they will leave but they only stay gone for a minute." MSH
Tr. Jan. 11, 2006 at 104. But the struggle with the voices was always a struggle to
control what was going on in his own mind.

Although the various experts disagree on exactly how to parse the health
implications of his voices, they converge on an understanding of the voices as a
symptom of dysregulation. MSH strenuously—and improperly[45]—told Mr. Pitchford

---

[45] "But the task of such an examination is to assess the subject, not to persuade him to change
what he is saying about what he experiences." 2018-09-15, B.S. Agharkar,¶23.

that the voices were actually his own normal thoughts and self-talk, the sort of thing that everyone experiences. After Mr. Pitchford said he heard voices that other people don't hear, Dr. Lott replied, "Okay. We've all experienced that. But do you hear someone constantly talking to you, carrying on a conversation, telling you to do things, that no one else around you can hear?" MSH Tr. Jan. 11, 2006 at 98. Mr. Pitchford again answered affirmatively. *Id.* Later, Dr. Lott asked "Now, let's be clear. Are we talking about voices where you can hear them in your mind or are you talking about like your own inner thoughts?" *Id.,* 103. But even if the voices are only Mr. Pitchford's own thoughts, what he has experienced is certainly not normal thinking that everyone experiences.

After his first examination of Mr. Pitchford, Dr. Dudley recognized the need for further examination "to clarify the nature of these thoughts or voices." 2011-09-14 Richard Dudley Aff. at 12. Specifically, he was unsure whether they were symptomatic of Psychotic Disorder or something more in line with "the ego-dystonic nature of the experiences" such as Obsessive-Compulsive Disorder. *Id.,* 13. The latter is suggested "by their content and the absence of classic ritualistic behaviors focused on warding them off, with the possible exception of hitting his head." *Id.* Upon further examination, Dr. Dudley concluded that the voices are auditory hallucinations, but that the absence of other symptoms of psychosis means these hallucinations "represent another symptom which is consistent with the other previously diagnosed disorders." 2011.11.14 Richard Dudley Supp. Aff. at 3. Dr. Hamm, on the other hand, stated, "Critical 'inner voices' which berate and chastise

233

… are often mistakenly identified as hallucinations." 2018.09.16 Barbara Hamm, ¶F.2. Dr. Hamm recognized this symptom as being associated with trauma and neglect. *Id.*

Even assuming the voices are not symptomatic of psychosis and not properly classed as auditory hallucinations, they undoubtedly demonstrate dysregulation. Mr. Pitchford's inability to control the voices—even accepting the improper steering by the MSH evaluators attempting to convince him that his experience was his own thoughts or self-talk—shows that Mr. Pitchford's experience was far from "normal" and represented an impaired ability to regulate what goes on in his mind.

Another way of understanding the voices as dysregulation is to take them as a symptom of his incomplete sense of himself—as Dr. Dudley says, they are "ego-dystonic experiences." That is, the fact that he identifies them as other than his own thoughts shows the breakdown of his sense of self or his identity.

Terry's poorly formed sense of self means he always thought of himself as the outsider. First, as a black child growing up in the predominantly white community of Coffeeville in Grenada County near the Yalobusha County border, he was an outsider. He met his girlfriend, Dominique, in school. She lived in the Tie Plant community within the small town of Grenada. She noted that when they began dating, Terry was an outsider to Tie Plant. 2018-08-26 Dominique Hogan, ¶8. "[I]t took him a few years to get comfortable with the guys there." *Id.* "Terry came from a church family in the country. He did not come from the Tie Plant neighborhood, which is the rougher part of town." 2018-08-10 Dantron Mitchell, ¶3.

234

As a result, Terry was a follower, someone constantly seeking approval and trying to fit in where he did not feel he belonged. 2018-08-26 Dominique Hogan, ¶11. According to Dantron:

> Terry did not have much of a back bone. There were guys in the community that Terry would follow around, including Demarquis, Quincy, Eric, and Antonio Conley ('Babycakes'). Terry would just do whatever they told him to do. He did not want them to think he was scared or soft, and he felt he was letting them down if he did not follow their lead.

2018-08-10 Dantron Mitchell, ¶5. DeShawn added that in trying to fit in, "He was trying to appear tougher than he really was. Terry wasn't used to the street-smart rough people he hung around. Our family never hung around Tie Plant." 2018-08-26 DeShawn Burnett, ¶15.

The voices in his head are perhaps the most exceptional evidence of his poorly formed sense of self. Even in his own head, he saw himself as an outsider, subject to the criticism and command of a voice that he identified as other than himself.

### Mr. Pitchford's Marijuana Use was Another Attempt to Compensate for Dysregulation.

At the time of the crime, Mr. Pitchford reported prodigious marijuana use. "When I got locked up, I was smoking like 20, 25 blunts a day." MHS Tr. Jan. 11, 2006 at 82. He smoked from when he woke up in the morning and all through the day, even on days he worked. *Id.,* 84. Mr. Pitchford recognized that "smoking marijuana never made the voice go away" but it was ameliorative because it "made it so he didn't care so much about what the voice was saying; therefore; with marijuana, he was less likely to respond to the voice." 2011-11-14 Richard Dudley Supp. Aff. at 2. As Dr. Dudley points out, even though heavy marijuana use began

"as self-medication" it became a problem in itself justifying the diagnosis of "Cannabis (marijuana) Abuse." 2011-09-14 Richard Dudley Aff. at 13. Ultimately, it was no more successful at conquering the voices than hitting his head or his mother's advice to refute Satan.

### Etiology: Trauma and Neglect Led to Mr. Pitchford's Regulatory Dysfunction.

The likely origin of Mr. Pitchford's impairments is the significant complex trauma and neglect he suffered, especially as a young child. 2018-09-16 Barbara Hamm, ¶¶F.1-5, ¶¶G1-20.

> Over time, the link between trauma, neglect and the damage these experiences cause may become obscured both to the afflicted individual and observers. The result is a confusing dysregulation of how the individual manages and interprets his emotions, which are often expressed in impulsivity and depression.

*Id.*, ¶E.4.

Mr. Pitchford's impaired sense of self and his inability to regulate the voices or thoughts in his own head were likely traceable to abuse he suffered especially from his mother. "She was always emotionally/psychologically abusive, constantly saying things like 'you can't do this/that' or 'you aren't going to be shit.'" 2011.09.14 Richard Dudley Aff. at 3. Even if there was a genetic predisposition to dysregulation, the trauma was a necessary cause. *See* [cross reference to appropriate Mitigation section] for the substantial emotional and physical abuse, neglect, and physical trauma Mr. Pitchford suffered as a small child. These factors impaired development of his fragile systems regulating EF, resulting in the many types of dysregulation he experienced.

*Conclusions of MSH were the Product of Bias and Egregiously Improper Methods.*

All of the various MSH reports were based on improper evaluation procedures exhibiting bias and carrying through the same foregone conclusions in each iteration of the evolving documents.

Dr. Bhusan Agharkar details the several serious flaws in the conduct of the MSH evaluation. 2018-09-15 B.S. Agharkar Declaration. The interview transcript[46] shows the three evaluators approached the interview with a bias. *Id.*, ¶ 17 ("My initial impression when reading the transcript was that it seemed like an interview by prosecuting attorneys. I double checked that this was indeed meant to be an independent psychiatric evaluation."). Most notably, they improperly failed to fully explore Mr. Pitchford's lifelong experience of hearing voices in his head and instead expended repeated efforts to persuade Mr. Pitchford that the voices were normal thought processes that everyone experiences. *Id.*, ¶¶ 17-26.

Such attempts to explain away symptoms, rather than explore them with no preconceived conclusions is improper and antithetical to the goal of a psychiatric evaluation. Their attempts to normalize these very serious symptoms is egregious in light of the other evidence from the myriad sources rehearsed *supra*, showing that Mr. Pitchford heard these voices since he was a child; that he did not think of them as his own thoughts; that his mother thought they were Satan; that he struggled unsuccessfully to control them and to resist the compulsion to obey their demands by hitting himself in the head, praying, using marijuana, and other

---

[46] The transcript from audio recording of the January 11, 2006 MSH interview is included as an exhibit in Dr. Agharkar's declaration. It is cited in this Petition as "MSH Tr."

methods; and that others heard him conversing with the voices throughout his life. As in Dr. Dudley's reporting, the proper consideration is to explore this very serious symptomology to determine whether the voices were auditory hallucinations and thus perhaps a symptom of psychosis (and if so what type), or whether the phenomena was abnormal self-talk, symptomatic of serious psychiatric disorders. It was certainly not proper to try to persuade Mr. Pitchford that his reported experience was normal thinking that everyone experiences.

