## DECLARATION OF R. ROBERT TRESSEL

I, R. Robert Tressel, declare:

1.        The current attorneys for Mr. Terry Pitchford have engaged me to analyze (a) his trial record, (b) files and records from prior stages of litigation maintained or collected by prior counsel, (c) the evidence admitted at his 2006 capital trial, (d) the prosecuting office's file, and (e) law enforcement's records and evidence in this case.

## I.  INTRODUCTION

2.        As stated more fully below (*infra* at ##), I have served as the Chief Criminal Investigator of the Cobb County District Attorney's Office, Marietta, Georgia since 2011. I perform this full-time role for Cobb County, which has a population of over 700,000 people, in addition to occasionally providing expert services in capital cases outside of Georgia. As Chief Criminal Investigator, I currently manage 20 criminal investigators and am responsible for directing all specially appointed cases and all death penalty cases for the Cobb County District Attorney's Office. I began my career in law enforcement in 1973. In my first months on the job, I began investigation on murders culminating in convictions and death sentences in Cobb County and concluded in Georgia executions.[1] (Attached here as Exhibit A is a copy of my curriculum vitae.)

3.         In February 2006, Mr. Pitchford was convicted and sentenced to death for the murder of Mr. Rueben Britt on the morning of November 7, 2004 during the robbery of the Crossroads Grocery & Bait Store on the outskirts of Grenada County, Mississippi. Mr. Pitchford was 18 years old when he was arrested that day at his home, which was about a ½ mile up the road from

---

[1] Specifically, these include the cases of Virgil Presnell, Jack Howard Potts (circa 1975), and Fred Gilreath (1979) and Marcus Wellons (1989). The State of Georgia ultimately executed Messrs. Potts, Gilreath, and Wellons.

1

Declaration of R. Robert Tressel, September 17, 2018

the scene of the crime. Meanwhile, within the Grenada city limits, the Sheriff's Office arrested his co-defendant, Eric Bullin, who had turned 16 years old the night before.

4.     Department of Corrections records show that on January 4, 2007—nearly a year after Mr. Pitchford's conviction—Eric Bullin pleaded guilty to manslaughter in the Britt murder, receiving a 20 years sentence (ten to run concurrently and ten to run consecutively to sentences previously imposed). Records reflect that, while Eric Bullin was jailed for the Britt murder, he and another individual committed a homicide by blunt force head trauma in a Grenada County Jail cell on March 21, 2005—nearly a year *before* Mr. Pitchford's trial—leading to a murder charge that was disposed of on July 29, 2005 by a manslaughter plea and 20 years' sentence.

5.      My following evaluation and professional opinion is based on my review of the above-referenced materials in this case (set forth more fully below).

6.     Critically, this analysis includes my in-person review in Grenada on September 12, 2018 of (a) the State's "open file" in the office of District Attorney Doug Evans; (b) my attempt on that date to review any and all evidence and records of the Grenada County Sheriff's Office, personally frustrated by Sheriff Strider; (c) my review on that date of the physical evidence admitted in Mr. Pitchford's 2006 trial, as maintained in the Grenada County Circuit Court's evidence vault; and (d) my visitation of the site of the crime scene (without access, at this point, to the interior of the former Crossroads Grocery & Bait Store).

7.     In my professional opinion, the State's investigation of the case and the respective roles of Mr. Pitchford and the other boys implicated in the Britt murder is deeply flawed. The resulting preparation and presentation of the State's evidence and case-theory against Mr. Pitchford is not reliable and lacks fundamental integrity. Further, the forensic autopsy in this case, as reflected in the trial testimony of Dr. Steven Hayne, possesses numerous inconsistencies and errors. The

2

Declaration of R. Robert Tressel, September 17, 2018

gross deficiencies leading to this conviction would be extremely troubling under any sentence. Obviously, the fact that Mr. Pitchford is under a death sentence magnifies the nature of these criminal justice failings.

**Crime Scene Investigation: An Overview**

8.      A thorough crime scene investigation is the centerpiece of any criminal investigation.

9.      The physical evidence recovered and documented from the crime scene is the pivotal point of a criminal investigation. The direction the criminal investigation takes is based on what evidence has been recovered and documented, where this evidence is located and how this evidence assists the investigator in determining the sequence of events that led to the incident.

10.      Investigation of the crime scene is the only opportunity the investigator has to preserve, recover and analyze these physical clues. Other case information, such as that gathered from interviews or witness statements must be carefully evaluated as to their validity based upon the physical evidence obtained from the crime scene. Details of the crime scene initially thought to be irrelevant, may become crucial in understanding exactly how the incident occurred.

11.      In homicide cases, crime scene investigation involves not only documenting the physical evidence found, but also the investigator or prosecutor explaining through a comprehensive evaluation of all aspects of the crime scene investigation why certain pieces of evidence were found in the locations they were in.

12.      A violent crime scene presents special aspects that the investigator must be aware of. It is not just where evidence is found, but also what that evidence can tell us about how the incident occurred, the location of victim and/or witnesses when injuries occurred and the possible sequence in which events occurred. The crime scene is merely a piece of the "puzzle" that must

3

Declaration of R. Robert Tressel, September 17, 2018

be evaluated with other components of the incident to thoroughly understand how a crime was committed.

13.     Other pieces of this "puzzle" include but are not limited to: (i) wounds or injuries received during the course of this event; (ii) laboratory evaluation of the evidence recovered (bullets, finger prints, blood stains, gunshot residue, etc.); and (iii) witness/subject statements and/or interviews.

14.     If the incident involves the death of an individual, the post-mortem autopsy of the deceased becomes a vital piece of the puzzle. Location of wounds, directionality of these wounds, and entry and exits of wounds must be evaluated with all other components of the crime scene to assist the investigator in determining the significance of each piece of evidence recovered.

15.     Documentation of the crime scene is done through three (3) primary steps:

- ▪ Written or verbal description of the crime scene, including location of items of evidence.

- ▪ Photographs or videotape of the crime scene to depict exactly what was observed at the crime scene.

- ▪ Diagram of the scene with measurements showing the location of evidence. (This is done to enable the crime scene to be reconstructed, if necessary, which requires an accurate depiction of what was recovered and where it was recovered).

16.     Failure to document the crime scene properly and precisely can hinder any prosecution and sometimes invalidate conclusions reached from the overall assessment of the crime scene.

17.     As a consultant on crime scenes, I am often asked to evaluate the opinions and/or conclusions reached by the investigator, prosecutors, and expert witnesses. In evaluating these opinions and/or conclusions, I must rely on the documentation they relied on to reach their conclusions or opinions. If certain pieces of the puzzle are missing or documentation is not

4

Declaration of R. Robert Tressel, September 17, 2018

thorough then validation of these conclusions or opinions cannot be confirmed. Additional scene information becomes necessary to complete this evaluation process, and if that information was not gathered at the time of the scene investigation, then only possible scenarios can be postulated.

18.     The validity of possible scenarios cannot be performed without the proper processing and documentation of any crime scene. Attempting to reconstruct or evaluate a crime scene without proper documentation and without evaluating all available pieces of the puzzle and how they portray the sequence of events leads to misleading and inaccurate conclusions and/or opinions that can be detrimental to any prosecution or defense of a criminal case.

**Suspect and Witness Interviews**

19.     Interviews are conducted in several different ways. The first responding officers will conduct "field" interviews, initial interviews with persons on the scene when they arrive. These are sometimes documented in notes that are later transferred to a written report. Once witnesses are identified, investigators may take taped interviews while on the scene or have witnesses taken to the department for further interviews. The current preferred procedure is to videotape interviews taken at the department.

20.     Interviews taken of suspects, whether audio or video recorded, should include the date and the beginning time. Should the interview be interrupted and the recording stopped, the time stopped should be documented on the recording and when the interview is resumed the time restarted should also be documented.

21.     In custodial interrogations investigating a homicide, it is presumed that questioning is on-going essentially from the moment a subject arrives and is processed. Substantial gaps in time between recorded interviews suggest periods when the questioning is not being recorded.

5

Declaration of R. Robert Tressel, September 17, 2018

## II. PRELIMINARY OPINION: THE BRITT MURDER INVESTIGATION

**September 12, 2018: Review Efforts with Office of the District Attorney; Sheriff's Office; and Grenada County Circuit Court**

22.     Mr. Pitchford's current attorney, Joseph Perkovich, scheduled a visit to the District Attorney's Office to view their file for this prosecution. I understand that the Office has an "open file" policy.

23.     Correspondence from Mr. Perkovich reflects that he visited the Grenada County Sheriff's Office and met with Sheriff Alton Strider on Friday, August 31, 2018. My review of the files in this case reflects that Mr. Strider was the sheriff at the time of this case.

24.     On Tuesday, September 4, 2018 (following the Memorial Day Holiday), Mr. Perkovich wrote Sheriff Strider, copying District Attorney Doug Evans in recognition of Sheriff Strider's indication to Mr. Perkovich that he desired to include Mr. Evans in any discussions about Mr. Pitchford's case. (Attached here as Exhibit B is a copy of the Sep. 4 letter.) Mr. Perkovich requested the following materials identified throughout the trial record and related records concerning the District Attorney's prosecution:

> a) any and all recordings, transcriptions, or other evidence relating to the statement given by James S. Hathcock in November 2004 while he was confined in the Grenada County Jail concerning the Britt investigation and prosecutions of Mr. Pitchford and his co-defendant, Eric Bullin;
> b) any and all records or other evidence concerning the subsequent release of Mr. Hathcock from jail and eventual disposition of his own criminal case;
> c) any interview with or statement by Dantron Mitchell in connection with the Britt investigation, in particular surrounding his discussion with Mr. Pitchford and Eric Bullin in November 2004 while he was confined in the Grenada County Jail;
>
> d) any and all records  on the subsequent release of Mr. Mitchell from jail and eventual disposition of his own criminal case;
> e) all interviews and statement(s) given by Eric Bullin to personnel of the Grenada County Sheriff's Department and/or the Office of the Fifth Circuit Court District

6

Declaration of R. Robert Tressel, September 17, 2018

Attorney (including Investigators Robert Jennings, Greg Conley, and McCain) concerning the Britt investigation and the prosecution of Mr. Bullin (Case No. 2005-010CR); and

f) any interview/statement by Shawn Bullin in connection with the Britt investigation; any interview/statement by Lewis Brooks in connection with the Britt investigation; any arrest and subsequent proceedings (including prosecution) of Stephanie Grey before or after 2004 for any offense, including but not limited to false pretense/bad check (ultimately docketed as Case No. CR2010-001).

25.    On Wednesday, September 5, 2018, Mr. Perkovich informed me that an assistant district attorney had scheduled review of their open file at their office on Wednesday, September 12, 2018 at 10:00 AM.

26.    Prior to attending the September 12, 2018 meeting in the District Attorney's Office, Mr. Perkovich faxed and emailed another letter to Sheriff Strider on Friday September 7, 2018, reiterating his requests sent on September 4 and communicating that the D.A.'s Office had scheduled a visit the following Wednesday, at which time counsel expected to have access to materials relating to Mr. Pitchford's prosecution in the custody of the Sheriff's Office. (Attached her as Exhibit C is a copy of the Sep. 7 letter.)

27.    On Wednesday, September 12, 2018, Mr. Perkovich and I arrived at the District Attorney's Office and met for several minutes with the District Attorney, Doug Evans, who confirmed that the Office's entire file was being made available to us at that time.

28.    We were then escorted to a small conference room by an Assistant District Attorney, Mr. Adam Hopper. Mr. Hopper observed our review of the file the Office made available to us. Mr. Hopper also stated that the Sheriff's Office's materials concerning the investigation and Mr. Perkovich's requests remained with the Sheriff's Office and had not been provided to the District Attorney.

7

Declaration of R. Robert Tressel, September 17, 2018

29.     ADA Adam Hopper assisted and observed us as we reviewed their materials. We were permitted to view approximately 371 Bates-stamped pages (from 001 – 371) of the Office's official file. Page 025 from this range of pages was missing. The surrounding pages concerned the identification of evidence inventoried from the crime scene.

30.     We were also permitted to review several manila folders relating to several witnesses, including James Hathcock, who testified for the State at trial. These witness files were not Bates stamped and contained no work product or notes. The files consisted only of copies of statements or disclosures filed or otherwise produced during the course of the pre-trial proceedings. It is my experience that witness files typically possess interview and preparation notes concerning the anticipated testimony in the case.

31.     In addition to this paper file, the Office provided for our review prints of crime scene and autopsy photographs and disks containing digital files of such photographs. The Office also provided cassette recordings of the custodial interview of Mr. Pitchford by Investigator Robert Jennings, of the District Attorney's Office, commencing (according to Mr. Jennings on the recording), at 10:20 AM. We were also presented a digital copy of this same Jennings interview conducted on November 8, 2004.

32.     This Jennings interview was at least the fifth custodial interview conducted by Grenada law enforcement. According to transcriptions of tapes, Sheriff's Office Investigator Greg Conley conducted three recorded interviews of Mr. Pitchford on November 7, 2004, the day of Mr. Pitchford's arrest, and a fourth recorded interview the next morning, on November 8, 2004 at 9:43 AM.

8

Declaration of R. Robert Tressel, September 17, 2018

33.     The District Attorney's Office did not present any recordings concerning the four confirmed interviews conducted by Investigator Conley. It has supplied transcriptions of these interviews only.

34.     In the afternoon of September 12, Mr. Perkovich and I visited Sheriff Strider's office next to the Grenada County Jail. At the time of this case, Sheriff Strider served in his current position for the county.

35.      Mr. Perkovich and I met with Sheriff Strider in his office, where he explained that the responsible investigator for the Pitchford case, Greg Conley, was not in the office that week. Sheriff Strider stated that Investigator Conley maintained the department's case file and that the sheriff was not able to provide access to any of its contents in Investigator Conley's absence.

36.     Any investigation file belongs to the responsible law enforcement agency, it is not the responsibility of any single officer. The head of the given agency, in this case the sheriff, clearly has the power and, in an investigation of this kind, the obligation to make his department's entire file available to the subject's legal team.

37.     Sheriff Strider was unable or unwilling to answer any questions about the file. He stated he recalled the crime scene but did not offer any details when asked.

38.     I asked if he recalled whether Mississippi Bureau of Investigation officers were called to the scene. He indicated that they did call state authorities and, upon their arrival, his officers backed off to let them handle the scene. He did not recall other specifics.

39.     Mr. Perkovich asked him if he was aware whether his department's file contained any audio recordings of interviews regarding the investigation of the Britt homicide. He responded that he did not know and offered that it would be their practice to transcribe such recordings.

9

Declaration of R. Robert Tressel, September 17, 2018

40.     After leaving Sheriff Strider's Office, Mr. Perkovich and I walked to the Grenada

County Circuit Clerk's Office in order to access the evidence maintained from Mr. Pitchford's

2006 trial. Ms. Lynda Pinnix from the Clerk's Office took us to the evidence vault on the second

floor of the two-story courthouse, down the hall from the main courtroom.

41.     Ms. Pinnix unlocked the vault and we accessed the single box containing, what we were

told, was the entirety of materials entered as evidence at Mr. Pitchford's trial.

42.     Ms. Pinnix observed us as I reviewed these materials on a long table in "Courtroom No.

2." I inspected all of the items provided in the box, including the following State's Exhbits:

> Ex. 1: Michelob wall clock
> Ex. 26: bullet, GSW #5
> Ex. 27: bullet, GSW #6
> Ex. 28: shot pellet GSW #1
> Ex. 29: bullet GSW #3
> Ex. 30: wadding from GSW #1
> Ex. 32: EIG .38 cal. revolver, Police Model SN: 7808
> Ex. 33: CCI cartridge (rat shot)
> Ex. 34: screwdriver
> Ex. 49: blow-up of scene diagram
> Ex. 53: .38 cal. cartridge case
> Ex. 54: .38 cal. cartridge case
> Ex. 55: .38 cal. cartridge case
> Ex. 56: .38 cal. cartridge case
> Ex. 57: .22 cal. cartridge case

43.     In addition,  the evidence I was able to view did *not* include Exhibit 45 from the trial,

which is a picture of a brown-handled .38 caliber revolver on the counter of the Crossroads Store

at the unspecified time, according to Investigator Greg Conley, when he arrived at the crime

scene on November 7, 2004. Tr. 516-17. Greg Conley testified that the revolver was recovered at

the Crossroads Store where it had been placed flat on the counter near the spot where the register

had been placed.

10

Declaration of R. Robert Tressel, September 17, 2018

**Crime Scene Conduct: November 7-8, 2004**

44.    Records show that 9-1-1 received a call from the Crossroads Store at 7:36 AM reporting the incident. Grenada County Sheriff's Office Investigators Adam Eubanks and Carver Conley arrived at the scene at approximately 7:42 AM. Emergency Medical Technicians reported arriving at the scene by 7:48 AM and leaving with Mr. Britt's body about an hour later.

45.    Carver Conley completed an offense report reflecting the time of his arrival at the crime scene and reporting that a cash register had been stolen from the store. The report does not note the presence of a .38 revolver anywhere in the store.

46.    The Sheriff's photos also show the location of projectiles from the .22 caliber revolver.

47.    After more than eight hours on the crime scene, reports indicate the Sheriff's Office (Deputy Investigator Adam Eubanks) first notified the state crime agency of the homicide at 18:00 (6:00 PM), receiving assistance from the Mississippi Crime Laboratory ("MCL"). Section Chief David Zeliff received that call "requesting full service crime scene processing of a convenience store where a homicide had occurred earlier in the day."

48.    Photos apparently taken by the Grenada Sheriff's Office prior to the arrival of MCL personnel, Mr. Zeliff and Forensic Scientist Clare Nethery, depict some noteworthy features about the victim and crime scene prior to the removal of Mr. Britt and, as Investigator Eubanks stated to Mr. Zeliff, the cleanup of the area where the victim had been shot and died.

49.    Reports reflect that Investigator Greg Conley and other Sheriff's Office officers arrived at Mr. Pitchford's home, located near the Crossroads Store, that afternoon.

50.    The Sheriff's Office requested the MCL's assistance in order to locate a projectile from the .22 caliber revolver that caused Mr. Britt's fatal injury. The local officers appear to have collected all but one of the projectiles that hit Mr. Britt.

11

Declaration of R. Robert Tressel, September 17, 2018

51.     Upon arrival at 20:40 (after receiving the 18:00 call from the Sheriff's Office), it appears that MCL personnel took their own photographs, but only of the interior due to MCL's arrival after nightfall. The MCL investigators needed to return the next morning, November 8, in order to photograph the exterior during daylight hours.

52.     Prior to MCL's arrival, the body of Mr. Britt had been removed and transported for an autopsy. Photos by MCL depict the crime scene after, presumably, the Sheriff's Office had cleaned the immediate vicinity where Mr. Britt had been shot and died. The Sheriff's Office thus altered the crime scene completely prior to turning over its control to the MCL.

53.     Of note, Investigator Nethery identified one piece of blue plastic on a shelf behind the cash register area. The exact location was not documented and no photograph was taken of this item.

54.     A certified report by MCL Case Analyst David Zeliff and Technical Reviewer Stacy Smith dated December 15, 2005, enumerates four enumerated collections of evidence provided two days after the homicide from Investigator Greg Conley of the Grenada Sheriff's Office to Ms. Nethery. The report also reflects the provision of a small collection of evidence submitted by MCL Ms. Nethery to Mr. Zeliff later that same day (November 9, 2004), and a subsequent collection from Nethery to Zeliff submitted on November 30, 2004.

55.     Interior photos taken by the MCL investigators reflect that, prior to their arrival at the scene at 8:40 PM, the Sheriff's Office appear to have removed the rat shot pellets that would have remained in the vicinity of where Mr. Britt was shot and fell to the ground.

56.     From the reports it appears that the .22 caliber cartridge cases, fingerprints, and the Michelob clock had also been collected.

12

Declaration of R. Robert Tressel, September 17, 2018

## Custodial Statements & Witnesses

57.     From the documents and information made available to Mr. Pitchford's representation at this point, there does not appear to be any recording of the witnesses who found Mr. Britt, only written reports from the local investigators. These witnesses should have been audio recorded.

58.     There are reports that a jail inmate came forward about Mr. Pitchford confessing to him while in custody in the Grenada County Jail. No recording or transcriptions of any "snitch" statements have been provided to Mr. Pitchford's representation. Such materials were made in the requests to Sheriff Strider discussed above.

59.     There are several transcribed statements from several subjects in this investigation, including Quincy Bullins, Demarquis Westmoreland, and Dantron Mitchell. I am aware only of transcriptions having been made available to Mr. Pitchford.

## Physical Evidence

60.     The crime scene photos taken before Mr. Britt's body was removed shows blood drops, in large diameter, to the left of his body. These large drops indicate that Mr. Britt was in an upright position when the drops were made. The overall size indicates they came from a height of several feet. Because no measurements were taken of the size of the drops and no measuring device was used to make closeup photos, a range of heights cannot be properly determined.

61.     Reviewing the autopsy report and locating the inflicted injuries, the only exposed area not protected by clothing that could have caused these drops would be the gunshot wound to the right cheek, with exit from the left neck.

62.     Photography by Grenada Sheriff's Office investigators depicts a brown-handled .38 caliber revolver on the counter underneath the "JOB" rolling papers. This weapon does not appear in any of the MCL crime scene picture.

13

Declaration of R. Robert Tressel, September 17, 2018

63.     At the Grenada County Circuit Court, I examined the black-handled .38 caliber revolver maintained in the evidence box for this case (*infra*).

64.     Examination of the autopsy report and photographs shows a pellet pattern over the upper abdomen with a distinct line of demarcation just above the umbilicus (belly button) and then an additional pellet pattern below this with a distinct void area. The right upper arm has pellet injuries that, when moving the arm over and above the voided area, would create the pattern on the victim's upper arm and upper abdomen seen in the photographs.

65.     Only one piece of wadding was recovered at the time of autopsy. No additional portions of wadding were recovered on the scene. Portions of blue plastic debris from the fired capsule were recovered from the scene. All considered, the physical evidence recovered and examined, to whatever extent, evidences no more than one shot from a .38 caliber revolver.

66.     CCI is the brand of ammunition recovered from the .38 caliber revolver purportedly recovered from Mr. Pitchford's vehicle. Research into CCI ammunition indicated that its .38 caliber "rat shot" consists of #9 shot. CCI's website indicates that each round is loaded with 100 grams of #9 shot.

67.     Further research into #9 shot indicates that for every ounce of shot there are +/- 580 pellets. The 100 grams in each round of #9 shot amounts to approximately 3.5 ounces. This means that the currently available ammunition would project more than 2,000 pellets per shot.

68.     Based on the autopsy photographs and the data from CCI, and due to the pattern and quantity of pellet impacts, Mr. Britt was struck with only one shot from the .38.

69.     Sheriff's Office investigators turned over to MCL several fingerprint lifts they had taken from the crime scene. On these finger print lifts were two identifiable prints that, when compared to the submitted inked finger prints, did not match any subject in this investigation.

14

Declaration of R. Robert Tressel, September 17, 2018

70.     Automated Fingerprint Identification System ("AFIS"), is essentially a digital database of fingerprints established by the FBI that permits searching for matches among an extremely large collection of criminal history records. In what I have seen about this case, there is no mention of whether these prints are of AFIS quality or if they have ever been processed through AFIS.

**Autopsy**

71.     My preliminary review of the materials concerning Mr. Britt's autopsy lead me to the following observations:

72.     Mr. Britt suffered multiple gunshot wounds. He suffered fatal gunshot wounds from a .22 caliber firearm and was also hit with rat shot fired from a .38 caliber revolver. A .38 caliber six-shot revolver was recovered with ammunition components consistent with fragments from the shot capsule apparently recovered at the scene. Tr. 553. When it was recovered, the .38 caliber revolver contained five rounds: one empty, one live, and four spent. The State admitted the four .38 caliber cartridge casings into evidence. State's Exhibits 53-56.

73.     At trial, Mr. Steve Byrd,  an MCL forensic specialist, testified that the "the four cartridge cases submitted in this case . . . at some point in time were discharged from this revolver," the .38 caliber firearm introduced into evidence and purportedly found in Mr. Pitchford's car. Tr. 551. Mr. Byrd's statement is properly limited to identifying that the revolver discharged the four cartridges "at some point in time."

74.     When Mr. Byrd was questioned about the wadding and plastic recovered from Mr. Britt's clothing, he testified that it was consistent with the capsules found in the .38 purportedly recovered from Mr. Pitchford's car. At this point, I have not examined any of the testing or that physical evidence. It is unsurprising that there is consistency with respect to this evidence. The

15

Declaration of R. Robert Tressel, September 17, 2018

basic question concerns the chain of custody of the revolver Mr. Byrd examined and the revolver identified in Ms. Nethery's reporting.

75.     Mr. Byrd also testified that "[a]ccording to the box of ammunition that that cartridge was probably removed from they say there is approximately 135 pellets in that particular shot capsule." Tr. 549. From the records available from the State, "the box of ammunition that that cartridge was probably removed from" is not apparent. Such a box is not in evidence. Perhaps Mr. Byrd consulted an ammunition box in his possession. In any case, CCI is the identified brand of ammunition for the cartridges retrieved from the .38 caliber revolver. Current research into CCI ammunition indicates that its .38 caliber "rat shot" consists of #9 shot. CCI's website indicates that each round is loaded with 100 grams of #9 shot.

76.     Further research into the currently available #9 shot indicates that for every ounce of shot there are +/- 580 pellets. The 100 grams in each round of #9 shot amounts to approximately 3.5 ounces. This means that the currently available ammunition would project more than 2,000 pellets per shot. Mr. Byrd's trial testimony identifying a mere 135 pellets per cartridge calls into question what source he accessed for that determination. The source is not apparent from the records.

77.     Based on the autopsy photographs and the data from CCI, and due to the pattern and quantity of pellet impacts, Mr. Britt was struck with only one shot from the .38.

78.     The totality of the evidence and, crucially, how the integrity of the crime scene and other evidence has been compromised, cannot support a conclusion that a .38 revolver fired more than one cartridge at Mr. Britt. Mr. Byrd's testimony is accurate but it might mislead a jury to think that four rounds were fired from a .38 at Mr. Britt. The evidence cannot support that conclusion.

16

Declaration of R. Robert Tressel, September 17, 2018

79.     At trial, the lay witness testimony of Mr. Marvin Fullwood offered a positive identification of the .38 revolver introduced into evidence as Exhibit 32 and purportedly retrieved by Investigator Greg Conley from Mr. Pitchford's car when he was arrested. Of course, .38 Specials were mass produced and proliferated throughout the country for many years. A definitive identification of any such firearm based simply on external appearance is of limited weight.

80.     Dr. Steven Hayne, the state's forensic pathologist, prepared an autopsy report and testified about the nature of Mr. Britt's wounds and the cause of death. Dr. Hayne testified that Mr. Britt suffered six gunshot wounds. One wound was from pellet strikes around the abdominal area consistent with rat shot. The other five gunshot wounds, four of which Dr. Hayne characterized as lethal, were from .22 caliber bullets. There are several problematic conclusions in Dr. Hayne's testimony.

81.     Dr. Hayne's autopsy report classified the rat shot wound as a single shot, but Dr. Hayne testified that it could have been as many as three shots. Later, the prosecutor told Dr. Hayne that when the .38 caliber revolver was recovered four shots had been fired and asked whether Dr. Hayne's conclusions would be consistent with the victim being shot four times with rat shot. Contrary to what Dr. Hayne had testified to earlier, he answered that it would not be inconsistent; that the victim could have been shot up to four times with rat shot. Tr. 415.

82.     Dr. Hayne's conclusions are not supported by the evidence. The four cartridge casings found in the .38 revolver do not tell us anything about when and where those shots were fired. It is not clear how Dr. Hayne arrived at the conclusion that the victim could have been shot up to three and even four times since no other components of the shots were documented or collected at the crime scene. If more than one shot had been fired, there would be wadding and plastic

17

Declaration of R. Robert Tressel, September 17, 2018

capsules somewhere in that store. Instead, only portions of the plastic shot capsule, wadding, and pellets recovered from the victim were collected and documented. No other wadding or capsules were found. Dr. Haynes testified that

83.     Dr. Hayne also testified that all of the wounds were either distant or near contact, except gunshot wound 2, which Dr. Hayne described as distant. Based on my review of the materials I was provided, none of the gunshot wounds could be classified as near contact; they are all distant. Near contact gunshot wounds are caused when the firearm is off the surface of the skin by a few inches, and none of the shots to the victim could be classified as such. No gunpowder residue testing was done in this case, which could have provided information on the range of fire.

84.     Ms. Clare Nethery of the Mississippi Crime Laboratory testified that, on the floor of the store, she "did not see any marks that would be consistent with a bullet strike." Tr. 540. However, she said nothing about the presence of pellets or pellet strikes on the floor. Rat shot pellets are very small and would not leave much of a mark if they hit the floor. It would be necessary to review high-resolution photographs of the crime scene in order to determine whether there are pellets or pellet marks on the floor, consistent with Mr. Pitchford's statement to police that he shot into the ground, in a state of fear and panic.

85.     The positioning of the shooter and victim is crucial in piecing together how the incident unfolded and the possible role of the shooter. The primary way to do this is through a trajectory analysis. No trajectory analysis was done in this case. In order to complete a trajectory analysis, it is necessary to have three points of contact—the entry wound, exit wound and location of the bullet strike upon exiting (e.g., the wall, floor). In this case, two .22 caliber bullets that hit the victim are unaccounted for. The Grenada County Sheriff's Office processed the crime scene for

Declaration of R. Robert Tressel, September 17, 2018

more than ten hours before they called for assistance from the Mississippi Crime Laboratory, who took over processing the scene and found evidence that the Sheriff's Office had missed.

86.     In total, five .22 caliber shell casings were collected from the scene. Dr. Hayne testified that two of the gunshot wounds were "through and through" wounds, which means that the bullets did not lodge in the victim's body. Those bullets would have to be somewhere in the crime scene. Yet, despite the lengthy time processing the scene, those two bullets were not recovered or documented in the crime scene. Without documentation of the bullet strike, it is not possible to determine the location and possible movement of the shooter and the victim. It is only possible to determine whether the bullet moved right to left; back to front; or upward, downward or level.

87.     The location of where the victim was found is also important in making a determination of his position and movement at the time he was shot. Where the victim was found may not be where the shooting started. For example, was he reaching for something? Was he himself able to fire off a shot from his own weapon? Nothing about the State's expert testimony established where the victim was when he was shot.

88.     In sum, there are numerous important questions left unanswered by the crime scene investigation in this case and multiple inonsistencies and errors in the expert testimony and report of Dr. Steven Hayne and others.

**Concluding Observations**:

89.     Mr. Britt was shot five times with a .22 caliber revolver. Dr. Hayne testified that three of the wounds were lethal, while a fourth from the .22 was potentially lethal. Law enforcement did not recover the .22 revolver. The evidence the State introduced at trial identified Eric Bullin, the 16-year-old, as the party who fired on Mr. Britt with the .22 revolver.

19

Declaration of R. Robert Tressel, September 17, 2018

90.     Autopsy and certain crime scene photos depict the victim's superficial wounds from #9 rat shot fired by a .38 caliber revolver. As described above, the pattern of this rat shot across the back of Mr. Britt's upper right arm and across a swath of his upper abdomen indicate that these injuries were caused by a single shot. The examined debris from the discharge of the weapon also evidences a single shot. Earliest crime scene photos do not suggest a volume of pellet debris consistent with multiple shots of the .38.

91.     Based on the placement of the wounds from the rat shot, Mr. Britt was first shot by the .22 and was likely falling to the floor or already on the floor by the time he was shot with a .38 revolver.

92.     Available crime scene photos and other evidence indicate that the scene was generally cleaned after the victim's body had been removed by 9:00 AM and taken for an autopsy to be conducted that evening. Thus, the pellet debris from the .38 revolver had been discarded, generally, before the arrival of MCL investigators at 8:40 PM on the night of the murder.

93.     Sheriff's Office Investigator Carver Conley completed an offense report reflecting the time of his arrival at 7:42 AM. It reported that a cash register had been stolen from the store. This appears to be the first reporting on the crime and its narrative begins:

> On 7 November 2004 at 7:35 hrs a call was dispatched in reference to a shooting. Upon arrival I observed a white male lying on his right side in a pool of blood. Officer Adam Eubanks who had arrived prior to myself had checked the subject, later identified as R.L. Britt, for vitals and found the subject to be deceased. Upon further investigation there were found (4) four shell casings of .22 caliber ammunition lying on the floor in various area [sic]. The shell casings were marked by Officer's [sic] Miller and Eubanks. As evidence in the order they were found.

(Attached here as Exhibit D is a copy of this report.) The report continues for three more pages, discussing other details of the crime scene and initial witness contacts. But the report *makes no*

20

Declaration of R. Robert Tressel, September 17, 2018

*reference or mention of the presence of a firearm, let alone one on the counter in the vicinity*
*where the victim was lying in a pool of blood.*

94. During the trial testimony of Investigator Greg Conley, the State marked as Exhibit 45 a
picture of a brown-handled .38 caliber revolver resting on the middle of the counter of the
Crossroads Store. Greg Conley, testified that he viewed this revolver placed there when he
arrived at the crime scene. Tr. 516-17. The time of Greg Conley's arrival is not specified in the
record. He testified that Carver Conley, Adam Eubanks, and Jamie Miller from the Sheriff's
Office were already at the scene. *Id.* (Attached here as Exhibit E, is a copy of State's Exhibit 45.)

95. A handwritten note from a Sheriff's Office investigator dated "7 NOV 2004 1415HR"
reports on Mr. Pitchford at his mother's home in the afternoon of Mr. Britt's killing, shortly
before his arrest. The note observes Mr. Pitchford and his mother at around 13:15.

96. Exhibit 45, the crime scene photo of the brown-handled .38, appears to have been taken
by the Sheriff's Office prior to the arrival of the MCL personnel at about 20:40 that night. MCL
notes reflect a briefing given by Adam Eubanks upon their arrival. The notes make no mention
of any gun at the crime scene.

97. The following day, November 8, 2004, Ms. Nethery of the MCL produced an evidence
log from the crime scene and items collected from Mr. Pitchford at the time of his arrest the prior
day. It includes clothes and footwear taken from Mr. Pitchford on November 7, 2004.

98. The first item of Ms. Nethery's log appears to be the black-handled .38 revolver. The
handwritten log reflects this entry at 9:30 AM, noting the revolver's serial number of "78088." A
certified report issued from Mr. Zeliff of the MCL on December 15, 2005—13 months later—
listed the logging of this .38 revolver, again with the serial number of "78088," a day later on

21

Declaration of R. Robert Tressel, September 17, 2018

November 9, 2004 at 10:02 AM by Ms. Nethery. I have seen no indication of any attempt to obtain serial number-related pedigree and ownership information of this weapon.

99.     At Mr. Pitchford's trial, a black-handled .38 revolver was introduced into evidence as the weapon that Investigator Greg Conley seized from Mr. Pitchford's car, midday on November 7, 2004. The State submitted that Mr. Pitchford used the black-handled .38 to shoot Mr. Britt while participating in the robbery. The firearm was marked as State's Exhibit 32. On September 12, 2018, I personally handled Exhibit 32 in the Grenada County Circuit Court. (Attached here as Exhibit F is a current photograph of State's Exhibit 32.)

100.    My personal inspection of the .38 caliber revolver marked as Exhibit 32 indicated that the serial number is "7808"—not "78088," as Ms. Nethery apparently transcribed from the error in Investigator Conley's initial submission to her. This suggests that she did not inspect the weapon herself.

101.    Thus, at least two .38 caliber revolvers emerged in this investigation. Only one .38 revolver was introduced into evidence at trial, the black-handled .38. The brown-handled .38 pictured at the crime scene between the time of Mr. Britt's murder and the arrival of MCL personnel that night has, apparently, simply disappeared from the case. These are damning facts for this investigation. It is inconceivable that a revolver—especially one of the same caliber as the weapon purportedly used by a defendant in the murder case—found at the crime scene in the immediate vicinity of the victim's body would not be taken into evidence.

102.    Due to the gross mishandling of the crime scene and, at the same time, the Sheriff's Office's mysterious handling of the evidence, the role the two .38 caliber revolvers play in this crime is far from clear. This investigation lacks basic reliability. It calls into question the evidence that the State submitted at trial.

22

Declaration of R. Robert Tressel, September 17, 2018

103.    This tainted investigation, especially when factored with the apparent amount of critical

information that has not been provided to Mr. Pitchford's representation, makes the State's

evidence against Mr. Pitchford unreliable.

### III. OPINION BACKGROUND

**Materials Reviewed**

104.    I have reviewed the following materials in preparing my initial opinion:

i.    Excerpts from the State's discovery disclosures, including:

1. 11/07/04 Statement of Quincy Bullins

2. 11/07/04 Statement of Demarcus Westmoreland

3. 12/02/04 Statement of Dantron Mitchell

4. Mississippi Crime Lab TAS Report (12/05/05)

5. Evidence recovery log

6. Technical Assistance Section Notes Page (11/07/04; 11/08/04)

7. Mississippi Crime Lab crime scene proof sheets of digital images

8. Physical evidence list

9. State's Supplemental Discovery Disclosure of Witness James Hathcock

10. Grenada County Sheriff's Department Offense Report (11/04/05)

11. Grenada County Sheriff's Department Underlying Fact Sheets

12. DNA data request form & motion to appoint and order appointing court
    expert for DNA analysis

13. Mississippi Crime Lab Bioscience/DNA Report (01/07/05)

14. Mississippi Crime Lab Latent Prints Report (01/26/05)

15. Mississippi Crime Lab Firearms/Toolmarks Report (02/07/05)

23

Declaration of R. Robert Tressel, September 17, 2018

16. Mississippi Crime Lab Evidence Submission Form

17. Mississippi Medical Examiner Report of Death Investigation by Richard Crenshaw

18. Provisional & Final Reports of Autopsy by Dr. Steven Hayne

19. Autopsy photographs of Rueben Britt

20. Photographs of Crossroads Grocery Store

21. handwritten notes

105.    Transcripts of trial testimony of: Clare Nethery; Steven Hayne; Steve Byrd; Investigator Gregory Conley; and Investigator Robert Jennings.

106.    The foregoing materials made available on September 12, 2018 at District Attorney Doug Evans's Office and the Grenada County Circuit Court.

**Professional Background**

107.    In July of 1973 I joined the Cobb County Police Department as a Uniform Patrol Officer. In October of 1973 I completed Basic Mandate Training at the Georgia Police Academy.

108.    In February of 1975 I was transferred to the Crimes Against Persons Unit, commonly known as the Homicide Unit. This unit is responsible for all death investigations including homicide, suicide, accidental and natural death cases. That unit also worked robberies, rapes and any case involving person-to-person contact.

109.    I was subsequently promoted to the rank of Detective Sergeant in July of 1978 and assigned to the evening shift as a supervisor in the Crimes Against Persons Unit. At that time I managed one other sergeant and four criminal investigators.

110.    In January of 1985, I transferred to the Cobb County Medical Examiner's Office as a Forensic Investigator. This position represents the Medical Examiner at all death scenes and is

App.0024

Declaration of R. Robert Tressel, September 17, 2018

responsible for crime scene processing around the body of the deceased, collection of evidence, and documenting the conditions and circumstances under which the body was discovered.

111.    I was promoted to Operations Manager of the Medical Examiner's Office in 1993.  This position required overseeing a staff of four investigators, autopsy technicians and support staff. This position also acted as chief investigator for the Medical Examiner.

112.    In December of 1998, I took an early retirement from Cobb County and went into private consulting.

113.    During my employment with Cobb County I received training in the field of death investigation including, but not limited to, crime scene processing, crime scene analysis, blood spatter interpretations, death investigations, and interpreting injuries and their causes. This training was from some of the most respected trainers in the country.  I received training at the University of Georgia, the University of Miami in association with the Dade County Medical Examiner's Office, the University of Saint Louis School of Medicine in association with the St. Louis Medical Examiner's Office, the National Law Enforcement Institute in Santa Rosa California, and through the FBI Training Center in Quantico, Virginia.  In total I have over 700 hours of continuing education in the field of death investigations.

114.    During my tenure with the Cobb County Medical Examiner's Office I trained under Dr. Joseph L. Burton, a renowned Forensic Pathologist.  I have been involved with all aspects of the death scene evaluation, gathering and documenting forensic evidence, autopsy and autopsy procedures and evaluating these findings in making determinations as to cause and manner of death.

115.    During my career, I have been involved in over 6,000 death investigations and have personally been involved in over 500 homicide investigations.  I have testified in eleven states

Declaration of R. Robert Tressel, September 17, 2018

(Georgia, Florida, Alabama, North Carolina, South Carolina, Connecticut, Missouri, Kansas, Texas, Pennsylvania and Utah) and in Federal Court as an expert witness in death investigations, crime scene analysis and blood spatter interpretations.

116.    In April 2011, I was appointed the Chief Criminal Investigator of the Cobb County District Attorney's Office, Marietta, GA. I currently manage 20 criminal investigators and am responsible for directing all specially appointed cases and all death penalty cases for the District Attorney's Office.

I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge.

Dated: September 17, 2018,
Marietta, Georgia

R. Robert Tressel

26

Exhibit A

CURRICULUM VITAE
*RALPH ROBERT TRESSEL*

**DATE OF BIRTH: JULY 18, 1953**

**NATIONALITY: U.S. CITIZEN**

**MARITAL STATUS: MARRIED**

**WIFE: CYNTHIA L. GEYER**

**TWO MARRIED CHILDREN – TWO ADULT CHILDREN SINGLE**

**HOME ADDRESS:   381 COTTON MILL DRIVE**
**                            HIRAM, GEORGIA 30141**

**PROFESSION:  CHIEF CRIMINAL INVESTIGATOR**
**                        COBB COUNTY DISTRICT ATTORNEY'S OFFICE**
**                        70 HAYNES STREET**
**                        3RD FLOOR**
**                        MARIETTA, GA. 30090**

**FORENSIC INVESTIGATOR/CONSULTANT FORENSIC EVIDENCE AND INVESTIGATION**

**TITLE: OWNER – *FORENSIC INVESTIGATIVE SERVICES***

**EDUCATION:**

**GRADUATED: SPRAYBERRY HIGH SCHOOL 1971**

**KENNESAW JR. COLLEGE – 1971-1972**

**SPECIALIZED TRAINING:**

**BASIC RECRUIT TRAINING**
**COBB REGIONAL POLICE ACADEMY**
**1973 80 HOURS**

**BASIC MANDATE TRAINING**
**GEORGIA POLICE ACADEMY**
**1973 120 HOURS**

**ROBBERY & BURGLARY SEMINAR**
**COBB REGIONAL POLICE ACADEMY**

Page 2
CV – Robert Tressel

**1974 16 HOURS**

**RAPE INVESTIGATION COURSE**
**COBB REGIONAL POLICE ACADEMY**
**1975 16 HOURS**
**GOVERNOR'S CRIME AWARENESS PROGRAM**
**COBB REGIONAL POLICE ACADEMY**
**1976 16 HOURS**

**SEX CRIMES WORKSHOP**
**GEORGIA STATE UNIVERSITY**
**1977 40 HOURS**

**ARSON & BOMB WORKSHOP**
**COBB REGIONAL POLICE ACADEMY**
**1978 40 HOURS**

**BASIC HOSTAGE NEGOTATIONS**
**F.B.I. – ATLANTA, GEORGIA**
**IN ASSOCATION WITH F.B.I., QUANITICO, VIRGINIA**
**1977 40 HOURS**

**ADVANCED CRIMINOLOGY**
**GEORGIA POLICE ACADEMY**
**IN ASSOCATION WITH F.B.I., QUANTICO, VIRGINA**
**1978 50 HOURS**

**HOMICIDE INVESTIGATION**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**TERRORISM SEMINAR**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**POLICE SUPERVISION**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**INTERVIEWS AND INTERROGATIONS**
**GEORGIA POLICE ACADEMY**
**1979 40 HOURS**

**POLICE DISCIPLINE**

Page 3
CV – Robert Tressel

**COBB COUNTY POLICE DEPARTMENT**
**1980 4 HOURS**

**FIREARMS INVESTIGATION TECHNIQUES**
**DEPARTMENT OF THE TREASURY**
**1981 40 HOURS**
**STRESS MANAGEMENT**
**COBB COUNTY POLICE DEPARTMENT**
**1981 4 HOURS**

**BLOOD STAINS/SPATTER WORKSHOP**
**FLORIDA INSTITUTE OF LAW ENFORCEMENT**
**ST. PETERSBURG, FLORIDA**
**1981 40 HOURS**

**SEX CRIMES**
**GEORGIA POLICE ACADEMY**
**1981 40 HOURS**

**INTERVIEWS AND INTERROGATIONS**
**LEVEL II**
**GEORGIA POLICE ACADEMY**
**1981 40 HOURS**

**HOSTAGE NEGOTIATIONS**
**COBB REGIONAL POLICE ACADEMY**
**1982 40 HOURS**

**SEARCH AND SEIZURE**
**COBB REGIONAL POLICE ACADEMY**
**1982 16 HOURS**

**COMPUTER APPLICATIONS IN LAW ENFORCEMENT**
**GEORGIA POLICE ACADEMY**
**1984 40 HOURS**

**SEARCH WARRANTS & AFFIDAVITS**
**GEORGIA POLICE ACADEMY**
**1984 16 HOURS**

**LAW ENFORCEMENT SUPERVISION**
**GEORGIA POLICE ACADEMY**
**1984 120 HOURS**

**MEDICO-LEGAL DEATH INVESTIGATION**

Page 4
CV – Robert Tressel

**ST. LOUIS UNIVERSITY SCHOOL OF MEDICINE**
**ST. LOUIS, MISSOURI**
**1985 40 HOURS**

**ARSON INVESTIGATION SEMINAR**
**ATLANTA, GEORGIA**
**1986 16 HOURS**
**HOMICIDE INVESTIGATION**
**NATIONAL LAW ENFORCEMENT INSTITUTE**
**ATLANTA, GEORGIA**
**1986 16 HOURS**

**POLICE MEDICO-LEGAL INVESTIGATION OF DEATH**
**UNIVERSITY OF MIAMI SCHOOL OF MEDICINE**
**MIAMI, FLORIDA**
**1986 40 HOURS**

**BLOODSTAIN EVIDENCE SEMINAR**
**NATIONAL LAW ENFORCEMENT INSTITUTE**
**SANTA ROSA, CALIFORNIA**
**1988 40 HOURS**

**SATANIC & CULT INFLUENCES IN HOMICIDE**
**VALENCIA COMMUNITY COLLEGE**
**1989 28 HOURS**

**SECOND NATIONAL CONFERENCE ON CHILD FATALITIES AND**
**PHYSICAL ABUSE**
**NATIONAL CENTER FOR PROSECUTION OF CHILD ABUSE**
**AMERICAN PROSECUTOR'S RESEARCH INSTITUTE**
**SAN DIEGO, CALIFORNIA**
**1991 32 HOURS**

**FORENSIC SYMPOSIUM 2011**
**FORENSIC EXAMINATION & CRIME SCENE PROCESSING**
**NORTH GEORGIA COLLEGE & STATE UNIVERSITY**
**DAHLONEGA, GEORGIA**
**MARCH 2011, 16 HOURS**

**CRIME SCENE RECONSTRUCTION**
**PATTERN INJURY INTERPRETATION**
**DR. JOSEPH L. BURTON**
**MARIETTA, GEORGIA**
**1985 - 2010**

Page 5
CV – Robert Tressel

**EXECUTIVE TRAINING**
**GEORGIA CHIEFS OF POLICE**
**DULUTH, GEORGIA**
**OCTOBER 2011 60 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JANUARY 2012 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA 14 HOURS**
**JULY 2012**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATHENS, GEORGIA**
**JANUARY 2013 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GA**
**JULY 2013 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JANUARY 2014 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2014 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JULY 2015 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JANUARY 2016 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2016 20 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2017 20 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**

Page 6
CV – Robert Tressel

**SAVANNAH, GEORGIA**
**JULY 2018 20 HOURS**

**BIOMECHANICS AND OCCUPANT KINEMATICS**
**DR. JOSEPH L. BURTON**
**MARIETTA, GEORGIA**
**1990 – 2010**

**PREVIOUS EMPLOYMENT:**

**SENIOR FORENSIC INVESTIGATOR**
**BURTON & ASSOCIATES**
**ALPHARETTA, GEORGIA**
**1999 – 2010**

**OPERATIONS MANAGER**
**COBB COUNTY MEDICAL EXAMINER'S OFFICE**
**MARIETTA, GEORGIA**
**1985 – 1998 (RETIRED)**

**SERGEANT, CRIMES AGAINST PERSONS UNIT**
**COBB COUNTY POLICE DEPARTMENT**
**MARIETTA, GEORGIA**
**1978 – 1985**

**DETECTIVE, CRIMES AGAINST PERSONS UNIT**
**COBB COUNTY POLICE DEPARTMENT**
**MARIETTA, GEORGIA**
**1975 – 1978**

**POLICE OFFICER – PATROL DIVISION**
**COBB COUNTY POLICE DEPARTMENT**
**MARETTA, GEORGIA**
**1973 – 1975**

**ADDITIONAL INFORMATION:**

**MEMBER:**

**FRATERNAL ORDER OF POLICE (inactive)**
**POLICE OFFICER'S ASSOCATION OF GEORGIA (inactive)**
**GEORGIA CHIEFS OF POLICE ASSOCIATION**
**INTERNATIONAL ASSOCIATION OF CHEIFS OF POLICE**
**ATLANTA METROPOL**

Page 7
CV – Robert Tressel

**INSTRUCTOR:**

**DEATH INVESTIGATION**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1983 – 1998**

**HOMICIDE INVESTIGATION**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1983 – 1998**
**CRIME SCENE PROCESSING**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1990 – 1998**

**INMATE AND JAIL DEATHS**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1990 – 1998**

**DRUG DEATHS**
**COBB COUNTY DISTRICT ATTORNEY'S DRUG AWARENESS PROGRAM**
**1985 – 1998**

**ADVANCED CRIME SCENE PROCESSING**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1993 – 1998**

**ADVANCED CRIME SCENE PROCESSING**
**NORTH WEST GEORGIA LAW ENFORCEMENT ACADEMY**
**1995 – 1996**

**CONSULTANT**

- **ABUSED AND BATTERED CHILDREN**
- **BLOOD SPATTER INTERPRETATIONS**
- **CRIME SCENE RECONSTRUCTION**
- **HOMICIDE INVESTIGATIONS**
- **TRAFFIC ACCIDENT RECONSTRUCTION**
- **INJURY PATTERN INTERPRETATIONS**
- **CRIME SCENE EVIDENCE COLLECTION**
- **EVIDENCE COLLECTION/RETENTION**

**APPOINTMENTS:**

Page 8
CV – Robert Tressel

**JANUARY 1990**
**ELECTED BOARD OF DIRECTORS**
**NATIONAL SUDDEN INFANT DEATH SYNDROME**
**GEORGIA CHAPTER**

**MAY 1990**
**APPOINTED**
**COBB COUNTY CHILD ABUSE PROTOCOL COMMITTEE PURSUANT TO**
**GEORGIA H.B. 1318**

**JULY 1990**
**RECIPIENT**
**INSTRUCTOR'S CERTIFICATE TO TEACH DEATH INVESTIGATION TO**
**LAW ENFORCEMENT OFFICERS OF THE STATE OF GEORGIA (RENEWED**
**1995)**

**JANUARY 1991**
**ELECTED**
**BOARD OF DIRECTOR'S OF SUDDEN INFANT DEATH RESEARCH**
**FOUNDATION**
**ASSISTED WITH INCORPORATION OF SAME**

Exhibit B

**PHILLIPS BLACK, INC.**

a nonprofit, public interest law practice

JOSEPH J. PERKOVICH          j.perkovich@phillipsblack.org          Principal Attorneys:
PO Box 4544                  212 400 1660 (tel)                    Lee Kovarsky¥
New York, New York 10163-4544   888 543 4964 (fax)                 Jennifer Merrigan†
                                                                    John R. Mills‡
                                                                    Joseph J. Perkovich§

September 4, 2018

VIA FACSIMILE (662.227.2872) & EMAIL (grenadaso1@cableone.net)
Sheriff Alton Strider
Grenada County Sheriff's Dep't
35 Doak Street
Grenada, MS 38901

Re: State v. Pitchford, Case No. 2005-009CR, Grenada County Circuit Court

Sheriff Strider,

Thank you for your time on Friday afternoon. As I explained when we met before the holiday weekend, I am one of Mr. Terry Pitchford's current attorneys in his federal habeas corpus proceedings in the U.S. District Court for the Northern District of Mississippi concerning his conviction and sentence entered in 2006 in relation to the robbery and murder of Mr. Rueben Britt.

I write to follow-up the request that I made in your office to see any and all recordings, transcriptions, or other evidence relating to the statement given by James S. Hathcock in November 2004 while he was confined in the Grenada County Jail concerning the Britt investigation and prosecutions of Mr. Pitchford and his co-defendant, Eric Bullin. Further, I request any and all records or other evidence concerning the subsequent release of Mr. Hathcock from jail and eventual disposition of his own criminal case.

In recognition of the desire you expressed to include District Attorney Evans in further discussion of this matter, I have copied him here, along with his assistant, Mr. Berry (whom I have spoken with earlier, in connection with my request to review his office's file for Mr. Pitchford's case).

In order to facilitate the discovery process at this stage, I am hereby supplying further requests, in addition to the above-stated query centered on Mr. Hathcock. Specifically, I ask that you make available any and all recordings, transcriptions, notes, or other evidence relating to:

1) any interview with or statement by Dantron Mitchell in connection with the Britt investigation, in particular surrounding his discussion with Mr. Pitchford and Eric Bullin in November 2004 while he was confined in the Grenada County Jail;

¥Admitted in Texas and inactive in New York
†Admitted only in Missouri and Pennsylvania
‡Admitted only in California and North Carolina
§Admitted only in New York

2)  the subsequent release of Mr. Mitchell from jail and eventual disposition of his own
    criminal case;

3)  all interviews and statement(s) given by Eric Bullin to personnel of the Grenada County
    Sheriff's Department and/or the Office of the Fifth Circuit Court District Attorney
    (including Investigators Robert Jennings, Greg Conley, and Mr. McCain) concerning the
    Britt investigation and the prosecution of Mr. Bullin (Case No. 2005-010CR);

4)  any interview/statement by Shawn Bullin in connection with the Britt investigation;

5)  any interview/statement by Lewis Brooks in connection with the Britt investigation;

6)  any arrest and subsequent proceedings (including prosecution) of Stephanie Gray before or
    after 2004 for any offense, including but not limited to false pretense/bad check (ultimately
    docketed as Case No. CR2010-001).

In closing, I would like to identify a time next week to view and otherwise access materials
concerning the foregoing either at your department or the courthouse. I would be available on
Tue., Sep. 11 or Wed., Sep. 12. Of course, please do not hesitate to contact me by phone or email
and/or contact my associate, Ms. Jenny Osborne, who may be reached via 888.532.0897.

                    Very truly yours,

                    JOSEPH J. PERKOVICH

cc:     District Attorney Doug Evans (by facsimile)
        Asst. District Attorney Ryan Berry (by facsimile)
        J. Scott Gilbert, Esq. (co-counsel, by email sgilbert@watkinseager.com)
        Jenny W.L. Osborne, Esq. (co-counsel, by email j.osborne@phillipsblack.org)

Exhibit C

**PHILLIPS BLACK, INC.**

a nonprofit, public interest law practice

JOSEPH J. PERKOVICH          **j.perkovich@phillipsblack.org**      Principal Attorneys:
PO Box 4544                  212 400 1660 (tel)                     Lee Kovarsky[¥]
New York, New York 10163-4544   888 543 4964 (fax)                  Jennifer Merrigan[†]
                                                                    John R. Mills[‡]
                                                                    Joseph J. Perkovich[?]

September 7, 2018

<u>VIA FACSIMILE  (662.227.2872) & EMAIL (grenadaso1@cableone.net)</u>
Sheriff Alton Strider
Grenada County Sheriff's Dep't
35 Doak Street
Grenada, MS 38901

Re: <u>State v. Pitchford, Case No. 2005-009CR, Grenada County Circuit Court</u>

Sheriff Strider,

I hope this letter finds you well this afternoon. I write simply to reiterate the requests enumerated in my letter on September 4 and to make sure your department was aware that the District Attorney's Office is making their file in Mr. Pitchford's case available for viewing beginning the morning of Wednesday, September 12. Thus, I will be in Grenada then and hope to be able to arrange with your department access to those materials in question in Mr. Pitchford's case.

Of course, please do not hesitate to contact me by phone or email and/or contact my associate, Ms. Jenny Osborne, who may be reached via 888.532.0897.

Very truly yours,

_s\ Joseph J. Perkovich_
JOSEPH J. PERKOVICH

cc:    District Attorney Doug Evans (by facsimile)
       Asst. District Attorney Ryan Berry (by facsimile)
       J. Scott Gilbert, Esq. (co-counsel, by email sgilbert@watkinseager.com)
       Jenny W.L. Osborne, Esq. (co-counsel, by email j.osborne@phillipsblack.org)

¥Admitted in Texas and inactive in New York
†Admitted only in Missouri and Pennsylvania
‡Admitted only in California and North Carolina
?Admitted only in New York

App.0040

phillipsblack.org          Austin • New York • Philadelphia • St. Louis • San Francisco

Exhibit D

GRENADA COUNTY SHERIFF'S DEPARTMENT OFFENSE REPORT   Date: _7 NOV 2004_

Crime or Incident Type: _ARMED ROBBERY / MURDER_   Complaint #: _2004110323_

| Victim's Name R.L. BRITT | | Address 11475 HWY 51 GRENADA, MS | | Phone |
|---|---|---|---|---|
| Rec-Call Ø | Arrival Time 07:42 | Type Premis BUSINESS | Location of Offense 4489 HWY 7 N | Dispatcher MERRIMAN |
| Victim Place of Employment SELF-EMPLOYED | Victim's Sex M | Victim's Race W | Victim's Age 47 | Date and Time Occurred 7 NOV'04 0630-0735 |

| Reporting Person Name and Address WALTER S. DAVIS | Date and Time Reported 7 NOV'04 0735 | Phone |
|---|---|---|

| Witness Name | Age | Phone | Place of Employment |
|---|---|---|---|
| | | | |

| Suspect Name and Address | Age | Race |
|---|---|---|
| | | |

| Vehicle Color SILVER/GREY | Year | Make | L.C. | Model | State |
|---|---|---|---|---|---|

Description of Items stolen - Size - Color - Model - Style - Serial # (1) ONE CASH REGISTER WITH AN UNDETERMINED AMOUNT OF CASH

Value $

| Victim Taken To DECEASED | Transported By N/A | Condition DECEASED |
|---|---|---|

Narrative: ON 7 NOVEMBER 2004 AT 07:35 HRS. A CALL WAS DISPATCHED IN REFERENCE TO A SHOOTING. UPON ARRIVAL I OBSERVED A WHITE MALE LYING ON HIS RIGHT SIDE IN A POOL OF BLOOD. OFFICER ADAM EUBANKS WHO HAD ARRIVED PRIOR TO MYSELF HAD CHECKED THE SUBJECT, LATER IDENTIFIED AS R.L. BRITT, FOR VITALS AND FOUND THE SUBJECT TO BE DECEASED. UPON FURTHER INVESTIGATION THERE WERE FOUND (4) FOUR SHELL CASINGS OF .22 CALIBRE AMMUNITION LYING ON THE FLOOR IN VARIOUS AREA. THE SHELL CASINGS WERE MARKED BY OFFICER'S MILLER AND EUBANKS AS EVIDENCE IN THE ORDER THEY WERE FOUND.   SEE CONTINUATION

| Investigating Officer C. Conley | | Badge number SO-31 |
|---|---|---|
| Photos taken by SO-6 SO-2 SO-3 | Assisting Officer | Badge number |

Evidence Obtained - prints, weapons, etc.

005

App.0042

## SUPPLEMENTAL REPORT

A FURTHER CHECK OF THE BUSINESS REVEALED THAT THE CASH REGISTER WAS MISSING. I LATER INTERVIEWED WALTER DAVIS OF 60 DAVIS RD. WHO ALONG WITH HIS SON, WALTER S. DAVIS ARRIVED AT THE STORE AT APPROX. 0727 HRS. TO PURCHASE SOME ITEMS BEFORE GOING HUNTING. ACCORDING TO MR. DAVIS HE HOLLERED FOR MR. BRITT BECAUSE HE THOUGHT HE MAY HAVE BEEN IN THE BATHROOM. MR. DAVIS STATED THAT AS HE APPROACHED THE COUNTER HE OBSERVED A BODY LYING ON THE FLOOR BEHIND THE COUNTER MR. DAVIS STATED THAT HE THEN WENT OUTSIDE AND ADVISED HIS SON TO CALL THE POLICE.

LATER I INTERVIEWED CLOVIS HARDY WHO STATED HE OBSERVED A SILVER-GREY IN COLOR VEHICLE PARKED AT THE SOUTHEAST CORNER OF THE PARKING LOT. HARDY STATED THAT HE ALONG WITH HIS BROTHER JERRY HARDY WERE AT THE STORE BETWEEN THE HOURS OF 0659 AND 0710 HRS. MR. HARDY ALSO STATED THAT THE VEHICLE WAS PARKED THERE DURING THE ENTIRE PERIOD HE WAS INSIDE THE STORE.

I ALSO INTERVIEWED STEPHANIE GREY OF 4479A HWY 7 NORTH AN EMPLOYEE OF CROSS ROADS GROCERY WHO STATED THAT WHEN SHE LEFT SHE OBSERVED A GREY/SILVER VEHICLE PARKED IN THE PARKING LOT. WHEN QUESTIONED ABOUT THE OCCUPANCY OF THE VEHICLE MS. GREY ADVISED THAT SHE COULDN'T ADVISE WHO OR HOW MANY PEOPLE WERE INSIDE THE VEHICLE DUE TO THE DARK TINT WHICH WAS ON THE WINDOWS.

AFTER SPEAKING WITH MS. GREY I ALSO SPOKE WITH GERALD GATLIN, OWNER OF G&W STEEL BUILDINGS, WHO STATED

| ARRESTING OFFICER | BADGE NUMBER | REVIEWING SUPERVISOR |
|---|---|---|

## SUPPLEMENTAL REPORT

THAT EARLIER, APPROXIMATELY ONE WEEK AND A HALF AGO THERE HAD BEEN AN ATTEMPT TO ROB THE BUSINESS. MR GATLIN INFORMED ME THAT HE HAD RECEIVED THIS INFORMATION FROM HIS SON, STEPHEN GATLIN, WHOM HAD RECEIVED THIS INFORMATION FROM (3)THREE EMPLOYEES OF G&W STEEL BUILDINGS A PAUL HUBBARD, LEWIS BROOKS AND HENRY ROSS, JR

I CONTACTED HENRY ROSS VIA CELLPHONE AND ASKED HIM WOULD HE COME BY THE SHERIFF'S DEPT. TO ANSWER A FEW QUESTIONS. MR. ROSS CAME BY THE SHERIFF'S DEPT BEING ACCOMPANIED BY MR. PAUL L. HUBBARD. BOTH MR. HUBBARD AND MR. ROSS WERE ADVISED WHY THEY WERE WANTED FOR QUESTIONING, REFERRING TO AN OCCASION WHERE THEY ENCOUNTERED A COUPLE OF BLACK MALE SUBJECTS WHO WERE ABOUT TO ROB THE STORE (CROSS ROAD GROCERY. MR HUBBARD AS WELL AS MR. ROSS STATED THEY REMEMBERED THE INCIDENT. MR. ROSS STATED THAT HE OBSERVED THE SUBJECTS ON (2) TWO DIFFERENT OCCASIONS. ONCE AT APPROX. 11:00 A.M. AND AGAIN AT 2:00 P.M. MR. ROSS STATED THAT HE ASKED ONE BLACK MALE THAT HE KNEW AS 'NOOK' "NOOK" LATER IDENTIFIED AS QUINCY BULLINS WHAT WAS HE DOING THERE. ROSS STATED THAT BULLINS STATED THEY WERE ABOUT TO ROB THE PLACE. ROSS STATED THAT BULLINS WAS ACCOMPANIED BY ANOTHER BLACK MALE DESCRIBED AS BEING DARK COMPLEXED, LOW HAIR APPROX. 5 FT 9 IN. IN HEIGHT AND A LIGHT COMPLEXED BLACK MALE WHO WAS STANDING BESIDE A VEHICLE THAT

| ARRESTING OFFICER | BADGE NUMBER | REVIEWING SUPERVISOR |
|---|---|---|

## SUPPLEMENTAL REPORT

WAS PARKED ON THE ROADWAY (SCENIC LOOP333) WITH THE HOOD AND FLASHERS ON. MR. HUBBARD COLLABARATED MR. ROSS'S STATEMENT ADDING THAT HE KNEW BULLINS AND THAT HE ADVISED BULLINS TO LEAVE BECAUSE OF THE CONSE QUENCES OF HIS ACTIONS. HUBBARD STATED THAT HE TOLD BULLINS HE COULD BE DEAD OR GET CAUGHT THUS SPENDING HIS LIFE IN PRISON

INVESTIGATION CONTINUES

| ARRESTING OFFICER | BADGE NUMBER | REVIEWING SUPERVISOR |
|---|---|---|
| C. Conley | 50·31 | |

Exhibit E

State's
Exh ID
#45 Evd
2-7-06



Exhibit F



Declaration of Barbara Hamm, Psy.D

**A. Request to Provide Expert Opinion**

1. I have been asked by Mr. Pitchford's legal counsel to review materials and provide an initial opinion regarding (1) the extent and nature of the trauma and abuse that Mr. Pitchford experienced; (2) the potential effect of these experiences on Mr. Pitchford's mental health, behavior and functioning; (3) the need for an assessment by an expert in psychological trauma; and (4) what such an assessment would entail (the nature of the work and estimate of time).

**B. Qualifications**

1. I am a clinical psychologist licensed to practice in the State of Massachusetts (License Number 6286). For the past 30 years my work has focused on the assessment and treatment of traumatic life events. I received my Bachelor of Arts (B.A.) degree from Knox College in Galesburg, Illinois; my Masters in Counseling Psychology (M.Ed.) from Boston College in Chestnut Hill, MA; and a Doctor of Psychology (Psy.D.) from the Massachusetts School of Professional Psychology (recently renamed William James College) in Newton, Massachusetts.

2. Since 1987, I have been a staff psychologist at the Cambridge Health Alliance, a multi-site urban safety net hospital system in the greater Boston area. For the majority of time my work has been with the Victims of Violence Program, an award-winning outpatient adult service providing assessment and treatment for individuals, groups and communities impacted by violence. From 2009 through June 2015, I was the Director of this program. During this time, I oversaw four federally funded victim services grants (Victim Office of Crime Act/VOCA) through the Massachusetts Office for Crime Assistance. These grants focused on providing specialized services for those who have lost ones to homicide, providing acute crime assistance and advocacy to victims of crime, empowering communities and groups impacted by violent events and bringing mindfulness practices into law enforcement wellness programming. Within the Department of Psychiatry at the Cambridge health Alliance my broader responsibilities have included oversight of training, research, clinical individual and

1

group treatment programming, crisis intervention and interdepartmental and interagency consultation for the assessment and treatment of both acute and chronic traumas.

3. Prior to this I served as the Director of the Political Trauma Services Network and Training Director for the Coordinated Care Program for Political Violence Survivors both within CHA.

4. Currently I am an Affiliate of the Center for Mindfulness and Compassion and since 2014 have been the Director of Connect Associates, a consultation and training group practice. I have presented on topics related to group treatment of trauma, the intergenerational transmission of trauma, traumatic loss and grief, creating trauma-informed organizations and the impact of trauma on first responders and providers both nationally and internationally. Beginning in July 2018, I will be the Co-Director and lead developer of programming for the Transformative Action Project (TAP), through the Northeastern Law School's Violence Transformed initiative of the Public Health Advocacy Program, a VOCA grant funded pilot project integrating mindfulness practices, psychoeducation about the impact of trauma and the arts with legal advocacy for communities and groups chronically exposed to violence to assist in their channeling resiliency.

5. Additionally I am on the Advisory Boards of the Hand in Hand Project at Medicine Wheel Productions, a Boston-based anti-violence community public arts initiative and The SEED Foundation, a Kurdistan, Iraq based NGO providing mental health and psychosocial support services to survivors of the Yazidi genocide by ISIS.

6. Most recently I have begun providing forensic consultation and expert testimony on the effects and impacts of childhood and adult trauma on development and behavior.

**C. Method**

1. My declaration is based upon conversations with Mr. Pitchford's legal team, Jenny Osborne and Joseph Perkovich, and review of the following documents: affidavits by friends and family members: Shirley Ann Jackson Pitchford (2018); Perry Pitchford (2018); DeShawn Burnett (2018); Dominique Hogan (2018); Roydetric Harris (2018); Dantron Mitchell (2018); Jessica Brown (2011,2013), Veronica Dorsey (2011); affidavits by teachers: Albert Britt, Jr. (2018); Laura Hoffman (2018); Michael Miles

2

(2018); Marshall Whittemore (2018); Michael Jackson (2018); Robert Wade (2018); an
expert report by Dr. Rahn Bailey (2006); Mississippi State Hospital evaluation (2006);
affidavit and summary report by Dr. Malcolm Spica (2011); affidavit and supplemental
report by Dr. Richard Dudley (2011); Terry Pitchford's five statements to police
(2004); and Terry Pitchford v. State of Mississippi, Competency Hearing ( 2013).

**D. Understanding the Nature and Impact of Neglect and Trauma**

1. The majority of childhood abuse occurs within the broader context of neglect. Neglect
   happens when parents or caretakers can't or won't meet a child's needs. Sometimes this
   is because they don't have the skills or support needed, and sometimes it's due to other
   problems such as mental health issues, drug and alcohol problems, cognitive
   impairment, poverty, housing instability and exposure to family, community /societal
   violence. Neglect can also occur on a societal and institutional level.

2. Neglect, in of itself, can have serious and long-lasting effects: children who don't get
   the love, care and respect they need may find it hard to maintain healthy relationships
   and seek out harmful relationships; they are more likely to experience health and
   mental health problems including depression and complex post-traumatic stress
   disorder; they develop poor coping mechanisms and problem solving skills; they are at
   greater risk of not abiding laws, and of relying on drugs and alcohol for either self-
   soothing or stimulation.

3. The first years of a child's life have a significant impact on how their brain develops.
   That is another reason why neglect can be so damaging. The development of emotional
   and verbal pathways can be shunted due to lack of healthy stimulation and opportunity
   for information processing. Because lack of safety and protection is the very root of
   neglect, neglected children are at greater risk of other forms of maltreatment. Left on
   their own they become easy prey for sexual predators, are at the mercy of bullies and are
   easily coerced or manipulated into antisocial activities. This backdrop of neglect
   contributes to lasting vulnerability to stress. And this vulnerability and the inherent nature
   of neglect create conditions in which the child is routinely having experiences that are
   emotionally and cognitively overwhelming. Without attentive caretakers, neglected
   children are left to their own devices to soothe themselves and make meaning of their
   environment and their place in it. This often leads to an under-evaluation of their personal

3

authority in the world. Life happens to them. They often find themselves in situations in which they do not understand their role and rely upon poorly developed problem-solving skills that don't anticipate consequences. They tend to take the brunt of other's ire and are left "holding the bag" when others have more quickly assessed a situation and sought safety or viable solutions.

4. They are the last child laughing in a classroom that has been instructed to be quiet. They may not follow complex instructions because they haven't registered that they are being spoken to. Their attempts to solicit help from others are often unheeded or not recognized. Their inner world – how they construct meaning, how they interpret and manage emotions – tends to remain child-like and developmentally immature. Their needs rendered invisible. These children are often exposed to illicit, illegal or violent behaviors by their caretakers.

5. Neglected children are invisible only when it comes to their needs, however. Neglected children are, more often than not, also children who are targeted for abuse. Because they are rendered as "less than," any actions that bring them into sight can be felt as irritations by others. They take the brunt of verbal and physical abuse in their homes, are bullied at school, and do not receive needed attention in schools. They either "fall through the cracks" or are identified as "the cracks" in institutions and in society.

**E. The Inter-relationship between Neglect, Physical, Emotional, Sexual Abuse and Exposure to Violence: Complex Trauma**

1. There are five well established subtypes of child maltreatment: physical abuse, emotional abuse, neglect, sexual abuse and witnessing /exposure to family/community violence.

2. As indicated previously in this report, neglect is often the backdrop for the other four. We know that for some adults, the effects of child abuse and neglect are chronic and debilitating while for others the outcomes are less severe despite their histories (Miller-Perrin & Perrin, 2007). Critical factors that may influence the way child abuse and neglect affects adults include 1) the frequency and duration 2) if more than one type of maltreatment has occurred 3) the response of caring others.

3. In attempting to explain some of the adverse outcomes associated with chronic and multi-type maltreatment a concept that is often employed is complex trauma. Complex trauma reflects the multiple and interacting symptoms, disorders and multiple adverse

4

experiences and the broad range of cognitive, affective and behavioral outcomes associated with prolonged trauma, particularly if occurring early in life and involving an interpersonal element (van der Kolk, 2005).

4. When trauma is unresolved and neglect is not rectified, the damage can endure and spiral over the course of a life. (Lebowitz, 2005). Over time, the link between trauma, neglect and the damage these experiences cause may become obscured both to the afflicted individual and to observers. The result is a confusing dysregulation of how the individual manages and interprets his emotions, which are often expressed in impulsivity and depression. World views develop which are idiosyncratic and sometimes illogical. Brain circuitry and the physiological systems that control responses to threat become hard wired to perceived danger rendering the individual subject to impulsivity, distortions in perception, gaps in planning and variability in the encoding of memory.

**F. The Impact of Complex Trauma on Thinking, Perceptions, Self-Organization and Relationship to Others**

1. There is a large body of research suggesting that trauma exposure early in life markedly increases the risk for major depression, bipolar disorder, schizophrenia, and post traumatic stress disorder (PTSD), all syndromes characterized by cognitive dysfunction including deficits in executive functioning, attention and concentration, memory and processing speed, poor reasoning performance, and dissociative symptoms. Although children are resilient to adverse experiences, the more ongoing and chronic the trauma, especially when it involves abuse within the caretaker relationship as it does in Mr. Pitchford's case, the more likely the consequences of trauma will endure and create impairments that are carried into adulthood. This is especially true when traumatized children lack access to safety and support.

2. Very early on, Mr. Pitchford reported hearing voices in his head that would tell him to do destructive things to himself and others. And several witnesses have reported hearing Mr. Pitchford responding to these voices. Critical "inner voices" which berate and chastise which are not formally considered auditory hallucinations are a hallmark of exposure to emotional maltreatment and are often mistakenly identified as hallucinations. The idea that stressful and traumatic life events may be relevant to the content of hallucinatory

experiences is not a new one. Freud (1936) argued that the phenomenon of hallucinations was a product of forgotten or repressed traumatic memories entering the conscious mind.

3. Recently, there has been increased awareness of the prevalence of traumatic life events within individuals diagnosed with schizophrenia (see Grubaugh et al., 2011, for a review). It has been estimated that 15% of this group will also be suffering from posttraumatic stress disorder (PTSD; Achim et al., 2011). However, there is debate as to whether these diagnoses are distinct conditions or whether the same phenomena may fulfill the diagnostic criteria for both disorders. For example, hearing voices/seeing visions may be both a hallucination, in terms of the diagnostic criteria for schizophrenia, and categorized as the re-experiencing of a traumatic event with respect to PTSD.

4. Human beings are innately social beings. From the moment of birth, one's identity and ability to make sense of the world is continuously shaped by social interactions. The most significant of these interactions occurs in early childhood when attachment to others—particularly caregivers—first forms. Attachment is the emotional bond that forms between a child and a caretaking other. Secure attachments create a solid foundation for understanding yourself and others and foster healthy self-agency necessary for positive interactions with others. Secure early attachments can also strengthen personal resilience. They serve as a kind of psychological template that guides both current and future experiences, informing your emotions, beliefs, expectations, and ability to form subsequent healthy attachments throughout life.

5. In early childhood, secure attachment develops within loving, nurturing, and stable relationships in which emotional and practical needs are met, offering a kind of oasis in times of distress. However, when early childhood experiences are marked by abuse, the ability to form such attachments is disrupted, resulting in attachment injury. This is particularly true if your caregivers—especially your parents—are the perpetrators of abuse. For children with histories of neglect and abuse, like that to which Mr. Pitchford was exposed, such attachment injuries often result in relationships characterized by "traumatic bonding" or the reenactment within relationships of the early abusive dynamics. These children come to expect bullying in school and by peers and irrational and/or demeaning treatment by adults. Thus their basic posture in life is one of expectation and acceptance of maltreatment.

6

**G. Terry Pitchford**

1. Terry Pitchford experienced multiple and various traumas during his developmental years. Evidence of these multiple traumatic events call for a careful assessment of the nature of the harm and how it may have affected Mr. Pitchford's life trajectory.

2. Dr. Richard Dudley's 9/14/2011 psychiatric evaluation and 11/14/11 supplement delved richly into Terry's experiential world and highlighted multiple traumatic events. Dr. Dudley's line of inquiry invited elaboration, explored contradictions and set the stage for Mr. Pitchford to provide more detail and to express curiosity about the events in his life and his role in them. Dr. Dudley's psychiatric evaluation provides a foundation for understanding Mr. Pitchford's trauma history. However, it is only a first step. As a psychiatrist, Dr. Dudley's evaluation sought to determine whether Mr. Pitchford suffered from any psychiatric disorders. It did not fully explore his trauma history and the likely neurobiological and behavioral effects from exposure to chronic and severe childhood trauma. The kind of damage caused by chronic childhood trauma is generally different from the kind of damage assessed through psychiatric evaluations and neurological testing.

3. The broad canvas of Terry Pitchford's early childhood and adolescence is one saturated with neglect and punctuated by verbal and physical abuse. By all accounts he was extremely close to his primary caretaker father. However, the remembrances appear to have an idealized quality and the positive aspect of the relationship may have had as much to do with its comparison to the explicitly abusive relationship he had with his mother, especially after his father's death. Safety is often relative. As Mr. Pitchford was given the opportunity to reflect back on this relationship during his interviews with Dr. Dudley it became more clear to him that his father exposed him to illicit activities and that he was exposed to more violence between his parents than he had previously recognized. Mr. Pitchford's father was a serial sexual predator, molesting his young stepdaughter and others who came into the home.

4. All who knew Mr. Pitchford as a child, recalled that his mother, who financially supported the family, was often overwhelmed and emotionally dysregulated. Shirley Jackson did not want any more children when she became pregnant with her twins Terry and Perry. For the first ten years of their life, Ms. Jackson generally did not participate in

7

their upbringing and was largely absent from their rearing. Instead, Terry's father spent his time with the twins, picking them up from school and taking them with him wherever he would go. When Mr. Pitchford's father died, leaving him without his primary caregiver as he just turned 11, his mother was unable or unwilling to provide the care and support that her young son required after the loss of his father.

5. Ms. Jackson left Mr. Pitchford largely unattended, and in response to his efforts to seek her attention, she would beat him or send him off on his own and out of the way. Terry was regarded as an irritation, always in the way, talking too much, and always doing the wrong thing; unlike his twin brother, who was quiet and stayed to himself. Family members have described Terry as always trying to get his mother's attention by acting out. When his mother got angry at him, which happened often, Terry would respond physically, either by hitting his hands against his head, punching the wall with his fists or hitting his head against the wall, breaking furniture or running outside into the woods and tearing branches off trees.

6. At one point when Mr. Pitchford and his brother were 12 or 13, their mother put them on a bus to California by themselves to visit relatives because she needed a break from them. When young Mr. Pitchford started exhibiting mental health issues—hearing voices that told him to do dangerous or violent things to himself or others, hitting himself in the head to make the voices stop, talking to himself in response to the voices, losing focus and acting out in elementary school—his mother told him that the devil had entered him and the only answer was to pray the devil out. She refused to take Mr. Pitchford to the doctor for the headaches he reported having because she believed the devil was in him. She did however take her son Perry to the doctor for his headaches because she believed he was actually in pain.

7. Ms. Jackson repeatedly told Mr. Pitchford that he wouldn't amount to anything, that he "ain't shit" and would end up in jail. Although Mr. Pitchford's mother reportedly physically abused all of her children, Mr. Pitchford was a particular target/victim of psychologically and physically abusive behavior by his mother. He reported experiencing her as both demeaning of him and rejecting of him.

8. Almost immediately after Mr. Pitchford's father died, his mother remarried an abusive alcoholic truck driver, Louis Jackson, introducing further violence and instability into Mr.

8

Pitchford's life. When Mr. Jackson came home each weekend from his long drives, the house descended into chaos. The police were called regularly in response to reports of violent fights in the home. Mr. Pitchford not only witnessed this regular violence against his mother; he was also the target of Mr. Jackson's verbal and physical rage. As a boy, Mr. Pitchford was often the one to step between his mother and Mr. Jackson. On one occasion, Mr. Jackson held a gun at Ms. Jackson and Mr. Pitchford intervened. Mr. Jackson then turned his violence onto Terry. Mr. Jackson would arrive home in the early hours of the morning, waking up Ms. Jackson and demanding that she fix him something to eat. He woke the kids in the process, turning on all the lights and cursing and yelling. While Terry tried to protect his mother, she responded by continuing to let Mr. Jackson back into the home and took out her frustration on Terry.

9. School is often a haven for neglected and abused children, but this was not so for Mr. Pitchford. He reports difficulty concentrating, following multi-stepped instructions and being distractible. His teachers report that Terry needed redirection and struggled to stay on task; some of them noticed that he appeared to act out to be noticed. It is also very early on that he first reports "hearing voices" that demean him and tell him to act impulsively and violently. The effort spent trying to mediate such voices can be considerable and certainly distract one from classroom tasks. During her testimony at his competency hearing in 2015, Mr. Pitchford's mother reported that she chose to minimize or berate him for these difficulties.

10. Mr. Pitchford's mother remembers being called to the principal's office regularly after Mr. Pitchford's father died; she didn't always go to the school when called and sometimes enlisted her older daughter Veronica to pick Terry up. But when she did get him from school, she would "whup" him as soon as she got there. She feared Terry would start talking about what was happening in the home. Mr. Pitchford's teachers do not recall ever meeting with Ms. Jackson to discuss her son's experience in school, and the principal remembers that Ms. Jackson seemed disinterested in dealing with the trouble her son was getting into.

11. Rejected and demeaned at home, Terry sought acceptance and belonging elsewhere. He was the class clown, wanting to please people and make them laugh to distract from his inability to concentrate in school. He began hanging with a peer group in a neighboring

9

community where his girlfriend lived, and he sought to impress and please this peer group who ultimately took advantage of him. Terry was vulnerable to being taken advantage of by adults and even other children. The peer group he gravitated toward in the Tie Plant neighborhood, where his girlfriend Dominique lived, steadily took advantage of him as he increasingly spent time there. Allowing other boys to take his car is a telling example of this. Even when one of his peers totaled his car, he did not pull away from the relationships and the indications are that he continued to seek their approval by capitulating to their wishes and acquiescing to manipulation.

12. Terry's relationship with his steady girlfriend Dominique is illustrative of a neglected and traumatized child in need of human connection. It is apparent that they both loved each other very much; they had a sincere and endearing relationship. Terry relied heavily on his relationship with Dominique. When she broke up with him at one point, he was in such despair that he tried to kill himself by overdosing on pills and was taken to the hospital.

13. In light of what we know about Mr. Pitchford's exposure to neglect, physical and emotional abuse as well as his witnessing family violence we can begin to better understand Mr. Pitchford. Mr. Pitchford appeared to have been routinely exposed to all five subtypes of maltreatment identified above in Section E. He was neglected by his mother; physically abused by his mother, father, and stepfather; emotionally abused by his mother and other family members, who referred to him as the bad twin; he witnessed family violence and alcohol abuse; and until he was 10 years old, he was under the care of his sexually abusive father. The likely consequence of this trauma was debilitating for Mr. Pitchford given the numerous types of inter-related trauma he suffered; the frequency and duration of the trauma he was exposed to during the critical developmental years; and the apparent lack of reparative opportunities that would have enabled Mr. Pitchford to heal and lead a successful life.

14. Growing up in a house with exposure to physical, emotional, and sexual abuse prevents a child from understanding and developing appropriate boundaries. Terry's father was a sexual predator; his mother responded to him with physical abuse or absence and repeatedly told him he would amount to nothing; he witnessed his mother in one dysfunctional and mutually abusive relationship after another. For Terry, who was

10

disadvantaged by neurodevelopmental cognitive impairments, the result was an inability to sublimate—in other words, to divert energy associated with a negative impulse into an acceptable activity. When he was overwhelmed and frustrated, Terry lacked the language capacity—the ability to use words—to organize himself and get a positive response from others. He was forced to act out physically to express himself. Unfortunately, this resulted in the most consistent parental attention he received, which was not only negative but also perpetuated the devastating cycle of degradation and abuse.

15. Terry's twin brother Perry, on the other hand, appeared to have an internal resiliency that Terry lacked. These fraternal twins appear to have been born with different capacities to navigate and survive in their environment. Perry's response to the trauma in his household was to stay out of the way. Because of Perry's disposition, even as a baby, and because of her own limited capacity as a caregiver, Ms. Jackson favored Perry. He did not require her attention.

16. Terry never got the treatment he so badly needed. The declarations from his teachers are striking. Despite the fact that he struggled in school, both academically and behaviorally, his teachers uniformly report that his mother never met with them to discuss her son. Ms. Jackson did not believe in taking her son to the doctor for physical ailments; and she never sought any mental health treatment for Terry, despite all the signs and symptoms he displayed.

17. Unresolved trauma like Mr. Pitchford experienced likely altered the way he thinks and feels as well as his brain functioning and physiology. It put him at greater risk for and more vulnerable to medical, behavioral, and psychological problems. We can also infer that he suffers from considerable anxiety. Like many severely traumatized children he is unable to offer explanations for his actions. His cognitive testing identifies that he is of average intelligence yet he has little understanding of interpersonal relationships nor how to function successfully in society. His capacity to generalize and abstract appear to be severely underdeveloped. Avoidant behavior as a cognitive strategy is a natural outgrowth of unfocused and constricted cognition. This strategy coupled with chronic exposure to unremitting verbal and physical abuse (especially by caretakers upon whom the child is dependent) can lead to a more malignant form of avoidance: active

11

avoidance of processing feeling states related to the traumas. No child can effectively process that his parents do not love him or thinks he is worthless. In these cases, the child strives for a state of "not knowing." He is literally unable to approach these feelings nor able to understand the impact of the betrayal. Because he is unable to articulate his distress and its origins, he can't effectively seek help from others nor develop more adaptive ways of coping. Terry demonstrates this dilemma in his outburst, which resemble self-implosions more than other directed explosions. Terry finds solace in marijuana use. This is a recourse frequently relied upon by trauma survivors. For Terry, it served as buffers from this trauma-related anxiety, the distress of his inner voices and nightmares, irritability and discomfort with others.

18. Further demonstration of the deleterious effect of Terry's delayed cognitive processing and its interaction with the pervasive effects of trauma may be seen in his response to being chastised or yelled at by his teachers. The more stressful the situation, the more disorganized Terry became. This escalation decreased his capacity for responding with language. He had difficulty using words to address such stress. These difficulties were also very evident in the incident with the other children bullying him after school, culminating in Terry acting out against inanimate objects—bus taillights. He was unable to verbalize his feelings or engage those responsible for the circumstances. He lashed out against physical property in an expression of his emotional state. This may have been to scare off the boys or it may have been an instance of self- implosion referred to above, which is all too common for children with Mr. Pitchford's combination of adverse childhood experiences and cognitive deficits. In either case, there was an incoherence to his outburst emanating from these experiences and deficits.

19. Psychological self-preservation for children exposed to chronic maltreatment and neglect by parental figures also involves a high level of accommodation on the child's part. Abuse and neglect are the norm around which children learn what is acceptable and what is not. Children, like Terry, often learn to tolerate high levels of neglect and abuse without protest in order to preserve their relationships. This accommodation can generalize to other affiliative groups such as friendship circles. Bending to peer pressure is all too common for children with these histories. However, the capacity for accommodation has limits which, when breached, can result in spontaneous,

12

disorganized reactivity. This reactivity often has a bi-phasic expression that manifests as spontaneous acts of survival best known as "fight, flight or freeze," rather than conscious choices.

20. During Terry's interrogation by law enforcement after his arrest, it was clear that he was under duress. Prolonged and excessive use of handcuffs injured his wrists. While cuffed, investigators pressured and badgered him to the extreme. Predictably as noted previously, this physical and emotional distress may have not only have caused confusion and highly elevated the disorganization of his thinking but also been reminiscent of the pernicious badgering and verbal denigration he experienced at home thus replicating the same pattern of dilemma and accommodation.

## H. Rationale for a Trauma-Focused Expert Assessment

1. In my review of the foregoing records and discussion with federal counsel, I found significant evidence of multiple forms of chronic and ongoing traumatic events including but not limited to: profound neglect, targeted physical abuse and emotional abuse, exposure to violence in the home (including sexual) and alcohol abuse by a caretaker. The unremitting exposure to this complex interaction of maltreatment and lack of protective factors is of such a caliber that it is highly unlikely that any child living within this environment could develop unscathed. However, the only way to understand the particular nature of this harm and how it may have affected the trajectory of Mr. Pitchford's life is to do a thoughtful assessment of traumatic impact.

2. Such an assessment would entail an extensive review of any documentation available pertaining to his parent's and extended family's history and exposure to trauma as well as their and his educational, medical and mental health records. It may also be useful to speak with those who knew Mr. Pitchford and his family and can speak to both his exposure to maltreatment and his responses to them. A review of records would encompass an estimated 8-16 hours.

3. In addition to a thorough review of the records, an in-depth, face-to face interview with Mr. Pitchford is necessary to evaluate his exposure to traumatic life experiences and allows for a better understanding of how he makes meaning of those experiences. An interview with Mr. Pitchford, using open-ended, discursive questions, is crucial to

13

understanding how he thinks, his cognitive strategies or lack thereof, his sense of agency, and the way in which he processes memories. Ideally this interview would take place over the course of two days but may require several days with shorter meetings to allow for trust to develop and for him to find language for experiences that have not been previously processed. These interviews are often non-linear initially. The focus is on establishing a rapport that supports associations and sharing of difficult to acknowledge experiences and, perhaps overwhelming emotions. These interviews would encompass an estimated 12-20 hours. Any report writing that follows would require another 16-32 hours.

I offer the above opinions with a reasonable degree of psychological certainty based on my knowledge of Mr. Pitchford's history as provided to me and with reference to the available knowledge in the field and the study of the impact of psychological trauma. This is subject to modification should additional material become available.

_Barbara Hamm, Psy.D. _____

Barbara Hamm, Psy.D.

September 16, 2018

14

**DECLARATION OF BHUSHAN S. AGHARKAR, MD, DFAPA**

I, Bhushan S. Agharkar, declare and state as follows:

1.     I have been asked to consult counsel for petitioner in the federal habeas litigation of Mr. Terry Pitchford, a 32 year-old African-American man serving a death sentence imposed in Mississippi since 2006.

2.     I am a psychiatrist in private practice with Comprehensive Psychiatric Services of Atlanta and have been licensed to practice medicine in Georgia since 2002. I am an Assistant Professor of Psychiatry at Morehouse School of Medicine and a Clinical Assistant Professor with the Emory University School of Medicine. I earned my Doctor of Medicine degree from the State University of New York Health Science Center at Syracuse, completed my residency at Emory University School of Medicine Department of Psychiatry and Behavioral Sciences where I was Chief Resident and held a Forensic Psychiatry Fellowship.  I hold dual board certification as a Diplomate of Adult Psychiatry (AP) and Forensic Psychiatry (FP) of the American Board of Psychiatry and Neurology (ABPN). I am also a Distinguished Fellow of the American Psychiatric Association (DFAPA). (Attached hereto is a current copy of the Curriculum Vitae of Dr. Agharkar.)

3.     I have been engaged to offer a review of the propriety of the initial psychiatric examination of Mr. Pitchford conducted by the Mississippi State Hospital ("MSH") in Whitfield, Mississippi on January 11, 2006, shortly before his trial.

4.     Counsel for Mr. Pitchford provided me with the transcript made from the audio tape recording of the January 11, 2006 interview.  (Attached hereto.)

5.     I understand the purpose of psychiatric testing at MSH was to help the trial court determine whether Mr. Pitchford may have been insane at the time of the offense, pursuant to the *M'Naghten* test, whether he was Intellectually Disabled and therefore ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and whether he was competent to stand trial or waive trial rights pursuant to *Drope v. Missouri*, 420 U.S. 162 (1975) or his right to remain silent under custodial interrogation pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

6.      Counsel for Mr. Pitchford has described the fundamental legal standards for competency and I have long been informed by these in offering my assessment and opinion in this declaration. Independently, I am conversant in the implicated legal framework for competency—including appropriate assessment practices and methods—and have published on this subject.[1]

7.      *Dusky v. United States*, 362 U.S. 402, 403 (1960), has provided the fundamental guidance: the two-fold question is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

8.      The following opinion and observations are based on review of the transcript of the January 11, 2006 preliminary interview of Mr. Pitchford conducted by three doctors[2] at MSH in the presence of an investigator from Mr. Pitchford's counsel's office and three others whose roles were never identified: Ted Ewing, Officer Dunbar, and Joe Witzel. Tr. at 1-2.

**EXECUTIVE SUMMARY AND CONCLUSIONS**

9.      The preliminary interview conducted on January 11, 2006, is unreliable as a screening for competence. It is marked by improper practices and a bias suggesting an *a priori* intent to find Mr. Pitchford competent.

***Conducting a Simultaneous Assessment with Three Doctors is Not Proper***

10.     Near the beginning of the transcript, Dr. Lott introduced himself as "a psychologist here doing consulting work;" Dr. McMichael introduced himself as "the psychiatrist who will

---

[1] For example: Lloyd Warford & Bushan S. Agharkar, *Delusions and False Memories: Roadblocks to Competency to Stand Trial*, 82 UMKC Law Rev. 396 (2014).

[2] Mr. Pitchford's federal habeas counsel has informed me that the three doctors were R. McMichael, M.D.; Chris Lott, Ph.D.; and Gilbert S. Macvaugh III, Psy.D., though the transcript identifies them as Drs. Lott, McMichael, and McMarr. The transcript identifies the investigator Sheila O'Flaherty, as Ms. O'Clarity, a paralegal.

2

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

be doing the report this morning;" and Dr. Macvaugh introduced himself as "a psychologist." Tr. at 1-2.

11.   Dr. Lott clearly took the lead, asking nearly all of the questions with one or both of the other doctors only chiming in on occasion, identified in the transcript, from time to time, as an "unidentified male speaker." See transcript generally; e.g., Tr. at 125.

12.   The only time it is valid for multiple psychiatric professionals to be present at an evaluation is the context of a trainee with a supervisor present. In such cases, the trainee is the evaluator, but the supervisor appropriately observes and signs off confirming the process.

13.   Here, three doctors present and simultaneously conducting the evaluation is not appropriate because it defeats the purpose of three independent opinions. In this situation, as reflected in this transcript, there is overarching deference to the lead evaluator.

14.   As a result, this practice does not validly constitute three separate evaluations. Only one of the three could usefully testify as to the conclusions or opinions. Based on the transcripts reflection of the absence of independent questioning, the other two evaluators merely serve here to bolster the single actual opinion.

15.   Instead each of the three doctors should conduct an independent evaluation and then testify to defend his own opinion.

16.   This grave problem in the evaluators' approach is extremely exacerbated by the remarkable deficiencies in the manner by which Dr. Lott conducted his examination of Mr. Pitchford.

### *The Evaluators' Bias is Evident*

17.   My initial impression when reading the transcript was that it seemed like an interview by prosecuting attorneys. I double checked that this was indeed meant to be an independent psychiatric evaluation.

18.   By contrast, a scientific approach requires examination of the subject with an open mind, committed to exploring relevant symptoms as they are presented in the evaluation, not to

3

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

influence, through leading follow-up questions, answers that would support an ultimate opinion of normality.

19. Mr. Pitchford presented very concerning symptoms in this examination. Rather than exploring these areas, the MSH doctors repeatedly attempted to normalize the symptoms, steering Mr. Pitchford away from his expressed answers and toward competent responses to the questions.

20. This effort is most evident in the discussion of the voices Mr. Pitchford has heard in his head since he was a small child. Tr. 98 et seq. When Mr. Pitchford first answered that he hears voices in his head that other people don't hear, Dr. Lott insisted to him, before learning how long this had been going on, whether other people knew about it, and what measures he'd taken to attempt to control the voices, "We've all experienced that." Tr. at 98. After Mr. Pitchford clarified that he hears them as he hears real voices and that they sometimes seem to be two different people telling him what to do, Dr. Lott suggested that he was only observing his own conscience. *Id*.

21. Mr. Pitchford again clarified that he hears voices and they sometimes tell him to do different things, such as slap someone, and that he has struggled to control the voices and his reaction to them. Dr. Lott then moved away from discussion of the voices, on to a series of questions exploring other possible delusional thinking. Tr. 99-101.

22. Despite Mr. Pitchford's admission that he was using an enormous quantity of marijuana at the time of his arrest, Tr. at 83-84, none of the doctors made any effort to see whether he was doing so in an attempt to find relief from the voices.

23. Mr. Pitchford said he hears the voices virtually all of the time, and was hearing them during the interview. He described his efforts to control the voices, things he could do to make them go away. Tr. at 104. He said the voices are male. Tr. at 104. Dr. Lott again attempted to normalize these very serious symptoms:

> But we all have ideas. For instance, we can all be here talking to you right now and we can think well, you know, what have I got to carry home for supper tonight. You know, we can all go that way and we have tangents and our mind works like that."

4

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

Tr. at 105. But the task of such an examination is to assess the subject, not to persuade him to change what he is saying about what he experiences. Nonetheless, this is the nature of the exchange that ensued. Mr. Pitchford volunteered that he hears the voices even "if I'm in a locked room by myself with and ain't nobody else talking or nothing like that. Nobody talking to me or anything else. I hear them." Tr. at 105. Dr. Lott again tried to normalize the experience, "But our minds all w[a]nder." Tr. at 106.

24.     Dr. Lott also sought to convince Mr. Pitchford that the voices were:

> just self-talk. You know, I wish that guy would shut up. He's gone on for three days talking and talking and I can't stand to hear him. He talks all the time. That's self-talk, okay. Because it's my thoughts, it's my thinking, it's my tangents. I'm wandering here, here and yonder. Am I going to get to go fishing next month. What have I got to do -- you know, did I pay the bills last week.

Tr. at 107. Mr. Pitchford acknowledged that he has that experience "too," but made clear that he's talking about something else. *Id*.

25.     When Mr. Pitchford related that, as a child, he jumped out of a moving vehicle at the urging of the voices, Dr. Lott suggested that he is misremembering what happened: "Do you remember—actually remember a voice back then telling you to do that? Is that just something now you think might have been a voice." Tr. at 110-11.

26.     A professional assessment should explore whether or not these are hallucinations or intrusive self-talk, and whether they are symptomatic of an impairment, and if so the examiner must then explore the nature of the disorder. In a psychiatric evaluation, explaining to the subject that what he is reporting in response to the examiners questions are not hallucinations is plainly improper. For that matter, even if the evaluator decides the subject has not been encountering auditory hallucinations, but only self-talk, given the struggles with controlling the voices Mr. Pitchford described, it is distressing that the examiner dismissed these intrusive voices he has struggled to control as being "normal" self-talk of the type everyone experiences.

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

### *The Cursory Cognitive Screening was Insufficient and Responses were Coached*

27.    Dr. Lott conducted an extremely truncated cognitive screening that seemed to include parts of the Mini-Mental Status Screening. In addition to a three-word test for immediate and delayed recall, he asked just a few questions testing the ability to understand abstract concepts. Tr. 124-25, 128. This cursory screening was inadequate to conclude anything about Mr. Pitchford's neuropsychiatric condition and, if anything, would provide unreliable and perhaps misleading results.

28.    Furthermore, responses to some of these questions were coached and not indicative of Mr. Pitchford's ability to understand abstract concepts. For example:

> Q. I'm going to give you a series of words and I want you to tell me how they are alike. If I say this apple and this orange, how are they alike?
> A. Both of them grow on trees.
> Q. Okay. An apple and an orange are both blank. Fill in the blank.
> A. Fruit.
> Q. A table and a chair?
> A. You can sit down on.
> BY DR. LOTT: Q. They're both what?
> BY UNIDENTIFIED MALE SPEAKER: Q. Yeah, a table and a chair are both what?
> A. Wood.
> Q. Wood. Sure. All right. A table and a chair, what section of a store would you go to?
> A. Furniture.
> Q. Okay. That's what I was looking for.

Tr. at 124-25. Mr. Pitchford's initial responses indicate difficulty understanding abstract concepts. The coaching and further prompting got him to the answer the evaluators were after, but it would be improper to base assessment of his ability to understand abstract concepts on the final, orchestrated answer.

### *Evaluators Improperly Carried on Off-Tape Conservations*

29.    Professional practice requires refraining from communication with the interview subject during pauses in the given evaluation. Conversation when flipping over or changing a tape in the audio recorder is plainly not compliant with the standard of care and undermines the reliability of the evaluators' findings. While digital audio recording, by

6

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

the date of the MHS evaluation in 2006, was cheap and available. Standard practice is to say, "Hang on," and wait until the tape is rolling but that apparently did not occur here.

30.     References to off-tape conversation are signs of potential coaching.

31.     The transcript shows an obvious reference to conversation that was not recorded. When the assessment turned to the question of whether Mr. Pitchford could understand the charges against him and relevant criminal process, one of the doctors suggested taking a bathroom break first. Dr. Lott pointed out that the current side of the tape was about to run out, so he began this line of inquiry, and the break took place when the tape ran out. Tr. at 126. The inquiry barely began with nothing more than a question about the name of the charges and the potential maximum punishment. Id. When the recording resumed, it was obvious that there was unrecorded questioning about consulting with attorneys:

> DR. LOTT:  This is tape three side B.
> BY DR. LOTT: Q.   And we were just asking you about your attorneys.
> Before you start, ***if you can tell me again.***  Do you think you will be able
> to work with your attorneys?
> A.  Yes, sir.
> Q.  Okay.  Do you trust them?
> A.  Yes, sir.
> Q.  Okay.  Now, I think I stopped **-- *the last question was***:  What do you
> need to do in order to help your lawyer prepare for this case?
> A.  Give them information.
> Q.  What does anybody need to be able to tell their attorney?
> A.  Everything.
> Q.  What would happen if you didn't, or what might happen?
> A.  They wouldn't know exactly what to come with to fight it.

Tr. at 127 (emphasis added). Not only are there explicit references to unrecorded questioning, these references make clear that Dr. Lott is repeating questions that were asked or discussed off-tape. This gives at least the appearance of impropriety. It strongly suggests coached answers.

### *Teaching the Concept is Inappropriate Unless the Subject is First Unable to Answer*

32.     In assessing the ability to understand the criminal processes the subject is facing, it is inappropriate to teach the concept first. Such parroting back of answers is not indicative of the ability to understand the relevant concepts.

B. Agharkar, MD, DFAPA (September 15, 2018 Decl.)

33.    The evaluator should first ask the given question. If the subject responds that he does not know the answer, the evaluator may then teach the concept and quiz the subject on it about an hour or so later.

34.    Here, Dr. Lott essentially answered some of the question for Mr. Pitchford. For example,

> Q.   Now, in a capital murder trial, there are two parts. Do you know the two parts of the capital murder trial?
> A.   The guilty phase. And what the name of it, latigation?
> Q.   [M]itigation.
> A.   [M]itigation.
> Q.   Okay. That's close. That's good. There's the guilt phase. If you're found guilty, like you just said. And then there's the penalty phase. So there are two parts. Okay. If they find you guilty in a death penalty trial, then you go to a sentencing phase.

Tr. at 138. This improper coaching and getting an immediate parroting of the answer provided by the interviewer provides no insight into whether or not the person has the capacity to rationally and factually understand the charges against him.

I declare under penalty of perjury under the laws of the State of Georgia, the State of Mississippi, and the United States of America that the foregoing is true and correct.

Executed this 15th day of September, 2018, in Atlanta, Georgia.

BHUSHAN S. AGHARKAR, M.D.

8

**Exhibit 1:** Transcript from Audio Recording of MSH Interview January 11, 2006.

```
0001
 1
 2

    TAPE RECORDED EVALUATION OF TERRY PITCHFORD
 3
 4      DR. LOTT:  Good morning.  Mr. Pitchford, I
 5  am Dr. Lott.  Let me make sure this tape recorder
 6  is going.  And then I'm going to ask everybody to
 7  introduce themselves.
 8      UNIDENTIFIED MALE SPEAKER:  It's on.
 9      DR. LOTT:  It's on.  And you understand, you
10  know why you're here.  You have an attorney
11  sitting beside you this morning.  We're going to
12  go around the room first and just introduce
13  ourselves.  And I've been under the weather so
14  pardon my voice.  If you can't hear me, just ask
15  me to repeat myself.
16      TERRY PITCHFORD:  Yes, sir.
17      DR. LOTT:  I'm Dr. Lott.  I am a
18  psychologist here doing consulting work.
19      DR. McMICHAEL:  Good morning.  I'm Dr.
20  McMichael.  I'm the psychiatrist who will be
21  doing the report this morning.  So I will
22  oftentimes be looking down.  It would be helpful
23  if you would speak up just so I can be sure that
24  I can hear you.
25      TERRY PITCHFORD:  Yes, sir.
```

1

0002
```
 1        DR. McMICHAEL:  Thank you.
 2        DR. MCMARR:  Good morning.  I'm Dr. McMarr,
 3   a psychologist.
 4        MALE SPEAKER:  I'm Ted Ewing.  I'm with
 5   (inaudible).
 6        MALE SPEAKER:  And I am Officer Dunbar.
 7        MALE SPEAKER:  Joe Witzel, the (inaudible).
 8        DR. LOTT:  All right.  And, I think, you
 9   know Ms. O'Clarity.
10        UNIDENTIFIED MALE SPEAKER:  She asked about
11   the chair.  You are in a chair that is not
12   rolling around like this.  If that gets
13   uncomfortable or if you want a bigger chair, we
14   can do that.  We just don't want people to have
15   their chairs scoot out from underneath them and
16   fall down.
17        DR. LOTT:  All right.  Now, as you can see,
18   we have a tape recorder going here today and we
19   are making a tape of this interview.
20        TERRY PITCHFORD:  Yes, sir.
21        DR. LOTT:  Now, we want to explain to make
22   sure you understand a couple of things before we
23   get started.
24        TERRY PITCHFORD:  Yes, sir.
25        DR. LOTT:  Do you know why you're here this
```

2

0003

1    morning?

2        TERRY PITCHFORD:  I mean I know I'm at

3    Whitfield to see am I, you know, insane or

4    something like that.

5        DR. LOTT:  Okay.  That's part of it.  That's

6    part of the legal question.  The Court has asked

7    us to do approximately three things here.  It's

8    important that you understand what might happen

9    as a result of our evaluation.  You are here --

10   we're going to assess your mental state at the

11   time of an alleged offense, at the time of the

12   crime you're charged with.

13       We're also going to be asked to assess

14   whether or not you're able to work with your

15   lawyers, go to court.

16       We're also being asked to assess your

17   intellectual level, whether or not we think that

18   you are mentally retarded.

19       TERRY PITCHFORD:  Yes, sir.

20       DR. LOTT:  Now, there's a very important

21   reason why we're assessing mental retardation and

22   these other issues, but particularly mental

23   retardation.  What are you charged with?

24       TERRY PITCHFORD:  Capital murder.

25       DR. LOTT:  What could happen to you if

0004

1   you're convicted in court of capital murder?

2       TERRY PITCHFORD:  Death.

3       DR. LOTT:  Okay.  Now, our report, our

4   assessment of you, our intellectual evaluation

5   and our report specifically addresses whether or

6   not we think you are mentally retarded.  And it

7   will have a direct impact on whether or not you

8   possibly receive the death penalty.

9       TERRY PITCHFORD:  Yes, sir.

10      DR. LOTT:  If people are found mentally

11  retarded by mental health specialists, then they

12  are not eligible for the death penalty if the

13  Court agrees with that interpretation.

14      TERRY PITCHFORD:  Yes, sir.

15      DR. LOTT:  Okay.  So you understand?

16      TERRY PITCHFORD:  Yes, sir.

17      DR. LOTT:  This evaluation goes directly to

18  the possible sentence in your case; that is,

19  whether or not you receive the death penalty.

20      TERRY PITCHFORD:  Yes, sir.

21      DR. LOTT:  Now, throughout this evaluation,

22  at any point during this evaluation you have the

23  right not to say anything about your case if you

24  think it might hurt you in any way in court.

25      TERRY PITCHFORD:  Yes, sir.

4

0005

1       DR. LOTT:  Your lawyer is sitting beside
2   you.  If you feel the need to consult or she
3   wants to consult with you, that's absolutely
4   appropriate and we encourage it.
5       UNIDENTIFIED MALE SPEAKER:  Dr. Lott keeps
6   trying to make Ms. O'Clarity a lawyer.  It's
7   imperative we get that clear.  She is a paralegal
8   but she represents the Office of Capital Defense
9   and she's working on your defense team.  And they
10  can try to use the information from this
11  evaluation to help you in your legal situation.
12  But we are also reporting to the D.A. And the
13  D.A. can try to use it against you, including
14  trying to argue, if you have a trial and if you
15  get convicted, the D.A. can try to use the
16  information from this evaluation to argue that
17  you should get the death penalty.  So it could go
18  either way.
19      We're not working with your defense team.
20  Although we're here with Ms. O'Clarity, we are
21  not working with them.  We're not working with
22  the D.A.  The Court asked us to do this
23  evaluation.  So they can use it to argue that you
24  should be convicted and get the death penalty.
25  They could use it to argue that you shouldn't be

5

0006

1   convicted or they can argue you shouldn't get the
2   death penalty.
3          That's a lot of stuff.  Does that make sense
4   to you?
5          TERRY PITCHFORD:  Yes, sir.
6          DR. LOTT:  Dr. McLaurin used the word D.A.
7   Do you know what that stands for?
8          TERRY PITCHFORD:  District Attorney.
9          DR. LOTT:  Okay.  And if you would, speak up
10  just a little bit.  I can hear you but I want to
11  make sure this tape is able to hear you.
12         UNIDENTIFIED MALE SPEAKER:  And if there's
13  anything that is not clear to you or if you want
14  to talk with Ms. O'Clarity, you are welcome to do
15  that.  And she can maybe explain things to you
16  better than we can.  And I know you have a
17  relationship with her.
18         TERRY PITCHFORD:  Yes, sir.
19         DR. LOTT:  Now, any questions about your
20  rights this morning before we get going?  Just so
21  I make sure that you sort of understand here,
22  what rights did we just explain to you?  What
23  rights do you have regarding this evaluation this
24  morning?
25         TERRY PITCHFORD:  That if I don't want to

6

```
0007
 1        say nothing pertaining to my case or whatever, I
 2        don't have to.  I have the right to talk to my
 3        paralegal if I need some advice.
 4             DR. LOTT:  Okay.  Very good.  And just
 5        remember that now.  When in doubt, I encourage
 6        you to talk with Ms. O'Clarity.
 7             TERRY PITCHFORD:  Yes, sir.
 8             DR. LOTT:  Okay.
 9             TERRY PITCHFORD:  Yes, sir.
10   BY DR. LOTT:
11        Q.   Now, would you state your full name for us?
12        A.   Terry Pitchford.
13        Q.   Any middle name?
14        A.   No, sir.
15        Q.   Okay.  Spell your last name for me.
16        A.   P-i-t-c-h-f-o-r-d.
17        Q.   And how old are you?
18        A.   Twenty.
19        Q.   What's your date of birth?
20        A.   1985.  12/30/1985.
21        Q.   Okay.  As you see, they're writing, so we
22   will give them a chance to catch up.
23        A.   Yes, sir.
24        Q.   I tend to talk very quickly and it's
25   relative to their writing abilities.
```

7

0008

```
 1        A.   Yes, sir.
 2        Q.   Okay.  Can you tell us where we are again?
 3        A.   At Whitfield.
 4        Q.   What's today's date?
 5        A.   I don't know.
 6        Q.   What month is it?
 7        A.   January.
 8        Q.   Okay.  What year is it?
 9        A.   2006.
10        Q.   What day of the week is it?
11        A.   I think Wednesday.
12        Q.   Okay.  Do you think it's the first of the
13   month, middle of the month or the end of the month?
14        A.   Around the first of the month.  Today's the
15   first of the month.
16        Q.   Today's what?
17        A.   I think today's the 11th.
18        Q.   The 11th.  That's correct.  Very good.
19             Now, we're going to ask you some questions
20   about your background, where you grew up.  And then
21   we're going to ask you questions about court and then
22   some other questions little bit later this afternoon.
23             But if you would, tell us, where were you
24   born?
25        A.   Greenwood.  Greenwood, Mississippi.
```

8

0009
```
 1        Q.   Greenwood, Mississippi?
 2        A.   Yes, sir.
 3        Q.   What are your parents names?
 4        A.   Shirley -- well, she married now.  It's
 5   Shirley Jackson now.  My daddy's name was James
 6   Pitchford.  He's deceased.
 7        Q.   When did your father die?
 8        A.   Back in 1996 when I was 10 years old.
 9        Q.   How did he die?
10        A.   He had kidney cancer.
11        Q.   Kidney cancer.  Okay.  And your mother's
12   name again?  You said she's remarried?
13        A.   Yes, sir.
14        Q.   What's her --
15        A.   Shirley Jackson.
16        Q.   Shirley Jackson.  How old is your mom?
17        A.   My mom's about 50, 51.
18        Q.   Fifties.  How old was your father when he
19   died?
20        A.   Sixty-seven.
21        Q.   Sixty-seven when he died?
22        A.   Yes, sir.
23        Q.   Okay.  Where does your mom live?
24        A.   In Grenada.
25        Q.   In Grenada?
```

9

```
0010
  1        A.    Yes, sir.
  2        Q.    Do you have any brothers and sisters?
  3        A.    Yes, sir.
  4        Q.    How many brothers?
  5        A.    On my daddy's side, I've got about 14 or 15.
  6        Q.    Fourteen or fifteen brothers by your father?
  7        A.    Yes, sir.
  8        Q.    Do you know them?
  9        A.    Not all of them.
 10        Q.    How about who raised you?  Did your mom
 11   raise you?
 12        A.    Yes, sir.
 13        Q.    How many brothers do you have by your
 14   mother?
 15        A.    Two.
 16        Q.    What are their names and ages?
 17        A.    Perry.  Perry, he's 20 years old.
 18        Q.    What is Perry's last name?
 19        A.    Pitchford.
 20        Q.    Okay.
 21        A.    I've got a brother named DeShawn Burnett.
 22   He's like 28, 29.
 23        Q.    Burnett, B-u-r-n-e-t-t?
 24        A.    Yes, sir.
 25        Q.    Is that right?
```

10

```
0011
 1        A.   Yes, sir.
 2        Q.   And you said Perry is how old?
 3        A.   Twenty.
 4        Q.   And how old are you?
 5        A.   Twenty.  He's my twin brother.
 6        Q.   He's your twin?
 7        A.   Yes, sir.
 8             UNIDENTIFIED MALE SPEAKER:  Are y'all
 9        identical twins?
10             TERRY PITCHFORD:  No, sir.
11   BY DR. LOTT:
12        Q.   And where does your brother live?
13        A.   He's still in Grenada.
14        Q.   With your mother?
15        A.   Yes, sir.  DeShawn lives down here in
16   Jackson.
17        Q.   In Jackson?
18        A.   Yes, sir.
19        Q.   Is he married?
20        A.   No, sir.
21        Q.   Okay.  Now, your father's children, where
22   were they primarily living?
23        A.   Everywhere.
24        Q.   Everywhere.
25        A.   Most of them stay in California.
```

11

```
0012
 1        Q.   California.
 2        A.   Yes, sir.
 3        Q.   Okay.  Did you ever visit them?
 4        A.   Yes, sir.
 5        Q.   You did?
 6        A.   Some of them.
 7        Q.   Some of them.  Okay.  And about age range?
 8   You don't have to be exact.  I don't expect you to
 9   know all of that.
10        A.   I have a brother, he older than my mom.  I
11   got another brother, they like late 30s or 40s and
12   20s or something.
13        Q.   Okay.  Now, where were you raised?
14        A.   I was raised in Grenada.
15        Q.   You were born where?
16        A.   I was born in Greenwood.
17        Q.   Born in Greenwood.  When did you move to
18   Grenada?
19        A.   See, I was born in Greenwood but I stayed in
20   Tchula.  And we moved from Tchula when I was about 6
21   years old.
22             UNIDENTIFIED MALE SPEAKER:  Tchula?
23             TERRY PITCHFORD:  Tchula, Mississippi.
24   BY DR. LOTT:
25        Q.   So when you started school, did you start
```

12

0013

1    kindergarten in Tchula?

2          A.    No, I started kindergarten in Grenada.

3          Q.    In Grenada.  So you went to school all the

4    way through in Grenada?

5          A.    Yes, sir.

6          Q.    Okay.  So you moved to Grenada when you were

7    about 6?

8          A.    Yes, sir.

9          Q.    And was it with your mom and dad?

10         A.    Yes, sir.

11         Q.    And they lived together?

12         A.    Yes, sir.

13         Q.    Did they live together until your father's

14   death?

15         A.    Yes, sir.

16         Q.    Okay.  So you born in Greenwood, moved to

17   Grenada, lived in Grenada, went to school throughout

18   in Grenada?

19         A.    Yes, sir.

20         Q.    Did anyone ever --

21         A.    Actually, I went to school in Jackson, too.

22         Q.    Where?

23         A.    Forest Hill and Capital City.

24         Q.    Okay.  I'll get there in just a second.  All

25   right.  But you were raised in Grenada for the most

13

0014

1    part?

2          A.   Yes, sir.

3          Q.   By your mother and father?

4          A.   Yes, sir.

5          Q.   Did anyone else ever raise you?

6          A.   My mom got married to a man named Louis

7    Jackson.

8          Q.   Louis Jackson.

9          A.   Yes, sir.

10         Q.   How old were you when she married Louis

11   Jackson?

12         A.   About 11 or 12 years old.

13         Q.   Okay.  How old was Mr. Jackson?  How old is

14   he now?

15         A.   Fifty-three, fifty-four.

16         Q.   Do they still live together?

17         A.   Yes, sir.

18         Q.   And does he live their in Grenada with her?

19         A.   Yes, sir.

20         Q.   Okay.  What does he do for a living?

21         A.   Drive a 18-wheeler.

22         Q.   What does your mom do for a living?

23         A.   She works at Whirlpool in Oxford.

24         Q.   Is that a factory?

25         A.   Yes, sir.

14

0015
1          Q.    Do you know what your father did for a
2    living?
3          A.    (No audible answer.)
4          Q.    You don't remember what he did for a living?
5          A.    He really didn't do nothing when I was a
6    little kid but drive a truck.
7          Q.    Was he disabled by his kidney disease?
8          A.    Didn't nobody know he had kidney disease.
9    He was in the Army at one point.  And he was a police
10   officer, LAPD.  He was a -- and he drove a 18-wheeler.
11         Q.    Okay.  Growing up, looking back, did you
12   spend much time with him?
13         A.    Yes, sir, all the time.
14         Q.    Did you feel like growing up when you were a
15   child that your parents were there for you?  Did you
16   feel like they were available, emotionally available,
17   loving, caring, kind parents?
18         A.    My dad was.
19         Q.    Your mother?
20         A.    We really didn't -- we really didn't talk to
21   my mother until my daddy died.  We really didn't have
22   too much to do with my mother until my daddy died.
23         Q.    Why?
24         A.    Cause I was always with my daddy.
25         Q.    Did you go places with your father when he

15

0016

```
 1   would take trips?
 2        A.   Yes, sir.
 3        Q.   But now, you were in school, too, during
 4   this time?
 5        A.   Yes, sir.
 6        Q.   Okay.  I'll come back to that in a second.
 7   Were you ever married?
 8        A.   No, sir.
 9        Q.   Do you have any children?
10        A.   Yes, sir.
11        Q.   How many?
12        A.   One.
13        Q.   Boy or girl?
14        A.   Boy.
15        Q.   What's his name?
16        A.   Deretterrius.
17        Q.   Spell that.
18        A.   D-e-r-e-t-t-e-r-r-i-u-s.
19        Q.   His last name?
20        A.   Pitchford.
21        Q.   Okay.  And where does he live?
22        A.   Grenada.
23        Q.   With whom?
24        A.   His mother.
25        Q.   What's his mother's name?
```

16

0017

```
 1        A.    Dominique.
 2        Q.    Dominique?
 3        A.    Dominique Hogan.
 4        Q.    Hogan.
 5        A.    Yes, sir.
 6        Q.    H-o-g-a-n?
 7        A.    Yes, sir.
 8        Q.    What's her phone number?
 9        A.    688--0511.
10        Q.    688-0511?
11        A.    Yes, sir.
12        Q.    What's the prefix?
13        A.    662.
14        Q.    Okay.  What's your mother's address?
15        A.    7651 Phoenix Loop, 333, Coffeeville,
16   Mississippi.
17        Q.    In Coffeeville.  That's a Coffeeville
18   address?
19        A.    Yes, sir.
20        Q.    Okay.  What's her phone number?
21        A.    662-267-9336.
22        Q.    Okay.
23   BY UNIDENTIFIED MALE SPEAKER:
24        Q.    Where is your twin brother staying now?
25        A.    He stays with my mom.
```

17

0018
1    BY DR. LOTT:
2          Q.   Does he work?
3          A.   No, sir.
4          Q.   He doesn't work?
5          A.   No, sir.
6          Q.   Okay.  So mom lives in Grenada and has a
7    Coffeeville address?
8          A.   Yes, sir.
9          Q.   Okay.  Now, forgive me, did you say your mom
10   is working?
11         A.   Yes, sir.
12         Q.   She's at a factory in Oxford?
13         A.   Yes, sir.
14         Q.   Okay.  Let me ask you now a little bit about
15   your education history.  Where did you go to school?
16   Did you start kindergarten in Grenada?
17         A.   Yes, sir.
18         Q.   Okay.  Kindergarten through elementary
19   school, let's go kindergarten through the fifth grade,
20   where were you?
21         A.   Grenada.
22         Q.   Okay.  Did you start middle school in the
23   sixth or seventh grade?  Do you remember which grade
24   you went and it was called middle school?
25         A.   Sixth grade.

18

0019

```
 1        Q.    It was sixth grade.  Where did you start
 2   school in the sixth grade?
 3        A.    Grenada.
 4        Q.    Okay.  Seventh?
 5        A.    Grenada.
 6        Q.    Eighth?
 7        A.    It was part Grenada and part down here.
 8        Q.    Down here where?
 9        A.    Jackson.
10        Q.    At where?
11        A.    Capital City.
12        Q.    Alternative school?
13        A.    Yes, sir.
14        Q.    How did you get sent from Grenada to Capital
15   City?  Capital City is only for Hinds County.
16        A.    My sister stays down here.
17        Q.    Oh, okay.  Okay.  Now, let me back up.
18   Kindergarten, first and second grades, what kind of
19   grades did you make?
20        A.    I made F's all the way through school.
21        Q.    Really.  Why?
22        A.    I really don't know.  I mean I made F's and
23   D's.  I think I got a short attention span, I think.
24        Q.    Okay.  I was looking over some of your
25   standardized scores, though, and they looked fairly
```

19

0020
1   decent.  Some of them were very good.  Do you remember
2   teachers saying that you should've been doing better?
3   Or did they?  Did they ever say anything like that?
4        A.   No, sir.
5        Q.   No one ever said -- tell you you're not
6   doing as well as you ought to be doing?
7        A.   Yeah, they probably did a couple of times.
8        Q.   Did they ever put you in a special class?
9        A.   Not really.  My mama and them tried to one
10  time.
11       Q.   What grade?
12       A.   Like third or fourth grade.
13       Q.   Did you get evaluated?  Did you receive
14  psychological testing?
15       A.   They were just claiming they were just
16  threatening.
17       Q.   Oh, threatening?
18       A.   Yeah, just to try to get my grades up.
19       Q.   Did your grades improve?
20       A.   No, sir.
21       Q.   Okay.  Did you repeat a grade?
22       A.   Yes, sir.
23       Q.   Which grade?
24       A.   Second and fourth grade.
25       Q.   Second and the fourth?

20

0021
```
 1        A.   Yes, sir.
 2        Q.   Why did you repeat the second grade?
 3        A.   Because I was flunking.
 4        Q.   Were you trying?  Can you recall?  Can you
 5   remember that far back?
 6        A.   No, sir.
 7        Q.   Okay.  Did you miss a lot of school?
 8        A.   No, sir.
 9        Q.   Were you sick much during the first five
10   grades?
11        A.   No, sir.
12        Q.   Okay.  The fourth grade, why did you repeat
13   the fourth grade?
14        A.   Cause I was just flunking.
15        Q.   Were you trying?  Did you need help?  Did
16   you ask for help?
17        A.   Yes, sir.  I don't really -- I don't know
18   what I had really.
19        Q.   Okay.  But you didn't get any special
20   classes, no tutoring, no assistance at any point
21   during your schooling?
22        A.   No, sir.
23        Q.   Okay.
24   BY UNIDENTIFIED MALE SPEAKER:
25        Q.   Were you ever tested or not?  Did you ever
```

21

0022
1   have any psychological testing, that kind of stuff,
2   more than just the standard tests that everybody gives
3   at school now?
4       A.   Yeah, I did like achievement tests and stuff
5   like that.  I mean it was basically I just wasn't
6   studying and stuff like that.
7       Q.   Did they ever do individual testing with you
8   where it wasn't everybody in the class, just you?
9       A.   No, sir.
10  BY DR. LOTT:
11      Q.   Where you put blocks together, stuff like
12  that?
13      A.   No, sir.
14  BY UNIDENTIFIED MALE SPEAKER:
15      Q.   Have you ever have your vision or your
16  hearing tested?
17      A.   Yeah, they did that at school.  They do all
18  of that.
19      Q.   Did they ever tell you that you needed
20  glasses?
21      A.   No, sir.
22  BY DR. LOTT:
23      Q.   What grade were you first suspended in?
24  What grade did you start getting in trouble at school?
25      A.   Like second grade.

22

0023

1       Q.   Second grade?

2       A.   Yes, sir.

3       Q.   You got suspended in the second grade?

4       A.   No, sir.

5       Q.   Did you get out-of-school suspension?

6       A.   They didn't have it then.

7       Q.   Okay.

8       A.   I mean I just started going to the office.

9       Q.   Okay.  When did you start getting suspended

10  and sent home for two or three days or more?

11      A.   Like in fourth grade.

12      Q.   What happened?  Why were you getting into

13  trouble in the fourth grade?

14      A.   There wasn't nothing to do.

15      Q.   So what were you doing to get in trouble?

16  What kind of things did you do to get in trouble?

17  Some people get caught smoking in the bathroom.  What

18  were you doing?

19      A.   I was just trying to talk and the teacher

20  would tell me to keep quiet and something like that.

21      Q.   Did you ever threaten a teacher?

22      A.   No, I ain't never threatened no teacher.

23      Q.   Did your ever carry a weapon to school?

24      A.   I was about in the first grade I brought a

25  knife to school.

0024
```
 1       Q.   First grade you brought a knife to school?
 2       A.   Yes, sir.
 3       Q.   Were you mad at someone?
 4       A.   No, sir.
 5       Q.   Did you threaten anybody with the knife?
 6       A.   No, sir.
 7       Q.    It was just a pocket knife or was it a knife
 8    that you got out of the kitchen sink?
 9       A.   No, a pocket knife.
10       Q.   Okay.  And you didn't threaten anyone with
11    it?
12       A.   No, sir.
13       Q.   So let's move on through.  Middle school,
14    how many times were you suspended in sixth, seventh
15    and eighth grades?
16       A.   Like four or five times.
17       Q.   Four or five times over those three years or
18    four or five times every year?
19       A.   Like three a year.
20       Q.   What kind of trouble were you getting into
21    then?
22       A.   Basically the same things, talking when the
23    teacher tells me not to and stuff like that.
24       Q.   Did you ever curse a teacher?
25       A.    I never did in Grenada.  In Grenada the
```

24

0025
1   school, the school was kind of different.  It was like
2   they did corporal punishment.  But you got some
3   teachers that just mad at you, just do a lot of
4   things.
5        Q.   What's corporal punishment?
6        A.   They paddle you.
7        Q.   Where they paddle you?
8        A.   Yes, sir.
9        Q.   So you got paddled in school?
10       A.   Yes, sir.
11       Q.   Until what grade?
12       A.   All the way up to the eighth grade.
13       Q.   They paddled you in the eighth grade?
14       A.   Yes, sir.
15       Q.   Who would paddle you?
16       A.   The principal.
17       Q.   The principal paddled you.  Okay.  I didn't
18  know we were doing that.
19  BY UNIDENTIFIED MALE SPEAKER:
20       Q.   Did he have to get permission from your mom
21  or somebody to use corporal punishment?
22       A.   Yeah, I believe.  I don't know about
23  everybody else.  But I see every time I received a
24  paddling because people come to the school and they
25  would tell us well, you can come to the office and you

25

0026

```
 1   won't receive a paddling and you can go home for the
 2   rest of the day, three days, stuff like that.  But
 3   then it just got the -- I got a paddling.  Sometimes
 4   you would agree with it and get it over with or
 5   whatever.
 6        Q.   Did they ever get in trouble for giving kids
 7   paddlings?
 8        A.   No, sir, nobody really knowed know.
 9   BY DR. LOTT:
10        Q.   Did you have the option -- could you take
11   the licks or if you refused the licks, would you get
12   sent home?
13        A.   Yes, sir.
14        Q.   You had that option?
15        A.   Yes, sir.
16        Q.   You could get paddled or if you didn't
17   receive the licks you would get sent home?
18        A.   Yes, sir.
19        Q.   Okay.
20        A.   Nobody wanted to get sent home.  Because if
21   you get sent home, your mom is going to whip you then
22   when you get home.
23        Q.   Okay.  In the eighth grade -- was it eighth
24   or ninth grade that you went to Capital City?
25        A.   Eighth grade.
```

26

0027

1    Q.    What happened?  Why did you get sent from
2   Grenada to Jackson to the Capital City?
3    A.    I left school one day.  I was -- well, I
4   didn't leave school, school was out.  And about 15 --
5   15, maybe 20 boys tried to jump on me.
6    Q.    What happened?
7    A.    The head principal at school, I knew she
8   didn't like me.  She never did anything but paddle
9   (inaudible) and stuff like that.  So they said when I
10  got into with the Board or whatever, the next day they
11  told me I got mad and I got upset and I had punched
12  the windows out of the buses and stuff like that.
13   Q.    The next day?
14   A.    No, the same day.
15   Q.    Oh, the same day.
16  BY UNIDENTIFIED MALE SPEAKER:
17   Q.    When the boys were after you and you punched
18  the windows, but then you say the next day something
19  else happened?
20   A.    Right.  The next day they told me don't come
21  to school.  And the day that I went back to school
22  they called me in the office and told me that I was
23  being suspended from school.  Then I went to
24  (inaudible) school.
25   Q.    So at that point you moved -- how did you

0028
1   get into alternative school in Jackson?
2       A.   I don't know.
3       Q.   You came down to stay with your sister?
4       A.   They really expelled me for a crazy reason.
5   They expelled me for a crazy reason.
6       Q.   What was the reason?
7       A.   They said that I made a threat toward the
8   Board or whatever.
9       Q.   So you didn't threaten anybody you were
10  going to get a gun or anything?
11      A.   No.
12      Q.   You didn't do that?
13      A.   No.  They said -- so my sister went and
14  talked to the other school, the School Board or
15  something like that.  And I moved down here and I
16  started at Capital City.  I went to Capital City for
17  three months.  And then they let me go to a public
18  school.
19      Q.   So you went to Capital City beginning when?
20  Is it in the fall or the spring?  Did you start in
21  August or January?
22      A.   I started like in February.  It was around
23  that time.
24      Q.   Okay.  So you went to Capital City for how
25  long?

28

0029

```
 1        A.    Three months.
 2        Q.    So you finished the year?
 3        A.    Yes, sir.
 4        Q.    At then you started what grade at Forest
 5   Hill?
 6        A.    Ninth grade.
 7        Q.    Did you finish the ninth grade there?
 8        A.    No, sir.
 9        Q.    What happened?
10        A.    I left town.  I left town and then I quit
11   school.  I went to Jobs Corp.
12        Q.    When you left town, where did you go?
13        A.    I went to Grenada.
14        Q.    Oh, so you moved back home?  You left Forest
15   Hill.  How long did you go to Forest Hill?
16        A.    I went there for about -- I quit in
17   December.  I started in August.
18        Q.    So did you get into any trouble at Forest
19   Hill?
20        A.    No, not really.
21        Q.    You didn't get expelled or suspended at
22   Forest Hill?
23        A.    No, I never did.
24        Q.    Okay.  So you quit in December?
25   BY UNIDENTIFIED MALE SPEAKER:
```

App.0101

0030
1       Q.   Did you get expelled from Forest Hill in
2   December of '03?
3       A.   No, sir.
4       Q.   That's what the records say.
5       A.   I got expelled?
6       Q.   You got expelled.
7       A.   From Forest Hill?
8   BY DR. LOTT:
9       Q.   You don't remember getting in trouble?
10      A.   I never did.  I never got expelled.  I just
11   quit.
12      Q.   So you just quit?
13      A.   I quit going to school.
14      Q.   So you just didn't go to school and they
15   kicked you out for missing days?  You didn't know that
16   you were expelled?
17      A.   No.  See, the way it happened was they let
18   us out of school.  And when they let us out of school
19   I just never did go back.
20      Q.   For the Christmas holidays?
21      A.   No, we weren't out for the Christmas
22   holidays.
23      Q.   Well, how did you get let out of school?
24      A.   The day was over with.  It was like on a
25   Monday or Tuesday or something.  The day was over with

30

0031
```
 1   and I went home that day and I never did return.
 2        Q.   You never came back?
 3        A.   Never went back.
 4        Q.   Okay.  And you said you went to the Job
 5   Corp?
 6        A.   Yes, sir.
 7        Q.   Where?
 8        A.   In Batesville.
 9        Q.   In Batesville?
10        A.   Yes, sir.
11        Q.   How long were you in the Job Corp?
12        A.   About three months.
13        Q.   Three months?
14        A.   Three months.
15        Q.   Did you complete the program at Job Corp?
16        A.   No, sir.
17        Q.   Did you get expelled?
18        A.   Yes, sir.
19        Q.   What happened?
20        A.   I got caught with a girl.
21        Q.   You got caught with a girl?
22        A.   Yes, sir.
23        Q.   Was that against the rules?
24        A.   Yes, sir.
25        Q.   What were you doing?
```

0032

```
 1        A.   Having sex.
 2        Q.   They caught you having sex with a girl in
 3   the room?
 4        A.   Yes, sir.
 5        Q.   Did she get expelled, too?
 6        A.   I don't know.
 7        Q.   You don't know.  Any other training?  Did
 8   you ever go to a training school?
 9        A.   No, sir.
10        Q.   Oakley?
11        A.   No, sir.
12        Q.   So when you were at Grenada and you got
13   expelled, they didn't threaten to send you to Oakley?
14        A.   No, sir.
15        Q.   Okay.  All right.  So after Job Corp, what
16   did you do?
17        A.   I went to GED school.
18        Q.   Where?
19        A.   Grenada.
20   BY UNIDENTIFIED MALE SPEAKER:
21        Q.   What kind of school?
22        A.   GED.
23   BY DR. LOTT:
24        Q.   Did you get your GED?
25        A.   No, sir.
```

32

0033

1      Q.   Why?

2      A.   That's when I started skipping school.  When

3  I went back to school I was going to take my practice

4  test and the teacher called me dumb or something like

5  that.  And I just went off on her.

6      Q.   You went off on her?

7      A.   Yes, sir.

8      Q.   So you never took the test, then?

9      A.   No, sir.

10  BY UNIDENTIFIED MALE SPEAKER:

11      Q.   What did you do at the Job Corp?

12      A.   The job, I don't even know really.

13      Q.   What's the point, though?

14      A.   Trying to send me for a high school diploma.

15  BY DR. LOTT:

16      Q.   All right.  Now, tell us about how you've

17  been -- where you've been working.  Were you working

18  anywhere before you finished school?  When you came

19  back to Grenada and were working on your GED, were you

20  working anywhere?

21      A.   No, sir.

22      Q.   Have you ever held a job?

23      A.   Yes, sir.

24      Q.   Where?

25      A.   I worked at Heathcraft.  I worked at

33

0034

1   Heathcraft and I worked in Coffeeville with Grenada
2   Wholesale.
3           Q.   Okay.  What did you do first?  Heathcraft?
4           A.   Yes, sir.
5           Q.   How long did you work at Heathcraft?
6           A.   About three weeks.
7           Q.   Three weeks.  What did you do there?
8           A.   They had us out on the line cleaning cords
9   and straightening cords out on the line.
10          Q.   Okay.  Why did you leave that job?
11          A.   Because I had -- my mama gave me a raggedy
12  van.  And the van really didn't make it back and forth
13  to work like it was supposed to.  The van was really
14  messed up.
15          Q.   So you were driving the van?
16          A.   Yes, sir.
17          Q.   And it was a raggedy van?
18          A.   I mean I didn't make it to work.
19  BY UNIDENTIFIED MALE SPEAKER:
20          Q.   What kind of van was it?
21          A.   Caravan.
22          Q.   A Caravan?
23          A.   Yes, sir.
24  BY DR. LOTT:
25          Q.   Who makes a Caravan?

34

0035

1     A.   Chrysler.

2     Q.   Chrysler.  So you were driving a raggedy van

3  and you weren't getting to work on time.  Did they

4  fire you or did you quit?

5     A.   They fired me.

6     Q.   They fired you.

7     A.   They just told me they didn't need me

8  (inaudible).

9     Q.   They don't need you if you can't to work on

10  time?

11     A.   Yes, sir.

12     Q.   Okay.  Where did you work next?  Well, let

13  me back up.  At Heathcraft how much were you making?

14     A.   About six-fifty or something.

15     Q.   Six-fifty.  Did you get a paycheck?

16     A.   Yeah, I got two of them.

17     Q.   You got two paychecks.  And how much were

18  the paychecks?

19     A.   The first one -- I mean I wasn't working at

20  that time.  I had --

21     Q.   I know you probably had left by the time you

22  got it, but how much did you get?

23     A.   One of them was only like for $157 or

24  something like that.

25     Q.   Okay.  Who was the payee that cashed it?

0036

1      A.   I cashed the check.

2      Q.   You cashed the check?

3      A.   Yes, sir.

4      Q.   What was the second check?  How much was the

5 second check?

6      A.   About the same.

7      Q.   Okay.  About the same?

8      A.   Yes, sir.

9      Q.   Okay.  Did you cash both checks?

10     A.   Yes, sir.

11     Q.   Okay.  Now, you worked where next?

12     A.   Taco Bell.

13     Q.   How long did you work at Taco Bell?

14     A.   About three weeks.

15     Q.   Three weeks.  What did you do there?

16     A.   I had to fix food.  I had to fix food.  And

17 part of the time they had me outside sweeping and

18 stuff like that.

19     Q.   So you were a cook and cleaned up the

20 parking lot?

21     A.   Yes, sir.

22     Q.   And you worked there three weeks.  Why did

23 you leave?

24     A.   I was working around too many women.

25     Q.   Working with too many women?

36

0037

```
 1        A.    Yeah.
 2        Q.    Did you quit or were you fired?
 3        A.    I actually quit.
 4        Q.    Okay.  Let me stop this and turn this tape
 5   over.
 6              DR. LOTT:  This is Dr. Lott again.  This is
 7        the second side of the first tape.
 8   BY DR. LOTT:
 9        Q.    Now, you said you were working at Taco Bell?
10        A.    Yes, sir.
11        Q.    How long?
12        A.    About three weeks.
13        Q.    Three weeks.  And you quit there because?
14        A.    I was working around too many women and they
15   always had something to say.
16        Q.    Okay.  Did you ever get into any trouble,
17   though, while you were working there?
18        A.    No, sir.
19        Q.    Did you ever threaten anybody, say anything
20   ugly to anybody, curse anyone?
21        A.    No, sir.
22        Q.    Okay.  How much were you making at Taco
23   Bell?
24        A.    I don't think I even got no paycheck from
25   Taco Bell.
```

37

0038

```
 1        Q.   You didn't get paid?
 2        A.   I got probably like one paycheck.  But I
 3   ain't never worked over four hours.
 4        Q.   A day?
 5        A.   Yes, sir.
 6        Q.   Okay.  Where was your next job?
 7        A.   Grenada Wholesale -- Grenada Wholesale
 8   Lumber.
 9        Q.   Grenada Wholesale Lumber.
10        A.   Yes, sir.
11        Q.   What did you do there?
12        A.   Loaded lumber.
13        Q.   Were you driving a truck to deliver?
14        A.   I drove a pickup truck.
15        Q.   Okay.  You could drive a pickup truck?
16        A.   Yes, sir.
17        Q.   How long did you work there?
18        A.   About seven months.
19        Q.   How much did you make there?
20        A.   I started off -- I started off at $7 an
21   hour.
22        Q.   Seven an hour?
23        A.   Yes, sir.
24        Q.   Is that a pretty good salary in Grenada?
25        A.   Yes, sir.
```

38

0039

```
 1        Q.   And how much would you make -- did you get
 2   paid weekly or every other week?
 3        A.   Weekly.
 4        Q.   You got paid weekly.  How much would you
 5   bring home?
 6        A.   I'd bring home about -- it was like two
 7   forty, two fifty, sometimes three hundred.
 8        Q.   $300 a week?
 9        A.   Yes, sir.
10        Q.   That sounds like that was good money for
11   someone your age?
12        A.   Yes, sir.
13        Q.   Did you pay any taxes?
14        A.   Yeah, I paid taxes, too.  That was it.
15        Q.   What did you do with your money?
16        A.   Nothing really, just had fun.
17        Q.   Had fun.  What did you do for fun?
18        A.   I mean basically what I did with my money, I
19   went out, chill with my girl, my baby's mama, bought
20   my son stuff, pampers and stuff.  And the rest of it
21   I'd just, you know (inaudible) or something like that,
22   go shopping.
23        Q.   And you were driving then?  Did you drive
24   the raggedy van?
25        A.   No, sir, I had about five or six cars.
```

39

0040

```
 1        Q.   You bought five or six different cars?
 2        A.   I said I had about five or six cars.
 3        Q.   How did you get another car?  Did you go out
 4   and buy it, go to a parking lot and buy it yourself?
 5        A.   No, sir.
 6        Q.   How did you end up with a car?  How did you
 7   get a car?
 8        A.   My mama cosigned.
 9        Q.   Your mama cosigned?
10        A.   Yes, sir.
11        Q.   And so you were making the payments?
12        A.   Yes, sir.
13        Q.   What kind of car did you own?
14        A.   My first car I had was a Cavalier, a 2002
15   Cavalier.
16        Q.   A 2002 Cavalier?
17        A.   Yes, sir.
18        Q.   That would've been a brand new car for you
19   back then, wouldn't it?  Almost.
20        A.   That was when I was 16.
21        Q.   Okay.
22   BY UNIDENTIFIED MALE SPEAKER:
23        Q.   Was it new when you bought it?
24        A.   Spanking new.
25   BY DR. LOTT:
```

40

0041

1      Q.   Was it brand new?

2      A.   Brand spanking new.

3      Q.   Wow.  Okay.  How long did you keep that car?

4      A.   About three months.

5      Q.   Three months.  What were the payments on it?

6      A.   I don't know.  It was around like $199 or

7  $200 a month.

8  BY UNIDENTIFIED MALE SPEAKER:

9      Q.   What happened to it after three months?

10     A.   I totaled it out.

11     Q.   How did you do that?

12     A.   Ran into a bridge.

13     Q.   How did you do that?

14     A.   I was just coming off a dirt road.  I think

15  I was going too fast and the brakes, I was having

16  problems with the brakes.  And when I hit the brakes

17  and went into the concrete, I hit the brakes and

18  instead of the brakes just stopping, it made a sound

19  like umm, umm, like that.  Then it just slammed into

20  the bridge.

21     Q.   Head-on?

22     A.   Yes, sir.

23  BY DR. LOTT:

24     Q.   Did you get hurt?

25     A.   No, sir.

41

0042

```
 1   BY UNIDENTIFIED MALE SPEAKER:
 2        Q.   Did you get knocked out?
 3        A.   No, sir.
 4   BY DR. LOTT:
 5        Q.   Did it hit the passenger side of the car?
 6        A.   It tore the whole front end off the car.
 7        Q.   So did you get insurance from it?  What did
 8   you do when you got a new car and you wrecked it?
 9   What happened?
10        A.   The insurance, they didn't pay nothing but
11   the car off.
12        Q.   The cost of it?
13        A.   Yes, sir.
14        Q.   So then what did you do next for a car?
15        A.   Then I had the van and I drove the van for a
16   little while.
17        Q.   Was that that raggedy van?
18        A.   Yes, sir.
19        Q.   Okay.
20        A.   And then I went and got me a Dodge Intrepid.
21        Q.   Intrepid?
22        A.   Yes, sir.
23        Q.   Really.  So mom cosigned for that one?
24        A.   Yes, sir.
25        Q.   Where did you buy that car?
```

42

0043

```
 1        A.    Vans Auto.
 2        Q.    Vans Auto in Grenada?
 3        A.    Yes, sir.
 4        Q.    And so you were making payments on that one?
 5        A.    Yes, sir.
 6        Q.    How much?
 7        A.    Like $200 a month.
 8        Q.    Okay.  And how long did you keep that one?
 9        A.    A month.
10        Q.    A month.  What happened to that one?
11        A.    I totaled that one out, too.
12        Q.    What did you do?
13        A.    I was coming home one night.  I don't know
14   what happened.  Like, I was just coming home one night
15   and the car just lost control and I went off in the
16   ditch and came out of the ditch and ran into a light
17   pole.
18        Q.    The car lost control?
19        A.    I lost control.
20        Q.    Okay.  Okay.  What happened with that one
21   with the insurance?
22        A.    They just paid it off.
23        Q.    Just paid it off.  So you had insurance each
24   time, though, right?
25        A.    Yes, sir.
```

43

0044

1    Q.   Okay.  Who was paying the insurance on these
2  cars?
3    A.   My mama was paying the insurance.
4    Q.   Your mother is paying the insurance.  So
5  here you are, you've wrecked two cars now.  How much
6  was the insurance?
7    A.   It was something like 300.
8    Q.   $300 a month for insurance?
9    A.   Yes, sir.
10   Q.   And your mother was paying it?
11   A.   Yes, sir.
12  BY UNIDENTIFIED MALE SPEAKER:
13   Q.   The insurance was more than the car payment?
14   A.   The car payment probably wouldn't but $200.
15  BY DR. LOTT:
16   Q.   Goodness.  So what was your next car?
17   A.   I had a Dodge Eagle.
18   Q.   An Eagle?
19   A.   Yes, sir.
20   Q.   These are fancy cars.  So how long did you
21  keep this car?
22   A.   About a month.
23   Q.   A month.  What did you do to this one?
24   A.   I came down here one day and the radiator or
25  something.  Something was going on.  It kept running

44

0045

1    hot.  So I let the folks take it back.  I didn't tear

2    that one up.

3         Q.   You didn't tear that one up.  Okay.  What

4    was your next one?

5         A.   A Grand Marquis.

6         Q.   A Grand Marquis.  And how long have you had

7    this car?

8         A.   About four months.

9         Q.   Four months.  What happened to it?

10        A.   It's still at my mama's.

11        Q.   Still at your mom's.  Who's paying for it?

12        A.   Nobody paying for it.  They probably come

13   and got it by now.

14        Q.   Okay.  How much were the payments?

15        A.   $300 a month.

16        Q.   So right before you got arrested, where were

17   you working?

18        A.   Grenada Wholesale.

19        Q.   The lumber company?

20        A.   Yes, sir.

21        Q.   And you were working there 40 hours a week?

22        A.   I was working ten hours a day.

23        Q.   Ten hours a day?

24        A.   Yes, sir.

25        Q.   How many days a week?

App.0117

0046

1      A.   Monday through Saturday.

2      Q.   You worked all day Saturday?

3      A.   No, half a day Saturday.

4      Q.   So you were working 55, six hours a week

5  then?

6      A.   Yes, sir.

7      Q.   So what did you do there?

8      A.   Load and delivered lumber.

9  BY UNIDENTIFIED MALE SPEAKER:

10     Q.   You said it was a wholesale lumber place?

11     A.   Yes, sir.

12     Q.   Why would somebody go to a wholesale lumber

13  place versus some other kind of lumber supply store?

14     A.   Because the wholesale lumber, you don't pay

15  taxes on it.  People just come and get their lumber.

16  And then most of those people loaded their own, things

17  like that.

18     Q.   Is it cheaper or more expensive being a

19  wholesale place?

20     A.   It ain't no cheap lumber.

21     Q.   It's not cheap.  Did it cost more or less to

22  go to a wholesale place as opposed to another place?

23     A.   I would think it would cost less.

24     Q.   Costs less?

25     A.   Yes, sir.

App.0118

0047

1    BY UNIDENTIFIED MALE SPEAKER:

2        Q.    Did you ever have a commercial license?

3        A.    To drive a big truck, no, sir.

4        Q.    You had a regular driver's license?

5        A.    Yes, sir.

6        Q.    Did you take a written test for that?

7        A.    I drove.  They made us drive.

8        Q.    Yeah, they make you drive.  But you also

9    have to take a written test.

10        A.    Oh, you talking about for my permit?

11        Q.    Yeah.

12        A.    Yes, sir.

13        Q.    Did you pass that?

14        A.    Not the first time.

15        Q.    Okay.  How many times did you take it?

16        A.    Two times.

17        Q.    Did you pass it the second time?

18        A.    Yes, sir.

19    BY DR. LOTT:

20        Q.    Did you take it on a computer?

21        A.    Uh.

22        Q.    The written part, did you take on a

23    computer?  Do you remember?

24        A.    I believe I took it on a paper.

25    BY UNIDENTIFIED MALE SPEAKER:

47

0048

```
 1        Q.    Did you take driver's ed in school?
 2        A.    No, sir.  I never made it that far.
 3  BY DR. LOTT:
 4        Q.    Did you ever get in any trouble while you
 5  were working for the lumber company?  Did you ever
 6  curse anybody, threaten anybody, get mad at anybody,
 7  breaking out any windows or lights in any van or bus
 8  or anything while you worked for the lumber company?
 9        A.    No, sir.
10        Q.    So they liked you and got along well with
11  you?
12        A.    Yes, sir.
13  BY UNIDENTIFIED MALE SPEAKER:
14        Q.    Was your boss at the lumber company Wesley
15  Thompson?
16        A.    Yes, sir.
17        Q.    Do you remember what the telephone number is
18  at the lumber place?
19        A.    237-1779.
20        Q.    1779?
21        A.    Yes, sir.
22  BY DR. LOTT:
23        Q.    Okay.  All right.  Now, let me move into --
24  let me back up.  Did you ever get disability benefits,
25  Social Security benefits when you were a child?
```

48

0049

```
 1          A.   I got a Social Security check.
 2          Q.   On whom?
 3          A.   My dad.
 4          Q.   On your father.  Did you ever get them for
 5     being a slow learner or anything in school?
 6          A.   No, sir.
 7          Q.   Did you ever get any personal injury
 8     benefits?  Did you ever sue someone, get hurt in a
 9     car, sue somebody, get injured on a job, sue anybody?
10          A.   No, sir.
11          Q.   Any unemployment benefits?  Did you get
12     fired from a job and file unemployment?
13          A.   No, sir.
14          Q.   Okay.  Now, let's go back and talk about
15     your legal history.  Before you turned 18 did you ever
16     get any other arrests?  Were you ever arrested for any
17     reason?
18          A.   I got in trouble a while back.  There was a
19     (inaudible) stay after Coach (inaudible) out of the
20     truck.  And after football practice (inaudible) cell
21     phone.  So I took the cell phone home.  (Inaudible).
22     And on my way to school the next day somebody called
23     the phone, so I answered the phone.  And they said who
24     is this.  And I told them Terry Pitchford.  And they
25     was like do you know whose phone you got and I said
```

49

0050

1    yeah.  (Inaudible).  They said no and (inaudible) told
2    me whose phone it was.  (Inaudible).  And the next
3    morning I took it to school and gave it back to the
4    teacher.  And about an hour later they called me to
5    the office and said the police was coming.
6         Q.   So what happened?
7         A.   They took me to this place and I called my
8    mom and told her to come and get me.
9         Q.   They took you to the detention center?
10        A.   Yes, sir.  I didn't have to stay there.  I
11   just went there to file some papers, some kind of
12   papers, and gave me a court date.  And told me to go
13   to John Paul Jones.  And I went to find him and he put
14   me on some kind of paper.
15        Q.   Probation?
16        A.   Juvenile probation.
17        Q.   Juvenile probation?
18        A.   Yes, sir.
19        Q.   Did you have any court counselor that you
20   had to meet with?
21        A.   No, sir.
22        Q.   You never met with a counselor?
23        A.   No, sir.
24        Q.   So he just said if I see you again in six
25   months you're going to go to training school?

0051
1      A.   He told me I had to report back to him.  And
2  when I reported back to him he took me off.
3      Q.   When did you report back?  A week, a month,
4  a year later?
5      A.   About a month later.
6      Q.   A month later?
7      A.   Yes, sir.
8      Q.   How old were you?
9      A.   I was about 15 years old -- no, I was about
10  14.
11      Q.   Well, what coach was this?  You said you
12  were at football practice?
13      A.   Yes, sir.  Coach Woods.
14      Q.   Were you playing football in junior high?
15      A.   Yes, sir.
16      Q.   I didn't ask you that earlier.  Did you
17  play -- you say you played football.  Sixth, seventh
18  grade, seventh, eighth grade?
19      A.   Seventh and eighth grade.
20      Q.   Seventh and eighth grade.  What did you
21  play?
22      A.   No, I ain't played eighth grade.  I played
23  seventh grade.
24      Q.   What position?
25      A.   Defensive end.

51

0052

```
1        Q.   How did y'all do?
2        A.   We did all right.
3   BY UNIDENTIFIED MALE SPEAKER:
4        Q.   Did you play tackle?
5        A.   No, I didn't tackle.
6        Q.   Block?
7        A.   Yeah, there was a couple blocks.  I had a
8   couple.  But I quit football.
9        Q.   Did you ever play any offense?
10       A.   No.  I wanted to play running back.  But
11  they -- I was sick the day when they was going to
12  decide and I didn't get the position.  They put me on
13  defensive end.
14  BY DR. LOTT:
15       Q.   Did you play first team?
16       A.   Yes, sir, first string.
17       Q.   First string, okay.  All right.  That's
18  good.
19       A.   I used to be good in basketball.
20       Q.   You used to be good?
21       A.   Uh-huh (affirmative).
22       Q.   What position did you play?
23       A.   I didn't play none in school.
24       Q.   You played street ball?
25       A.   Yes, sir.
```

52

0053

1        Q.    What kind of games did you play, 21, or?

2        A.    Twenty-one or regular basketball.

3        Q.    Okay.  And so just football.  No baseball,

4 basketball, soccer, nothing else?  Okay.  Back to your

5 legal history.  You got in trouble for that.  You got

6 on probation.  You got off probation.  Any other

7 arrests?  Or any other contact with the police for any

8 reason?

9        A.    I mean I got in -- the Grenada police, they

10 crazy, so they had come down -- I was over at my

11 baby's mama's house.  And I had left and I was going

12 up to a girl named Chasity's house.  And she was

13 supposed to cook for me.  And I walked across the

14 street and these dudes were standing on the corner

15 where (inaudible).  And so I had a little chit chat

16 with them.  And the dude hollered the police coming,

17 the police coming.  And the dude went over the hill.

18 And the dude was like (inaudible) turn around and come

19 back.  (Inaudible).  So I started out walking.  And,

20 shoot, the dude came back.  He came back like man,

21 (inaudible).  And he told me to come here and stuff

22 like that.  And he told me to come here and then he

23 searched me and stuff like that.  Then I told him I

24 didn't do nothing.  Then he told me to get down in the

25 road and he put the handcuffs on me.

53

0054

1      Q.   Did he assume that you just engaged in a
2  drug deal?  Is that what the cop thought?
3      A.   I don't know what he thought.  He lied and
4  told his folks that I was in the street and flagged
5  him down.  I didn't flag down nobody.  I had just
6  walked in front of his car.  So he brought me to jail.
7  And I told him, I said, I ain't -- I said y'all can
8  sign papers on me.  I told them I wanted to sign
9  papers on him.  And the head chief, he was like a
10  detective.  And the police officer went back there and
11  talked to the chief or something.  And right before my
12  mama came over there, he came in the room and begged
13  me to not put no charges on him.
14      Q.   Who did?
15      A.   The officer.
16      Q.   The officer.  Did you press charges on him?
17      A.   No.
18      Q.   Did he let you go home?
19      A.   Yes, sir.
20      Q.   So you didn't go to jail?
21      A.   No, sir.
22      Q.   You didn't get arrested then formally?
23      A.   No, I ain't never been behind bars.
24      Q.   Okay.  Any other problems with the police,
25  any other contact?

App.0126

0055

1       A.   When I was -- I mean one time the police
2   told me and my friends to get on the ground and stuff.
3   It was crazy.  We didn't even do nothing.  They just
4   came out there and told us to get on the ground.
5       Q.   Where were you?
6       A.   Out at Tie Plant with my friends and
7   whatever.  We weren't doing nothing.  There was kids
8   there.  It was like the Fourth of July or something
9   like that.  And they threw some fireworks under my
10  car.  And I told the kids, you know, quit throwing
11  them fireworks and stuff like that.  And the police
12  came out there and told us to get on the ground and
13  stuff.
14      Q.   Did they think that you were throwing the
15  fireworks?
16      A.   I don't know what that thought.
17      Q.   What did they do to you?
18      A.   Nothing.
19      Q.   After you got on the ground did they take
20  you in?
21      A.   No, just went to the car.  We just got up
22  and we went to put charges on them.  We went to my
23  friend's mama's house and told his mama.  And so we
24  went up there to the police station.  I think they put
25  charges on him.  I told him I didn't want to fool with

55

0056

1    it.

2         Q.   They put charges on you or your friend put

3    charges on the police?

4         A.   Police.

5         Q.   But you didn't?

6         A.   No, sir.

7         Q.   Okay.

8    BY UNIDENTIFIED MALE SPEAKER:

9         Q.   What county is Tie Plant?

10        A.   Tie Plant is Grenada.

11   BY DR. LOTT:

12        Q.   Grenada County.

13        A.   Yeah.

14        Q.   Where is Tie Plant?  I know where

15   Coffeeville is.  I know where Grenada is located.

16   Where is Tie Plant?

17        A.   Do you know where Duck Hill is at?

18        Q.   I know where Duck Hill is located.

19        A.   Tie Plant's like going toward Duck Hill.

20        Q.   On 51 going south?  There's a community

21   called Tie Plant between Grenada and Duck Hill?  Or is

22   it past Duck Hill?

23        A.   No, it's in between.  Do you know where

24   Elliott is?

25        Q.   Elliott.  I'm not familiar with that.

App.0128

```
0057
 1        A.   There's Tie Plant, then it's Elliott, then
 2   it's (inaudible) road.
 3        Q.   I didn't know there were two communities.
 4   Okay.
 5   BY UNIDENTIFIED MALE SPEAKER:
 6        Q.   Is Tie Plant there?
 7        A.   No, there's two of them.  One of them on
 8   this side and one on this side.
 9   BY DR. LOTT:
10        Q.   Two what?
11        A.   Tie Plants.
12   BY UNIDENTIFIED MALE SPEAKER:
13        Q.   Tie Plant and Tie Plant west?
14   BY DR. LOTT:
15        Q.   How many people live in Tie Plant?
16        A.   It's a pretty nice neighborhood.  It's about
17   a hundred.
18        Q.   About a hundred.  All right.  Now, so moving
19   on.  Any other arrests by the police before these
20   charges?
21        A.   No, sir.
22        Q.   Okay.  So did you ever go to a training
23   school?  Were you ever sent to Oakley?
24        A.   No, sir.
25        Q.   Other than Capital City, that's the only
```

57

0058

1    alternative school that you went to?

2        A.    Yes, sir.

3        Q.    Okay.  Anybody in your family ever been sent

4    to Oakley or Parchman or anywhere like that?

5        A.    I mean I've got brothers that have.

6        Q.    By your mom or by your dad?

7        A.    My daddy.

8        Q.    Did you know them very well?

9        A.    One of them was Michael, my brother.

10       Q.    Michael.  How old is Michael?

11       A.    About 40.

12       Q.    Okay.  So you didn't grow up with him?

13       A.    No, sir.

14       Q.    All right.  I was going to ask if you ever

15   -- legally, you don't have to answer this if you don't

16   want to.  You know, illegal things that you didn't get

17   caught for that you thought that you might have been

18   caught for?  In other words, if the police would have

19   found out about it, would you have been arrested?

20       A.    Probably.

21       Q.    Pardon?

22       A.    Yes, sir.

23       Q.    Yes?  Would you care to say what those are?

24   You certainly don't have to say that because of the

25   fact it's being tape-recorded.

58

0059

```
 1        A.   No, sir.
 2        Q.   You'd rather not say?
 3   BY UNIDENTIFIED MALE SPEAKER:
 4        Q.   Let me ask you about -- to get some -- Ms.
 5   O'Clarity is here and you don't have to answer.  But
 6   let me ask you kinds of stuff, theft, vandalism,
 7   breaking windows, spray painting, blowing up mailboxes
 8   with firecrackers, anything like that, keying cars?
 9        A.   No, sir.
10        Q.   Okay.  Did you ever set any fires on
11   purpose, burning up old houses or cars, or woods,
12   anything like that?  Ever play with fire and get into
13   trouble when you were little playing with matches,
14   cigarette lighters, anything like that?  What kind of
15   trouble did you get into?
16        A.   You mean my mom?
17        Q.   Yeah, with your mom.  What did she do?
18        A.   Said don't play with it.
19        Q.   Would you ever injure animals, dogs, cats,
20   stray animals?
21        A.   Yeah, I did things to them.
22        Q.   Like what?
23        A.   There was just one dog would always come,
24   big old dog, he would always come down the street and
25   mess with our dog.  And would always come back in the
```

59

App.0131

0060

1   backyard where we would feed him and he'd come back
2   there and try to take the dog's food, so I took a bat
3   and I busted him in the head.
4        Q.  Did you kill him?
5        A.  I mean I wasn't trying to kill him.  I was
6   just trying to run him off.
7        Q.  How old were you?
8        A.  About 11, 12 or so.
9        Q.  How about cats?  Did you ever hurt any cats
10  or frogs or any birds?
11       A.  If I see a frog, sometimes I just stomp on
12  it.
13       Q.  Did you ever kill any neighbor's cats or
14  pets?
15       A.  No, sir.
16       Q.  Did you ever throw any kittens or puppies in
17  the river or in the lake or in the pond?
18       A.  I mean I'd throw a cat up in the air just to
19  see him land on his feet but no worse than that.
20       Q.  How old were you then?
21       A.  About 12, 13 years old.
22  BY DR. LOTT:
23       Q.  Would you consider yourself somebody who
24  likes animals?  You said you had your own dogs.  Are
25  you a dog person?  A dog lover?

0061

```
 1        A.   Yeah, I like dogs.
 2        Q.   You like dogs.  Did you have any other pets
 3   growing up?
 4        A.   My uncle, I had an uncle named Ricky Laytag.
 5   And we called him Uncle Rick.  He used to come up the
 6   road and we lived in a little community.  (Inaudible).
 7   And he was having a farm.  I think it was like a farm.
 8   Man, he had a whole bunch of chickens.  And when I got
 9   older, you know, I didn't want a whole bunch of
10   chickens around the house.  Me and my brothers got out
11   there and would shoot the chickens so we could get rid
12   of them.  And then when he come home he asked what
13   happened to the chickens and we said his dogs got
14   them.
15        Q.   So it embarrassed you to have chickens
16   around the house?
17        A.   Yeah, we didn't want to have no chickens
18   running around at the house.
19        Q.   Well, if you're on a farm, what's wrong with
20   having chickens on a farm?
21        A.   We wasn't on no farm.  They just had them.
22        Q.   Were you in town?
23        A.   No, we stayed in the country.
24        Q.   You stayed in the country.  What's wrong
25   with having chickens in the country?
```

61

0062
```
 1        A.   We was getting older then.
 2        Q.   Okay.  All right.  Back in your school days
 3   did you get into any fights with your peers?
 4        A.   Yeah, I had a couple of fights with them.
 5        Q.   Are you a tough guy?
 6        A.   I wouldn't say I'm tough.
 7        Q.   Huh?
 8        A.   I wouldn't say I'm tough but (inaudible) me
 9   really.  Well, really didn't no person (inaudible).
10        Q.   Would you say that you have been in more
11   than five fights or less than five?
12        A.   In my life?
13        Q.   Yeah.
14        A.   More than five.
15        Q.   More than five.  More than ten?
16        A.   About ten.
17        Q.   About ten.  Did you start those or were you
18   just defending yourself in the majority of them?
19        A.   I never started a fight.
20        Q.   You never started a fight?
21        A.   No, sir.
22        Q.   Never was aggressive toward your girlfriends
23   in the past?  I'm guessing you had girlfriends?
24        A.   Yes, sir.  I mean I really -- I wasn't
25   really aggressive.  No, I ain't hit on no woman.
```

App.0134

0063

```
 1        Q.   Did you ever slap her?
 2        A.   I might've grabbed her, that's it.
 3        Q.   Have you ever slapped your mother?
 4        A.   No, no way.  She would bust my head.
 5   BY UNIDENTIFIED MALE SPEAKER:
 6        Q.   Did she ever bust your head?
 7        A.   Yes, sir.
 8        Q.   Why?  What happened?
 9        A.   I'd just act crazy in the house after my
10   daddy died.  And I was kind of like the bad child, I
11   guess.  And they thought I was just bad.  And my twin
12   brother, he was just sneaky, so.  And when we was
13   going -- he kept going on to my mama (inaudible)
14   telling her I was doing stuff.  And she was like don't
15   mess with the crutches.  I wasn't messing with the
16   crutches.  My brother was running around the house and
17   messing with the crutches.  I told him to put down the
18   crutches.  And she came back there and she hit him a
19   couple of times.  But I let loose and (inaudible) she
20   was steady hitting on me and she wasn't hitting him no
21   more.  So I told her I wasn't messing with the
22   crutches.  I told her to get off of me.  And she hit
23   me in the head with the starch, a starch can.
24        Q.   Did it knock you out?
25        A.   No, it just broke the skin.
```

0064
```
 1       Q.   Is that where you got that scar?
 2       A.   Yeah, that's one of them.  There's two
 3   scars.
 4       Q.   What else did she hit you with?
 5       A.   That's it.
 6       Q.   Didn't knock you out?
 7       A.   No.
 8       Q.   Did you have to have stitches?
 9       A.   Yes, sir.
10       Q.   Did she carry you to the hospital to get
11   stitches?
12       A.   Yes, sir.
13       Q.   Did she tell them what happened?
14       A.   No, sir.
15       Q.   Did you?
16       A.   I mean we told them -- she said we were
17   playing or something like that.  I was going to tell
18   the folks, though.
19       Q.   What kept you from it?
20       A.   I didn't want my mom to go to jail.
21   BY DR. LOTT:
22       Q.   All right.  Now, moving on through here.
23   Did you have any other problems now?  Is that all the
24   problems you've had with the police?
25       A.   No, sir.
```

64

0065

```
 1        Q.   That's it?
 2        A.   Yes, sir.
 3   BY UNIDENTIFIED MALE SPEAKER:
 4        Q.   Okay.  Were the police ever called when you
 5   were having problems in school?
 6        A.   No, sir.
 7   BY DR. LOTT:
 8        Q.   Other than the one time with the cell phone?
 9        A.   No, sir.
10        Q.   That's it?
11        A.   Yes, sir.
12        Q.   Okay.
13   BY UNIDENTIFIED MALE SPEAKER:
14        Q.   Did you -- let me try to clarify what
15   happened.  After you were at the alternative school in
16   Jackson, did you go back to Grenada High School or to
17   Tie Plant?
18        A.   After I left the alternative school down
19   here I went to Forest Hill.
20        Q.   Did you go back to school up in Grenada
21   County for your GED?
22        A.   Yeah, my GED in Grenada County.
23        Q.   We have some documents here indicating that
24   you were expelled from school in '02, and then went
25   back to school in '03 and got expelled again after you
```

65

0066

1    got into it with a teacher, a Ms. Sands?

2         A.   That was why I got expelled from GED school.

3         Q.   That was GED school.  Okay.  I got it.  Was

4    it something about a math test?

5         A.   She was calling me dumb.  See, the teacher

6    told me to go to my math teacher.  And then my math

7    teacher come back to the class.  So I did that.  And

8    on my way out of the class she told me, you know, she

9    just started calling me dumb, so I told her how I

10   felt.

11        Q.   What did you tell her?

12        A.   To shut up telling me all kind of stuff like

13   that.

14        Q.   Did you threaten her?

15        A.   I mean I just told her how I felt.  I never

16   did even threaten her.

17        Q.   Did you ever have a favorite teacher at any

18   of your schools?

19        A.   I had a couple of favorites.

20        Q.   You had a couple of favorites.  If we were

21   to contact your teachers, which ones would you say you

22   liked the best?

23        A.   Ms. Caufman.  She don't teach school now.

24   (Inaudible.)

25        Q.   Spell it for me.

66

0067

1       A.   C-a-u-f-m-a-n.

2       Q.   Ms. Caufman is at what school?

3       A.   She teach like fifth grade.

4       Q.   What school?

5       A.   This is like fifth grade school.

6       Q.   What school are you talking about, Grenada,

7 or?

8       A.   Grenada.

9       DR. LOTT:  Okay.  This tape is about over.

10    Let me stop it.

11        This is the second tape, side A.

12 BY DR. LOTT:

13       Q.   Now, let's move on.  Tell me a little bit

14 about growing up.  I want to know a little bit about

15 how you -- what are some of your earliest memories

16 with mom and dad?

17       A.   I know we would go to California all the

18 time.

19       Q.   You did?

20       A.   Yes, sir.

21       Q.   How did you go to California?

22       A.   My dad.

23       Q.   Fly, drive?

24       A.   Drive over there.

25       Q.   You would drive?

0068
```
 1        A.   Yeah.
 2        Q.   So who would you visit in California?
 3        A.   My people (inaudible).
 4        Q.   Okay.  What was it like growing up in
 5   Grenada?  Do you remember?
 6        A.   Grenada, I mean after I got to know
 7   everybody, you know, it was all right.  But I mean I
 8   don't know, I never did like Grenada.
 9        Q.   You didn't what?
10        A.   I never did like it in Grenada, Mississippi.
11        Q.   You didn't.  Did you have any friends?
12        A.   Yeah, I had a whole bunch of friends.
13        Q.   You had lots of friends?
14        A.   Yeah.
15        Q.   Did you feel connected?  Did you feel like
16   you had about the same number of friends as most guys
17   your age growing up in elementary school?
18        A.   I had friends but they wasn't really just
19   friends cause a lot of people didn't chill.  They
20   didn't want to be around you because -- they didn't
21   want to be around you either cause they intimidated by
22   you or, you know, (inaudible) or things like that.
23        Q.   Were you intimidating in the first grade?
24        A.   No, sir.
25        Q.   Did you intimidate people to make them
```

68

0069

1   uncomfortable being around you in the first and second
2   grades?
3       A.   I don't know.
4       Q.   Well, do you feel like if there was a school
5   birthday party, someone said hey, let's go to Chucky
6   Cheese's, did you get invited to those kind of things
7   about as much as everybody else?
8       A.   No, I never went to no birthday parties.  I
9   never went to no friends' birthday parties.
10      Q.   You didn't growing up?
11      A.   No.
12      Q.   Did you know if any of the other group went?
13  For instance, did everybody get invited to things that
14  they would not invite you that you knew about?
15      A.   I'd probably been one that know about it.
16  I'd probably know.  Cause I went (inaudible). I mean a
17  lot of people went to a lot of different places.  They
18  went to parties.  I don't like going to all the
19  parties and clubs.
20      Q.   No, I'm talking about when you were a child
21  now, not older.
22      A.   When I was a little kid I never went to
23  parties.
24      Q.   Okay.  You never had -- did you have a
25  birthday party when you were young, 5, 6, 7, 8 years

69

0070
```
 1   old?  You never had a birthday party?
 2        A.   No.
 3        Q.   Never went to a birthday party?
 4        A.   No.
 5        Q.   Can you explain why?
 6        A.   Because like Christmas and my birthday is
 7   right there on each other, so no, we just get things
 8   for Christmas.  I mean birthdays to me is just like
 9   another birthday.
10        Q.   Did you get everything on Christmas?
11        A.   Yes, sir.
12        Q.   Your birthday is in November, right?
13        A.   December.
14        Q.   December.  Okay.  Just got more around
15   Christmas?
16        A.   Yeah.
17        Q.   Well, that's not fun.  Now, I know other
18   kids that would have their birthdays in July or June
19   if they had a Christmas birthday.
20        A.   No, sir.
21        Q.   You didn't do that?
22        A.   No, sir.
23        Q.   Okay.  Well, all right.  So would you say
24   that you had as many friends as most people growing up
25   or would you consider yourself somewhat of a loner?
```

70

0071

```
 1        A.    Sort of a loner, what you mean?
 2        Q.    Well, you know.
 3        A.    By myself?
 4        Q.    Yeah, by yourself.  Exactly.
 5        A.    I mean as far as -- I knew a lot of people
 6   and a lot of people knew me.  So when I with them,
 7   they were like hey, what's up, Terry, you know what
 8   I'm saying.
 9        Q.    Okay.
10        A.    And that was it.  But as far friends with me
11   chilling with, no, I had a (inaudible) -- you know,
12   just something to do to pass time, you know.
13   (Inaudible).
14        Q.    What about with your parents, did you feel
15   like you were as loved and cared for as your brothers
16   and sisters?
17        A.    Not when I was young.  I always feel my
18   mama, she showed favor to him.
19        Q.    To who?
20        A.    My twin brother.
21        Q.    To your twin?
22        A.    Yeah.
23        Q.    Did he not get in much trouble?  He was
24   sneaky?
25        A.    Yeah.
```

71

0072

1    BY UNIDENTIFIED MALE SPEAKER:

2        Q.   Did he do as much bad stuff, he just didn't

3    get caught at it?

4        A.   He just didn't get caught at it.

5    BY DR. LOTT:

6        Q.   So you were, you said earlier the bad child.

7    At the house, if something gets broken at the house

8    they would think you did it.  But do you think that

9    your mother and your father loved you?  Did they show

10   love and affection?

11       A.   Yeah.

12       Q.   You felt loved and cared for?

13       A.   I felt love and care.

14       Q.   Okay.  But did you ever feel abused?

15       A.   Yeah.

16       Q.   How?

17       A.   When my mama whipped me.

18       Q.   I'm not talking about just getting in

19   trouble now.  Did you feel like she would abuse you

20   for no reason?  Did she ever come up and take a stick

21   to you for no reason?

22       A.   No.

23   BY UNIDENTIFIED MALE SPEAKER:

24       Q.   Or if she had a reason do you think she

25   punished you too much?  Like (inaudible.)

0073

```
 1        A.   One thing about my mama, if you catch her
 2   and she ain't got no switch or something, she's going
 3   to hit you with something.
 4        Q.   Has your mama got a quick temper?
 5        A.   No, not no more.
 6        Q.   Did she used to?
 7        A.   Not if you do right for her.
 8        Q.   Say again?
 9        A.   As long as you do right.
10        Q.   Do you have a quick temper?
11        A.   I mean I'd get upset with her.  I mean I
12   didn't know how to control.
13        Q.   Did your mom fight with your step-dad?
14        A.   (Inaudible).
15        Q.   Did your step-dad ever mistreat you, beat
16   you or anything like that when he was drinking?
17        A.   No, sir.
18        Q.   He was a drinker?
19        A.   Yes, sir.
20        Q.   Too much?
21        A.   Yes, sir.
22   BY DR. LOTT:
23        Q.   How about your father before he passed?
24        A.   My daddy would go to bed and that was it.
25        Q.   But was he ever abusive towards you in any
```

73

0074
1   way?
2        A.   He would get on your tail.
3        Q.   What did he do?
4        A.   Get a long, orange extension cord and he
5   would whip your tail until you stop doing what you
6   were doing.  You didn't want to do it no more.
7        Q.   So it was discipline but it wasn't excessive
8   or anything as far as you can remember?
9        A.   It was like normal kids, like that.
10       Q.   When you were growing up, who did you spend
11  most of your time with?
12       A.   With my parents?
13       Q.   Right.  When you were at home, you come home
14  after school, who would you stay with?
15       A.   My daddy.
16       Q.   Your dad was always home after school?
17       A.   Yeah.
18       Q.   You got in at 3:00 o'clock.  He would?
19       A.   My daddy was always there.
20       Q.   Your dad was always there.  I thought you
21  said he was a truck driver.
22       A.   This is when I was little.
23       Q.   Okay.  So he wasn't working then when you
24  were in grade school?
25       A.   No, sir.

74

0075

1      Q.  So you spent most of your time with him.

2  Who would prepare supper for you?

3      A.  He would.

4      Q.  He did.  If you went to the doctor, who

5  carried you to the doctor?

6      A.  Well, I ain't never had to go to the doctor.

7  But if we would, it would've been him taking me.

8      Q.  Or the dentist?

9      A.  He would be the one taking.

10     Q.  He would have taken you?  Okay.  When you

11  buy school supplies and school clothes at the

12  beginning of the year, who would do that with you?

13     A.  Both of them.

14     Q.  Both of them.  Okay.  What did you enjoy

15  doing for fun when you were growing up?

16     A.  Going outside and started shooting

17  basketball, me and my brother.  I really didn't do

18  nothing.  We made fun.

19     Q.  What did you do?

20     A.  I played basketball, shoot each other with

21  the pellet gun.

22     Q.  Shoot each other with the pellet gun?

23     A.  Yeah.

24     Q.  Did that hurt?

25     A.  Far off it wouldn't hurt.

0076

1      Q.   Do what?

2      A.   If you run far off it wouldn't hurt.

3      Q.   How close would you get to each other?

4      A.   Depending on (inaudible).

5      Q.   Did you use garbage cans to try and protect

6  yourselves from each other, garbage can lids?  You

7  didn't do that?

8      A.   No, sir.

9      Q.   Did you ever play video games?

10     A.   Yeah, I played video games.  I didn't like

11  it though.

12     Q.   After you got up a little bit older, after

13  you got old enough to get a driver's license, what did

14  you do for fun?

15     A.   Chilled with the girls.

16     Q.   Chilled with the girls?

17     A.   Yeah.

18     Q.   How many girlfriends did you have?

19     A.   About five.

20     Q.   Five girlfriends?

21     A.   Yeah.

22     Q.   And the longest girlfriend you had was how

23  long?

24     A.   About six.  What you mean?

25     Q.   How long did you date them?  How long had

76

0077

1    you been seeing them?

2          A.    I mean the longest one I had was with my

3    baby's mama.

4          Q.    Okay.  How long was that?

5          A.    Six years.

6          Q.    Six years.  But you had other girlfriends in

7    addition to your baby's mother during that period of

8    time?

9          A.    Yes, sir.

10         Q.    Because you mentioned earlier you left your

11   baby's mother and you went somewhere and Chasity was

12   preparing you something to eat.

13         A.    Yeah.

14         Q.    So was that a girlfriend?

15         A.    No, Chasity was just like a good friend,

16   something like that.

17         Q.    She cooked supper for you?

18         A.    Yes, sir.

19         Q.    Okay.  So you had six relationships.  How

20   old were you when you first started having sex?

21         A.    About 13 or 14.

22         Q.    Thirteen or fourteen.  Did you always use

23   protection?

24         A.    No, sir.

25         Q.    Did you ever use protection?

0078

1      A.   About one or two times.

2      Q.   Okay.  Now, you've got your baby.  How often

3  would you see your baby?

4      A.   All the time.

5      Q.   How often?

6      A.   Every day.

7      Q.   Every day.  How did you get there?

8      A.   In my car.

9      Q.   Did you drive over there?  How far did she

10  live from you -- or he live from you?

11      A.   It was a long way.  I stay in the country

12  and they stay in town.  But after work I'd leave work

13  and go over there.

14      Q.   So you would go by every day?

15      A.   Yes, sir.

16      Q.   You said that earlier about you helped with

17  pampers and diapers.  Did you provide food and any

18  clothes for the baby?

19      A.   Yes, sir.

20      Q.   How old is your baby now?

21      A.   A year old.

22      Q.   A year.  So you would go by about every day?

23      A.   Yes, sir.

24      Q.   If he got sick did you ever have to go to

25  the doctor?

0079

```
 1        A.    Yes, sir.
 2        Q.    You have?
 3        A.    Yes, sir.
 4        Q.    Where would you go to the doctor?
 5        A.    One of the clinics.
 6        Q.    Do you know which clinic?
 7        A.    No, I can't think of the name of it.
 8        Q.    Where was it?
 9        A.    In Grenada.
10        Q.    If your baby started running a high fever
11   what would you do?
12        A.    What would I do?
13        Q.    Yeah, what would you do?  Let's say you had
14   the baby.  Did you ever keep the baby at your mom's?
15        A.    I didn't know to.  I took him by my
16   sister's.
17        Q.    Did he ever stay overnight with you at
18   mom's?  No?  If you had the baby and the baby started
19   running a high fever, what would you do?
20        A.    Go get some medicine or take him to the
21   clinic.
22        Q.    What if he had a fever of, let's say, 102.
23   What do you think you should do?
24        A.    Take him to (inaudible).
25        Q.    What is a high fever?  Like over what
```

0080

1   number?  Is 102 a high fever or is it about normal?

2        A.   I think it's pretty high.

3        Q.   Pretty high, especially for a baby.

4   BY UNIDENTIFIED MALE SPEAKER:

5        Q.   Do you know what normal temperature is for a

6   person?

7        A.   (Inaudible).  Fourth grade (inaudible).

8   Like 99.8.

9        Q.   Pretty close, less than 100

10  BY DR. LOTT:

11       Q.   Well, so you had been -- how often were you

12  seeing your other girlfriends?

13       A.   Every night.

14       Q.   Every night.  Were you spending the night

15  with them?

16       A.   Sometimes.

17       Q.   Sometimes.  Okay.  So you lived with your

18  parents but sometimes you'd stay with girlfriends?

19       A.   Yes, sir.

20       Q.   Okay.  Other than hanging out with the

21  girlfriends, what other kind of fun things did you do?

22       A.   Chilled with the fellas.

23       Q.   Chill with the fellas.  What were you doing

24  with the fellas?

25       A.   Like just running with the fellas and we

80

0081

1   would go visit the girls or, you know, smoke, stuff
2   like that.
3       Q.   Okay.  Let's talk about substance abuse.
4   How old were you when you first used any drugs or
5   alcohol?
6       A.   My daddy used to give us beer when I was a
7   little kid.
8       Q.   Give you beer.  How old were you?
9       A.   I was about -- I was young.  About 7 --
10      Q.   How much would he give you?
11      A.   -- eight.  He'd give us a can.  You know how
12  they buy the can.  He'd give us about that much.
13      Q.   So he let you drink beer?
14      A.   Yeah.  He said that when we get older we
15  won't want to drink beer no more.
16      Q.   Is that true for you?  When you got older
17  did you want to drink more beer?
18      A.   I mean when I'm chilling with the boys I may
19  drink a little beer or something.  (Inaudible).
20      Q.   Do you ever drink heavily?  Do you ever wake
21  up in the morning with the shakes?
22      A.   No, sir.
23      Q.   Do you ever have to have a beer in the
24  morning, what's called an eye-opener?  Get one first
25  thing out of the fridge in the morning?

0082

```
 1        A.   Not really.
 2        Q.   Did you ever drink hard liquor?
 3        A.   I have (inaudible).
 4        Q.   What did you drink?
 5        A.   Out of a bottle, out of a can, (inaudible.)
 6        Q.   What is the most you ever consumed in one
 7   day?
 8        A.   One day, probably about this much.  Probably
 9   like two cups.
10        Q.   Two cups of what?
11        A.   Of a hard liquor, I can't drink nothing but
12   like one cup or I get drunk.
13        Q.   Okay.  What about drug use?  What have you
14   done?
15        A.   Just smoke weed.
16        Q.   How old were you when you started?
17        A.   Fifteen.
18        Q.   And how much were you smoking?
19        A.   At first I was only like, it was like every
20   other day, something like that.
21        Q.   What did it progress to?
22        A.   When I got locked up I was smoking like 20,
23   25, blunts a day.
24        Q.   Twenty blunts a day?
25        A.   Something like that.
```

82

0083

1     Q.   Where were you getting that kind of

2  marijuana?  Were you making the blunts or buying the

3  blunts?

4     A.   I made it.

5     Q.   You were making your own blunts?

6     A.   Yes, sir.

7     Q.   So how much marijuana was that a day?

8     A.   About an ounce.

9     Q.   An ounce a day.  How much do they cost?

10    A.   It didn't cost nothing.

11    Q.   Didn't cost anything?  Explain.

12         UNIDENTIFIED FEMALE SPEAKER:  You don't have

13        to answer that one.

14  BY DR. LOTT:

15    Q.   You don't have to answer that.  But my

16  assumption is that if it didn't cost anything, you

17  were dealing it.  So you were smoking an ounce a day?

18    A.   Yeah.

19    Q.   Around that much.  Anything else?  Anything

20  in the marijuana, cocaine, PCP, anything else?

21    A.   I never used anything else.

22    Q.   You never tried any other drugs other than

23  marijuana.  No ecstasy, LSD, PCP?

24    A.   I popped some pills when I went to the Job

25  Corp.

0084

1       Q.   What kind of pills?

2       A.   I don't really know.

3       Q.   How many times did you pop them?

4       A.   About four times.

5       Q.   Four times.  What did they do to you?  Make

6  you sleepy?  Make you high?  Make you hyper?

7       A.   They didn't do nothing.

8       Q.   Nothing.  So you smoke marijuana.  You were

9  smoking 20 to 25 blunts a day when you got arrested.

10      A.   Yes, sir.

11      Q.   What time of day did you start smoking?

12      A.   When I woke up in the morning.

13      Q.   So you were working?

14      A.   Yes, sir.

15      Q.   So how did you manage to smoke that many

16  blunts a day while you were working?  You were working

17  ten hour days.  Did you smoke on the job?

18      A.   Yes, sir.

19      Q.   And you were driving?

20      A.   Yes, sir.

21      Q.   Oh, boy.

22  BY UNIDENTIFIED MALE SPEAKER:

23      Q.   Did you ever put anything else besides

24  marijuana and tobacco?

25      A.   I didn't put no tobacco in it.

84

0085

```
 1          Q.   Say that again?
 2          A.   I didn't put no tobacco in it.
 3     BY DR. LOTT:
 4          Q.   You didn't put any tobacco in them?
 5          A.   No.
 6          Q.   You just put (inaudible).  You have any
 7     cocaine?
 8          A.   No, I never put any coke.
 9          Q.   Did you ever dip them in (inaudible).
10          A.   Yeah, I had some syrup.
11          Q.   What kind of syrup?
12          A.   Cough syrup.
13          Q.   Like a cough syrup?
14          A.   Yeah, something like that.
15          Q.   Like prescription cough syrup?
16          A.   Yeah.
17          Q.   What did that do to you?
18          A.   Make me real relaxed.
19          Q.   Have you ever dipped them in formaldehyde or
20     water?
21          A.   No, sir.
22          Q.   How often did you dip them in cough syrup?
23          A.   I did it about two times.
24          Q.   How long did that last when you did that?
25          A.   It last about the same.  It would do nothing
```

85

0086

1    but give you a rush.

2         Q.   Do you know what kind of cough syrup it was

3    and what was in it?

4         A.   No, it's one of the brand syrups.

5         Q.   You put it in an ounce of various marijuana?

6         A.   Yeah.

7         Q.   How much does an ounce go for?

8         A.   You can get an ounce for $50.

9         Q.   Fifty dollars an ounce?

10        A.   If you know the right person, $50.  But some

11   people sell it for a $100, $150.  Some people sell it

12   for $80.  Some people sell it for $70.  If you know

13   the right person you can get it for $50.

14        Q.   Was it good weed or would they mix it and

15   cut it?

16        A.   The best you can buy.

17        Q.   The best you can buy for $50 an ounce?

18        A.   Yes, sir.

19        Q.   Okay.  No other drugs.  Did you ever use a

20   needle?

21        A.   No, sir.

22   BY UNIDENTIFIED MALE SPEAKER:

23        Q.   Ever huff anything?

24        A.   No, sir.

25        Q.   Even when you were little?

86

0087
```
 1        A.   Yeah, I probably did when I was young.
 2        Q.   How young?
 3        A.   I was probably like 11, 12, 9.
 4   BY DR. LOTT:
 5        Q.   What did you do?
 6        A.   I don't know.  I mean I huffed some -- I
 7   think it was paint or something one time.  I'd seen a
 8   TV show or something and I just did it.  It wasn't
 9   nothing to it.
10        Q.   How sick did you get?
11        A.   I didn't get sick at all.
12        Q.   Did you get high?
13        A.   I don't think I did, no.
14        Q.   Did you ever huff glue or freon?
15        A.   No.
16        Q.   No other drugs?  Did you ever use a needle?
17        A.   No.
18        Q.   Did you ever get treated for drug use?
19        A.   No.
20        Q.   Did anybody ever suggest that you needed
21   treatment for drug use?
22        A.   Nobody even knowed I was smoking.
23        Q.   Nobody knew you were smoking.  Twenty-five
24   blunts a day and nobody knew that you were stoned?
25        A.   No, sir.
```

87

0088

1    BY UNIDENTIFIED MALE SPEAKER:

2        Q.   Do you think your brother didn't know you

3    were smoking that much dope?

4        A.   Yeah, my brother.  He didn't know I was

5    smoking like that, though.  If you drop some Visine in

6    your eyes you never can tell.

7        Q.   Did you ever take any pain pills?

8        A.   No, sir.

9    BY DR. LOTT:

10       Q.   Did you smoke crack?

11       A.   No.

12       Q.   I'm assuming many of your other buddies were

13   using crack.  No?  That wasn't something you guys were

14   doing?

15       A.   No.

16       Q.   No?  Okay.

17       A.   We weren't doing none of those others.

18       Q.   Meth?

19       A.   No.

20       Q.   Ice or Crank or anything like that?  Okay.

21   Now, and I didn't ask this earlier.  I think we

22   touched on it.  Has anybody in your family got any

23   drug and alcohol problems?

24       A.   Yeah.

25       Q.   Who?

88

0089

```
 1         A.    I mean (inaudible).
 2         Q.    Well, how many brothers, sisters, uncles?
 3         A.    That smoke?
 4         Q.    That have a problem with drugs and alcohol.
 5    They do drugs and have a problem with alcohol?
 6         A.    I mean they use them.  About all my brothers
 7    and sisters on the Pitchford side use drugs, they
 8    smoke weed.
 9         Q.    All of them.  You said you've got about 15.
10         A.    About all of them.
11         Q.    What about your father?
12         A.    No, my father never smoked at all.
13         Q.    Did he have a problem with alcohol?
14         A.    No.
15         Q.    A problem with it now?
16         A.    No, he didn't.
17         Q.    Okay.  Stepfather?
18         A.    Yeah.
19         Q.    He did.  What about with drugs?
20         A.    I don't know about drugs.
21         Q.    You don't know about any drugs.  What about
22    your mom?
23         A.    No.
24         Q.    What about your grandparents, your mom's
25    parents or your dad's parents, any of them have any
```

App.0161

0090

1  history of drug and alcohol problems?

2      A.   I mean my mama's daddy died from drinking

3  too much.

4      Q.   Your mom's daddy did.  So it sounds like you

5  have quite a history of alcohol abuse?

6      A.   Yes, sir.

7      Q.   Okay.  Anybody else, any major problems,

8  aunts, uncles, anybody?

9      A.   My uncle was.  He had a real bad drug

10 problem but he don't do it no more.

11     Q.   Mom's or dad's?

12     A.   My mom's.

13     Q.   Your mom's brother.  Okay.  Anybody in your

14 family that you know of that went to Whitfield or any

15 mental health facility like Whitfield?

16     A.   I had a brother named James.  He went to

17 Whitfield.

18     Q.   James did?

19     A.   Yeah.

20     Q.   How old was James when he went to Whitfield?

21     A.   I don't know.  He was smoking dope.

22     Q.   You don't know what diagnosis he might have

23 had?

24     A.   No.

25     Q.   Was it drug and alcohol-related?

90

0091
```
1          A.   I don't know.
2          Q.   You don't know?
3          A.   No.
4          Q.   Okay.
5    BY UNIDENTIFIED MALE SPEAKER:
6          Q.   You didn't know him at all?
7          A.   Who?
8          Q.   James.
9          A.   That's my brother.  He -- no, I didn't know
10   him.  He died before I was born.
11   BY DR. LOTT:
12         Q.   Oh, he died?
13         A.   Yeah.  Well, he was probably alive when I
14   was born but I didn't know him.
15         Q.   You just don't remember him?
16         A.   No.
17         Q.   Okay.  No one else that you know of that was
18   treated for mental illness.  Anybody in your family
19   considered to be mentally retarded?  Any of your
20   brothers or sisters, anybody considered to be mentally
21   retarded?  Do you know what I mean by mentally
22   retarded?
23         A.   Like crazy.
24         Q.   Well, what do you mean by that?  Mentally
25   retarded, not mentally ill?
```

91

0092

1       A.   I really (inaudible).

2       Q.   You've heard of people described as

3    retarded, haven't you?

4       A.   Yeah.

5       Q.   What does that mean to you?

6       A.   They got a brain condition like in their

7    head or something that is messed up.

8       Q.   Possibly.  But what else does it mean?

9    You've got retarded and you've got crazy.  Growing up

10   when people use those terms, or he's retarded or she's

11   crazy, what did that mean to you?

12      A.   Retarded means to me that, you know,

13   something wrong, they retarded in some kind of way.

14   The only time (inaudible) crazy.

15      Q.   Well, did you ever go to school when people

16   were called mentally retarded?  Did you ever know

17   students growing up who were mentally retarded?

18      A.   I would see them (inaudible).

19      Q.   Okay.  Were they called retarded?

20      A.   No, they called them the local dummy.

21      Q.   Okay.  Well -- called what?

22      A.   Local dummy.

23      Q.   Local dummy.  What do you think that would

24   really stand for?

25      A.   I believe it would stand for retarded.

0093

1          Q.   That's right.  Okay.  All right.  Now, I'm
2    going to ask you some questions about how you're doing
3    today as you're sitting here.  Let me back up.  How
4    tall are you?
5          A.   About 5-6.
6          Q.   How much do you weigh?
7          A.   I've lost a lot of weight.
8          Q.   Just give me a guess.
9          A.   160.
10         Q.   160.  Are you doing any weightlifting in the
11   jail?
12         A.   I do push-ups.
13         Q.   You do push-ups.  Okay.  What's the tattoo
14   on your hand there say?
15         A.   It's my son's name.  My son's name.
16         Q.   Okay.  Is that your son's name?
17         A.   Yes, sir.
18         Q.   Any other tattoos?
19         A.   No, sir.
20         Q.   Okay.  How are you feeling today, your mood,
21   just in general, happy, sad, mad, glad?  How you
22   doing?
23         A.   I mean sad really.  Sad.
24         Q.   As you're sitting here now, how are you
25   doing today?  Are you doing okay?

0094

```
 1        A.   Yes, sir.
 2        Q.   How have you been doing since your arrest?
 3        A.   I been adapting to it.
 4        Q.   Been adapting.  Have you tried to hurt
 5   yourself since you've been arrested?
 6        A.   No, sir.
 7        Q.   Have you ever tried to hurt yourself?
 8        A.   (Inaudible).
 9        Q.   Tried to hurt yourself, commit suicide?
10        A.   Yes, sir.
11        Q.   When?
12        A.   It's been when I was a kid.
13        Q.   How old were you?
14        A.   About 14.
15        Q.   Fourteen.  Why?  What was going on with you
16   at 14 for you to do that?
17        A.   I just had a real bad temper.
18        Q.   You had a real bad temper?
19        A.   Yeah.  I got mad.
20        Q.   At who?
21        A.   I got mad at my baby's mama, my mama and
22   daddy.
23        Q.   So what did you take?
24        A.   I took a whole bottle of pain pills.
25        Q.   A bottle of pain pills.  Whose were they?
```

0095

```
 1          A.   I don't know.
 2          Q.   You don't know.
 3          A.   I got them out of the cabinet.
 4          Q.   You got them out of the cabinet.  So what
 5     happened to you?
 6          A.   I started to shake at first.  And then I
 7     went and told my sister and I just blacked out.
 8          Q.   And then what happened?
 9          A.   They was taking me to the hospital and
10     trying to wake me up.  They started trying to wake me
11     up and took me to the hospital.  After some time
12     (inaudible).
13          Q.   So they didn't pump your stomach?
14          A.   No, sir.
15          Q.   So what happened after that?  Did you leave
16     that day or were you in the hospital overnight?
17          A.   I left that day.
18          Q.   You left that day.  Did you have any
19     problems after that walking, talking, anything that
20     you can recall?
21          A.   No, sir.
22          Q.   Okay.  Is that the only time you ever tried
23     to hurt yourself?
24          A.   No, sir.
25          Q.   What?
```

95

0096

1          A.    Some people think (inaudible) crazy.  I cut

2     myself one time.

3          Q.    Were you trying to hurt yourself or just

4     feel the pain?  Some people cut on themselves and say

5     it makes them feel better, release tension.  What were

6     you doing?

7          A.    I cut.

8          Q.    Did you have stitches?

9          A.    No, sir.

10         Q.    Did you tell anybody?  Is that the scar on

11    your left arm there?

12         A.    No, it was this here.

13         Q.    Here and here.  Is that what we are talking

14    about?

15         A.    Yes, sir.

16         Q.    Okay.  That's under the left arm?

17    BY UNIDENTIFIED MALE SPEAKER:

18         Q.    What was going on then when you cut

19    yourself?

20         A.    I was mad.

21         Q.    Who were you mad at?

22         A.    I was mad.

23         Q.    What was going on?

24         A.    I was just doing it.

25         Q.    Do you know or don't want to say?

0097

```
 1        A.   I was just doing something.
 2        Q.   Well, there's a long list of doing something
 3   when you're cutting yourself.  Was it gang-related?
 4        A.   No.  I was just sitting on the bed at the
 5   house and after I got off the phone or something and I
 6   (inaudible) something and I just started scraping
 7   myself.
 8   BY DR. LOTT:
 9        Q.   Any other place besides those two?
10        A.   No, sir.
11        Q.   Okay.  Now, right now you talked about
12   hurting yourself.  What if you go back to court and
13   you get the death penalty?  Did you tell anyone if you
14   get the death penalty you're going to commit suicide?
15        A.   No, sir.
16        Q.   Okay.  How have you been sleeping?
17        A.   I've been sleeping all right but my leg
18   hurts.
19        Q.   Why has your leg been hurting?
20        A.   Exercise.
21        Q.   Exercise.  Okay.  How is your appetite?
22        A.   Good.
23        Q.   It's good.  You said you'd lost some weight.
24   Any idea how much?
25        A.   A lot of weight.
```

App.0169

0098

1      Q.   You've lost a lot of weight.  How much?

2      A.   I normally weigh about 210.

3      Q.   Bulked up or are we overweight?  For 210 you

4  would have been overweight unless you had added muscle

5  and it was mostly muscle.

6      A.   No, sir.

7      Q.   All right.  Now, have you ever heard voices

8  other people didn't hear?

9      A.   Just voices in my head.

10     Q.   But did you hear anybody talking to you like

11  I am talking to you right now that other people

12  wouldn't hear?

13     A.   I might hear somebody calling my name or

14  something.

15     Q.   Okay.  We've all experienced that.  But do

16  you hear someone constantly talking to you, carrying

17  on a conversation, telling you to do things, that no

18  one else around you can hear?

19     A.   Like I might I hear them in my head.

20     Q.   Like what?

21     A.   I might hear a whole bunch of things, like

22  two different people in my head telling me what to do.

23     Q.   What about your conscience?  Do you know

24  what I mean by we all have a conscience that we deal

25  with when we would do something bad?

0099

1       A.    Lying is bad.  I mean it don't be no -- I
2   mean it ain't like this and like that.  It's a whole
3   bunch of stuff.
4            DR. LOTT:  Okay.  Well -- let me turn this
5       tape over.
6       A.    I hear voices in my head sometimes.
7       Q.    Explain.
8       A.    Like I would be up doing something and
9   something tells me to do something else and something
10  tells me to do this and do that and different things.
11      Q.    Did you ever hear voices telling you to slap
12  somebody for no reason?
13      A.    Yeah, I'd hear them.
14      Q.    And what would you do?
15      A.    Most of the time I don't react on them.
16      Q.    You don't?
17      A.    I learned how to control it.
18      Q.    Did you ever think that people could read
19  your mind and you could read other people's minds?
20      A.    No, sir.
21      Q.    Can you read my mind?
22      A.    I can take a guess.
23      Q.    I'm not asking you to guess.  I'm asking can
24  you read my mind.  Can you turn this tape recorder on
25  and off just by looking at it and thinking about it?

99

0100

1     A.   I don't (inaudible) I could.

2     Q.   But can you?

3     A.   No, sir.

4     Q.   Can you move objects in this room just by

5  looking at them?

6     A.   No, sir.

7     Q.   Okay.  Can I read your mind?

8     A.   No, sir.

9     Q.   Do you ever feel like you have any special

10  powers of any sort?  Any unique powers or abilities?

11     A.   I ain't got no powers.

12     Q.   Did you ever think you could heal the sick

13  and raise the dead?

14     A.   I believe it's possible.

15     Q.   But can you do it?  If I were to have a

16  stroke out here and literally died, can you bring me

17  back to life?

18     A.   No, sir.

19     Q.   Okay.  Have you ever thought that aliens

20  were trying to haunt you, your parents, anything

21  bizarre or weird like that go on with you?

22     A.   No, sir.

23     Q.   Okay.  Have you ever thought that you had

24  different body parts that say someone had taken

25  something from your body or put something in your

100

0101
1  body?
2      A.   No.
3      Q.   Have you ever thought that you had women's
4  female anatomy, like breasts?  Did you ever think you
5  had breasts or a vagina, anything strange like that?
6      A.   No, sir.
7      Q.   Okay.  So nothing been removed or added to
8  you?
9      A.   No, sir.
10     Q.   Okay.  Did you ever have any reason to think
11  that the government or anybody else was out to get
12  you, to get you personally?
13     A.   No, sir.
14     Q.   Okay.  Do you think that we are somehow out
15  to get you personally, that we have any unique grudge
16  or anything against you?
17     A.   No, sir.
18     Q.   Okay.
19  BY UNIDENTIFIED MALE SPEAKER:
20     Q.   Have you ever spoken with other people, any
21  spirits, anything like that?
22     A.   My daddy.
23     Q.   Like what?
24     A.   Seeing my daddy.
25     Q.   How old were you?

101

0102

```
 1        A.   About 12.
 2        Q.   How often did this happen?
 3        A.   Every day.  You talking about now?
 4        Q.   No, when you saw him?
 5        A.   About three years.
 6        Q.   What did he look like?
 7        A.   Like his regular self.
 8        Q.   Say again?
 9        A.   Like his regular self.
10        Q.   Like his regular self.  Did he say anything
11   to you?
12        A.   No, sir.
13        Q.   Were you awake or asleep?
14        A.   Awoke.
15        Q.   How long did that last?
16        A.   For a minute.  Just for a minute.  I just
17   thinking I was dreaming or something like that.
18        Q.   It scared you?
19        A.   Yeah.
20        Q.   Did it shake you up a little bit?
21        A.   No, sir.
22        Q.   What do you think that was?
23        A.   What you mean?  Like, I just thought it was
24   a dream.
25        Q.   Well, do you think it was really your dad?
```

102

0103

```
 1    Did you think it was a ghost?  Did you think it was in
 2    your mind?
 3         A.   Ghost.
 4         Q.   Huh?
 5         A.   I knew it was a ghost.
 6    BY DR. LOTT:
 7         Q.   Was it in color or black-and-white?
 8         A.   It was in color.
 9         Q.   It was in color?
10         A.   Yes, sir.
11         Q.   I'd like to go back to the voices for a
12    minute.  Now, let's be clear.  Are we talking about
13    voices where you can hear them in your mind or are you
14    talking about like your own inner thoughts?
15         A.   Voices I hear in my mind.
16         Q.   Voices in your mind?
17         A.   Yes, sir.
18         Q.   Did they ever carry on a conversation with
19    you such that you would talk back to them?
20         A.   Yes, sir.
21         Q.   Like what?
22         A.   Just -- I just tell what I think.  Sometimes
23    I might tell them to shut up talking to me.  Sometimes
24    I -- like you could tell them to shut up probably.
25         Q.   Are you still having them, hearing them?
```

103

0104

1        A.   I hear them all the time.

2        Q.   All the time?

3        A.   Yes, sir.

4        Q.   Is there anything that you can do to make

5 them go away?

6        A.   There's one voice in my mind that I can say

7 certain things and they will leave but they only stay

8 gone for a minute.

9        Q.   Do the voices have a name?

10       A.   No, sir.

11       Q.   Do they come to molest you or (inaudible).

12       A.   No, they all in my head, in my mind.

13       Q.   And are they male or female voices?

14       A.   Male.

15       Q.   Male?

16       A.   Male, yes, sir.

17       Q.   Do you know whose voices they are?

18       A.   I used to think -- I was thinking, as I got

19 older, that it was Satan -- it was Satan and God

20 having a battle in my head, the voice in my head.

21 That's what I started thinking. So now I just let

22 them act on their own.

23       Q.   When you would hear the voices did you ever

24 have the sensation of tickling at the end of your nose

25 when you hear the voices?

104

0105

1      A.   No, it don't tickle.  I usually hit my head.

2  I usually hit my head or something like that.

3      Q.   Can you give me an example of the last time

4  you heard the voices?

5      A.   I can hear them now.

6      Q.   You hear the voices now?

7      A.   Yes, sir.

8      Q.   And what are they saying now?

9      A.   A whole bunch of things.

10     Q.   Give me an example.

11     A.   How long is this going to take.  What's

12  going on outside.  What y'all thinking about.  Trying

13  to call you outside.

14     Q.   But now, again, we want to make sure we

15  understand.  Because there's a big difference between

16  what we call self talk.

17     A.   Sometimes -- sometimes it be -- sometimes it

18  be like -- they have (inaudible), sometime just have a

19  number of different things, you know what I'm saying.

20     Q.   But we all have ideas.  For instance, we can

21  all be here talking to you right now and we can think

22  well, you know, what have I got to carry home for

23  supper tonight.  You know, we can all go that way and

24  we have tangents and our mind works like that.

25     A.   This is like say if I'm locked in a room by

105

0106

1   myself with and ain't nobody else talking or nothing
2   like that.  Nobody talking to me or anything else.  I
3   hear them.  Right now I'm kind of like controlling my
4   thoughts.  But when I'm just, you know, just sitting
5   here in jail or something like that or laying in the
6   bed or something like and no one else in the room and
7   I can hear them.  My mind can just go off and go
8   somewhere else.
9        Q.   Okay.  But our minds all wonder.
10       A.   Well, I do.  Like I say, my mind thinks
11  stuff like this person talking, I can't stand to hear
12  their voice or something like that, you know, my mind
13  telling me something like that.  And I say you need to
14  shut up or, you know, can he whip me, you know, what
15  he's thinking about, what these folks are doing or
16  something like that.
17       Q.   Okay.  Now, I would consider that to be just
18  self-talk.  You know, I wish that guy would shut up.
19  He's gone on for three days talking and talking and I
20  can't stand to hear him.  He talks all the time.
21  That's self-talk, okay.  Because it's my thoughts,
22  it's my thinking, it's my tangents.  I'm wandering
23  here, here and yonder.  Am I going to get to go
24  fishing next month.  What have I got to do -- you
25  know, did I pay the bills last week.  You know, those

106

0107

1   kind of things.

2        A.   Right.

3        Q.   Is that similar to what you're experiencing?

4        A.   Yeah, that sound like that, too.

5        Q.   Okay.  But I don't hear anybody now talking

6   to me whose voice I don't recognize, other than yours,

7   the folks in this room and my own thoughts.  Okay. I

8   don't have Satan and God telling me, you know, I need

9   to run out of this room and start hollering and go

10  over there and slap anybody.

11       A.   They do things like that.  It be that, too.

12  It be a whole bunch of things.  Some tell me to slap

13  this person.  Some tell me to hit this person.  Some

14  tell me go over there and straighten you out.

15       Q.   Do you ever do it?

16       A.   I know how to control it now.

17       Q.   Okay.  Have you ever slapped anyone if the

18  voices said, you know, I'm tired of hearing him talk,

19  I could just slap him.

20       A.   (No audible response.)

21       Q.   What if they were to tell you to do crazy

22  things like take off all your clothes and run out into

23  the street and jump up and down, wave your hands?

24       A.   I would never do nothing crazy.  No.

25       Q.   Have you ever used the bathroom and peed in

0108

1  a cup and drank it?

2      A.   No.

3      Q.   Anything like that?

4      A.   No.

5  BY UNIDENTIFIED MALE SPEAKER:

6      Q.   Okay.  Have the voices made you do things?

7      A.   I get upset.

8      Q.   How do you get upset?

9      A.   I get mad.  I get a temper or something.  I

10 mean it don't be me.  It be something they told me to

11 do.

12 BY DR. LOTT:

13     Q.   Are the voices ever mean to you?  Or do they

14 ever tell you how great you are?

15     A.   Sometimes they tell me something.  I don't

16 think they ever tell me like that.  One of them kind

17 of help me though.  One of them be on my side.

18     Q.   What do you mean?

19     A.   I mean he tell me different things.  I don't

20 believe it to be true, though.  But at different

21 times, you know, like why don't you do this and why

22 don't you do that.  I don't go by neither one of them.

23     Q.   But are they derogatory toward you?  Do they

24 say you're a piece of crap or you're not worth

25 anything or something like that?  Or do they tell you

App.0180

0109

1    you're God's gift to women or you're, you know, a
2    world leader?  Do the voices ever tell you stuff like
3    that?
4        A.   They told me I was a leader.  They tell me,
5    you know, I'm the hottest male or.
6        Q.   They do or don't?
7        A.   I mean that's what I be thinking.  I guess
8    that's them telling me.  You mean my own self?
9        Q.   Yeah, I mean do you think you're the hottest
10   male in the jail?
11       A.   They ain't no (inaudible).
12       Q.   Okay.  All right.  Well, I have my own
13   opinion about what's going on with you right now.  But
14   let me ask -- I forgot to ask you a couple of things
15   that Dr. McMichael needs to write down here.  When you
16   were little, did you ever have any accidents or
17   injuries?
18       A.   Accidents.  I mean I fell out the back of a
19   Jeep.
20       Q.   Did you get hurt?
21       A.   Yeah, I busted my head.
22       Q.   Stitches?
23       A.   No.
24       Q.   Anything else?
25       A.   I was 9 years old, 8 years old.

App.0181

0110

1       Q.   Eight or nine.  Why did you do that?

2       A.   Voices.

3       Q.   What?

4       A.   Voices or something told me to jump out

5 there and see if I could turn around and grab the

6 thing.

7       Q.   Grab what thing?

8       A.   You know how the back of the Jeep the trunk

9 close down like that.  And it's got a little thing

10 stick up there and catch onto it.

11      Q.   The trailer hitch?

12 BY UNIDENTIFIED MALE SPEAKER:

13      Q.   The back window of the Jeep?

14      A.   Yeah, the Jeep, you know how it close down.

15 It got a little latch that catches it to keep it

16 closed.  And I told Perry to jump out and he said you

17 crazy, man, I'm not jumping out the back of that Jeep.

18 So he went up front.  And I just said I'm going to try

19 it.  And something just said don't do it, don't do it.

20 And I jumped out of that thing.

21 BY DR. LOTT:

22      Q.   You jumped and you tried to catch the latch?

23      A.   Tried to turn around real fast and catch it.

24      Q.   As you were driving down the road?

25      A.   Yeah.

App.0182

0111
1      Q.   Were you backing out of the driveway?
2      A.   No, we were driving, going down the street.
3      Q.   You were going the street?
4      A.   Yes, sir.
5      Q.   How far away from home were you?
6      A.   Right there in front of our house.
7      Q.   So you backed out and you started down the
8   road and you jumped out?
9      A.   We come to the street and when we got down
10  the street I jumped out.
11     Q.   Right in front of the house?
12     A.   Yeah.
13     Q.   Were you about to turn in the driveway?
14     A.   No, we was going to go up the street.
15     Q.   What was the point of that?
16     A.   See can I do it, I guess.
17     Q.   Did you think you had a special gymnastic
18  ability or something?  Was it a dare?
19     A.   Unh-unh, I was just trying to grab that
20  latch, see can I grab it.
21     Q.   But the voices told you to do that?
22     A.   Yes, sir.
23     Q.   Do you remember -- actually remember a voice
24  back then telling you to do that?  Is that just
25  something now you think might have been a voice?

0112

1        A.    Back then I really didn't think about it.
2    I'd usually, say if I was going to the bathroom or
3    something.  I'd be sitting on the toilet or something
4    and the voices tell me you hate God and this and that,
5    you know what I mean.  And I'd be like shut up, shut
6    up, stop talking to me.  But now I got control, you
7    know what I'm saying.  Now, they tell me to do
8    something, you know, and I just say -- well, I really
9    don't have to say anything then and they leave for a
10   minute but then they come right back.
11       Q.    How long do they have control over you?
12       A.    They had control since I got older, you know
13   what I'm saying.  And I try to (inaudible).
14   BY UNIDENTIFIED MALE SPEAKER:
15       Q.    How old were you the first time you heard
16   anything like that?
17       A.    I can't remember.  It's been a long time.
18       Q.    About how old?  You said you were hearing
19   them when you were 9.  About how old were you when you
20   first heard it?
21       A.    About 7 years old.
22       Q.    Okay.  And how old were you about when you
23   learned to control it?
24       A.    About 16, 17.
25       Q.    What is the weirdest thing they ever said to

112

App.0184

0113

1   you or told you to do?

2        A.   Weirdest thing.  To do something crazy and

3   hurt myself.

4        Q.   Like what?

5        A.   Like jump over the balcony or something like

6   that.

7        Q.   Jump over the balcony?

8        A.   Crazy stuff like that.  Window at the jail

9   house or just do something, you know, anything.

10  BY DR. LOTT:

11       Q.   Did you do it?

12       A.   No.

13       Q.   You didn't jump over the balcony at the

14  jail.

15  BY UNIDENTIFIED MALE SPEAKER:

16       Q.   What if it told you to get into it with

17  somebody at the jail?

18       A.   I wouldn't do it.

19       Q.   How come?

20       A.   Because, you know, if I do something to

21  somebody else, I ain't doing nothing but hurting

22  myself and I ain't gone hurt myself.

23       Q.   Have you had any rule violations or anything

24  like that at the jail while you've been there?

25       A.   Yeah.

App.0185

0114

1     Q.   What kind of stuff?

2     A.   Fighting.

3     Q.   When was the last time you were in a beef

4   with somebody?

5     A.   About six or seven months ago.

6     Q.   Did you ever get locked down?

7     A.   Yes, sir.

8     Q.   For how long?

9     A.   The longest I ever got locked down was about

10  a week.

11    Q.   What did that do to the other guy?

12    A.   Lock him down to.

13    Q.   Anybody now that you have a beef with?

14  Anybody you seriously thought about hurting or

15  killing?

16    A.   No, sir.

17    Q.   Jailers, anybody at the jail, anything like

18  that?

19    A.   Well, I mean my mind wanders off sometimes

20  but I don't think about hurting nobody or something

21  like that.

22    Q.   Do you think they're poisoning your food at

23  the jail?

24    A.   One time this dude, he had a piece of glass.

25  And I thought maybe they were trying to pull

114

0115

1   something.  Maybe they were trying to, you know, get

2   out on or something like that.

3        Q.   Are you concerned about that now, though?

4        A.   No, sir.

5   BY DR. LOTT:

6        Q.   I need to ask you a couple of other

7   questions regarding your medical.  Have you ever been

8   hospitalized or had surgery for any reason?

9        A.   Yes, sir.

10        Q.   What for?

11        A.   I had a CAT scan.  I had high blood pressure

12   at one point.

13        Q.   When did you have a CAT scan?

14        A.   It was around when I had high blood pressure

15   and stuff like that.

16        Q.   How old were you?

17        A.   About 11, 12.

18        Q.   What's a CAT scan?

19        A.   They lay you down and they take you in there

20   for a whole day.  And then they lay you down and put

21   this thing they call a eye and put it inside your head

22   or something like that.  And they lay you down in the

23   thing.  And then they strap you down.  And then you go

24   inside this thing and you try not to open your eyes.

25   Then they do something, I guess, to read your mind or

115

0116
1    check on your brain, something like that.
2        Q.    Okay.  And how old were you?
3        A.    About 11.
4        Q.    What hospital was this?
5        A.    Grenada Medical.
6        Q.    Grenada Medical?
7        A.    Yes, sir.
8    BY UNIDENTIFIED MALE SPEAKER:
9        Q.    And that was going to find out what was
10   causing your blood pressure problem?
11       A.    I guess.
12   BY DR. LOTT:
13       Q.    Are you taking any medicine now for blood
14   pressure?
15       A.    I never took medicine.
16       Q.    Never took medicine.  Did you have any other
17   accidents or injuries?  Have you had any head
18   injuries?
19       A.    Head injuries like?
20       Q.    Serious head injuries.  Like get hit in the
21   head with a baseball or bat, or anything like that?
22       A.    No, sir.
23       Q.    Been in any car wrecks?
24       A.    Yeah, car wrecks I hit my head.
25       Q.    You got in a couple of car wrecks.  Did you

116

0117

1   ever get any treatment?  Were you ever knocked

2   unconscious?

3        A.   Yes, sir.

4        Q.   Where?

5        A.   One time at football and we were practicing

6   with no gear on and people ran me over.  When I woke

7   up the game was over with.  And when I wrecked I hit

8   my head on the windshield and it put me out for a

9   second.

10        Q.   For a second?

11        A.   Less than a minute.

12        Q.   A minute.  Okay.  Any problems walking or

13   talking after that?

14        A.   My leg hurt.

15        Q.   Did you hurt your legs in that accident?

16        A.   Yes, sir.

17        Q.   Your left or right leg?

18        A.   My right leg.

19        Q.   Your right leg.  Did you have any treatment?

20        A.   No, sir.

21        Q.   Any other accidents or injuries?

22        A.   That's it for my head.

23        Q.   Any STDs?

24        A.   No, sir.

25        Q.   How do you know?

0118
```
 1        A.   They give me a check-up at the jail.
 2        Q.   What about HIV?
 3        A.   They gave me a check for that.
 4        Q.   What's an STD?
 5        A.   Sexual disease.
 6        Q.   Give me an example of one.
 7        A.   Herpes, gonorrhea.
 8        Q.   So you've been checked for that?
 9        A.   Yes, sir.
10   BY UNIDENTIFIED MALE SPEAKER:
11        Q.   Have you ever taken any medicines for your
12   nerves?
13        A.   My nerves, no, sir.
14        Q.   Have you ever taken any medicines for being
15   hyperactive or attention deficit, Ritalin, that kind
16   of stuff?
17        A.   No, sir.
18        Q.   No?
19        A.   No, sir.
20        Q.   Are there any medicines that you're allergic
21   to?
22        A.   No, sir.
23        Q.   Penicillin, sulfur drugs, anything like
24   that?
25        A.   No, sir.
```

118

0119

```
 1        Q.   Have you ever had any operations?
 2        A.   I had surgery.
 3        Q.   For what?
 4        A.   My toe.
 5        Q.   How old were you?
 6        A.   About 17.
 7        Q.   What was the problem?
 8        A.   My toenail got twisted up.
 9        Q.   Did it swell up and hurt?
10        A.   It swelled up.
11        Q.   Both of them or just one?
12        A.   Both of them.
13        Q.   And they did that with an operation?
14        A.   Yes, sir.
15        Q.   Were you in the hospital overnight or just
16   part of the day?
17        A.   Part of the day.
18        Q.   Are you having any physical problems this
19   morning, anything hurting?  Headache, backache, cold,
20   trouble breathing?
21        A.   My legs.
22        Q.   Which one?
23        A.   Both of them.
24        Q.   What's wrong?
25        A.   Working out.
```

119

0120
1        Q.   Working out.  Anything else like that?
2   Headaches, dizziness, things like that?
3        A.   (No audible answer.)
4   BY DR. LOTT:
5        Q.   Do you ever have seizures or blackouts?
6        A.   No.
7        Q.   Are you ever concerned about organs rotting
8   away or decaying, any organs or parts of the brain,
9   all that stuff?
10       A.   No, sir.
11  BY UNIDENTIFIED MALE SPEAKER:
12       Q.   If you had to pick the one thing that's been
13  bothering you the most lately, anything at all, what
14  would that be?
15       A.   Do you mean like bothering me, like hurting
16  me?
17       Q.   Hurting you physically, hurting you
18  mentally, hurting you in any kind of way?
19       A.   Mentally.
20       Q.   Worrying you?
21       A.   This charge.
22       Q.   How do you think that's affecting you
23  mentally?
24       A.   Cause I think about it all day every day.
25       Q.   Do you think of yourself as having trouble

120

App.0192

0121

1    with your nerves or emotions?

2        A.   No, sir.

3    BY DR. LOTT:

4        Q.   So that stuff with the voices, do you think

5    most people experience what you experience or do you

6    think you're different?  Or is that some kind of a

7    special mental problem?

8        A.   Sometimes I think about that and I really

9    don't know.

10       Q.   Well, what's your best thought on that?  Do

11   you think that most people experience what you've

12   described to us about the voices or do you think

13   you're different from other people in some way?

14       A.   I think I'm kind of different.  I mean I

15   don't believe everybody is like this.

16       Q.   Have you ever known anyone who had that

17   problem?

18       A.   No, sir.

19   BY UNIDENTIFIED MALE SPEAKER:

20       Q.   Did you ever talk to anybody like your mom

21   or your brother about the voices you were hearing?

22       A.   Yes, sir.

23       Q.   Who did you talk to?

24       A.   At first I talked to my guys about it.

25       Q.   Who is that?

121

0122

1     A.   His name is Willie B.  Willie B. Thurman or

2  something like that.

3     Q.   Willie B. Thurman.  Where is he?

4     A.   He stays in Tchula, Mississippi.

5     Q.   What did he say?

6     A.   He really didn't say nothing.  He just said

7  pray.  He said pray when I started hearing them.  I

8  told my mom about it.

9     Q.   When did she say?

10     A.   She didn't say nothing.  She just said ain't

11  got no cure for it.

12     Q.   Did you ever tell your friends?

13     A.   I told them and they said they didn't know

14  where I got that.  They said to rebuke Satan.

15     Q.   Rebuke Satan?

16     A.   Yeah.

17     Q.   Okay.  Would you say that helped for a

18  little while?

19     A.   Yes, sir.

20  BY DR. LOTT:

21     Q.   Do you think you need medicines for that?

22     A.   No, sir.

23     Q.   You don't think you need medicine?

24     A.   No, sir.

25     Q.   Has it ever interfered with your ability to

122

0123

1    work?  When you were working, did it ever interfere

2    with your ability to drive the truck or to unload the

3    truck or to load the truck?

4         A.   No.

5         Q.   Did it ever interfere with your ability to

6    carry on a conversation like you and I have had this

7    morning?  Because I haven't suspected at all you were

8    hearing voices and that they were distracting you.

9         A.   No.

10        Q.   And you haven't appeared to be responding to

11   any kind of voices, anything other than our questions

12   we asked to you.  So has it interfered with anything

13   you've done before?  If you're with a woman and you

14   guys are having sex, did it ever interfere with your

15   ability to have sex with a woman?

16        A.   No, sir.

17        Q.   Okay.

18   BY UNIDENTIFIED MALE SPEAKER:

19        Q.   Do you have any trouble with your memory?

20        A.   Yeah, I forget things.

21        Q.   Can you remember who we are sending our

22   reports to?

23        A.   Yeah, to the Court.

24        Q.   Who else?

25        A.   To the Court and to the judge.

0124
1       Q.   Who else?
2       A.   To the D.A.
3       Q.   Do you remember that from us telling you or
4   did you just know that?
5       A.   I remember it.  I just know it, I guess.
6       Q.   We're going to give you three things to
7   remember.  And if I can remember, I'm going to ask you
8   in about five minutes, okay.
9       A.   Okay.
10      Q.   A possum, a pine tree, and an oyster.  Can
11  you say those back to me?
12      A.   A possum, a pine tree and an oyster.
13      Q.   Okay.  If I can remember in about five
14  minutes I'll ask you.
15           I'm going to give you a series of words and
16  I want you to tell me how they are alike.  If I say
17  this apple and this orange, how are they alike?
18      A.   Both of them grow on trees.
19      Q.   Okay.  An apple and an orange are both
20  blank.  Fill in the blank.
21      A.   Fruit.
22      Q.   A table and a chair?
23      A.   You can sit down on.
24  BY DR. LOTT:
25      Q.   They're both what?

0125

1   BY UNIDENTIFIED MALE SPEAKER:

2       Q.   Yeah, a table and a chair are both what?

3       A.   Wood.

4       Q.   Wood.  Sure.  All right.  A table and a

5   chair, what section of a store would you go to?

6       A.   Furniture.

7       Q.   Okay.  That's what I was looking for.  Okay.

8   A pencil and a pen are both?

9       A.   Writing utensils.

10      Q.   Writing utensils.  Good for you.  A poem and

11  a short story are both what?

12      A.   Both you can read.

13      Q.   Huh?

14      A.   Both you can read.

15      Q.   Okay.  What does the expression mean that

16  some folks use sometimes when they say, don't judge a

17  book by its cover?

18      A.   Don't judge by what you see.

19      Q.   Excellent.  Okay.  What can you do with an

20  orange that you can't do with a baseball?

21      A.   I can eat an orange.  I can't eat the

22  baseball.

23      Q.   How are they alike?

24      A.   They're both round.

25  BY DR. LOTT:

125

0126

```
 1       Q.   All right.  Okay.  Now, we're going to move
 2  on into some questions about court.  Remember your
 3  rights that we told you about earlier.
 4       A.   Yes, sir.
 5       Q.   What rights did we say that you had?
 6       A.   I don't have to answer.
 7       Q.   Okay.  I will pause for just a second.
 8            UNIDENTIFIED MALE SPEAKER:  Are we going to
 9       take a break or anything?
10            DR. LOTT:  Do you need to take a break?
11            MR. PITCHFORD:  Yeah, I need to go to the
12       bathroom.
13  BY DR. LOTT:
14       Q.   Okay.  I'm going to go ahead and get
15  started.  This tape is about to run out.  We've only
16  got a minute here.
17            What are you charged with?
18       A.   Capital murder.
19       Q.   What's the other charge?
20       A.   Conspiracy.
21       Q.   Conspiracy.  Okay.  What's the maximum
22  penalty that anyone can receive for that?
23       A.   Death.
24       Q.   The death penalty.  Is this serious?
25       A.   Yes, sir.
```

0127

1                    DR. LOTT:  This is tape three side B.

2     BY DR. LOTT:

3          Q.    And we were just asking you about your

4     attorneys.  Before you start, if you can tell me

5     again.  Do you think you will be able to work with

6     your attorneys?

7          A.    Yes, sir.

8          Q.    Okay.  Do you trust them?

9          A.    Yes, sir.

10         Q.    Okay.  Now, I think I stopped -- the last

11    question was:  What do you need to do in order to help

12    your lawyer prepare for this case?

13         A.    Give them information.

14         Q.    What does anybody need to be able to tell

15    their attorney?

16         A.    Everything.

17         Q.    What would happen if you didn't, or what

18    might happen?

19         A.    They wouldn't know exactly what to come with

20    to fight it.

21         Q.    Do you think that's important?

22         A.    Yeah.

23         Q.    What would happen if you didn't tell your

24    attorney the truth?  Do you think it would hurt you or

25    help you?

0128

1     A.   I believe it would kind of hurt me.

2     Q.   You're right.  They wouldn't know how to

3 prepare for it.

4 BY UNIDENTIFIED MALE SPEAKER:

5     Q.   Can I interrupt for just a second.  Can you

6 remember those three things I asked you to remember?

7     A.   A possum, a pine tree and like a shell

8 thing, an oyster.

9     Q.   Good for you.  Great.

10 BY DR. LOTT:

11     Q.   Did you ever kill a possum?

12     A.   Killed one one time.

13 BY UNIDENTIFIED MALE SPEAKER:

14     Q.   Now, let me ask you something else that is

15 more important than that.  That was kind of silly to

16 test your memory.  Do you remember a couple of hours

17 ago when we first started how I told you any

18 information from this evaluation can be used?

19     A.   How it can be used?

20     Q.   Uh-huh.  I told you two ways they can try

21 and use it?

22     A.   The D.A. might try to use it to prosecute

23 me.

24     Q.   And when we get to the sentencing phase of a

25 capital trial how the D.A. might use it?

0129

```
 1        A.    He might try and give me the death penalty.
 2        Q.    Okay.  And you started to answer the other
 3   part of it.
 4        A.    To help me.
 5              DR. LOTT:  Good.
 6   BY UNIDENTIFIED MALE SPEAKER:
 7        Q.    Do you have any questions about that?
 8        A.    No, sir.
 9   BY DR. LOTT:
10        Q.    What do you mean by prosecute you?  What
11   does that mean in plain talk?
12        A.    Convict me.
13        Q.    Mr. Pitchford, do you think you're going to
14   get a fair trial?
15        A.    Do I think that, no.
16        Q.    Why?  Why wouldn't you get a fair trial?
17        A.    Because the system basically, you know, they
18   already know what they're going to do to me.  They
19   already know what they plan on doing.
20        Q.    What do you think they're going to do to
21   you?
22        A.    They get a chance, they going try to get rid
23   of me.
24        Q.    How so?  What do you mean by get rid of?
25        A.    Death penalty.
```

129

0130

1    Q.   Do you think that's the system's plan is to

2  give you the death penalty?

3    A.   Yes, sir.

4    Q.   Why you?

5    A.   What I'm charged with.

6    Q.   So does that work with just about

7  everybody's case because the death penalty system

8  works against them?

9    A.   It mainly means the system's kind of

10  crooked, you know what I mean.  It ain't what it

11  pretends to be.

12    Q.   Well, do you feel like the judge has

13  anything against you personally?

14    A.   I mean if he knew the person, yeah, he would

15  have something against me.

16    Q.   But do you think the judge should be

17  involved in this case by prosecuting you or should be

18  hearing this case if the judge was friends with the

19  victim?  Do you think that's appropriate?

20    A.   I don't think nobody should be there.

21    Q.   I don't think that the judge would be

22  hearing the case if they were personal friends with

23  the victim.

24  BY UNIDENTIFIED MALE SPEAKER:

25    Q.   Finish that thought that you started.  I

130

0131
1   don't think nobody should be there?
2        A.   Be there for them.  I just don't think they
3   should be there.  Because the way I feel about it,
4   they going off what they hear, what they heard that
5   they did, you know.  So when we do get to court they
6   ain't going to be no pointing fingers or anything, he
7   said, she said, you know what I mean, stuff like that.
8   I mean it's crazy.
9        Q.   Can you think of anything specific about
10  you, not about the system or not about the case, that
11  would cause them at trial to do something unfair to
12  you?
13       A.   What do you mean by me?
14       Q.   About you personally.  Somebody in the legal
15  system have it in for you, not about this case but
16  just, you know, the D.A. out to get you, or the
17  sheriff out to get you?
18       A.   Not that I know of.
19       Q.   Is there any bad blood between you and the
20  folks before all this happened?
21       A.   Before?
22       Q.   Yes, sir.
23       A.   I ain't never tried to fool with the law.
24  BY DR. LOTT:
25       Q.   We may have asked you this question already.

131

0132

```
 1    But do you think that you're just as likely or more
 2    likely or less likely to be treated fairly by the
 3    legal system compared to somebody else?
 4         A.   Less likely.
 5         Q.   You're less likely to be treated fairly
 6    compared to Officer Dunbar or any of us or your twin
 7    brother?  Is there something specific about you that
 8    you think you would get a less fair trial in the legal
 9    system?
10         A.   It ain't fair.  It's crooked.  And one
11    reason because if you -- say something, like one of
12    y'all to try to do whatever, y'all would get away with
13    certain things that I won't because one guy's a
14    doctor.  Another reason, y'all got money.  And then.
15         Q.   Don't be so sure of that.  Do you know what
16    they pay here at the state hospital?
17         A.   I just know it's like certain people, man,
18    certain people they don't.  Since I been locked up I
19    done seen people come in with identical charges and
20    everything and some people walk off and some people
21    get locked up.  Depends on what you did, too.
22         Q.   What else might it depend on?
23         A.   Color, race, all kind of stuff.  The system
24    only works for certain people.  We ain't all equal in
25    it.  You know, anybody you really know, they will tell
```

App.0204

0133

1   you it ain't work, you know, for everybody, you know
2   what I'm saying.  You might be in here for the same
3   charge that I might be in and he's in on the same
4   charge I'm on.
5       Q.    For capital murder?
6       A.    Yeah.  But he walked free, you know what I
7   mean.  I mean they didn't -- he didn't go to court and
8   go to trial or nothing, you know what I'm saying.  He
9   was in on the same charges and they just let him go.
10  But you got me in here, you know what I'm saying, and
11  they ain't trying to let me go.
12      Q.    What was the difference, though, in that
13  case?  What do you think was responsible for him
14  getting to walk free?  Did it have anything to do with
15  his lawyer or other issues of the law?
16      A.    I feel like this, you know, I feel like --
17  okay, I feel like he should be treated no kind of
18  different from me because the simple reason is because
19  he had the same charges on him, you know what I'm
20  saying.  It ain't no statute of limitations on the
21  charges.
22      Q.    Did he have money?
23      A.    Yeah, he probably had money.
24      Q.    Did he ever pay --
25      A.    And so-called they said they let him go

133

0134

1  because one of the witnesses died or something like
2  that or his sister died.  And I said my folks going to
3  die and they ain't let me go.
4      Q.    Okay.  And you've answered this question
5  already but I just want to make sure we get it down.
6  Tell me the two attorneys in the courtroom, what are
7  their titles?
8      A.    (Inaudible).
9      Q.    And that's whose attorney?
10     A.    That's my attorney.
11     Q.    That's your attorney.  Who is the opposing
12  attorney?
13     A.    I don't know.
14     Q.    What's their title?  What do you call them?
15     A.    Attorney.
16          UNIDENTIFIED MALE SPEAKER:  The one that's
17  against you.
18  BY DR. LOTT:
19     Q.    The one against you?
20     A.    The D.A.
21     Q.    What does the D.A. stand for?
22     A.    District Attorney.
23     Q.    District Attorney.  What's the D.A.'s job?
24     A.    To prosecute me.
25     Q.    To prosecute you and what?

134

0135

```
 1        A.   To convict me.
 2        Q.   Why do we have trials?
 3        A.   To judge people.
 4        Q.   Okay.  Tell me a little bit more.  If I go
 5   to court -- if I'm charged with something, what is the
 6   purpose of that trial?
 7        A.   To convict you.
 8        Q.   Or it could prove just the opposite.  What
 9   would be the opposite?
10        A.   Not guilty.
11        Q.   Yeah.  Who determines the verdict in a
12   trial?  If you go to court and have a trial, who
13   determines the verdict?
14        A.   The jury.
15        Q.   How many people are on a jury in
16   Mississippi?
17        A.   Twelve.
18        Q.   How many of those folks have to agree?
19        A.   All 12 of them.
20        Q.   What is it called when they cannot agree?
21        A.   A hung jury.
22        Q.   Very good.  Do you know what happens if
23   there's a hung jury or what could happen?
24        A.   I could walk free.
25        Q.   Could walk free.  And?
```

App.0207

0136

1     A.   I don't really know.

2     Q.   Well, I'm asking you now.

3     A.   Either walk free or they can throw me away.

4     Q.   Well, if it's a hung jury, you could walk.

5  It would be up to the D.A. to decide whether or not

6  the D.A. wants to go for another trial.  The D.A.

7  would say hey, I'm going to retry this, or not.  And

8  if the D.A. didn't, you could walk.  Okay.

9  BY UNIDENTIFIED MALE SPEAKER:

10     Q.   Mistrial.  Have you ever heard of a

11  mistrial?

12     A.   No, sir.

13     Q.   Let me explain.  The judge could declare a

14  mistrial.

15  BY DR. LOTT:

16     Q.   Now, you've answered this question already,

17  too.  What are the possible verdicts?  They can find

18  you what?

19     A.   Guilty and innocent.

20     Q.   Okay.  What are they?  Tell me again.

21     A.   If they find me guilty?

22     Q.   No, what are the possible verdicts?  You've

23  answered this.  They find you.

24     A.   Guilty and innocent.

25     Q.   The third one.  Have you ever heard of the

App.0208

0137

1   third one?
2        A.   Innocent.
3        Q.   Not guilty by reason of insanity is the
4   third one.  That's an actual verdict that they can
5   find.
6        A.   That's by reason.
7        Q.   Insanity.
8   BY UNIDENTIFIED MALE SPEAKER:
9        Q.   Ever heard of that?
10       A.   I've heard of declaring you insane or
11  something like that and they go straight to Whitfield.
12  BY DR. LOTT:
13       Q.   Okay.  Well, that may be the case.  But if
14  they find you innocent, what happens to you?
15       A.   I walk free.
16       Q.   You walk free.  If they find you guilty?
17       A.   They gone try to give me the death penalty.
18       Q.   Well, we'll go over that in just a second.
19  But if they find you not guilty by reason of insanity,
20  what do you think happens?
21       A.   Come here.
22       Q.   You could.  And how long would you stay here
23  if you're found you're GI?
24       A.   A long time.
25       Q.   You could.  There isn't a certain period of

0138

1    time that you have to stay.  You won't receive a
2    sentence if you come to Whitfield.  You come here,
3    you're here indefinitely.  And it's up to the hospital
4    to decide when you get out.
5            Now, in a capital murder trial, there are
6    two parts.  Do you know the two parts of the capital
7    murder trial?
8        A.   The guilty phase.  And what the name of it,
9    latigation?
10       Q.   Litigation.
11       A.   Litigation.
12       Q.   Okay.  That's close.  That's good.  There's
13   the guilt phase.  If you're found guilty, like you
14   just said.  And then there's the penalty phase.  So
15   there are two parts.  Okay.  If they find you guilty
16   in a death penalty trial, then you go to a sentencing
17   phase.  Let me back up now.  Who did you say
18   determined the verdict?
19       A.   The jury.
20       Q.   In a death penalty trial, who determines
21   whether or not you get the death penalty?
22       A.   The jury.
23       Q.   That's right.  In Mississippi the jury
24   determines that.  What happens if the jury, they find
25   you guilty and you're in the sentencing phase, what

0139

1    happens if the jury cannot agree on the death penalty?
2         A.   I get life.
3         Q.   Who decides how much?
4         A.   The judge.
5         Q.   The judge decides life or life without,
6    whatever that may be.  But remember, only a jury can
7    give you the death penalty.  It has to be all 12.
8    Okay.  Any questions about that process?
9         A.   No, sir.
10        Q.   Do you think you understand it?
11        A.   Yes, sir.
12        Q.   Okay.  And we may be years and even part of
13   the trial toward the end of the guilt phase or
14   possibly toward the end of the sentencing phase, so
15   the experts will come in at either part.  What do
16   witnesses do at trial?
17        A.   Testify.
18        Q.   Testify.  There are three different types of
19   witnesses generally.  What are they?  Do you know?
20        A.   Character witnesses.
21        Q.   Character.
22        A.   See if they can help with you.
23        Q.   Okay.  What's a person at the scene of the
24   crime called?
25        A.   Eyewitness.

0140

1       Q.   An eyewitness.  Okay.  And an eyewitness
2   would then testify obviously about what?
3       A.   What they seen.
4       Q.   Okay.  And a character witness would testify
5   about what?
6       A.   What type of person I am.
7       Q.   What type of person.  Can you give me an
8   example of a character witness?  Who might be a
9   character witness for you?
10      A.   Preacher.
11      Q.   Preacher.  Very good.  Parent, teacher.
12  Give an example of an expert witness.  Who would be an
13  expert?
14      A.   You.
15      Q.   Okay.  We would be expert witnesses.  We
16  would testify about this evaluation.  Do we know you?
17  Has anyone sitting here ever met you before today?
18      A.   No, sir.
19  BY UNIDENTIFIED MALE SPEAKER:
20      Q.   Okay.  Would we be asked to testify
21  about whatever you're in for?
22      A.   No, sir.
23      Q.   What do you think we would be asked to talk
24  about?  I think Dr. Lott mentioned it, but I just want
25  to see.

140

0141
1          A.    Evaluation.
2          Q.    Evaluation.  Evaluation pertaining to what?
3    Your physical health?
4          A.    (No audible response.)
5          Q.    Pardon?
6          A.    Mental health.
7          Q.    Mental health.
8    BY DR. LOTT:
9          Q.    If the witnesses on the stand are testifying
10   and you think they're not telling the truth, what is
11   the appropriate way to challenge a witness during the
12   trial?  Someone is up there testifying and you think
13   they're actually lying, what could you do?
14         A.    Tell my attorney.
15         Q.    Very good.  What would happen if you jumped
16   up and started shouting at the witness during the
17   trial?
18         A.    Contempt of court.
19         Q.    Contempt of court.  Very good.  What does
20   that mean?
21         A.    It means I got another charge.
22         Q.    Got another charge.  Okay.  Good.  They
23   could obviously add more time.  If you're too
24   disruptive in court, they could possibly remove you
25   from the courtroom.  Do you think you need to be in

141

0142
1   court during your trial?
2          A.    Yes, sir.
3          Q.    Why?
4          A.    To hear what they're talking about and what
5   was going on.
6          Q.    Who knows the most about your case?
7          A.    I do.
8          Q.    You do.  Exactly.  Can anyone make you
9   testify at your trial?
10         A.    No, they can't make me testify.
11         Q.    Why not?
12         A.    Because I don't have to.
13         Q.    Okay.  What is that based on?  What right is
14  that based on?
15         A.    The Fifth.
16         Q.    That's right.  Very good.  Where did you
17  learn that?
18         A.    A long time in jail.
19         Q.    The Fifth what?
20         A.    Fifth Amendment.  I can plead the Fifth and
21  I don't got to talk.
22         Q.    The Fifth what, though?
23         A.    The Fifth Amendment.
24         Q.    The Fifth Amendment.  What's the overall
25  body or context?  The Fifth Amendment of what?

142

0143

1      A.   My rights.

2      Q.   Your rights.  Are those rights documented

3  anywhere or laid out in any kind of document?

4      A.   The Declaration of Independence, I think.

5      Q.   Close.  No help from the sidelines, now.

6      A.   I done forgot the name of it.

7      Q.   This is -- I don't want to say a bonus

8  question.

9  BY UNIDENTIFIED MALE SPEAKER:

10      Q.   You don't have to know this.  It's another

11  document but it's not the Declaration of Independence.

12      A.   Civil rights.

13  BY DR. LOTT:

14      Q.   Close.  Think American History.  It's

15  commonly referred to and called the United States

16  blank.

17      A.   United States.

18      Q.   Three guesses.  One more guess.  What do you

19  think?

20      A.   I don't know.

21      Q.   All right.

22  BY UNIDENTIFIED MALE SPEAKER:

23      Q.   Is it the Constitution?

24      A.   That's it.

25  BY DR. LOTT:

0144

```
 1        Q.   All right.  The circuit court?
 2        A.   No.
 3        Q.   The Fifth Amendment of?
 4        A.   The Constitution.
 5        Q.   Now, following this up, can anybody prevent
 6   you from testifying at your trial?  You can take the
 7   Fifth if they try to make you.  But can they stop you?
 8   If you want to get up there and take the stand and
 9   tell your side of the story, can anyone stop you?
10        A.   No, sir.
11        Q.   Very good.  They can't make you and they
12   can't stop you.  Can they make us?
13        A.   Yeah.
14        Q.   We could be asked to testify and made to
15   testify and give our evaluation at your trial.  Okay.
16   BY UNIDENTIFIED MALE SPEAKER:
17        Q.   Could they make her testify if it's going to
18   hurt you?
19        A.   No, because she's my lawyer.
20   BY DR. LOTT:
21        Q.   Very good.  She works with your lawyer.
22        A.   If she wants to gets up there, she can get
23   up there.
24        Q.   Your lawyer is not compelled to testify.
25   Okay.  Now, tell us a little bit about a plea bargain.
```

144

0145

1       A.   A plea bargain is something they want you to
2  jump on and do time.
3       Q.   Okay.  Tell me a little more about it.  Who
4  offers it to you?
5       A.   The D.A.
6       Q.   The D.A. offers it to you.  How do you have
7  to plead?  If you accept it, how do you have to plead?
8       A.   You have to plead guilty.
9       Q.   That's right.  What do you get out of it,
10  you or any other defendant get out of a plea bargain?
11      A.   Time.
12      Q.   Well, what's in it for you?  They call it
13  copping a deal.  What's the deal?
14      A.   You don't get the max.
15      Q.   You don't get the max.  Why does the State
16  offer plea bargains?
17      A.   They want to keep us in jail and they don't
18  have to go to court.
19      Q.   Don't have to go to court.  That's good.
20  Any other reason?  Don't have to go to court.  What
21  else is in it for the State?
22      A.   Money.  They don't have to spend no money.
23      Q.   What's the big reason for it?  They don't
24  have to spend money or time.  But what else do they
25  get out of it?

145

0146

1       A.   Going to jail.

2       Q.   You going to jail.  That's exactly right.

3  They got a conviction.  Now, could anyone make you

4  take a plea bargain?

5       A.   No.

6  BY UNIDENTIFIED MALE SPEAKER:

7       Q.   Do you know why?

8       A.   It's one of my rights.

9       Q.   It is one of your rights.  Do you know which

10  right?  They can't make you take a plea bargain

11  because you have a right to?

12       A.   Have a right to.

13  BY DR. LOTT:

14       Q.   Well, if you don't take the plea bargain and

15  cop a deal, what's going to happen to you?

16       A.   Oh, I got a right to a fair and speedy

17  trial.

18       Q.   Exactly.  Very good.  Fair and speedy.

19  BY UNIDENTIFIED MALE SPEAKER:

20       Q.   Do you know what Amendment that is?

21            DR. LOTT:  Don't ask me.

22       A.   I think it's the Third.

23       Q.   Third?

24       A.   Yeah.

25  BY DR. LOTT:

App.0218

0147
1        Q.    Okay.  Now, what do you risk -- you've
2    answered this in part.  What do you risk if you refuse
3    a plea bargain?
4        A.    The death penalty.
5        Q.    You risk the death penalty.  Exactly.  Does
6    the judge, in general -- now, this is -- we ask this
7    question, but in general, does the judge have to go
8    along with a plea bargain?
9        A.    No.
10       Q.    What could the judge do?
11       A.    Drop it down.
12       Q.    They could drop it down.  What else could
13   the judge do?
14       A.    Raise it up.
15       Q.    Could raise it up.  Now, can the judge give
16   you the death penalty?  In a plea agreement, let's say
17   you copped a deal.  Can you go before a judge and the
18   judge give you the death penalty?
19       A.    No.
20       Q.    Why?
21       A.    Just the jury.
22       Q.    Only a jury can do that.  That's exactly
23   right.  What does the judge usually do?  What do you
24   think?
25       A.    The judge can hold it up.

147

0148

1     Q.   I'm sorry.  I need to rephrase that.  In
2  terms of a plea bargain, if the D.A. makes a
3  recommendation, what do you think the judge usually
4  does?
5     A.   Accept it.
6     Q.   Probably.  Probably.  I don't know how all
7  that works.  We're not lawyers.  So I don't know how
8  all of that works.  But that's what we generally
9  understand to be the case.  But your lawyers would
10  know that.  And your lawyers would also know about
11  this particular judge and what may or may not happen.
12  So they would advise you along those lines, too.  How
13  do you know whether or not you're going to take a plea
14  bargain or should you take a plea bargain?  Let me
15  rephrase that.
16  BY UNIDENTIFIED MALE SPEAKER:
17     Q.   How would you decide?
18  BY DR. LOTT:
19     Q.   Yeah, how would you decide to take a plea
20  bargain?  You or any other defendant, think about this
21  in general terms, not just you personally, but how
22  would you, me or anyone else, decide whether or not we
23  should take a plea bargain?
24     A.   Your lawyer is going to tell you.
25     Q.   Your lawyer could tell you what?

0149
1          A.   If you should take it.
2     BY UNIDENTIFIED MALE SPEAKER:
3          Q.   If your lawyer tells you it's in your best
4     interest to take it and you don't want to take it, who
5     has the final say?
6          A.   I do.
7          Q.   How come?
8          A.   Because it's me.
9          Q.   What's that?
10         A.   Because it's me.
11         Q.   And we're not -- I understand they have
12    offered you something.  We're not asking whether or
13    not you're going to take it.  What we're asking is,
14    how would you think about it?  What kind of stuff
15    would you want to know if Ms. O'Clarity or Mr. Carter
16    comes to you and says they are offering you a deal.
17    What are you going to ask them?
18         A.   What kind of deal they're offering.
19         Q.   Okay.  And when they say what do you want to
20    know, what are you going to ask them?
21         A.   How much time.
22         Q.   Okay.  Anything else?
23         A.   If I get good time.
24         Q.   Okay.
25         A.   Am I going to have to do the whole time.

149

0150

1     Q.  Okay.

2     A.  If there's a possibility I might get out.

3     Q.  How do you mean?

4     A.  Will I get out.

5     Q.  After time served, you get out before?

6     A.  Like -- yeah.  After my time served there

7 might be a chance of that.  Some kind of way the law

8 changes or something, you know what I'm saying, you

9 know to get me out whether I accepted it or anything

10 like that.

11    Q.  Would you want to ask them what they thought

12 your chances were at trial?

13    A.  Yeah.

14    Q.  Okay.  What other kind of information like

15 that would you want to know?

16    A.  Everything they got against me.

17    Q.  Okay.  And how would that influence whether

18 you thought about taking a plea or taking it to trial?

19    A.  If it's like me, if they say, you know, they

20 got too much evidence or something.

21 BY DR. LOTT:

22    Q.  Yeah, let's say hypothetically.  Just

23 pretend, they got you robbing a bank and there's a

24 video camera there and they've got you in full view.

25    A.  Better take that plea.

150

0151

1      Q.   Better take that plea.  But what if you find
2  out that there is no video and there were several
3  people in there that looks sort of like you and they
4  don't have anybody as an eyewitness in a line up or
5  photo that can identify you?
6      A.   I mean I may not take the plea.  If they
7  don't, crank it up.
8      Q.   Crank it up.  I mean it's your call.  Let's
9  be clear.  When you say crank it up, what do you mean?
10     A.   Get a jury and then go to trial.
11     Q.   What does a jury weigh when they make their
12  decision about a verdict?
13     A.   The evidence.
14  BY UNIDENTIFIED MALE SPEAKER:
15     Q.   What does the D.A. risk if they don't offer
16  you a deal?  What could happen at the trial if the
17  D.A. didn't offer you a deal?
18     A.   I could win.
19     Q.   And then what happens to you?
20     A.   I would go free.
21     Q.   Whatever you want.  What rights do you give
22  up if they offer you some kind of deal and you decide
23  to take it and plead guilty?
24     A.   What rights?
25  BY DR. LOTT:

151

0152

1     Q.   What two rights?

2     A.   Right to do what I want to do.

3     Q.   Okay.  But what two things will not happen?

4  BY UNIDENTIFIED MALE SPEAKER:

5     Q.   Think about the rights we've talked about

6  already today.

7  BY DR. LOTT:

8     Q.   If you take a plea bargain, are you giving

9  up any of those rights?

10    A.   My right to a fair and speedy trial.  My

11  right to freedom.

12    Q.   If you don't have a trial what other right

13  do you not have, at least initially?

14    A.   What rights if I don't have a trial?

15    Q.   If you don't have a trial, what other basic

16  right do you not have, at least initially?

17       UNIDENTIFIED MALE SPEAKER:  And I think you

18     know this about when Dr. Lott asked you

19     questions.  You said if you take a plea bargain,

20     how do you have to plea?

21    A.   Guilty.

22  BY DR. LOTT:

23    Q.   Guilty.  But if you plead guilty, what right

24  is basically tossed out the window?

25    A.   My right to a fair and speedy trial.

0153

1        Q.    Yeah, that's correct.

2   BY UNIDENTIFIED MALE SPEAKER:

3        Q.    If you were tried and found guilty, you have

4   a right to what?

5        A.    To appeal.

6   BY DR. LOTT:

7        Q.    Very good.  But there's another one.  And

8   that is the right to avoid self-incrimination.  If you

9   accepted the plea of guilt, you're basically giving up

10  your right not to incriminate yourself.

11       A.    To the Fifth Amendment.

12  BY UNIDENTIFIED MALE SPEAKER:

13       Q.    I know you know this.  But if they offer you

14  a deal and you take it and you don't have a trial?

15       A.    My rights cause I plead guilty.

16  BY UNIDENTIFIED MALE SPEAKER:

17       Q.    I think Dr. Lott had asked you if you were

18  hearing voices on the day of the alleged offense.

19  And, I think, you said I hear them every day.  And

20  then later he asked you about that again.  I just want

21  to see if, for the second time, just to be clear.

22  Were you or were you not hearing any voices in your

23  mind on the day the alleged offense occurred?

24       A.    Yes, sir.

25       Q.    You were?

153

0154

1     A.   Yes, sir.

2     Q.   And what specifically were the voices saying

3  to you?

4     A.   They were saying a whole bunch of things, go

5  hurt somebody, go do this, go do that.

6     Q.   Were they telling you to rob a store?

7     A.   They were telling me -- I don't know.

8     Q.   Were they telling you to shoot somebody?

9     A.   I mean, yeah, if somebody did me wrong.  If

10  somebody do something wrong or something.

11     Q.   Is that what the voices were telling you, to

12  shoot somebody?

13     A.   I don't know about that.

14     Q.   Okay.  Let me ask you something else.  And

15  you may not want to answer.  In your statement,

16  according to the information that we have, you said

17  something about your codefendants threatened you and

18  (inaudible) pointing a gun at you.  And Ms. O'Clarity

19  is here.  You don't have to tell us any of this stuff.

20  One of the things that they have asked us about is

21  mitigation, is there anything from a mental health

22  point of view that might help you.  Is there anything

23  -- and you've previously consulted with Ms.

24  O'Clarity -- that you want to tell us about what

25  happened to you that morning that was affecting you

App.0226

0155

1   mentally like somebody threatened you?  It didn't
2   happen or you don't want to talk about it?
3         A.   I mean ain't nobody threatened me.
4         Q.   Did you tell somebody that somebody
5   threatened you?
6         A.   I mean yeah, I told the detective that.
7         Q.   You did?
8         A.   Yes, sir.
9         Q.   But that wasn't true?
10        A.   No, that whole big statement is a lie.
11        Q.   So nobody threatened you?
12        A.   No, sir.
13  BY DR. LOTT:
14        Q.   Do you understand --
15        A.   Like he said, he told me that was just a way
16  that I could get off, you know what I'm saying.  He
17  basically told me what to say in that statement
18  himself.  He didn't tell me to say it like we sitting
19  up here talking and I'm sitting here, this and this.
20  I mean he didn't say it like that.  But he told me, he
21  put the fragment out there and told me, you know what
22  I'm saying, how it was going and stuff like that.  He
23  told me that if I do, just like you in here saying, it
24  will help me.
25        Q.   So the officer told you that Mr. (inaudible)

155

0156

1   had threatened you?

2       A.   He told me to act like I was shooting down

3   at the ground.  He said (inaudible) that your gun had

4   rat pellets in it.  He said to act like I didn't want

5   to do it and when he threatened me or whatever I felt

6   like my life was in danger and that I just shot down

7   at the ground, not trying to hurt nobody.

8       Q.   That's what the officer told you?

9        DR. LOTT:  This is tape 4, side A.

10  BY DR. LOTT:

11      Q.   Now, they were just asking you about your

12  statement and who said what.  Tell us again what you

13  just told us.

14      A.   Detective James, well, she came in the

15  office.  And after I told them I wanted to (inaudible)

16  and stuff like that, she told (inaudible) to get out

17  of the office.  And that's when he started telling me

18  what the police had on me, what this and that.  Told

19  me that the gun had rat pellets in it.  Told me, you

20  know, that there's a person said that you did it.

21  Said that but I know a way I can get off of it.  Said

22  to say that, you know what I'm saying, where he said

23  if I said that he was trying to threaten me, that he

24  threatened like pointing the gun at me.  And you know

25  what I'm saying, I said man, I ain't going to do this,

0157

1   you know what I'm saying.  You know, you going to have
2   to go down with me or something like that.  He said,
3   you know, to say that I shot down at the floor with
4   the rat pellet.  I knew the gun had rat pellets and
5   that I, you know what I'm saying, that I wasn't trying
6   to hurt nobody and stuff like that.  It would be
7   something like in self-defense or something like that
8   and I would get, you know, I wouldn't get as much time
9   as they were trying to give me.
10      Q.   Okay.  Were you worried about any multiple
11  statements that weren't consistent with each other
12  after you'd done that or did that thought come in your
13  mind?
14      A.   No, I didn't think about that.
15      Q.   Did you think that the police officer and
16  the detective and investigator, they were trying to
17  help you?
18      A.   At first I thought, you know what I'm
19  saying, at first I thought they were, you know, until
20  come to find out, you know what I'm saying, they
21  weren't trying to help me, you know, they done had it
22  set on me.  They (inaudible) set on trying to get
23  nobody.
24  BY UNIDENTIFIED MALE SPEAKER:
25      Q.   I've got a couple of background questions,

157

0158

```
 1   just to clear up some things I didn't understand in
 2   the beginning.  And you don't have to answer any of
 3   this.  Is Quincy Bolands the same as Eric Bolands?
 4        A.   No, sir.
 5        Q.   Are they brothers?
 6        A.   They're cousins.
 7        Q.   They're cousins.  Who is the older?
 8        A.   Quincy.
 9        Q.   Quincy is older than Eric?
10        A.   Yes, sir.
11        Q.   How old is Eric?
12        A.   About 17.
13        Q.   Is it Bolands with an S, or Boland without
14   an S?
15        A.   I don't know.  I think it's with an S.
16        Q.   Okay.  Who is (inaudible).
17        A.   Eric's brother.
18        Q.   Who is (inaudible)?
19        A.   DeMarcus Westwood.
20        Q.   Say again?
21        A.   DeMarcus Westwood.
22        Q.   Is he indicated on the conspiracy thing?
23        A.   Conspiracy.
24        Q.   Okay.  But not on the murder?
25        A.   No, sir.
```

158

0159

1     Q.   One of the other things they asked for in
2  the order was mitigation.  And we've been asking you a
3  lot about your history.  We've been asking you
4  questions about your mental state at the time of the
5  alleged offense.

6          Now, as Dr. Lott has said, they're not going
7  to ask us, hopefully, whether you did anything wrong,
8  they're going to ask us about your mental state.
9  Mitigation would mean anything that your defense team
10  can use to help you.  It is not limited to just the
11  time of the alleged offense, it's anything.  Can you
12  think of anything in your past, starting when you were
13  a little kid, up through school?  It can be around the
14  time of the alleged offense but it can be anything
15  that you think would be helpful for us to know,
16  understanding that this is going to the judge and the
17  D.A., as well as your defense team, from a mental
18  health or emotional or psychological point of view
19  that they can use to help you?

20     A.   Do you mean like something bad in my past?

21     Q.   Something bad in your past.  Like trouble
22  with your step-dad, anybody who abused you at any
23  point in the past, physically, emotionally, sexually?

24     A.   Yeah, I used to see my step-daddy whip my
25  mama.

0160

1       Q.   How old were you then?

2       A.   About 11, 12.

3       Q.   How did that affect you emotionally?

4       A.   I couldn't do nothing, you know what I'm

5    saying.  That was my step-daddy, you know.

6       Q.   And how did that make you feel?

7       A.   Bad.

8    BY DR. LOTT:

9       Q.   How often did that happen?

10      A.   Every weekend.

11      Q.   Every weekend.  Was your stepfather

12   drinking?

13      A.   Yes, sir.

14      Q.   So when he started drinking he would become

15   abusive to your mom?

16      A.   Yes, sir.

17      Q.   What was the worst thing you witnessed of

18   your stepfather's abuse toward your mom?

19      A.   He hit her all the time.  One time he chased

20   her out of the house with a shotgun.

21      Q.   He chased her through the house with a

22   shotgun?

23           UNIDENTIFIED MALE SPEAKER:  Out of the

24           house.

25      A.   Out of the house with it.

160

0161

1      Q.   Did he abuse your brother at all or you or
2    did you see any of that?
3      A.   I mean I know he wanted to but, you know, we
4    boys.
5      Q.   Yeah.
6      A.   And I jumped on him one time when I got old
7    enough when he tried to hit on me.
8      Q.   How old were you when you jumped on him?
9      A.   About 16, 17.
10     Q.   How do you think his drinking affected you
11   besides how he treated your mama?
12     A.   I just didn't want to be around when he was
13   drinking.
14     Q.   How did it affect you when your father
15   passed?
16     A.   It made me sad.
17     Q.   How?
18     A.   I was sad.  I was just sad.
19     Q.   That was when you were 10 or 11?
20     A.   Ten or eleven.
21     Q.   Ten or eleven?
22     A.   Ten or eleven.
23     Q.   Anything else like that?  Anything when you
24   were a little kid, anything particularly stressful to
25   you around the time of the alleged offense, not

161

0162

1    getting along with your mom, not getting along with
2    your baby's mom, things that were worrying you,
3    weighing on your mind?
4        A.   At the time me and my baby's mama, we was
5    separated.  We weren't separated, you know, just
6    started doing other things, you know.
7        Q.   You were seeing other folks, other ladies.
8    Was she seeing other guys?
9        A.   Yes, sir.
10       Q.   How was that affecting you?
11       A.   I mean I wouldn't never try to hurt her or
12   anything like that.  I wasn't mad.
13       Q.   Anything else you want us to know about?
14       A.   There's not anything I can really just think
15   of, you know.
16       Q.   Well, there may be things that you want to
17   talk with your defense team about that you don't want
18   to talk to us about.  Because as we keep reminding
19   you, we're also reporting to the judge and the D.A.
20   They could put us on the stand and make us tell them
21   anything you tell us.  Knowing all of that, can you
22   think of anything else that you want to tell us about?
23       A.   Yeah, I need to get out of this mess.
24   BY DR. LOTT:
25       Q.   I just want to underscore something,

162

0163

1    Mr. Pitchford.  You certainly don't have to say
2    anything to us that can hurt you.  But if, at the time
3    of the crime, some things were going on -- and I'm not
4    asking you to respond to this question, I just want
5    you -- I'm going to make a statement.
6            If some things were going on then that might
7    have certainly affected your behavior that day,
8    whether it was doing some strange drug for the first
9    time or whether or not someone was threatening you at
10   gunpoint to do something or threatening you in general
11   to do something, that's mitigating.  Okay.
12           Now, you need to think about those issues.
13   Because we can't use it in our report, obviously, if
14   you don't -- if you say it didn't happen unless we
15   have some other significant sources to substantiate
16   it.
17           Now, I'm not asking you to respond to that.
18   But that it's important for you to realize.
19       A.   Yes, sir.
20       Q.   We can't argue for mitigation if you're
21   saying it didn't happen.  Okay.  So I just want you to
22   think about that and be aware of that fact.
23   BY UNIDENTIFIED MALE SPEAKER:
24       Q.   Were you ever picked on in school?
25       A.   No, I wasn't never picked on.

163

0164

1      Q.   You mentioned before something about

2   teachers telling you you had a short attention span

3   when you were in school?

4      A.   No, I used to think that.

5      Q.   You used to think that yourself or were you

6   told that?

7      A.   I used to think that myself.

8   BY DR. LOTT:

9      Q.   But you were never told that?

10      A.   I never let nobody know what was going on

11   with me.

12          DR. LOTT:  Ms. O'Clarity, anything else we

13      need to explore?

14          UNIDENTIFIED MALE SPEAKER:  Now, one

15      positive of this mitigation (inaudible).

16          DR. LOTT:  Do you have any questions for us?

17      We've asked you lots and lots of questions today.

18      Anything for us?

19          MR. PITCHFORD:  No, not really.

20          DR. LOTT:  Okay.  Anybody else?

21          UNIDENTIFIED MALE SPEAKER:  We're going to

22      take a break and going to give you some lunch.

23   BY DR. LOTT:

24          We have discussed our opinion and we are

25      unanimous that Mr. Pitchford has the sufficient

0165
```
 1        capability to confer with his attorney with a
 2        reasonable degree of rational understanding and
 3        has a factual and (inaudible) understanding of
 4        the charges against him.
 5             We also are unanimous in our opinion that
 6        Mr. Pitchford was not suffering from a severe
 7        mental illness at the time of the alleged
 8        offenses and therefore he would have been able to
 9        understand the nature and (inaudible) of his
10        alleged actions and would have been able to
11        understand the difference between right and wrong
12        for his alleged actions at that time.
13             We are also unanimous in our opinion that
14        Mr. Pitchford currently understands his
15        constitutional rights.
16             Doctors Lott and McMichael agree that he
17        would have been able to understand his rights at
18        the time that he made his statements.  And
19        Dr. McMarr is of the opinion that his ability at
20        that time may have been questionable.
21             We are also unanimous in our opinion that
22        Mr. Pitchford was not suffering an extreme and
23        mental or emotional disturbance at the time of
24        the alleged offenses and his ability to conform
25        his conduct to the (inaudible) of the law and to
```

0166
1       appreciate the criminality of his conduct was not
2       substantially impaired at that time.
3            We are deferring diagnoses regarding mental
4       retardation and anti-social personality disorder
5       and malingering until further testing is
6       completed.
7            Mr. Pitchford will be returned to the
8       custody of the Grenada County Sheriff's
9       Department.
10           We will discuss further the protocol for
11      testing and completing the evaluation.
12           Thank you.
13
14
15
16
17
18
19
20
21
22
23
24
25

166

0167

1                          CERTIFICATE

2           I, Debbie G. Williams, Court Reporter and

3    Notary Public, in and for the State of Mississippi,

4    hereby certify that I transcribed the foregoing tape

5    recorded evaluation of TERRY PITCHFORD.

6           This the 11th day of  July, 2011.

7

8

9                              _____

                               DEBBIE G. WILLIAMS

10                             CVR, CSR

     My Commission Expires:

11   January 7, 2015

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 2:** Curriculum Vitae of Bushan S. Agharkar, M.D.


# Bhushan S. Agharkar, M.D.

**<u>Mailing Address</u>**
**4062 Peachtree Road NE, Suite A-203**
**Atlanta, Georgia 30319**
**404.939.6636**
**agharkarmd@gmail.com**

---

**<u>Professional Experience</u>:**

    Comprehensive Psychiatric Services of Atlanta, July 2005-present
    Atlanta, GA 30319
    Private Practice

    Emory University School of Medicine, July 2005-present
    Atlanta, GA 30322
    Adjunct Assistant Professor

    Morehouse School of Medicine, August 2005-present
    Atlanta, GA 30310
    Assistant Professor
    Associate Residency Training Director, 2005-2011
    Course Director, *Patient Evaluation and Treatment I and II*, 2005-2013
    Course Director, *Business of Medicine*, 2005-2013
    Course Director, *Forensic Psychiatry*, 2005-present
    Course Director, *Applied Clinical Psychopharmacology*, 2014-present
    Faculty Advisor, *Resident Journal Club*, 2005-2011
    Member, *Residency Training and Admissions Committee*, 2005-2011

    University of Texas School of Law, Austin, TX
    Guest Lecturer, 2016-present

    Emory University School of Law, Atlanta, GA
    Guest Lecturer, 2015-present

    Forefront Behavioral Telecare, December 2009-present
    Founder and Director of Physician Network Development

    Georgia Tech Student Health Services, March-May 2007, September 2008-
    Atlanta, GA 30313                                February 2009
    Staff Psychiatrist

Georgia State University Student Health Services, August 2007-June 2008
Atlanta, GA 30303
Staff Psychiatrist

Skyland Trail, July 2006-January 2007
Atlanta, GA 30319
Interim Medical Director

DeKalb Community Service Board, July 2005-February 2007
Decatur, GA 30031
Staff Psychiatrist

**Education:**

Emory University School of Medicine, 2004-2005
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Forensic Psychiatry Fellowship

Emory University School of Medicine, 2000-2004
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Adult Psychiatry Residency
Chief Resident at Emory University Hospitals, 2003-2004

State University of New York Health Science Center at Syracuse, 1996-2000
Syracuse, NY 13210
Doctor of Medicine degree, May 2000

Case Western Reserve University (CWRU), 1993-1997
Cleveland, OH 44106
Grade Point Average 3.83 (A= 4.00)
BA in Psychology, senior *in absentia* privilege
Magna Cum Laude

**Certification and Licensure:**

Certified Mediator, California State University, Sacramento, 2008
Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology, 2007, Re-certified 2017
Diplomate in Adult Psychiatry, American Board of Psychiatry and Neurology, 2005, Re-certified 2015
Georgia Medical License, 2002

2

**Research Experience and Publications**:

· "Traumatic Brain Injury in Criminal Litigation" Stacey Wood, JD, and Bhushan S. Agharkar, MD [84 UMKC L. Rev. 411, Winter 2015]

· "Delusions and False Memories: Roadblocks to Competency to Stand Trial" Lloyd Warford, JD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 389, Winter 2014]

· "Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance in IQ Ceilings in *Atkins* (Death Penalty) Cases" Nancy Haydt, JD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 359, Winter 2014]

· "Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders" George W. Woods, MD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD, Journal of Psychiatry and Law, Spring 2011

· "Improving Cognition and Treatment Outcomes in Schizophrenia" Bhushan S. Agharkar, MD [The Psychiatry Report 2004; 2(1): 24-34]

· "Violence While on SSRIs – a Litigation Perspective" poster presentation at American Academy of Psychiatry and the Law conference, October 22, 2004

· "Prescribing Conventional Antipsychotics at Two Veterans Administration Hospitals: Are There Geographical Differences?" Prakash S. Masand, MD, Monica Arora, MD, Thomas L. Schwartz, MD, Anil Sharma, MD, Xiaohong Wang, MD, Subhash Bhatia, MD, Jacob Manjooran, MD, William Hardoby, MD, Subhdeep Virk, MD, Daniel J. Kuhles, MPH, Bhushan Agharkar, BA, and Sanjay Gupta, MD [CNS Spectrums 2001; 6(11): 894-896]

· "Prescribing Conventional Antipsychotics in the Era of Novel Antipsychotics: Informed Consent Issues" Prakash S. Masand, Thomas L. Schwartz, Xiaohong Wang, Daniel J. Kuhles, Sanjay Gupta, Bhushan Agharkar, Jacob Manjooran, M. Ahmad Hameed, William Hardoby, Subhdeep Virk, and Bradford Frank. [Am J Ther 2002 Nov-Dec; 9(6):484-7]

· Research Assistant in Neuropsychiatry laboratory working on the solubilization of the 5-HT2A receptor under Brian Roth, M.D., Ph.D., at Case Western Reserve University (20 hrs/wk, fall 1995)

· Summer Research Fellow in Retrovirology lab under Bernard Poiesz, M.D., at SUNY HSC at Syracuse (40 hrs/wk, 5/1995-8/1995)

3

· Research Assistant at CWRU, Department of Neurology, Division of Clinical Research (3-5 hrs/wk, 1993-1994)

**Presentations:**

· *Telehealth Modalities to Facilitate Evaluations Globally as well as in Use by Legal Teams for Case Coordination*, International Academy of Mental Health and the Law, Vienna, Austria, July 16, 2015
· *Update on Post-Traumatic Stress Disorder*, Continuing Medical Education lecture, Sixth Annual Mental and Behavioral Health Symposium, Baptist Health South Florida, Miami, FL, March 8, 2014
· *Dealing with the Difficult Patient*, Continuing Medical Education lecture, Primary Care Medicine and Neurology Update for the Primary Care Provider, Chattanooga, TN, June 26, 2010
· *Conflict Prevention and Dispute Avoidance through Teambuilding: Can it be transferred to legal/medical teams?*, International Academy of Mental Health and the Law, New York, NY, July 2, 2009
· *Understanding and Treating Bipolar Disorder*, Continuing Education lecture, Pine River Psychotherapy Associates, Atlanta, GA, October 27, 2008
· *Risk Management Issues in Psychiatry*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, February 27, 2008
· *Suicide and Violence Risk Assessment*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, January 23, 2008
· *Suicide Risk Assessment*, Nepalese Association in Southeast America Convention, Atlanta, GA, September 1, 2007
· *Schizophrenia*, Continuing Education lecture, United Behavioral Healthcare, Atlanta, GA, September 28, 2006

**Consultations:**

· Georgia Tech Athletic Department
· Federal Bureau of Investigation
· Cobb County School District
· Emory University Hospitals
· Georgia Composite State Board of Medical Examiners
· Fulton County Sheriff's Department
· Georgia State University
· Atlanta Journal Constitution
· City of Little Rock
· The Clemency Project 2014
· 392nd District Court of Henderson County, Texas
· National Law University, Delhi

**Professional Society Memberships:**
· American Neuropsychiatric Association
· American Association on Intellectual and Developmental Disabilities
· American Psychiatric Association
· American Academy of Psychiatry and the Law
· Georgia Psychiatric Physicians Association
· American Association of Directors of Psychiatric Residency Training, 2005-2011
· International Academy of Mental Health and the Law
· American Psychological Association, Division 33

**Awards and Honors:**
· Distinguished Fellow, American Psychiatric Association, 2015
· Fellow, American Psychiatric Association, 2011
· Phi Beta Kappa
· Honorable Mention, The Joe and Hope Skobba Memorial Award Resident Research Competition, 2005
· Emory University Department of Psychiatry Resident Teaching Award, 2004
· State Farm Foundation Scholarship Recipient (through National Merit Scholarship Corporation), 1993-1997
· Presidential Scholarship Recipient at Case Western Reserve University, 1993-1996
· Psi Chi, National Honor Society in Psychology
· Dean's High Honors List at CWRU, 1993-1996
· Who's Who in American Colleges and Universities, 1996
· USAA All-American Scholar-Athlete, 1995

**Leadership, Teaching, and Volunteer Activities:**
· Georgia Psychiatric Physicians Association (GPPA) Trustee 2006-2007, 2008-2011
· GPPA Ethics Committee, Member 2007-present
· GPPA Distinguished Fellow Nominating Committee, Member 2016-present
· Review Editor, *Frontiers in Forensic Psychiatry,* 2011-present
· Georgia Composite State Board of Medical Examiners, Peer Reviewer, November 2008-present
· National Institute of Trial Advocacy Training, Golden Gate University School of Law, San Francisco, California, 2008
· The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento, CA, Member 2008-present
· National Institute of Trial Advocacy Training, Georgia State Law School, Atlanta, Georgia, 2007
· American Academy of Psychiatry and the Law *Private Practice* Committee, Member 2007-2010
· American Academy of Psychiatry and the Law *Forensic Training of Psychiatry Residents* Committee, Member 2007-2010

5

- American Academy of Psychiatry and the Law *Early Career Development* Committee, Member 2007-2010
- Skyland Trail, Professional Advisory Board, Member 2006-2009
- GPPA Board of Trustees Public Affairs Committee, Chair 2005-2011
- GPPA Board of Trustees Early Career Psychiatrists Committee, Chair 2004-2011
- GPPA co-representative to the Medicare Carrier Advisory Committee, 2003-2004
- Developed, organized and taught weekly seminar series in psychodynamic psychotherapy for medical students in Emory Psychiatry rotations, 2003-2004
- APA ECP Advocacy/Leadership Fellow, 2004
- Emory MIT Trustee to the GPPA Board of Trustees, 2003-2004
- Emory Psychiatry Residents Political Action Committee, Chair 2002-2003
- Blackwell Science Publications, Reviewer 2001-present
- Co-editor of BMM's *Vritta*, national Marathi youth newsletter, 1998
- Judo, Brown belt

**Declaration of John Seals**
**Pursuant to 28 U.S.C. §1746**

I, John Seals, declare as follows:

1.  I live in the Tie Plant neighborhood of Grenada, Mississippi, with my wife, Sammie Seals.

2.  I am a mechanic by trade. Many of the kids in the neighborhood would come by my house, and I would teach them how to work on cars. I always had several tools around and people in the neighborhood knew they could borrow tools from me.

3.  Sammie testified at the trial of Terry Pitchford in February 2006. One morning in 200̸5, she came to the bedroom and told me that Terry Pitchford was at the door and wanted to borrow a screwdriver. I told her to go ahead.

4.  Later, I learned about the killing of Rueben Britt. I knew the boy Eric Bullins, he used to come by my house like other boys did, to learn about fixing cars and mechanics. People called Eric "Thang," and Thang always used to come by and use my jack or whatever tools they needed. Thang's brothers Shawn and Quintez also used to come by to work on cars and borrow tools whenever they needed them.

5.  Quintez was the one who seemed to want to learn about mechanic work. He would come by regularly. He was shot and killed several years ago.

6.  Terry Pitchford was not one of the boys who came by. He did not live in the neighborhood. At the time, he was going with a girl in our neighborhood, Dominique Hogan, but I did not know him and I would not know him if he walked through my door right now.

*JAS*

1

7.   The morning my wife came to ask me if Terry could borrow my screwdriver, I was still in bed. I had kept the screwdriver on the window sill of the house, on the outside. I told Sammie to let Terry borrow it. Before that morning, Terry had not come to my house to borrow tools or work on cars with me.

8.   Later on, Officer Greg Conley came by my house with a screwdriver asking if it was mine. I told Officer Conley that it was the one that Sammie let Terry borrow. I knew Officer Conley because he lives in our neighborhood.

I declare under penalty of perjury that the foregoing is true and correct.

_John A. Seals_
John Seals

_8-6-18_
Date

2

Declaration of Sammie Seals
Pursuant to 28 U.S.C. §1746

I, Sammie Seals, declare as follows:

1. I live in Grenada, Mississippi, in the Tie Plant neighborhood with my husband, John Seals.

2. I testified for the State at Terry Pitchford's trial in February 2006. I testified that on the morning of Sunday, November 7, 2004, Terry Pitchford came to my door and rang the doorbell, asking to use a screwdriver.

3. Before that morning, I had only seen Terry around the neighborhood because he was dating Dominique Hogan. But I did not know him well.

4. My husband John is a mechanic by trade, and always had tools around. Kids in the neighborhood would come by our house and borrow John's tools and he would teach them how to work on cars. The three Bullins brothers, Eric, Shawn, and Quintez, came by often. But I had never seen Terry come by our house before that morning.

5. There was a screwdriver on the window sill of our house, on the outside. John was still in bed when Terry rang the doorbell that morning to ask if he could use that screwdriver, so I went to ask him if it was alright if Terry borrowed it. John said he could and then I let Terry use it.

6. When I learned what happened and that Terry was involved, I was surprised. I did not know him well, like we knew the Bullins brothers, but Terry always seemed like a sweet and polite boy.

SS 8/6/18

1

I declare under penalty of perjury that the foregoing is true and correct.

Sammie Seals

8/6/18
Date

2

Declaration of Roydetric Leetrell Harris
Pursuant to 28 U.S.C. §1746

I, Roydetric Leetrell Harris, declare as follows:

1.  I am Terry's maternal cousin. My dad, Roy Lee, is Shirley Jackson's brother. I live in Horn Lake, Mississippi and work as a truck driver for McLane. I signed an affidavit in Terry's state post-conviction case.

2.  I grew up in Tchula, Mississippi with my dad and mom LuBertha Brown. Our grandparents lived on a farm in Tchula and that's where my dad and his siblings were raised. Terry and Perry would come to Tchula on the weekends to visit.

3.  Terry and I were close when we were younger. As we got older, we went our separate ways but still kept in touch. I was born on October 14, 1983, and am a couple years older than Terry. I think he looked up to me. He liked hanging around with me when he came to Tchula. Perry hung out with our other cousins more and Terry hung out with me and our cousin, Andrew, who was my Aunt Sandra's son. Terry was always getting into things. He would chase the chickens and tear up the trees, pulling branches off. To keep him under control, our grandmother had him doing a lot of farm work when he visited.

4.  Terry was usually very respectful and polite to adults, but sometimes he would talk back to his mom, my aunt, Shirley Ann. She did not take that. I've seen her pick up something from the floor and knock Terry upside the head with it. I remember one time Terry broke something in the back room of Ms. Shirley Ann's house when he was running around. I saw her whip him with extension cords.

5.  When Terry came to Tchula, he usually came with his dad, James. Shirley Ann had to

App.0250

work to support them. She seemed always to be working and didn't come as often. James didn't work. He was the primary caretaker and was the one who did things with the boys.

6.  James was from California and I remember he returned there at different times when we were growing up and Terry and Perry would go with him.

7.  Terry was closer with his dad than Perry was. When both James and Shirley were around, I observed Terry being under James more, hanging around him and being near him, while Perry was under Aunt Shirley Ann. When Terry's dad died, it was really hard on Terry. He went from having his dad who picked him up from school and stayed home with him to coming home from school to an empty house with no caretaker. Shirley Ann still had to work and the boys were basically raising themselves at that point. I remember Terry would cry a lot, for apparently no particular reason after his dad died. I would often see him off to himself away from everyone and just crying. Terry wouldn't say why he was crying but the episodes didn't start until after his dad died. I don't believe Terry ever got counseling after James died and I could tell he was not moving past it in life. It seemed that Perry was much better able to go on with things after his dad died and kind of put it behind him somewhat.

8.  When Terry and Perry were around twelve, Shirley Ann got together with Louis. Maybe Shirley Ann was with Louis because she wanted to have someone to help her with the boys. They didn't see eye to eye with him and there seemed to be resentment toward Louis because Terry might have thought Louis was trying to take the place of James. Louis had a drinking problem, and everyone knew it.

9.  When we were younger, I was pretty mischievous. Terry followed along with what I would do. If I told Terry to do something, he would do it without asking questions and without thinking

App.0251

about the trouble he'd get into. For instance, we would leave the house in Tchula together after his parents had told him not to. I would get him to sneak off with me to go to a football game.

10. Terry was a follower. Perry would think things through for himself and wouldn't just go with the crowd. But Terry would do what everybody else was doing and not question or, it seems, even think about the trouble he could get in.

11. Ever since his dad died, Terry was looking for a father figure from basically anybody who would show him some attention. I remember gangs were very prevalent in Grenada when we were growing up and Terry was very curious about them but never managed to join one. I am glad that he didn't join one. But, he did end up picking the wrong group of people to hang around; they stood in for a father figure. Terry badly wanted to fit in and to be accepted. After James died, there was nobody to steer him away from following new friends and doing what they wanted him to do because he was trying so hard to fit in. Terry was desperate to fit in at that point and was going to go along with whatever they were saying and doing so that he could be a part of their group.

12. Around that time, when Terry was about sixteen, I remember Terry had a friend in Grenada who was shot and killed. This seemed to affect him badly. I think the fact that he had never been able to move on after his dad died made it harder for him to handle his friend's death.

13. When we were older, Terry was expelled from school in Grenada and he went to stay with his sister, Veronica, in Jackson. There were times when I would come by to hang out with him at Veronica's or just pick him up and ride around in my car. Terry seemed to like it in Jackson. I was going to Hinds Community College at the time. He talked about going there as well and even came out to visit me at my dorm.

14. No one from Terry's trial team ever contacted me. I would have testified to the above i

nformation if asked.

I declare under penalty of perjury that the foregoing is true and correct.

_Roy Dietrich Harris_ Royketric   Lee tre ll Harris

08-23-18
Date

Declaration of DeShawn Burnett
Pursuant to 28 U.S.C. §1746

I, DeShawn Burnett, declare as follows:

1. I am Terry Pitchford's older half-brother. Terry, and his twin Perry, and I have the same mother, Ms. Shirley Jackson. I was born on October 13, 1975 and am about ten years older than Terry. I live in Duluth, Georgia, where I have worked for about the past ten years as a computer systems analyst with the Gwinnet County Public Schools. I service the whole school system, which includes about 160 schools.

2. I was born in Detroit, Michigan. My father is Sterling Burnett. My father wasn't around when I was growing up. It has only been recently that we've developed a relationship.

3. When I was between the ages of five and seven, my mother moved me and my older half-sister, Veronica, from Detroit back to her home in Tchula, Mississippi. I don't remember exactly how old I was when we moved. But, I grew up and went to school primarily in the Tchula area. I lived with my mom in Tchula, but on the weekends and in the summertime, I stayed with my grandmother, Ms. Valley Brown, in a rural community called Thornton near Tchula. My mom lived in a white neighborhood in Tchula.

4. My grandmother and grandfather lived on a farm. I was taught to work hard on my grandmother's farm. I always had chores. I would help take care of the chickens, cows and horses, and I would help in the garden. If my grandmother didn't have anything for me to do, my uncles always had work for me.

D.B

5.  I remember my mother getting together with James Pitchford pretty soon after she divorced my father. She had met James when she was still living in Detroit and had come home to Tchula for a visit. They continued to talk when my mom was in Detroit. Then we moved to Tchula after my mother left my dad. When my mother and James were together in Tchula, they would go to California a lot. I would usually go with them, but Veronica usually stayed behind with our grandmother.

6.  I remember caring for the twins and Jessica when they were little babies in Tchula. Shirley and James were running a burger spot in Tchula, so I would help take care of the babies. I would warm up bottles and change diapers. When my mother and James moved to Grenada, I was in the eleventh grade. I went to school in Grenada for about a month of my eleventh grade year, but I returned to Thornton and stayed with my grandmother to finish high school. After I graduated from high school, I enrolled in Jackson State University, but I dropped out after two years. I eventually decided I wanted to get out of Jackson and Mississippi, so I moved to Georgia and stayed in one of my cousin's rental properties.

7.  I have been told that when I was very young my dad came and grabbed me out of the yard and took me back to Detroit. He apparently did this more than once. He would come and take me back to Detroit, and my mom would come and take me back to Tchula. My father didn't stop doing this until my mother went to court in Detroit to get me back.

$\mathcal{J}\,\mathcal{B}$

8. My father is the one who told me that Jessica is James Pitchford's daughter with Veronica. I think he told me this because he was angry at my mom and wanted to expose her for letting her daughter remain in the house with the person who was molesting her. Veronica and I had a good relationship. She's three years older than me and were very close growing up. I remember some nights when Veronica would ask me to sleep in her room with her. Looking back, I think she was afraid to be alone because of James. I wish I had done more to protect her.

9. I remember when Jessica was born because I remember my mom bringing her back from Detroit. My mom had taken Veronica to Detroit to have the baby. Getting pregnant so young was a stain on our family. My mom left Veronica in Detroit to finish school. She stayed with Shirley's sister, our Aunt Bessie Mae. I had always known Jessica was Veronica's daughter; I just didn't know who the father was until later. I mistakenly thought it was a guy who lived down the street from us because that's what people were saying. I am angry at James and angry about what happened to Veronica. I have not talked to my mother about this, and she never told me anything about what was going on in the house. She is secretive and all my life has swept things under the rug.

10. When James died, Terry had a very difficult time. I remember James' other children from prior relationships coming to Mississippi to take his body back to California. Terry never got counseling or any therapy after his dad died. Terry was looking for a father figure or some other kind of center for support. He was young

D ß

and immature, and had always been an emotional child. Searching for this support, he picked the wrong group of people to fill the whole left by James' death.

11. Terry and Perry were very different. Perry was more levelheaded. Terry took more risks and was always testing the limits. He did not make good decisions. When we were young, we were taught never to interrupt an adult. Terry couldn't help himself. He would often interrupt when adults were talking. Our mom or whatever adult was around would whip him or slap him in the mouth for this. When the twins and Jessica were being picked up, Terry wouldn't be where he was supposed to be at the time he was supposed to be there. Everyone else would be in their spots. This made my mom very angry and singled Terry out. It seemed like Terry was not developed emotionally, like then other kids. He remained childlike, even as he got older.

12. When James died, my mom struggled a lot taking care of the twins. She had never really had to take care of her kids on her own. Our grandmother, Ms. Valley Brown, was the primary caretaker for me and Veronica, and with Veronica, Shirley also had the help of her sister in Detroit. James was the primary caretaker of the twins and Jessica when he was alive. When James died, Shirley wasn't equipped to deal with a grieving child, like Terry was.

13. I had moved out and was living in Jackson by the time she brought Louis Jackson around. Louis was a drunk and would argue and fight with my mother a lot. He was not a father figure to the boys. Terry would complain to me about Louis

D.B

being physically abusive to our mom, and he asked me not to say anything to our mom because she had told Terry not to tell me about what Louis was doing.

14. Terry was usually friendly and laid-back, but sometimes he would lose control and start hitting or kicking things, punching holes in the wall. One time, something happened with Terry when he was at Veronica's house that made him upset. I can't remember what it was. My mom brought him over to my apartment to try to calm him down. Terry was very angry and started kicking our mother's car door. He was also hitting his head with his hands, side to side. I had to physically restrain him until he calmed down. When I held him tight, he didn't resist, and he calmed down. Terry had extreme mood changes and sometimes didn't appear to be himself. The adults in our family would say that Terry's behavior was "nothing but the devil." They would say this to Terry. They called him the "bad twin."

15. When Terry got older, he ran with a rough crowd in Tie Plant. He was trying to appear tougher than he really was. Terry wasn't used to the street-smart rough people he hung around. Our family never hung around Tie Plant.

16. My mom took it really hard when Terry was sentenced to death. She turned her back on God and did not want to talk about faith. She had given up. I had to remind her that at least she could still touch him and he wasn't dead.

17. Members of Terry's trial team came to interview me once before Terry's trial and they talked to me about Terry taking a plea. I spoke with Terry over the phone to try to get him to consider a plea. I did not hear from the defense after Terry

D.B

didn't take the plea. I was present for Terry's whole trial. I would have testified to the above information if asked.

I declare under penalty of perjury that the foregoing is true and correct.

DeShawn Burnett

8/26/18
Date

Declaration of Dominique D. Hogan
Pursuant to 28 U.S.C. §1746

I, Dominique De'Lauren Hogan, declare as follows:

1.  I am from Grenada, Mississippi and was born on December 11, 1985. Terry
Pitchford is the father of my child, De'Terrius X'Zavion Pitchford. De'Terrius was
born on April 30, 2004, when I was 18 years old. In high school, I was involved in
ROTC and ran track before I became pregnant in the summer before 12th grade.. I
had to give that up when I became pregnant with De'Terrius. After high school, I
went to Holmes Community College. I eventually received an administrative
assistant degree from Everest Institute Technical College. I live with De'Terrius in
Stone Mountain, Georgia. I work as a property manager with Public Storage in
Tucker, Georgia.

2.  Terry and I met at Second New Hope Baptist Church in the Tie Plant section
of Grenada when we were 13 years old. I had seen Terry in study hall at school and
at first I didn't know we were the same age because he was two grades below me. I
recognized him from vacation Bible school at church. We started dating soon after
we met at church. I continued to date Terry until after he was sentenced and on and
off for a few years after that.  I still care a lot about Terry. He is a positive presence
in our son's life.

3.  I remember when I found out I was pregnant. Terry was very excited with
our news. He was more excited than I was. He couldn't wait to be a father. He was
very loving and nurturing. We named our boy with a combination of my middle
name and Terry's name. De'Terrius was seven months old when Terry was arrested.

1



App.0260

These days, people call De'Terrius "Buddy." He is doing well in Georgia but likes being in Grenada, he feels very close to his family here.

4.  I get sad and frustrated sometimes that I've had to raise Buddy without Terry because he was so excited about being a father. Buddy is a very good boy. He looks just like Terry, and when I look at him I am reminded of Terry. Terry has continued to provide for Buddy in whatever way he can. The two of them talk on the phone regularly and Buddy visits Terry during holidays.

5.  When we were dating, Terry always had money and a car, which his mother bought him. Terry would always take care of me. He bought me clothing, school supplies and other things I needed.

6.  I grew up in a rough part of Grenada called Tie Plant. I was raised by my grandmother, Ms. Laura Mohead. My mother struggled with drug addiction and she lost custody of me and my siblings. When we started dating, Terry started hanging around Tie Plant to be close to me. Sometimes I would go over to Terry's house and sneak in without his mother knowing. But most of the time, Terry was in Tie Plant, spending time at my house.

7.  My grandmother was very strict. She did not let Terry stay at my house past 7:00pm. My grandmother was a caretaker for someone and she often stayed at that person's house. When I was between the ages of 15 and 18, my grandmother had the same schedule. She would come home from work at around 3:00pm, and then leave the house around 8:00pm to go to her caretaking job. This allowed Terry to sneak back over to my house and spend the night. Terry would be at my house after school



2

and he would leave at 7:00pm. He would often go over to Eric Bullins' house and wait until my grandmother left to come back. Eric lived nearby and Terry wanted to stay in the neighborhood so he could come back and see me. Sometimes Terry would stay over at Eric's house; Eric's mom didn't care who was in the house. She had a revolving door.

8.   Because he was in Tie Plant so much visiting me, he eventually made friends with the guys there. By the time Terry was 16, a few years after we started dating, he was no longer considered an outsider in Tie Plant. But it took him a few years to get comfortable with the guys there. In addition to Eric ("Thang"), Terry spent time with Demarquis Westmoreland ("Pooh Bear"), my brother Antonio Hogan, and a bunch of other guys who lived in Tie Plant. Since they lived close to me in Tie Plant, Terry saw them often. But, he still had his close friends from growing up before he hung around Tie Plant, like Frankie Reed and George Jones. When Terry and I were together, it was usually in Tie Plant. I didn't go to Terry's house as much; he usually came to my neighborhood.

9.   Of all the guys in Tie Plant, Terry was closest with Pooh Bear. Pooh Bear was the leader between the two of them. Eric Bullins also followed Pooh Bear's lead. Terry tended to follow both of those guys. He would drop everything just to do things for them. Pooh Bear and Eric were always asking Terry for favors. I would get so frustrated. When Terry and I were spending time together, we were interrupted by Pooh Bear and Eric all the time. They'd ask Terry to drive them where they wanted to go or ask to borrow his car. Sometimes, Terry would stop



3

App.0262

hanging out with me just to make them happy. Pooh Bear really got on my nerves the way he would always call Terry to do stuff for him. Terry was very easily persuaded to do things, especially by them. Pooh Bear and Eric used him. It made me angry the way Terry would follow up behind Pooh Bear, who was usually up to no good.

10. Terry was always letting people borrow his car. One time when Terry let Pooh Bear borrow his car, Pooh Bear crashed and wrecked the car. Terry and I were at my house trying to have some time to ourselves. Pooh Bear started beating on the window of my house, asking Terry to take him somewhere. Pooh Bear kept beating on the window and harassing Terry until Terry just gave him the keys. Later, Pooh bear came back and told Terry he had wrecked the car. Terry never told his mom what happened, and she just thought Terry was the one who wrecked it.

11. Quincy Bullins is Eric's cousin. Quincy and Terry were the followers of the group, trying too hard to fit in. But Terry didn't like Quincy very much. Quincy was irritating. He was the type that always wanted to start a fight but couldn't finish. He was like a crash test dummy. He would get beat up a lot and stir things up for no reason. He was also really loud and gave his input when no one asked. Quincy was always trying to fit in. He was usually the fall guy, when Pooh Bear and Eric would get in trouble.

12. In Tie Plant, everybody knew the Bullins were trouble. Many of their relatives were in jail, killed, or had lengthy prior criminal records. Eric Bullins'

4

264 of 324 PageID #: 939

brother, Quintez, was shot and killed near the Double Quick in Grenada a year or so after Terry was arrested. They still don't have a suspect in that case.

13. My older brother had an addiction. He stole my grandmother's car and wanted to swap it for drugs. He pawned it to Eric Bullins and Eric told Terry about it and asked if he wanted to go around joyriding. Terry called me when he saw the car and that's how I found out it was stolen. Terry didn't go joyriding with them, and the car was eventually returned to my grandmother.

14. When Terry got in trouble at school, it often involved fights over me. I remember one bad incident in particular. In the schoolyard, some boys from the eastside were trying to talk to me and then it turned into taunting Terry about me. There were a lot of them. They all ganged up on Terry and were trying to fight him. Other kids started to surround the boys and Terry to watch the situation like spectators at a fight. This made it difficult for the teachers to see what was going on.

15. Terry felt very threatened and was afraid the eastside boys would attack him. People were holding him back and finally some teachers tried to intervene. Terry was trying to walk away and started backing up away from the crowd. Perry didn't stay to help Terry fight; he ran and told their mom, who was in her school bus nearby. It got very scary and Terry finally broke away and headed to where the buses were parked. He took out his frustration and anger on the bus taillights, punching them out instead of the kids.

DH

5

App.0264

16. When I met Terry, his mother had already married Louis Jackson, Terry's stepfather. Lewis and Terry didn't get along. Louis got drunk a lot and Terry would intervene when Louis was fighting with Terry's mom. Perry didn't fight or try to get in the way of that situation. Sometimes when I was on the phone with Terry, he would be crying and very upset because Louis was drunk and fighting with his mom. I could hear Louis in the background, cussing and acting a fool. I heard him telling Shirley he was going to bear her ass. I remember Terry arguing with Ms. Shirley about how she was letting Louis mistreat her, and Shirley wanted Terry to mind his business and not get into it. Louis was a truck driver and Shirley would go on the road with him frequently, leaving the twins and Jessica (their sister Veronica's daughter), at home alone for long periods.

17. Terry learned differently. He had trouble absorbing information when somebody was just talking to him. He did better if he could learn by doing. Terry would pretend to write words with his fingers on his thigh or a table or in the air to better understand what he was being told. Terry could not remember oral directions very well, even if they were simple. I remember one time when Terry was given directions to McDonalds. He started driving off but he soon turned around and came back to get the directions written down. There were only two turns, but he couldn't remember them. It has always been best to write things down for him because even if you verbally tell him something to do and it is simple, he is almost always going to forget what you said as soon as you finish telling him. He could never remember



6

phone numbers either. He had to write digits in the air to try to remember if he didn't have a pen.

18. Over the years, I heard Terry talking to himself, as if he were responding to someone who wasn't there, and I heard him fighting with people that weren't in the room. He was afraid of the dark, too, and always had a light on in the room when he was sleeping. When I asked Terry about the voices, he said he felt like they were demons and they were on his shoulders. The voices told him to do things. Terry told me he felt like people were after him. One time, I walked in on him in the kitchen at Ms. Shirley's house and he was talking to himself. I asked him who he was talking to, and acted like I was crazy because I couldn't hear the voices in his head. When Terry would cut himself after hearing the voices. He would use a pen or paperclip and carve into his arm. He did this during school, too. He had scars on his arms from all the cutting.

19. During the time Terry and I were together, he regularly had bad headaches. He would constantly rub the side of his head to try to make it hurt less. I don't remember hearing that his mother ever took him to a doctor to help him figure out what was causing the headaches or to get treated. I also had headaches growing up; I went to the doctor and found out I needed glasses.

20. When I had Buddy, I was still living with my grandmother, Ms. Laura. She still wouldn't let Terry stay at the house past 7:00pm. I really wanted Terry to help with our baby, so I persuaded Terry to find us an apartment so we could be on our own. It was my idea to move out. While we lived together, Terry worked at Grenada



7

Wholesale Lumber. Our relationship was pretty good; we had the normal ups and downs. Terry would sometimes mess around with other girls, but he was a good boyfriend and an attentive father. It really messed me up when Terry was arrested. He was my best friend.

21. The sheriff's department investigator who worked on Terry's case, Greg Conley, lived in Tie Plant. I saw him at the grocery store and around town. He used to hit on me. One time, when Terry had just been arrested and was waiting for his trial, I saw Greg Conley. He asked me if I wanted to meet him at a hotel and tried to entice me by saying that we could talk about Terry's case and maybe work something out. I did not go with him to a hotel. Greg Conley knows the whole Bullins family because he is from the same place as them. When my brother, Carlos Hogan, was killed, Greg Conley was the investigator on the case. Everyone knew who killed Carlos, but District Attorney Evans dismissed the case against the killer for lack of evidence. I am still very upset by this.

22. I attended Terry's trial, and I testified during the penalty phase. On several occasions during breaks throughout the trial, I saw jurors talking to the Britt family. There were three or four jurors who I usually saw talking to Mr. Britt's family. I also recognized my teacher Lisa Wilbourn as one of the jurors. I remember her as a study hall and computer class teacher. I believe she also taught Terry and Perry.



8

23. After Terry's guilty plea fell through, it seemed like his lawyers gave up on him. By that point, they were not really communicating with Terry. Just watching them at the trial, they didn't seem prepared to defend him.

24. I remember speaking with the trial mitigation specialist, Sheila O'Flaherty, before my testimony. I remember talking to Terry's lawyer just before the day of my testimony, but I did not feel prepared to testify. I was not asked background questions or about the areas of my experience with Terry and his life that I have said in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Dominique Hogan

_____
Date    8/26/18

9

Declaration of Perry Pitchford<br>Pursuant to 28 U.S.C. §1746

I, Perry Pitchford, declare as follows:

1.   I am the twin brother of Terry Pitchford. I live with my fiancé and her children outside Charleston, South Carolina. For about the past seven years, I have worked for Boeing Aviation in Charleston as a chief mechanic.

2.   Soon after Terry's arrest in 2004, I left Grenada. I went to Jackson State University for college and later moved to Atlanta to attend aviation school. After earning my aviation degree in 2010, I moved to Charleston to work for Boeing.

3.   Terry and I are fraternal twins and we were born in Greenwood, Mississippi on December 30, 1985. Both of our parents are from Tchula, Mississippi, and we spent our early years there. We eventually moved to "the country" section of Grenada when we were about six years old.

4.   We grew up with our older half-sister Veronica and our older half-brother Deshawn. We all had the same mother. Veronica's father is a man named John Otis and Deshawn's father is a man named Sterling Burnett. We also lived with Veronica's daughter Jessica, who was a few years younger than us, and we grew up thinking she was our niece only to find out later she was our younger sister. There were times when Veronica and Deshawn weren't living with us and were living with our grandparents. My father died when Terry and I had just turned 11 years old. Our mom got together with Louis Jackson very soon afterward and eventually married him.

1

5.  Our mom's house that Terry and I grew up in was near Highway 7, a few miles from Grenada Lake. Her room is in the front of the house, off from the living room. The kitchen is on the other side. Down the hallway facing away from the living room, there are two bedrooms. The one on the left has been a guest room and the one on the right was Jessica's room when we were growing up. You had to pass through Jessica's room to get to the den that was turned into the bedroom Terry and I shared. That room has a door leading outside to the back of the house.

6.  It was very secluded where we grew up. The homes were separated by a lot of land, and we didn't know our neighbors. We were outsiders in Grenada. People in Grenada knew we were not from there because we did not have extended family in Grenada. We had no connections there. Terry and I would get teased at school for being "country." The kids would hear our drawl and say "ya'll country."

7.  Tie Plant is a neighborhood in Grenada that is more like a small city. It is more densely populated with residential homes next to each other. It is also a rough area. We didn't really mingle with anyone from "the city." And people from the city never came to the country. As church-going country boys, we were always told Tie Plant was a place where we needed to be careful. There was a lot of drug dealing and crime in that neighborhood. Terry didn't mingle in Tie Plant until he met his girlfriend, Dominique Hogan, when they were teenagers.

8.  Terry and I have always been very different. Growing up, Terry was friendly and always sought attention from other people and wanted to be around people. He was also very emotional, with extreme highs and lows sometimes. Terry would be

2



calm one minute and then in a split second, he'd switch and become very upset. It was like he was a different person. It usually happened when he was getting in trouble because he had difficulty expressing himself in response. He had problems expressing how he felt and would become upset when he couldn't get it out. I was quiet, more laid back, and tended to stay to myself. And I was better able to express myself and avoid letting the frustration spill over.

9.   From an early age, our parents and others in our family called Terry "the bad twin" sometimes, or the "dumb twin" or "dark twin," because my complexion was lighter than his. We were also physically very different. I was taller and leaner and Terry was shorter and heavier. Terry got teased for his weight. Looking back on it, I fed into this treatment of Terry and I would tease him often too. I called him "dumb" when he struggled in school.

10. Our parents treated us differently. My mom—and when he was alive, my dad—paid more attention to me and praised me. Terry never got the attention or praise that I got from my mom and others in the family. Overall, my mother didn't pay attention to Terry, even though he was constantly seeking attention from her. Terry was more vocal with things and sought attention mostly by not falling in line or doing what he wasn't supposed to do, whereas I was quieter and hid things. I was definitely my mother's favorite. My mother would tell Terry "you ain't shit" and "you're going to end up in jail."

11. When my father was alive, he was strict with Terry and severely punished him. Terry would get the "full punishment," which included beatings all over his

3



App.0271

body with extension cords, switches, and anything else that was lying around. I remember my father catching Terry cheating on a take-home spelling test. My dad whipped him until Terry was crying out he couldn't breathe. Terry finally ran under the coffee table to avoid more of a beating.

12. I would only get a couple of licks when I got in trouble, but Terry would get extreme beatings. Terry would often talk back or fight back when he was being hit, which would make things worse for him. Unlike Terry, I was able to avoid trouble by staying quiet and out of the way.

13. Sometimes, I would take the blame for things that Terry did because I knew I would not be punished, or at least not as harshly, as Terry. One time our mother's Jeep rolled down the hill and crashed into a tree. I think it was either our Uncle Willie or Terry who was responsible. But I knew my mom would think Terry did it, so I took the blame. If she could have proven that Terry wrecked her Jeep, he would have gotten a bad beating. But since she thought I did it, she ended up buying us a boom box so we wouldn't be sitting in her truck listening to the radio.

14. Our father was what I call a rolling stone. He was always hanging out and spending time with different women. My mom spent most of her time working and out of the house. Our father was much older than our mother and had several kids from prior marriages and relationships.

15. My dad spent a lot of his time with us and did many things with us. My mother was a school bus driver for the Grenada School District and over the years held other jobs too. While mom was working, James was at home, so Terry and I

4



App.0272

were with him most of the time. We were with him when he did things out of the house, like fishing at Grenada Lake and rehearsing with his gospel music group. He took us with him when he went into town or to visit people. During about the last four years of our dad's life, he drove us to California in the summers and dropped us off with our Aunt Dora or with his children, Kee-eso or Keisha. We didn't realize it at the time, but our father was seeing a lot of other women when we were in California. He told our mom she couldn't come out to California.

16. Terry and I were inseparable before my dad died. His death hit Terry hard. I started to pay more attention to our mom and took on more of the role of the good son. Terry really took on the "bad twin" identity at that point. I did not really notice my father's death affecting my mother. She did not seem upset or depressed at all by it. She was busy working and was not very attentive to Terry or me at that point.

17. After my father's death, things started to change between me and Terry. Terry and I always had pretty much all the same friends, but Terry started dating Dominque and eventually he ended up spending a lot of his time with kids in Tie Plant who I didn't like much; kids who got into trouble.

18. Terry met Dominique at Second New Hope Baptist Church in Tie Plant when he was around 13 years old. Second New Hope is the church we started going to after my dad died. I think because Dominique was from Tie Plant and due to her surroundings, Terry was exposed to the street life and other negative influences there. As they got older and Terry could drive, he visited Dominque in Tie Plant

5



App.0273

basically every day. I think it made him a target in some ways because he was a country boy coming into "the city" to date someone who all the boys liked.

19. Everyone in the community knew about Eric Bullins and Shawn Bullins. They had a reputation for being bad. Shawn was a known "dope boy" (he sold marijuana) and he liked to fight—he was not to be played with. Eric Bullins and Quincy Bullins were cousins and best friends. We went to the same school as the Bullins kids, but we didn't get to know them from school. Terry didn't start hanging out with them until he was dating Dominique. A couple months before Terry was arrested, Terry got in a fight with Shawn Bullins. I didn't witness the fight but Terry came and told me. I was over at Kerry Jackson's house that night when Terry told us. People knew that whenever Shawn Bullins and his gang were around, a fight could break out. The whole Bullins family was known for trouble and selling drugs.

20. Terry and I were good friends with Demarquis Westmoreland. We had known Demarquis since we were about nine years old. When we were a little older we all hung out together, doing kid stuff. We would drink Mad Dog 20/20, play video games, smoke black and mild cigars, freestyle rap, and play basketball. Demarquis was tough and didn't fear many things. Terry followed Demarquis' lead. Demarquis could convince Terry to do anything. Demarquis was from a good family but he hung around with the wrong crowd. Our mom would drop us off over there and I would hang with him sometimes. He didn't attend Second New Hope, where we went after our dad died. Demarquis' dad had a church.

6

21. The crime in Terry's case doesn't make sense to me. Terry knew Ruben Britt well and liked him. We were in that store every day. I don't believe Terry would go in there and intentionally hurt him.

22. When we were kids, Terry would talk about killing himself. When he'd get into trouble with our mother, he would say that he was going to kill himself and go be with his father. One time, Terry ran out of the house and grabbed a log, threatening to kill himself. He pretended to hit himself in the head with the log. He sometimes said that he heard voices telling him to kill himself. Terry threatened to harm himself so many times, I can't remember all the different episodes.

23. There were times that I walked by the bathroom at home, and Terry would be in there talking to himself. It was like he was having a conversation with someone who wasn't there. He would switch back and forth and respond. Terry told me about hearing voices; he described them as a male voice. After our father died, Terry said he could hear our father talking to him.

24. Terry was always challenging and irritating adults by asking them questions. I remember one time in bible study, Terry got in an argument with the pastor about whether or not God is real and if God is actually good. Terry questioned whether God was maybe more like the Devil and the Devil could actually be good. This made the pastor very angry, and I knew then that Terry probably wouldn't be as welcome at the church anymore. Our mother was very active in the church, and thankfully she wasn't there when this happened. I remember she was always praying for us

7

App.0275

and anointing us with oil. She anointed us daily. She would anoint the house with oil, too.

25. When Terry and I were around 13 years old, our mother put us on a bus to Los Angeles, California for two days by ourselves to visit our brother Kee-eso. Kee-eso was older than us and one of our father's children. Looking back on it, she needed a break from us. She packed us some food and snacks, but we were on our own. We had to rely on each other. We had one cassette tape by the rapper Juvenile, and we listened to it over and over again. By the end of the trip, we had memorized every song on the tape. It was a two-day bus ride, and we would spend the night on the bus. I remember an older man on the bus accused us of stealing his belongings. We had to plead with him to defuse the situation. I was worried that he was going to try to fight us. It was a scary situation for 13 year-olds. We stayed in California for the whole summer. Our half-brothers, Jimmy and Michael Pitchford, drove us back to Mississippi. I remember Jimmy or Michael going into a store and stealing a T.V. on our way home.

26. About two years after our father died, my mother married Louis Jackson, and he moved into our house. Terry and I were had just turned 12 when they got married. We didn't know they were getting married until we came home one day and they told us they were married. But Louis had been together with my mother for a while before they got married. He'd always be over at the house. At first, he played the role of a good man. He pretended he didn't drink a lot and would give us a small allowance.

8



27. But, living with Louis was hell. He drank too much, and when he was drunk, he beat our mom. I remember during one of these beatings, Terry jumped between Louis and my mom. Jessica called 911 and when the police arrived, they told Louis he had to leave. It embarrassed my mom that the police showed up and there was also a fine to pay. So, she told us all not to call 911 again.

28. Louis was a truck driver, so he'd be gone for long stretches of time. Things would be okay at home when Louis was gone. But, when he got home, he started drinking and fighting with our mom. One time, when Terry and I were about 16 years old, part of our house burned down from an electrical fire. Louis was in the house alone at the time of the fire and called my mom to tell her. We had to move into a hotel for a few weeks until the damage was repaired.

29. While we were living in the hotel Louis came back late one night after being out drinking. My mom and Jessica were asleep in one bed and Terry was sleeping in the other. Louis woke them all up, demanding that our mom go get him some food. She refused and Louis got physical with her. Terry stepped in to defend our mom. Louis, who was at least six feet tall and much bigger than Terry, who was about 5'7", turned on Terry. This is the first time I remember Louis physically beating Terry. I was working at Taco Bell at the time and wasn't in the room. Louis got into numerous other altercations with Terry.

30. Louis Jackson was definitely not the role model or father figure that Terry and I needed. In addition to working, I tried to find distractions to avoid being home when Louis was around. When Terry and I were 15 years old, Louis and his friend

9

App.0277

Kilo paid for a prostitute to have sex with us. We each went into the room alone with the woman. I remember her being very drunk. Louis and Kilo had to have known the lady and been regulars because she knew their names and everything. We both had sex with the prostitute. I was uncomfortable with the situation. Terry and I eventually left together. Louis made us promise not to tell our mother. Once we left the place, Terry and I never talked about it again.

31. In eighth grade, Terry was kicked out of Grenada Middle School when he punched the taillights of a school bus. I was there. I was a couple of grades older and attending the high school, which was just across the street from the middle school. Terry and I and some other kids were walking toward the bus after school. A big group of kids from the eastside of town were saying things about his girlfriend, Dominique, trying to pick a fight with him. When I saw how angry Terry had gotten, I went to find our mom's bus, which happened to be very nearby. She was on it, getting ready to drive some kids home. Terry was surrounded and there wasn't an easy way out of the situation.

32. Instead of getting into a fight with these eastside kids, Terry went toward the buses and when he got there, started punching the lights out on a bus with his fists. I remember our black principal and two other adults coming to my mother's bus with Terry. He was still so upset when we got on mom's bus she had to slap him to calm him down. Terry didn't receive any medical attention for his hand. Terry's relationship with our mom was never the same after that. She was mad at him for

making her look bad; she was worried about people knowing it was her son that busted the taillights.

33. After he was expelled, Terry moved to Jackson to live with our sister Veronica. He started ninth grade at a school in Jackson called Forest Hill. But he didn't last long there and moved back to Grenada after the first semester.

34. That's when things seemed to really take a negative turn. He started staying out all night and finally it progressed until he would be gone the whole weekend. He moved into a place with Dominique and did not come home as often. My mom didn't try to stop him from moving in with Dominique, nor did she try to talk with him about it. Terry stopped going to school.

35. Starting around ninth grade, my mom bought Terry cars. She ended up buying several cars for Terry over the years, even though near the end she was frustrated with Terry and his antics after he moved in with Dominique. I think my mom bought cars for Terry so that he would stay away and stop bothering her. Terry had a way of pushing her buttons and irritating her so she just gave in to get him out of her hair.

36. Terry and I shared our first car together, which was a Cavalier. When I got a job at Taco Bell and she saw I was working and being responsible, she bought me a Chevy Lumina. I remember when my mom bought Terry a Grand Marquis, it was the first car that Terry was really proud of. He took good care of it. That car looked like a dope boy car.

11

37. One time, Terry and I raced home together. Terry was in his car (a white Dodge Intrepid), and I was in my mom's van. Terry forgot there was a dip in the ground and went flying into the trees. When my mom got there, Terry complained that his head hurt and that he couldn't see. We took him to the hospital. Terry told our mother that the floormat got stuck under the brake pedal and he couldn't stop the car.

38. Terry frequently let people borrow his car or would give them rides. He was trying to impress people and get them to like him. He pretended like he was a big-shot drug dealer, with his dope boy car, but really he was just a country boy with a little money to put gas in the car.

39. Terry didn't even know about weed until he started hanging out with all the Bullins kids. He was around 16 years old at that time. He thought if he hung out with a dope boy like Eric Bullins, other people would think he was a dope boy. The dope boys got respect, and that appealed to Terry. He was not getting respect at home or at school. Terry was a follower. He wanted his friends to pay attention to him and like him. Terry couldn't focus and smoking weed seemed to mellow him out. Looking back on it, I believe Terry had something like ADHD and the weed helped him be less anxious and agitated. Terry wanted to get attention from people for having weed. He would buy it for everyone around him to smoke.

40. After his arrest, I visited Terry in jail. Later, I went to all of his trial. I recall recognizing two of the jurors on Terry's jury. One of these jurors had a boat on Grenada Lake and would come to Mr. Britt's store for his fishing gear, such as baits

12

and minnows. All the fishermen on the lake knew Mr. Britt because his store was cheaper than the one right near the lake.

41. Terry seemed like he was off in another world during the trial. He did not seem to know the seriousness of his situation. On the day he was found guilty and sentenced to death, the guard let me walk with him from the courthouse to the holding cell. Terry asked me for a cigarette and he didn't seem to understand that he'd just been sentenced to death. He was totally removed from the situation. This made it harder for me to witness all of this.

42. I had testified for the defense at the penalty phase of Terry's trial. I actually didn't think I was going to testify until they called my name in court. Terry's lawyers had not prepared me to testify. Including the day of trial, I remember meeting with members of his defense team twice. I had gone to Jackson and talked with the black lawyer at his office. He wasn't interested in what was going on. The lawyer was talking on his phone and talking to people that were coming in and out of his office. We only met for about 10 or 15 minutes.

43. After getting convicted, Terry got a new set of lawyers. I remember meeting with an investigator named Patricia once and talking with an attorney, a woman named Van, on the phone once.

44. I was willing and able tof testify for my brother and I would have testified to the above information if Terry's lawyers had asked me.

I declare under penalty of perjury that the foregoing is true and correct.

13

App.0281

Perry Pitchford

8 - 26 - 2018

Date

14

Declaration of Albert C. Britt Jr.
Pursuant to 28 U.S.C. §1746

I, Albert C. Britt Jr., declare as follows:

1.  I was a bus driver and vocational teacher for the Grenada County school district when Terry Pitchford was in middle school. I was hired as an instructor and bus driver for the school district in 1998, the same year that Terry's mother, Shirley Ann Jackson, was hired as a bus driver. Since 2009, I have served as the Transportation Director and, since 2013, Director of Security for the Grenada School District. In that capacity I am responsible for a fleet of 85 buses and the safety and security of over 4,000 students in grades K-12. People call me "Benji."

2.  I have known Ms. Shirley Jackson over the course of my work as a driver and director for the school district. Currently, I am Ms. Jackson's direct supervisor.

3.  I was very familiar with Terry, and I was present when Terry got in trouble for punching out the school bus taillights. This was the only time I observed Terry acting aggressively and, in the end, it was against property rather than another person. The situation could have gone very differently, and with many other children than Terry, I think it would have ended in a physical assault on other students.

4.  I was parked in the bus line getting ready to pick up students for my afternoon route. I noticed a group of kids outside my bus harassing Terry and trying to "jump" him. I got out of my bus to try to deescalate the situation. As several

1


App.000000

teachers were trying to talk to the other kids and to Terry, one of the kids kept trying to start a fight with Terry. Someone was holding Terry back.

5.  I think Terry was scared and needed to figure out how to avoid a fight and get out of harm's way. He needed to be removed from the very stressful situation that was unfolding in front of him and his peers. Terry started screaming and cussing and then he walked over to a bus right in front of mine and punched out the taillights. It appeared that Terry was avoiding physical confrontation with the other students. He was attempting to scare off the kids who were trying to fight him by using tough words and actions. He seemed to channel his fear and anger at those kids into the bus taillights. I do not think Terry realized his own strength. With all that adrenaline, he beat out the taillights with his fists.

6.  I remember there was a lot of blood on Terry's hands. I tried to get Terry to calm down, but he pushed past me and walked briskly toward some other buses. Along with some other teachers, I helped take Terry to his mother's bus and tried to calm him down. Ms. Jackson said she would take care of the situation. I remember she was very quiet and didn't show much emotion. I went back to my bus and completed the route for the day. Later, as I drove my route, I looked down at my shirt and noticed Terry's blood from holding and taking him to Ms. Jackson's bus.

7.  Many times over the years, I have seen students behave in the way Terry did that day. I have learned a lot about crisis intervention techniques with children. As part of my job as director of security, I completed police academy training and obtained certification in Crisis Intervention Team Management, Proactive School

2


App.

Security, and Crisis Preparedness Training. When students are in an anxiety-producing environment with their peers, it is hard for them to back down. They need to be removed from the stressful situations and given an opportunity to regain some control. Then they are able to make better decisions. The trick is helping kids learn how to maintain control during these stressful situations.

8.   I made a statement at Terry's expulsion hearing after this incident. I recall being asked about my role in the incident. I was asked if I had instigated or provoked the incident somehow, to which I answered no. The question surprised me. I explained in the hearing that I was attempting to calm Terry. At the time, I did not agree with the decision to expel Terry from the school based on what I knew. I also didn't have an opportunity to hear Terry's side of the story.

9.   I was aware of the killing of Rueben Britt and Terry's trial in 2006. Despite my surname, I am not related to Mr. Britt. Sometime in the 1990s, after going through a divorce, I happened to have sold Mr. Britt a firearm. It was a Ruger P95, I believe, which is a 9mm semiautomatic pistol. I recall Mr. Britt reaching into a tool box on the floor to retrieve money to exchange for the weapon. At the time, I thought it was interesting that he apparently attempted to hide money in that box rather than keep it in a cash register. I remember engaging in small talk with Mr. Britt about having the same last name.

10. I would have testified to the above information if asked. No one from Terry's prior legal teams had contacted me over the years.

3

App.0285

I declare under penalty of perjury that the foregoing is true and correct.

_____
Albert C. Britt Jr.


_____
Date

8-28-2018

4

App.0286

Declaration of Laura Hoffman
Pursuant to 28 U.S.C. §1746

I, Laura Hoffman, declare as follows:

1. I taught Terry Pitchford when he was in the fifth grade at Grenada Elementary School in 1998. I have been employed as a teacher with the Grenada school district for more than 20 years. I spent 18 years at the elementary school before moving to the middle school, where I have taught for the past six years.

2. Before becoming a teacher, I earned my bachelor's degree in Elementary Education from Louisiana State University. I have over 18 years of experience working with at risk students and "inclusion students," which are special needs students who spend their time with general education students.

3. I answered several questions for the defense at the penalty phase of Terry Pitchford's trial in 2006. The only time I met with Terry's attorney was the day I received the subpoena to testify. I remember the attorney telling me that Terry was hurting himself by not taking a plea. The attorney did not discuss my testimony with me or prepare me for testifying. I do not understand why I was asked to testify and do not sense that my testimony was of use to Mr. Pitchford or his jury.

4. I taught Terry in the afternoons. Terry stood out because he often slept in class and was lethargic. Otherwise, he was a polite kid and followed directions in my class. He was generally quiet and did not talk much in class. Mostly, he was a withdrawn child. But he was generally well-liked and knew most of the kids in his class; he was like a big Teddy Bear.

1

5.  I have a lot of experience teaching children with histories of behavioral problems. Terry was not one of those kids. I run an organized classroom and over my career have learned to manage some of the toughest children. Terry did not present a behavior problem in my classroom, apart from being unable to control his sleeping at times. I do not recall asking him about why he was so tired or talking with his parents about how he was doing. I did not bring up this issue to school administration when Terry was my student.

6.  Terry had been held back twice by the time he got to my class.  He was older than the other kids in the fifth grade class, and he was noticeably taller and stockier. In my experience, children who are held back in school often become embarrassed and lose interest; and the problem gets worse when children are two or three grades behind. By the time he go to my class, Terry had fallen so far behind in school that it would have required a lot of support to motivate him to catch up and get back on track.

7.  When children do not get support at home and do not have a parent or caretaker to push them to strive for success, they tend to just give up. I do not remember any family involvement in Terry's education. I do not remember Terry's mother coming to any parent-teacher conference or meeting with her at any time to discuss Terry's academic progress. I never met Terry's father.

8.  I remember talking to Wesley Thomas, Terry's old boss at Grenada Wholesale Lumber. He told me that two guys showed up on payday and waited for Terry in the parking lot. Wesley thought those guys were trouble. Terry left with the two guys

2

that day. The crime occurred days later. Wesley spoke highly of Terry and thought he was a good employee.

9.  In recent years, Terry Pitchford's son, De'Terrius, became one of my students at the middle school. De'Terrius was a very bright student, a motivated and pleasant child to teach. Sadly, as students, De'Terrius and his father were night and day. It was apparent that, unlike his father, De'Terrius was expected to excel. In my experience, expectations matter greatly in student achievement.

10. I would have testified to the above information if trial counsel had asked me.


I declare under penalty of perjury that the foregoing is true and correct.


Laura Hoffman

8/28/18
Date

3

Declaration of Michael Miles
Pursuant to 28 U.S.C. §1746

I, Michael Miles, declare as follows:

1.  I was Terry Pitchford's seventh grade math teacher at Grenada Middle School. I taught math at Grenada Middle School for 25 years, starting in 1983. I retired in 2008. I now work as a Water and Wastewater Operator for the Army Corps of Engineers at Grenada Lake.

2.  I live on Tie Plant Road in Grenada. The community is named for a plant in the area that had produced railroad ties beginning, I believe, around the time of the civil war. At the time, Grenada was a rail junction. The old Tie Plant was near a major Confederate supply depot. Over the years, I have found civil war cannon balls on my property.

3.  I taught math to both Terry and his twin brother Perry. But I taught them in different years because by middle school, Perry was ahead of Terry. In fact, I didn't know they were twins; I thought they were just brothers. Terry did not get in trouble in my class. He did talk more than Perry, but he was never rude. Terry struggled academically. He needed extra time to understand material and complete assignments. He would have benefited from academic support and I was not aware that he received any support when he was my student. It was clear that he needed assistance at home. Parents are a key component to academic success. I do not recall meeting with Terry's mother. I didn't even know she worked for the school district until the day of the bus incident.

1

AUGUST 28 2018

App.0290

4. Terry and Perry were very different. Physically, Terry was darker in complexion, stockier and very strong. Perry was light-skinned, tall and lanky. They also had different personalities. Terry was more talkative than Perry.

5. In addition to teaching math, I was responsible for bus duty every day. As part of my bus duty responsibilities, I would accompany students across the street to the buses and make sure they got on the right bus; I would manage student behavior and report discipline problems to the appropriate administrator. I've had to break up fights before. I was there when Terry punched out the taillights of the school bus. Students often met by the tree near the buses to start fights. I had never seen Terry as upset as he was that day.

I declare under penalty of perjury that the foregoing is true and correct.

Michael Miles

AUGUST 28 2018
Date

2

App.0291

Declaration of Marshall Whittemore
Pursuant to 28 U.S.C. §1746

I, Marshall Whittemore, declare as follows:

1.  I was Terry Pitchford's middle school football coach in seventh and eighth grades. I also taught Terry seventh grade science. I am currently the principal of Grenada Middle School. Before I became the principal of the middle school, I taught science, social studies, and physical education.

2.  I remember Terry well and was shocked to hear that he was involved in the crime. Terry was a great kid. He was respectful and always wanted to please. He was a typical junior high kid. He didn't get into trouble or cause any problems in my class. I did notice that Terry had trouble getting motivated in class. I don't remember ever meeting with Terry's mother about how he was doing in school. But I did know his mother. She worked in the cafeteria for a while, and she worked hard. She seemed to always be working.

3.  Terry was a great football player and a gifted athlete. He played fullback. Terry's speed, size, and strength made him a perfect "blocking back/fullback." He was strong and hit hard. Terry loved the game and I could tell he was happy when he was playing. One of Terry's primary responsibilities as a fullback was blocking and occasionally carrying the ball. He also helped on the offensive line. Terry's roles on the football field exposed him to head impacts and helmet-to-helmet contact.

4.  I think Terry had the ability to play football at a higher level because he really understood the game. Unfortunately, Terry was only able to complete one full year of football. Terry had eligibility issues because of his age, having been held

1

back twice before. When Terry was in seventh grade, he played on the eighth grade football team because of his age. But, he couldn't play for the seventh grade team when he was in sixth grade because the district doesn't allow students classified as sixth graders to participate in athletics. Terry could have played for the ninth grade team when he was in eighth grade, but he had academic eligibility issues.

5.  I would have testified to the above information if asked. No one from Terry's prior legal teams has ever contacted me.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Marshall Whittemore

_____
Date

8-31-18

Declaration of Michael Jackson
Pursuant to 28 U.S.C. §1746

I, Michael Jackson, declare as follows:

1.  I was a middle school teacher at Grenada Middle School when Terry
Pitchford was a student. I am now a seventh grade social studies teacher at
Grenada Middle School. I did not teach Terry or his twin brother Perry when they
were students. But, I was present when Terry Pitchford got in trouble for punching
the taillights of the school bus. I helped to calm Terry down.

2.  I remember seeing Terry that day and he seemed to have lost it. He was in
another world. I remember Terry talking in a way that I didn't understand, saying
things that didn't make sense. He was using belligerent language and it seemed like
he was fussing and arguing with himself. I could tell he was really agitated and
upset. Next thing I know, he punched the taillights of one of the buses. Terry's
hands were bleeding and he definitely did some damage to the bus.

3.  Benji Britt and I walked Terry over to his mother's bus trying to keep him
calm and avoid agitating him or causing more confusion for him. I will never forget
his mother's reaction. I expected her to show a level of concern or more of a
response, but all she said was, "I'll handle it."

4.     I would have testified to the foregoing information if asked. No one
from Terry's prior legal team has ever contacted me.

I declare under penalty of perjury that the foregoing is true and correct.

m/

1

App.0294

_Michael Jackson_
Michael Jackson

_8/31/18_
Date

2

Declaration of Robert Wade
Pursuant to 28 U.S.C. §1746

I, Robert Wade, declare as follows:

1. I was the principal of Grenada Elementary School when Terry Pitchford was in fourth and fifth grades. I retired in 2008, with over 30 years of service in the Grenada County public school system. Currently, I am the principal of the elementary school at Kirk Academy, a private school in Grenada.

2. I remember Terry well. Terry was a good kid overall with a good attitude. He was a talkative kid and sometimes he would find himself in trouble with teachers for talking back or not following directions. That is usually what landed Terry in the principal's office. But Terry was not a combative child who got into fights or was at odds with other students. Terry seemed like a child looking for attention. I felt that Terry acted out in order to be noticed. There were children at the school who had serious behavior problems. But Terry was not one of those students. He was not a kid with significant behavior problems. Terry was the type of kid that you could talk calmly to and he would listen.

3. I had to talk differently with Terry than with other kids. I needed to be firm with him but also make sure I encouraged him. He responded well to being encouraged. Terry needed to be redirected often, but he could be redirected easily with the right approach. Terry was usually cooperative. When he did get into trouble, we would call his mother. But she never seemed interested in addressing Terry's behavior and she would usually brush it off. It was like she didn't want to be bothered with a call from the school.

1

App.0296

4. I remember Terry was more of a follower. If kids were up to something mischievous, Terry would fall in line with what they were doing. He seemed to act on impulse, rather than think through the consequences of following other kids. I remember Perry, too. He was taller and more slender than Terry. He had a positive attitude. Unlike Terry, Perry seemed to think things through.

5. I was interviewed once by members of Terry's trial defense team, but I did not hear from them after the one interview. I would have testified to the above information if asked.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Robert Wade

8-31-18
_____
Date

2

Declaration of Jerome Clay
Pursuant to 28 U.S.C. §1746

I, Jerome Clay, declare as follows:

1. I was born on October 29, 1970, in Grenada, Mississippi. From 1994 to 2000, I was married to Terry Pitchford's older sister, Veronica. We have one child together, Destiny Clay, who was born in 1992. I have worked at a local factory called Heatcraft since 1993, and for the past 12 years I have also worked as a custodian for the Grenada School District.

2. Veronica's family relocated to Grenada in 1989. A year later in 1990, we met at Holmes Community College in Goodman, Mississippi. I was a student athlete there at the time, playing football. We were introduced by some mutual friends because we were both from Grenada. I didn't believe it at first because I had never seen her and I knew everyone in Grenada.

3. Veronica was very independent and was pretty much on her own when we met. I met Veronica's immediate and extended family early on. I remember going to her grandmother's house in Tchula, Mississippi. They struck me as a very close-knit family. At first, Veronica's mother, Ms. Shirley, was pleasant towards me and inviting. Veronica and I had our share of differences over the years, and Ms. Shirley's feelings toward me changed as well.

4. The first place Veronica and I lived together was in a trailer behind my mother's house in Grenada, Mississippi. Our only child, Destiny, was born in 1992. Veronica stopped attending Holmes Community College when she had Destiny. I

1



continued to attend Holmes Community College and I worked on the weekends to support our family. Veronica and I eventually married in 1994.

5. I have been around Terry and Perry since they were about six years old. While Veronica and I were living in the trailer, both Terry and Perry would visit us and spend the night regularly. They were helpful and kind kids, and we enjoyed having them visit. They would help out with yardwork at our house. Perry was quiet as a child, while Terry was more talkative. Terry had difficulty following directions, especially the first time he was told to do something. Often, he would need additional guidance. It took Terry more time than most people to understand even simple things.

6. I remember Terry's father James as a nice man. He was actively involved with the church and performed in a gospel music group. I had heard James was a bounty hunter and truck driver before he stopped working. By the time the boys were born, James had stopped working. He stayed home and took care of the kids, while Ms. Shirley worked a lot. She was the sole person working outside the home and supporting the family. She took disciplining her children seriously. She was not to be messed with. She was a strict parent and would discipline her children physically. After James died, I noticed behavioral problems in Terry. Terry would talk back and have an attitude, especially toward his mother. I sometimes would try to talk to Terry about his behavior. These talks seemed to go in one ear and out the other.

2

7. Terry looked like his mom; he was stocky, short, and darker in complexion. While Perry looked like this dad; he was tall, slim, and light skinned. As he got older, Terry ran with a rougher crowd; they were more physical and aggressive than Terry. Perry didn't want anything to do with them. Terry would fight to protect Perry and other kids.

8. Louis Jackson was a truck driver and was always on the road working. He did not replace James as a father figure to Terry and Perry. He was not very involved in the boys' lives. Louis drank a lot when he wasn't working. He worked right up until he was diagnosed with cancer. After getting sick, he stopped drinking and started attending church. However, Louis became so ill that he had to be placed in a nursing home for over a year. Louis eventually died from cancer.

9. I knew the Bullins' family because they lived in a home owned by my family. Eric Bullins grew up in that home. The Bullins' were a troubled family. They often could not pay their rent. I remember one of Eric's siblings dying as a result of a drug-related incident. Eric was known for stealing and being involved in illegal activity. When I knew Terry, I don't think he was friends with Eric or the other Bullins boys.

10. I remember one time I had to pick Terry up in Tie Plant when he got in a fight with his girlfriend Dominique. Dominque's family had asked Terry to pay some kind of electric bill for their house and that must have made Terry mad. I was already in the Tie Plant neighborhood, and someone told me I better go check on Terry at Dominique's house. When I got there, Terry and Dominque were really

3

going at it, yelling and cussing at each other. I put Terry in my car and took him home.

11. I have a close relationship with Veronica's older daughter Jessica. Jessica lived with us for a period of time when she was younger, but she ended up moving back to Ms. Shirley's house. I don't remember when she found out that Veronica was her mom and not Shirley. I was working a lot and wasn't always home for those conversations. I do remember Jessica always called Shirley "Momma," and she did not call Veronica "Mom."

12. Veronica always showed animosity toward James Pitchford and she and Ms. Shirley had frequent conflicts. I remember one time Ms. Shirley bought Jessica a car. Veronica didn't think Jessica was ready for a car. Several months passed and Shirley fell behind on car payments. She asked Veronica for the money to make the monthly payments, but Veronica refused since she didn't agree with Jessica having the car in the first place. Veronica's refusal to help caused a rift between her and Ms. Shirley and Jessica.

13. Veronica and I had ups and downs. She wanted me to stay at home with her and Destiny, and I wanted to enjoy myself outside of the home during the little spare time I had when I wasn't working. I was young and wanted to have fun. We eventually divorced in 2000. Age has slowed me down and made me more mature. Over the years, my relationship with Veronica has evolved into a healthy one. We co-parent and co-grandparent our child and grandson.

4


App.0301

14. I remember when Terry was expelled from Grenada middle school in 2002. I drove him to Jackson after that to live with Veronica. Veronica had moved to Jackson to find better job opportunities, and we were sharing custody of Destiny. Veronica asked me if I would bring Terry to Jackson when I was headed there to drop off Destiny. Terry stayed with Veronica and started school in Jackson.

15. I remained close with Terry and Perry over the years, even after Veronica and I divorced. I still feel like part of the family. My daughter Destiny was at Ms. Shirley's house when the police came and took Terry into custody. Terry's arrest was very hard on the family. I think Perry moved away from the area because he was so close to his twin brother. I don't think he could cope with Terry being taken away.

16. Terry was a follower by nature, and because of that he was easily influenced by others. Terry was a person that could be persuaded to do things without considering the consequences. He was child-like in that way. Terry put a lot of trust in people. Sometimes this trust was misplaced.

17. I remember specifically that Ms. Shirley and the entire family wanted Terry to take a plea deal. But I don't think Terry really understood the seriousness of the trial or the charges. The family was devastated when the verdict and sentence were handed down. Ms. Shirley even left her church and found a different one farther away, to get away from it all. Since Terry has been incarcerated, Perry and Deshawn have helped Dominique raise De'Terrius, the son she shares with

5



Terry. During the holidays we all get together and talk to Terry on speaker phone at Ms. Shirley's house.

18. I would have testified to the above information if asked. No one from Terry's prior defense teams has ever contacted me.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Jerome Clay

_____
9-8-18
Date

6

Declaration of Shirley Ann Pitchford Jackson
Pursuant to 28 U.S.C. §1746

I, Shirley Ann Pitchford Jackson, declare as follows:

1. I am the mother of twins Terry Pitchford and Perry Pitchford. I have two other older children, Veronica Cowins and DeShawn Burnett. They each have different fathers. I live in Coffeeville, Mississippi, right next to Grenada, in the same house I lived in when I first moved to the area. I live less than a mile up the road from what used to be Crossroads Grocery. I am a school bus driver for the Grenada County School District.

2. I grew up on a farm near Tchula, Mississippi, with my mother Ms. Valley B. Brown and father Dave Brown, Sr. I was born on August 23, 1954. When I was born, my parents were living and working on Greenbrier Plantation in Itta Bena, Mississippi. My father worked as a foreman for the plantation owner and my mother worked as a seamstress and cook. When I was still young, we moved to the farm near Tchula where I grew up because my father wanted to have his own family farm. My parents leased the land.

3. When we were growing up, we always had to wake up early, by 5:00a.m., to start working. My job was to help my mother in the kitchen making breakfast for the whole family. One of my sisters had the job of cleaning the house. During cotton-picking season—the months of August and September—I was pulled from school to pick cotton. I started school late and always felt behind. It was hard to catch up. I learn better when I use my hands. It was hard for me to catch on to many subjects, the way my friends did, and I especially struggled with math. I remember I had to repeat third grade.



1

4. When I was young, I used to speak with a stutter. I remember walking up to my mother in the kitchen one day, I was stuttering and couldn't get out what I was trying to say. My mother turned around and slapped me hard in the mouth. From then on, I stopped stuttering.

5. I attended SV Marshall High School in Tchula. I was supposed to graduate in 1973, but I got pregnant with my oldest child Veronica during my senior year. When I started showing, I was told I had to leave school. I wasn't able to graduate and had to go back the next fall to finish my classes. I think I could have stayed in school and graduated on time because Veronica wasn't born until May 1973.

6. After I graduated, I moved to Detroit, Michigan, with my older sister, Bessie Mae. Veronica stayed in Mississippi with my mother. I met Sterling Burnett in Detroit. Sterling worked at the Chrysler plant in Detroit. I married him when I was 19 or 20, and he was a year older. Sterling and I had one child together, DeShawn Burnett, in October 1975.

7. Sterling refused to let me see my friends or family unless he was there with me. He told me I had to stay a certain size, and he bought all my clothes. He controlled what I did and did not do. I had to fix his lunch and bring it to him at work every day. I remember he would sit in a rocking chair, rocking back and forth and staring at me. When he would stop rocking, I knew he was getting ready to start something or accuse me of something.

8. I eventually got tired of being with Sterling and I moved back to Mississippi around 1979. I took DeShawn with me. Sterling came to Mississippi one time soon after I moved back. DeShawn was playing in the front yard, and Sterling told me he wanted to take him on a trip to the store, but he kept on driving. He kidnapped DeShawn and



2

took him back to Detroit. I had to go to court in Detroit to get sole custody of him because at that time we both had custody. Right after that, Sterling filed for divorce.

9.   I met Terry's father James Pitchford on one of my trips back to Tchula when I was living in Detroit. I was still married to Sterling when I met James. I met him through my mother's next-door neighbor, Ms. Griffin, who was James' grandmother. I was 24 or 25 at the time. James was 27 years older than me. My friends just thought I was fascinated by him because he was an older man. But I really liked him. When I met James, he was in a gospel group and would go back and forth between California and Mississippi.

10.   When I met him, James was married to another woman in California. He had been married several times before and had lots of children. Including the twins, James had 12 children, with 6 different women. I could never keep track of which woman went with which kids. I dated James for a while before we moved in together. He was still married to another woman when I moved in with him. When he was in California, I would fly there to visit him and he paid my way. One time, I stayed out there for six months. James paid for the apartment where I stayed and the bills, but I did get a part-time job while I was out there. I was actually living in California dating James when his wife gave birth to their son, Kee-Eso Pitchford. When I was in California, Veronica and DeShawn stayed with my mother Valley B.

11. I got tired of living in California as a mistress and I moved back to Mississippi. James followed me back. Then we started living together. Before I got pregnant with the twins, James and I had a son, Pierre, who was born in 1983 or 1984. I can't remember the exact year. I had gone to a hospital in Lexington, Mississippi first and they did a test



3

and told me that I would need a cesarean section because there was a risk that the placenta would come out before the baby and the baby would die. The doctor said I needed to go to the University of Mississippi Medical Center in Jackson because they didn't do cesarean section surgeries at the hospital in Lexington. I brought the paperwork to UMMC when I was going into labor, but the doctor there did his own exam and thought I should have a normal vaginal birth. All I remember is there was blood everywhere and I was rushed into surgery. Apparently, blood had filled Pierre's lungs. Pierre lived for about 5 hours.

12. This experience was really hurtful for me and James. I knew I didn't want to have any more children after Pierre, and I had signed up for tubal ligation. The doctors wouldn't do it because Pierre had just died and I might want to try for another baby. But, I knew I did not want any more children.

13. In 1985, I became pregnant with my twins. James knew I was pregnant with them before I did. I had gone out one night with my girlfriends and came back drunk. I don't remember it, but James had sex with me that night. When I woke up there was a tissue in my vagina. James had stuffed it there to increase the chances that I'd get pregnant. James often had sex with people when they were asleep or trying to go to sleep.

14. When I gave birth to the twins, I hadn't picked out names for them. In the hospital room, I saw William "Refrigerator" Perry, the football player, on the television. So, I decided to name one boy "Perry" and picked "Terry" for the other boy because it rhymed.

15. I was overwhelmed with the twins. I didn't know how to care for two babies at the same time. From the beginning, even as a baby, Perry was always the good child. He



4

was quiet and sat and played by himself. He was good at staying in his room; he always tried to mind me and stay out of the way. Terry was always moving, active, and trying to get people's attention. He needed to interact with people all the time. He was lively. Even as a baby, he didn't follow directions. He would get into mischief and break things. Even as a baby, I had to whup him. Terry and Perry were totally different babies. To me, it seemed like the twins weren't even related.

16. James and I moved to Grenada in 1991, when the twins were around 5. A preacher who James knew asked him to come to Grenada to start a church. We liked it there but we were outsiders and there was always a difference in how people there would treat us. The twins felt like outsiders in Grenada because I kept them sheltered and close. The boys would tell me they thought I didn't want them to have any friends because I didn't have any friends. But, I have always been a private person and more of a loner. I spent my time at home, in church, and at work. That's it.

17. James never did start a church, but we stayed anyway. We found a house to live in; it needed a lot of fixing. Eventually, we were able to fix it up. Terry and Perry mostly grew up in that house and I still live in it today.

18. I know that James did inappropriate things with Veronica and other girls. I don't know much about James' life before I met him, but I did learn from him that his grandmother sexually abused him when he was very young. He never got any counseling or therapy for that, which I think explains why he went along and hurt others in the same way. I don't want the twins to have a bad image of their father, but marrying James was a mistake.

5

19. When my daughter Veronica was 14 years old, she gave birth to a baby girl Jessica. James and I raised Jessica because Veronica was so young. I gave Jessica my maiden name "Brown" as her family name.

20. When James was alive, he was the one who spent most of the time with the twins. I was working multiple jobs and wasn't home very much. James was retired and had started having health problems. He got a disability check every month. James was the primary caregiver. I didn't really ever hug the boys until James died. Terry and Perry were very close with their father. They would sleep with him in the same bed. When I walked in, Terry would tell James not to let me in the bed. There was a period when I slept in another room.

21. One time, when Terry was eight or nine, he and Perry were riding in the truck with James. Terry said that voices were telling him to jump out of the truck while it was moving. He jumped. He got a very large gash in his head. It turned into a knot. It bled a lot and was full of puss. He still has a big scar on his head today. I didn't take him to the doctor because I wasn't raised to go to the doctor unless it was "life or death." I was raised that you should pray and be healed that way.

22. I was raised in the Baptist church. My father was always a Baptist, but my mother got tired of the Baptist church. I don't remember why. But, my mother's cousin convinced her to join the Church of God in Christ (COGIC). It caused a lot of confusion in the family. All of my siblings converted to COGIC with my mother, except me and my brother, Roy Lee. We stayed Baptist. COGIC is extremely strict, with lots of rules for every detail of your life. James Pitchford belonged to Church of God and Christ. When we moved to Grenada, James went to COGIC and I joined Second New Hope Baptist

6

Church in Tie Plant. The boys went with James to COGIC when he was alive; they went to church almost every day.

23. When James died, the twins started going to Second New Hope Baptist with me. That's where we had James' funeral. The twins enjoyed Second New Hope. They met a lot of friends there and were active in the church. But, Second New Hope had problems and there were arguments over money. In 2001 or 2002, I left the Baptist church and joined COGIC with the rest of my family. I regret taking the twins out of the Baptist church. Terry did not want to leave it because all his friends were at Second New Hope.

24. After Terry was arrested, I left COGIC. It put too heavy a burden on me to live a perfect life. There was so much pressure to live right, dress right, and attend church daily. I regret putting the twins back into that church, with all the rules. I am now back with a Baptist church.

25. Terry was always getting into things and would get upset easily. When he became upset as a young child, he would bang his head against the wall, peel paint off the walls, run outside into the woods behind the house and tear branches off trees and hit the ground with the branches. He complained of headaches a lot. I think it was because of the voices he heard. Perry also had headaches. I took Perry to see the doctor for his headaches because he was feeling pain, but I didn't take Terry to the doctor because Terry was hearing voices and I felt the devil was with Terry. Terry had a hard time controlling himself. Sometimes, I would have to slap him around and knock him real hard against the wall when he was having a tantrum.

26. It was difficult to deal with Terry after James died. He took his father's death the hardest, much harder than Perry and me. Terry was in the hospital room with James



7

when he was dying. He was calling his daddy's name, trying to get him to respond. The doctor walked in, and Terry asked the doctor why his daddy's mouth was open. The doctor said, "nothing is wrong, he's just dying." I did not think that was an appropriate or compassionate way to respond to a 10-year-old. I think that really affected Terry. His emotions and behavior got worse. He had very poor self-control.

27. After James died, the school was calling me often for disruptive things Terry did. I was stressed and couldn't keep taking time off from my responsibilities driving a school bus route to go to the principal's office. They would send him home and I would whup him, but it never seemed to help. There were times I was whupping him day in and day out, and he still wouldn't sit in his seat and do what the teachers told him. I do not remember ever getting a call about Perry acting out in school. Perry did what he was told and adults and students liked him.

28. Terry would tell me often that he heard voices that told him to do things. He wouldn't tell me something was wrong until I saw him hitting the side of his head and asked him what he was doing. He always said someone was talking to him. This would occur regularly, and it got worse after James died. When we were in church one day when Terry was 13 or 14, Terry whispered to me and said that a voice was telling him to go up and hit the pastor. I told him that was just the devil talking to him. Another time when he was around the same age, he rode the lawnmower into the little pond near our house. He told me that a voice told him to do it. It was a huge ordeal having to get the lawnmower out of the pond. Terry had many episodes when he would hit his head with his hands over and over. He could only explain that he was trying to make the voices stop.

8

29. Looking back on it, I realize that maybe I should have gotten Terry some counseling or treatment after his father died. I knew his behaviors were strange, and I knew he needed help. At the time, I thought he would get over it so I kept praying for him. My answer had always been to pray it away. Terry kept telling me he was hearing voices, and it got worse and worse. I thought it was Satan that had entered him and the only thing I could do was pray. When I think about memories from the past, my mind starts spinning and I can't sleep. The devil starts blaming me for everything.

30. With James gone, the boys needed a father figure; they were telling me this and their behavior showed it. Sitting at the breakfast table, Terry would flat out say he needed a father. I brought Louis Jackson into the home but he wasn't really father material. I met Louis Jackson soon after James died when I was working at a convenience store. Soon, he moved into the house. We eventually got married in January 1998.

31. Living with Louis was chaotic. He was gone most of the time during the week, driving long-haul trucks. He would come home drunk on the weekends and want to fight. Every weekend it was a madhouse. He would get home at around 2:00am or 3:00am on a Friday or Saturday night. He'd turn on all the lights and shake me awake, demanding that I fix him something to eat. Sometimes I was so deep in sleep that it would take me a while to wake up. I eventually got used to this and would have some food ready in the microwave. All I had to do was push a button. But he wouldn't even do that by himself. He would call me all sorts of names. With all his yelling and screaming, he woke the kids up, too. Terry would come out into the kitchen and Louis would cuss and yell, telling him to get back to bed, "I'm talking to your mama!"

9

32. The police were called all the time when I was living with Louis. It was a mess. But he would usually leave on Sunday and we'd go to church and things would quiet down for a bit.

33. Terry told his teachers at different times what was happening at home. I got so mad at him for putting our business out there. When he got in trouble, I had to come get him from the principal's office. When I got there, I would give him a look to shut him up before he started talking about the business in my home. I would grab him and get out of there as soon as I could.

34. The boys begged me to put Louis out, but I never did. I feel bad for staying with him, but it was hard to leave. He also supported me financially. I feel weak that I couldn't leave. But I also grew up thinking violence was normal. My father was very violent and abusive with my mother. When I was five or six years old, my father held a gun to my mother and shot her in the shoulder. I don't remember it, but my older siblings talked about it. My father was a drunk and eventually died from alcoholism. Louis's treatment of me seemed normal.

35. Louis was not only violent, he was unfaithful. He had a lot of women. Sometimes I would go with him on his truck drives. I saw many women come up to the parked trucks. They're called "road lizards." Sometimes he wouldn't even come home on the weekends, and I knew he was with other women. He'd come home Sunday night, walk in the door, and ask for dinner. If there was no food cooked, there'd be a fight. Sometimes, I would put on nice clothes and go to Walmart or go sit in the woods behind the house, so that I wouldn't be home when he got in. I wanted him to see me walk in

10

and think maybe I had something going on. But, he was just mad that I was not there when he got home.

36. I was there when Terry was arrested. He didn't fight back. When they handcuffed him, he kept saying he didn't do anything. I remember when he was finally able to call home the next day, he was crying about how his arms were hurting and numb. While they were questioning him, they never took the handcuffs off and he was in the same position for hours.

37. A little while after Terry was arrested, his lawyer Ray Carter called me and told me to meet him at the jail. He explained to me that the prosecutor had offered Terry a deal to plead guilty in exchange for a sentence of life without parole. Ray wanted me to talk to Terry. I begged Terry to take the plea. I remember asking Perry and DeShawn to talk to Terry about taking the plea. I also asked Reverend Body to talk to Terry to try to get him to accept the plea. But Rev. Body said Terry had made up his mind. Terry told me he couldn't plead to something he didn't do.

38. I testified at the penalty phase of Terry's trial. I was not prepared for my testimony. When I had met with Ray Carter before, it was to discuss the possibility of Terry taking a plea. I do remember talking to the psychiatrist when he visited Terry in jail right before the trial. But I don't remember talking to Ray Carter about my testimony at the penalty phase. After Terry had been found guilty, Ray Carter took me into a room and just told me to answer the questions honestly and not to be scared. Then I took the witness stand.

39. After the trial, I hugged Mr. Britt's family in the hallway and said how sorry I was. I spoke to his wife. I knew Mr. Britt and had always considered him a friend. I went into

11

App.0314

his store often and he was always very nice. I got a letter from Terry about five days after his trial. He told me he knew I was worrying about him but that he would be okay. I remember standing by the mailbox reading the letter and crying.

40. I would have testified to the above information if I had been asked.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Shirley Ann Pitchford Jackson

9-8-2018
_____
Date

12

## Declaration of Robert Triplett, Jr.

I, Robert Triplett, Jr., declare as follows:

1. I was born on September 7, 1966. I am the first cousin of Terry Pitchford. My mother Willie Captora was the older sister of Terry's mother, Shirley. I went to Holmes Community College in Goodman, Mississippi, and then graduated from Mississippi College in Clinton, Mississippi. I currently live in Madison, Mississippi and am employed with Canadian National Railway Company as a conductor. I signed an affidavit in Terry's post-conviction case.

2. I was raised in Tchula, Mississippi. I am the middle child of seven children in my family. I have a twin sister, Patosha, and two of my other sisters are also twins. My father Robert Triplet, Sr. owned a small grocery store there in the neighborhood of Gwinn. After my mother's death in 1976, I was raised by my father and my grandparents. I lived with my father during the schoolyear and with my grandparents in the summertime. My grandparents wanted to raise me after my mother died because they did not see eye to eye with my father. My upbringing was typical for families during that time in rural Mississippi. My family farmed cotton and soybeans. Every day there was something to do on the farm and everyone had their part. My mother's father was originally a sharecropper.

3. I was one of the older cousins and most of the younger cousins looked up to me. I was a pretty good football player back in the day and was featured in the newspaper often. I remember talking with Terry about his dreams of playing

1



App.0316

football. I know that Terry attempted to play football in school, but I don't think he played for long.

4. Terry's father James Pitchford was a member of a gospel group named The Gospel Tornadoes. Their slogan was "We tear the walls of the church down." James was known for romancing the women in the church after performances. It was well known that he would travel from place to place with the Gospel Tornadoes and have a different woman in each town he visited. James never had a steady job. He relied on his monthly disability paycheck. Terry's mom Shirley was aware of her husband's infidelity. Everyone knew he was unfaithful to her.

5. I remember my parents and grandmother helping Shirley out with money often. Shirley always had financial problems. James never had a steady job. I remember Shirley working several jobs and at one point she ran a snack bar. Shirley liked to live above her means. I remember when Shirley and James bought an RV one time, but they did not even have a dependable car or a nice house. When I was a teenager, I remember watching my father kill a hog and give the meat to Shirley and her kids. My grandmother would frequently send food to Shirley to feed her family, especially after Shirley left Tchula and moved to Grenada in 1989. I used to help my grandmother freeze and pack food items to send to Shirley. We would send chickens, vegetables, sugar, eggs, and other staples regularly.

6. My twin sister Patoshia and I would often spend time helping out at our father's store. I remember Shirley bringing Terry and Perry to the store on weekends. Terry and Perry used to be inseparable. But as Terry got older he found

2

some of his own friends separate from Perry. Terry tried to act cool and be a tough guy. He saw how kids in the street would dress, and he would overdress, trying to fit in. He wanted to be the life of the party. But I think Terry was actually insecure and his acting out was an attempt to get attention. Terry was very trusting of people and he never wanted to do things on his own. Because of this he was easily influenced. It was also easy for others to take advantage of Terry. Terry needed validation and acceptance from those around him. I remember Terry complaining that no one cared about him, and maybe that is why he gravitated toward the streets and the friendships he found there.

7. I remember Terry receiving low grades in school. No one addressed his academic needs. Terry was slow at understanding things. When I tried to explain something to Terry I had to explain it to him in a very basic way or else he wouldn't understand. Whereas, Perry would pick up on things and process information much quicker. Perry was more quiet and withdrawn, but I would consider Perry the leader of the two. Terry always felt inferior to Perry. I think that's another reason Terry gravitated toward a crowd of peers that didn't have goals or aspirations; he felt more comfortable, confident, and accepted with that group.

8. Terry would get frustrated very easily. He would often break things to get his frustration out. I remember at Shirley Ann's house he once tore the screen out of the screen door. This was usually in response to Shirley punishing him for something else.

3

9. When James died Terry's behavior got worse. Terry appeared lost. James was strict but loved Terry. When the love disappeared, Terry acted out and became more defiant. When James died, Shirley wasn't equipped to handle the twins. You could tell at one point she gave up on trying to raise Terry and just let time run its course, hoping Terry would grow out of it. Terry's behavior got so bad that Terry's elderly grandmother offered to raise Terry, to take him off Shirley's hands. Shirley told me she refused to give Terry to her mom because she did not want to burden her mother.

10. A lot of things were not talked about in the family. There are definitely family secrets but the secrets did not trickle down to me; only the generals and lieutenants in the family knew the family secrets. For instance, it was not until much later in life that I found out that Veronica Dorsey was Jessica's mother, not my Aunt Shirley. When Veronica got pregnant with Jessica, it was an embarrassment for the family and we didn't talk about it. I remember Veronica struggling in school during this time.

11. I would have testified to the above information if asked. No one from Terry's trial team ever contacted me.

I declare under penalty of perjury that the foregoing is true and correct.

Robert Triplett, Jr.

9-10-18

Date

4

Declaration of Jessica Brown
Pursuant to 28 U.S.C. §1746

I, Jessica Brown, declare as follows:

1. Terry Pitchford is my uncle. I live in Jackson, Mississippi. After attending college, I completed a training program in hospitality with IHG, the Intercontinental Hotels Group company. For the past eight years, I've worked for Holiday Inn in Pearl, Mississippi. I am currently the director of sales.

2. I am a few years younger than Terry and grew up with him in the same house. I was raised as Terry and Perry's sister. I found out when I was around 9 years old that Veronica Cowins is my mother and that Shirley Jackson is my grandmother, not my mother. I signed two affidavits in Terry's state post-conviction case.

3. I spent a lot of time with Terry and Perry growing up because we were close in age. I was born on October 13, 1987. When James Pitchford was alive, the four of us—me, Terry, Perry and James—were always together. Wherever James went, we went. He would take us to church, rehearsals with his gospel group, and his friends' houses. When James was alive, Shirley worked a lot. She worked as a school bus driver for the Grenada County public schools; she also worked at the Shell gas station, the nursing home, and Shoney's restaurant. She was not around much. I remember sometimes James would wake us up early, pile us into a truck and drive us to California without Ms. Shirley knowing. I can't remember how long we'd stay in California.

1


App.0320

4. When we were growing up, Terry behaved in bizarre ways sometimes. Terry would talk to himself often. Sometimes I would ask him who he was talking to, and he just brushed it off and act like nothing was happening. He would eat food while he was on the toilet. He used to urinate in bottles and save the bottles. When Shirley found out, she would whup him. I remember one time when Terry was 11 or 12, he cut a hole in my stuffed rabbit, near the bottom where the genitals would be. It was a huge floppy rabbit. I later found the rabbit in the bushes outside the house. I think Terry was humping the rabbit.

5. Growing up, we spent a lot of time in church. Shirley was very religious. Every day, she would put oil on our heads in the form of a cross. At that time, we attended the Baptist church. We went to Bible study on Wednesday, choir rehearsal on Saturday, and then service on Sunday. I remember attending week-long revivals growing up. After James died, Shirley switched from Baptist to Church of God in Christ.

6. Growing up, I remember Terry getting in trouble a lot. He was hyperactive and wanted to be the life of the party. He was always talking and interrupting. Terry was very close with his father James. When James died, Terry's behavior got worse. He cried all the time and starting getting in trouble even more. I don't even think Perry cried at the funeral. But Terry took it really hard. The physical discipline in our home became more severe after James died. James would discipline us, but Shirley's discipline was more physical in nature. Terry always received the most physical abuse.

2


App.0821

7.  I remember one time Terry was in trouble and he ran out of the house holding a log from the fireplace over his head and saying that he wanted to kill himself and be with his father again. Terry would often threaten to kill himself, often when he was getting in trouble. He'd say he was going to swallow a bunch of pills. And he did it. I remember Terry overdosing on pills twice.

8.  Terry often got in trouble for having bad grades in school or lying about his grades. When Shirley found out she got mad at him and would tell him, "you can never do right." She would hit him with her hands or whatever she could pick up. In response, Terry would hit his head against the wall or punch a hole in the wall. I even saw him punch a car and leave a dent in it once when he got in trouble. This was when Terry was around 14 years old.

9.  Sometimes when Shirley was doing bible study or missionary work in town, she would drop us off at friends' houses, like Patrick Collins. We all knew we had to be at a particular location at a certain time to be picked up. But Terry always wandered off; sometimes he'd end up in Tie Plant at Dominique's house. Terry would not be in the right place when it was time for pick up. We would have to spend time looking for him. Shirley would always tell Terry that he could never do the right thing and he was always giving her problems. She told him he was a bad seed.

10. James passed away when I was nine years old. Soon after, Shirley got together with Louis Jackson. Shirley became more of a homemaker while Louis was the primary breadwinner. Louis was a truck driver, and Shirley would travel with

3

App.0322

him a lot when he was on the road. Shirley still worked but not as much as she worked when James was alive. When she and Louis left to go on the road, for weeks at a time, the twins and I were left alone in the house. Older church members would sometimes come by to check on us. By then the twins were around 16 years old, and they were responsible for me when Shirley and Louis were gone.

11. Louis was a drunk, and he would put his hands on Shirley. Shirley could hold her own, and she would often instigate fights with Louis and hit him back. Terry would intervene to try to protect his mother. Terry would try to intervene more than anybody else. Louis would hit him in the face. Sometimes Perry and I would go in another room to get away. Sometimes when Louis was really drunk, he would come into my room and try to get into my bed. I would have to turn him around and guide him out. There were several incidents when the police were called to stop Louis from fighting with Shirley. But it would keep happening. Louis was a big guy, very tall and strong. But Terry would still jump on him to try to stop him from hurting Shirley.

12. I remember a week or so before the crime, I was driving home from work and saw Terry and Pooh Bear on the side of the road near where highway 7 meets route 333. The hood was up on Terry's car. He needed a jump and asked me for booster cables. I helped him with the jump and went home.

13. Terry would go to Crossroads Grocery regularly, at least 2-3 times a week. He would stop there in the morning to get breakfast before heading to work. We all

4

App.0323



knew and loved Mr. Britt. He remembered our birthdays and would give us extra candy; he also gave us fireworks on Fourth of July.

14. The morning Mr. Britt was killed, I was at Shirley's house. I remember waking up and seeing Eric Bullins at our house. I hadn't seen him before. I remember Terry arguing with Eric because Eric was supposed to have woken him up earlier to get to work. Terry was rushing around the house getting ready because he was late.

15. When I visited Terry in jail leading up to trial, he was always trying to stay in high spirits; he didn't seem to realize how serious it all was. I also attended Terry's trial. I remember him gazing off into space and he didn't seem to be paying attention. From looking at him, it seemed like he was not understanding what was going on and what he was facing.

16. During Terry's trial, I was working at McAlister's Deli in Grenada. My boss at the time told me he knew the family of the victim.

17. I would have testified to the above information if asked. None of the lawyers from Terry's trial team ever spoke with me.

I declare under penalty of perjury that the foregoing is true and correct.

_J. Brown_____
Jessica Brown

_9/11/18_____
Date

App.0324