This bias was exacerbated by the improper simultaneous evaluation conducted by the three evaluators, Drs. Lott, McMichael, and Macvaugh. *Id.*, ¶¶ 10-16. The only time it is proper to have multiple mental health evaluators present is in the context of a trainee/supervisor situation where the supervisor must observe and sign off on the trainee's evaluation. *Id.*, ¶ 12. In other cases, like here, what happens is that one evaluator takes a lead role, and the others give the leader's opinion undue deference to Dr. Lott who led the interview. *Id.*, ¶ 13. In other words, there is just one opinion, and not three distinct evaluations. "[T]his practice does not validly constitute three separate evaluations. Only one of the three could usefully testify as to the conclusions or opinions. Based on the transcripts reflection of the absence of independent questioning, the other two evaluators merely serve here to bolster the single actual opinion." *Id.*, ¶ 14.

The interview transcript shows other evidence of bias. Evaluators improperly coached answers to cognitive screening questions. *Id.*, ¶ 27-28. For example:

> Q. I'm going to give you a series of words and I want you to tell me how they are alike. If I say this apple and this orange, how are they alike?

238

> A. Both of them grow on trees.
> Q. Okay. An apple and an orange are both blank. Fill in the blank.
> A. Fruit.
> Q. A table and a chair?
> A. You can sit down on.
> BY DR. LOTT: Q. They're both what?
> BY UNIDENTIFIED MALE SPEAKER: Q. Yeah, a table and a chair
> are both what?
> A. Wood.
> Q. Wood. Sure. All right. A table and a chair, what section of a store
> would you go to?
> A. Furniture.
> Q. Okay. That's what I was looking for.

MSH Tr. 124-25. Making any conclusion based on Mr. Pitchford's ultimate response,

"Furniture," is invalid, because he was improperly led to this answer. 2018-09-15

B.S. Agharkar Declaration, ¶ 28. Similarly, evaluators improperly recited legal

concepts only to have Mr. Pitchford parrot them back. *Id.*, ¶¶ 32-34. The transcript

further shows that evaluators improperly rehearsed questions and answers when

the tape was not recording:

> DR. LOTT: This is tape three side B.
> BY DR. LOTT: Q. And we were just asking you about your attorneys.
> Before you start, *if you can tell me again.* Do you think you will be able
> to work with your attorneys?
> A. Yes, sir.
> Q. Okay. Do you trust them?
> A. Yes, sir.
> Q. Okay. Now, I think I stopped -- *the last question was*: What do you
> need to do in order to help your lawyer prepare for this case?
> A. Give them information.
> Q. What does anybody need to be able to tell their attorney?
> A. Everything.
> Q. What would happen if you didn't, or what might happen?
> A. They wouldn't know exactly what to come with to fight it.

MSH Tr. 127 (emphasis added). The conversations referred to here were not in the

transcript. *See* MSH Tr. 126. It is never appropriate to carry on conversation while

changing the tape.[47] 2018-09-15 B.S. Agharkar Declaration, ¶¶ 29-31. Any time this is done, it suggests improper coaching and rehearsal of questions and answers. Here, the transcript makes clear that such coaching in fact took place. Dr. Lott refers explicitly to questions asked and answers rehearsed off tape. Furthermore, the ensuing exchange of questions and answers seems to show uncharacteristically quick and confident answers by Mr. Pitchford. Such practice is merely a test of short term memory and fails to show anything about the ability to understand processes against him or to consult with his attorneys.

And the biased and unreliable conclusions of the January 11 initial evaluation carried through to other MSH reports issued following the January 25 testing. A close look at the various documents generated by MSH from January 11, 2006 until the beginning of the trial shows repeated cut-and-paste recitations of the conclusions Dr. Lott likely formulated before meeting Mr. Pitchford and first announced at the end of the transcribed audio. MSH Tr. 164-66; 2006-01-11 MSH Admission Note; 2006-01-11; MSH 19 page Eval.; Unsigned MSH 17 page Eval. filed Feb. 2, 2006.

And there is even more evidence of the unreliability of the MSH opinion. On January 26, 2006, Mr. Carter sent MSH medical records from Grenada Lake Medical Center, and asked MSH to consider them "before finishing your final report." Every indication is that MSH failed to consider these records at all, despite

---

[47] As Dr. Agharkar notes, "This problem is obviated by digital audio recording, but the MSH was using a cassette tape recorder even though digital audio was cheap and generally used in 2006. But even with a cassette recorder, it takes virtually no time to flip the tape over and press record. Standard practice is simply to say, 'Hang on,' and wait until the tape is rolling." *Id.*, ¶ 29.

counsel's effort and the inherent relevance of the information contained therein. The medical records detail numerous accounts of physical trauma including a head injury sustained at age 13 when he was hit with a can of spray starch;[48] a shoulder injury from a fight at age 14; a "knot to the forehead" at age 17 which was attributed, incredibly, to being hit by a baseball two years earlier; a head injury sustained just months before the crime, when Mr. Pitchford crashed into a telephone pole, and hit his head on the windshield.

### Mr. Pitchford's Impairments Deprived Him of the Ability to Understand the Proceedings Against Him or Consult with His Attorneys, as Displayed to the Trial Court at the Aborted Plea Colloquy.

Mr. Pitchford could essentially parrot back what was made to appear to be a basic understanding of some of the relevant legal processes and concepts in a lower-stress, highly coached setting like the January 11, 2006 MSH interview. But his impairments deprived him of that ability in the real world. For example, Mr. Pitchford's

> anxiety and fear, at times to the level of paranoia, along with the depression, impulsivity, etc. made it extremely difficult for Mr. Pitchford to consistently trust and cooperate with his trial attorney. He further noted there were times when he was meeting with his trial attorney when the voice would be saying 'full of shit,' at which point he would withdraw/become quiet.

2011-11-14 Richard Dudley Supp. Aff. at 3.

Significantly, even in the lower-stress environment of a psychiatric evaluation, he was unable to recite an understanding of key concepts: he was unable "to describe his rationale to accept the plea bargain offered by the district

---

[48] Subsequent investigation revealed this was abuse at the hands of his mother.

attorney He was unable to identify a likely alibi. He was unable to disassociate himself from the pertinent elements of the crime. Finally, he was unable to describe a thought process consistent with insanity." Bailey signed report at 12.

Further, his utter inability to make crucial legal decisions was placed in stark relief in two real world situations: his alleged waivers of Miranda rights in police interrogation and the aborted pre-trial plea colloquys, when he struggled to make a life and death decision in a highly pressurized setting in court, with voices internal and external besetting him.

While Dr. Mcvaugh deferred to Dr. Lott's opinion on all other points, he disagreed with the conclusion that Mr. Pitchford was competent to waive *Miranda* rights. MSH Tr. 165. On January 19, 2006, the court convened after counsel indicated that Mr. Pitchford wished to plead guilty. *Id.,* 7. The State expressed willingness: "This is the second time we've got him here for a plea.[49] If he wants to go through with it today, we have no problem with making him an offer." *Id.,* 8. Mr. Pitchford immediately launched into a confused statement which seemed to indicate that he had not understood beforehand that the court would be taking his plea that day. Mr. Pitchford conveyed that he was not equipped to plead guilty without his mother's presence or before speaking with her a final time. *Id.,* 8-9. Judge Loper stated,

---

[49] The State offered Mr. Pitchford a sentence of life without possibility of parole in exchange for a guilty plea. Tr. at 1. On January 9, 2006, Judge Loper told Mr. Pitchford, "I want to make it clear that I am not going to accept any plea past today." *Id.,* 2. At that time, the trial was set to begin on February 6. *Id.,* 1.

> Well, Mr. Pitchford, we're going to go forward today. I don't see any reason why your mother needs to be here for sentencing. I'm sure you've already had an opportunity to talk to her about what kind of sentence recommendation was going to be made. And so we're going to proceed.

*Id.*, 9. The court proceeded with the plea colloquy, and Mr. Pitchford expressed that he had not had such an opportunity to address this extraordinary decision with his mother. *Id.,* 13. When Judge Loper asked him whether he understood the rights he would be waiving if he entered a plea, Mr. Pitchford replied, "Yes, sir, I do." *Id.*, 12. But when he was asked, "Is it your desire at this time to waive or give up those constitutional rights and enter a plea of guilty at this time to the crime of capital murder?" he replied, "No, sir." *Id.,* 12-13. Mr. Pitchford elaborated:

> I mean, I—I want to take the plea. Sir, I want to take the plea because they're telling me that if I take it to trial that they're going to give me the death penalty, the way it goes. You see what I'm saying?
> …
> They tell me that there's no way I can win. That's what they're telling me now. I want to take the plea for life without parole. You see? But I mean, I ain't talked to my folks. I ain't did none of this. You know—

*Id.,* 13. Judge Loper interrupted to add further pressure to the situation by observing that "Mr. Britt didn't get to talk to his family, either." *Id.,* 14. Judge Loper continued to increase the temperature in the courtroom:

> And you're getting a whole lot more mercy and a whole lot more understanding than he got. He didn't get to say goodbye to anybody. He didn't get to talk to anybody. So I really don't much care to see your crocodile tears here today. Now, you can go forward, and you can plead guilty. You can waive these rights or we can go to trial. I get paid the same either way. I'll go home, and I won't be getting a lethal injection. So, I mean, it just does not make one bit of difference to me. But you better make up your mind right now what you want to do, because this is the second time that we've gone through this.
> Now, do you wish to give those constitutional rights up and plead guilty to this charge?

<div align="center">243</div>

*Id.,* 14-15. Mr. Pitchford, who had just expressed a desire to plead guilty, replied, "No, sir." *Id.,* 15. Mr. Pitchford begged for more time, again stating that he had not understood that his plea would be accepted that very day. *Id.* He admitted he spoke to the defense team investigator the day before and said he wished to plead guilty and not go to trial, but insisted he had not been able to address this with his mother, *Id.,* 13, and did not understand the plea would be entered that day, *Id.,* 16.

Mr. Pitchford was unable to process what was coming at him in real time. "So what has changed?" the judge demanded. *Id.*

By the Defendant: I never knew I was going today. I never said—
By the Court: Well, what difference does it make whether it's today, next week or February the 6th? What difference does it possibly make?"

*Id.* Without giving him any time to process these questions or think of how to respond, Mr. Pitchford's attorney dialed up the pressure again: "Terry, this is your last chance. If you don't want to risk what I've been telling you about all along, you need to take this plea. It's up to you. Yes or no." *Id.* But with his impairments, Mr. Pitchford could not process this information quickly enough to make a rational decision.

After a recess, Mr. Pitchford told the court he decided to plead guilty after all. *Id.,* 17. The court proceeded with the plea colloquy, which had plainly become a sham, as Mr. Pitchford struggled, after the State, the court, and the defense had all pressured him to accept guilt, to say that no one pressured him to plead. *Id.,* 18. As the colloquy proceeded, he began to make 'wrong' answers:

By the Court: And have [your attorneys] discussed with you any possible defenses you might have to the charge?
By the Defendant: No, sir.

244

*Id.,* 19. This suggests that Mr. Pitchford thought he was required to admit that he

did the crime and that he had no possible defenses before the court could accept his

plea. Rather than acknowledge the problematic answer, Judge Loper explained

what a defense was, but then asked a completely different question: "But they've

had an opportunity to go over all the proof in this case with you, have they not?" *Id.*

This elicited the 'right' answer, "Yes, sir." *Id.*

Mr. Pitchford again dithered when asked whether his attorneys met his

expectations and did everything a defense attorney ought to have done. "They

pretty much did everything that I think a lawyer probably could do. I mean, an

appointed lawyer probably could do." *Id.,* 21. The court again asked him whether he

had been pressured into the decision, and Mr. Pitchford, by then unable to speak in

full sentences, replied:

> Yes, sir. I mean, if I feel like—I wasn't —I feel like I made my own
> decision. But in all, I feel like, you know, that with—with—*with
> hollering, with, you know, this and this, and talking talking*—I feel like
> in some kind of way I was pressured, and in some kind of way I wasn't
> pressured. I—
> …
> I mean, I don't feel—feel like what a—what a—like what a mother and
> father probably tell their son. Well, you got your own decision, but this
> and this, you know—

*Id.,* 22 (emphasis added). Bearing in mind Mr. Pitchford's inability to regulate his

own thoughts or the voices he heard in his head and his inability to regulate his

attention and mood, it is clear he was not competent to make the life and death

decision being demanded of him in this high pressure setting. He responds

ineffectually to "hollering" in the courtroom "and talking talking" from voices

apparently yelling at him inside his head.

245

But rather than provide any time or space, the court argued at length with Mr. Pitchford that he was not feeling pressured,[50] to get him to acknowledge that what he was expressing was "My decision." *See id.,* 22-24. The court proceeded with the State's recitation of the facts of the case. *Id.,* 25-27. But Mr. Pitchford could not bring himself to agree to the facts as stated: "I mean, the way he got it put down, all of it, exactly how it got in my motion, but all—all of it is not correct." *Id.,* 27. Judge Loper asked him whether he murdered Mr. Britt during the commission of an armed robbery, and Mr. Pitchford replied, "If I—if I say no, then I can't accept this plea, right?" *Id.* The State pointed out that its theory of the case did not require proving that Mr. Pitchford himself did the killing, a point that did not seem to register with Mr. Pitchford as he stood before the court. *Id.,* 27-28. Judge Loper directly asked him, "Did you kill Mr. Britt?" and Terry replied, "No, sir." *Id.,* 29. Loper then asked two serial questions: "Well, then, who did and what happened out there? You're going to stand here and you're going to say after all this, No, I didn't do it. I didn't have anything I wasn't involved. Is that correct?" *Id.* Mr. Pitchford answered the last one, "Yes, sir," and Loper announced, "Then we'll have a trial." *Id.*

This episode displays Mr. Pitchford's impairments in the highly-pressured circumstances in the real world. It also shows that the presumption he was competent to waive rights and to stand trial was misplaced.

---

[50] Judge Loper's conduct here echoed Dr. Lott's attempts to persuade him that the voices he heard in his head and struggled vainly to control his entire life were normal thoughts or self-talk that all of us experience. *See infra.*

246

## B. Exhaustion

Petition has not exhausted his state remedy claims as to this substantive due process competency claim, due to ineffective assistance of counsel at the trial, appellate, and post-conviction stages.

## C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to ineffective assistance of appellate counsel.

## D. Post-conviction

Post-conviction counsel raised a substantive due process competency claim at post-conviction in Mississippi Supreme Court Case Number 2010-CR-01032-SCT. The state supreme court found there was a procedural due process violation for the failure to conduct a pre-trial evidentiary hearing to determine competence, and remanded the case for a retrospective hearing. It summarily rejected all other grounds for relief, presumably including the substantive due process competence claim. On appeal of the retrospective determination of competence, post-conviction counsel failed to renew the substantive due process claim. The state supreme court's affirmance was limited to the procedural claim. *Pitchford v. State*, 240 So. 3d 1061, 1072 (Miss. 2017).

## XVII.    PETITIONER'S DIRECT APPEAL COUNSEL FAILED TO RAISE THE VIOLATION OF HIS RIGHT TO A COMPETENCY HEARING, VIOLATING PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE ON APPEAL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### A. Supporting Facts

*Procedural Facts and Background*

On direct review in the Mississippi Supreme Court, Petitioner's appellate counsel failed to raise the violation of Mr. Pitchford's right to a competency hearing,[51] violating his equal protection and due process safeguards under the Constitution. *Smith v. Robbins*, 528 U.S. 259 (2000); *Douglas v. California*, 372 U.S. 353 (1960); *Griffin v. Illinois*, 351 U.S. 12 (1956).

In the post-conviction proceedings at bar, the Mississippi Supreme Court determined that the trial court had violated Mr. Pitchford's right to a competency hearing. *Pitchford v. State*, 240 So.3d 1061, 1063 (Miss. 2017). However, the supreme court, in then remanding the case to the trial court to conduct a retrospective competency hearing, violated Mr. Pitchford's underlying due process right to be tried only while competent—that is, his right *not* to be tried while legally incompetent. The resulting retrospective hearing demonstrated the "inherent difficulties of such a *nunc pro tunc* determination," and the reasons behind the presumption, for lack of reliability in the result, against such a hearing in the

---

[51] *See Pitchford v. State*, 45 So.3d 216 (Miss. 2010). Further, at the post-conviction retrospective hearing discussed herein, Judge Loper stated, "This court will also note that on appeal, Mr. Carter raised no concerns about Pitchford's competency during the course of the trial." Tr. May 11-12, 2015 at 300.

typical case. *Drope v. Missouri*, 420 U.S. 162, 183, *citing Pate v. Robinson*, 383 U.S. 375, 386-87 (1966).

Like *Drope* and *Pate*, the circumstances at bar were clearly inadequate for holding a post-trial proceeding to overcome a violation of the right to a pre-trial competency hearing. *Id.* The resulting proceedings on remand for Mr. Pitchford only demonstrate the core point of the controlling decisions restricting the use of retrospective competency determinations for only the smallest cross-section of cases concerning the denial of a hearing despite the requisite "*bona fide* doubt" of competence. *Pate*, 383 U.S. at 386. The remand reflects the "*bona fide* doubt" before Judge Loper in January 2006, and, critically, direct appeal counsel's deficiency in failing to raise the violation of Mr. Pitchford's right to a competency hearing has caused grave prejudice. A retrospective competency determination could not remedy this violation of Mr. Pitchford's rights; rather, the *nunc pro tunc* determination in the state court *evidences* the unremedied violation due to counsel's failure to appeal the issue.

Mississippi law recognizes the State's burden in "demonstrating that a meaningful retrospective competency hearing can be conducted." *Pitchford*, 240 So. 3d at 1070. Critically, however, the procedural posture on which such a question is presented is, in the normal course, direct appeal—not, as was the case in Mr. Pitchford's 2013-15 litigation, post-conviction.

In *Coleman v. State*, the state court explained that rather than reversing and remanding for a new trial, the State could satisfy the burden to secure a *nunc pro*

*tunc* hearing by evincing "sufficient evidence from which to make a meaningful retrospective competency determination." 127 So.3d 236, 240 (Miss. 2012), *citing Wheat v. Thigpen*, 793 F.2d 621, 630 (5th Cir. 1986) (citing *United States v. Markis*, 535 F.2d 899, 904 (5th Cir. 1976). Under Mississippi law, the State possessed a burden to overcome the presumptive reversal of the judgment from a violation of the kind at bar.

        As set forth here, had appellate counsel raised this clear point of appeal—indeed, it was so clear that the Mississippi Supreme Court, in post-conviction, adjudged the violation of Mr. Pitchford's right to a competency hearing—then under the Mississippi jurisprudence at that time, Mr. Pitchford's judgment would have simply been reversed. *Sanders v. State*, 9 So.3d 1132, 1136 (Miss. 2009). Even applying the supreme court's more recent precedent in *Coleman*, decided on October 24, 2013, to Mr. Pitchford's direct appeal, which his counsel briefed on October 29, 2008 and the court decided June 24, 2010, *Pitchford*, 45 So.3d 216, the State would not have carried its burden to permit a *nunc pro tunc* competency hearing.  Instead, because of appellate counsel's failure to raise the certain violation of the right to a competency hearing, the Mississippi Supreme Court, sitting in post-conviction review, simply sent the case back for a retrospective hearing *without requiring the State to meet any burden as to its viability*. Thus, the case returned to Judge Loper for a *nunc pro tunc* determination of a defendant's competency *over nine years* in the past. Thus, at the time of that hearing in May 2015, Mr. Pitchford himself was nearly 30 years of age and, in many senses unrecognizable from the profoundly

troubled and developmentally stunted young person facing the foregone conclusion of a death sentence.

A year prior to the trial court's February 2, 2006 ruling denying defense counsel's continuance motion, clearing the way to jury selection on February 6, Mr. Pitchford's counsel had moved on February 1, 2005 for a mental evaluation pursuant to § 99-13-1 *et seq*. The court never ruled on this motion. Instead, a compromised handling of this central issue cleared the path to Mr. Pitchford's unconstitutional conviction and sentence.

On September 8, 2005, eight months after trial counsel's initial mental evaluation motion and based on joint oral motions, the court ordered a competency, insanity, and intellectual disability evaluation of Mr. Pitchford at the Mississippi State Hospital at Whitfield ("MSH"). *See* Tr. 34; Order, Sept. 9, 2005.

As the Mississippi Supreme Court recognized in post-conviction, Judge Loper never ruled on competency. Rather, the state high court concluded that the trial court had violated Mr. Pitchford's right to a competency hearing, thereby recognizing *sub silentio* that the threshold of a "*bona fide* doubt" of competency, *Pate,* 383 U.S. at 386, had been before Judge Loper but he failed to conduct the requisite inquiry under the Constitution. After the judge granted a joint motion and ordered Mr. Pitchford's MSH evaluation in January 2006, the court simply failed to conduct a competency hearing, affording no notice to the defense to prepare and present evidence at an appointed time. Instead, the trial court just discarded the matter without a ruling and proceeded to trial. Order, Feb. 14, 2013.

On remand, after extensive pre-hearing motion practice, Judge Loper conducted Mr. Pitchford's retrospective competency hearing on May 11-12, 2015, more than nine years after the conviction in that court. It was the culmination of a profoundly compromised inquiry in terms of its capacity to deliver any insight to the both legal and factual question at issue—namely, the question of Terry Pitchford's competency to stand trial in early 2006, at the age of 20 years. On display in these May 2015 proceedings was the shambolic mismanagement of expert evidence and, generally, a hopeless exercise in the presentation of fragments of the remaining record concerning Mr. Pitchford's prior health condition and capacity. Considerable time was dedicated to surmising the pedigree, sequence, and thereby materiality, of slightly differing versions of an expert report by Dr. Bailey, the single defense expert to evaluate Mr. Pitchford before his 2006 trial (but who was prohibited from testifying due to a Texas subpoena proscribing his travel to Mississippi on the date of the penalty phase, February 9, 2006). *See generally* Tr. May 11-12, 2015. At the hearing, Judge Loper digressively explained his belief that a pre-trial competency hearing was not required:

> Back prior to recent opinions of the Supreme Court, generally, if I got a competency report that said somebody was competent, that was it. Now, of course, the rules said differently but the practice as far as I know for every judge in the State of Mississippi was if the state hospital ruled somebody competent, unless the defense lawyer later asked for a competency hearing, there was not one held. And so that was what the practice was at the time was, you know….

*Id.* at 144-45. On May 12, 2015 the court found Mr. Pitchford retrospectively competent. Order, May 12, 2015; Tr. May 11-12, 2015 at 297-300.

The record before the Mississippi Supreme Court following this May 2015 hearing shed no light on the question prompting the 2013 remand. Anything but sufficient information had been before the court below. Nonetheless, the supreme court ruled, "Where sufficient information is available to conduct a meaningful hearing to evaluate retrospectively the defendant's competence to stand trial, such a hearing does not violate due process standards." *Pitchford v. State*, 240 So. 3d 1061, 1070 (Miss. 2017).

## XVIII. THE JURY'S CONSIDERATION OF THE INVALID PECUNIARY GAIN AGGRAVATING CIRCUMSTANCE VIOLATED MR. PITCHFORD'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing

To the extent that trial counsel failed to raise these issues in the trial court, and to the extent that these issues could have been, but were not, raised on direct appeal, Mr. Bolden was denied the right to the effective assistance of counsel.

### 1. THE PECUNIARY GAIN AGGRAVATOR IS UNCONSTITUTIONALLY VAGUE.
#### A. Supporting Facts

One of the two statutory aggravating circumstances argued by the State was that the capital offense was committed for pecuniary gain. *See* Miss. Code Ann. § 99-19-101 (5)(f). The Court instructed the jury that it could consider whether "the

capital offense was committed for pecuniary gain during the course of a robbery." Tr. 764. The pecuniary gain aggravating circumstance violates due process and the Eighth Amendment on vagueness grounds. A penal statute must define a criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. When a statute is subject to multiple interpretations, the due process-based rule of lenity requires that the statute be interpreted narrowly, and in favor of the defendant. In the capital sentencing context, the Eighth Amendment requires clear standards to channel the exercise of discretion at all stages of the process. The wording of the pecuniary gain aggravating circumstance is so vague that ordinary people cannot understand the precise conduct it seeks to cover.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel.

## C. Direct Appeal

This claim was raised on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief. *Pitchford v. State*, 45 So. 3d 216, 247 (Miss. 2010).

### D. Post-Conviction

This claim was not raised in post-conviction proceedings due to the ineffective assistance of post-conviction counsel.

### 2. THE PECUNIARY GAIN AGGRAVATOR DOES NOT SUFFICIENTLY NARROW THE CLASS OF DEATH-ELIGIBLE DEFENDANTS

### A. Supporting Facts

A capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty. In addition to reserving the punishment to sufficiently culpable offenders, a sentencing body's discretion must be "suitably directed and limited" in order to avoid arbitrary and capricious executions. *Gregg v. Georgia,* 428 U.S. 153, 189 (1976). Statutory aggravating circumstances serve as a constitutionally necessary narrowing function for the imposition of capital punishment. *Pulley v. Harris,* 465 U.S. 37, 50 (1984).

The indictment in Mr. Pitchford's case required the government to prove that the homicide occurred during the course of a robbery. The pecuniary gain aggravating circumstance is duplicative of this essential element of the underlying homicide offense. If the pecuniary gain aggravator is interpreted broadly to apply to a case like Mr. Pitchford's, it fails to narrow the class of death-eligible defendants because all homicides committed in the course of a robbery would satisfy the broad definition of pecuniary gain.

As the prosecutor told the jury in closing, there was no question the capital offense was committed for pecuniary gain because of all "the stuff that was taken"

255

from the store. Tr. 807. The jury was not asked to determine whether the capital offense—the killing—was committed for pecuniary gain.

Mr. Pitchford's death sentence must be vacated. It is Eighth Amendment error for a jury to weigh an improper aggravating factor. This Court cannot say that the jury's improper consideration of an invalid aggravating factor did not tip the scales toward death.

### B. Exhaustion

Petitioner exhausted his state remedies on direct appeal.

### C. Direct Appeal

This claim was raised on direct appeal in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The state supreme court denied relief. *Pitchford v. State*, 45 So. 3d 216, 247 (Miss. 2010).

### D. Post-Conviction

This claim was not raised in post-conviction proceedings due to the ineffective assistance of post-conviction counsel.


## XIX. Mr. Pitchford's Death Sentence Must be Vacated because it was Imposed in Violation of the Constitution of the United States.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

## A. Supporting Facts

### *The State Impermissibly Failed to Include Aggravating Circumstances in Mr. Pitchford's Indictment.*

The indictment in this case impermissibly failed to charge all elements necessary to impose the death penalty under Mississippi law. The indictment against Mr. Pitchford read as follows:

> on or about the 7th day of November 2004, in Grenada County, Mississippi and within the jurisdiction of this Court, while acting in concert with another or while aiding, abetting, assisting or encouraging another, did willfully, feloniously, intentionally, without authority of law and with or without the deliberate design to effect death, kill and murder Reuben Britt, a human being, while engaged in the felony crime of ARMED ROBBERY, as set forth in section 97-3-79 of MISS. CODE ANN. and in violation of section 97-3-19(2)(e) MISS. CODE. ANN. as amended, and against the peace and dignity of the State of Mississippi.

This indictment failed to include both a valid statutory aggravator and a mens rea element of Miss. Code § 99-19-101(5) and (7). The Due Process Clause of the Fifth Amendment and the Sixth Amendment mandate that any fact outside of a prior conviction, that increases the maximum penalty for a crime must be charged in an indictment, submitted to the jury, and proven beyond a reasonable doubt. *Apprendi v. New Jersey,* 530 U.S. 466, 476-82 (2000); *See Ring v. Arizona,* 536 U.S. 584, 609 (2002) ("The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both."); *See also In re Winship,* 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the

accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Any fact that increases the penalty for a crime must be submitted to the jury and found beyond a reasonable doubt. *Alleyne v. United States,* 570 U.S. 99, 103 (2013). Mississippi too requires that "each and every material fact and essential ingredient of the offense must be with precision and certainty set forth." *Burchfield v. State,* 277 So.2d 623, 625 (Miss. 1973). Thus, an indictment which fails to allege the essential elements of an offense is defective and a violation of due process. Here, Mr. Pitchford's indictment failed to include a valid statutory aggravator and a mens rea element compliant with the Mississippi Code. This was a constitutional violation of Mr. Pitchford's rights under the Due Process Clause and the Sixth Amendment.

The State cannot circumvent these constitutional requirements. Moreover, merely because an element of a crime operates also as a sentencing enhancer does not rid a criminal defendant of his constitutional guarantee to an adequate indictment. In *Apprendi*, the High Court held,

> As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment. Merely using the label 'sentence enhancement' to describe the latter surely does not provide a principles basis for treating them differently.

*Apprendi,* 530 U.S. at 476.

The State of Mississippi has done just that. This procedural safeguard is a matter or *simple justice.* Mr. Pitchford was denied even that. This violation requires reversal of Mr. Pitchford's conviction.

### Mr. Pitchford Did Not Possess the Requisite Culpability for a Sentence of Death Under Enmund *and* Tison.

In order to be sentenced to death, a person convicted of capital murder must have actually killed, attempted to kill, or intended to kill. *Enmund v. Florida,* 458 U.S. 782, 787 (1982); *Tison v. Arizona,* 481 U.S. 1676 (1987). The *Enmund* Court held that "[t]he focus must be on *his* culpability, . . . for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence[.]' " *Id.* at 798, (*citing Lockett v. Ohio,* 438 U.S. 586, 605, (1078)). To be sentenced to the ultimate punishment of death a criminal defendant must be a major participant in the crime and have possessed a reckless indifference to human life. *Tison v. Arizona,* 481 U.S. 1676, 1685 (1987). [how does this overlap with statute's

The evidence in Mr. Pitchford's case was legally insufficient to prove that Mr. Pitchford actually killed, attempted to kill, or intended to kill. The State failed to prove that Mr. Pitchford fired the fatal shots with the .22 caliber firearm. The State's theory at trial was that Mr. Pitchford orchestrated the robbery and murder of Mr. Britt with co-defendant, Eric Bullins. Although the State was unable to prove that Mr. Pitchford shot and killed Mr. Britt, through the testimony of Quincy Bullins, the State attempted to show that the .22 belonged to Terry and therefore he was the one who used it at Crossroads Grocery. [see IAC guilt claim].

However, Mr. Pitchford did not fire the fatal shots. Mr. Pitchford has always denied shooting Mr. Britt, stating at most that he fired his gun containing rat shot into the floor after Eric Bullins turned his gun onto Mr. Pitchford threatening him to shoot. The ballistics evidence as well as the autopsy report demonstrate that the .38 was loaded with rat shot. This .38 belonged to Mr. Pitchford and not Mr. Britt as the State has maintained. There is not a scintilla of forensic evidence existing that links Mr. Britt's missing .38 to Mr. Pitchford. At trial, the State's forensic pathologist, Dr. Steven Hayne testified outside of the scope of his expertise and to issues that had no basis in the evidence or science. It was impossible to determine how many times Mr. Britt was hit by rat shot. *See* Tressel Declaration at 5. And the spent casing shed no insight onto when and where those shots were fired. *Id.* Dr. Hayne's conclusions were highly unreliable and should not have been considered by the jury.

Moreover, as discussed infra, the informant testimony of James Hathcock and Demarquis Westmoreland was highly unreliable and should not have even been heard by the jury. Not only did both of their testimonies contradict each other, but both witnesses faced conspiracy charges and had every motive to exculpate themselves and place the blame on Mr. Pitchford.

In order to be sentenced to death if a defendant neither killed, attempted to kill, or intended to kill, the defendant must be a major participant in the crime and have possessed a reckless indifference to human life. *Tison v. Arizona,* 481 U.S. 1676, 1685 (1987). When the jury returned the verdict in Mr. Pitchford's case, it

260

relied in part upon the provision of the Mississippi statute that permits imposition of the death penalty on a felony murder conviction even if the only mens rea established is that Mr. Pitchford "contemplated that lethal force would be employed" in the underlying felony. Even if this language is sufficient in some circumstances to meet the requisites of *Enmund* and *Tison*, it was not sufficient here. The State failed to prove that Mr. Pitchford "contemplated that lethal force would be employed" in the underlying felony.

There was no reliable evidence that Mr. Pitchford or Eric Bullins had intended or planned to shoot Mr. Britt. There was evidence that supports that Mr. Pitchford possessed a gun loaded with rat shot. However, the State failed to present reliable testimony supporting the notion that Mr. Pitchford entered Crossroads Grocery with the intent to discharge his non-lethal rat shot at Mr. Britt. On the other hand, there is also evidence to support that Mr. Pitchford didn't even know that Eric Bullins had a gun on him when they entered the store, and was therefore surprised and startled when Eric fired shots at Mr. Britt.

To sentence a criminal defendant to death who does not possess these prerequisites, is a violation of the Eighth Amendment to the United States Constitution. The *Tison* Court emphasized:

> A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime. Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished.

*Id.* at 1687.

261

A heightened culpability specific to the individual being charged is required for a death sentence. Mr. Pitchford was not sufficiently culpable for the death of Mr. Britt to receive a death sentence. Further, Mr. Pitchford met neither of the requirements outlined in *Tison.*

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner presented these issues on direct appeal. On direct appeal, the Mississippi State Supreme Court rejected Petitioner's arguments surrounding failure to include aggravating circumstances in his indictment and dual the use of robbery. *Pitchford v. State,* 45 So.3d 216 (Miss. 2010).

## D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## XX. THE DEATH PENALTY IS DISPROPORTIONATE FOR AN EIGHTEEN-YEAR-OLD LIKE TERRY PITCHFORD, WHO DID NOT KILL, ATTEMPT TO KILL, OR INTEND TO KILL.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

### A. Supporting Facts

The Eighth Amendment to the United States Constitution bars imposition of the death penalty for juveniles under eighteen years of age. *Roper v. Simmons,* 543 U.S. 551, 567 (2005). This is because juveniles are "'categorically less culpable than the average criminal.'" *Id.* (*quoting Atkins v. Virginia,* 536 U.S. 304, 316 (2002)). And "the death penalty is reserved for a narrow category of crimes and offenders*."* *Roper,* 543 U.S. at 569. The *Roper* Court emphasized that the attributes of youth including: a lack of maturity, vulnerability and susceptibility to negative influences and outside pressures, as well as the character and personality still being in development, "render suspect any conclusion that a juvenile falls among the worst offenders." *Id.* at 569-70. This same reasoning applies to Mr. Pitchford's death sentence imposed on him for a crime that occurred when he was eighteen years-old.

Mr. Pitchford's alleged involvement in Mr. Britt's death simply was not within that "narrow category of the most serious crimes" that the Eighth Amendment contemplates punishing with the ultimate penalty. Nor is Mr. Pitchford someone whose "extreme culpability" at nineteen years-old at the time of trial, makes him "the most deserving of execution." *Id.* at 568-69. Instead, even under the evidence that supports the conviction, the admissible proof shows that Mr. Pitchford was a willing participant in a robbery, but that his co-defendant initiated the fatal conduct in an act of panic when he saw the decedent with a gun. Tr. 509-514. This co-defendant, Eric Bullins, received a plea bargain to manslaughter and drug charges; he is serving a total sentence of forty years. Mr. Bullins' role in the death of Mr. Britt and his ultimate penalty of forty years for manslaughter instead of death, support the fact that Mr. Pitchford's sentence is clearly disproportionate.

In addition to Mr. Pitchford's diminished culpability surrounding his lack of involvement in the crime, his youthful status as an eighteen year-old at the time of the crime requires a sentence less than death in itself. In the thirteen years since *Roper* was decided, science surrounding juvenile's brain functioning and development has dramatically evolved. Although studies as early as 2001 suggest that eighteen to twenty-one year-old adolescents possess behavioral deficiencies similar to those eighteen and under, the scientific community has only recently come to the consensus that such characteristics are caused by developmental brain immaturity.

Indeed, in the intervening years since *Roper,* a growing body of neuroimaging research and other scientific testing has emerged in support of the proposition that adolescents in the eighteen to twenty-one year-old range are still undergoing significant brain growth and maturation, particularly in the frontal lobe, which controls "executive functions" such as impulse, planning, and memory. Sara B. Johnson et al, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J ADOLESC. HEALTH 216 (Sept. 2009). Accordingly, courts and state legislatures have swiftly followed suit and used this new evidence as the basis for banning the imposition of the death penalty for adolescents in the eighteen to twenty-one year-old range. *See e.g., Com. v. Bredhold,* No. 14-CR-161, 2017 WL 8792559, at *3 (Ky. Cir. Ct. Aug. 1, 2017) ("Given this consistent direction of change, this Court thinks it clear that national consensus is growing more and more opposed to the death penalty, as applied to defendants eighteen (18) to twenty-one (21)."). Thirty states now prohibit capital punishment for a youthful offender under the age of twenty-one years-old. This includes states which have abolished capital punishment, states with de facto prohibitions, and states in which the governor has imposed a moratorium on executions.[52]

---

[52] Oregon, Pennsylvania, and Washington have moratoria on executions. The Governor of Colorado has granted an indefinite stay to an individual on death row there. In addition, Kansas and New Hampshire have not executed anyone since 1977. Both Montana and Wyoming have never executed anyone under twenty-one, nor do they have such an individual on death row. Utah, Idaho, and Kentucky has not executed anyone under twenty-one years-old in the last fifteen years.

The American Bar Association too supported this proposition in February 2018 when it passed a resolution calling for the abolition of capital punishment for individuals aged twenty-one and under at the time of their offense:

> In light of this evolution of both the scientific and legal understanding surrounding young criminal defendants and broader changes to the death penalty landscape, it is now time for the ABA to revise its dated position and support the exclusion of individuals who were 21 years old or younger at the time of their crime.

Rawles, L., *Ban Death Penalty for Those 21 or Younger, ABA House Says*, ABA Journal (Feb. 5, 2018).

Although the *Roper* Court in 2005, drew the line at eighteen, it too was aware that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper,* 543 U.S. at 574. Mr. Pitchford was eighteen at the time of the offense for which he was convicted. Medical and scientific communities have determined that eighteen years-old is on the lower end of this adolescent age range of which the brain is still under significant development. This new scientific consensus regarding brain development problematize Mr. Pitchford's conviction and sentence. Mr. Pitchford's diminished culpability and young age warrant a reversal of his sentence.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the

state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012).

### C. Direct Appeal

Petitioner presented this issue on direct appeal in 2006-DP-00441-SCT. The state supreme court rejected Mr. Pitchford's arguments surrounding this issue. *Pitchford v. State,* 45 So.3d 216, 259-60 (Miss. 2010).

### D. Post-Conviction

These issues were not raised during post-conviction proceedings due to ineffective assistance of post-conviction counsel.

## XXI. MR. PITCHFORD WAS DENIED A FAIR TRIAL BY A JUROR THAT CONCEALED MATERIAL FACTS THAT DEMONSTRATE BIAS DURING VOIR DIRE.

In support of this claim, Mr. Pitchford alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, depositions, access to this Court's subpoena power, expansion of the record and an evidentiary hearing.

A defendant is entitled to a new trial if a juror's failure to disclose a material fact denied the defendant his or her right to an impartial jury. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548 (1984). In *McDonough Power,* the Supreme Court emphasized that "[o]ne touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case, solely on the evidence before

it.'" *Id.* at 554 (*quoting Smith v. Phillips,* 455 U.S. 209, 217 (1982)). The Court further explained:

> Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

*McDonough Power,* 464 U.S. at 554.

Therefore, a new trial is warranted when a party demonstrates that a juror failed to honestly answer a material question on voir dire, and a correct response would have been a valid basis for a challenge for cause. *Id.* at 556.

## A. Supporting Facts

In Mr. Pitchford's trial, seated Juror Richardson withheld and was dishonest in response to questions during voir dire. For the reasons discussed below, this dishonesty concerned material facts that would have been challenged for cause had Juror Richardson been truthful. Mr. Pitchford was denied a fair trial by an impartial jury in violation of the Sixth Amendment to the United States Constitution.

### *Juror Richardson Unequivocally Withheld That She Knew Family Members of the Victim.*

During voir dire, the trial court asked the following questions:

Ladies and gentlemen, I want to know now if any of you have heard anything about this case. And I know obviously a few of you have already responded that you have heard a little bit about the case. But any of the rest of you that have not spoken up or any of you that have spoken up but need to do so again, feel need to do so again, any of you have any knowledge about the case. Have any of you heard anything about the case?

> Again, it was alleged that Mr. Britt was murdered during the course of
> an armed robbery.

Tr. 194

Juror Andrea Richardson responded: "I just found out today that Tim McDaniel was a nephew of someone involved. And Tim McDaniel has done some plumbing work at my home. And I know—I know Tim McDaniel's daughter as well. I don't know anything about the case." *Id.* Juror Richardson then confirmed with the court that she just knew that Tim McDaniel might be related to someone, and that fact would not influence her ability to form an opinion about the guilt or innocence of Mr. Pitchford. Tr. 202-03.

Juror Richardson not only withheld the fact that she knew Tim McDaniel but she affirmatively lied to the trial court when explicitly asked the following:

> And since Mr. Barrett raised that issue, I'll ask all of you. If any of you
> have a situation where you have got friends that are kin to Mr. Britt
> and it would affect your ability to be fair and impartial, if any of you
> have a situation like that where you might know some of Mr. Britt's
> family and that would affect you then I want you to sand. I take it
> nobody has that situation.

Tr. 247

Juror Richardson failed to stand up at the trial court's request, even though she had previously seen Mr. McDaniels in the hallway outside of the courtroom, when he informed her that this case was about the murder of his uncle. 2011-09-22 Tracy Krause Affidavit, ¶ 6. In fact Juror Richardson knew Mr. McDaniels "quite well" because he had done a lot of plumbing work at her house as a result of her constant plumbing problems. *Id.*, ¶ 5.

### *Juror Richardson Withheld the Fact That She Knew a Prosecution Witness.*

In addition to the violation concerning Juror Richardson's relationship with Mr. Britt's nephew, Juror Richardson also knew Malcolm Grant who had also done plumbing work for her, and was married to a member of the Britt family. App. 0672. Not only was Mr. Grant a family member by marriage to Mr. Britt, but he was also a prosecution witness at Mr. Pitchford's trial. But again, Juror Richardson concealed this information when explicitly asked by the court if any juror knew any family member of the victim.

Juror Richardson also withheld this relationship when the trial court asked the jury if anyone knew or had any association with any of the potential witnesses in this case. Tr. 219-23. Juror Richardson fell silent. Mr. Grant was specifically named by the court and ultimately testified against Mr. Pitchford. Juror Richardson knew Mr. Grant before trial. App. 0672. This relationship with a prosecution witness was ripe for a challenge for cause. Juror Richardson should have admitted this relationship during voir dire when asked. After trial, Juror Richardson stated she found the evidence provided by Mr. Grant very compelling. App. 0667. Juror Richardson's relationship with a prosecution witness tainted Mr. Pitchford's trial with prejudice. Mr. Pitchford's right to a fair trial was deprived because Juror Richardson was dishonest about material facts during voir dire.

### *Juror Richardson Concealed Contact*
### *with the Victim's Family During Jury Selection.*

Juror Richardson also concealed her contact with Mr. Britt's family during jury selection. Juror Richardson withheld this information even though she was

explicitly asked about this issue by the trial court. At the request of Mr. Pitchford's

defense counsel, the trial court asked the following questions during voir dire:

> I wanted to make sure during the recess; none of you have talked to
> anybody involved with the case, have you? I mean have any of you had
> even incidental contact with anybody involved? Have any of you, even
> by accident, run into the Britt family or run into Mr. Pitchford's family
> or talked to anybody? I just want to caution you. I guess I am just
> doing this to make sure you understand throughout the course of this
> trial you can't talk to anybody about the case. You are going to have to
> talk by any family members of either side or whatever and just be
> completely, you know, almost like with tunnel vision with blinders on
> where you are just going to have to talk right on by and not say
> anything to anybody involved in the case.

Tr. 289-99. Juror Richardson again fell silent. Before trial commenced but after jury

selection had begun, Juror Richardson saw Mr. McDaniels in the hall outside the

courtroom. App. 0671. They greeted each other, because as Juror Richardson stated,

they knew each other "quite well." *Id.*, ¶ 5. This is when Juror Richardson

discovered the case she might be sitting as a juror on, was about the murder of Mr.

McDaniels' uncle. *Id.*, ¶ 6. Additionally, Juror Richardson also had three separate

incidents of contact with the Brit family outside of the courtroom. App. 0672. Juror

Richardson recognized them immediately and commented on their presence to the

other jurors. *Id.* This concealment concerning contacts with the victim's family is

itself is a material fact and would have been a valid basis for a strike for cause. The

failure by Juror Richardson to produce the truth when asked deprived Mr. Pitchford

of his right to a fair trial.

### *Juror Richardson Harbored Prejudicial*
### *Feelings about Defense Counsel on the Basis of his Race.*

Juror Richardson made racist remarks about defense counsel after trial that call into serious doubt that she was unbiased and objective from the start. Juror Richardson opined that the black defense attorney did a poor job, that he was unprofessional, and did not come across prepared. App. 0668. Juror Richardson said that she could not understand the black defense attorney because he spoke with "Ebonics." *Id.* Juror Richardson expressed that she wished she had heard more from the white lawyer instead. *Id.* This raises serious concerns about Juror Richardson's remarks toward other jury members about defense counsel during deliberations. These statements by Juror Richardson are even more problematic in light of the fact that Mr. Pitchford is also a black male.

The Supreme Court of the United States has noted that the departure from even basic principles in a criminal trial is exacerbated when the departure concerns race. *Buck v. Davis,* 137 S.Ct. 759, 778 (2017); *see also Rose v. Mitchell,* 443 U.S. 545, 555 (1979) ("Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice."). The departure here cannot be minimized. Because at a minimum, the right to a fair trial guarantees that the jury shall not be swayed based on any external factors, including the race of counsel and the defendant. This concealment of bias is material.

### *Juror Richardson Should Have Been Excused for Cause.*

Juror Richardson would have been dismissed for cause had she disclosed all of, and even part of, this critical information that she withheld. Juror Richardson's dishonesty rises to the level of that which would guarantee a new trial for Mr.

Pitchford. Juror Richardson's active and repeated concealment of relations with family members of the victim, including a prosecution witness, goes to a material fact of the case against Mr. Pitchford. Prior existing relationships with the victim, let alone a prosecution witness, do not hint at bias; they scream of prejudice. Further, Juror Richardson's racist remarks about defense counsel after trial implicate serious concerns about her ability to have been a fair and unbiased juror during Mr. Pitchford's trial. Juror Richardson's conduct denied Mr. Pitchford to his constitutional right to a fair trial.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). Petitioner may establish cause for the delay in asserting his claim in state court under prior counsel's representation and actual prejudice resulting from the State's alleged violation of his constitutional rights. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner did not raise this issue on direct appeal because the evidence concerning Juror Richard's improprieties was not discovered until the investigation by post-conviction counsel.

### D. Post-Conviction

This issue was raised during post-conviction proceedings in a Supplement to Motion for Leave to Proceed in the Trial Court with Petition for Post-Conviction Relief on December 28, 2011. The Mississippi Supreme Court determined the issue lacked sufficient merit to warrant a hearing. *Pitchford v. State,* Order No. 2010-DR-01032-SCT (Miss. Feb. 7, 2013).

## XXII.   Mr. Pitchford is Innocent of Capital Murder and His Conviction and Sentence Violate the Fifth, Sixth, Eighth and Fourteenth Amendments and are Manifest Miscarriage of Justice.

### A. Supporting Facts

The State failed to prove that Mr. Pitchford was guilty of the robbery and murder of Mr. Britt. No forensic evidence linked Mr. Pitchford to the crime, and his conviction was predicated on the State's mishandling of the crime scene evidence, misrepresentations of evidence, and unreasonable inferences drawn from unreliable and untrustworthy testimony.

The evidence points to Eric Bullins, and not Terry Pitchford, as the leader of the enterprise and the one who fired the fatal shots. Mr. Britt was not shot with pellets from his own .38 caliber revolver. He was hit with pellets from a shot fired

274

from Mr. Pitchford's .38, which Mr. Pitchford fired into the floor after Eric had shot Mr. Britt and turned his gun on Mr. Pitchford. Mr. Pitchford never planned a robbery and certainly never foresaw that Mr. Britt would be shot. Instead, the friends Mr. Pitchford had recently made on the other side of town decided the Crossroads Grocery store in Coffeeville near Mr. Pitchford's house would be a perfect place to rob. They used Mr. Pitchford's familiarity with the location and his access to a car to go through with it. Mr. Pitchford was a follower seeking favor and acceptance from the Bullins boys and Demarquis Westmoreland, and he was easily persuaded to go along with their plan.

Because he is actually innocent of the crime of capital murder, Mr. Pitchford's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to United States Constitution.

## B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present this claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner did not raise this claim on direct appeal due to the ineffective assistance of appellate counsel.

### D. Post-Conviction

Petition did not raise this claim in post-conviction due to the ineffective assistance of post-conviction counsel.

## XXIII.  MISS. CODE ANN. § 97-3-19(2) DOES NOT ADEQUATELY LIMIT PROSECUTORIAL DISCRETION TO ENSURE THAT ONLY A MEANINGFULLY NARROWED CLASS OF OFFENDERS ARE ELIGIBLE FOR THE DEATH PENALTY, VIOLATING THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION

### A. Supporting Facts

The Eighth Amendment requires death penalty statutes to provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring). "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of person eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988), *quoting Zant v. Stephens*, 462 U.S. 862, 877 (1983). The Mississippi scheme fails to meaningfully narrow the class of death-eligible offenders. Miss. Code Ann. § 97-3-19(2). The statute affords overbroad prosecutorial discretion in charging and prosecution decisions. As a result, prosecutorial excesses such as those dictating the

276

death penalty prosecution—and death sentence—of Petitioner are enabled by dint of the state circuit court in which the crime in question was committed.

Since taking office in 1992, District Attorney Doug Evans has taken to verdict 21 known death penalty prosecutions, (Affidavit of Prof. Barbara O'Brien at 2-3 (2016.03.16 submitted in *Flowers v. State*, No. 2015-DR-00591-SCT; Circuit Court of Montgomery County, Cause No. 2003-0071-CR).), a rate that widely outstrips the mean rate of death penalty prosecutions.

### B. Exhaustion

Petitioner did not exhaust his state remedies with respect to this claim. This claim was not presented to the state courts because of the ineffective assistance of trial, appellate and state post-conviction counsel. Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present this claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan*, 134 S. Ct. 1309 (2012) and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### C. Direct Appeal

Petitioner did not raise this claim on direct appeal because of the ineffective assistance of appellate counsel.

### D. Post-Conviction

Petitioner did not raise this claim on direct appeal because of the ineffective assistance of post-conviction counsel.

# XXIV. Petitioner Was Denied Due Process, Reliable Sentencing and the Effective Assistance of Counsel as a Result of the Prejudicial Effects of the Cumulative Errors in This Case, Which Undermine Confidence in the Outcome at Both Stages of Trial

## A. Supporting Facts

The claims and factual allegations set forth in all other sections of this Petition are realleged as if set forth entirely herein.

Mr. Pitchford did not receive the fundamentally fair trial to which he was entitled. The process as a whole failed Mr. Pitchford. It has failed because the sheer number and types of errors involved in his trial, when considered as a whole, resulted in a fundamentally unjust conviction and sentence. The errors are not isolated; they are interrelated. Attempting to determine their effect on the outcome in isolation, then, would unfairly water down the prejudicial effect of the errors.

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. *See, e.g.,* Kyles v. Whitley, 514 U.S. 419, 437-38 (1995).

The circumstances of this case demonstrate that the cumulative effect of prior counsel's serious failures, and the constitutional errors committed by the court and the prosecutor, undermined the fairness of Mr. Pitchford's trial and sentencing proceedings.

Accordingly, Mr. Pitchford was deprived of due process, a fair trial, reliable sentencing and the effective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## B. Exhaustion

Petitioner exhausted his state remedies in part with respect to this claim. To the extent undersigned counsel has modified this claim in a way that renders it unexhausted in whole or in part, Mr. Pitchford can show good cause for a stay to be granted under *Rhines v. Weber*, 125 S. Ct. 1528 (2005), to present this claim to the state court because prior counsel was ineffective for failing to present the modified claim. Any procedural default resulting from that presentation can be overcome under *Martinez v. Ryan,* 134 S. Ct. 1309 (2012) and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

## C. Direct Appeal

Petitioner exhausted his state remedies in part with respect to this claim in Mississippi Supreme Court Case Number 2006-DP-00441-SCT. The Mississippi Supreme Court denied relief on the issues presented. *Pitchford v. State*, 45 So.3d 216 (Miss. 2010).

## D. Post-Conviction

Petitioner exhausted his state remedies in part with respect to this claim in Mississippi Supreme Court Case Number 2010-CR-01032-SCT. The Mississippi Supreme Court denied relied on the issues presented. Order, Feb. 14, 2013.

13. Presentation of claims to the Mississippi Supreme Court was detailed in number 12.

14. Petitioner has not previously filed any type of petition, application, or motion in federal court regarding the conviction he challenges in this petition, other than Petitioner's motion for appointment of counsel and related funding and the already mentioned petition for writ of certiorari following the direct appeal in the Supreme Court of Mississippi.

15. Mr. Pitchford does not currently have any petition or appeal now pending in any state or federal court.

16. The names and addresses of each attorney who previously represented Petitioner are as follows:

    (a)    At preliminary hearing: n/a

    (b)    At arraignment and plea: Raymond Baum, P.O. Box 586, Winona, MS 38967.

    (c)    At trial: Ray Charles Carter & Allison Steiner, Office of Capital Defense Counsel, 510 George St., Ste. 300, Jackson, MS 39202; and Ray Baum, P.O. Box 586, Winona, MS 38967.

    (d)    At sentencing: Same as trial.

    (e)    On appeal: Ray Charles Carter & Allison Steiner, Office of Capital Defense Counsel, 510 George St., Ste. 300, Jackson, MS 39202

    (f)    In state post-conviction proceedings (including remand for retrospective competency hearing and subsequent appeal): Scott Johnson & Louwlynn Vanzetta Williams, Office of Capital Post-Conviction Counsel, 239 North Lamar Street, Ste. 404, Jackson, MS 39201.

    (g)    On appeal from adverse ruling in state post-conviction proceedings: Same as in first instance state post-conviction proceedings.

17. Petitioner has no future sentence to serve after completion of the death sentence in the judgment challenged here.

18. Timeliness: The limitations period calculation applicable to this case is as follows:

Pursuant to 28 U.S.C. § 2244(d)(1)(A), the limitations period began to run on April 19, 2011, the day after petitioner's conviction and sentence became final by the conclusion of direct review. Petitioner filed his petition for state post-

conviction relief on September 23, 2011, after 158 days of the federal limitations period had run.

The September 23, 2011 filing statutorily tolled the limitations period pursuant to 28 U.S.C. § 2244(d)(2) until the denial on February 22, 2018 of the motion for rehearing of the Supreme Court of Mississippi's denial of post-conviction relief.

The one-year limitations period resumed on February 23, 2018, at which time 207 days remained and the present habeas corpus petition was determined to be due by September 17, 2018.

## CONCLUSION

Therefore, Mr. Pitchford asks that the Court grant the following relief:

vacation of the judgment in conviction and the death sentence or any other relief to

which he may be entitled.

Respectfully submitted,

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH
Phillips Black, Inc.
PO Box 4544
New York, NY 10163-4544
(212) 400-1660

*/s/ J. Scott Gilbert*
J. SCOTT GILBERT
Watkins & Eager PLLC
The Emporium Building
400 East Capitol Street
Jackson, MS 39201
(601) 965-1922

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of September, 2018, the foregoing Petition for Writ of Habeas Corpus was served upon all counsel of record in this case via the ECF filing system, pursuant to the Federal Rules of Civil Procedure.

*/s/ Joseph J. Perkovich*