# FIRST STATEMENT OF

## TERRY PITCHFORD

### 11-07-04

CONLEY: I'm Greg Conley, Investiogator with Grenada Sheriff's Department. Today's date is the 7th day of November, year 2004. Gonna be doing an interview with Terry, was it Prichard?

PITCHFORD: Pitchford.

CONLEY: Huh?

PITCHFORD: Pitch-ford.

CONLEY: Pitch...

PITCHFORD: Ford.

CONLEY: Pitchford. Terry Pitchford. Ah, we're here at Grenada Sheriff's Department. Present, myself and Officer House. Ah, Terry, I have read you your rights, is that correct?

PITCHFORD: Yes, sir.

CONLEY: You understand what your rights are?

PITCHFORD: Yes, sir.

CONLEY: And it's your own free will to make this statement?

PITCHFORD: Yes, sir.

CONLEY: Okay. About a week and a half ago, you guys, you, and two of your friends were seen (Tape cuts off briefly) by Crossroads Grocery. Right?

PITCHFORD: Uhm.....I think so.

CONLEY: You had your car parked, y'all was out by the Crossroads Grocery. Am I right or wrong?

PITCHFORD: Yeah, you talking about the day my battery went down, I stopped on the side of the road, and had to go home and get the battery, came back, and, ah,......

CONLEY: But your friends told me, your friends told me that y'all stopped, raised the hood, battery ain't gone just go down with you running the car, y'all stopped and raised

1

the hood, you sitting on the car, and y'all had plans, y'all had plans to go in there and rob the man at Crossroads Grocery. True or false?

PITCHFORD: False. That's something we didn't do.

CONLEY: You didn't plan to rob the man at Crossroads Grocery?

PITCHFORD: I didn't plan to rob him.

CONLEY: Did you have two friends with you.

PITCHFORD: Hmm, that day? Yeah.

CONLEY: Did you? What was they names.

PITCHFORD: One of 'em named Demarcus, the other one......

CONLEY: Westmoreland?

PITCHFORD: Yeah, Westmoreland.

CONLEY: And the other one named what?

PITCHFORD: Quincy Bullins.

CONLEY: And Quincy is right up here with you.

PITCHFORD: The only reason why Quincy.....

CONLEY: And Quincy is telling the truth.

PITCHFORD: No he ain't.

CONLEY: He's not sitting her lying to me like you doing.

PITCHFORD: Only reason why Quincy Bullins came out there that day with us is 'cause he had stopped me on the side of the road and wanted to ride with me to town, he asked me for a ride out there....I said I had to go out to my house, and he said all right, I'll ride with you, he rode out there to the house, we stayed out there to the house 'til approximately, uh, 'bout twenty minutes he stayed at the house, so, ah, he didn't never come with me down there to the store, I always go to the store, I go to both stores, I sometimes go down the street and tip on it, or whatever,......

CONLEY: Tip on what?

PTICHFORD: Like I buy (Unintelligible) a lot, so I went down there to the store, and, uh, he came, and I had left the store since I had quit, I pulled over, I eased the car over there in the middle where the air conditioner of the car was cooling down.

CONLEY: Uh, huh.

PITCHFORD: So I was sitting in the car, and at first I thought it was the oil, then when I started, at the time I was woring on it and all, I pushed, the cable went over, and it was kind of loose on my battery, so my niece was coming down there, I had called her to come down there, she came down there, and I was like, ah, I need some some booster cables, whenever I checked the car, I didn't have no booster cables, so she had came back and brought me my booster cables, and come to find out, we put the booster cables on the battery, or whatever, see I don't know so much about what you told me that the battery wouldn't go down like that, anyway, that's, that's regardless of the subject, ah, I had been messing with the cables on the car, the wire, and they wouldn't fire, and then when I get back in, I see that hood light had popped on, then I had told, ah......

CONLEY: But the guys, they was down there by, they was probably right behind the store at that time.

PITCHFORD: Right. And guess what. Quincy Bullins, the one we said.....

CONLEY: Both of 'em had guns....

PITCHFORD: But that ain't who......

CONLEY: Both of 'em, both the guys had pistols int heir hands.

PITCHFORD: I didn't see no guns.

CONLEY: And had a towel wrapped around 'em, and, matter of fact, they told the guys, we got witnesses that they told the guys that they was going in the place to rob it.

PITCHFORD: I didn't know nothing about that.

CONLEY: And the guys told 'em y'all better get out of here, 'before that man kill you or you wind up in prison for life.

PITCHFORD: Well, I didn't know.......

App.0327 033

CONLEY: Then ....

PITCHFORD: I ain't been told nothing.....

CONLEY: ...then this morning, you right back down there. Then you carry it out. You carried it out.

PITCHFORD: No, I did not.

CONLEY: Who was with you?

PITCHFORD: I didn't go down there, I didn't do it.

CONLEY: Who was with you?

PITCHFORD: I didn't do it.

CONLEY: Who was with you this morning?

PITCHFORD: Ah, a cat named Thang, he, he's a young boy, he's 'bout, 'bout fifteen years old.

CONLEY: Where will we find him at?

PITCHFORD: Around in there. I don't know where he lives.

CONLEY: You and Thang carried it out this morning.

PITCHFORD: No, I ain't did nothing, I wasn't down there, that wasn't me. The only reason, the reason why Thang's still at my house this morning is because he had came home last night, they had a party on Dogwood.......

CONLEY: So where you drop Thang off at?

PITCHFORD: I dropped him off at, ah, like going to the other side of Tie Plant, ah, you know where the school is at?

CONLEY: Uh, huh.

PITCHFORD: Right down the street from the school, that's where I dropped him.

CONLEY: What's Thang's name, light complexioned?

PITCHFORD: I believe that's what it is. Only reason why he's with me is 'cause, like I said, he went...

CONLEY: You believe his name is light-complexioned?

PITCHFORD: I only know his name is Thang, I come and got him, that's where my son.....

CONLEY: Dark skinned or light skinned?

PITCHFORD: Light skinned.

CONLEY: Jerry Bond's son, he's a Bond?

PITCHFORD: I don't know, I only know him by Thang, that's the only way I know him, he is a young, he is a young cat, he told me about a party going on on Dogwood, I said I'm going with you.....

CONLEY: How old are you?

PITCHFORD: He told me they ain't gone, I'm eighteen.

CONLEY: You a young cat, he's younger than you?

PITCHFORD: Yes, sir. He's younger than me. I guess he is....

CONLEY: So he spent the night with you?

PITCHFORD: No. The only why he spent the night, 'cause when I went home, I told him to wake me up...

CONLEY: Your mama didn't tell us about no Thang or nobody being with you this morning.

PITCHFORD: Nah, this was last night. When he came to the house. See, he's supposed to been to a party last night...

CONLEY: Did your mama see Thang this morning when you left?

PITCHFORD: I mean my mama wasn't even, I mean, I don't know.

CONLEY: What, what you doing getting up so early on Sunday morning.

PITCHFORD: 'Cause you see I wake up every morning, I work at Grenada Wholesale.

CONLEY: Okay.

PITCHFORD: I wake up every morning.

CONLEY: Weekends, I like to sleep in late, I was just wondering why you was up so early on Sunday morning..

App.0329

035

PITCHFORD:  I mean, I just....

CONLEY:  'Cause you had something to do.

PITCHFORD:  Nah,.....

CONLEY:  You had to go rob this man and kill him.  You had to go rob him, that's why you was up so early.

PITCHFORD:  ...(Unintelligible)....I didn't, I didn't do all that.  They blaming me, putting false blame on me, I didn't do that, I hate when people to blame me for something that I did not do.  I mean, you ask me a question and you actually, you ain't telling me that I did it.  See what I'm saying?

CONLEY:  I know that you did.

PITCHFORD:  No, I.....

CONLEY:  I know that you did.  I know that you planned it, and then you carried it out.  A week and a half later.

PITCHFORD:  I didn't do it.  Tell me your evidence that you have.

CONLEY:  I ain't got to tell you nothing.

PITCHFORD:  Okay.  We through talking to you.

CONLEY:  I don't have to tell you nothing.

PITCHFORD:  We quit talking to you.

CONLEY:  .....Turn around.

(Tape cut off, end of interview)

App.0330   036

2ND STATEMENT OF

TERRY PITCHFORD

11-07-04

CONLEY:  Once again I'm Greg Conley, Investigator with Grenada Sheriff's Department. Today is the 7th day of November, year 2004.  The time is 4:45 P.M.  Present, myself, Carver Conley with Grenada Sheriff's Department, and Terry Pitchford.  Okay.  Terry, I read you your rights earlier, right?

PITCHFORD:  Yes, sir.

CONLEY:  And at that time, you said you didn't want to talk to me anymore, correct?

PITCHFORD:  Yes, sir.

CONLEY:  But since then, you requested to talk to me.

PITCHFORD:  Yes, sir.

CONLEY:  And you understand what your rights are?

PITCHFORD:  Yes, sir.

CONLEY:  And it is your free will to make this statement.

PITCHFORD:  Yes, sir.

CONLEY:  Sspeak up a little bit.

PITCHFORD:  Okay.

CONLEY:  What you want to tell me?

PITCHFORD:  About that day, you kow, that day we was out there, we was riding the roads, like, like I was telling you before and everything, didn't nobody, like, nobody like me, I mean, there wasn't no planning to rob nobody or nothing...

CONLEY:  You talking about a week and a half ago.

PITCHFORD:  Yeah  Yes, sir, I, I.....

CONLEY:  Who was all out there with you?

PITCHFORD:  It was just me, Demarcus Westmoreland, and Quincy Bullins.  Like I told you, I picked up Quincy up in town, and, uh, Quincy, when he got in the car, you know

1

what I'm saying, we always known Quincy, you understand, to talk, talk a lot, where, you know what I'm saying, like a cat talking about what he's got, he got this, he got that, you know what I'm saying? Anyway, he got me kind of talking back, you know, he need a lick, he need a lick, you know what I'm saying? So, you know, what don't nobody really pay him no, no attention, you see what I'm saying? I mean, he's just like, he's jus tlike an ordinary, you know, fellow you catch out there on the street. So, ah, we go riding to the house, you know, I'm gone put on some clothes or whatever, and we all fixing to go out. Well, Quincy, we dropped him off, so....

CONLEY: Did you have them pants on this morning?

PITCHFORD: Uh, uh, yeah, I had 'em on when I woke up this morning.

CONLEY: Okay, go ahead.

PITCHFORD: So, ah, so, you know, when we was going out yesterday to my house, (Unintelligible)..........then go to the store. But it wasn't, you know what I'm saying, it wasn't no robbery did, or nothing like that, we just went to the store. And everybody got them a little something, I bought me something to drink, as a matter of fact I had just walked out the store. So, ah, he drove down the street, like I told you my car had quit, but it wasn't no, you know what I'm saying, I couldn't really tell you what was wrong with it.

CONLEY: Did y'all have some guns in the car?

PITCHFORD: Quincy had a pistol.

CONLEY: What kind of pistol?

PITCHFORD: I believe it was a, like a .25, it was a small pistol

CONLEY: Where'd he get it from?

PITCHFORD: I don't know. Like I told you, I had picked him up in town. Quincy, like I said, he was talking about licking with us. Quincy......

CONLEY: .22 automatic or a revolver?

2

PITCHFORD:  Automatic, automatic is like that ain't it?  He pulled it and cocked it back, but I ain't examined it, the only thing I do know, it's a pistol. So, ah....

CONLEY:  Did, ah, Westmoreland have one?

PITCHFORD:  I didn't see Westmoreland with no pistol, no.

CONLEY:  Did you have one?

PITCHFORD:  Uh, uh.

CONLEY:  When was it that you began to own a pistol?

PITCHFORD:  Well, my, I mean, I been on and off, you know what I'm saying, like when I went down ..

CONLEY:  How long you had that pistol, that gun we got out of your car this morning?

PITCHFORD:  I been had it about........

CONLEY:  Two weeks, three weeks, a month?

PITCHFORD:  No, it's been about......

CONLEY:  Six months?

PITCHFORD:  I'm trying to think when I......

CONLEY:  Hiding it from your mama, huh?

PITCHFORD:  Naw, see my mama drives a truck.

CONLEY:  How long has it been there?

PITCHFORD:  I'm trying to think when I first seen it.  The first day I had it, my sister had came outside and caught me with it, well, she didn't catch me with it, I ain' gone trying to hide it from her or nothing like that. I was outside shooting the pistol.  And, uh, then when she caught me with it, I put it back in the car, but I remember, I ain't touched it or nothing like that.  But after then, you know, I just kept it under my seat for protection. I was on the streets a lot, I mean, all the drugs going on.......

CONLEY:  So how long have you had a pistol?

PITCHFORD:  Been about, it's been about three weeks, about three or two weeks. And, uh....

3

CONLEY: Where you by your bullets from? When you was out there shooting around?

PITCHFORD: Well, when I had got the gun it had bullets for it already.

CONLEY: Who'd you buy it from?

PITCHFORD: I bought it from a white boy down the street.

CONLEY; What was his name?

PITCHFORD: He's got a black car. Ah, used to hang with me when I was young, but you know what I'm saying, his name ain't......

CONLEY: Forgot his name.

PITCHFORD: His name ain't too familiar with me, I promise you that. I'll tell you who he was. You guys go by the jail, cause like a month ago, white guy, he robbed the, the store right down the street from my house, ...(Unintelligible)..that's what he went to jail for, but he broke out, when he broke out, ah, like, ah, y'all ever heard of some guy that break out of jail?

CONLEY: I know who you talking about.

PITCHFORD: Yeah. Luke.

CONLEY: You bought it from him?

PITCHFORD: I bought it from the big white boy. (Unintelligible) So, ah.....

CONLEY: Now, let me, let me ask you this. That pistol was used this morning to rob that man. You the owner, you the owner of the pistol?

PITCHFORD: Yeah.

CONLEY: It's got blood on it. We, we, we got bullets. They match the bullets that was used.. The pistol was used this morning there at the store.

PITCHFORD: I aint did nothing.

CONLEY: The blood on the pistol matched his blood on the floor.

CONLEY, C: Uh, huh.

CONLEY: The bullet match, don't it?

CONLEY, C: Sure does.

4

CONLEY, C: It's got bloodstains on the pistol. And that is the man's (Unintelligible) Shots been fired from the pistol. Matches to the pistol We got the (Unintelligible)

CONLEY: Now tell me how could that be? How could that be, Terry?

PITCHFORD: How'd the blood and stuff get on it?

CONLEY: How could everything match up and wind up in your car, and you tell me you had this pistol two weeks, how could it be, now, all I want to know, is how could it be?

PITCHFORD: I mean, I don't know what happened.

CONLEY: And you was at the store this morning, you and your little friend, did your friend go to the store with you?

PITCHFORD: Yeah. He's the one who bought the crackers and beer.

CONLEY: Both of y'all went in there?

PITCHFORD: Yeah. I went in there, too. But I got ready first.

CONLEY: But you don't know who this little firend is?

PITCHFORD: His name's Thang, that's the only thing, I come and got him, last night when I, when I was messing with him.....

CONLEY: What's your home number?

PITCHFORD: Ah, 227-9457.

CONLEY: What's your mama's name?

PITCHFORD: Lynn Shelby Ratliff.

CONLEY: Call Mrs. Ratliff, Carver, if you would, please, (Unintelligible)

PITCHFORD: Ah, you know what I'm saying, like I said, we went down there to the store. Ah, Pooh Bear, that's what we call him, Pooh Bear, Demarcus Westmoreland, and Quincy Bullins. They was walking down the street. They was walking like they was, ah, walking down the street to the store, I guess, you know, but I was stay at the car, I was waiting on my niece to come back with....

CONLEY: I, I ain't concerned about that.....

PITCHFORD: ...the, you know, the booster cables.

5

App.0335 041

CONLEY: ...right now. I already know the details on that.

PITCHFORD: Okay.

CONLEY: I want to know about this morning. Who pulled the trigger? Who chased the man through the store? And who pulled the trigger. 'Cause y'all chased him throught the store. He ran. I can see it in your eyes, you 'bout to cry. Remorse. One thing about it, when you do something crazy, man, one thing about it, I'll tell you. You might be real tough at one point, you know, but God's got a way, and remorse ...

PITCHFORD: You know what?

CONLEY: You got a conscience, .....

PITCHFORD: I don't know a thing about it.

CONLEY: .... . you got a conscience, let me tell you, you got a conscience, you got a good mama, you got a conscience, and your conscience is looking me, I can look into your eyes and tell by your teary eyes, that you chased that man through there and you, you, you regret that you did it, but you did it. You chased him through there, and you and somebody else, or you by yourself, you and somebody else done shot him. Probably wasn't even intended, all you wanted was some money, you wanted him to give up the money, but you winded up, it turned bad and y'all had to shoot him. Why? Somebody, somebody, why?

PITCHFORD: 'Cause I didn't...

CONLEY: Just tell me why, man.

PITCHFORD: 'Cause I didn't.

CONLEY: Tell me why. Your gun, with blood on it, your gun, minus the bullets, Terry, why?

PITCHFORD: I didn't do it..I promise you.

CONLEY: What'd you do with the cash register?

PITCHFORD: I didn't.....

6

CONLEY: What's you do with the cash register? What'd you do with the safe that you took out of there? What did you do with, what did you do with the other stuff that you took out of there? You had a cash register and a lot of stuff, what'd you do with all that stuff.

PITCHFORD: .I'm gone tell you something. One thing about me, I'm, I'm not slow, I'm not stupid....

CONLEY: Okay, but what, what did you do with .....

PITCHFORD: I'm gone tell you, I'm gone tell you this......

CONLEY: Terry, what did you do with the safe you took out of there?

PITCHFORD: I promise, I'm telling you, I'm telling you, only reason why you might see tears in my eyes is 'cause I got (Unintelligible) 'cause you say that I got this stuff, and you say I chased the man through the store and stuff like that, I promise you, I'm telling you face to face, man to man, ...(Unintelligible).....I've never stole from nobody. You can look, you can look at everything that I got, my mama, I mean, I got a job, my mama takes care, I got, I have money, I have lots of money, my daddy died and left me plenty of money, I mean, I don't, I don't have to steal, I mean, I didn't steal from nobody, you see what I'm saying, you can, you can check records, you can check police records.......

(Some aside conversation, not intelligible)

CONLEY: Ah, a minute ago, tears was aboutt o fall out of his eyes, when I got to talking about how they chased the man throught the store,

CONLEY, C: Uh, huh.

CONLEY: .. well chased him or threw him chased him through the store there and gunned him down like he was some kind of deer or squirrell, or something.

(Tape cut off, end of first side)

PITCHFORD: I didn't do it. I will do anything, sir...

CONLEY: But you know what, you know what?

PITCHFORD: ..I was gonna tell you.....

CONLEY: Let me tell you this. Let me tell you this. There is nothing you can do to make me believe you. 'Cause you know what? That gun you have was used to shoot him. Two guns. Two guns used. A .22 and your gun. Or do you own both of 'em? But there was two guns used. Now y'all got a cash register and a safe. Where's the safe? What happened to the safe? 'Cause we done found the cash register. We got the cash register. So, where's the safe?

PITCHFORD: I'm telling you, I don't have no idea.

CONLEY: You don't have no idea, huh?

PITCHFORD: I didn't, I didn't, I don't know nothing about this crime.

CONLEY: You didn't......

PITCHFORD: I'm telling you the honest-to-God truth, sir.

CONLEY: And you told somebody this morning that you bought the gun today.

PITCHFORD: I mean....

CONLEY: See, your lies are getting so twisted up.....

PITCHFORD: Hold on, hold on.

CONLEY: You getting so twisted in your lies.

PITCHFORD: It was like this.

CONLEY: Did he not tell somebody he bought the gun......?

PITCHFORD: Yeah, yeah, this morning when y'all had came in, I admit.....

CONLEY: Your lies, your lies.....

PITCHFORD: I admit....

CONLEY: Let me tell you what's happening, partner. When you lie, let me tell you what happens.

PITCHFORD: I already know.

CONLEY: When you lie, what happens?

— PITCHFORD: It's gone come back.......

CONLEY: You forget what you say.

PITCHFORD: You forget what you say.

CONLEY: One thing about a lie,.....

PITCHFORD: I told you.....

CONLEY: ...you can't remember a lie.

PITCHFORD: ...when y'all came out there, when y'all first came out there, I told y'all, you know, that the gun, that I had just got the gun today, right? I admit to, that day, I mean when y'all was out there, while y'all was out there, I admitted to y'all that I had been had the gun. I admitted to y'all, and I admit now that I had lied when you first asked me about the questions 'cause everything was running through my head. You see what I'm saying? But, I'm admitting to you.....

CONLEY: What's running through your head is, how in the world did they get on me so fast? So, you know what, I'm wasting my time talking to you...

PITCHFORD: I mean, sir......

CONLEY: ...'cause you ain't telling me nothing, you not telling me nothing. I'm wasting my time..

PITCHFORD: I'm fixing to tell y'all, the witness, I'm fixing to tell you how these witnesses right now, they gone point you straight toward me.

CONLEY: Okay.

PITCHFORD: See, the sheriff, the big sheriff just told me when he got here, when he came in there, he told me that they had a witness, they had a witness that point, that pinpoint everything got right. Okay. You think you got a witness that pointed me out, but they, they......

CONLEY: Terry, we ain't got the pointing out.

PITCHFORD: Sir, I didn't have nothing, sir, I'm....

CONLEY: You got anything? 'Cause what he's saying, I don't even want to hear it.

CONLEY, C: Terry, let's go back to when we was back to...(Unintelligible)

PITCHFORD: Yes, sir.

9

CONLEY, C:  .......While on the side of the house, one day  ...(Unintelligible)  ah,...

PITCHFORD:  You know what I'm saying, y'all didn't pay any attention, I didn't say nothing......

CONLEY:  That's fine.  We're gonna end the interview at this time.

3RD STATEMENT OF

TERRY PITCHFORD

11-07-04

CONLEY: I'm Greg Conley, Grenada Sheriff's Department. Today's date is the 7th day of November, 2004. Present, myself, Adam Eubanks, SO-7, and also Mr. ..., state your name.

PITCHFORD: Pitchford.

CONLEY: What's your first name?

PITCHFORD: Terry.

CONLEY: Terry. Okay. Terry, I, you want to talk to me, I'm not forcing you to talk to me, right?

PITCHFORD: Right.

CONLEY: I read you your rights earlier, you know what your rights are?

PITCHFORD: Yes, sir.

CONLEY: And it is your own free will to make this statement?

PITCHFORD: Yes, sir.

CONLEY: Okay. Ah, last night, where did you pick up, ah, Eric & Quincy?

PITCHFORD: In Tie Plant.

CONLEY: At about what time?

PITCHFORD: Ah, it was about, ah, I don't know, it was about seven o'clock. Or even earlier than that.

CONLEY: Okay. What'd you pick 'em up for?

PITCHFORD: Ah, Thang was talking about, ah, it was his birthday, he said, we was gone go somewhere when I got off. Well, when I got home, my sister was telling us about a party, so me and him was fixing to go to the party, we was thinking about something to do. You know, we was talking about it.......

CONLEY: Did y'all go to the party?

1

PITCHFORD: Nah. 'Cause I had fell asleep, I told him to wake me up, and he never did wake me up, he said he fell asleep himself. So, we, when I woke up this morning, well, he woke me up this morning, he was like, ah, you got anything to eat in the house, and I told him, naw, I don't, like that......

CONLEY: What time did he wake you up?

PITCHFORD: Ah, it was 'bout six-thirty, six or six-thirty.

CONLEY: What did y'all do when you, when you woke up. Y'all left, where did y'all go?

PITCHFORD: Uh, huh. We left. See, we had, earlier in the night, he was talking about doing something, but like I said, I had fell asleep.

CONLEY: Okay.

PITCHFORD: So, ah, when we got up this morning, he was like, ah, you know, get him something to eat, or whatever, I said all right, I'm gone go on to the store. Gone get, gone get something to eat. I went in the store to get me something, and he said he never, he never did, I asked him did he have, ah, sausage and egg, or something like that, and he was like, naw, he said the only thing I got today is these right here.

CONLEY: What?

PITCHFORD: Ah, sausage and biscuit, he had a whole lot of sausage and biscuit, ...

CONLEY: Did you get one?

PITCHFORD: I never did buy one, I just ....

CONLEY: How many did Eric have?

PITCHFORD: Ah, it seems like two of 'em.

CONLEY: Who ate 'em?

PITCHFORD: He did. He ate both of 'em.

CONLEY: Where'd he eat 'em at? Did y'all go sit in the parking lot and eat 'em?

PITCHFORD: Naw...

CONLEY: Where was your car parked at when you went into the store?

2

App.0342

048

PITCHFORD: Well, when you coming down the street, it was like, it was like, before, you can go past that store and turn like that, and turn in.....

CONLEY: Another turn.

PITCHFORD: Yeah.

CONLEY: Where'd you park?

PITCHFORD: I parked like coming in, like when you get to the first turn, coming in?

CONLEY: Yeah.

PITCHFORD: I parked there.

CONLEY: That's where you parked.

PITCHFORD: And then, everybody was going by could see my car, I wasn't trying to hide it or nothing. You see, I was.....

CONLEY: It was kind of back in the cut, wasn't it?

PITCHFORD: Nah. You, you could look out the window and see it, see that's my car there.

CONLEY: All right, y'all went in the store.

PITCHFORD: Uh, huh.

CONLEY: He got him a sausage and biscuit, you didn't get nothing.

PITCHFORD: I didn't get nothing. I went back to the car.

CONLEY: Did you talk to the man?

PITCHFORD: Yeah. Yeah, I talked to him all the time, like I said, he's been there since I was a little boy.

CONLEY: Then what, then what happened?

PITCHFORD: Ah, we got in the car, took him back to, ah, Tie Plant, dropped him off.

CONLEY: What time you drop him off?

PITCHFORD: Ah, soon as we left there, we didn't make no, no other calls, other stops, then I left there, when I left the house, they had called me, my baby's mama had called me.....

3

049

App.0343

CONLEY: After you dropped him off, what'd you do?

PITCHFORD: I went to see my baby's mama.

CONLEY: What time was that?

PITCHFORD: 'Bout seven, about seven, around seven o'clock, seven-thirty. You know, it took up a little time to get there, I had to go all the way from Tie Plant.

CONLEY: Then what'd you do when you got to your baby's, baby's mama house?

PITCHFORD: I stayed over there all day. You can call her, I didn't see anybody else. We was at the house. I didn't leave the house and then about twelve o'clock, I went to Wal Mart, when I left Wal Mart, I went to the house.

CONLEY: What'd you buy at Wal Mart?

PITCHFORD: Ah, a cell phone.

CONLEY: How much did you pay for it?

PITCHFORD: I didn't have to pay for it, (Unintelligible)

CONLEY: You didn't have to pay no money down on it?

PITCHFORD: Well, I had to pay for the cell.......

CONLEY: How much you pay for it?

PITCHFORD: Cell phone was sixty dollars.

CONLEY: Your girlfriend told me you was broke.

PITCHFORD: I was.

CONLEY: Then where'd you get sixty dollars?

PITCHFORD: She paid for it. (Unintelligible) I, I had already, she'd... (Unintelligible)

CONLEY: She told me owed her twenty dollars, and she needed sixty dollars to turn her cell phone on. Where did you get the money to pay for a cell phone?

PITCHFORD: I mean, I got a job, too, you know what I'm saying?

CONLEY: Yeah, but she told me you was broke.

PITCHFORD: Well, I was, 'cause, I mean, sixty dollars ain't no money to me.

CONLEY: It is to me if I'm broke, fifty dollars is like I had a million dollars.

4

PITCHFORD: But I didn't have it, I didn't have the whole fifty dollars, like that. I had like, I had forty dollars in my pocket. And she had gave me a twenty, because, well, she had gave me a twenty before we had left the house. And then I went up there.

CONLEY: Yeah, I talked, I talked to Barbara. I went over there and asked her.

PITCHFORD: You know Barbara's number in there?

CONLEY: Yeah. (Unintelligible conversation) And they're telling me that it was around eight-thirty.

PITCHFORD: Eight-thirty?

CONLEY: Not seven o'clock. Eight-thirty when you come over there.

PITCHFORD: Well, like I said, I went on to get his stuff, like I said, I wasn't too familiar, I, I hadn't never been with the boy down there.

CONLEY: By 'em pulling it off at, at, t 6:30, you got two hours in there, what'd you do in them two hours?

PITCHFORD: Ahh...

CONLEY: What time was it when y'all were in the store?

PITCHFORD: To be honest with you, I really, I, every time we wake up, I ususally ride the bus home. See, my mama used to drive the bus, and when it come time, you know, have lunch, you know, she would stop at the store and get me, you know, get our lunch, so by the time we get down there to the store, I'd leave the house about six-thirty, I'd never know, you know what I'm saying, what time he'd be open.

CONLEY: He opened early, huh?

PITCHFORD: I guess so. I believe he opened earlier, though, than six-thirty, 'cause he was open when I'd get there.... (Unintelligible) .......he, he was a cool fellow, I mean, I mean that serious, he was a nice fellow, he would let me get gas, or whatever....

CONLEY: What happened today......

PITCHFORD: ...let me pay.....

CONLEY: .....what happened today wasn't meant to happen, though, right?

CONLEY: ...what Eric was telling me, and, ah, Chris.....

EUBANKS: All Quincy said was he was there, ah, a week and a half ago, or whatever, and y'all was planning it.

CONLEY: Now when Eric was telling me, it was something totally different.

PITCHFORD: What did Eric say?

CONLEY: Y'all went in there, y'all scoped the place out, when you got the sausage and biscuit, went back in there, did the shooting......

EUBANKS: Eric said, Eric said, the way Eric told it, you got two sausage and biscuits, and he bought you those......

PITCHFORD: He didn't, he never did buy me a sausage and biscuit, true enough, true enough, he gave me a dollar, he gave me a dollar, but I gave him the money back in the car. Matter of fact, you can find out when he went to the store, same time he went in there, we bought two sausage in the store. But we didn't pull a, a, a robbery or nothing...

CONLEY: Y'all didn't do it right then.

PITCHFORD: We never did even do it.

CONLEY: That's not what he's saying. He's a juvenile, his, charge is gonna be a little slack from ..(Unintelligible)....he knows he's a juvenile, he knows he ain't gone, he's gone be over in Paul Harvey's court over there.

PITCHFORD: I want Thang, I want Thang to come up in here, and I want him to say it in my face, that me and him pulled a robbery.

CONLEY: Well, I can't bring a juvenile in here with you....

PITCHFORD: He's just trying to ...

CONLEY: Huh?

PITCHFORD: He's just trying to......(Some conversation, not intelligible)

CONLEY: I'm telling you that he's saying, what he's saying is that you guys scoped the place out, went in there, you chased the man around shooting at him, and you finally got him over in the corner, and, ah, ....

7

App.0346

053

PITCHFORD: All we did is.....

CONLEY: Y'all screwed up, 'cause you know what you did? You missed all the money. Y'all got the cash register, but you missed all the money.

EUBANKS: All the money.

CONLEY: All the money, you missed it all.

EUBANKS: Eight thousand.......

CONLEY: You missed it all. You missed about eight thousand dollars.

PITCHFORD: Well, I didn't do it, I didn't do it. I didn't do it, I promise you.

CONLEY: You missed all the money.

PITCHFORD: Eric didn't tell you to your face or nothing, he (Unintelligible)

CONLEY: You don't believe you missed all the money? You don't believe you missed all the money? You think I'm shucking and jiving with you? I mean, you missed all the money.

PITCHFORD: I didn't get no money.

CONLEY: Look at that. You missed all the money. You guys scoped it out. You missed all th money. You screwed up. You murdered a man, and missed all the money. Did you hear that? You missed all the money. You killed a man, you could have had you eight thousand dollars. And you missed it all.

EUBANKS: All Eric took was the cash register.

CONLEY: He got a cash register.

EUBANKS: He said, his exact words was, I didn't shoot nobody, I didn't go in there, I didn't have a gun, I didn't shoot nobody.

PITCHFORD: Well, Eric, promise to God, he's telling you a honest-to-goodness lie, and I raise my right hand to God right now.

CONLEY: What part did Eric, ...

PITCHFORD: God gone strike me dead.

CONLEY: ...what role did he play in it if he lied, tell me what he did.

PITCHFORD: Eric did not even go down there. We went down there this morning, got a sausage and biscuit, but we didn't even pull no robbery together, I promise you.

CONLEY: You pull it by yourself?

PITCHFORD: I didn't pull no robbery period. If Eric pulled a robbery, guess what, there goes y'all's criminal right there, 'cause if the robbery was done, Eric had to pulled it by himself. If he's confessing to the crime, if he said...

CONLEY: Hey....

PITCHFORD: ....that he took a cash register.......

CONLEY: ..hey, but, guess what. He pulled it with this gun they found in your car this morning.

PITCHFORD: First off, like I told you, like I told y'all, Eric had been riding with me, okay? Ain't no telling what he would try to do. He, he could have did it by himself, I mean, you know what I'm saying, the gun, ...

CONLEY: But what about the gun?

PITCHFORD: ....that gun that was in my car, I, I don't even know that it was used part in a crime, you know what I'm saying, I'm going by what you told me earlier, ...

CONLEY: We telling you......

EUBANKS: There ain't no doubt about it......

CONLEY: We telling you......

EUBANKS: There ain't no hesitation in it...it was used...

(BUZZING, SOME SIDE CONVERSATION)

PITCHFORD: You can go back to the crime scene and take fingerprints, you can ask them about it, who was in that store earlier today, 'cause y'all found out I was in the store, so y'all had to know who else was in the store.

EUBANKS: Well, they fixing to go back to the store.

PITCHFORD: Y'all need to go back. They need to get fingerprints, they need to get witnesses, they need to do all this before, you know what I'm saying, before anything can

9

App.0348                        055

be put to a match, you know what I'm saying? 'Cause when it comes back, I got witnesses saying where I was all morning. I got witnesses saying where I was all morning.

CONLEY: I already know where you was, in the store.

EUBANKS: Yeah.

PITCHFORD: ...(Unintelligible) there's about a hundred where I was.

CONLEY: I talked to Barbara, then Robert, I just sit down and talked to Barbara, Robert, and that little girl, and all them ..(Unintelligible) .. and the little girl and Barbara said...(Unintelligible) And they ain't got no reason to lie.

PITCHFORD: Like I told you, I went to, I was home,......

CONLEY: And missed all that money.

PITCHFORD: Nah.

CONLEY: But y'all messed up, okay. Y'all, y'all really messed up.

PITCHFORD: Did y'all find some money?

CONLEY: Hey.....

PITCHFORD: Did y'all find money on me?

CONLEY: Y'all messed up, man....

PITCHFORD: Did y'all find money in my pocket?

CONLEY: 'Cause you know what? 'Cause you got that cash register and that son of a gun was about empty. You messed up. You left eighty-five hundred cash dollars in there. If you don't believe it, you want to see it? You want to see it?

PITCHFORD: Well, you can write down anything.....

CONLEY: That's what you left in it.

PITCHFORD: Just like you came.....

CONLEY: Oh, I just write that down?

PITCHFORD: ...and lied about.....

CONLEY: That's what you left in it. Look at it.....

PITCHFORD: ......like you lied about...

10

App.0349

CONLEY: ...that's what you left in there. Am I lying? That's what you left in there.

PITCHFORD: Just by you saying it, look, you done lied and stuff like that, guess what, that can end up, you don't know what kind of lying you think that is, that could end up to a murder back there, it could end up to somebody killing me, or taking me...

CONLEY: Oh, do you want to kill somebody?

PITCHFORD: No. Didn't I tell you, what'd I just say?

CONLEY: Ain't nobody gone murder me.....

PITCHFORD: That could end up with somebody killing you, like I could end up for a murder, I ain't said a damn time I'm gone murder nobody, they might jump me, they might get you, any, anything, .......

CONLEY: A'nt nobody gone jump you back there.

EUBANKS: We aint' gone let nobody go back there...

PITCHFORD: I know what he told me, I know what he just told me. He said that y'all saying that I hit him, and I told him that you told me that he said that come to find out the whole thing was a total loss.

CONLEY: We wasting time again.

PITCHFORD: We ain't wasting no time. I mean, what, look here, what do you want? What you want me to say?

CONLEY: The truth.

PITCHFORD: I'm telling you the truth. I did not pull no robbery this mornig.

TAPE SHUT OFF

4TH STATEMENT OF

TERRY PITCHFORD

11-08-04

CONLEY: I'm Greg Conley, Investigator, Grenada Sheriff's Department. Today's date is the 8th day of November, year 2004. The time is 9:43 A.M. Present, myself, Mr. Robert Jennings, ah, District Attorney's Investigator, and also Terry Pitchford. Terry, ah, Mr. Jennings and also I have read you your Miranda Rights, is that correct?

PITCHFORD: Yes, sir.

CONLEY: And you understand what your own, your rights are?

PITCHFORD: Yes, sir.

CONLEY: And it's your own free will to make this statement?

PITCHFORD: Yes, sir.

CONLEY: Okay. Yesterday, November the 7th, year 2004, you and, ah, Eric Bullins. Eric spent the night with you, right?

PITCHFORD: Yes, sir.

CONLEY: You and Eric Bullins went to, ah, Crossroads Grocery, correct?

PITCHFORD: Yes, sir.

CONLEY: And that's about a half mile from your house, is that not correct?

PITCHFORD: Yes, sir.

JENNINGS: Speak up a little bit.

PITCHFORD: Yes, sir.

CONLEY: About a half mile from your house. You went in the store, you had a .38 pistol in your pocket, that's what you just told us. Is that correct?

PITCHFORD: Yes, sir.

CONLEY: Speak up. Is that correct?

PITCHFORD: Yes, sir.

1

058

CONLEY: Okay. Your plans was to do what? (No audible response) What, what did you just tell us your plans was?

PITCHFORD: When I walked in the store, when we was sitting in the car, Thang was like, ah, okay, man, we need to hit this lick, we need to hit this lick, and I was like, yeah, and so we walked in the store.

CONLEY: So, you mean hitting this lick, your plans was to rob the store, you and Thang?

PITCHFORD: Yes, sir.

CONLEY: And you had the .38 in your pocket?

PITCHFORD: Yes, sir.

CONLEY: Okay.

PITCHFORD: I had the .38 in my pocket when I went in, but I never did even pull it, I never did, we walked in the store......

CONLEY: Okay. At that time, it was a few minutes, y'all got you, y'all got a sausage and biscuit..

PITCHFORD: Got two sausage and biscuits.

CONLEY: You got a sausage and biscuit, you got in the car, you left, then you came back, right back

PITCHFORD: Naw, I didn't come back.

CONLEY: Well, your car was seen coming right back.

PITCHFORD: Well, whoever told y'all that, I didn't, you know, I'll take a polygraph, or whatever, .....

CONLEY: Okay, so what, ...

PITCHFORD: I never did come back.

CONLEY: ...what are you telling me? Who, who committed the robbery? And the murder?

059

PITCHFORD: Well, I'm telling you the truth, I don't know who committed the robbery, I don't know who comitted the murder,...

CONLEY: Your gun ...

PITCHFORD: ...but I know.....

CONLEY: Your gun was used. And we found the gun in your car yesterday.

PITCHFORD: And I told you that I believe Thang had took it.

CONLEY: Okay. Wait a minute. Still not, still not clear. If you gave Thang that pistol,

PITCHFORD: Yes, sir.

CONLEY: ....how did you get it back?

PITCHFORD: I guess he put it back when I wasn't driving....

CONLEY: When?

PITCHFORD: Ah, like when I had, well,... (Unintelligible)...asked me to go to his apartment, and, uh, well, Thang stayed out.....(Unintelligible)...

CONLEY: Okay, you let Thang use your car also? Is that why it was seen there?

PITCHFORD: No, Thang ain't never used my car.

CONLEY: Well, explain why your car, explain why your car was at the store, it left the store, came back to the store.....

JENNINGS: That's another thing that you made a mistake on. The reason, while ago, you said you was tell us all in detail, you caught yourself on that, didn't you?

PITCHFORD: Naw, listen to me, listen to me...

CONLEY: Let me tell you, let me tell you,

PITCHFORD: I didn't tell you that......

CONLEY: Now, now.......

PITCHFORD: I'm sorry about that, I am......

CONLEY: Terry, you know what I'm gone tell you, Terry? Terry, Terry, your car was seen. It was there, left, came back, three times, three times, three times, all like this,

PICHFORD: Uh, uh.

3

CONLEY: ....all like this......

PITCHFORD: That information right there, that's totally wrong, I didn't, I didn't, I wasn't back there.....

JENNINGS: You say it's totally wrong? But that person will sit in that court and testify to it.

CONLEY: We got three people gonna testify to that. Three people gonna testify to you being there, leaving coming right back, right back. And you just saying yourself that you went in there with the intention to rob, and you had, and you had Eric with you. See, I'm gonna tell you what happened. I don't know who had what gun. You had one gun. Eric had one gun. Y'all robbed the man, you chased him, you shot at him, you shot at him, you shot at him, and y'all killed him. That's what happened, plain and simple, just plain and simple There's no doubt about it, there's no story, 'cause your story didn't gee-haw when you told me that you, your first story you told me yesterday was you got him, see, it was a planned thing, let me tell you, it was planned, naw, I just want you to listen to me real quick. It was a plaanned thing....

PITCHFORD: See, the thing is.......

CONLEY: Listen to me. That's why he spent the night with you. He never spent the night with you before. He spent the night with you and y'all got up early. Young boys don't get up at six o'clock on Sunday morning. I don't do that.

PITCHFORD: .....every night. You can call my mama.........

CONLEY: Hold on, hold on. Okay. Y'all planned it, y'all carried it out, and your times, you told me that you took him, you got your sausage and biscuit, and you took him home. I come through there that morning, going to Camp McCain. Nobody was up nowhere on that street, not a light on no house on that street. Okay,.....

PITCHFORD: That's my......

CONLEY: ...let me finish, let me finish.

PITCHFORD: That's wrong.

4

061

CONLEY: Let me finish, let me finish. When I went to talk to Barbara and your girlfriend, Barbara Hankin, that is, I asked Barbara what time did Terry come over, she said, Greg, Terry came over 'bout nine, 'bout eight-thirty. Huh. Terry told me, I said to myself, Terry told me he came over to her house seven or seven-thirty. So, that's a big gap in time right there. So, so, you know what I told you yesterday, that's the one thing about a lie, when you lie, you forget what you say, and you got to keep on lying. When you lie, you can't remember a lie. But you remember the truth, Terry. And Terry, you telling us part of the truth, that you did have intentions of robbing him, and it was somebody in there the first time you went, but y'all went back and you carried it out. That's what happened, Mr. Jennings.

PITCHFORD: ....(Unintelligible)......I did not go back. That's the honest-to-God truth, right there, what I just told you? I did go in there as intending to rob the store, but when I got in there, it just come, I just couldn't do it, I just took the gun out, I couldn't do it. I freaked out. When we walked in the store, I told 'em .....

JENNINGS: Nah, you didn't freak out, you pulled that trigger, 'cause there is rat shot all over that store.

PITCHFORD: Okay, I'm telling you.....

CONLEY: And there's fingerprints all over the weapon........

PITCHFORD: I had, I had......

CONLEY: ......all over the weapon.....

PITCHFORD: ...I got that fingerprint.....

CONLEY: ...and when I asked his mom for consent to search that car,.....

JENNINGS: He went all to pieces.

CONLEY: .......he went all to pieces, he went to dancing and jerking around, then he went to cussing me out, ..

PITCHFORD: No....

CONLEY: I know Terry, you went to talking fast and cussing me.....

5

PITCHFORD:  I gave you permission.....

CONLEY:  ...and saying Mama, Mama, I need to tell you something.  And Mama say, I said tell your mama what you want to tell her, Mama, I want to tell you something, you want to whisper in her ear......

JENNINGS:  Now this man ain't got no reason to be lying about how you acted.

CONLEY:  He wanted to whisper in his mama's ear, ......

PITCHFORD:  Sir, I swear 'fore Heaven, God, God can take my life right now, I mean it from the bottom of my heart, my son could die now, he was just born, that he is saying an honest-to-goodness lie, right now, you can call my mama, when he came to my house, I gave him permission to search anything, he asked me could he search my room, I said yes, I said you can search my room, he said, well I want to search your car, I said yes, you can search my car, when my mama came out there, I said Mama, I got something to tell you, I got something to tell you....

CONLEY:  He, he said, but he thought, he thought I was......

PITCHFORD:  When he first came out there......

CONLEY:  ...he thought I wasn't going to do it.

PITCHFORD:  ...when I first came out there, I, he said he wanted me to sign some consent so he can search the car.  I said, okay, ain't no problem with it, only thing I .....on him, was he shoved me of to the car, he, look, in my face, he said don't fucking, he said don't act like you don't know what the fuck I'm talking about, he said you went down there and you robbed that store, I explained to him, I said look, if you gone ask me a question, you need to ask me a question, don't tell me that I did anything wrong.  He said, well, I'm telling you, you did it, you did it, you did it, that's the reason why I went off...

JENKINS:  Terry, right now...

PITCHFORD:  ...you can ask my mama.

CONLEY:  I don't remember all that.

JENNINGS:  .....what, what we're doing, is telling you what .....

6

PITCHFORD: Take a polygraph test, take a polygraph test.

CONLEY: I'll take it when you leave. Come on.

PITCHFORD: ...you take the polygraph test.....

CONLEY: We'll plug me up when you leave. Ain't, I ain't charged with no crime, you are.

PITCHFORD: I ain't charged with it, 'cause I didn't do it. I didn't, I didn't shoot, I promise I'm telling y'all the truth, I did not shoot the man, I gave Thang the pistol, Thang, you know, Thang did whatever....

CONLEY: Where's the cash register?

PITCHFORD: I don't know.

CONLEY: Where's, where's the safe y'all took?

PITCHFORD: I didn't take no safe, I didn't take no cash register, I didn't take none of that. Only thing I did, ...(Unintelligible)

CONLEY: What about yesterday when I said, Terry, you know, y'all killed a man, and didn't get that much money, wasn't much money in that cash register. Then, I said Terry, you missed about eight-five hundred dollars. Guess what he said, Mr. Jennings. Wow.

PITCHFORD: Get it on tape.

CONLEY: It's on tape.

PITCHFORD: You lying the whole time.

CONLEY: Wow.

PITCHFORD: I didn't say wow. ......(Unintelligible) Tell him to take a polygraph, and that will prove.....

JENNINGS: Terry, that ain't, that ain't, that ain't what we're here for.

PITCHFORD: Okay, all right......

JENNINGS: We're here because all the ..

PITCHFORD: That's why I wasn't talking to you........I mean I did ........

7

JENNINGS:  You are telling some of the truth, and we're just gone have to get all the way with it.

PITCHFORD:  Yes, sir.

JENNINGS:  I mean, you know, I know that you are scared to death, because right now, you are in a very, very serious situation.

PITCHFORD:  Yes, sir.  I know that.  Like I told you, we went, we went in the store and whatever, but when the dude started talking to us, we went in there with the intentions, you know, intentions of robbing him, but when the dude started talking to me, ...(Unintelligible)...I couldn't do it.  I promise you that.  I couldn't, I couldn't do it.

JENNINGS:  You took your gun out on him. Now tell me what happened.

PITCHFORD:  I didn't do the gun out on him.

JENNINGS:  What, the dude started talking to you about what?

PITCHFORD:  I mean, when he started talking, I started telling him about the ...(Unintelligible)....I mean, I, just something, I started thinking about, man, this dude, he's been you know, he stay down the street from me, I mean, he works at the store, you know what I'm saying, these are all the things that are running through my head, you know, ain't no way, ain't no way that I can, you know, go through with no shit like this.  So when I walked out of the store, Thang said what happened, man, what happened?  I said, man, I ain't gone do this shit, man, I ain't fixing to do it, so ........

JENNINGS:  Thang's a kid, and that's why y'all went back and did it. He made you feel like you was a, a lowlife.

PITCHFORD:  Naw, he didn't, after, after we left....

JENNINGS:  This is a kid.......

CONLEY:  You and Thang stood out in the car and planned this thing.

JENNINGS:  This is a kid that's done put you down......

PITCHFORD:  No, yeah, this is a kid

CONLEY:  Saying you.......

8

PITCHFORD: That's why, that's why, you know what I'm saying?

JENNINGS: He said you didn't have, you didn't have the guts to do it.

PITCHFORD: Naw, he couldn't tell, he couldn't tell me nothing to make me feel bad or, or lower than him, or make me feel low, for the simple fact that I know I got more than Thang, I know it, I know I got a life, you hear what I'm saying?

CONLEY: You know what, Terry?

PITCHFORD: ......that Thang never did, I promise you that on my life.

CONLEY: You know what, Terry?

PITCHFORD: Thang never did even say anything else about those robberies.

CONLEY: You know, Terry.

PITCHFORD: When he got out there to the house, he asked me for that pistol, and I gave him the pistol.

JENNINGS: Let's do it this way then. You said you'd take a polygraph test.

PITCHFORD: Yes, sir.

JENNINGS: Okay. I'm gone write down questions, whether you did or did not do anything in that store as far as the robbery.

PITCHFORD: Okay.

JENNINGS: That's what we're gone do. We're gone, we're gone, instead of trying to give you the chance to tell the truth, we'll let you go ahead and take the polygraph.

CONLEY: You got permission on it.

JENNINGS: Ah, .....

CONLEY: Let me....we're gonna end the interview at this time.

JENNINGS: Okay. And, ah, somebody that worked at the place there close to where y'all were parked at come up and, ah, kind of got on to y'all didn't he, told you you better get home?

PITCHFORD: Well, yeah, Quincy and, like I told you, I didn't even go up there, and I was leaning, I was leaning on the car, and they had walked up the street, At first, Im thinking that, you know, I thought they was fixing to bluff, you hear what I'm saying?

JENNINGS: Yeah.

PITCHFORD: 'Cause when they left, they had their hat on, then they had their little dew, lik a dew rag or something on their head, and they wasn't, you know, wasn't....

JENNINGS: Wasn't pulled down.

PITCHFORD: ......or whatever. They just walking down the street, and, uh, I seen these dudes from G & W pulled up, they worked at, ah, at G & W Steel.

JENNINGS: Uh, huh.

PITCHFORD: They had pulled up. And I seen Quincy, he was walking to the car, and he started talking to the dude, I don't know what they was talking about, though. Then I seen 'em turn around and coming back. And then, when he came back, he was like, ah, well, man, we don't need to go out there, what we gone do if we go out there, I'm, you know what I'm saying, I'm tired of even sitting out there. Opened the door and said I tell you one thing, I'm fixing to get ready to go. So Pooh Bear was like, yeah, me, too, man, but he was like naw, naw, naw, or whatever, you know what I'm saying, and I was like get your ass in this car, you know what I'm saying, opened the door, and we left, I took them home. (Unintelligible)

JENNINGS: All right, and then, ah, Saturday night, ah, here at, what's Eric's last name?

PITCHFORD: Bullins.

JENNINGS: Bullins. Eric spent the night with you, ah, and, ah, yesterday morning, y'all got up. And if you would, just tell me what happened from that point.

068

App.0360

PITCHFORD: Well, we got up the next morning, and, and, ah, I didn't know that, ah, Thang had a gun under his clothes, but, ah, he woke up that next morning, he woke me up actually, and he was like, ah, I'm hungry, I been hungry all night, Thang was like, have I got something to eat or whatever and I'm like naw, and he was like, I'm thirsty, you want to go get me something to ear, and I was like, all right, he was like, then you gone take me home, and I was like yeah. So we left there and went down there to the store, and we pulled up to the store, . And when we got to the store, ah, Quincy Bullins was parked out there. And he said was I ready to rob the store or whatever, and he was like,.....(Unintelligible)... he's got bout four thousand dollars in there, and I said man, I don't need nothing like that, at first I was like, you know, nah, we don't need to pull no shit like that, man, so he was like, man, look at the money, he got four thousans dollars, I just walked off, we walked in there, and I had my pistol in my pocket, and, ah, he had a pistol on him, too, but when we walked in there, you know what I'm saying, the three of us started talking, you know how people, you know how that trash is, ..(Unintelligible).. so we walked over to Thang, and Thang was like what's happening, what's happening, what's happening, you know, and I was like, uh, I was like, man, you know what I'm saying, I just changed my mind, and, I don't want to do it, you know what I mean? And he was like, man, you don't do it now, I'm gone tell Bullins, I'm gone tell Bullins, you know what I'm saying? Bullins is ..(Unintelligible).., you ever heard of him?

JENNINGS: Uh, huh.

PITCHFORD: And, ah, me and Bullins had a little, you know what I'm saying? A little thing, you know what I'm saying? ...(Unintelligible) and , uh, Thang must know that, I mean, 'cause he's like, I'm gone tell Bullins, I'm gone tell Bullins, so I had to do it, man, 'cause, I really didn't want Bullins to, you know, find out about it, 'cause if he finds out, I said we ain't gone kill nobody, you know what I'm saying, I didn't try to shoot nobody, so he was like ...(Unintelligible)...so he walked off in there, Thang was like, ah, put your hands up, stick your hands up or whatever, you know what I'm saying, I was standing

behind him, I was standing over there on the side or whatever, then he was like, ah, put your hands up, ah, and I turned, I turned around like this, and I looked at the, and when I looked, I saw out the window, 'cause you know, I look at most things, I didn't want to be seen or whatever, and I was like, man, I turned back around, and as soon as I was turning around, I heard the gun go off, pow, pow, pow, like that, ah, I looked at 'em, and I said man, what, and he was like, ah, you gone shoot him, you want a shot, I said hell, naw, man, and he was like you gone have to do something, you gone have to do something, said I ain't supposed to be in here by myself, and I was like, you know, he was holding the gun at me, and, uh, I was like, ah, you know what I'm saying, I had shot, but I wasn't trying, I, I didn't try to shoot the dude or nothing, I was shooting dead at the ground, I was just, you know what I mean, and it was like, ah, while I was shooting down at the ground, he was grabbing the cash register, and he ran outside. When he ran outside, I was like, uh, man, it's fucked up, it's fucked up, you know what I'm saying, he was like man, let me get inside, I can get more stuff, I said man, I'm fixing to take you to the house, I said you can do whatever you want to do with the money, you can do whatever, you can keep all of it, you know what I'm saying, he was like, aw, man, you pussing out, you pussing out, I said I ain't pussing out, man, I said man, you don't understand, we fucked up, you fucked up and he was like, aw shit, I'm fixing to try to, you understand, I'm fixing to get me a car or whatever, I'm fixing to do that, I'm fixing to do this, I said you got the money, you do whatever you want to do with it. I dropped him out. And that was the end of it. And then I went back to my girlfriend's house.

JENNINGS: Have you told anybody else about it?

PITCHFORD: Nobody. The only reason why I didn't tell Greg is because I, man I don't know nothing to do, I don't want none of the take, when I do get out, if I do get out, his brothers are outside, you understand, you know, like if I get his brothers put away, what brother that you know that ain't gonna, you know what I'm saying, try to retaliate. I ———— mean, it happens all the time, you know what I'm saying? If he get off, you understand,

for anything, you know, all the time......(Unintelligible) ...that's why I asked you

...(Unintelligible)

JENNINGS: Well, this right here, like I told you, this interview is between me and you.

And, ah, the time now is 10:30. It's still, ah, November the8th, 2004. This interview is

now concluded.



MSH PITCHFORD
P109

5TH STATEMENT OF

TERRY PITCHFORD

11-08-04

JENNINGS: ah, Terry Pitchford at the Grenada County Sheriff's Department. Today's date is November the 8th, 2004. The time is 10:20 A.M. Terry and I have been talking, ah, I'm Investigator Robert Jennings of the District Attorney's Office, and Terry is, ah, at the jail, ah, under investigation of a robbbery and murder that occurred in Grenada County, ah, early yesterday morning, early Sunday morning. Ah, Terry, of course we talked a good bit, and just a little bit ago, ah, Investigator Conley was in here also and we talked a little bit, and there were some things that were recorded then. Since that time, you, ah, you and I have been talking, and you have told me basically what happened out there yesterday morning. What I want to do is start at the very beginning. Ah, a week ago, ah, there was a situation that occurred, ah, there at the Crossroads Store, ah, that you were involved in along with some othere people. Is that correct?

PITCHFORD: Yes, sir.

JENNINGS: All right, who all was present at that particular time?

PITCHFORD: It was Demarcus Westmoreland and Quincy Bullins.

JENNINGS: Okay. Quincy Bullins? And Demarcus Westmoreland?

PITCHFORD: Yes, sir.

JENNINGS: Okay. And on that particular day, ah, y'all had talked about, ah, or at least Quincy had talked about, discussed trying to hit a lick, meaning robbing the store

PITCHFORD: Uh, huh. It was him and Pooh Bear.

JENNINGS: Him and Pooh Bear was the ones talking about it, but you were present and y'all were in your car. Is that correct?

PITCHFORD: Yes, sir.

1

JENNINGS: Okay. And, ah, somebody that worked at the place there close to where y'all were parked at come up and, ah, kind of got on to y'all didn't he, told you you better get home?

PITCHFORD: Well, yeah, Quincy and, like I told you, I didn't even go up there, and I was leaning, I was leaning on the car, and they had walked up the street. At first, Im thinking that, you know, I thought they was fixing to bluff, you hear what I'm saying?

JENNINGS: Yeah.

PITCHFORD: 'Cause when they left, they had their hat on, then they had their little dew, lik a dew rag or something on their head, and they wasn't, you know, wasn't....

JENNINGS: Wasn't pulled down.

PITCHFORD: ......or whatever. They just walking down the street, and, uh, I seen these dudes from G & W pulled up, they worked at, ah, at G & W Steel.

JENNINGS: Uh, huh.

PITCHFORD: They had pulled up. And I seen Quincy, he was walking to the car, and he started talking to the dude, I don't know what they was talking about, though. Then I seen 'em turn around and coming back. And then, when he came back, he was like, ah, well, man, we don't need to go out there, what we gone do if we go out there, I'm, you know what I'm saying, I'm tired of even sitting out there. Opened the door and said I tell you one thing, I'm fixing to get ready to go. So Pooh Bear was like, yeah, me, too, man, but he was like naw, naw, naw, or whatever, you know what I'm saying, and I was like get your ass in this car, you know what I'm saying, opened the door, and we left, I took them home. (Unintelligible)

JENNINGS: All right, and then, ah, Saturday night, ah, here at, what's Eric's last name?

PITCHFORD: Bullins.

JENNINGS: Bullins. Eric spent the night with you, ah, and, ah, yesterday morning, y'all got up. And if you would, just tell me what happened from that point.

2

068

PITCHFORD: Well, we got up the next morning, and, and, ah, I didn't know that, ah, Thang had a gun under his clothes, but, ah, he woke up that next morning, he woke me up actually, and he was like, ah, I'm hungry, I been hungry all night, Thang was like, have I got something to eat or whatever and I'm like naw, and he was like, I'm thirsty, you want to go get me something to eat, and I was like, all right, he was like, then you gone take me home, and I was like yeah. So we left there and went down there to the store, and we pulled up to the store, . And when we got to the store, ah, Quincy Bullins was parked out there. And he said was I ready to rob the store or whatever, and he was like,.....(Unintelligible)... he's got bout four thousand dollars in there, and I said man, I don't need nothing like that, at first I was like, you know, nah, we don't need to pull no shit like that, man, so he was like, man, look at the money, he got four thousans dollars, I just walked off, we walked in there, and I had my pistol in my pocket, and, ah, he had a pistol on him, too, but when we walked in there, you know what I'm saying, the three of us started talking, you know how people, you know how that trash is, ..(Unintelligible).. so we walked over to Thang, and Thang was like what's happening, what's happening, what's happening, you know, and I was like, uh, I was like, man, you know what I'm saying, I just changed my mind, and, I don't want to do it, you know what I mean? And he was like, man, you don't do it now, I'm gone tell Bullins, I'm gone tell Bullins, you know what I'm saying? Bullins is ..(Unintelligible).., you ever heard of him?

JENNINGS: Uh, huh.

PITCHFORD: And, ah, me and Bullins had a little, you know what I'm saying? A little thing, you know what I'm saying? ...(Unintelligible) and , uh, Thang must know that, I mean, 'cause he's like, I'm gone tell Bullins, I'm gone tell Bullins, so I had to do it, man, 'cause, I really didn't want Bullins to, you know, find out about it, 'cause if he finds out, I said we ain't gone kill nobody, you know what I'm saying, I didn't try to shoot nobody, so he was like ...(Unintelligible)...so he walked off in there, Thang was like, ah, put your hands up, stick your hands up or whatever, you know what I'm saying, I was standing

3

behind him, I was standing over there on the side or whatever, then he was like, ah, put your hands up, ah, and I turned, I turned around like this, and I looked at the, and when I looked, I saw out the window, 'cause you know, I look at most things, I didn't want to be seen or whatever, and I was like, man, I turned back around, and as soon as I was turning around, I heard the gun go off, pow, pow, pow, like that, ah, I looked at 'em, and I said man, what, and he was like, ah, you gone shoot him, you want a shot, I said hell, naw, man, and he was like you gone have to do something, you gone have to do something, said I ain't supposed to be in here by myself, and I was like, you know, he was holding the gun at me, and, uh, I was like, ah, you know what I'm saying, I had shot, but I wasn't trying, I, I didn't try to shoot the dude or nothing, I was shooting dead at the ground, I was just, you know what I mean, and it was like, ah, while I was shooting down at the ground, he was grabbing the cash register, and he ran outside. When he ran outside, I was like, uh, man, it's fucked up, it's fucked up, you know what I'm saying, he was like man, let me get inside, I can get more stuff, I said man, I'm fixing to take you to the house, I said you can do whatever you want to do with the money, you can do whatever, you can keep all of it, you know what I'm saying, he was like, aw, man, you pussing out, you pussing out, I said I ain't pussing out, man, I said man, you don't understand, we fucked up, you fucked up and he was like, aw shit, I'm fixing to try to, you understand, I'm fixing to get me a car or whatever, I'm fixing to do that, I'm fixing to do this, I said you got the money, you do whatever you want to do with it. I dropped him out. And that was the end of it. And then I went back to my girlfriend's house.

JENNINGS: Have you told anybody else about it?

PITCHFORD: Nobody. The only reason why I didn't tell Greg is because I, man I don't know nothing to do, I don't want none of the take, when I do get out, if I do get out, his brothers are outside, you understand, you know, like if I get his brothers put away, what brother that you know that ain't gonna, you know what I'm saying, try to retaliate. I mean, it happens all the time, you know what I'm saying? If he get off, you understand,

4

070

MSH PITCHFORD
P113

for anything, you know, all the time......(Unintelligible) ...that's why I asked you ...(Unintelligible)

JENNINGS: Well, this right here, like I told you, this interview is between me and you. And, ah, the time now is 10:30. It's still, ah, November the 8th, 2004. This interview is now concluded.

5

071

STATEMENT OF

PAUL HUBBARD AND HENRY ROSS, JR.

11-07-2004

CONLEY:  I'm Greg Conley, Investigator, Grenada Sheriff's Department.  Today's date is the 7th day of November, year 2004.  Gonna be speaking with, ah, Paul Hubbard, and also present is, ah, Henry Ross, Jr., and Officer Carver Conley.  We're all, ah, we're at Grenada Sheriff's Department.  Gonna be speaking with them about an incident that happened about a week and a half ago out at Crossroads Grocery in Grenada County, Mississippi. Ah, first I'm gone talk with Paul Hubbard.  Paul, ah, tell me what, ah, what you witnessed one evening when you got off of work.

HUBBARD:  Well, about a week and a half ago, we had come from Starkville, we didn't have no work to do.

CONLEY:  You work for who?

HUBBARD:  Ah, Gerald.

CONLEY:  Okay.

HUBBARD:  Gerald Gatlin.

CONLEY:  Okay.

HUBBARD: So, ah...

CONLEY:  You was getting off of work 'til...

HUBBARD:  I was getting off of work til...

CONLEY:  Where was y'all at?

HUBBARD:  At the shop, at Gerald Gatlin's shop.

CONLEY:  And that's right next to......

HUBBARD:  It's right behind the store, Crossroads.

CONLEY:  Okay.

HUBBARD:  So, ah, I noticed a guy I knew, goes by the name of NukNuk 'cause I got in trouble by asking what they doing out there.  He said that they was gone hit the store, so I

1

told 'em, I said, now y'all gone get killed, or life, and it ain't worth it, man, get out and try to get your own money...

CONLEY: What...

HUBBARD: You know what I'm saying, you know, get you a job, so, he said okay, and they left, well, they went down the street, they left, so I said, man, I ain't seen nothing.

C. CONLEY: This NukNuk, NukNuk was whereabouts?

HUBBARD: They was in the gravel in our, ah, parking spot.

CONLEY: What was they doing? Standing, sitting?

HUBBARD: They, they was headed towards the store, going across the gravel, but when they seen the truck pull in, they stopped.

CONLEY: So they, they was walking.

HUBBARD: They was walking.

CONLEY: Him and another dude.

HUBBARD: Him and another dude.

CONLEY: NukNuk is who?

HUBBARD: NukNuk, ah...

CONLEY: Whose son is he?

HUBBARD: Sam, Sam Jr. Stewart's.

CONLEY: About how old is he?

HUBBARD: He can't be no more than about seventeen or eighteen, if that old.

CONLEY: Did you see something in his hand?

HUBBARD: I seen a towel.

CONLEY: You find out what was in that towel?

HUBBARD: He seen me walk up, and he said, but now I seen the towel in his hand, both of 'em had something wrapped up

CONLEY: Something wrapped up in their hands?

2

HUBBARD: I don't know the other dude, though. Yeah, both of 'em had something wrapped up.

CONLEY: One of 'em, one of 'em talked to you, when you talked to him...

HUBBARD: NukNuk, I talked to him.

CONLEY: ..tell me kind of how y'all's conversation went.

HUBBARD: I just, first I asked him, I said man, what you doing way out here? And he, he told me straight out of his head, we fixing to hit this store.

CONLEY: "Hit" meaning what?

HUBBARD: Means kill the dude and rob him.

CONLEY: That's basically what he told you.

HUBBARD: That was basically what he was telling me.

CONLEY: What did the other guy say?

HUBBARD: He didn't say nothing. I don't know him.

CONLEY: Okay. What time of day was it?

HUBBARD: (Some iunintelligible aside conversation) ...bout two o'clock.

CONLEY: 'Bout two o'clock?

HUBBARD: 'Cause it was still...

CONLEY: 'Cause y'all came in early,...

HUBBARD: Yeah.

CONLEY: ....so it was the middle of the day.

HUBBARD: Yeah. In the evening like.

CONLEY: In the evening.

HUBBARD: Yeah, kind of.

CONLEY: But, ah, the other guy never did say nothing?

HUBBARD: The other guy didn't say nothing.

CONLEY: Describe him to me. What's he look like?

HUBBARD: Ah, he was real dark. He was real dark, that's all I can tell you about him.

3

CONLEY: Was he short, tall?

HUBBARD: Naw, he's short, he's shorter than me.

CONLEY: How, how tall is NukNuk?

HUBBARD: NukNuk is about my height.

CONLEY: And you are about five-nine?

HUBBARD: I'm 'bout five-nine.

CONLEY: Okay, NukNuk is about five-nine.

HUBBARD: He's real narrow, though, NukNuk is real tall and narrow.

CONLEY: Skinny?

HUBBARD: Skinny.

CONLEY: And the other guy is about...

HUBBARD: He's short, he ought to be about five-seven.

CONLEY: And both of 'em looked to be 'bout how old.

HUBBARD: They 'bout the same old, 'bout eighteen.

CONLEY: Okay.

HUBBARD: I could give 'em eighteen.

CONLEY: Ah, NukNuk, you 'bout know who he is, right?

HUBBARD: I know NukNuk, you know, I don't know his...

CONLEY: You just don't know his name.

HUBBARD: I don't know his first ..

CONLEY: Real name.

HUBBARD: I know his, what he go by.

CONLEY: The other guy, he have long hair, short hair?

HUBBARD: Short hair. They both had short hair.

CONLEY: Both of 'em had short hair. Light, dark complexion, other guy?

HUBBARD: The other guy was real dark. Real black.

CONLEY: What about the guy that was sitting on the car, did y'all, did you see him?

4

HUBBARD: We seen him sitting on the car when we passed through, but we just didn't get a, like a look at him.

CONLEY: Describe the car to me.

HUBBARD: It's a gray Caprice, Chevy....

CONLEY: That's a gray Chevy Caprice.

HUBBARD: Chevy Caprice.

CONLEY: What direction was it pointed, toward the store, or back...?

HUBBARD: No, towards, towards Grenada, towards......

CONLEY: Did they have the trunk up, or the hood?

HUBBARD: The had the hood up.

CONLEY: Which is like he was working on it.

HUBBARD: Which is like, like it had went off, you know, went dead or something.

CONLEY: How far, approximately how far f rom the store?

HUBBARD: Not too far.

CONLEY: So it's close? Is it before you get to the track?

HUBBARD: It's before, it, it was parked on the side like going toward the store, but now the car was facing like going toward Grenada

CONLEY: Yeah. So it wasn't that far from the store?

HUBBARD: Nah, nah, nah, it was, well, you couldn't see it from the store.

CONLEY: But you don't know who the other guy was?

HUBBARD: Only him.
CONLEY: Okay, so it was three of 'em.

HUBBARD: Three of 'em, one sitting on the hood, two walking.

CONLEY: You seen that car before? You know who, who owned that car? It was NukNuk's car or one of the other guys?

HUBBARD: Nah, he ain't got no car, so it's got to be the guy that owned the car, it's got to be his, 'cause NukNuk ain't got a car.

200

App.0373

Ross starts Here

CONLEY: Now, I'm gonna be talking to Henry, Henry Ross, Jr. Henry, ah, tell me, tell me what you witnessed that day.

ROSS: The day that, ah, we seen NukNuk out there, see, that morning, we got to the office about seven o'clock.

CONLEY: Okay.

OROSS: We came back to the office to pick up some stuff, and move to another job, and we was gone go by Steve's house across the road from Crossroads Store. I was leaving and going to the curch, so I was gone drive my car, so I come off the back of G & W Steel to go in the parking lot to get my car.

CONLEY: G & W Steel is right behind the store.

CONLEY: Right behind it. It's right behind the Crossroads.

ROSS: Okay.

CONLEY: And I come behind the building and making it to my car, I see two guys out in front of G & W....

ROSS: What time of day was this?

CONLEY: This was like about eleven, eleven-thirty, right before dinner.

ROSS: You seen two black guys?

CONLEY: Uh, huh, but I never seen the car.

CONLEY: They were where now?

ROSS: Right there, right in front of G & W, right were we got our trees planted at.

CONLEY: Okay.

ROSS: They was in G & W's...

CONLEY: They see you?

ROSS: ....parking lot. Yeah, I said what's up, man, 'cause I knew...

CONLEY: Who was there then?

ROSS: NukNuk.

CONLEY: NukNuk was there then?

6

App.0374 201

ROSS: NukNuk was there then. But it was like they'd been out there almost, we made it back, okay, let me think, I seen 'em then, they was at G & W parking lot.

CONLEY: This was around eleven o'clock.

ROSS: Around eleven.

CONLEY: Okay.

ROSS: I said, what's over there, I thought they was fixing to go in and ......

CONLEY: You didn't see no car?

ROSS: Uh, uh, didn't see no car then.

CONLEY: Okay. I got in my car and got ready to leave, Gerald said, don't leave yet, because we going over here to the Steve's house, and I pulled my car back around there, and they was walking down the road like headed twoard the lake. I said, well, what's going on; he going back and all, he get into worse trouble, then goes back to work, you getoff work....

ROSS: Let me freeze you a minute. Was it the same guys that you seen at two o'clock that you seen at eleven o'clock ...

CONLEY: Yeah.

CONLEY: ...messing up?

ROSS: Yeah, yeah.

CONLEY: Okay.

ROSS: Okay, so we come back in, but this time the work truck don't pull in the back, he pull in the front 'cause everybody going home. Pull in the front, me, Silver Fox, Two Dollars get out of the truck, Ted's in the back trying to leave, NukNuk and this tall black dude, he's 'bout my height, (Some aside conversation, unintelligible) he's about my height, yeah, he was, yeah, he was, he was mean looking, I looked at him.

CONLEY: He was mean looking?

ROSS: Uh, huh. And then....

CONLEY: What you mean by that?

ROSS: He looked at me like..

CONLEY: Oh, okay.

ROSS: 'Cause that's how he's mean-looking. And Two Dollar hollered at me like, what's up, man. What you doing way out here? Aw, man, we gone hit that store. Hit that store?

CONLEY: Two Dollars is Hubbard, right?

ROSS: Yeah, that's right. Hit the store? They gone catch y'all, man, you'll end up dead or in jail, man.

CONLEY: That's what you told him?

ROSS: That's what we all told him. They went down, they went down the road and then when I noticed the car when we was leaving, them two was walking back to the car, after we told 'em don't do that, there was a little short fat red dude was sitting on the trunk.

CONLEY: Okay.

ROSS: I looked at him..

CONLEY: The guy was sitting on the trunk.

ROSS: He was light skinned.

CONLEY: Okay.

ROSS: He was light skinned.

CONLEY: You sure?

ROSS: He was light-skinned.

CONLEY: Okay, keep going.

ROSS: He was light-skinned. So that was it, you know, we just went straight on across the lake, they was still out there. You know, and we got back to work the next morning, told Gerald about it, what was going on, you know, Gerald went over there and told Reuben. The I went over there this week, Gerald told me to go over there and talk to him you know, 'cause ...

CONLEY: Tell who?

ROSS: The guy in the store.

8

203

App.0376

CONLEY: Did you talk with him?

ROSS: Yeah, I talked with him, I talked with him yesterday

CONLEY: What did he say?

ROSS: I just told him to be careful, 'cause them guys might try to come back out there. You know, and he was like, you know, how they look, and I was like, I didn't know but one of 'em, you know, and I didn't too much remember how the other ones looked, but he was like, I'm gone be careful, you know. I borrowed his air thing, aired up my tire, brought it back up there, told him you be careful, you know. Then, I left. You know.

CONLEY: So, that NukNuk, how would we find him?

ROSS: The last time I seen NukNuk, man, you know, you pass the church in Tie Plant, then it's one, two, I'm trying to......

CONLEY: You, you can go ahead and tell us.

ROSS: You might could find him now he stay in Como Village, you might find him over there by that over there by liquor store, over there by (Unintelligible)

CONLEY: Okay. Let me end this tape right now. Anything else about that particular day, let me just clarify something, let me backtrack you, you, you went to the shop two times that day. You went at eleven o'clock, right?

ROSS: Yeah.

CONLEY: And at eleven o'clock, you seen NukNuk and the other boy.

ROSS: Yeah, they both was black dudes.

CONLEY: The other black dude, but you didn't see the car at that time.

ROSS: Uh, uh.

CONLEY: And they was walking around G & W Steel Buildings?

ROSS: Yeah.

CONLEY: And, did you ask him what he was doing at that time?

ROSS: Naw, not that time. I just.....

CONLEY: You said that to him.

9

ROSS: I just told him, I said man, I said what, y'all looking for a job? And they said, naw. I'm like, will there ain't nobody in the office no way.

CONLEY: Okay. Then at two o'clock, when y'all come in for the day, that's when y'all seen him, asked him what, what are y'all doing out here...

ROSS: Yeah.

CONLEY: ...and that's when they replied back to you guys that they are, they're out there to hit the store. Did you see a towel...

ROSS: Yeah.

CONLEY: ...also? Both of 'em had towels.

ROSS: Yeah. Both of 'em had towels.

CONLEY: And had guns wrapped .....did they tell you what was in the towels?

ROSS: Yeah.

CONLEY: What did they tell you it was?

ROSS: He told, he showed me what he had in the towel....

CONLEY: What, you seen the gun?

ROSS: He just opened up the towel like this and me and Hubbard saw...

CONLEY: Did you see the gun?

ROSS: I seen the gun, he had a white towel, and the other guy had a blue towel. A dark blue towel, and he was walking with his on this arm.

CONLEY: Did you see his, too?

ROSS: You know, bouncing his gun, and walking up and down the road, you now.

CONLEY: All right. Okay. Then this light complexioned guy was sitting on the car?

ROSS: He was sitting on the trunk.

(Some aside conversation, not intelligible.)

CONLEY: Okay. I'm gonna end this tape at this time.

10

2005-009

## STATEMENT OF QUINCY BULLIN
### 1-9-06
## STATEMENT TAKEN BY GREG CONLEY GRENADA CO. SHERIFF'S DEPT. AND ROBERT JENNINGS DISTRICT ATTORNEY'S OFFICE.

5:00Pm 1-9-06

In late August on the first week of November I, caught a ride with Terry Pitchford and Demarcus Westmoreland. I thought they were headed to Terry's Girlfriends near Monday Road. Instead Terry said that he had to run by his Mothers first which he did. Afterwards he pulled down the hill from his house towards the Crossroads Store. He and Demarcus stated talking about hitting a Lick or Robbing the Store. Me and Westmoreland got out. Terry and Westmoreland had reached under the seat and pulled out guns. The one Terry had was a Ruger 22 Automatic. Westmoreland had what looked like a 32 or 38 revolver. Terry said the man knows me from a kid and asked me to go with Demarcus. We started walking to the Store. Terry sat on the hood of his car. Just before we got to the store Paul Hubbard walked out from his job and asked what we were doing. There was another man with him. I told him that we were going to hit a Lick and he said No ya'll gonna get killed or end up in jail for a long time. He also said we better get out of there. We went back to the car and went to Monday Road. After being arrested Eric Bullin my cousin told me that the gun that Terry had they had got from Dantron Mitchell and that they had shot it at Dantrons Grandfathers. Eric told me that he wasn't in it with Terry but that he did spend the nite with him and they went in the store that morning and got sausage and biscuit and then Terry took him home. Terry tells everyone he did it, but now says he didn't.

Robert c. jennings

*[signature]*

FILED

JAN 1 0 2006

Linda Barnette
Circuit Clerk

App. 0379

344

STATEMENT OF QUINCY BULLIN

*2005-009*

1-9-06

**STATEMENT TAKEN BY GREG CONLEY GRENADA CO. SHERIFF'S DEPT. AND ROBERT JENNINGS DISTRICT ATTORNEY'S OFFICE.**

5:00Pm 1-9-06

In late August on the first week of November I, caught a ride with Terry Pitchford and Demarcus Westmoreland. I thought they were headed to Terry's Girlfriends near Monday Road. Instead Terry said that he had to run by his Mothers first which he did. Afterwards he pulled down the hill from his house towards the Crossroads Store. He and Demarcus stated talking about hitting a Lick or Robbing the Store. Me and Westmoreland got out. Terry and Westmorland had reached under the seat and pulled out guns. The one Terry had was a Ruger 22 Automatic. Westmoreland had what looked like a 32 or 38 revolver. Terry said the man knows me from a kid and asked me to go with Demarcus. We started walking to the Store. Terry sat on the hood of his car. Just before we got to the store Paul Hubbard walked out from his job and asked what we were doing. There was another man with him. I told him that we were going to hit a Lick and he said No ya'll gonna get killed or end up in jail for a long time. He also said we better get out of there. We went back to the car and went to Monday Road. After being arrested Eric Bullin my cousin told me that the gun that Terry had they had got from Dantron Mitchell and that they had shot it at Dantrons Grandfathers. Eric told me that he wasn't in it with Terry but that he did spend the nite with him and they went in the store that morning and got sausage and biscuit and then Terry took him home. Terry tells everyone he did it, but now says he didn't.

Robert c. jennings

*[signature]*

FILED

IJAN 1 0 2006

Linda Barnette
Circuit Clerk

App.0386

GRENADA COUNTY SHERIFF'S DEPARTMENT OFFENSE REPORT

Date: 7 NOV 2004

Crime or Incident Type: ARMED ROBBERY / MURDER

Complaint #: 2004110323

| Victim's Name | | Address | | Phone |
|---|---|---|---|---|
| R. L. BRITT | | 11475 HWY 51 GRENADA, MS | | |

| Rec-Call | Arrival Time | Type Premis | Location of Offense | Dispatcher |
|---|---|---|---|---|
| 0 | 07:42 | BUSINESS | 4489 HWY 7 N | MERRIMAN |

| Victim Place of Employment | Victim's Sex | Victim's Race | Victim's Age | Date and Time Occurred |
|---|---|---|---|---|
| SELF-EMPLOYED | M | W | 47 | 7 NOV'04 0630-0735 |

| Reporting Person Name and Address | Date and Time Reported | Phone |
|---|---|---|
| WALTER S. DAVIS | 7 NOV'04 0735 | |

| Witness Name | Age | Phone | Place of Employment |
|---|---|---|---|
| | | | |
| | | | |

| Suspect Name and Address | | Age | Race |
|---|---|---|---|
| | | | |

| Vehicle Color | Year | Make | L.C. | Model | State |
|---|---|---|---|---|---|
| SILVER/GREY | | | | | |

Description of Items stolen - Size - Color - Model - Style - Serial # (1) ONE CASH REGISTER WITH AN UNDETER-MINED AMOUNT OF CASH

Value $

| Victim Taken To | Transported By | Condition |
|---|---|---|
| DECEASED | N/A | DECEASED |

Narrative: ON 7 NOVEMBER 2004 AT 07:35 HRS. A CALL WAS DISPATCHED IN REFERENCE TO A SHOOTING. UPON ARRIVAL I OBSERVED A WHITE MALE LYING ON HIS RIGHT SIDE IN A POOL OF BLOOD. OFFICER ADAM EUBANKS WHO HAD ARRIVED PRIOR TO MYSELF HAD CHECKED THE SUBJECT, LATER IDENTIFIED AS R.L. BRITT, FOR VITALS AND FOUND THE SUBJECT TO BE DECEASED. UPON FURTHER INVESTIGATION THERE WERE FOUND (4) FOUR SHELL CASINGS OF .22 CALIBRE AMMUNITION LYING ON THE FLOOR IN VARIOUS AREA. THE SHELL CASINGS WERE MARKED BY OFFICER'S MILLER AND EUBANKS AS EVIDENCE IN THE ORDER THEY WERE FOUND. SEE CONTINUATION

| Investigating Officer | | Badge number |
|---|---|---|
| C. Conley | | SO-31 |
| Photos taken by | Assisting Officer | Badge number |
| SO-6 SO-2 SO-3 | | |

Evidence Obtained · prints, weapons, etc.

005

App.0381

### SUPPLEMENTAL REPORT

A FURTHER CHECK OF THE BUSINESS REVEALED THAT THE CASH REGISTER WAS MISSING. I LATER INTERVIEWED WALTER DAVIS OF 60 DAVIS RD. WHO ALONG WITH HIS SON, WALTER S. DAVIS ARRIVED AT THE STORE AT APPROX. 0727 HRS. TO PURCHASE SOME ITEMS BEFORE GOING HUNTING. ACCORDING TO MR. DAVIS HE HOLLERED FOR MR. BRITT BECAUSE HE THOUGHT HE MAY HAVE BEEN IN THE BATHROOM. MR. DAVIS STATED THAT AS HE APPROACHED THE COUNTER HE OBSERVED A BODY LYING ON THE FLOOR BEHIND THE COUNTER MR. DAVIS STATED THAT HE THEN WENT OUTSIDE AND ADVISED HIS SON TO CALL THE POLICE.

LATER I INTERVIEWED CLOVIS HARDY WHO STATED HE OBSERVED A SILVER-GREY IN COLOR VEHICLE PARKED AT THE SOUTHEAST CORNER OF THE PARKING LOT. HARDY STATED THAT HE ALONG WITH HIS BROTHER JERRY HARDY WERE AT THE STORE BETWEEN THE HOURS OF 0659 AND 0710 HRS. MR. HARDY ALSO STATED THAT THE VEHICLE WAS PARKED THERE DURING THE ENTIRE PERIOD HE WAS INSIDE THE STORE.

I ALSO INTERVIEWED STEPHANIE GREY OF 4479A HWY 7 NORTH AN EMPLOYEE OF CROSS ROADS GROCERY WHO STATED THAT WHEN SHE LEFT SHE OBSERVED A GREY/SILVER VEHICLE PARKED IN THE PARKING LOT. WHEN QUESTIONED ABOUT THE OCCUPANCY OF THE VEHICLE MS. GREY ADVISED THAT SHE COULDN'T ADVISE WHO OR HOW MANY PEOPLE WERE INSIDE THE VEHICLE DUE TO THE DARK TINT WHICH WAS ON THE WINDOWS.

AFTER SPEAKING WITH MS. GREY I ALSO SPOKE WITH JERALD GATLIN, OWNER OF G&W STEEL BUILDINGS, WHO STATED

| ARRESTING OFFICER | BADGE NUMBER | REVIEWING SUPERVISOR |
|---|---|---|

## SUPPLEMENTAL REPORT

THAT EARLIER, APPROXIMATELY ONE WEEK AND A HALF AGO THERE HAD BEEN AN ATTEMPT TO ROB THE BUSINESS. MR. GATLIN INFORMED ME THAT HE HAD RECEIVED THIS INFORMATION FROM HIS SON, STEPHEN GATLIN, WHOM HAD RECEIVED THIS INFORMATION FROM (3)THREE EMPLOYEES OF G&W STEEL BUILDINGS A PAUL HUBBARD, LEWIS BROOKS AND HENRY ROSS, JR.

I CONTACTED HENRY ROSS VIA CELLPHONE AND ASKED HIM WOULD HE COME BY THE SHERIFF'S DEPT. TO ANSWER A FEW QUESTIONS. MR. ROSS CAME BY THE SHERIFF'S DEPT BEING ACCOMPANIED BY MR. PAUL L. HUBBARD. BOTH MR. HUBBARD AND MR. ROSS WERE ADVISED WHY THEY WERE WANTED FOR QUESTIONING, REFERRING TO AN OCCASION WHERE THEY ENCOUNTERED A COUPLE OF BLACK MALE SUBJECTS WHO WERE ABOUT TO ROB THE STORE (CROSS ROAD GROCERY. MR. HUBBARD AS WELL AS MR. ROSS STATED THEY REMEMBERED THE INCIDENT. MR. ROSS STATED THAT HE OBSERVED THE SUBJECTS ON (2) TWO DIFFERENT OCCASIONS. ONCE AT APPROX. 11:00 A.M. AND AGAIN AT 2:00 P.M. MR. ROSS STATED THAT HE ASKED ONE BLACK MALE THAT HE KNEW AS "NOOK" "NOOK" LATER IDENTIFIED AS QUINCY BULLINS WHAT WAS HE DOING THERE. ROSS STATED THAT BULLINS STATED THEY WERE ABOUT TO ROB THE PLACE. ROSS STATED THAT BULLINS WAS ACCOMPANIED BY ANOTHER BLACK MALE DESCRIBED AS BEING DARK COMPLEXED, LOW HAIR APPROX. 5 FT 9 IN. IN HEIGHT AND A LIGHT COMPLEXED BLACK MALE WHO WAS STANDING BESIDE A VEHICLE THAT

| ARRESTING OFFICER | BADGE NUMBER | REVIEWING SUPERVISOR |
|---|---|---|

## SUPPLEMENTAL REPORT

WAS PARKED ON THE ROADWAY (SCENIC LOOP 333) WITH THE HOOD AND FLASHERS ON. MR. HUBBARD COLLABARATED MR. ROSS'S STATEMENT ADDING THAT HE KNEW BULLINS AND THAT HE ADVISED BULLINS TO LEAVE BECAUSE OF THE CONSEQUENCES OF HIS ACTIONS. HUBBARD STATED THAT HE TOLD BULLINS HE COULD BE DEAD OR GET CAUGHT THUS SPENDING HIS LIFE IN PRISON

INVESTIGATION CONTINUES

| ARRESTING OFFICER | BADGE NUMBER | REVIEWING SUPERVISOR |
|---|---|---|
| C. Conley | 50-31 | |

7 Nov 2001
1415 hr.

On this date 7 Nov 2001 approved 1315 hrs.. My self and SO80 Steve Howell was watching Terry Pitchford on the south of the house. His Mother came by him and ask if he had been to the store, He said he went there to get a Sausage & Biscuit and there was some people there and he did not know who they were. He went after the Sausage & biscuit for himself and his son. The address was 7651 Sevai lway 333

Jake Moore
SO2d

I Shirley Jackson Give OFFICER Conley
CONSENT TO SEARCH MY VEHICLE TAG No 927 GHN

TAG #927 GHN


Shirley Jenkins

WITNESS
CARVER Conley
TIME 1430 HRS

Case: 4:18-cv-00002-MPM Doc #: 38-1 Filed: 09/18/18 63 of 338 PageID #: 1066



# Technical Assistance Section
## NOTES PAGE

Initials: _mw_
Date: _11/7/04_

MCL # __04-15153__     Agency Case # __2004 110323__     Page __1__ of __9__
Analyst: __C. NETHERY mw 11/7/04__
__D. ZELIZZ DZ 11/17/04__

**Initial Notification:**

| | | |
|---|---|---|
| Time: 1800 | Date: 07 NOV 04 | |

Notified by (Mark one): MHP     MIB     Police     (Sheriff)

Notified by: Name __ADAM EUBANKS__     Title: __INVESTIGATOR__

Response Call Back: Date: _____     Time: _____

Agency Name: __GRENADA COUNTY S.O.__     Title: _____

Officer in Charge: __ADAM EUBANKS__

City: __GRENADA__     County: __GRENADA__

Offense: __DEATH INVESTIGATION__     Offense Date/Time: __07 NOV 04__

Report To: __ADAM EUBANKS__     mw 11/7/04

Telephone: __(662) 226 2121__ Cell: __(662) 227 2971__     Pager: _____

Senior Analyst: __DAVID ZELIZZ__     Title: __SECTION CHIEF__ BV/(KN)/MER/BLX

Secondary Analyst: __CLARE NETHERY__     Title: __SECONDARY__ BV/(KN)/MER/BLX

Depart Lab: __R&O__     Arrived on Scene: __2040__     Date: __07 NOV 04__

Depart Scene: __0850__     Arrived at Lab: __2000__     Date: __08 NOV 04__

**Personnel Assignment:**

Photographed by: __D. ZELIZZ__     Title: __SECTION CHIEF__

35mm: Yes /(No)     Digital (Yes)/ No     Polaroid: Yes /(No)

Video by: __N/A__     Title: _____

**Crime Scene – Arrival:**

Outside Temp: __60-65°__

Weather Conditions (Circle, which apply): Drizzle / Rain / Snow / Sleet /(Clear)/ Cloudy / Overcast / Fog

Natural Light Conditions (Circle, which apply): Dawn / Daylight / Dusk /(Night)

Moon: ¼  ½  Full  None

Visibility: __CLEAR__

Weather previous 24 hours: __CLEAR__

Technical Review ___(F)___ Date __12/15/05__ PAGE __7__ OF __18__ PAGES

TASNP1-011504

App.0387 298



# Technical Assistance Section
# NOTES PAGE

Initials: _m a_
Date: _11/7/04_

MCL # _04-15153_  Agency Case # _2004110323_  Page _2_ of _9_
Analyst: _C. NETHERY ma 11/7/04_
_D. ZELITT RZ 11/7/04_

**Law Enforcement Personnel Present At Crime Scene:**

| | Name | Agency |
|---|---|---|
| 1. | ADAM EUBANKS | GRENADA S.O. |
| 2. | CHRIS McCAIN | " |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |

**Coroner/Medical Examiner/Medical Personnel & Agency:** _N/A_

| | |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |

~~Body Released to:~~                                Time:

_BODY WAS RELEASED PRIOR TO ARRIVAL OF MCL_

Was first aid attempted on victim by law enforcement personnel/witness/medical personnel:  Yes / No

If Yes, Describe:

Technical Review _ C _ Date _12/15/05_  PAGE _8_ OF _18_ PAGES



# Technical Assistance Section
# NOTES PAGE

Initials: _ama_
Date: _11/7/04_

MCL # _04-15153_          Agency Case # _2004110323_          Page _3_ of _9_
Analyst: _C. NETHERY ana 11/7/04_
_D. ZELITT SDB 11/7/04_

**Crime Scene Exam (Indoor):**

Type of Area (Circle One): Residential / Rural / (Commercial) Recreation / Open Field / Other

If Other, Describe:

Common Name of Area: _CROSSROADS GROCERY_

Nearest Building / Landmark:

Describe Terrain: _FLAT_

Crime Scene Search Authority Obtained: Time: _UNK_     Date: _11/7/04_

Obtained by: _GRENADA S.O._          Title:

Exact Address: _4489 HWY 7 NORTH_

City: _GRENADA_     County: _GRENADA_     State: _MS_

Family Housing (Circle One): Single / Multi-Family / Mobile Home / Apartment / Other:

Commercial Building (Circle One) (Convenience Store) Motel / Hotel / Other:

Occupant / Owner: _R.L. McDANIEL ama 11/18/04_
_RUBIN L. PRITT_

**Initial Observations:**

Crime Scene is located on the _1st_ floor of a _1_ story structure.

Building constructed of _CORRUGATED TIN_ and _WOOD_

Number of persons occupying house/room:

Exact location of crime scene inside the building:

Inside Temp:          Was Building/Room secure? Yes / No; Describe:

Could lock have been locked from outside? Yes / No; Type of lock: _N/A_

Was screen door/storm door/windows locked from inside? Yes / No _N/A_

Lights: On / Off.   VCR: On / Off;   Tape in VCR? Yes / No;  Radio: On / Off, Stereo: On / Off;

Heat: On / Off,   Air: On / Off,   Fan: On / Off     _N/A_

Electro-static dust print lifter: Yes / (No) Latent prints developed: Yes / (No) U-V Light: Yes / No;

Poly Light: Yes / No

Were any pets present? Yes / (No) If Yes; Type(s):

Telephone: Yes / No;  Answering machine (Any messages, # messages, dates & time) Yes / No _N/A_

Any valuables missing? Yes / No;  If Yes, describe: . _N/A_

Unusual smells?

Mail in Mail-box: Yes / No; If Yes, Earliest Date: _N/N_

Technical Review ___(C)___     Date _12/15/05_  PAGE _9_ OF _18_ PAGES          300



# Technical Assistance Section
# NOTES PAGE

Initials: _mco_
Date: _11/7/04_

MCL # __04-15153__      Agency Case # __2004110323__      Page __4__ of __9__

Analyst: __C. NETHERY  unc 11/7/04__
__D. ZELITT  DZ 11/7/04__

Newspapers on lawn or in box: Yes / No; If Yes, What date: __N/A__

Food dishes from victims last meal? Yes / No; If Yes, how many settings? __N/A__

Describe:

Beds Made: Yes / No; Describe: __N/A__

Weapon(s) brought to scene: (Yes) No; Type: __.22 + .38 HANDGUNS__

Signs of struggle noted: Yes / No; If yes, Describe:

Indications that suspect remained at location following assault: (Yes)/ No: Describe:
__BROKEN GLASS IN GAME MACHINE, MONEY IN REGISTER GONE__

Property obviously missing from scene: Yes / No; __N/A__

Other negative evidence noted: Yes / No; Describe: __N/A__

Evidence of other crime: (Robbery)/ Rape / Burglary / Arson / Other:

Search Beyond Crime Scene: __SEARCHED FULL LOT THAT GROCERY STORE
IS ON, BUT DID NOT LOCATE ANYTHING OF VALUE.__

## Entry

Normal Entrance/Exit Located: __NORTH SIDE OF BLD__ Describe: __FRONT DOOR__

Alarms: (Yes) / No, If Yes were they activated: Yes / No; Any efforts to disable alarm: Yes / No __UNK__

Forced Entry: Yes / (No) Could victim have allowed entry: (Yes)/ No; Describe:
__DOOR TO STORE WAS UNLOCKED DURING BUSINESS HOURS.__

How did person making discovery enter: __THROUGH FRONT DOOR__

Indications of multiple vehicle(s) or person(s)? (Yes)/ No; __MULTIPLE ASSAILANTS__

Described overall crime scene area:
__RURAL AREA - DARK AT NIGHT, WELL LIT DURING
DAY. CONSISTS OF SMALL CONVENIENCE STORE W/ GAS
PUMPS, OFFERS FISHING + BAIT SUPPLIES.__

Technical Review _____(J)_____ Date __12/15/05__ PAGE __10__ OF __18__ PAGES

__301__



# Technical Assistance Section
# NOTES PAGE

Initials: _m w_
Date: _11/7/04_

MCL # _04-15153_                          Agency Case # _2004 110323_     Page _5_ of _9_
Analyst: _C. NETHERY_  _mw 11/7/04_
_D. ZELITT_  _bg 11/7/04_

**Crime Scene Exam (Outdoor):**

Nearest Street Name: _HWY 7 NORTH + HIGHWAY 333_

Nearest Available Light: _STREET LIGHT BEHIND STORE_   Type:

Was light working? (Yes) No

Type of road (Circle One) (Black top) / Dirt / Gravel / Trail / Fire Break / Other:

Road conditions (Circle One) (Dry) Dusty / Oiled / Wet / Muddy / Snow / Ice / Other:

If other, Describe:

**Collection of Evidence:**

Tire Casts:  Yes / (No;) Description of tracks:  Width          ;Length          ft; Depth

Type of tire:                    Consistent with any vehicles found?  Yes / No

Footwear Casts:  Yes / (No;) Type of shoe:

Soil Samples:  Yes / (No;) Standards:  Yes / (No;) Vegetation:  Yes (No)

Pornographic materials found at scene:  Yes / (No) If Yes, Describe:

Search beyond crime scene:

_SEARCHED LOT AROUND STORE, BUT DID NOT
LOCATE ANYTHING OF INTEREST._

Technical Review ___(S)___ Date _12/15/05_  PAGE _11_ OF _19_ PAGES

TASNP1-011504

App.039 **302**



# Technical Assistance Section
# NOTES PAGE

Initials: _cncw_
Date: _11/7/04_

MCL # _04-15153_          Agency Case # _2004 110 323_     Page _7_ of _9_

Analyst: _C. NETHERLY_ _cncw 11/7/04_
_D. ZELITT_ _DZ 11/7/04_

| | |
|---|---|
| Rigor Present:  Yes / No;  Livor Mortis Present:  Yes / No;  Decomposition/Discoloration:  Yes / No | |
| Remarks: | N/A |
| Insects/Larva present:  Yes / No; If Yes, Type:          Location: | |
| Insect/Animal Damage:  Yes / No; Describe: | |
| Antomology collection report completed:  Yes / No | |
| GSR conducted on victim:  Yes / No; Victim hands bagged:  Yes / No | |
| Broken Nails/Hairs/Fibers/Objects in hands?  Yes / No; Describe: | |
| Possible self inflicted  wounds/Hesitation marks:  Yes / No; Describe: | |
| Suicide notes:  Yes / No; Describe: | |
| Victim Bound:  Yes / No; If Yes, Circle all that apply:  Mouth / Hands / Feet | |
| Bond Type:  Rope / Leather / Handcuff / Tape / Plastic / Other.  If Other, Describe: | |
| Escape Mechanism in place:  Yes / No; Describe: | |
| Items Protruding from/Inserted into body:  Yes / No; Describe: | |
| Staging Present:  Yes / No; Describe: | |

Technical Review ___(S)___ Date _12/15/05_  PAGE _13_ OF _18_ PAGES

TASNP1-011504



# Technical Assistance Section
## NOTES PAGE

Initials: _uncw_
Date: _11/7/04_

MCL #: 04 - 15153
Analyst: C. NETHERY _yuw 11/7/04_
D. ZELIFF _11/7/04_

Page 1 of 3

| Date | Notes |
|------|-------|
| 11/7/04 2040 | DAVID ZELIFF + CLARE NETHERY w/ MCL JACKSON ARRIVED ON SCENE. SCENE IS AT 4489 HWY 7 NORTH AND IS KNOWN AS CROSSROADS GROCERY. THE BUILDING IS DESCRIBED AS A ONE STORY COMMERCIAL STRUCTURE |
| GRENADA S.O. CASE #: 2004110323 | (CONVENIENCE STORE) MADE OF CORRUGATED TIN SHEETS AND WOOD W/ A SLAB FLOOR OF CONCRETE. THE STORE HAS TWO GASOLINE PUMPS IN FRONT PARKING LOT. FRONT OF THE BUILDING FACES NORTH. |
| *NOTE* VICTIM WAS LATER IDENTIFIED AS RUBIN L. BRITT. McDANIEL WAS A CUSTOMER. _uncw 11/18/04_ | ADAM EUBANKS OF GRENADA S.O. ARRIVED ON SCENE SHORTLY AFTER 2040 AND GAVE A SHORT BRIEFING; STATED THAT THE VICTIM / LEASEE OF THE STORE R.L. McDANIEL w/m, CAME TO WORK THIS MORNING. AROUND 0730 - 0745 A CUSTOMER CAME IN AND FOUND THE VIC. LYING ON THE FLOOR BEHIND THE FRONT COUNTER. ONE CASH REGISTER WAS TAKEN, THE OTHER ONE WAS BROKEN INTO. A GAME MACHINE IN THE REAR OF THE STORE THAT CONTAINED A LARGE AMOUNT OF CHANGE AND AT LEAST ONE $100 BILL WAS BROKEN AND THE MONEY WAS GONE. SHATTERED GLASS WAS FOUND IN THE MACHINE + ON THE FLOOR. EUBANKS STATED THAT SEVERAL SHELL CASINGS WERE RECOVERED, BOTH .22 CASINGS AND 38 CASINGS (4 ROUNDS SHOT + 1 ROUND STILL LIVE IN WEAPON) WERE RECOVERED. GRENADA S.O. PROCESSED THE SCENE w/ PHOTOGRAPHS AND DUSTING PRINTS, AND ALSO COLLECTING THE 22 SHELL CASINGS. EUBANKS REQUESTS THAT MCL DO A PARTIAL SCENE PROCESSING - SPECIFICALLY TO LOOK FOR PROJECTILES. |

Technical Review ☜ Date 10/15/05 PAGE 16 OF 18 PAGES

TASNP3-011504

App.0393

Case 4:18-cv-00002-MPM Doc # 38-1 Filed: 09/18/18 70 of 338 PageID #: 1073



# Technical Assistance Section
# NOTES PAGE

Initials: mw
Date: 11/7/04

MCL #: CU - 15153
Analyst: C. NETHERY mw 11/7/04
         D. ELLITT sk 11/7/04

Page 2 of 3

| Date | Notes |
|------|-------|
| 11/7/04 | |
| 2116 | GLASS FROM GAME MACHINE WAS COLLECTED. |
| 2121 | ONE 22 SHELL CASING IS LOCATED ON THE FLOOR NEAR THE COOLER BEHIND THE CASHIER COUNTER. |
| 2149 | A SEARCH TURNED UP NUMEROUS PELLETS AND BLUE PLASTIC FRAGMENTS ON THE FLOOR AROUND WHERE BODY WAS LOCATED. A BLACK IN COLOR HAIR WAS ALSO FOUND IN THIS AREA. |
| | LOOKING AT THE FRONT OF THE STORE (STORE FRONT FACES NORTH) THERE ARE THREE WINDOWS + ONE DOOR. THE FRONT DOOR ALSO HAS A STORM DOOR. UPON ENTERING THE STORE, TO THE WEST THERE ARE TWO AISLES CONTAINING SHELVING W/ VARIOUS FOOD + CONVENIENCE ITEMS. COOLERS LINE THE NORTH WALL IN THIS AREA AND BUILT IN BEER COOLERS LINE THE WEST WALL. THERE IS A MEN'S + LADIES REST ROOM ON THE SOUTH WALL, W/ A SMALL STORAGE AREA. THERE ARE TWO WINDOWS ON THE SOUTH WALL. TO THE EAST, UPON ENTERING, IS THE CASHIER'S COUNTER + WORK AREA, A COOLER W/ LUNCHEON MEATS, A KITCHEN-TYPE AREA TO PREPARE FOOD W/ A SINK. TO THE SOUTH, ON THE EAST SIDE ARE TWO TABLES W/ CHAIRS AND A BAIT AREA W/ MINNOW TANK. THERE ARE TWO GAME MACHINES (ONE W/ STUFFED ANIMALS + ONE BROKEN THAT HAD MONEY IN IT). THE COVER FOR THE STUFFED ANIMAL GAME IS OPEN. THE WALLS BEHIND THE CASHIER AREA, AS WELL AS THE CEILING, WERE SEARCHED, BUT NO PROJECTILES LARGER THAN A PELLET WERE LOCATED. SCENE WAS SECURED BY LOCK BY GRENADA S.O. CLEARED SCENE AT 2230 HRS. |

Technical Review (S) Date 12/15/05 PAGE 17 OF 18 PAGES

TASNP3-011504

# Technical Assistance Section
## NOTES PAGE

Initials: _MCW_
Date: _11/7/04_

MCL # __04-15153__
Analyst: __C. NETHERY mcw 11/8/04__
__D. ZELIFF soy 11/8/04__

Page __3__ of __3__

| Date | Notes |
|------|-------|
| 11/8/04 0740 | ARRIVED AT SCENE (CONVENIENCE STORE) TO TAKE PICTURES, DO A SEARCH OUTSIDE THE SCENE AND TO DO ANOTHER SEARCH W/I THE BUILDING TO TRY TO LOCATE ANY ADDITIONAL EVIDENCE. ZELIFF IS TAKING PHOTOGRAPHS. |
| | ONE PIECE OF IN-TACT BLUE PLASTIC -IN THE SHAPE OF A CYLINDER W/A FLAT BASE - WAS FOUND TO THE NORTHEAST OF THE GAS PUMPS. IT WAS PHOTOGRAPHED. UPON MANUAL INSPECTION, IT WAS DISCOVERED TO NOT BE CONSISTENT W/ THE FRAGMENTS FOUND INSIDE THE STORE. THIS ITEM WAS NOT COLLECTED. |
| mcw 11/8/04 REAR GAME AREA OF STORE (SW CORNER) WAS SEARCHED, ← BUT APPEARS SECURE. CONTAINS GAMBLING-TYPE VIDEO GAMES. | ADAM EUBANKS W/ GRENADA S.O. ARRIVED ON SCENE AROUND 0810. HE LET MCL INTO THE STORE. ON FURTHER INSPECTION OF THE CASHIER AREA, ZELIFF LOCATED SEVERAL MORE BLUE PLASTIC FRAGMENTS ON A SHELF BEHIND THE COUNTER. THESE WERE |
| 0827 | COLLECTED TOGETHER. |
| 0830 | THE SEARCH BEYOND THE SCENE DID NOT RECOVER ANY ADDITIONAL EVIDENCE. SCENE SECURED BY LOCK BY GRENADA S.O. |
| 0850 | SCENE CLEARED |

Technical Review ___⑤___ Date _12/15/05_ PAGE _18_ OF _18_ PAGES

TASNP3-011504  306

App.0395 _replaced_

GRENADA COUNTY SHERIFF'S

UNDERLYING FACTS SHEET'S REGARDING; Armed Robbery and Murder

On 7 Nov 04, Grenada County (EOC) called Officer Carver Conley,Officer Miller and Officer Eubank to go to Crossroad Grocery to a shooting.Officer Conley told Me when he got there he found a white male in the store lying in a pool of blood. The body was identified as R.L.Britt the person that ran the store. The call time Was 0734 on the 7 Nov04, Officer Conley arrived at 0742. The items that was taken was a cash register.
I (Officer Greg Conley) begin to investigate this matter,I found a white male lying In the store with two differt types of gun shot wounds. In the store there was a trail of spent 22 cal. casing. In the victim back I could see that he was shoot in the back. Around the stomach area he was shot with something with little small Pebbles. I later found out that one of Stephen Gatlin worker have told him that About a week and half ago Lewis Brooks told him that some boys was out back Of the store one day wait to rob the store. I talk to Paul Hubbard,Henry RossJr. And Lewis Brooks,they all told me that about a week and half ago when they Go in around 2:00 pm two boys were in front of the G&W Steel building and one Was sitting on the trunk of a silver car. The two boys that was in front of the store Had pistol in there hands. They asked the boys what was they about to do and Quincy Bullins told them that they about to hit the store. Paul and Henry told me That they told the boys they better get there butt away from there before they Got shot or be put in jail for life. They stated that the boys left. I talk to Quincy and he told me the same thing. I found out from Quincy that the other boys was Demarcus Westmoreland,and Terry Pitchford. I spoked to Demarcus and he Told me the same store as Quincy. Terry told me that they was there but he did Not know what the guys was getting ready to do.
I was given permission to search Terry car by his mother because her name is on the car also. While searching the car I found a 38 cal. pistol under the driver Seat. It had 5 rounds in it 4 of the rounds had been fired. I check the gun and Found out the rounds was rat shots. The gun had a small amount of blood on It. Terry car was seen at the store that morning and he told me that he did go To the store early that morning alone with Eric Bullins. He told me that Eric had Spent the night with him. I later talk with Eric and he told me that they got around 6:00 am on the 7 Nov 04 and that Terry took him home. Then he later told me that they went to the store and he bought two sausage and biscuit.
Other witness seen Terry car leave and enter the store numerous times early On the 7Nov 04.
Later the Mississippi crime lab. arrived , they begun to process the crime

Scene. Were the body was found at the store ,there was numerous part of rat shot found on the floor. The rat shot match the rat shot that was found in the Gun that was in Terry car.

OFFICER_____

SWORN BEFORE ME THIS THE___DAY OF _____2004

JUSTICE COURT CLERK_____

# EVIDENCE RECOVERY LOG

LOCATION:  Grenada Sheriff's Office Impound Area  Grenada, MS
DATE:  08 November 2004
CASE IDENTIFIER:  04-015153
PREPARER/ASSISTANTS:  Clare Nethery *uua 11/8/04*
David Zeliff *DZ 11/8/04*

PAGE _____ OF _____

PERSONNEL: _____
_____
_____
_____

| ITEM # | TIME | DESCRIPTION | LOCATION | PACKAGING METHOD | COLLECTED BY |
|---|---|---|---|---|---|
| 1 | 1515 | (2) Latent lift cards | Exterior of vehicle | Paper Bag | DJZ |
| 2 | 1545 | (4) Druggist folds containing Post-It notes with hair and fibers | Front seat area of vehicle | Paper Bag | DJZ |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| * | | | | | |

Page 1 of 12 Pages

Date: 10/15/05

Initiatls (Tech Rev): ____

TASERL011504

App.0398

# EVIDENCE RECOVERY LOG

LOCATION: _MERCURY GRAND MARQUIS - GRENADA S.O. IMPOUND_
DATE: _08 NOV 04_
CASE IDENTIFIER: _04-15153_
PREPARER/ASSISTANTS: _C. NETHERY Ing. 11/8/04_
_D. ZELIFF 88g 11/8/04_

PAGE _____ OF _____

PERSONNEL: _____
_____
_____
_____

| ITEM # | TIME | DESCRIPTION | LOCATION | PACKAGING METHOD | COLLECTED BY |
|---|---|---|---|---|---|
| 1 | 1515 | (2) LATENT LIFT CARDS | EXTERIOR OF VEHICLE | PAPER BAG | DJZ |
| 2 | 1545 | (4) DRUGGIST FOLDS CONTAINING POST-IT | — | — | — |
| — | — | NOTES w/ HAIR + FIBERS | FRONT SEAT AREA OF VEHICLE | PAPER BAG | DJZ |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| * | | | | | |

313

Page ____ of __12__ Pages

Date: _12/15/05_

Intials (Tech Rev): ____

# EVIDENCE RECOVERY LOG

LOCATION: __Grenada County Sheriff's Office_____

DATE: _11/08/2004_____

CASE IDENTIFIER: 04-015153_____

PREPARER/ASSISTANTS: _David Zeliff ___ 11/8/04_____
                      Clare Nethery ___ 11/8/04_____

PAGE _____ OF __

PERSONNEL: _____

314

| ITEM # | TIME | DESCRIPTION | LOCATION | PACKAGING METHOD | COLLECTED BY |
|---|---|---|---|---|---|
| 1 | 0930 | 1) 38 Special Revolver Serial # 78088 bearing suspected blood stains | Grenada SO | Cardboard Box | Greg Conley |
| 2 | 0938 | 1) Live round from 38 Revolver | Grenada SO | Cardboard Box | Greg Conley |
| 3 | 0939 | 1) Spent Casing from 38 Revolver | Grenada SO | Cardboard Box | Greg Conley |
| 4 | 0940 | 1) Spent Casing from 38 Revolver | Grenada SO | Cardboard Box | Greg Conley |
| 5 | 940 | 1) Spent Casing from 38 Revolver | Grenada SO | Cardboard Box | Greg Conley |
| 6 | 0941 | 1) Spent Casing from 38 Revolver | Grenada SO | Cardboard Box | Greg Conley |
| 7 | 1106 | 4) Manila Env. Each containing one cartridge case from .22 Cal | Grenada SO | Paper Bag | Greg Conley |
| 8 | 1108 | 1) Black leather Holster | Grenada SO | Paper Bag | Greg Conley |
| 9 | 1111 | 1) Folding knife inside leather holder | Grenada SO | Cardboard Box | Greg Conley |
| 10 | 1124 | 1) Sm Cardboard box containing numerous rocks w/ suspected blood stains | Grenada SO | Paper Bag | Greg Conley |
| 11 | 1126 | 2) Wrappers w/ Blood stains by light pole | Grenada SO | Paper Bag | Greg Conley |
| 12 | 1129 | Several Latent lift cards from scene | Grenada SO | Manila Envelope | Greg Conley |
| 13 | 1132 | 1) Manila envelope containing one cigarette butt | Grenada SO | Paper Bag | Greg Conley |
| 14 | 1345 | 1) Right Shoe - White Reebok Classic from suspect Terry Pitchfork w/ stains | Grenada SO | Paper Bag | Greg Conley |
| 15 | 1347 | 1) Left Shoe - White Reebok Classic from suspect Terry Pitchfork w/ stains | Grenada SO | Paper Bag | Greg Conley |
| 16 | 1350 | 1) Red T-Shirt collected from suspect Terry Pitchfork | Grenada SO | Paper Bag | Greg Conley |
| 17 | 1400 | 1) Pair of gray sweat pants collected from suspect Terry Pitchfork | Grenada SO | Paper Bag | Greg Conley |
| 18 | | Terry Pitchfork - known prints | Grenada SO | Manila Envelope | Greg Conley |
| | | Eric Bullin - known prints | Grenada SO | Manila Envelope | Greg Conley |
| | | Quincy Bullin - known prints | Grenada SO | Manila Envelope | Greg Conley |
| | | Marquis Westmoreland - known prints | Grenada SO | Manila Envelope | Greg Conley |
| * | | | | | |

TASERL011504

App.0400

# EVIDENCE RECOVERY LOG

LOCATION: GRENADA COUNTY SHERIFF OFFICE
DATE: 08 NOV 04
CASE IDENTIFIER: 04-15153
PREPARER/ASSISTANTS: C. NETHERY wvc 11/8/04
D. ZELIFF DZ 11/8/04

PAGE _____ OF _____

PERSONNEL:
_____
_____
_____
_____

315

Page 4 of 12 Pages

| ITEM # | TIME | DESCRIPTION | LOCATION | PACKAGING METHOD | COLLECTED BY |
|---|---|---|---|---|---|
| 1 | 0930 | (1) 38 SPEIAL REVOLVER SERIAL # 78088 BEARING SUSP. BLOOD STAINS | GRENADA S.O. | CARDBOARD BOX | GREG CONLEY |
| 2 | 0938 | (1) LIVE ROUND FROM 38 REVOLVER | GRENADA S.O. | " | " |
| 3 | 0939 | (1) SPENT CASING FROM 38 REVOLVER | " | " | " |
| 4 | 0940 | (1) SPENT CASING FROM 38 REVOLVER | " | " | " |
| 5 | 0940 | (1) SPENT CASING FROM 38 REVOLVER | " | " | " |
| 6 | 0941 | (1) SPENT CASING FROM 38 REVOLVER | " | " | " |
| 7 | 1010 | (4) MANILA ENV. EACH CONTAINING ONE CARTRIDGE CASE FROM 22 CAL. | " | PAPER BAG | " |
| 8 | 1108 | (1) BLACK LEATHER HOLSTER | " | | " |
| 9 | 1111 | (1) FOLDING KNIFE INSIDE LEATHER HOLDER | " | CARDBOARD BOX | " |
| 10 | 1124 | (1) S.N. CARDBOARD BOX CONTAINING NUMEROUS ROCKS W/ SUSPECTED BLOOD STAINS. | " | PAPER BAG | " |
| 11 | 1120 | (2) WRAPPERS W/ BLOOD STAINS BY LIGHT POLE | " | PAPER BAG | " |
| 12 | 1129 | SEVERAL LATENT LIFT CARDS FROM SCENE | " | MANILA ENV. | " |
| 13 | 1132 | (1) MANILA ENV. CONTAINING ONE CIGARETTE BUTT | " | PAPER BAG | " |
| 14 | 1345 | (1) RIGHT SHOE - WHITE REEBOK CLASSIC FROM SUSPECT TERRY PITCHFORK W/STAINS | " | " | " |
| 15 | 1347 | (1) LEFT SHOE - WHITE REEBOK CLASSIC FROM SUSPECT TERRY PITCHFORK W/STAINS | " | " | " |
| 16 | 1350 | (1) RED T-SHIRT COLLECTED FROM SUSPECT TERRY PITCHFORK. | " | " | " |
| 17 | 1400 | (1) PAIR OF GRAY SWEATPANTS COLLECTED FROM SUSPECT TERRY PITCHFORK | " | " | " |
| 18 | | TERRY PITCHFORD - KNOWN PRINTS | " | MANILA ENV | " |
| 19 | | ERIC BULLIN - KNOWN PRINTS | " | " | " |
| 20 | | QUINCY BULLIN - KNOWN PRINTS | " | " | " |
| *21 | | MARQUIS WESTMORELAND - KNOWN PRINTS | " | | |

EVIDENCE RELEASED BY: GREG CONLEY - GRENADA S.O.
Greg Conley 8 Nov 04

EVIDENCE RECEIVED BY: CLARE NETHERY - MCL JXN
11/8/04

Date: _____
Initialls (Tech Rev): _____

TASERI011504
MBP0401

# OFFENCE REPORT

On 11-8-04 I, went to the Grenada Sheriffs Office in reference to a Capital Murder that had occurred on Sunday morning. The clerk at the Crossroads Grocery was found murdered sometime around 7:00am Witnesses indicated that a car with dark tented windows had been seen several times at the store that morning. The owner of the car lived approximately ½ mile from the store. This was a Terry Pitchford and Eric Bullen. Both individuals had been interviewed about the robbery Homicide and denied any knowledge .

I spoke with Terry Pitchford first and after talking for a little bit he stated that he wanted to make a confession. I stated Ok but that I wanted the Sheriffs Investigator to be present . I summoned Greg Connley and he then placed a tape in the recorder and we began talking about what he wanted to say. He admitted that he and Eric went to the store with the intent to rob the store and he admitted that he had his gun on him but he chickened out. They bought sausage and biscuits and left. He stated that that did not return after that. He stated that that was all he knew.
Connley left out of the room and I began prepareing the Polygraph to give him a Polygraph Test. While explaining some of the procedure to Terry I noted that he began to cry. I asked what was wrong and he stated I have never been in trouble before. I asked him if there was more he wanted to tell me and he stated I prayed all night. I stated that's good. If there's more you need to tell me before the test because If you lie to any of the questions it will show it.

He then stated that he and Eric returned to the store and walked around the counter and Eric immediately shot. He stated that he fired several times and was saying he's got a gun. At that point the man fell and Eric turned to me saying you gonna do it and I then shot about three times. He further stated that he fired into the floor. He stated that they got the register but did not see if Eric picked up a gun. Terry stated he then took Eric to a road close to his house and let him out. He said he told Eric to take all of it that he didn't want anything to do with it.

# OFFENCE REPORT

I then recorded what Terry had told me. I also took some hand written notes.

I then received information that Eric wanted to take a Polygraph test. He was brought in and I advised Eric of his Miranda Rights and also explained the Polygraph. I wrote a series of 15 questions and read them to Eric. He stated that he understood. And that he had nothing to do with the robbery. He did state that Terry had took him home around 7:00am and that he returned a little later with two guns and the cash register in the car Eric said that his cousin Eddie Johnson saw this. He also said that he thought that Terry had borrowed a gun from Denton Mitchell.

The following relevant questions were asked and Eric showed deception to all questions on both tests ran.

Did you plan and conspire with anyone to rob Crossroads Groc Sunday Morning?

Did you shoot the man at the Crossroads Groc. Sunday Morning?

Did you and Terry rob and shoot the man at the crossroads Grocery Sunday Morning?

Do you know for sure where the 22 and cash register are now?

As I stated he showed Deception to all these questions on both tests. It is my Opinion that Eric was lying during the test and that he is directly involved in the Robbery/Homicide.


Robert C. Jennings

016

App.0403

# OFFENCE REPORT

ON 11-16-04 I SPOKE TO STEPHANIE GREY WHO LIVES NEXT TO THE
CROSSROARDS GROCERY ON MISS. HWY. 7. MS GREY HAD WITNESSES
A VEHICLE SEVERAL TIMES AT THE STORE SUNDAY MORNING 11-7-04.
SHE DESCRIBED THE CAR AS LOOKING LIKE A POLICE CAR
UNMARKED WITH CROME WHEELS AND VERY CLEAN. THE CAR
ACCORDING TO HER HAD DARK TENTED WINDOWS AND SHE WAS
UNABLE TO SEE THE NUMBER OF SUBJECTS IN THE VEHICLE, SHE
STATED THAT SHE HAD LISTED THE TIMES SHE HAD OBSERVED THE
VEHICLE. I OBTAINED A COPY OF THIS FROM HER. SHE STATED THAT
SHE ALONG WITH A FRIEND SANDY TRUSTY , WERE ON HER PORCH
AND THAT IT WAS OBEVIOUS THAT THE SUBJECTS IN THE CAR WERE
WATCHING THEM. SHE STATED THAT SHE HAD GONE TO THE STORE
AND GOT $10.00 GAS AND ALSO JUST BEFORE SHE AND HER FRIEND
LEFT THEY GOT A SOFT DRINK. SHE STATED THAT AS THEY WERE
LEAVING SHE OBSERVED THE CAR PULLING INTO THE STORE FOR A
THIRD TIME. SHE NOTED THAT THE TIME WAS 7:20AM.

# OFFENCE REPORT

ON 11-17-04 I CALLED SANDY TRUSTY AT 226-4556, ADDRESS
BEING ON HUCLEBERRY RD.  SHE WAS NOT AT HOME AT THE
TIME BUT RETURNED THE CALL SHORTLY AFTERWARDS.
SHE HAD WITNESSED A VEHICLE AT THE CROSSROARDS
GROCERY ON SUNDAY NOVEMBER 7, 2004   SHE WAS WITH
STEPHANIE GREY WHO I HAD ALREADY SPOKEN TO.  MS
TRUSTY STATED THAT SHE AND STEPHANIE WERE ON
STEPHANIE'S BACK PORCH AND OBESERVED THE CAR
SEVERAL TIMES.  SHE FELT THAT THE OCCUPANT(S) WERE
WATCHING THEM   SHE DESCRIBED THE CAR AS LOOKING
LIKE A POLICE TYPE CAR GREY OR SILVER IN COLOR WITH
VERY SHINEY WHEELS.  SHE ALSO NOTED THAT THE
WINDOWS WERE TINTED REAL DARK.  SHE STATED THAT
THE TIMES WAS BETWEEN 6:30 TO 7:30 AM  SHE WAS EXACT
BUT KNEW STEPHANIE WAS PAYING MORE ATTENTION TO
THE TIMES.   SHE STATED THAT WHEN THEY LEFT
STEPHANIES TRAILER THE CAR PULLED IN AGAIN.  THEY
LATER LEARNED OF THE MURDER OF MR. BRITT.

014

# OFFENCE REPORT

On 11-8-04 I, went to the Grenada Sheriffs Office in reference to a Capital Murder that had occurred on Sunday morning. The clerk at the Crossroads Grocery was found murdered sometime around 7:00am Witnesses indicated that a car with dark tented windows had been seen several times at the store that morning. The owner of the car lived approximately ½ mile from the store. This was a Terry Pitchford and Eric Bullen. Both individuals had been interviewed about the robbery Homicide and denied any knowledge.

I spoke with Terry Pitchford first and after talking for a little bit he stated that he wanted to make a confession. I stated Ok but that I wanted the Sheriffs Investigator to be present. I summoned Greg Connley and he then placed a tape in the recorder and we began talking about what he wanted to say. He admitted that he and Eric went to the store with the intent to rob the store and he admitted that he had his gun on him but he chickened out. They bought sausage and biscuits and left. He stated that that did not return after that. He stated that that was all he knew.

Connley left out of the room and I began prepareing the Polygraph to give him a Polygraph Test. While explaining some of the procedure to Terry I noted that he began to cry. I asked what was wrong and he stated I have never been in trouble before. I asked him if there was more he wanted to tell me and he stated I prayed all night. I stated that's good. If there's more you need to tell me before the test because If you lie to any of the questions it will show it.

He then stated that he and Eric returned to the store and walked around the counter and Eric immediately shot. He stated that he fired several times and was saying he's got a gun. At that point the man fell and Eric turned to me saying you gonna do it and I then shot about three times. He further stated that he fired into the floor. He stated that they got the register but did not see if Eric picked up a gun. Terry stated he then took Eric to a road close to his house and let him out. He said he told Eric to take all of it that he didn't want anything to do with it.

# OFFENCE REPORT

I then recorded what Terry had told me. I also took some hand written notes.

I then received information that Eric wanted to take a Polygraph test. He was brought in and I advised Eric of his Miranda Rights and also explained the Polygraph. I wrote a series of 15 questions and read them to Eric. He stated that he understood. And that he had nothing to do with the robbery. He did state that Terry had took him home around 7:00am and that he returned a little later with two guns and the cash register in the car Eric said that his cousin Eddie Johnson saw this. He also said that he thought that Terry had borrowed a gun from Denton Mitchell.

The following relevant questions were asked and Eric showed deception to all questions on both tests ran.

Did you plan and conspire with anyone to rob Crossroads Groc Sunday Morning?

Did you shoot the man at the Crossroads Groc. Sunday Morning?

Did you and Terry rob and shoot the man at the crossroads Grocery Sunday Morning?

Do you know for sure where the 22 and cash register are now?

As I stated he showed Deception to all these questions on both tests. It is my Opinion that Eric was lying during the test and that he is directly involved in the Robbery/Homicide.


Robert C. Jennings



$3h°20'$

# MISSISSIPPI STATE HOSPITAL

## ADMISSION NOTE

Addressograph
SS# 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
30 Dec 85

1210 - 1325  Σ 15'
0950 - 1155 → 2h 05'

DATE: 11 Jan 06  NAME: Terry Pitchford    CASE # ~/a  RACE/SEX: AA ♂ AGE: ~~19~~ 20

PREVIOUS ADMISSION: ~/a

PREVIOUS DIAGNOSIS: ~/a

This information has been disclosed to you from records whose confidentiality is protected. Statutes/regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

CHIEF COMPLAINT:    (State in Patient's Own Words)

" ... this charge "

PRESENT ILLNESS: 1ST MSH contact, 1ST known forensic mental evaluation ᷐ instant offense, 1ST known mental health contact of any kind for this ~~19~~ 20 y/o, never married, African American man from Grenada County. CAUSE NO. 2005-009 CR Sent on a Grenada County Circuit Court Order, on a motion ore tenus " of the parties herein, for competency, sanity, constitutional rights, statutory mitigation, any mitigation, and Atkins. (Pt is authorized.) Reports to Court, defense, & DA (Cofer Carter) (Evans) Charges ᷐ a ? codefendant(s) of conspiring to rob, and (Eric Bullins) (David Westmoreland) of robbing and killing Reuben Britt, a store clerk ~ 7 Nov. 04.

AP. m Abilities ↑220 later

Arrested 7 Nov 04. No reported mental health or medical problems. "He has been involved in several disciplinary incidents." No suicidal or para-suicidal behavior reported.

Jail update 10 Jan 06 - No recent write-ups, No medical or mental health problems.

MSH-29 (06/2003)

App.0408

**MISSISSIPPI STATE HOSPITAL**
**Admission Note**
**Page 2**

---

**PSYCHIATRIC HISTORY:** No prior mental health problems or counselling. O.D. on pills @ 14 or 15 → Grenada Lake Medical Center → no mental health evaluation. No Hx of psychotic Sx. Δ reported seeing his fa. p̄ he died [15 acc. to Δ]

**SUBSTANCE USE/ABUSE:** ⊕ marijuana, maybe started @ 17. Mo. found alcohol in his room once. "My daddy used to give us beer when we was little kids."

**MEDICAL HISTORY:** C-section for twins, no perinatal problems, x̄ for surgery. No unusual medical problems, no overnight hospitalizations. [knocked out in football practice] "He was always slow." ⊼ loss of consciousness @ age 16 in jump out of jeep ~ 9 y/o. "voices told me to do it." Bike wreck. 2 MVA's p̄ L. of C. No seizures. ↑BP c̄ ll

**ALLERGIES:** NKDA

**MEDICATIONS:** Ø     No Hx of ever taking psychiatric ℞

This information has been disclosed to you from records whose confidentiality is protected. Statutes/regulations prohibit you from making further ... protected ... of the person to whom ... the or as otherwise permitted by such ... thorization for the release ... is not sufficient for this purpose. The ... restrict any use of this information to criminal ... investigate or prosecute any alcohol or drug patient (42 ...

**SURGICAL HISTORY:** Testicular surgery for torsion @ 14 or 15

**REVIEW OF SYSTEMS:** Losing wt. N-stat. Legs "sore" from working out yesterday.

**FAMILY HISTORY:** Father died at Δ age 10. Has a twin brother "Perry." Step-fa. was alcoholic; fought c̄ mother. Mo. was a school bus driver. M.U. used crack. M1st C MR. Mo. denied any MH problems in family. [MGF "died from drinkin' too much"] ["kidney cancer"]. Mo. called to school "all the time" for behavior problems.

**SOCIAL HISTORY:** 7th reg. Repeated 2nd and 4th grades. 50% in 6th. 70's in 8th grade. Went to alt. school "Capital City" in Jackson. Destroying school property. Expelled from school in April or "D-5" for threatening a teacher (Δ denies) → Job Corps. Threatening to bring a gun to school and kill people. Δ waskicked out p̄ 3 mo. Never married, 1 known child. GED ⊕ driver's license. Employed @ wholesale lumber co. Heathcraft, GED. 2nd try. Coach, deliver lumber. No military. No disability income. Baptist. Started @ G.E.D.

**FORENSIC Hx:** ⊕ youth court, stealing a cell phone, ~ 14 y/o → Y.C.

**MISSISSIPPI STATE HOSPITAL**
**Admission Note**
Page 3

TATOO ON ~~(1)~~ BOTH WRISTS → SON'S NAME

NO ABNORMAL MOVEMENTS OBSERVED

**GENERAL APPEARANCE & BEHAVIOR:** WD, WN, YOUNG ADULT AA MAN,
APPEARS SOMEWHAT YOUNGER THAN STATED AGE OF 20, NEATLY
GROOMED, SMALL MUSTACHE AND CHIN PATCH, POLITE

**STREAM OF THOUGHT / SPEECH:** SOFT-SPOKEN, RESPONSIVE TO ?,
RELEVANT, WELL-ORGANIZED SPEECH, NOT ACCELERATED
OR SLOWED IN RATE, NO L. of A. or F. of T

**AFFECT:** INITIALLY MILD ANXIOUS, NOT CONSTRICTED, OCC SMILES APPROPRIATELY

**MOOD:** " SAD, REALLY (R) " I'M DOING ALL

RIGHT. "

**THOUGHT CONTENT/PERCEPTION:** " ... VOICES IN MY HEAD ...
DIFFERENT IDEAS ... JUST A WHOLE BUNCH OF STUFF TELLING
ME TO DO DIFFERENT THINGS ... (VOICES SOMETIMES TELLING HIM
TO SLAP PEOPLE FOR NO REASON) SAW HIS fa's GHOST × T
~ 2 YEARS 5 HE DIED.

**LEVEL OF CONSCIOUSNESS:** FULLY AWAKE ALERT ATTENTIVE
NOT DISTRACTABLE OR INTERNALLY STIMULATED

**CONCENTRATION:** ADEQUATE TO INTERVIEW SITUATION

**ORIENTATION:** "WHITFIELD JACKSON MS, JAN 2006 " as→ THE FIRST OF THE MONTH
(a) " THE 11TH " → To SEE AM I
INDATE

**MEMORY:** RECALLS 3 PERSONS TO WHOM REPORT WILL BE
SENT 3/3 UNRELATED ITEMS @ 10 MINUTES
GROSSLY INTACT FOR RECENT AND REMOTE EVENTS

**INTELLIGENCE:** APPEARS CLINICALLY LOW AVERAGE

**ABSTRACT REASONING:** (DJABBIC) "DON'T JUDGE ME BY
WHAT YOU SEE. " FRUIT FURNITURE, WRITING INSTRUMENTS

**JUDGMENT:** IMPAIRED BY HX; IMPAIRED AT PRESENT E.G DESCRIBING
THOUGHTS AS "VOICES"

**INSIGHT:** (DO YOU THINK OF YOURSELF AS HAVING TROUBLE
WITH YOUR NERVES OR EMOTIONS?) "NO, SIR"

This information has been disclosed to you from records whose confidentiality is protected. Statutes/regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. Federal rules prohibit you from making any use of this information to criminally investigate or prosecute any alcohol or drug patient.

**MISSISSIPPI STATE HOSPITAL**
**Admission Note**
**Page 4**

SUICIDE/HOMICIDE RISK ASSESSMENT: (+) O.D ~ 5 hrs AGO ; DENIED

S.I. SINCE INCARCERATION    DENIES HOMICIDAL IDEATION

NEED FOR HOSPITALIZATION (Circle):    ACKNOWLEDGES FIGHTING IN JAIL

A.    Potential danger to self or others or destructive behavior.
B     Impaired reality testing accompanied by disordered behavior.
C.    Need for continuous psychiatric intervention, high dose medication or active rehabilitation
      program.
D.    Impaired social, family or occupational functioning.
E.    Legally mandated admission.
F.    Non-compliance or inadequate response to outpatient treatment.
G.    Substance abuse.
H.    Need for detoxification.
I.    Severe psychophysiological dysfunction presenting a health risk.
J.    Other_____

This information has been disclosed to you from records whose confidentiality is protected. Statutes/regulations prohibit you from making further disclosures of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by law. A general authorization for the release of medical or other information is not sufficient for this purpose. The federal rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

PROVISIONAL DIAGNOSIS:

AXIS I:    ① R/O MALINGERING (FABRICATING OR EXAGGERATING
           Sx OF PSYCHOSIS) ② CANNABIS ABUSE ③ CONDUCT DISORDER,   PRIOR HX

AXIS II:   DEFERRED

AXIS III:  NO DX

AXIS IV:   Psychological Stressors: PROBLEMS RELATED TO INTERACTION c̄ THE LEGAL
           Severity: SYSTEM ; FACING CAPITAL PUNISHMENT

AXIS V:    Highest level of adaptive functioning on admission:    81
           Highest level of adaptive functioning past year:

INITIAL PLAN OF TREATMENT: OUTPATIENT EVALUATION,

PSYCHOLOGICAL TESTING, URINE DRUG SCREEN

Pt WILL BE RETURNED TO THIS SERVICE TO

COMPLETE PSYCHOLOGICAL ASSESSMENT.

R.T. Picard MD / W. Criss Lott PhD          11 JAN 06
SIGNATURE                                    DATE    App.0411

```
0001
 1
 2
    TAPE RECORDED EVALUATION OF TERRY PITCHFORD
 3
 4      DR. LOTT:  Good morning.  Mr. Pitchford, I
 5  am Dr. Lott.  Let me make sure this tape recorder
 6  is going.  And then I'm going to ask everybody to
 7  introduce themselves.
 8      UNIDENTIFIED MALE SPEAKER:  It's on.
 9      DR. LOTT:  It's on.  And you understand, you
10  know why you're here.  You have an attorney
11  sitting beside you this morning.  We're going to
12  go around the room first and just introduce
13  ourselves.  And I've been under the weather so
14  pardon my voice.  If you can't hear me, just ask
15  me to repeat myself.
16      TERRY PITCHFORD:  Yes, sir.
17      DR. LOTT:  I'm Dr. Lott.  I am a
18  psychologist here doing consulting work.
19      DR. McMICHAEL:  Good morning.  I'm Dr.
20  McMichael.  I'm the psychiatrist who will be
21  doing the report this morning.  So I will
22  oftentimes be looking down.  It would be helpful
23  if you would speak up just so I can be sure that
24  I can hear you.
25      TERRY PITCHFORD:  Yes, sir.
```

1

0002
1     DR. McMICHAEL:  Thank you.
2     DR. MCMARR:  Good morning.  I'm Dr. McMarr,
3  a psychologist.
4     MALE SPEAKER:  I'm Ted Ewing.  I'm with
5  (inaudible).
6     MALE SPEAKER:  And I am Officer Dunbar.
7     MALE SPEAKER:  Joe Witzel, the (inaudible).
8     DR. LOTT:  All right.  And, I think, you
9  know Ms. O'Clarity.
10    UNIDENTIFIED MALE SPEAKER:  She asked about
11  the chair.  You are in a chair that is not
12  rolling around like this.  If that gets
13  uncomfortable or if you want a bigger chair, we
14  can do that.  We just don't want people to have
15  their chairs scoot out from underneath them and
16  fall down.
17    DR. LOTT:  All right.  Now, as you can see,
18  we have a tape recorder going here today and we
19  are making a tape of this interview.
20    TERRY PITCHFORD:  Yes, sir.
21    DR. LOTT:  Now, we want to explain to make
22  sure you understand a couple of things before we
23  get started.
24    TERRY PITCHFORD:  Yes, sir.
25    DR. LOTT:  Do you know why you're here this

0003

1    morning?

2        TERRY PITCHFORD:  I mean I know I'm at

3    Whitfield to see am I, you know, insane or

4    something like that.

5        DR. LOTT:  Okay.  That's part of it.  That's

6    part of the legal question.  The Court has asked

7    us to do approximately three things here.  It's

8    important that you understand what might happen

9    as a result of our evaluation.  You are here --

10   we're going to assess your mental state at the

11   time of an alleged offense, at the time of the

12   crime you're charged with.

13       We're also going to be asked to assess

14   whether or not you're able to work with your

15   lawyers, go to court.

16       We're also being asked to assess your

17   intellectual level, whether or not we think that

18   you are mentally retarded.

19       TERRY PITCHFORD:  Yes, sir.

20       DR. LOTT:  Now, there's a very important

21   reason why we're assessing mental retardation and

22   these other issues, but particularly mental

23   retardation.  What are you charged with?

24       TERRY PITCHFORD:  Capital murder.

25       DR. LOTT:  What could happen to you if

3

0004
1   you're convicted in court of capital murder?
2        TERRY PITCHFORD:  Death.
3        DR. LOTT:  Okay.  Now, our report, our
4   assessment of you, our intellectual evaluation
5   and our report specifically addresses whether or
6   not we think you are mentally retarded.  And it
7   will have a direct impact on whether or not you
8   possibly receive the death penalty.
9        TERRY PITCHFORD:  Yes, sir.
10       DR. LOTT:  If people are found mentally
11  retarded by mental health specialists, then they
12  are not eligible for the death penalty if the
13  Court agrees with that interpretation.
14       TERRY PITCHFORD:  Yes, sir.
15       DR. LOTT:  Okay.  So you understand?
16       TERRY PITCHFORD:  Yes, sir.
17       DR. LOTT:  This evaluation goes directly to
18  the possible sentence in your case; that is,
19  whether or not you receive the death penalty.
20       TERRY PITCHFORD:  Yes, sir.
21       DR. LOTT:  Now, throughout this evaluation,
22  at any point during this evaluation you have the
23  right not to say anything about your case if you
24  think it might hurt you in any way in court.
25       TERRY PITCHFORD:  Yes, sir.

4

0005

1       DR. LOTT:  Your lawyer is sitting beside
2   you.  If you feel the need to consult or she
3   wants to consult with you, that's absolutely
4   appropriate and we encourage it.
5       UNIDENTIFIED MALE SPEAKER:  Dr. Lott keeps
6   trying to make Ms. O'Clarity a lawyer.  It's
7   imperative we get that clear.  She is a paralegal
8   but she represents the Office of Capital Defense
9   and she's working on your defense team.  And they
10  can try to use the information from this
11  evaluation to help you in your legal situation.
12  But we are also reporting to the D.A. And the
13  D.A. can try to use it against you, including
14  trying to argue, if you have a trial and if you
15  get convicted, the D.A. can try to use the
16  information from this evaluation to argue that
17  you should get the death penalty.  So it could go
18  either way.
19      We're not working with your defense team.
20  Although we're here with Ms. O'Clarity, we are
21  not working with them.  We're not working with
22  the D.A.  The Court asked us to do this
23  evaluation.  So they can use it to argue that you
24  should be convicted and get the death penalty.
25  They could use it to argue that you shouldn't be

5

0006

1   convicted or they can argue you shouldn't get the
2   death penalty.
3       That's a lot of stuff.  Does that make sense
4   to you?
5       TERRY PITCHFORD:  Yes, sir.
6       DR. LOTT:  Dr. McLaurin used the word D.A.
7   Do you know what that stands for?
8       TERRY PITCHFORD:  District Attorney.
9       DR. LOTT:  Okay.  And if you would, speak up
10  just a little bit.  I can hear you but I want to
11  make sure this tape is able to hear you.
12      UNIDENTIFIED MALE SPEAKER:  And if there's
13  anything that is not clear to you or if you want
14  to talk with Ms. O'Clarity, you are welcome to do
15  that.  And she can maybe explain things to you
16  better than we can.  And I know you have a
17  relationship with her.
18      TERRY PITCHFORD:  Yes, sir.
19      DR. LOTT:  Now, any questions about your
20  rights this morning before we get going?  Just so
21  I make sure that you sort of understand here,
22  what rights did we just explain to you?  What
23  rights do you have regarding this evaluation this
24  morning?
25      TERRY PITCHFORD:  That if I don't want to

App.0417

0007

```
 1        say nothing pertaining to my case or whatever, I
 2        don't have to.  I have the right to talk to my
 3        paralegal if I need some advice.
 4              DR. LOTT:  Okay.  Very good.  And just
 5        remember that now.  When in doubt, I encourage
 6        you to talk with Ms. O'Clarity.
 7              TERRY PITCHFORD:  Yes, sir.
 8              DR. LOTT:  Okay.
 9              TERRY PITCHFORD:  Yes, sir.
10  BY DR. LOTT:
11        Q.   Now, would you state your full name for us?
12        A.   Terry Pitchford.
13        Q.   Any middle name?
14        A.   No, sir.
15        Q.   Okay.  Spell your last name for me.
16        A.   P-i-t-c-h-f-o-r-d.
17        Q.   And how old are you?
18        A.   Twenty.
19        Q.   What's your date of birth?
20        A.   1985.  12/30/1985.
21        Q.   Okay.  As you see, they're writing, so we
22  will give them a chance to catch up.
23        A.   Yes, sir.
24        Q.   I tend to talk very quickly and it's
25  relative to their writing abilities.
```

7

0008
1        A.    Yes, sir.
2        Q.    Okay.  Can you tell us where we are again?
3        A.    At Whitfield.
4        Q.    What's today's date?
5        A.    I don't know.
6        Q.    What month is it?
7        A.    January.
8        Q.    Okay.  What year is it?
9        A.    2006.
10       Q.    What day of the week is it?
11       A.    I think Wednesday.
12       Q.    Okay.  Do you think it's the first of the
13   month, middle of the month or the end of the month?
14       A.    Around the first of the month.  Today's the
15   first of the month.
16       Q.    Today's what?
17       A.    I think today's the 11th.
18       Q.    The 11th.  That's correct.  Very good.
19             Now, we're going to ask you some questions
20   about your background, where you grew up.  And then
21   we're going to ask you questions about court and then
22   some other questions little bit later this afternoon.
23             But if you would, tell us, where were you
24   born?
25       A.    Greenwood.  Greenwood, Mississippi.

8

0009
```
 1      Q.  Greenwood, Mississippi?
 2      A.  Yes, sir.
 3      Q.  What are your parents names?
 4      A.  Shirley -- well, she married now.  It's
 5  Shirley Jackson now.  My daddy's name was James
 6  Pitchford.  He's deceased.
 7      Q.  When did your father die?
 8      A.  Back in 1996 when I was 10 years old.
 9      Q.  How did he die?
10      A.  He had kidney cancer.
11      Q.  Kidney cancer.  Okay.  And your mother's
12  name again?  You said she's remarried?
13      A.  Yes, sir.
14      Q.  What's her --
15      A.  Shirley Jackson.
16      Q.  Shirley Jackson.  How old is your mom?
17      A.  My mom's about 50, 51.
18      Q.  Fifties.  How old was your father when he
19  died?
20      A.  Sixty-seven.
21      Q.  Sixty-seven when he died?
22      A.  Yes, sir.
23      Q.  Okay.  Where does your mom live?
24      A.  In Grenada.
25      Q.  In Grenada?
```

9

```
0010
  1         A.    Yes, sir.
  2         Q.    Do you have any brothers and sisters?
  3         A.    Yes, sir.
  4         Q.    How many brothers?
  5         A.    On my daddy's side, I've got about 14 or 15.
  6         Q.    Fourteen or fifteen brothers by your father?
  7         A.    Yes, sir.
  8         Q.    Do you know them?
  9         A.    Not all of them.
 10         Q.    How about who raised you?  Did your mom
 11   raise you?
 12         A.    Yes, sir.
 13         Q.    How many brothers do you have by your
 14   mother?
 15         A.    Two.
 16         Q.    What are their names and ages?
 17         A.    Perry.  Perry, he's 20 years old.
 18         Q.    What is Perry's last name?
 19         A.    Pitchford.
 20         Q.    Okay.
 21         A.    I've got a brother named DeShawn Burnett.
 22   He's like 28, 29.
 23         Q.    Burnett, B-u-r-n-e-t-t?
 24         A.    Yes, sir.
 25         Q.    Is that right?
```

10

```
0011
  1        A.   Yes, sir.
  2        Q.   And you said Perry is how old?
  3        A.   Twenty.
  4        Q.   And how old are you?
  5        A.   Twenty.  He's my twin brother.
  6        Q.   He's your twin?
  7        A.   Yes, sir.
  8             UNIDENTIFIED MALE SPEAKER:  Are y'all
  9        identical twins?
 10             TERRY PITCHFORD:  No, sir.
 11   BY DR. LOTT:
 12        Q.   And where does your brother live?
 13        A.   He's still in Grenada.
 14        Q.   With your mother?
 15        A.   Yes, sir.  DeShawn lives down here in
 16   Jackson.
 17        Q.   In Jackson?
 18        A.   Yes, sir.
 19        Q.   Is he married?
 20        A.   No, sir.
 21        Q.   Okay.  Now, your father's children, where
 22   were they primarily living?
 23        A.   Everywhere.
 24        Q.   Everywhere.
 25        A.   Most of them stay in California.
```

0012

```
 1          Q.   California.
 2          A.   Yes, sir.
 3          Q.   Okay.  Did you ever visit them?
 4          A.   Yes, sir.
 5          Q.   You did?
 6          A.   Some of them.
 7          Q.   Some of them.  Okay.  And about age range?
 8     You don't have to be exact.  I don't expect you to
 9     know all of that.
10          A.   I have a brother, he older than my mom.  I
11     got another brother, they like late 30s or 40s and
12     20s or something.
13          Q.   Okay.  Now, where were you raised?
14          A.   I was raised in Grenada.
15          Q.   You were born where?
16          A.   I was born in Greenwood.
17          Q.   Born in Greenwood.  When did you move to
18     Grenada?
19          A.   See, I was born in Greenwood but I stayed in
20     Tchula.  And we moved from Tchula when I was about 6
21     years old.
22               UNIDENTIFIED MALE SPEAKER:  Tchula?
23               TERRY PITCHFORD:  Tchula, Mississippi.
24     BY DR. LOTT:
25          Q.   So when you started school, did you start
```

App.0423

0013

1    kindergarten in Tchula?

2         A.   No, I started kindergarten in Grenada.

3         Q.   In Grenada.  So you went to school all the

4    way through in Grenada?

5         A.   Yes, sir.

6         Q.   Okay.  So you moved to Grenada when you were

7    about 6?

8         A.   Yes, sir.

9         Q.   And was it with your mom and dad?

10        A.   Yes, sir.

11        Q.   And they lived together?

12        A.   Yes, sir.

13        Q.   Did they live together until your father's

14   death?

15        A.   Yes, sir.

16        Q.   Okay.  So you born in Greenwood, moved to

17   Grenada, lived in Grenada, went to school throughout

18   in Grenada?

19        A.   Yes, sir.

20        Q.   Did anyone ever --

21        A.   Actually, I went to school in Jackson, too.

22        Q.   Where?

23        A.   Forest Hill and Capital City.

24        Q.   Okay.  I'll get there in just a second.  All

25   right.  But you were raised in Grenada for the most

13

0014

1    part?
2          A.    Yes, sir.
3          Q.    By your mother and father?
4          A.    Yes, sir.
5          Q.    Did anyone else ever raise you?
6          A.    My mom got married to a man named Louis
7    Jackson.
8          Q.    Louis Jackson.
9          A.    Yes, sir.
10         Q.    How old were you when she married Louis
11   Jackson?
12         A.    About 11 or 12 years old.
13         Q.    Okay.  How old was Mr. Jackson?  How old is
14   he now?
15         A.    Fifty-three, fifty-four.
16         Q.    Do they still live together?
17         A.    Yes, sir.
18         Q.    And does he live their in Grenada with her?
19         A.    Yes, sir.
20         Q.    Okay.  What does he do for a living?
21         A.    Drive a 18-wheeler.
22         Q.    What does your mom do for a living?
23         A.    She works at Whirlpool in Oxford.
24         Q.    Is that a factory?
25         A.    Yes, sir.

App.0425

0015

1        Q.    Do you know what your father did for a
2    living?
3        A.    (No audible answer.)
4        Q.    You don't remember what he did for a living?
5        A.    He really didn't do nothing when I was a
6    little kid but drive a truck.
7        Q.    Was he disabled by his kidney disease?
8        A.    Didn't nobody know he had kidney disease.
9    He was in the Army at one point.  And he was a police
10   officer, LAPD.  He was a -- and he drove a 18-wheeler.
11       Q.    Okay.  Growing up, looking back, did you
12   spend much time with him?
13       A.    Yes, sir, all the time.
14       Q.    Did you feel like growing up when you were a
15   child that your parents were there for you?  Did you
16   feel like they were available, emotionally available,
17   loving, caring, kind parents?
18       A.    My dad was.
19       Q.    Your mother?
20       A.    We really didn't -- we really didn't talk to
21   my mother until my daddy died.  We really didn't have
22   too much to do with my mother until my daddy died.
23       Q.    Why?
24       A.    Cause I was always with my daddy.
25       Q.    Did you go places with your father when he

15

0016

1    would take trips?

2         A.    Yes, sir.

3         Q.    But now, you were in school, too, during

4    this time?

5         A.    Yes, sir.

6         Q.    Okay.  I'll come back to that in a second.

7    Were you ever married?

8         A.    No, sir.

9         Q.    Do you have any children?

10        A.    Yes, sir.

11        Q.    How many?

12        A.    One.

13        Q.    Boy or girl?

14        A.    Boy.

15        Q.    What's his name?

16        A.    Deretterrius.

17        Q.    Spell that.

18        A.    D-e-r-e-t-t-e-r-r-i-u-s.

19        Q.    His last name?

20        A.    Pitchford.

21        Q.    Okay.  And where does he live?

22        A.    Grenada.

23        Q.    With whom?

24        A.    His mother.

25        Q.    What's his mother's name?

App.0427

```
0017
  1        A.    Dominique.
  2        Q.    Dominique?
  3        A.    Dominique Hogan.
  4        Q.    Hogan.
  5        A.    Yes, sir.
  6        Q.    H-o-g-a-n?
  7        A.    Yes, sir.
  8        Q.    What's her phone number?
  9        A.    688--0511.
 10        Q.    688-0511?
 11        A.    Yes, sir.
 12        Q.    What's the prefix?
 13        A.    662.
 14        Q.    Okay.  What's your mother's address?
 15        A.    7651 Phoenix Loop, 333, Coffeeville,
 16   Mississippi.
 17        Q.    In Coffeeville.  That's a Coffeeville
 18   address?
 19        A.    Yes, sir.
 20        Q.    Okay.  What's her phone number?
 21        A.    662-267-9336.
 22        Q.    Okay.
 23   BY UNIDENTIFIED MALE SPEAKER:
 24        Q.    Where is your twin brother staying now?
 25        A.    He stays with my mom.
```

App.0428

0018
1   BY DR. LOTT:
2       Q.  Does he work?
3       A.  No, sir.
4       Q.  He doesn't work?
5       A.  No, sir.
6       Q.  Okay.  So mom lives in Grenada and has a
7   Coffeeville address?
8       A.  Yes, sir.
9       Q.  Okay.  Now, forgive me, did you say your mom
10  is working?
11      A.  Yes, sir.
12      Q.  She's at a factory in Oxford?
13      A.  Yes, sir.
14      Q.  Okay.  Let me ask you now a little bit about
15  your education history.  Where did you go to school?
16  Did you start kindergarten in Grenada?
17      A.  Yes, sir.
18      Q.  Okay.  Kindergarten through elementary
19  school, let's go kindergarten through the fifth grade,
20  where were you?
21      A.  Grenada.
22      Q.  Okay.  Did you start middle school in the
23  sixth or seventh grade?  Do you remember which grade
24  you went and it was called middle school?
25      A.  Sixth grade.

18

0019

1      Q.   It was sixth grade.  Where did you start

2  school in the sixth grade?

3      A.   Grenada.

4      Q.   Okay.  Seventh?

5      A.   Grenada.

6      Q.   Eighth?

7      A.   It was part Grenada and part down here.

8      Q.   Down here where?

9      A.   Jackson.

10     Q.   At where?

11     A.   Capital City.

12     Q.   Alternative school?

13     A.   Yes, sir.

14     Q.   How did you get sent from Grenada to Capital

15  City?  Capital City is only for Hinds County.

16     A.   My sister stays down here.

17     Q.   Oh, okay.  Okay.  Now, let me back up.

18  Kindergarten, first and second grades, what kind of

19  grades did you make?

20     A.   I made F's all the way through school.

21     Q.   Really.  Why?

22     A.   I really don't know.  I mean I made F's and

23  D's.  I think I got a short attention span, I think.

24     Q.   Okay.  I was looking over some of your

25  standardized scores, though, and they looked fairly

19

0020
1    decent.  Some of them were very good.  Do you remember
2    teachers saying that you should've been doing better?
3    Or did they?  Did they ever say anything like that?
4         A.   No, sir.
5         Q.   No one ever said -- tell you you're not
6    doing as well as you ought to be doing?
7         A.   Yeah, they probably did a couple of times.
8         Q.   Did they ever put you in a special class?
9         A.   Not really.  My mama and them tried to one
10   time.
11        Q.   What grade?
12        A.   Like third or fourth grade.
13        Q.   Did you get evaluated?  Did you receive
14   psychological testing?
15        A.   They were just claiming they were just
16   threatening.
17        Q.   Oh, threatening?
18        A.   Yeah, just to try to get my grades up.
19        Q.   Did your grades improve?
20        A.   No, sir.
21        Q.   Okay.  Did you repeat a grade?
22        A.   Yes, sir.
23        Q.   Which grade?
24        A.   Second and fourth grade.
25        Q.   Second and the fourth?

0021

```
 1        A.   Yes, sir.
 2        Q.   Why did you repeat the second grade?
 3        A.   Because I was flunking.
 4        Q.   Were you trying?  Can you recall?  Can you
 5   remember that far back?
 6        A.   No, sir.
 7        Q.   Okay.  Did you miss a lot of school?
 8        A.   No, sir.
 9        Q.   Were you sick much during the first five
10   grades?
11        A.   No, sir.
12        Q.   Okay.  The fourth grade, why did you repeat
13   the fourth grade?
14        A.   Cause I was just flunking.
15        Q.   Were you trying?  Did you need help?  Did
16   you ask for help?
17        A.   Yes, sir.  I don't really -- I don't know
18   what I had really.
19        Q.   Okay.  But you didn't get any special
20   classes, no tutoring, no assistance at any point
21   during your schooling?
22        A.   No, sir.
23        Q.   Okay.
24   BY UNIDENTIFIED MALE SPEAKER:
25        Q.   Were you ever tested or not?  Did you ever
```

21

0022

1  have any psychological testing, that kind of stuff,
2  more than just the standard tests that everybody gives
3  at school now?
4      A.  Yeah, I did like achievement tests and stuff
5  like that.  I mean it was basically I just wasn't
6  studying and stuff like that.
7      Q.  Did they ever do individual testing with you
8  where it wasn't everybody in the class, just you?
9      A.  No, sir.
10 BY DR. LOTT:
11     Q.  Where you put blocks together, stuff like
12 that?
13     A.  No, sir.
14 BY UNIDENTIFIED MALE SPEAKER:
15     Q.  Have you ever have your vision or your
16 hearing tested?
17     A.  Yeah, they did that at school.  They do all
18 of that.
19     Q.  Did they ever tell you that you needed
20 glasses?
21     A.  No, sir.
22 BY DR. LOTT:
23     Q.  What grade were you first suspended in?
24 What grade did you start getting in trouble at school?
25     A.  Like second grade.

App.0433

0023

```
 1        Q.   Second grade?
 2        A.   Yes, sir.
 3        Q.   You got suspended in the second grade?
 4        A.   No, sir.
 5        Q.   Did you get out-of-school suspension?
 6        A.   They didn't have it then.
 7        Q.   Okay.
 8        A.   I mean I just started going to the office.
 9        Q.   Okay.  When did you start getting suspended
10   and sent home for two or three days or more?
11        A.   Like in fourth grade.
12        Q.   What happened?  Why were you getting into
13   trouble in the fourth grade?
14        A.   There wasn't nothing to do.
15        Q.   So what were you doing to get in trouble?
16   What kind of things did you do to get in trouble?
17   Some people get caught smoking in the bathroom.  What
18   were you doing?
19        A.   I was just trying to talk and the teacher
20   would tell me to keep quiet and something like that.
21        Q.   Did you ever threaten a teacher?
22        A.   No, I ain't never threatened no teacher.
23        Q.   Did your ever carry a weapon to school?
24        A.   I was about in the first grade I brought a
25   knife to school.
```

App.0434

0024

```
 1        Q.   First grade you brought a knife to school?
 2        A.   Yes, sir.
 3        Q.   Were you mad at someone?
 4        A.   No, sir.
 5        Q.   Did you threaten anybody with the knife?
 6        A.   No, sir.
 7        Q.    It was just a pocket knife or was it a knife
 8   that you got out of the kitchen sink?
 9        A.   No, a pocket knife.
10        Q.   Okay.  And you didn't threaten anyone with
11   it?
12        A.   No, sir.
13        Q.   So let's move on through.  Middle school,
14   how many times were you suspended in sixth, seventh
15   and eighth grades?
16        A.   Like four or five times.
17        Q.   Four or five times over those three years or
18   four or five times every year?
19        A.   Like three a year.
20        Q.   What kind of trouble were you getting into
21   then?
22        A.   Basically the same things, talking when the
23   teacher tells me not to and stuff like that.
24        Q.   Did you ever curse a teacher?
25        A.    I never did in Grenada.  In Grenada the
```

24

0025
1    school, the school was kind of different.  It was like
2    they did corporal punishment.  But you got some
3    teachers that just mad at you, just do a lot of
4    things.
5         Q.    What's corporal punishment?
6         A.    They paddle you.
7         Q.    Where they paddle you?
8         A.    Yes, sir.
9         Q.    So you got paddled in school?
10        A.    Yes, sir.
11        Q.    Until what grade?
12        A.    All the way up to the eighth grade.
13        Q.    They paddled you in the eighth grade?
14        A.    Yes, sir.
15        Q.    Who would paddle you?
16        A.    The principal.
17        Q.    The principal paddled you.  Okay.  I didn't
18   know we were doing that.
19   BY UNIDENTIFIED MALE SPEAKER:
20        Q.    Did he have to get permission from your mom
21   or somebody to use corporal punishment?
22        A.    Yeah, I believe.  I don't know about
23   everybody else.  But I see every time I received a
24   paddling because people come to the school and they
25   would tell us well, you can come to the office and you

App.0436

0026

1    won't receive a paddling and you can go home for the
2    rest of the day, three days, stuff like that.  But
3    then it just got the -- I got a paddling.  Sometimes
4    you would agree with it and get it over with or
5    whatever.
6         Q.   Did they ever get in trouble for giving kids
7    paddlings?
8         A.   No, sir, nobody really knowed know.
9    BY DR. LOTT:
10        Q.   Did you have the option -- could you take
11   the licks or if you refused the licks, would you get
12   sent home?
13        A.   Yes, sir.
14        Q.   You had that option?
15        A.   Yes, sir.
16        Q.   You could get paddled or if you didn't
17   receive the licks you would get sent home?
18        A.   Yes, sir.
19        Q.   Okay.
20        A.   Nobody wanted to get sent home.  Because if
21   you get sent home, your mom is going to whip you then
22   when you get home.
23        Q.   Okay.  In the eighth grade -- was it eighth
24   or ninth grade that you went to Capital City?
25        A.   Eighth grade.

26

0027

1     Q.   What happened?  Why did you get sent from
2  Grenada to Jackson to the Capital City?
3     A.   I left school one day.  I was -- well, I
4  didn't leave school, school was out.  And about 15 --
5  15, maybe 20 boys tried to jump on me.
6     Q.   What happened?
7     A.   The head principal at school, I knew she
8  didn't like me.  She never did anything but paddle
9  (inaudible) and stuff like that.  So they said when I
10  got into with the Board or whatever, the next day they
11  told me I got mad and I got upset and I had punched
12  the windows out of the buses and stuff like that.
13     Q.   The next day?
14     A.   No, the same day.
15     Q.   Oh, the same day.
16  BY UNIDENTIFIED MALE SPEAKER:
17     Q.   When the boys were after you and you punched
18  the windows, but then you say the next day something
19  else happened?
20     A.   Right.  The next day they told me don't come
21  to school.  And the day that I went back to school
22  they called me in the office and told me that I was
23  being suspended from school.  Then I went to
24  (inaudible) school.
25     Q.   So at that point you moved -- how did you

App.0438

0028
1   get into alternative school in Jackson?
2          A.   I don't know.
3          Q.   You came down to stay with your sister?
4          A.   They really expelled me for a crazy reason.
5   They expelled me for a crazy reason.
6          Q.   What was the reason?
7          A.   They said that I made a threat toward the
8   Board or whatever.
9          Q.   So you didn't threaten anybody you were
10  going to get a gun or anything?
11         A.   No.
12         Q.   You didn't do that?
13         A.   No.  They said -- so my sister went and
14  talked to the other school, the School Board or
15  something like that.  And I moved down here and I
16  started at Capital City.  I went to Capital City for
17  three months.  And then they let me go to a public
18  school.
19         Q.   So you went to Capital City beginning when?
20  Is it in the fall or the spring?  Did you start in
21  August or January?
22         A.   I started like in February.  It was around
23  that time.
24         Q.   Okay.  So you went to Capital City for how
25  long?

28

0029

```
 1        A.   Three months.
 2        Q.   So you finished the year?
 3        A.   Yes, sir.
 4        Q.   At then you started what grade at Forest
 5   Hill?
 6        A.   Ninth grade.
 7        Q.   Did you finish the ninth grade there?
 8        A.   No, sir.
 9        Q.   What happened?
10        A.   I left town.  I left town and then I quit
11   school.  I went to Jobs Corp.
12        Q.   When you left town, where did you go?
13        A.   I went to Grenada.
14        Q.   Oh, so you moved back home?  You left Forest
15   Hill.  How long did you go to Forest Hill?
16        A.   I went there for about -- I quit in
17   December.  I started in August.
18        Q.   So did you get into any trouble at Forest
19   Hill?
20        A.   No, not really.
21        Q.   You didn't get expelled or suspended at
22   Forest Hill?
23        A.   No, I never did.
24        Q.   Okay.  So you quit in December?
25   BY UNIDENTIFIED MALE SPEAKER:
```

App.0440

0030

1     Q.   Did you get expelled from Forest Hill in
2  December of '03?
3     A.   No, sir.
4     Q.   That's what the records say.
5     A.   I got expelled?
6     Q.   You got expelled.
7     A.   From Forest Hill?
8  BY DR. LOTT:
9     Q.   You don't remember getting in trouble?
10     A.   I never did.  I never got expelled.  I just
11  quit.
12     Q.   So you just quit?
13     A.   I quit going to school.
14     Q.   So you just didn't go to school and they
15  kicked you out for missing days?  You didn't know that
16  you were expelled?
17     A.   No.  See, the way it happened was they let
18  us out of school.  And when they let us out of school
19  I just never did go back.
20     Q.   For the Christmas holidays?
21     A.   No, we weren't out for the Christmas
22  holidays.
23     Q.   Well, how did you get let out of school?
24     A.   The day was over with.  It was like on a
25  Monday or Tuesday or something.  The day was over with

30

0031

1   and I went home that day and I never did return.

2       Q.   You never came back?

3       A.   Never went back.

4       Q.   Okay.  And you said you went to the Job

5   Corp?

6       A.   Yes, sir.

7       Q.   Where?

8       A.   In Batesville.

9       Q.   In Batesville?

10      A.   Yes, sir.

11      Q.   How long were you in the Job Corp?

12      A.   About three months.

13      Q.   Three months?

14      A.   Three months.

15      Q.   Did you complete the program at Job Corp?

16      A.   No, sir.

17      Q.   Did you get expelled?

18      A.   Yes, sir.

19      Q.   What happened?

20      A.   I got caught with a girl.

21      Q.   You got caught with a girl?

22      A.   Yes, sir.

23      Q.   Was that against the rules?

24      A.   Yes, sir.

25      Q.   What were you doing?

App.0442

0032

1     A.   Having sex.

2     Q.   They caught you having sex with a girl in

3  the room?

4     A.   Yes, sir.

5     Q.   Did she get expelled, too?

6     A.   I don't know.

7     Q.   You don't know.  Any other training?  Did

8  you ever go to a training school?

9     A.   No, sir.

10     Q.   Oakley?

11     A.   No, sir.

12     Q.   So when you were at Grenada and you got

13  expelled, they didn't threaten to send you to Oakley?

14     A.   No, sir.

15     Q.   Okay.  All right.  So after Job Corp, what

16  did you do?

17     A.   I went to GED school.

18     Q.   Where?

19     A.   Grenada.

20  BY UNIDENTIFIED MALE SPEAKER:

21     Q.   What kind of school?

22     A.   GED.

23  BY DR. LOTT:

24     Q.   Did you get your GED?

25     A.   No, sir.

32

0033
```
 1        Q.   Why?
 2        A.   That's when I started skipping school.  When
 3   I went back to school I was going to take my practice
 4   test and the teacher called me dumb or something like
 5   that.  And I just went off on her.
 6        Q.   You went off on her?
 7        A.   Yes, sir.
 8        Q.   So you never took the test, then?
 9        A.   No, sir.
10   BY UNIDENTIFIED MALE SPEAKER:
11        Q.   What did you do at the Job Corp?
12        A.   The job, I don't even know really.
13        Q.   What's the point, though?
14        A.   Trying to send me for a high school diploma.
15   BY DR. LOTT:
16        Q.   All right.  Now, tell us about how you've
17   been -- where you've been working.  Were you working
18   anywhere before you finished school?  When you came
19   back to Grenada and were working on your GED, were you
20   working anywhere?
21        A.   No, sir.
22        Q.   Have you ever held a job?
23        A.   Yes, sir.
24        Q.   Where?
25        A.   I worked at Heathcraft.  I worked at
```

0034
1    Heathcraft and I worked in Coffeeville with Grenada
2    Wholesale.
3         Q.   Okay.  What did you do first?  Heathcraft?
4         A.   Yes, sir.
5         Q.   How long did you work at Heathcraft?
6         A.   About three weeks.
7         Q.   Three weeks.  What did you do there?
8         A.   They had us out on the line cleaning cords
9    and straightening cords out on the line.
10        Q.   Okay.  Why did you leave that job?
11        A.   Because I had -- my mama gave me a raggedy
12   van.  And the van really didn't make it back and forth
13   to work like it was supposed to.  The van was really
14   messed up.
15        Q.   So you were driving the van?
16        A.   Yes, sir.
17        Q.   And it was a raggedy van?
18        A.   I mean I didn't make it to work.
19   BY UNIDENTIFIED MALE SPEAKER:
20        Q.   What kind of van was it?
21        A.   Caravan.
22        Q.   A Caravan?
23        A.   Yes, sir.
24   BY DR. LOTT:
25        Q.   Who makes a Caravan?

0035

```
1        A.    Chrysler.
2        Q.    Chrysler.  So you were driving a raggedy van
3   and you weren't getting to work on time.  Did they
4   fire you or did you quit?
5        A.    They fired me.
6        Q.    They fired you.
7        A.    They just told me they didn't need me
8   (inaudible).
9        Q.    They don't need you if you can't to work on
10  time?
11       A.    Yes, sir.
12       Q.    Okay.  Where did you work next?  Well, let
13  me back up.  At Heathcraft how much were you making?
14       A.    About six-fifty or something.
15       Q.    Six-fifty.  Did you get a paycheck?
16       A.    Yeah, I got two of them.
17       Q.    You got two paychecks.  And how much were
18  the paychecks?
19       A.    The first one -- I mean I wasn't working at
20  that time.  I had --
21       Q.    I know you probably had left by the time you
22  got it, but how much did you get?
23       A.    One of them was only like for $157 or
24  something like that.
25       Q.    Okay.  Who was the payee that cashed it?
```

35

0036

1      A.   I cashed the check.

2      Q.   You cashed the check?

3      A.   Yes, sir.

4      Q.   What was the second check?  How much was the

5  second check?

6      A.   About the same.

7      Q.   Okay.  About the same?

8      A.   Yes, sir.

9      Q.   Okay.  Did you cash both checks?

10     A.   Yes, sir.

11     Q.   Okay.  Now, you worked where next?

12     A.   Taco Bell.

13     Q.   How long did you work at Taco Bell?

14     A.   About three weeks.

15     Q.   Three weeks.  What did you do there?

16     A.   I had to fix food.  I had to fix food.  And

17  part of the time they had me outside sweeping and

18  stuff like that.

19     Q.   So you were a cook and cleaned up the

20  parking lot?

21     A.   Yes, sir.

22     Q.   And you worked there three weeks.  Why did

23  you leave?

24     A.   I was working around too many women.

25     Q.   Working with too many women?

36

0037

```
 1        A.    Yeah.
 2        Q.    Did you quit or were you fired?
 3        A.    I actually quit.
 4        Q.    Okay.  Let me stop this and turn this tape
 5   over.
 6              DR. LOTT:  This is Dr. Lott again.  This is
 7         the second side of the first tape.
 8   BY DR. LOTT:
 9        Q.    Now, you said you were working at Taco Bell?
10        A.    Yes, sir.
11        Q.    How long?
12        A.    About three weeks.
13        Q.    Three weeks.  And you quit there because?
14        A.    I was working around too many women and they
15   always had something to say.
16        Q.    Okay.  Did you ever get into any trouble,
17   though, while you were working there?
18        A.    No, sir.
19        Q.    Did you ever threaten anybody, say anything
20   ugly to anybody, curse anyone?
21        A.    No, sir.
22        Q.    Okay.  How much were you making at Taco
23   Bell?
24        A.    I don't think I even got no paycheck from
25   Taco Bell.
```

37

0038

```
 1          Q.   You didn't get paid?
 2          A.   I got probably like one paycheck.  But I
 3   ain't never worked over four hours.
 4          Q.   A day?
 5          A.   Yes, sir.
 6          Q.   Okay.  Where was your next job?
 7          A.   Grenada Wholesale -- Grenada Wholesale
 8   Lumber.
 9          Q.   Grenada Wholesale Lumber.
10          A.   Yes, sir.
11          Q.   What did you do there?
12          A.   Loaded lumber.
13          Q.   Were you driving a truck to deliver?
14          A.   I drove a pickup truck.
15          Q.   Okay.  You could drive a pickup truck?
16          A.   Yes, sir.
17          Q.   How long did you work there?
18          A.   About seven months.
19          Q.   How much did you make there?
20          A.   I started off -- I started off at $7 an
21   hour.
22          Q.   Seven an hour?
23          A.   Yes, sir.
24          Q.   Is that a pretty good salary in Grenada?
25          A.   Yes, sir.
```

38

0039

1    Q.   And how much would you make -- did you get
2    paid weekly or every other week?
3    A.   Weekly.
4    Q.   You got paid weekly.  How much would you
5    bring home?
6    A.   I'd bring home about -- it was like two
7    forty, two fifty, sometimes three hundred.
8    Q.   $300 a week?
9    A.   Yes, sir.
10   Q.   That sounds like that was good money for
11   someone your age?
12   A.   Yes, sir.
13   Q.   Did you pay any taxes?
14   A.   Yeah, I paid taxes, too.  That was it.
15   Q.   What did you do with your money?
16   A.   Nothing really, just had fun.
17   Q.   Had fun.  What did you do for fun?
18   A.   I mean basically what I did with my money, I
19   went out, chill with my girl, my baby's mama, bought
20   my son stuff, pampers and stuff.  And the rest of it
21   I'd just, you know (inaudible) or something like that,
22   go shopping.
23   Q.   And you were driving then?  Did you drive
24   the raggedy van?
25   A.   No, sir, I had about five or six cars.

39

0040

1     Q.   You bought five or six different cars?

2     A.   I said I had about five or six cars.

3     Q.   How did you get another car?  Did you go out

4 and buy it, go to a parking lot and buy it yourself?

5     A.   No, sir.

6     Q.   How did you end up with a car?  How did you

7 get a car?

8     A.   My mama cosigned.

9     Q.   Your mama cosigned?

10    A.   Yes, sir.

11    Q.   And so you were making the payments?

12    A.   Yes, sir.

13    Q.   What kind of car did you own?

14    A.   My first car I had was a Cavalier, a 2002

15 Cavalier.

16    Q.   A 2002 Cavalier?

17    A.   Yes, sir.

18    Q.   That would've been a brand new car for you

19 back then, wouldn't it?  Almost.

20    A.   That was when I was 16.

21    Q.   Okay.

22 BY UNIDENTIFIED MALE SPEAKER:

23    Q.   Was it new when you bought it?

24    A.   Spanking new.

25 BY DR. LOTT:

App.0451

0041

```
 1        Q.    Was it brand new?
 2        A.    Brand spanking new.
 3        Q.    Wow.  Okay.  How long did you keep that car?
 4        A.    About three months.
 5        Q.    Three months.  What were the payments on it?
 6        A.    I don't know.  It was around like $199 or
 7   $200 a month.
 8   BY UNIDENTIFIED MALE SPEAKER:
 9        Q.    What happened to it after three months?
10        A.    I totaled it out.
11        Q.    How did you do that?
12        A.    Ran into a bridge.
13        Q.    How did you do that?
14        A.    I was just coming off a dirt road.  I think
15   I was going too fast and the brakes, I was having
16   problems with the brakes.  And when I hit the brakes
17   and went into the concrete, I hit the brakes and
18   instead of the brakes just stopping, it made a sound
19   like umm, umm, like that.  Then it just slammed into
20   the bridge.
21        Q.    Head-on?
22        A.    Yes, sir.
23   BY DR. LOTT:
24        Q.    Did you get hurt?
25        A.    No, sir.
```

0042

1    BY UNIDENTIFIED MALE SPEAKER:

2        Q.   Did you get knocked out?

3        A.   No, sir.

4    BY DR. LOTT:

5        Q.   Did it hit the passenger side of the car?

6        A.   It tore the whole front end off the car.

7        Q.   So did you get insurance from it?  What did

8    you do when you got a new car and you wrecked it?

9    What happened?

10       A.   The insurance, they didn't pay nothing but

11   the car off.

12       Q.   The cost of it?

13       A.   Yes, sir.

14       Q.   So then what did you do next for a car?

15       A.   Then I had the van and I drove the van for a

16   little while.

17       Q.   Was that that raggedy van?

18       A.   Yes, sir.

19       Q.   Okay.

20       A.   And then I went and got me a Dodge Intrepid.

21       Q.   Intrepid?

22       A.   Yes, sir.

23       Q.   Really.  So mom cosigned for that one?

24       A.   Yes, sir.

25       Q.   Where did you buy that car?

App.0453

0043

```
 1        A.    Vans Auto.
 2        Q.    Vans Auto in Grenada?
 3        A.    Yes, sir.
 4        Q.    And so you were making payments on that one?
 5        A.    Yes, sir.
 6        Q.    How much?
 7        A.    Like $200 a month.
 8        Q.    Okay.  And how long did you keep that one?
 9        A.    A month.
10        Q.    A month.  What happened to that one?
11        A.    I totaled that one out, too.
12        Q.    What did you do?
13        A.    I was coming home one night.  I don't know
14   what happened.  Like, I was just coming home one night
15   and the car just lost control and I went off in the
16   ditch and came out of the ditch and ran into a light
17   pole.
18        Q.    The car lost control?
19        A.    I lost control.
20        Q.    Okay.  Okay.  What happened with that one
21   with the insurance?
22        A.    They just paid it off.
23        Q.    Just paid it off.  So you had insurance each
24   time, though, right?
25        A.    Yes, sir.
```

43

0044

1     Q.   Okay.  Who was paying the insurance on these

2 cars?

3     A.   My mama was paying the insurance.

4     Q.   Your mother is paying the insurance.  So

5 here you are, you've wrecked two cars now.  How much

6 was the insurance?

7     A.   It was something like 300.

8     Q.   $300 a month for insurance?

9     A.   Yes, sir.

10     Q.   And your mother was paying it?

11     A.   Yes, sir.

12 BY UNIDENTIFIED MALE SPEAKER:

13     Q.   The insurance was more than the car payment?

14     A.   The car payment probably wouldn't but $200.

15 BY DR. LOTT:

16     Q.   Goodness.  So what was your next car?

17     A.   I had a Dodge Eagle.

18     Q.   An Eagle?

19     A.   Yes, sir.

20     Q.   These are fancy cars.  So how long did you

21 keep this car?

22     A.   About a month.

23     Q.   A month.  What did you do to this one?

24     A.   I came down here one day and the radiator or

25 something.  Something was going on.  It kept running

44

0045

1   hot.  So I let the folks take it back.  I didn't tear
2   that one up.
3       Q.   You didn't tear that one up.  Okay.  What
4   was your next one?
5       A.   A Grand Marquis.
6       Q.   A Grand Marquis.  And how long have you had
7   this car?
8       A.   About four months.
9       Q.   Four months.  What happened to it?
10      A.   It's still at my mama's.
11      Q.   Still at your mom's.  Who's paying for it?
12      A.   Nobody paying for it.  They probably come
13  and got it by now.
14      Q.   Okay.  How much were the payments?
15      A.   $300 a month.
16      Q.   So right before you got arrested, where were
17  you working?
18      A.   Grenada Wholesale.
19      Q.   The lumber company?
20      A.   Yes, sir.
21      Q.   And you were working there 40 hours a week?
22      A.   I was working ten hours a day.
23      Q.   Ten hours a day?
24      A.   Yes, sir.
25      Q.   How many days a week?

45

0046
1      A.   Monday through Saturday.
2      Q.   You worked all day Saturday?
3      A.   No, half a day Saturday.
4      Q.   So you were working 55, six hours a week
5   then?
6      A.   Yes, sir.
7      Q.   So what did you do there?
8      A.   Load and delivered lumber.
9   BY UNIDENTIFIED MALE SPEAKER:
10     Q.   You said it was a wholesale lumber place?
11     A.   Yes, sir.
12     Q.   Why would somebody go to a wholesale lumber
13  place versus some other kind of lumber supply store?
14     A.   Because the wholesale lumber, you don't pay
15  taxes on it.  People just come and get their lumber.
16  And then most of those people loaded their own, things
17  like that.
18     Q.   Is it cheaper or more expensive being a
19  wholesale place?
20     A.   It ain't no cheap lumber.
21     Q.   It's not cheap.  Did it cost more or less to
22  go to a wholesale place as opposed to another place?
23     A.   I would think it would cost less.
24     Q.   Costs less?
25     A.   Yes, sir.

46

0047

1   BY UNIDENTIFIED MALE SPEAKER:

2        Q.   Did you ever have a commercial license?

3        A.   To drive a big truck, no, sir.

4        Q.   You had a regular driver's license?

5        A.   Yes, sir.

6        Q.   Did you take a written test for that?

7        A.   I drove.  They made us drive.

8        Q.   Yeah, they make you drive.  But you also

9   have to take a written test.

10       A.   Oh, you talking about for my permit?

11       Q.   Yeah.

12       A.   Yes, sir.

13       Q.   Did you pass that?

14       A.   Not the first time.

15       Q.   Okay.  How many times did you take it?

16       A.   Two times.

17       Q.   Did you pass it the second time?

18       A.   Yes, sir.

19  BY DR. LOTT:

20       Q.   Did you take it on a computer?

21       A.   Uh.

22       Q.   The written part, did you take on a

23  computer?  Do you remember?

24       A.   I believe I took it on a paper.

25  BY UNIDENTIFIED MALE SPEAKER:

App.0458

0048

1     Q.   Did you take driver's ed in school?

2     A.   No, sir.  I never made it that far.

3  BY DR. LOTT:

4     Q.   Did you ever get in any trouble while you

5  were working for the lumber company?  Did you ever

6  curse anybody, threaten anybody, get mad at anybody,

7  breaking out any windows or lights in any van or bus

8  or anything while you worked for the lumber company?

9     A.   No, sir.

10    Q.   So they liked you and got along well with

11  you?

12    A.   Yes, sir.

13  BY UNIDENTIFIED MALE SPEAKER:

14    Q.   Was your boss at the lumber company Wesley

15  Thompson?

16    A.   Yes, sir.

17    Q.   Do you remember what the telephone number is

18  at the lumber place?

19    A.   237-1779.

20    Q.   1779?

21    A.   Yes, sir.

22  BY DR. LOTT:

23    Q.   Okay.  All right.  Now, let me move into --

24  let me back up.  Did you ever get disability benefits,

25  Social Security benefits when you were a child?

48

0049

```
 1        A.    I got a Social Security check.
 2        Q.    On whom?
 3        A.    My dad.
 4        Q.    On your father.  Did you ever get them for
 5   being a slow learner or anything in school?
 6        A.    No, sir.
 7        Q.    Did you ever get any personal injury
 8   benefits?  Did you ever sue someone, get hurt in a
 9   car, sue somebody, get injured on a job, sue anybody?
10        A.    No, sir.
11        Q.    Any unemployment benefits?  Did you get
12   fired from a job and file unemployment?
13        A.    No, sir.
14        Q.    Okay.  Now, let's go back and talk about
15   your legal history.  Before you turned 18 did you ever
16   get any other arrests?  Were you ever arrested for any
17   reason?
18        A.    I got in trouble a while back.  There was a
19   (inaudible) stay after Coach (inaudible) out of the
20   truck.  And after football practice (inaudible) cell
21   phone.  So I took the cell phone home.  (Inaudible).
22   And on my way to school the next day somebody called
23   the phone, so I answered the phone.  And they said who
24   is this.  And I told them Terry Pitchford.  And they
25   was like do you know whose phone you got and I said
```

49

0050

1   yeah. (Inaudible). They said no and (inaudible) told
2   me whose phone it was. (Inaudible). And the next
3   morning I took it to school and gave it back to the
4   teacher. And about an hour later they called me to
5   the office and said the police was coming.
6       Q. So what happened?
7       A. They took me to this place and I called my
8   mom and told her to come and get me.
9       Q. They took you to the detention center?
10      A. Yes, sir. I didn't have to stay there. I
11  just went there to file some papers, some kind of
12  papers, and gave me a court date. And told me to go
13  to John Paul Jones. And I went to find him and he put
14  me on some kind of paper.
15      Q. Probation?
16      A. Juvenile probation.
17      Q. Juvenile probation?
18      A. Yes, sir.
19      Q. Did you have any court counselor that you
20  had to meet with?
21      A. No, sir.
22      Q. You never met with a counselor?
23      A. No, sir.
24      Q. So he just said if I see you again in six
25  months you're going to go to training school?

App.0461

0051

1      A.  He told me I had to report back to him.  And

2  when I reported back to him he took me off.

3      Q.  When did you report back?  A week, a month,

4  a year later?

5      A.  About a month later.

6      Q.  A month later?

7      A.  Yes, sir.

8      Q.  How old were you?

9      A.  I was about 15 years old -- no, I was about

10  14.

11      Q.  Well, what coach was this?  You said you

12  were at football practice?

13      A.  Yes, sir.  Coach Woods.

14      Q.  Were you playing football in junior high?

15      A.  Yes, sir.

16      Q.  I didn't ask you that earlier.  Did you

17  play -- you say you played football.  Sixth, seventh

18  grade, seventh, eighth grade?

19      A.  Seventh and eighth grade.

20      Q.  Seventh and eighth grade.  What did you

21  play?

22      A.  No, I ain't played eighth grade.  I played

23  seventh grade.

24      Q.  What position?

25      A.  Defensive end.

App.0462

0052

```
 1        Q.   How did y'all do?
 2        A.   We did all right.
 3   BY UNIDENTIFIED MALE SPEAKER:
 4        Q.   Did you play tackle?
 5        A.   No, I didn't tackle.
 6        Q.   Block?
 7        A.   Yeah, there was a couple blocks.  I had a
 8   couple.  But I quit football.
 9        Q.   Did you ever play any offense?
10        A.   No.  I wanted to play running back.  But
11   they -- I was sick the day when they was going to
12   decide and I didn't get the position.  They put me on
13   defensive end.
14   BY DR. LOTT:
15        Q.   Did you play first team?
16        A.   Yes, sir, first string.
17        Q.   First string, okay.  All right.  That's
18   good.
19        A.   I used to be good in basketball.
20        Q.   You used to be good?
21        A.   Uh-huh (affirmative).
22        Q.   What position did you play?
23        A.   I didn't play none in school.
24        Q.   You played street ball?
25        A.   Yes, sir.
```

52

0053

1      Q.    What kind of games did you play, 21, or?

2      A.    Twenty-one or regular basketball.

3      Q.    Okay.  And so just football.  No baseball,

4   basketball, soccer, nothing else?  Okay.  Back to your

5   legal history.  You got in trouble for that.  You got

6   on probation.  You got off probation.  Any other

7   arrests?  Or any other contact with the police for any

8   reason?

9      A.    I mean I got in -- the Grenada police, they

10  crazy, so they had come down -- I was over at my

11  baby's mama's house.  And I had left and I was going

12  up to a girl named Chasity's house.  And she was

13  supposed to cook for me.  And I walked across the

14  street and these dudes were standing on the corner

15  where (inaudible).  And so I had a little chit chat

16  with them.  And the dude hollered the police coming,

17  the police coming.  And the dude went over the hill.

18  And the dude was like (inaudible) turn around and come

19  back.  (Inaudible).  So I started out walking.  And,

20  shoot, the dude came back.  He came back like man,

21  (inaudible).  And he told me to come here and stuff

22  like that.  And he told me to come here and then he

23  searched me and stuff like that.  Then I told him I

24  didn't do nothing.  Then he told me to get down in the

25  road and he put the handcuffs on me.

53

0054

1     Q.   Did he assume that you just engaged in a
2  drug deal?  Is that what the cop thought?
3     A.   I don't know what he thought.  He lied and
4  told his folks that I was in the street and flagged
5  him down.  I didn't flag down nobody.  I had just
6  walked in front of his car.  So he brought me to jail.
7  And I told him, I said, I ain't -- I said y'all can
8  sign papers on me.  I told them I wanted to sign
9  papers on him.  And the head chief, he was like a
10  detective.  And the police officer went back there and
11  talked to the chief or something.  And right before my
12  mama came over there, he came in the room and begged
13  me to not put no charges on him.
14     Q.   Who did?
15     A.   The officer.
16     Q.   The officer.  Did you press charges on him?
17     A.   No.
18     Q.   Did he let you go home?
19     A.   Yes, sir.
20     Q.   So you didn't go to jail?
21     A.   No, sir.
22     Q.   You didn't get arrested then formally?
23     A.   No, I ain't never been behind bars.
24     Q.   Okay.  Any other problems with the police,
25  any other contact?

0055

```
1        A.    When I was -- I mean one time the police
2   told me and my friends to get on the ground and stuff.
3   It was crazy.  We didn't even do nothing.  They just
4   came out there and told us to get on the ground.
5        Q.    Where were you?
6        A.    Out at Tie Plant with my friends and
7   whatever.  We weren't doing nothing.  There was kids
8   there.  It was like the Fourth of July or something
9   like that.  And they threw some fireworks under my
10  car.  And I told the kids, you know, quit throwing
11  them fireworks and stuff like that.  And the police
12  came out there and told us to get on the ground and
13  stuff.
14       Q.    Did they think that you were throwing the
15  fireworks?
16       A.    I don't know what that thought.
17       Q.    What did they do to you?
18       A.    Nothing.
19       Q.    After you got on the ground did they take
20  you in?
21       A.    No, just went to the car.  We just got up
22  and we went to put charges on them.  We went to my
23  friend's mama's house and told his mama.  And so we
24  went up there to the police station.  I think they put
25  charges on him.  I told him I didn't want to fool with
```

55

0056

1    it.

2        Q.    They put charges on you or your friend put

3    charges on the police?

4        A.    Police.

5        Q.    But you didn't?

6        A.    No, sir.

7        Q.    Okay.

8    BY UNIDENTIFIED MALE SPEAKER:

9        Q.    What county is Tie Plant?

10       A.    Tie Plant is Grenada.

11   BY DR. LOTT:

12       Q.    Grenada County.

13       A.    Yeah.

14       Q.    Where is Tie Plant?  I know where

15   Coffeeville is.  I know where Grenada is located.

16   Where is Tie Plant?

17       A.    Do you know where Duck Hill is at?

18       Q.    I know where Duck Hill is located.

19       A.    Tie Plant's like going toward Duck Hill.

20       Q.    On 51 going south?  There's a community

21   called Tie Plant between Grenada and Duck Hill?  Or is

22   it past Duck Hill?

23       A.    No, it's in between.  Do you know where

24   Elliott is?

25       Q.    Elliott.  I'm not familiar with that.

0057
1        A.    There's Tie Plant, then it's Elliott, then
2    it's (inaudible) road.
3        Q.    I didn't know there were two communities.
4    Okay.
5    BY UNIDENTIFIED MALE SPEAKER:
6        Q.    Is Tie Plant there?
7        A.    No, there's two of them.  One of them on
8    this side and one on this side.
9    BY DR. LOTT:
10        Q.    Two what?
11        A.    Tie Plants.
12    BY UNIDENTIFIED MALE SPEAKER:
13        Q.    Tie Plant and Tie Plant west?
14    BY DR. LOTT:
15        Q.    How many people live in Tie Plant?
16        A.    It's a pretty nice neighborhood.  It's about
17    a hundred.
18        Q.    About a hundred.  All right.  Now, so moving
19    on.  Any other arrests by the police before these
20    charges?
21        A.    No, sir.
22        Q.    Okay.  So did you ever go to a training
23    school?  Were you ever sent to Oakley?
24        A.    No, sir.
25        Q.    Other than Capital City, that's the only

App.0468

0058

1    alternative school that you went to?

2        A.    Yes, sir.

3        Q.    Okay.  Anybody in your family ever been sent

4    to Oakley or Parchman or anywhere like that?

5        A.    I mean I've got brothers that have.

6        Q.    By your mom or by your dad?

7        A.    My daddy.

8        Q.    Did you know them very well?

9        A.    One of them was Michael, my brother.

10       Q.    Michael.  How old is Michael?

11       A.    About 40.

12       Q.    Okay.  So you didn't grow up with him?

13       A.    No, sir.

14       Q.    All right.  I was going to ask if you ever

15   -- legally, you don't have to answer this if you don't

16   want to.  You know, illegal things that you didn't get

17   caught for that you thought that you might have been

18   caught for?  In other words, if the police would have

19   found out about it, would you have been arrested?

20       A.    Probably.

21       Q.    Pardon?

22       A.    Yes, sir.

23       Q.    Yes?  Would you care to say what those are?

24   You certainly don't have to say that because of the

25   fact it's being tape-recorded.

58

0059

1        A.   No, sir.

2        Q.   You'd rather not say?

3    BY UNIDENTIFIED MALE SPEAKER:

4        Q.   Let me ask you about -- to get some -- Ms.

5    O'Clarity is here and you don't have to answer.  But

6    let me ask you kinds of stuff, theft, vandalism,

7    breaking windows, spray painting, blowing up mailboxes

8    with firecrackers, anything like that, keying cars?

9        A.   No, sir.

10        Q.   Okay.  Did you ever set any fires on

11    purpose, burning up old houses or cars, or woods,

12    anything like that?  Ever play with fire and get into

13    trouble when you were little playing with matches,

14    cigarette lighters, anything like that?  What kind of

15    trouble did you get into?

16        A.   You mean my mom?

17        Q.   Yeah, with your mom.  What did she do?

18        A.   Said don't play with it.

19        Q.   Would you ever injure animals, dogs, cats,

20    stray animals?

21        A.   Yeah, I did things to them.

22        Q.   Like what?

23        A.   There was just one dog would always come,

24    big old dog, he would always come down the street and

25    mess with our dog.  And would always come back in the

59

0060
1    backyard where we would feed him and he'd come back
2    there and try to take the dog's food, so I took a bat
3    and I busted him in the head.
4        Q.   Did you kill him?
5        A.   I mean I wasn't trying to kill him.  I was
6    just trying to run him off.
7        Q.   How old were you?
8        A.   About 11, 12 or so.
9        Q.   How about cats?  Did you ever hurt any cats
10   or frogs or any birds?
11       A.   If I see a frog, sometimes I just stomp on
12   it.
13       Q.   Did you ever kill any neighbor's cats or
14   pets?
15       A.   No, sir.
16       Q.   Did you ever throw any kittens or puppies in
17   the river or in the lake or in the pond?
18       A.   I mean I'd throw a cat up in the air just to
19   see him land on his feet but no worse than that.
20       Q.   How old were you then?
21       A.   About 12, 13 years old.
22   BY DR. LOTT:
23       Q.   Would you consider yourself somebody who
24   likes animals?  You said you had your own dogs.  Are
25   you a dog person?  A dog lover?

App.0471

0061
1      A.   Yeah, I like dogs.
2      Q.   You like dogs.  Did you have any other pets
3  growing up?
4      A.   My uncle, I had an uncle named Ricky Laytag.
5  And we called him Uncle Rick.  He used to come up the
6  road and we lived in a little community.  (Inaudible).
7  And he was having a farm.  I think it was like a farm.
8  Man, he had a whole bunch of chickens.  And when I got
9  older, you know, I didn't want a whole bunch of
10 chickens around the house.  Me and my brothers got out
11 there and would shoot the chickens so we could get rid
12 of them.  And then when he come home he asked what
13 happened to the chickens and we said his dogs got
14 them.
15     Q.   So it embarrassed you to have chickens
16 around the house?
17     A.   Yeah, we didn't want to have no chickens
18 running around at the house.
19     Q.   Well, if you're on a farm, what's wrong with
20 having chickens on a farm?
21     A.   We wasn't on no farm.  They just had them.
22     Q.   Were you in town?
23     A.   No, we stayed in the country.
24     Q.   You stayed in the country.  What's wrong
25 with having chickens in the country?

61

0062

```
 1        A.    We was getting older then.
 2        Q.    Okay.  All right.  Back in your school days
 3   did you get into any fights with your peers?
 4        A.    Yeah, I had a couple of fights with them.
 5        Q.    Are you a tough guy?
 6        A.    I wouldn't say I'm tough.
 7        Q.    Huh?
 8        A.    I wouldn't say I'm tough but (inaudible) me
 9   really.  Well, really didn't no person (inaudible).
10        Q.    Would you say that you have been in more
11   than five fights or less than five?
12        A.    In my life?
13        Q.    Yeah.
14        A.    More than five.
15        Q.    More than five.  More than ten?
16        A.    About ten.
17        Q.    About ten.  Did you start those or were you
18   just defending yourself in the majority of them?
19        A.    I never started a fight.
20        Q.    You never started a fight?
21        A.    No, sir.
22        Q.    Never was aggressive toward your girlfriends
23   in the past?  I'm guessing you had girlfriends?
24        A.    Yes, sir.  I mean I really -- I wasn't
25   really aggressive.  No, I ain't hit on no woman.
```

62

0063

```
 1          Q.    Did you ever slap her?
 2          A.    I might've grabbed her, that's it.
 3          Q.    Have you ever slapped your mother?
 4          A.    No, no way.  She would bust my head.
 5   BY UNIDENTIFIED MALE SPEAKER:
 6          Q.    Did she ever bust your head?
 7          A.    Yes, sir.
 8          Q.    Why?  What happened?
 9          A.    I'd just act crazy in the house after my
10   daddy died.  And I was kind of like the bad child, I
11   guess.  And they thought I was just bad.  And my twin
12   brother, he was just sneaky, so.  And when we was
13   going -- he kept going on to my mama (inaudible)
14   telling her I was doing stuff.  And she was like don't
15   mess with the crutches.  I wasn't messing with the
16   crutches.  My brother was running around the house and
17   messing with the crutches.  I told him to put down the
18   crutches.  And she came back there and she hit him a
19   couple of times.  But I let loose and (inaudible) she
20   was steady hitting on me and she wasn't hitting him no
21   more.  So I told her I wasn't messing with the
22   crutches.  I told her to get off of me.  And she hit
23   me in the head with the starch, a starch can.
24          Q.    Did it knock you out?
25          A.    No, it just broke the skin.
```

0064

```
 1        Q.   Is that where you got that scar?
 2        A.   Yeah, that's one of them.  There's two
 3   scars.
 4        Q.   What else did she hit you with?
 5        A.   That's it.
 6        Q.   Didn't knock you out?
 7        A.   No.
 8        Q.   Did you have to have stitches?
 9        A.   Yes, sir.
10        Q.   Did she carry you to the hospital to get
11   stitches?
12        A.   Yes, sir.
13        Q.   Did she tell them what happened?
14        A.   No, sir.
15        Q.   Did you?
16        A.   I mean we told them -- she said we were
17   playing or something like that.  I was going to tell
18   the folks, though.
19        Q.   What kept you from it?
20        A.   I didn't want my mom to go to jail.
21   BY DR. LOTT:
22        Q.   All right.  Now, moving on through here.
23   Did you have any other problems now?  Is that all the
24   problems you've had with the police?
25        A.   No, sir.
```

64

0065
1      Q.   That's it?
2      A.   Yes, sir.
3    BY UNIDENTIFIED MALE SPEAKER:
4      Q.   Okay.  Were the police ever called when you
5    were having problems in school?
6      A.   No, sir.
7    BY DR. LOTT:
8      Q.   Other than the one time with the cell phone?
9      A.   No, sir.
10     Q.   That's it?
11     A.   Yes, sir.
12     Q.   Okay.
13   BY UNIDENTIFIED MALE SPEAKER:
14     Q.   Did you -- let me try to clarify what
15   happened.  After you were at the alternative school in
16   Jackson, did you go back to Grenada High School or to
17   Tie Plant?
18     A.   After I left the alternative school down
19   here I went to Forest Hill.
20     Q.   Did you go back to school up in Grenada
21   County for your GED?
22     A.   Yeah, my GED in Grenada County.
23     Q.   We have some documents here indicating that
24   you were expelled from school in '02, and then went
25   back to school in '03 and got expelled again after you

65

0066

1    got into it with a teacher, a Ms. Sands?

2        A.    That was why I got expelled from GED school.

3        Q.    That was GED school.  Okay.  I got it.  Was

4    it something about a math test?

5        A.    She was calling me dumb.  See, the teacher

6    told me to go to my math teacher.  And then my math

7    teacher come back to the class.  So I did that.  And

8    on my way out of the class she told me, you know, she

9    just started calling me dumb, so I told her how I

10   felt.

11       Q.    What did you tell her?

12       A.    To shut up telling me all kind of stuff like

13   that.

14       Q.    Did you threaten her?

15       A.    I mean I just told her how I felt.  I never

16   did even threaten her.

17       Q.    Did you ever have a favorite teacher at any

18   of your schools?

19       A.    I had a couple of favorites.

20       Q.    You had a couple of favorites.  If we were

21   to contact your teachers, which ones would you say you

22   liked the best?

23       A.    Ms. Caufman.  She don't teach school now.

24   (Inaudible.)

25       Q.    Spell it for me.

66

0067

```
 1        A.   C-a-u-f-m-a-n.
 2        Q.   Ms. Caufman is at what school?
 3        A.   She teach like fifth grade.
 4        Q.   What school?
 5        A.   This is like fifth grade school.
 6        Q.   What school are you talking about, Grenada,
 7   or?
 8        A.   Grenada.
 9             DR. LOTT:  Okay.  This tape is about over.
10        Let me stop it.
11             This is the second tape, side A.
12   BY DR. LOTT:
13        Q.   Now, let's move on.  Tell me a little bit
14   about growing up.  I want to know a little bit about
15   how you -- what are some of your earliest memories
16   with mom and dad?
17        A.   I know we would go to California all the
18   time.
19        Q.   You did?
20        A.   Yes, sir.
21        Q.   How did you go to California?
22        A.   My dad.
23        Q.   Fly, drive?
24        A.   Drive over there.
25        Q.   You would drive?
```

67

0068

```
 1        A.    Yeah.
 2        Q.    So who would you visit in California?
 3        A.    My people (inaudible).
 4        Q.    Okay.  What was it like growing up in
 5   Grenada?  Do you remember?
 6        A.    Grenada, I mean after I got to know
 7   everybody, you know, it was all right.  But I mean I
 8   don't know, I never did like Grenada.
 9        Q.    You didn't what?
10        A.    I never did like it in Grenada, Mississippi.
11        Q.    You didn't.  Did you have any friends?
12        A.    Yeah, I had a whole bunch of friends.
13        Q.    You had lots of friends?
14        A.    Yeah.
15        Q.    Did you feel connected?  Did you feel like
16   you had about the same number of friends as most guys
17   your age growing up in elementary school?
18        A.    I had friends but they wasn't really just
19   friends cause a lot of people didn't chill.  They
20   didn't want to be around you because -- they didn't
21   want to be around you either cause they intimidated by
22   you or, you know, (inaudible) or things like that.
23        Q.    Were you intimidating in the first grade?
24        A.    No, sir.
25        Q.    Did you intimidate people to make them
```

68

0069

1  uncomfortable being around you in the first and second

2  grades?

3      A.   I don't know.

4      Q.   Well, do you feel like if there was a school

5  birthday party, someone said hey, let's go to Chucky

6  Cheese's, did you get invited to those kind of things

7  about as much as everybody else?

8      A.   No, I never went to no birthday parties.  I

9  never went to no friends' birthday parties.

10      Q.   You didn't growing up?

11      A.   No.

12      Q.   Did you know if any of the other group went?

13  For instance, did everybody get invited to things that

14  they would not invite you that you knew about?

15      A.   I'd probably been one that know about it.

16  I'd probably know.  Cause I went (inaudible). I mean a

17  lot of people went to a lot of different places.  They

18  went to parties.  I don't like going to all the

19  parties and clubs.

20      Q.   No, I'm talking about when you were a child

21  now, not older.

22      A.   When I was a little kid I never went to

23  parties.

24      Q.   Okay.  You never had -- did you have a

25  birthday party when you were young, 5, 6, 7, 8 years

69

0070

```
 1    old?  You never had a birthday party?
 2         A.   No.
 3         Q.   Never went to a birthday party?
 4         A.   No.
 5         Q.   Can you explain why?
 6         A.   Because like Christmas and my birthday is
 7    right there on each other, so no, we just get things
 8    for Christmas.  I mean birthdays to me is just like
 9    another birthday.
10         Q.   Did you get everything on Christmas?
11         A.   Yes, sir.
12         Q.   Your birthday is in November, right?
13         A.   December.
14         Q.   December.  Okay.  Just got more around
15    Christmas?
16         A.   Yeah.
17         Q.   Well, that's not fun.  Now, I know other
18    kids that would have their birthdays in July or June
19    if they had a Christmas birthday.
20         A.   No, sir.
21         Q.   You didn't do that?
22         A.   No, sir.
23         Q.   Okay.  Well, all right.  So would you say
24    that you had as many friends as most people growing up
25    or would you consider yourself somewhat of a loner?
```

70

0071

```
 1        A.   Sort of a loner, what you mean?
 2        Q.   Well, you know.
 3        A.   By myself?
 4        Q.   Yeah, by yourself.  Exactly.
 5        A.   I mean as far as -- I knew a lot of people
 6   and a lot of people knew me.  So when I with them,
 7   they were like hey, what's up, Terry, you know what
 8   I'm saying.
 9        Q.   Okay.
10        A.   And that was it.  But as far friends with me
11   chilling with, no, I had a (inaudible) -- you know,
12   just something to do to pass time, you know.
13   (Inaudible).
14        Q.   What about with your parents, did you feel
15   like you were as loved and cared for as your brothers
16   and sisters?
17        A.   Not when I was young.  I always feel my
18   mama, she showed favor to him.
19        Q.   To who?
20        A.   My twin brother.
21        Q.   To your twin?
22        A.   Yeah.
23        Q.   Did he not get in much trouble?  He was
24   sneaky?
25        A.   Yeah.
```

71

0072

1   BY UNIDENTIFIED MALE SPEAKER:

2       Q.   Did he do as much bad stuff, he just didn't

3   get caught at it?

4       A.   He just didn't get caught at it.

5   BY DR. LOTT:

6       Q.   So you were, you said earlier the bad child.

7   At the house, if something gets broken at the house

8   they would think you did it.  But do you think that

9   your mother and your father loved you?  Did they show

10  love and affection?

11      A.   Yeah.

12      Q.   You felt loved and cared for?

13      A.   I felt love and care.

14      Q.   Okay.  But did you ever feel abused?

15      A.   Yeah.

16      Q.   How?

17      A.   When my mama whipped me.

18      Q.   I'm not talking about just getting in

19  trouble now.  Did you feel like she would abuse you

20  for no reason?  Did she ever come up and take a stick

21  to you for no reason?

22      A.   No.

23  BY UNIDENTIFIED MALE SPEAKER:

24      Q.   Or if she had a reason do you think she

25  punished you too much?  Like (inaudible.)

App.0483

0073

1     A.   One thing about my mama, if you catch her
2   and she ain't got no switch or something, she's going
3   to hit you with something.
4     Q.   Has your mama got a quick temper?
5     A.   No, not no more.
6     Q.   Did she used to?
7     A.   Not if you do right for her.
8     Q.   Say again?
9     A.   As long as you do right.
10    Q.   Do you have a quick temper?
11    A.   I mean I'd get upset with her.  I mean I
12  didn't know how to control.
13    Q.   Did your mom fight with your step-dad?
14    A.   (Inaudible).
15    Q.   Did your step-dad ever mistreat you, beat
16  you or anything like that when he was drinking?
17    A.   No, sir.
18    Q.   He was a drinker?
19    A.   Yes, sir.
20    Q.   Too much?
21    A.   Yes, sir.
22  BY DR. LOTT:
23    Q.   How about your father before he passed?
24    A.   My daddy would go to bed and that was it.
25    Q.   But was he ever abusive towards you in any

73

0074

1   way?

2          A.   He would get on your tail.

3          Q.   What did he do?

4          A.   Get a long, orange extension cord and he

5   would whip your tail until you stop doing what you

6   were doing.  You didn't want to do it no more.

7          Q.   So it was discipline but it wasn't excessive

8   or anything as far as you can remember?

9          A.   It was like normal kids, like that.

10         Q.   When you were growing up, who did you spend

11  most of your time with?

12         A.   With my parents?

13         Q.   Right.  When you were at home, you come home

14  after school, who would you stay with?

15         A.   My daddy.

16         Q.   Your dad was always home after school?

17         A.   Yeah.

18         Q.   You got in at 3:00 o'clock.  He would?

19         A.   My daddy was always there.

20         Q.   Your dad was always there.  I thought you

21  said he was a truck driver.

22         A.   This is when I was little.

23         Q.   Okay.  So he wasn't working then when you

24  were in grade school?

25         A.   No, sir.

74

0075

1     Q.   So you spent most of your time with him.

2  Who would prepare supper for you?

3     A.   He would.

4     Q.   He did.  If you went to the doctor, who

5  carried you to the doctor?

6     A.   Well, I ain't never had to go to the doctor.

7  But if we would, it would've been him taking me.

8     Q.   Or the dentist?

9     A.   He would be the one taking.

10     Q.   He would have taken you?  Okay.  When you

11  buy school supplies and school clothes at the

12  beginning of the year, who would do that with you?

13     A.   Both of them.

14     Q.   Both of them.  Okay.  What did you enjoy

15  doing for fun when you were growing up?

16     A.   Going outside and started shooting

17  basketball, me and my brother.  I really didn't do

18  nothing.  We made fun.

19     Q.   What did you do?

20     A.   I played basketball, shoot each other with

21  the pellet gun.

22     Q.   Shoot each other with the pellet gun?

23     A.   Yeah.

24     Q.   Did that hurt?

25     A.   Far off it wouldn't hurt.

0076

1     Q.   Do what?

2     A.   If you run far off it wouldn't hurt.

3     Q.   How close would you get to each other?

4     A.   Depending on (inaudible).

5     Q.   Did you use garbage cans to try and protect

6  yourselves from each other, garbage can lids?  You

7  didn't do that?

8     A.   No, sir.

9     Q.   Did you ever play video games?

10    A.   Yeah, I played video games.  I didn't like

11  it though.

12    Q.   After you got up a little bit older, after

13  you got old enough to get a driver's license, what did

14  you do for fun?

15    A.   Chilled with the girls.

16    Q.   Chilled with the girls?

17    A.   Yeah.

18    Q.   How many girlfriends did you have?

19    A.   About five.

20    Q.   Five girlfriends?

21    A.   Yeah.

22    Q.   And the longest girlfriend you had was how

23  long?

24    A.   About six.  What you mean?

25    Q.   How long did you date them?  How long had

76

0077
1    you been seeing them?
2        A.    I mean the longest one I had was with my
3    baby's mama.
4        Q.    Okay.  How long was that?
5        A.    Six years.
6        Q.    Six years.  But you had other girlfriends in
7    addition to your baby's mother during that period of
8    time?
9        A.    Yes, sir.
10       Q.    Because you mentioned earlier you left your
11   baby's mother and you went somewhere and Chasity was
12   preparing you something to eat.
13       A.    Yeah.
14       Q.    So was that a girlfriend?
15       A.    No, Chasity was just like a good friend,
16   something like that.
17       Q.    She cooked supper for you?
18       A.    Yes, sir.
19       Q.    Okay.  So you had six relationships.  How
20   old were you when you first started having sex?
21       A.    About 13 or 14.
22       Q.    Thirteen or fourteen.  Did you always use
23   protection?
24       A.    No, sir.
25       Q.    Did you ever use protection?

77

0078

1     A.   About one or two times.

2     Q.   Okay.  Now, you've got your baby.  How often

3  would you see your baby?

4     A.   All the time.

5     Q.   How often?

6     A.   Every day.

7     Q.   Every day.  How did you get there?

8     A.   In my car.

9     Q.   Did you drive over there?  How far did she

10  live from you -- or he live from you?

11     A.   It was a long way.  I stay in the country

12  and they stay in town.  But after work I'd leave work

13  and go over there.

14     Q.   So you would go by every day?

15     A.   Yes, sir.

16     Q.   You said that earlier about you helped with

17  pampers and diapers.  Did you provide food and any

18  clothes for the baby?

19     A.   Yes, sir.

20     Q.   How old is your baby now?

21     A.   A year old.

22     Q.   A year.  So you would go by about every day?

23     A.   Yes, sir.

24     Q.   If he got sick did you ever have to go to

25  the doctor?

78

0079

```
 1        A.   Yes, sir.
 2        Q.   You have?
 3        A.   Yes, sir.
 4        Q.   Where would you go to the doctor?
 5        A.   One of the clinics.
 6        Q.   Do you know which clinic?
 7        A.   No, I can't think of the name of it.
 8        Q.   Where was it?
 9        A.   In Grenada.
10        Q.   If your baby started running a high fever
11   what would you do?
12        A.   What would I do?
13        Q.   Yeah, what would you do?  Let's say you had
14   the baby.  Did you ever keep the baby at your mom's?
15        A.   I didn't know to.  I took him by my
16   sister's.
17        Q.   Did he ever stay overnight with you at
18   mom's?  No?  If you had the baby and the baby started
19   running a high fever, what would you do?
20        A.   Go get some medicine or take him to the
21   clinic.
22        Q.   What if he had a fever of, let's say, 102.
23   What do you think you should do?
24        A.   Take him to (inaudible).
25        Q.   What is a high fever?  Like over what
```

0080
1   number?  Is 102 a high fever or is it about normal?
2        A.   I think it's pretty high.
3        Q.   Pretty high, especially for a baby.
4   BY UNIDENTIFIED MALE SPEAKER:
5        Q.   Do you know what normal temperature is for a
6   person?
7        A.   (Inaudible).  Fourth grade (inaudible).
8   Like 99.8.
9        Q.   Pretty close, less than 100
10  BY DR. LOTT:
11       Q.   Well, so you had been -- how often were you
12  seeing your other girlfriends?
13       A.   Every night.
14       Q.   Every night.  Were you spending the night
15  with them?
16       A.   Sometimes.
17       Q.   Sometimes.  Okay.  So you lived with your
18  parents but sometimes you'd stay with girlfriends?
19       A.   Yes, sir.
20       Q.   Okay.  Other than hanging out with the
21  girlfriends, what other kind of fun things did you do?
22       A.   Chilled with the fellas.
23       Q.   Chill with the fellas.  What were you doing
24  with the fellas?
25       A.   Like just running with the fellas and we

80

0081

1   would go visit the girls or, you know, smoke, stuff
2   like that.
3         Q.   Okay.  Let's talk about substance abuse.
4   How old were you when you first used any drugs or
5   alcohol?
6         A.   My daddy used to give us beer when I was a
7   little kid.
8         Q.   Give you beer.  How old were you?
9         A.   I was about -- I was young.  About 7 --
10        Q.   How much would he give you?
11        A.   -- eight.  He'd give us a can.  You know how
12   they buy the can.  He'd give us about that much.
13        Q.   So he let you drink beer?
14        A.   Yeah.  He said that when we get older we
15   won't want to drink beer no more.
16        Q.   Is that true for you?  When you got older
17   did you want to drink more beer?
18        A.   I mean when I'm chilling with the boys I may
19   drink a little beer or something.  (Inaudible).
20        Q.   Do you ever drink heavily?  Do you ever wake
21   up in the morning with the shakes?
22        A.   No, sir.
23        Q.   Do you ever have to have a beer in the
24   morning, what's called an eye-opener?  Get one first
25   thing out of the fridge in the morning?

0082

1      A.   Not really.

2      Q.   Did you ever drink hard liquor?

3      A.   I have (inaudible).

4      Q.   What did you drink?

5      A.   Out of a bottle, out of a can, (inaudible.)

6      Q.   What is the most you ever consumed in one

7  day?

8      A.   One day, probably about this much.  Probably

9  like two cups.

10     Q.   Two cups of what?

11     A.   Of a hard liquor, I can't drink nothing but

12  like one cup or I get drunk.

13     Q.   Okay.  What about drug use?  What have you

14  done?

15     A.   Just smoke weed.

16     Q.   How old were you when you started?

17     A.   Fifteen.

18     Q.   And how much were you smoking?

19     A.   At first I was only like, it was like every

20  other day, something like that.

21     Q.   What did it progress to?

22     A.   When I got locked up I was smoking like 20,

23  25, blunts a day.

24     Q.   Twenty blunts a day?

25     A.   Something like that.

82

0083

1      Q.    Where were you getting that kind of
2  marijuana?  Were you making the blunts or buying the
3  blunts?
4      A.    I made it.
5      Q.    You were making your own blunts?
6      A.    Yes, sir.
7      Q.    So how much marijuana was that a day?
8      A.    About an ounce.
9      Q.    An ounce a day.  How much do they cost?
10     A.    It didn't cost nothing.
11     Q.    Didn't cost anything?  Explain.
12           UNIDENTIFIED FEMALE SPEAKER:  You don't have
13        to answer that one.
14  BY DR. LOTT:
15     Q.    You don't have to answer that.  But my
16  assumption is that if it didn't cost anything, you
17  were dealing it.  So you were smoking an ounce a day?
18     A.    Yeah.
19     Q.    Around that much.  Anything else?  Anything
20  in the marijuana, cocaine, PCP, anything else?
21     A.    I never used anything else.
22     Q.    You never tried any other drugs other than
23  marijuana.  No ecstasy, LSD, PCP?
24     A.    I popped some pills when I went to the Job
25  Corp.

App.0494

0084
```
 1        Q.   What kind of pills?
 2        A.   I don't really know.
 3        Q.   How many times did you pop them?
 4        A.   About four times.
 5        Q.   Four times.  What did they do to you?  Make
 6   you sleepy?  Make you high?  Make you hyper?
 7        A.   They didn't do nothing.
 8        Q.   Nothing.  So you smoke marijuana.  You were
 9   smoking 20 to 25 blunts a day when you got arrested.
10        A.   Yes, sir.
11        Q.   What time of day did you start smoking?
12        A.   When I woke up in the morning.
13        Q.   So you were working?
14        A.   Yes, sir.
15        Q.   So how did you manage to smoke that many
16   blunts a day while you were working?  You were working
17   ten hour days.  Did you smoke on the job?
18        A.   Yes, sir.
19        Q.   And you were driving?
20        A.   Yes, sir.
21        Q.   Oh, boy.
22   BY UNIDENTIFIED MALE SPEAKER:
23        Q.   Did you ever put anything else besides
24   marijuana and tobacco?
25        A.   I didn't put no tobacco in it.
```

84

0085

1      Q.   Say that again?

2      A.   I didn't put no tobacco in it.

3  BY DR. LOTT:

4      Q.   You didn't put any tobacco in them?

5      A.   No.

6      Q.   You just put (inaudible).  You have any

7  cocaine?

8      A.   No, I never put any coke.

9      Q.   Did you ever dip them in (inaudible).

10      A.   Yeah, I had some syrup.

11      Q.   What kind of syrup?

12      A.   Cough syrup.

13      Q.   Like a cough syrup?

14      A.   Yeah, something like that.

15      Q.   Like prescription cough syrup?

16      A.   Yeah.

17      Q.   What did that do to you?

18      A.   Make me real relaxed.

19      Q.   Have you ever dipped them in formaldehyde or

20  water?

21      A.   No, sir.

22      Q.   How often did you dip them in cough syrup?

23      A.   I did it about two times.

24      Q.   How long did that last when you did that?

25      A.   It last about the same.  It would do nothing

0086

1   but give you a rush.

2       Q.   Do you know what kind of cough syrup it was

3   and what was in it?

4       A.   No, it's one of the brand syrups.

5       Q.   You put it in an ounce of various marijuana?

6       A.   Yeah.

7       Q.   How much does an ounce go for?

8       A.   You can get an ounce for $50.

9       Q.   Fifty dollars an ounce?

10      A.   If you know the right person, $50.  But some

11  people sell it for a $100, $150.  Some people sell it

12  for $80.  Some people sell it for $70.  If you know

13  the right person you can get it for $50.

14      Q.   Was it good weed or would they mix it and

15  cut it?

16      A.   The best you can buy.

17      Q.   The best you can buy for $50 an ounce?

18      A.   Yes, sir.

19      Q.   Okay.  No other drugs.  Did you ever use a

20  needle?

21      A.   No, sir.

22  BY UNIDENTIFIED MALE SPEAKER:

23      Q.   Ever huff anything?

24      A.   No, sir.

25      Q.   Even when you were little?

0087

1       A.   Yeah, I probably did when I was young.

2       Q.   How young?

3       A.   I was probably like 11, 12, 9.

4    BY DR. LOTT:

5       Q.   What did you do?

6       A.   I don't know.  I mean I huffed some -- I

7    think it was paint or something one time.  I'd seen a

8    TV show or something and I just did it.  It wasn't

9    nothing to it.

10      Q.   How sick did you get?

11      A.   I didn't get sick at all.

12      Q.   Did you get high?

13      A.   I don't think I did, no.

14      Q.   Did you ever huff glue or freon?

15      A.   No.

16      Q.   No other drugs?  Did you ever use a needle?

17      A.   No.

18      Q.   Did you ever get treated for drug use?

19      A.   No.

20      Q.   Did anybody ever suggest that you needed

21   treatment for drug use?

22      A.   Nobody even knowed I was smoking.

23      Q.   Nobody knew you were smoking.  Twenty-five

24   blunts a day and nobody knew that you were stoned?

25      A.   No, sir.

App.0498

0088
1    BY UNIDENTIFIED MALE SPEAKER:
2        Q.   Do you think your brother didn't know you
3    were smoking that much dope?
4        A.   Yeah, my brother.  He didn't know I was
5    smoking like that, though.  If you drop some Visine in
6    your eyes you never can tell.
7        Q.   Did you ever take any pain pills?
8        A.   No, sir.
9    BY DR. LOTT:
10       Q.   Did you smoke crack?
11       A.   No.
12       Q.   I'm assuming many of your other buddies were
13   using crack.  No?  That wasn't something you guys were
14   doing?
15       A.   No.
16       Q.   No?  Okay.
17       A.   We weren't doing none of those others.
18       Q.   Meth?
19       A.   No.
20       Q.   Ice or Crank or anything like that?  Okay.
21   Now, and I didn't ask this earlier.  I think we
22   touched on it.  Has anybody in your family got any
23   drug and alcohol problems?
24       A.   Yeah.
25       Q.   Who?

88

0089

```
 1          A.   I mean (inaudible).
 2          Q.   Well, how many brothers, sisters, uncles?
 3          A.   That smoke?
 4          Q.   That have a problem with drugs and alcohol.
 5     They do drugs and have a problem with alcohol?
 6          A.   I mean they use them.  About all my brothers
 7     and sisters on the Pitchford side use drugs, they
 8     smoke weed.
 9          Q.   All of them.  You said you've got about 15.
10          A.   About all of them.
11          Q.   What about your father?
12          A.   No, my father never smoked at all.
13          Q.   Did he have a problem with alcohol?
14          A.   No.
15          Q.   A problem with it now?
16          A.   No, he didn't.
17          Q.   Okay.  Stepfather?
18          A.   Yeah.
19          Q.   He did.  What about with drugs?
20          A.   I don't know about drugs.
21          Q.   You don't know about any drugs.  What about
22     your mom?
23          A.   No.
24          Q.   What about your grandparents, your mom's
25     parents or your dad's parents, any of them have any
```

89

0090

1    history of drug and alcohol problems?

2         A.   I mean my mama's daddy died from drinking

3    too much.

4         Q.   Your mom's daddy did.  So it sounds like you

5    have quite a history of alcohol abuse?

6         A.   Yes, sir.

7         Q.   Okay.  Anybody else, any major problems,

8    aunts, uncles, anybody?

9         A.   My uncle was.  He had a real bad drug

10   problem but he don't do it no more.

11        Q.   Mom's or dad's?

12        A.   My mom's.

13        Q.   Your mom's brother.  Okay.  Anybody in your

14   family that you know of that went to Whitfield or any

15   mental health facility like Whitfield?

16        A.   I had a brother named James.  He went to

17   Whitfield.

18        Q.   James did?

19        A.   Yeah.

20        Q.   How old was James when he went to Whitfield?

21        A.   I don't know.  He was smoking dope.

22        Q.   You don't know what diagnosis he might have

23   had?

24        A.   No.

25        Q.   Was it drug and alcohol-related?

90

0091
1        A.   I don't know.
2        Q.   You don't know?
3        A.   No.
4        Q.   Okay.
5   BY UNIDENTIFIED MALE SPEAKER:
6        Q.   You didn't know him at all?
7        A.   Who?
8        Q.   James.
9        A.   That's my brother.  He -- no, I didn't know
10  him.  He died before I was born.
11  BY DR. LOTT:
12       Q.   Oh, he died?
13       A.   Yeah.  Well, he was probably alive when I
14  was born but I didn't know him.
15       Q.   You just don't remember him?
16       A.   No.
17       Q.   Okay.  No one else that you know of that was
18  treated for mental illness.  Anybody in your family
19  considered to be mentally retarded?  Any of your
20  brothers or sisters, anybody considered to be mentally
21  retarded?  Do you know what I mean by mentally
22  retarded?
23       A.   Like crazy.
24       Q.   Well, what do you mean by that?  Mentally
25  retarded, not mentally ill?

App.0502

0092

1    A.   I really (inaudible).

2    Q.   You've heard of people described as

3  retarded, haven't you?

4    A.    Yeah.

5    Q.   What does that mean to you?

6    A.    They got a brain condition like in their

7  head or something that is messed up.

8    Q.   Possibly.  But what else does it mean?

9  You've got retarded and you've got crazy.  Growing up

10  when people use those terms, or he's retarded or she's

11  crazy, what did that mean to you?

12    A.    Retarded means to me that, you know,

13  something wrong, they retarded in some kind of way.

14  The only time (inaudible) crazy.

15    Q.   Well, did you ever go to school when people

16  were called mentally retarded?  Did you ever know

17  students growing up who were mentally retarded?

18    A.   I would see them (inaudible).

19    Q.   Okay.  Were they called retarded?

20    A.   No, they called them the local dummy.

21    Q.   Okay.  Well -- called what?

22    A.   Local dummy.

23    Q.   Local dummy.  What do you think that would

24  really stand for?

25    A.   I believe it would stand for retarded.

92

0093

1          Q.    That's right.  Okay.  All right.  Now, I'm
2    going to ask you some questions about how you're doing
3    today as you're sitting here.  Let me back up.  How
4    tall are you?
5          A.    About 5-6.
6          Q.    How much do you weigh?
7          A.    I've lost a lot of weight.
8          Q.    Just give me a guess.
9          A.    160.
10          Q.    160.  Are you doing any weightlifting in the
11    jail?
12          A.    I do push-ups.
13          Q.    You do push-ups.  Okay.  What's the tattoo
14    on your hand there say?
15          A.    It's my son's name.  My son's name.
16          Q.    Okay.  Is that your son's name?
17          A.    Yes, sir.
18          Q.    Any other tattoos?
19          A.    No, sir.
20          Q.    Okay.  How are you feeling today, your mood,
21    just in general, happy, sad, mad, glad?  How you
22    doing?
23          A.    I mean sad really.  Sad.
24          Q.    As you're sitting here now, how are you
25    doing today?  Are you doing okay?

93

```
0094
  1        A.   Yes, sir.
  2        Q.   How have you been doing since your arrest?
  3        A.   I been adapting to it.
  4        Q.   Been adapting.  Have you tried to hurt
  5   yourself since you've been arrested?
  6        A.   No, sir.
  7        Q.   Have you ever tried to hurt yourself?
  8        A.   (Inaudible).
  9        Q.   Tried to hurt yourself, commit suicide?
 10        A.   Yes, sir.
 11        Q.   When?
 12        A.   It's been when I was a kid.
 13        Q.   How old were you?
 14        A.   About 14.
 15        Q.   Fourteen.  Why?  What was going on with you
 16   at 14 for you to do that?
 17        A.   I just had a real bad temper.
 18        Q.   You had a real bad temper?
 19        A.   Yeah.  I got mad.
 20        Q.   At who?
 21        A.   I got mad at my baby's mama, my mama and
 22   daddy.
 23        Q.   So what did you take?
 24        A.   I took a whole bottle of pain pills.
 25        Q.   A bottle of pain pills.  Whose were they?
```

94

0095

```
 1        A.   I don't know.
 2        Q.   You don't know.
 3        A.   I got them out of the cabinet.
 4        Q.   You got them out of the cabinet.  So what
 5   happened to you?
 6        A.   I started to shake at first.  And then I
 7   went and told my sister and I just blacked out.
 8        Q.   And then what happened?
 9        A.   They was taking me to the hospital and
10   trying to wake me up.  They started trying to wake me
11   up and took me to the hospital.  After some time
12   (inaudible).
13        Q.   So they didn't pump your stomach?
14        A.   No, sir.
15        Q.   So what happened after that?  Did you leave
16   that day or were you in the hospital overnight?
17        A.   I left that day.
18        Q.   You left that day.  Did you have any
19   problems after that walking, talking, anything that
20   you can recall?
21        A.   No, sir.
22        Q.   Okay.  Is that the only time you ever tried
23   to hurt yourself?
24        A.   No, sir.
25        Q.   What?
```

95

0096

1      A.   Some people think (inaudible) crazy.  I cut

2  myself one time.

3      Q.   Were you trying to hurt yourself or just

4  feel the pain?  Some people cut on themselves and say

5  it makes them feel better, release tension.  What were

6  you doing?

7      A.   I cut.

8      Q.   Did you have stitches?

9      A.   No, sir.

10      Q.   Did you tell anybody?  Is that the scar on

11  your left arm there?

12      A.   No, it was this here.

13      Q.   Here and here.  Is that what we are talking

14  about?

15      A.   Yes, sir.

16      Q.   Okay.  That's under the left arm?

17  BY UNIDENTIFIED MALE SPEAKER:

18      Q.   What was going on then when you cut

19  yourself?

20      A.   I was mad.

21      Q.   Who were you mad at?

22      A.   I was mad.

23      Q.   What was going on?

24      A.   I was just doing it.

25      Q.   Do you know or don't want to say?

App.0507

0097
1          A.    I was just doing something.
2          Q.    Well, there's a long list of doing something
3    when you're cutting yourself.  Was it gang-related?
4          A.    No.  I was just sitting on the bed at the
5    house and after I got off the phone or something and I
6    (inaudible) something and I just started scraping
7    myself.
8    BY DR. LOTT:
9          Q.    Any other place besides those two?
10         A.    No, sir.
11         Q.    Okay.  Now, right now you talked about
12   hurting yourself.  What if you go back to court and
13   you get the death penalty?  Did you tell anyone if you
14   get the death penalty you're going to commit suicide?
15         A.    No, sir.
16         Q.    Okay.  How have you been sleeping?
17         A.    I've been sleeping all right but my leg
18   hurts.
19         Q.    Why has your leg been hurting?
20         A.    Exercise.
21         Q.    Exercise.  Okay.  How is your appetite?
22         A.    Good.
23         Q.    It's good.  You said you'd lost some weight.
24   Any idea how much?
25         A.    A lot of weight.

97

0098

1     Q.   You've lost a lot of weight.  How much?

2     A.   I normally weigh about 210.

3     Q.   Bulked up or are we overweight?  For 210 you

4  would have been overweight unless you had added muscle

5  and it was mostly muscle.

6     A.   No, sir.

7     Q.   All right.  Now, have you ever heard voices

8  other people didn't hear?

9     A.   Just voices in my head.

10    Q.   But did you hear anybody talking to you like

11  I am talking to you right now that other people

12  wouldn't hear?

13    A.   I might hear somebody calling my name or

14  something.

15    Q.   Okay.  We've all experienced that.  But do

16  you hear someone constantly talking to you, carrying

17  on a conversation, telling you to do things, that no

18  one else around you can hear?

19    A.   Like I might I hear them in my head.

20    Q.   Like what?

21    A.   I might hear a whole bunch of things, like

22  two different people in my head telling me what to do.

23    Q.   What about your conscience?  Do you know

24  what I mean by we all have a conscience that we deal

25  with when we would do something bad?

0099
```
 1        A.    Lying is bad.  I mean it don't be no -- I
 2   mean it ain't like this and like that.  It's a whole
 3   bunch of stuff.
 4             DR. LOTT:  Okay.  Well -- let me turn this
 5        tape over.
 6        A.    I hear voices in my head sometimes.
 7        Q.    Explain.
 8        A.    Like I would be up doing something and
 9   something tells me to do something else and something
10   tells me to do this and do that and different things.
11        Q.    Did you ever hear voices telling you to slap
12   somebody for no reason?
13        A.    Yeah, I'd hear them.
14        Q.    And what would you do?
15        A.    Most of the time I don't react on them.
16        Q.    You don't?
17        A.    I learned how to control it.
18        Q.    Did you ever think that people could read
19   your mind and you could read other people's minds?
20        A.    No, sir.
21        Q.    Can you read my mind?
22        A.    I can take a guess.
23        Q.    I'm not asking you to guess.  I'm asking can
24   you read my mind.  Can you turn this tape recorder on
25   and off just by looking at it and thinking about it?
```

99

0100
1          A.    I don't (inaudible) I could.
2          Q.    But can you?
3          A.    No, sir.
4          Q.    Can you move objects in this room just by
5    looking at them?
6          A.    No, sir.
7          Q.    Okay.  Can I read your mind?
8          A.    No, sir.
9          Q.    Do you ever feel like you have any special
10   powers of any sort?  Any unique powers or abilities?
11         A.    I ain't got no powers.
12         Q.    Did you ever think you could heal the sick
13   and raise the dead?
14         A.    I believe it's possible.
15         Q.    But can you do it?  If I were to have a
16   stroke out here and literally died, can you bring me
17   back to life?
18         A.    No, sir.
19         Q.    Okay.  Have you ever thought that aliens
20   were trying to haunt you, your parents, anything
21   bizarre or weird like that go on with you?
22         A.    No, sir.
23         Q.    Okay.  Have you ever thought that you had
24   different body parts that say someone had taken
25   something from your body or put something in your

App.0511

0101

1  body?

2      A.  No.

3      Q.  Have you ever thought that you had women's

4  female anatomy, like breasts?  Did you ever think you

5  had breasts or a vagina, anything strange like that?

6      A.  No, sir.

7      Q.  Okay.  So nothing been removed or added to

8  you?

9      A.  No, sir.

10     Q.  Okay.  Did you ever have any reason to think

11 that the government or anybody else was out to get

12 you, to get you personally?

13     A.  No, sir.

14     Q.  Okay.  Do you think that we are somehow out

15 to get you personally, that we have any unique grudge

16 or anything against you?

17     A.  No, sir.

18     Q.  Okay.

19 BY UNIDENTIFIED MALE SPEAKER:

20     Q.  Have you ever spoken with other people, any

21 spirits, anything like that?

22     A.  My daddy.

23     Q.  Like what?

24     A.  Seeing my daddy.

25     Q.  How old were you?

101

0102

```
 1        A.   About 12.
 2        Q.   How often did this happen?
 3        A.   Every day.  You talking about now?
 4        Q.   No, when you saw him?
 5        A.   About three years.
 6        Q.   What did he look like?
 7        A.   Like his regular self.
 8        Q.   Say again?
 9        A.   Like his regular self.
10        Q.   Like his regular self.  Did he say anything
11   to you?
12        A.   No, sir.
13        Q.   Were you awake or asleep?
14        A.   Awoke.
15        Q.   How long did that last?
16        A.   For a minute.  Just for a minute.  I just
17   thinking I was dreaming or something like that.
18        Q.   It scared you?
19        A.   Yeah.
20        Q.   Did it shake you up a little bit?
21        A.   No, sir.
22        Q.   What do you think that was?
23        A.   What you mean?  Like, I just thought it was
24   a dream.
25        Q.   Well, do you think it was really your dad?
```

102

0103

```
 1   Did you think it was a ghost?  Did you think it was in
 2   your mind?
 3        A.   Ghost.
 4        Q.   Huh?
 5        A.   I knew it was a ghost.
 6   BY DR. LOTT:
 7        Q.   Was it in color or black-and-white?
 8        A.   It was in color.
 9        Q.   It was in color?
10        A.   Yes, sir.
11        Q.   I'd like to go back to the voices for a
12   minute.  Now, let's be clear.  Are we talking about
13   voices where you can hear them in your mind or are you
14   talking about like your own inner thoughts?
15        A.   Voices I hear in my mind.
16        Q.   Voices in your mind?
17        A.   Yes, sir.
18        Q.   Did they ever carry on a conversation with
19   you such that you would talk back to them?
20        A.   Yes, sir.
21        Q.   Like what?
22        A.   Just -- I just tell what I think.  Sometimes
23   I might tell them to shut up talking to me.  Sometimes
24   I -- like you could tell them to shut up probably.
25        Q.   Are you still having them, hearing them?
```

103

0104

1    A.   I hear them all the time.

2    Q.   All the time?

3    A.   Yes, sir.

4    Q.   Is there anything that you can do to make
5    them go away?

6    A.   There's one voice in my mind that I can say
7    certain things and they will leave but they only stay
8    gone for a minute.

9    Q.   Do the voices have a name?

10   A.   No, sir.

11   Q.   Do they come to molest you or (inaudible).

12   A.   No, they all in my head, in my mind.

13   Q.   And are they male or female voices?

14   A.   Male.

15   Q.   Male?

16   A.   Male, yes, sir.

17   Q.   Do you know whose voices they are?

18   A.   I used to think -- I was thinking, as I got
19   older, that it was Satan -- it was Satan and God
20   having a battle in my head, the voice in my head.
21   That's what I started thinking.  So now I just let
22   them act on their own.

23   Q.   When you would hear the voices did you ever
24   have the sensation of tickling at the end of your nose
25   when you hear the voices?

104

0105

1        A.    No, it don't tickle.   I usually hit my head.
2   I usually hit my head or something like that.
3        Q.    Can you give me an example of the last time
4   you heard the voices?
5        A.    I can hear them now.
6        Q.    You hear the voices now?
7        A.    Yes, sir.
8        Q.    And what are they saying now?
9        A.    A whole bunch of things.
10       Q.    Give me an example.
11       A.    How long is this going to take.   What's
12  going on outside.   What y'all thinking about.   Trying
13  to call you outside.
14       Q.    But now, again, we want to make sure we
15  understand.   Because there's a big difference between
16  what we call self talk.
17       A.    Sometimes -- sometimes it be -- sometimes it
18  be like -- they have (inaudible), sometime just have a
19  number of different things, you know what I'm saying.
20       Q.    But we all have ideas.   For instance, we can
21  all be here talking to you right now and we can think
22  well, you know, what have I got to carry home for
23  supper tonight.   You know, we can all go that way and
24  we have tangents and our mind works like that.
25       A.    This is like say if I'm locked in a room by

105

0106

1   myself with and ain't nobody else talking or nothing
2   like that.  Nobody talking to me or anything else.  I
3   hear them.  Right now I'm kind of like controlling my
4   thoughts.  But when I'm just, you know, just sitting
5   here in jail or something like that or laying in the
6   bed or something like and no one else in the room and
7   I can hear them.  My mind can just go off and go
8   somewhere else.
9        Q.   Okay.  But our minds all wonder.
10       A.   Well, I do.  Like I say, my mind thinks
11  stuff like this person talking, I can't stand to hear
12  their voice or something like that, you know, my mind
13  telling me something like that.  And I say you need to
14  shut up or, you know, can he whip me, you know, what
15  he's thinking about, what these folks are doing or
16  something like that.
17       Q.   Okay.  Now, I would consider that to be just
18  self-talk.  You know, I wish that guy would shut up.
19  He's gone on for three days talking and talking and I
20  can't stand to hear him.  He talks all the time.
21  That's self-talk, okay.  Because it's my thoughts,
22  it's my thinking, it's my tangents.  I'm wandering
23  here, here and yonder.  Am I going to get to go
24  fishing next month.  What have I got to do -- you
25  know, did I pay the bills last week.  You know, those

106

0107

1   kind of things.
2        A.   Right.
3        Q.   Is that similar to what you're experiencing?
4        A.   Yeah, that sound like that, too.
5        Q.   Okay.  But I don't hear anybody now talking
6   to me whose voice I don't recognize, other than yours,
7   the folks in this room and my own thoughts.  Okay. I
8   don't have Satan and God telling me, you know, I need
9   to run out of this room and start hollering and go
10  over there and slap anybody.
11       A.   They do things like that.  It be that, too.
12  It be a whole bunch of things.  Some tell me to slap
13  this person.  Some tell me to hit this person.  Some
14  tell me go over there and straighten you out.
15       Q.   Do you ever do it?
16       A.   I know how to control it now.
17       Q.   Okay.  Have you ever slapped anyone if the
18  voices said, you know, I'm tired of hearing him talk,
19  I could just slap him.
20       A.   (No audible response.)
21       Q.   What if they were to tell you to do crazy
22  things like take off all your clothes and run out into
23  the street and jump up and down, wave your hands?
24       A.   I would never do nothing crazy.  No.
25       Q.   Have you ever used the bathroom and peed in

107

0108

1    a cup and drank it?

2         A.   No.

3         Q.   Anything like that?

4         A.   No.

5    BY UNIDENTIFIED MALE SPEAKER:

6         Q.   Okay.  Have the voices made you do things?

7         A.   I get upset.

8         Q.   How do you get upset?

9         A.   I get mad.  I get a temper or something.  I

10   mean it don't be me.  It be something they told me to

11   do.

12   BY DR. LOTT:

13        Q.   Are the voices ever mean to you?  Or do they

14   ever tell you how great you are?

15        A.   Sometimes they tell me something.  I don't

16   think they ever tell me like that.  One of them kind

17   of help me though.  One of them be on my side.

18        Q.   What do you mean?

19        A.   I mean he tell me different things.  I don't

20   believe it to be true, though.  But at different

21   times, you know, like why don't you do this and why

22   don't you do that.  I don't go by neither one of them.

23        Q.   But are they derogatory toward you?  Do they

24   say you're a piece of crap or you're not worth

25   anything or something like that?  Or do they tell you

108

0109
1   you're God's gift to women or you're, you know, a
2   world leader?  Do the voices ever tell you stuff like
3   that?
4        A.   They told me I was a leader.  They tell me,
5   you know, I'm the hottest male or.
6        Q.   They do or don't?
7        A.   I mean that's what I be thinking.  I guess
8   that's them telling me.  You mean my own self?
9        Q.   Yeah, I mean do you think you're the hottest
10  male in the jail?
11       A.   They ain't no (inaudible).
12       Q.   Okay.  All right.  Well, I have my own
13  opinion about what's going on with you right now.  But
14  let me ask -- I forgot to ask you a couple of things
15  that Dr. McMichael needs to write down here.  When you
16  were little, did you ever have any accidents or
17  injuries?
18       A.   Accidents.  I mean I fell out the back of a
19  Jeep.
20       Q.   Did you get hurt?
21       A.   Yeah, I busted my head.
22       Q.   Stitches?
23       A.   No.
24       Q.   Anything else?
25       A.   I was 9 years old, 8 years old.

0110
1        Q.    Eight or nine.  Why did you do that?
2        A.    Voices.
3        Q.    What?
4        A.    Voices or something told me to jump out
5   there and see if I could turn around and grab the
6   thing.
7        Q.    Grab what thing?
8        A.    You know how the back of the Jeep the trunk
9   close down like that.  And it's got a little thing
10  stick up there and catch onto it.
11       Q.    The trailer hitch?
12  BY UNIDENTIFIED MALE SPEAKER:
13       Q.    The back window of the Jeep?
14       A.    Yeah, the Jeep, you know how it close down.
15  It got a little latch that catches it to keep it
16  closed.  And I told Perry to jump out and he said you
17  crazy, man, I'm not jumping out the back of that Jeep.
18  So he went up front.  And I just said I'm going to try
19  it.  And something just said don't do it, don't do it.
20  And I jumped out of that thing.
21  BY DR. LOTT:
22       Q.    You jumped and you tried to catch the latch?
23       A.    Tried to turn around real fast and catch it.
24       Q.    As you were driving down the road?
25       A.    Yeah.

110

0111

1     Q.   Were you backing out of the driveway?

2     A.   No, we were driving, going down the street.

3     Q.   You were going the street?

4     A.   Yes, sir.

5     Q.   How far away from home were you?

6     A.   Right there in front of our house.

7     Q.   So you backed out and you started down the

8  road and you jumped out?

9     A.   We come to the street and when we got down

10  the street I jumped out.

11     Q.   Right in front of the house?

12     A.   Yeah.

13     Q.   Were you about to turn in the driveway?

14     A.   No, we was going to go up the street.

15     Q.   What was the point of that?

16     A.   See can I do it, I guess.

17     Q.   Did you think you had a special gymnastic

18  ability or something?  Was it a dare?

19     A.   Unh-unh, I was just trying to grab that

20  latch, see can I grab it.

21     Q.   But the voices told you to do that?

22     A.   Yes, sir.

23     Q.   Do you remember -- actually remember a voice

24  back then telling you to do that?  Is that just

25  something now you think might have been a voice?

111

0112
```
 1          A.    Back then I really didn't think about it.
 2     I'd usually, say if I was going to the bathroom or
 3     something.  I'd be sitting on the toilet or something
 4     and the voices tell me you hate God and this and that,
 5     you know what I mean.  And I'd be like shut up, shut
 6     up, stop talking to me.  But now I got control, you
 7     know what I'm saying.  Now, they tell me to do
 8     something, you know, and I just say -- well, I really
 9     don't have to say anything then and they leave for a
10     minute but then they come right back.
11          Q.    How long do they have control over you?
12          A.    They had control since I got older, you know
13     what I'm saying.  And I try to (inaudible).
14     BY UNIDENTIFIED MALE SPEAKER:
15          Q.    How old were you the first time you heard
16     anything like that?
17          A.    I can't remember.  It's been a long time.
18          Q.    About how old?  You said you were hearing
19     them when you were 9.  About how old were you when you
20     first heard it?
21          A.    About 7 years old.
22          Q.    Okay.  And how old were you about when you
23     learned to control it?
24          A.    About 16, 17.
25          Q.    What is the weirdest thing they ever said to
```

112

0113

1   you or told you to do?

2      A.   Weirdest thing.  To do something crazy and

3   hurt myself.

4      Q.   Like what?

5      A.   Like jump over the balcony or something like

6   that.

7      Q.   Jump over the balcony?

8      A.   Crazy stuff like that.  Window at the jail

9   house or just do something, you know, anything.

10  BY DR. LOTT:

11     Q.   Did you do it?

12     A.   No.

13     Q.   You didn't jump over the balcony at the

14  jail.

15  BY UNIDENTIFIED MALE SPEAKER:

16     Q.   What if it told you to get into it with

17  somebody at the jail?

18     A.   I wouldn't do it.

19     Q.   How come?

20     A.   Because, you know, if I do something to

21  somebody else, I ain't doing nothing but hurting

22  myself and I ain't gone hurt myself.

23     Q.   Have you had any rule violations or anything

24  like that at the jail while you've been there?

25     A.   Yeah.

113

0114

1      Q.   What kind of stuff?

2      A.   Fighting.

3      Q.   When was the last time you were in a beef

4  with somebody?

5      A.   About six or seven months ago.

6      Q.   Did you ever get locked down?

7      A.   Yes, sir.

8      Q.   For how long?

9      A.   The longest I ever got locked down was about

10  a week.

11      Q.   What did that do to the other guy?

12      A.   Lock him down to.

13      Q.   Anybody now that you have a beef with?

14  Anybody you seriously thought about hurting or

15  killing?

16      A.   No, sir.

17      Q.   Jailers, anybody at the jail, anything like

18  that?

19      A.   Well, I mean my mind wanders off sometimes

20  but I don't think about hurting nobody or something

21  like that.

22      Q.   Do you think they're poisoning your food at

23  the jail?

24      A.   One time this dude, he had a piece of glass.

25  And I thought maybe they were trying to pull

114

0115

1    something.  Maybe they were trying to, you know, get
2    out on or something like that.
3        Q.   Are you concerned about that now, though?
4        A.   No, sir.
5    BY DR. LOTT:
6        Q.   I need to ask you a couple of other
7    questions regarding your medical.  Have you ever been
8    hospitalized or had surgery for any reason?
9        A.   Yes, sir.
10       Q.   What for?
11       A.   I had a CAT scan.  I had high blood pressure
12   at one point.
13       Q.   When did you have a CAT scan?
14       A.   It was around when I had high blood pressure
15   and stuff like that.
16       Q.   How old were you?
17       A.   About 11, 12.
18       Q.   What's a CAT scan?
19       A.   They lay you down and they take you in there
20   for a whole day.  And then they lay you down and put
21   this thing they call a eye and put it inside your head
22   or something like that.  And they lay you down in the
23   thing.  And then they strap you down.  And then you go
24   inside this thing and you try not to open your eyes.
25   Then they do something, I guess, to read your mind or

App.0526

0116
1   check on your brain, something like that.
2       Q.   Okay.  And how old were you?
3       A.   About 11.
4       Q.   What hospital was this?
5       A.   Grenada Medical.
6       Q.   Grenada Medical?
7       A.   Yes, sir.
8   BY UNIDENTIFIED MALE SPEAKER:
9       Q.   And that was going to find out what was
10  causing your blood pressure problem?
11      A.   I guess.
12  BY DR. LOTT:
13      Q.   Are you taking any medicine now for blood
14  pressure?
15      A.   I never took medicine.
16      Q.   Never took medicine.  Did you have any other
17  accidents or injuries?  Have you had any head
18  injuries?
19      A.   Head injuries like?
20      Q.   Serious head injuries.  Like get hit in the
21  head with a baseball or bat, or anything like that?
22      A.   No, sir.
23      Q.   Been in any car wrecks?
24      A.   Yeah, car wrecks I hit my head.
25      Q.   You got in a couple of car wrecks.  Did you

116

0117

1    ever get any treatment?  Were you ever knocked
2    unconscious?
3           A.    Yes, sir.
4           Q.    Where?
5           A.    One time at football and we were practicing
6    with no gear on and people ran me over.  When I woke
7    up the game was over with.  And when I wrecked I hit
8    my head on the windshield and it put me out for a
9    second.
10          Q.    For a second?
11          A.    Less than a minute.
12          Q.    A minute.  Okay.  Any problems walking or
13   talking after that?
14          A.    My leg hurt.
15          Q.    Did you hurt your legs in that accident?
16          A.    Yes, sir.
17          Q.    Your left or right leg?
18          A.    My right leg.
19          Q.    Your right leg.  Did you have any treatment?
20          A.    No, sir.
21          Q.    Any other accidents or injuries?
22          A.    That's it for my head.
23          Q.    Any STDs?
24          A.    No, sir.
25          Q.    How do you know?

117

```
0118
 1       A.   They give me a check-up at the jail.
 2       Q.   What about HIV?
 3       A.   They gave me a check for that.
 4       Q.   What's an STD?
 5       A.   Sexual disease.
 6       Q.   Give me an example of one.
 7       A.   Herpes, gonorrhea.
 8       Q.   So you've been checked for that?
 9       A.   Yes, sir.
10   BY UNIDENTIFIED MALE SPEAKER:
11       Q.   Have you ever taken any medicines for your
12   nerves?
13       A.   My nerves, no, sir.
14       Q.   Have you ever taken any medicines for being
15   hyperactive or attention deficit, Ritalin, that kind
16   of stuff?
17       A.   No, sir.
18       Q.   No?
19       A.   No, sir.
20       Q.   Are there any medicines that you're allergic
21   to?
22       A.   No, sir.
23       Q.   Penicillin, sulfur drugs, anything like
24   that?
25       A.   No, sir.
```

App.0529

0119
```
 1        Q.    Have you ever had any operations?
 2        A.    I had surgery.
 3        Q.    For what?
 4        A.    My toe.
 5        Q.    How old were you?
 6        A.    About 17.
 7        Q.    What was the problem?
 8        A.    My toenail got twisted up.
 9        Q.    Did it swell up and hurt?
10        A.    It swelled up.
11        Q.    Both of them or just one?
12        A.    Both of them.
13        Q.    And they did that with an operation?
14        A.    Yes, sir.
15        Q.    Were you in the hospital overnight or just
16   part of the day?
17        A.    Part of the day.
18        Q.    Are you having any physical problems this
19   morning, anything hurting?  Headache, backache, cold,
20   trouble breathing?
21        A.    My legs.
22        Q.    Which one?
23        A.    Both of them.
24        Q.    What's wrong?
25        A.    Working out.
```

119

0120
1        Q.    Working out.  Anything else like that?
2   Headaches, dizziness, things like that?
3        A.    (No audible answer.)
4   BY DR. LOTT:
5        Q.    Do you ever have seizures or blackouts?
6        A.    No.
7        Q.    Are you ever concerned about organs rotting
8   away or decaying, any organs or parts of the brain,
9   all that stuff?
10       A.    No, sir.
11  BY UNIDENTIFIED MALE SPEAKER:
12       Q.    If you had to pick the one thing that's been
13  bothering you the most lately, anything at all, what
14  would that be?
15       A.    Do you mean like bothering me, like hurting
16  me?
17       Q.    Hurting you physically, hurting you
18  mentally, hurting you in any kind of way?
19       A.    Mentally.
20       Q.    Worrying you?
21       A.    This charge.
22       Q.    How do you think that's affecting you
23  mentally?
24       A.    Cause I think about it all day every day.
25       Q.    Do you think of yourself as having trouble

App.0531

0121

1    with your nerves or emotions?

2         A.   No, sir.

3    BY DR. LOTT:

4         Q.   So that stuff with the voices, do you think

5    most people experience what you experience or do you

6    think you're different?  Or is that some kind of a

7    special mental problem?

8         A.   Sometimes I think about that and I really

9    don't know.

10        Q.   Well, what's your best thought on that?  Do

11   you think that most people experience what you've

12   described to us about the voices or do you think

13   you're different from other people in some way?

14        A.   I think I'm kind of different.  I mean I

15   don't believe everybody is like this.

16        Q.   Have you ever known anyone who had that

17   problem?

18        A.   No, sir.

19   BY UNIDENTIFIED MALE SPEAKER:

20        Q.   Did you ever talk to anybody like your mom

21   or your brother about the voices you were hearing?

22        A.   Yes, sir.

23        Q.   Who did you talk to?

24        A.   At first I talked to my guys about it.

25        Q.   Who is that?

0122
```
 1        A.   His name is Willie B.  Willie B. Thurman or
 2   something like that.
 3        Q.   Willie B. Thurman.  Where is he?
 4        A.   He stays in Tchula, Mississippi.
 5        Q.   What did he say?
 6        A.   He really didn't say nothing.  He just said
 7   pray.  He said pray when I started hearing them.  I
 8   told my mom about it.
 9        Q.   When did she say?
10        A.   She didn't say nothing.  She just said ain't
11   got no cure for it.
12        Q.   Did you ever tell your friends?
13        A.   I told them and they said they didn't know
14   where I got that.  They said to rebuke Satan.
15        Q.   Rebuke Satan?
16        A.   Yeah.
17        Q.   Okay.  Would you say that helped for a
18   little while?
19        A.   Yes, sir.
20   BY DR. LOTT:
21        Q.   Do you think you need medicines for that?
22        A.   No, sir.
23        Q.   You don't think you need medicine?
24        A.   No, sir.
25        Q.   Has it ever interfered with your ability to
```

App.0533

0123
1   work?  When you were working, did it ever interfere
2   with your ability to drive the truck or to unload the
3   truck or to load the truck?
4       A.   No.
5       Q.   Did it ever interfere with your ability to
6   carry on a conversation like you and I have had this
7   morning?  Because I haven't suspected at all you were
8   hearing voices and that they were distracting you.
9       A.   No.
10      Q.   And you haven't appeared to be responding to
11  any kind of voices, anything other than our questions
12  we asked to you.  So has it interfered with anything
13  you've done before?  If you're with a woman and you
14  guys are having sex, did it ever interfere with your
15  ability to have sex with a woman?
16      A.   No, sir.
17      Q.   Okay.
18  BY UNIDENTIFIED MALE SPEAKER:
19      Q.   Do you have any trouble with your memory?
20      A.   Yeah, I forget things.
21      Q.   Can you remember who we are sending our
22  reports to?
23      A.   Yeah, to the Court.
24      Q.   Who else?
25      A.   To the Court and to the judge.

App.0534

0124

1      Q.   Who else?

2      A.   To the D.A.

3      Q.   Do you remember that from us telling you or

4  did you just know that?

5      A.   I remember it.  I just know it, I guess.

6      Q.   We're going to give you three things to

7  remember.  And if I can remember, I'm going to ask you

8  in about five minutes, okay.

9      A.   Okay.

10     Q.   A possum, a pine tree, and an oyster.  Can

11  you say those back to me?

12     A.   A possum, a pine tree and an oyster.

13     Q.   Okay.  If I can remember in about five

14  minutes I'll ask you.

15       I'm going to give you a series of words and

16  I want you to tell me how they are alike.  If I say

17  this apple and this orange, how are they alike?

18     A.   Both of them grow on trees.

19     Q.   Okay.  An apple and an orange are both

20  blank.  Fill in the blank.

21     A.   Fruit.

22     Q.   A table and a chair?

23     A.   You can sit down on.

24  BY DR. LOTT:

25     Q.   They're both what?

0125

1    BY UNIDENTIFIED MALE SPEAKER:

2        Q.   Yeah, a table and a chair are both what?

3        A.   Wood.

4        Q.   Wood.  Sure.  All right.  A table and a

5    chair, what section of a store would you go to?

6        A.   Furniture.

7        Q.   Okay.  That's what I was looking for.  Okay.

8    A pencil and a pen are both?

9        A.   Writing utensils.

10       Q.   Writing utensils.  Good for you.  A poem and

11   a short story are both what?

12       A.   Both you can read.

13       Q.   Huh?

14       A.   Both you can read.

15       Q.   Okay.  What does the expression mean that

16   some folks use sometimes when they say, don't judge a

17   book by its cover?

18       A.   Don't judge by what you see.

19       Q.   Excellent.  Okay.  What can you do with an

20   orange that you can't do with a baseball?

21       A.   I can eat an orange.  I can't eat the

22   baseball.

23       Q.   How are they alike?

24       A.   They're both round.

25   BY DR. LOTT:

App.0536

0126

```
 1        Q.    All right.  Okay.  Now, we're going to move
 2   on into some questions about court.  Remember your
 3   rights that we told you about earlier.
 4        A.    Yes, sir.
 5        Q.    What rights did we say that you had?
 6        A.    I don't have to answer.
 7        Q.    Okay.  I will pause for just a second.
 8              UNIDENTIFIED MALE SPEAKER:  Are we going to
 9        take a break or anything?
10              DR. LOTT:  Do you need to take a break?
11              MR. PITCHFORD:  Yeah, I need to go to the
12        bathroom.
13   BY DR. LOTT:
14        Q.    Okay.  I'm going to go ahead and get
15   started.  This tape is about to run out.  We've only
16   got a minute here.
17              What are you charged with?
18        A.    Capital murder.
19        Q.    What's the other charge?
20        A.    Conspiracy.
21        Q.    Conspiracy.  Okay.  What's the maximum
22   penalty that anyone can receive for that?
23        A.    Death.
24        Q.    The death penalty.  Is this serious?
25        A.    Yes, sir.
```

0127

1           DR. LOTT:  This is tape three side B.
2      BY DR. LOTT:
3           Q.   And we were just asking you about your
4      attorneys.  Before you start, if you can tell me
5      again.  Do you think you will be able to work with
6      your attorneys?
7           A.   Yes, sir.
8           Q.   Okay.  Do you trust them?
9           A.   Yes, sir.
10          Q.   Okay.  Now, I think I stopped -- the last
11     question was:  What do you need to do in order to help
12     your lawyer prepare for this case?
13          A.   Give them information.
14          Q.   What does anybody need to be able to tell
15     their attorney?
16          A.   Everything.
17          Q.   What would happen if you didn't, or what
18     might happen?
19          A.   They wouldn't know exactly what to come with
20     to fight it.
21          Q.   Do you think that's important?
22          A.   Yeah.
23          Q.   What would happen if you didn't tell your
24     attorney the truth?  Do you think it would hurt you or
25     help you?

0128

1     A.   I believe it would kind of hurt me.

2     Q.   You're right.  They wouldn't know how to

3  prepare for it.

4  BY UNIDENTIFIED MALE SPEAKER:

5     Q.   Can I interrupt for just a second.  Can you

6  remember those three things I asked you to remember?

7     A.   A possum, a pine tree and like a shell

8  thing, an oyster.

9     Q.   Good for you.  Great.

10  BY DR. LOTT:

11     Q.   Did you ever kill a possum?

12     A.   Killed one one time.

13  BY UNIDENTIFIED MALE SPEAKER:

14     Q.   Now, let me ask you something else that is

15  more important than that.  That was kind of silly to

16  test your memory.  Do you remember a couple of hours

17  ago when we first started how I told you any

18  information from this evaluation can be used?

19     A.   How it can be used?

20     Q.   Uh-huh.  I told you two ways they can try

21  and use it?

22     A.   The D.A. might try to use it to prosecute

23  me.

24     Q.   And when we get to the sentencing phase of a

25  capital trial how the D.A. might use it?

0129
1        A.    He might try and give me the death penalty.
2        Q.    Okay.  And you started to answer the other
3    part of it.
4        A.    To help me.
5              DR. LOTT:  Good.
6    BY UNIDENTIFIED MALE SPEAKER:
7        Q.    Do you have any questions about that?
8        A.    No, sir.
9    BY DR. LOTT:
10       Q.    What do you mean by prosecute you?  What
11   does that mean in plain talk?
12       A.    Convict me.
13       Q.    Mr. Pitchford, do you think you're going to
14   get a fair trial?
15       A.    Do I think that, no.
16       Q.    Why?  Why wouldn't you get a fair trial?
17       A.    Because the system basically, you know, they
18   already know what they're going to do to me.  They
19   already know what they plan on doing.
20       Q.    What do you think they're going to do to
21   you?
22       A.    They get a chance, they going try to get rid
23   of me.
24       Q.    How so?  What do you mean by get rid of?
25       A.    Death penalty.

0130
1        Q.    Do you think that's the system's plan is to
2    give you the death penalty?
3        A.    Yes, sir.
4        Q.    Why you?
5        A.    What I'm charged with.
6        Q.    So does that work with just about
7    everybody's case because the death penalty system
8    works against them?
9        A.    It mainly means the system's kind of
10   crooked, you know what I mean.  It ain't what it
11   pretends to be.
12       Q.    Well, do you feel like the judge has
13   anything against you personally?
14       A.    I mean if he knew the person, yeah, he would
15   have something against me.
16       Q.    But do you think the judge should be
17   involved in this case by prosecuting you or should be
18   hearing this case if the judge was friends with the
19   victim?  Do you think that's appropriate?
20       A.    I don't think nobody should be there.
21       Q.    I don't think that the judge would be
22   hearing the case if they were personal friends with
23   the victim.
24   BY UNIDENTIFIED MALE SPEAKER:
25       Q.    Finish that thought that you started.  I

130

0131

1    don't think nobody should be there?

2        A.    Be there for them.  I just don't think they

3    should be there.  Because the way I feel about it,

4    they going off what they hear, what they heard that

5    they did, you know.  So when we do get to court they

6    ain't going to be no pointing fingers or anything, he

7    said, she said, you know what I mean, stuff like that.

8    I mean it's crazy.

9        Q.    Can you think of anything specific about

10   you, not about the system or not about the case, that

11   would cause them at trial to do something unfair to

12   you?

13       A.    What do you mean by me?

14       Q.    About you personally.  Somebody in the legal

15   system have it in for you, not about this case but

16   just, you know, the D.A. out to get you, or the

17   sheriff out to get you?

18       A.    Not that I know of.

19       Q.    Is there any bad blood between you and the

20   folks before all this happened?

21       A.    Before?

22       Q.    Yes, sir.

23       A.    I ain't never tried to fool with the law.

24   BY DR. LOTT:

25       Q.    We may have asked you this question already.

0132

1    But do you think that you're just as likely or more
2    likely or less likely to be treated fairly by the
3    legal system compared to somebody else?
4         A.    Less likely.
5         Q.    You're less likely to be treated fairly
6    compared to Officer Dunbar or any of us or your twin
7    brother?  Is there something specific about you that
8    you think you would get a less fair trial in the legal
9    system?
10        A.    It ain't fair.  It's crooked.  And one
11   reason because if you -- say something, like one of
12   y'all to try to do whatever, y'all would get away with
13   certain things that I won't because one guy's a
14   doctor.  Another reason, y'all got money.  And then.
15        Q.    Don't be so sure of that.  Do you know what
16   they pay here at the state hospital?
17        A.    I just know it's like certain people, man,
18   certain people they don't.  Since I been locked up I
19   done seen people come in with identical charges and
20   everything and some people walk off and some people
21   get locked up.  Depends on what you did, too.
22        Q.    What else might it depend on?
23        A.    Color, race, all kind of stuff.  The system
24   only works for certain people.  We ain't all equal in
25   it.  You know, anybody you really know, they will tell

0133

1   you it ain't work, you know, for everybody, you know
2   what I'm saying.  You might be in here for the same
3   charge that I might be in and he's in on the same
4   charge I'm on.
5        Q.   For capital murder?
6        A.   Yeah.  But he walked free, you know what I
7   mean.  I mean they didn't -- he didn't go to court and
8   go to trial or nothing, you know what I'm saying.  He
9   was in on the same charges and they just let him go.
10  But you got me in here, you know what I'm saying, and
11  they ain't trying to let me go.
12       Q.   What was the difference, though, in that
13  case?  What do you think was responsible for him
14  getting to walk free?  Did it have anything to do with
15  his lawyer or other issues of the law?
16       A.   I feel like this, you know, I feel like --
17  okay, I feel like he should be treated no kind of
18  different from me because the simple reason is because
19  he had the same charges on him, you know what I'm
20  saying.  It ain't no statute of limitations on the
21  charges.
22       Q.   Did he have money?
23       A.   Yeah, he probably had money.
24       Q.   Did he ever pay --
25       A.   And so-called they said they let him go

133

0134

1    because one of the witnesses died or something like
2    that or his sister died.  And I said my folks going to
3    die and they ain't let me go.
4        Q.   Okay.  And you've answered this question
5    already but I just want to make sure we get it down.
6    Tell me the two attorneys in the courtroom, what are
7    their titles?
8        A.   (Inaudible).
9        Q.   And that's whose attorney?
10       A.   That's my attorney.
11       Q.   That's your attorney.  Who is the opposing
12   attorney?
13       A.   I don't know.
14       Q.   What's their title?  What do you call them?
15       A.   Attorney.
16            UNIDENTIFIED MALE SPEAKER:  The one that's
17       against you.
18   BY DR. LOTT:
19       Q.   The one against you?
20       A.   The D.A.
21       Q.   What does the D.A. stand for?
22       A.   District Attorney.
23       Q.   District Attorney.  What's the D.A.'s job?
24       A.   To prosecute me.
25       Q.   To prosecute you and what?

134

0135

1     A.   To convict me.

2     Q.   Why do we have trials?

3     A.   To judge people.

4     Q.   Okay.  Tell me a little bit more.  If I go

5   to court -- if I'm charged with something, what is the

6   purpose of that trial?

7     A.   To convict you.

8     Q.   Or it could prove just the opposite.  What

9   would be the opposite?

10     A.   Not guilty.

11     Q.   Yeah.  Who determines the verdict in a

12   trial?  If you go to court and have a trial, who

13   determines the verdict?

14     A.   The jury.

15     Q.   How many people are on a jury in

16   Mississippi?

17     A.   Twelve.

18     Q.   How many of those folks have to agree?

19     A.   All 12 of them.

20     Q.   What is it called when they cannot agree?

21     A.   A hung jury.

22     Q.   Very good.  Do you know what happens if

23   there's a hung jury or what could happen?

24     A.   I could walk free.

25     Q.   Could walk free.  And?

135

0136

```
 1        A.   I don't really know.
 2        Q.   Well, I'm asking you now.
 3        A.   Either walk free or they can throw me away.
 4        Q.   Well, if it's a hung jury, you could walk.
 5   It would be up to the D.A. to decide whether or not
 6   the D.A. wants to go for another trial.  The D.A.
 7   would say hey, I'm going to retry this, or not.  And
 8   if the D.A. didn't, you could walk.  Okay.
 9   BY UNIDENTIFIED MALE SPEAKER:
10        Q.   Mistrial.  Have you ever heard of a
11   mistrial?
12        A.   No, sir.
13        Q.   Let me explain.  The judge could declare a
14   mistrial.
15   BY DR. LOTT:
16        Q.   Now, you've answered this question already,
17   too.  What are the possible verdicts?  They can find
18   you what?
19        A.   Guilty and innocent.
20        Q.   Okay.  What are they?  Tell me again.
21        A.   If they find me guilty?
22        Q.   No, what are the possible verdicts?  You've
23   answered this.  They find you.
24        A.   Guilty and innocent.
25        Q.   The third one.  Have you ever heard of the
```

136

0137

1    third one?

2         A.    Innocent.

3         Q.    Not guilty by reason of insanity is the

4    third one.  That's an actual verdict that they can

5    find.

6         A.    That's by reason.

7         Q.    Insanity.

8    BY UNIDENTIFIED MALE SPEAKER:

9         Q.    Ever heard of that?

10        A.    I've heard of declaring you insane or

11   something like that and they go straight to Whitfield.

12   BY DR. LOTT:

13        Q.    Okay.  Well, that may be the case.  But if

14   they find you innocent, what happens to you?

15        A.    I walk free.

16        Q.    You walk free.  If they find you guilty?

17        A.    They gone try to give me the death penalty.

18        Q.    Well, we'll go over that in just a second.

19   But if they find you not guilty by reason of insanity,

20   what do you think happens?

21        A.    Come here.

22        Q.    You could.  And how long would you stay here

23   if you're found you're GI?

24        A.    A long time.

25        Q.    You could.  There isn't a certain period of

0138
1   time that you have to stay.  You won't receive a
2   sentence if you come to Whitfield.  You come here,
3   you're here indefinitely.  And it's up to the hospital
4   to decide when you get out.
5          Now, in a capital murder trial, there are
6   two parts.  Do you know the two parts of the capital
7   murder trial?
8       A.   The guilty phase.  And what the name of it,
9   latigation?
10      Q.   Litigation.
11      A.   Litigation.
12      Q.   Okay.  That's close.  That's good.  There's
13  the guilt phase.  If you're found guilty, like you
14  just said.  And then there's the penalty phase.  So
15  there are two parts.  Okay.  If they find you guilty
16  in a death penalty trial, then you go to a sentencing
17  phase.  Let me back up now.  Who did you say
18  determined the verdict?
19      A.   The jury.
20      Q.   In a death penalty trial, who determines
21  whether or not you get the death penalty?
22      A.   The jury.
23      Q.   That's right.  In Mississippi the jury
24  determines that.  What happens if the jury, they find
25  you guilty and you're in the sentencing phase, what

0139
1    happens if the jury cannot agree on the death penalty?
2         A.   I get life.
3         Q.   Who decides how much?
4         A.   The judge.
5         Q.   The judge decides life or life without,
6    whatever that may be.  But remember, only a jury can
7    give you the death penalty.  It has to be all 12.
8    Okay.  Any questions about that process?
9         A.   No, sir.
10        Q.   Do you think you understand it?
11        A.   Yes, sir.
12        Q.   Okay.  And we may be years and even part of
13   the trial toward the end of the guilt phase or
14   possibly toward the end of the sentencing phase, so
15   the experts will come in at either part.  What do
16   witnesses do at trial?
17        A.   Testify.
18        Q.   Testify.  There are three different types of
19   witnesses generally.  What are they?  Do you know?
20        A.   Character witnesses.
21        Q.   Character.
22        A.   See if they can help with you.
23        Q.   Okay.  What's a person at the scene of the
24   crime called?
25        A.   Eyewitness.

139

0140

1        Q.    An eyewitness.  Okay.  And an eyewitness
2    would then testify obviously about what?
3        A.    What they seen.
4        Q.    Okay.  And a character witness would testify
5    about what?
6        A.    What type of person I am.
7        Q.    What type of person.  Can you give me an
8    example of a character witness?  Who might be a
9    character witness for you?
10       A.    Preacher.
11       Q.    Preacher.  Very good.  Parent, teacher.
12   Give an example of an expert witness.  Who would be an
13   expert?
14       A.    You.
15       Q.    Okay.  We would be expert witnesses.  We
16   would testify about this evaluation.  Do we know you?
17   Has anyone sitting here ever met you before today?
18       A.    No, sir.
19   BY UNIDENTIFIED MALE SPEAKER:
20       Q.    Okay.  Would we be asked to testify
21   about whatever you're in for?
22       A.    No, sir.
23       Q.    What do you think we would be asked to talk
24   about?  I think Dr. Lott mentioned it, but I just want
25   to see.

140

0141

1        A.    Evaluation.

2        Q.    Evaluation.   Evaluation pertaining to what?

3   Your physical health?

4        A.    (No audible response.)

5        Q.    Pardon?

6        A.    Mental health.

7        Q.    Mental health.

8   BY DR. LOTT:

9        Q.    If the witnesses on the stand are testifying

10  and you think they're not telling the truth, what is

11  the appropriate way to challenge a witness during the

12  trial?  Someone is up there testifying and you think

13  they're actually lying, what could you do?

14       A.    Tell my attorney.

15       Q.    Very good.  What would happen if you jumped

16  up and started shouting at the witness during the

17  trial?

18       A.    Contempt of court.

19       Q.    Contempt of court.  Very good.  What does

20  that mean?

21       A.    It means I got another charge.

22       Q.    Got another charge.  Okay.  Good.  They

23  could obviously add more time.  If you're too

24  disruptive in court, they could possibly remove you

25  from the courtroom.  Do you think you need to be in

141

0142

1  court during your trial?

2     A.  Yes, sir.

3     Q.  Why?

4     A.  To hear what they're talking about and what

5  was going on.

6     Q.  Who knows the most about your case?

7     A.  I do.

8     Q.  You do.  Exactly.  Can anyone make you

9  testify at your trial?

10    A.  No, they can't make me testify.

11    Q.  Why not?

12    A.  Because I don't have to.

13    Q.  Okay.  What is that based on?  What right is

14  that based on?

15    A.  The Fifth.

16    Q.  That's right.  Very good.  Where did you

17  learn that?

18    A.  A long time in jail.

19    Q.  The Fifth what?

20    A.  Fifth Amendment.  I can plead the Fifth and

21  I don't got to talk.

22    Q.  The Fifth what, though?

23    A.  The Fifth Amendment.

24    Q.  The Fifth Amendment.  What's the overall

25  body or context?  The Fifth Amendment of what?

0143
1       A.   My rights.
2       Q.   Your rights.  Are those rights documented
3  anywhere or laid out in any kind of document?
4       A.   The Declaration of Independence, I think.
5       Q.   Close.  No help from the sidelines, now.
6       A.   I done forgot the name of it.
7       Q.   This is -- I don't want to say a bonus
8  question.
9  BY UNIDENTIFIED MALE SPEAKER:
10      Q.   You don't have to know this.  It's another
11 document but it's not the Declaration of Independence.
12      A.   Civil rights.
13 BY DR. LOTT:
14      Q.   Close.  Think American History.  It's
15 commonly referred to and called the United States
16 blank.
17      A.   United States.
18      Q.   Three guesses.  One more guess.  What do you
19 think?
20      A.   I don't know.
21      Q.   All right.
22 BY UNIDENTIFIED MALE SPEAKER:
23      Q.   Is it the Constitution?
24      A.   That's it.
25 BY DR. LOTT:

App.0554

0144

1      Q.   All right.  The circuit court?

2      A.   No.

3      Q.   The Fifth Amendment of?

4      A.   The Constitution.

5      Q.   Now, following this up, can anybody prevent

6  you from testifying at your trial?  You can take the

7  Fifth if they try to make you.  But can they stop you?

8  If you want to get up there and take the stand and

9  tell your side of the story, can anyone stop you?

10     A.   No, sir.

11     Q.   Very good.  They can't make you and they

12  can't stop you.  Can they make us?

13     A.   Yeah.

14     Q.   We could be asked to testify and made to

15  testify and give our evaluation at your trial.  Okay.

16  BY UNIDENTIFIED MALE SPEAKER:

17     Q.   Could they make her testify if it's going to

18  hurt you?

19     A.   No, because she's my lawyer.

20  BY DR. LOTT:

21     Q.   Very good.  She works with your lawyer.

22     A.   If she wants to gets up there, she can get

23  up there.

24     Q.   Your lawyer is not compelled to testify.

25  Okay.  Now, tell us a little bit about a plea bargain.

144

0145

1      A.    A plea bargain is something they want you to
2   jump on and do time.
3      Q.    Okay.  Tell me a little more about it.  Who
4   offers it to you?
5      A.    The D.A.
6      Q.    The D.A. offers it to you.  How do you have
7   to plead?  If you accept it, how do you have to plead?
8      A.    You have to plead guilty.
9      Q.    That's right.  What do you get out of it,
10  you or any other defendant get out of a plea bargain?
11     A.    Time.
12     Q.    Well, what's in it for you?  They call it
13  copping a deal.  What's the deal?
14     A.    You don't get the max.
15     Q.    You don't get the max.  Why does the State
16  offer plea bargains?
17     A.    They want to keep us in jail and they don't
18  have to go to court.
19     Q.    Don't have to go to court.  That's good.
20  Any other reason?  Don't have to go to court.  What
21  else is in it for the State?
22     A.    Money.  They don't have to spend no money.
23     Q.    What's the big reason for it?  They don't
24  have to spend money or time.  But what else do they
25  get out of it?

145

0146

1      A.   Going to jail.

2      Q.   You going to jail.  That's exactly right.

3  They got a conviction.  Now, could anyone make you

4  take a plea bargain?

5      A.   No.

6  BY UNIDENTIFIED MALE SPEAKER:

7      Q.   Do you know why?

8      A.   It's one of my rights.

9      Q.   It is one of your rights.  Do you know which

10  right?  They can't make you take a plea bargain

11  because you have a right to?

12     A.   Have a right to.

13  BY DR. LOTT:

14     Q.   Well, if you don't take the plea bargain and

15  cop a deal, what's going to happen to you?

16     A.   Oh, I got a right to a fair and speedy

17  trial.

18     Q.   Exactly.  Very good.  Fair and speedy.

19  BY UNIDENTIFIED MALE SPEAKER:

20     Q.   Do you know what Amendment that is?

21          DR. LOTT:  Don't ask me.

22     A.   I think it's the Third.

23     Q.   Third?

24     A.   Yeah.

25  BY DR. LOTT:

146

0147

1     Q.   Okay.  Now, what do you risk -- you've
2   answered this in part.  What do you risk if you refuse
3   a plea bargain?
4     A.   The death penalty.
5     Q.   You risk the death penalty.  Exactly.  Does
6   the judge, in general -- now, this is -- we ask this
7   question, but in general, does the judge have to go
8   along with a plea bargain?
9     A.   No.
10    Q.   What could the judge do?
11    A.   Drop it down.
12    Q.   They could drop it down.  What else could
13  the judge do?
14    A.   Raise it up.
15    Q.   Could raise it up.  Now, can the judge give
16  you the death penalty?  In a plea agreement, let's say
17  you copped a deal.  Can you go before a judge and the
18  judge give you the death penalty?
19    A.   No.
20    Q.   Why?
21    A.   Just the jury.
22    Q.   Only a jury can do that.  That's exactly
23  right.  What does the judge usually do?  What do you
24  think?
25    A.   The judge can hold it up.

147

0148

1       Q.   I'm sorry.  I need to rephrase that.  In
2   terms of a plea bargain, if the D.A. makes a
3   recommendation, what do you think the judge usually
4   does?
5       A.   Accept it.
6       Q.   Probably.  Probably.  I don't know how all
7   that works.  We're not lawyers.  So I don't know how
8   all of that works.  But that's what we generally
9   understand to be the case.  But your lawyers would
10  know that.  And your lawyers would also know about
11  this particular judge and what may or may not happen.
12  So they would advise you along those lines, too.  How
13  do you know whether or not you're going to take a plea
14  bargain or should you take a plea bargain?  Let me
15  rephrase that.
16  BY UNIDENTIFIED MALE SPEAKER:
17      Q.   How would you decide?
18  BY DR. LOTT:
19      Q.   Yeah, how would you decide to take a plea
20  bargain?  You or any other defendant, think about this
21  in general terms, not just you personally, but how
22  would you, me or anyone else, decide whether or not we
23  should take a plea bargain?
24      A.   Your lawyer is going to tell you.
25      Q.   Your lawyer could tell you what?

148

0149

1      A.   If you should take it.

2   BY UNIDENTIFIED MALE SPEAKER:

3      Q.   If your lawyer tells you it's in your best

4   interest to take it and you don't want to take it, who

5   has the final say?

6      A.   I do.

7      Q.   How come?

8      A.   Because it's me.

9      Q.   What's that?

10      A.   Because it's me.

11      Q.   And we're not -- I understand they have

12   offered you something.  We're not asking whether or

13   not you're going to take it.  What we're asking is,

14   how would you think about it?  What kind of stuff

15   would you want to know if Ms. O'Clarity or Mr. Carter

16   comes to you and says they are offering you a deal.

17   What are you going to ask them?

18      A.   What kind of deal they're offering.

19      Q.   Okay.  And when they say what do you want to

20   know, what are you going to ask them?

21      A.   How much time.

22      Q.   Okay.  Anything else?

23      A.   If I get good time.

24      Q.   Okay.

25      A.   Am I going to have to do the whole time.

149

0150

```
 1        Q.   Okay.
 2        A.   If there's a possibility I might get out.
 3        Q.   How do you mean?
 4        A.   Will I get out.
 5        Q.   After time served, you get out before?
 6        A.   Like -- yeah.  After my time served there
 7   might be a chance of that.  Some kind of way the law
 8   changes or something, you know what I'm saying, you
 9   know to get me out whether I accepted it or anything
10   like that.
11        Q.   Would you want to ask them what they thought
12   your chances were at trial?
13        A.   Yeah.
14        Q.   Okay.  What other kind of information like
15   that would you want to know?
16        A.   Everything they got against me.
17        Q.   Okay.  And how would that influence whether
18   you thought about taking a plea or taking it to trial?
19        A.   If it's like me, if they say, you know, they
20   got too much evidence or something.
21   BY DR. LOTT:
22        Q.   Yeah, let's say hypothetically.  Just
23   pretend, they got you robbing a bank and there's a
24   video camera there and they've got you in full view.
25        A.   Better take that plea.
```

150

0151

1    Q.   Better take that plea.  But what if you find
2  out that there is no video and there were several
3  people in there that looks sort of like you and they
4  don't have anybody as an eyewitness in a line up or
5  photo that can identify you?
6    A.   I mean I may not take the plea.  If they
7  don't, crank it up.
8    Q.   Crank it up.  I mean it's your call.  Let's
9  be clear.  When you say crank it up, what do you mean?
10    A.   Get a jury and then go to trial.
11    Q.   What does a jury weigh when they make their
12  decision about a verdict?
13    A.   The evidence.
14  BY UNIDENTIFIED MALE SPEAKER:
15    Q.   What does the D.A. risk if they don't offer
16  you a deal?  What could happen at the trial if the
17  D.A. didn't offer you a deal?
18    A.   I could win.
19    Q.   And then what happens to you?
20    A.   I would go free.
21    Q.   Whatever you want.  What rights do you give
22  up if they offer you some kind of deal and you decide
23  to take it and plead guilty?
24    A.   What rights?
25  BY DR. LOTT:

151

0152

```
 1        Q.   What two rights?
 2        A.   Right to do what I want to do.
 3        Q.   Okay.  But what two things will not happen?
 4   BY UNIDENTIFIED MALE SPEAKER:
 5        Q.   Think about the rights we've talked about
 6   already today.
 7   BY DR. LOTT:
 8        Q.   If you take a plea bargain, are you giving
 9   up any of those rights?
10        A.   My right to a fair and speedy trial.  My
11   right to freedom.
12        Q.   If you don't have a trial what other right
13   do you not have, at least initially?
14        A.   What rights if I don't have a trial?
15        Q.   If you don't have a trial, what other basic
16   right do you not have, at least initially?
17             UNIDENTIFIED MALE SPEAKER:  And I think you
18        know this about when Dr. Lott asked you
19        questions.  You said if you take a plea bargain,
20        how do you have to plea?
21        A.   Guilty.
22   BY DR. LOTT:
23        Q.   Guilty.  But if you plead guilty, what right
24   is basically tossed out the window?
25        A.   My right to a fair and speedy trial.
```

App.0563

0153

1      Q.   Yeah, that's correct.
2  BY UNIDENTIFIED MALE SPEAKER:
3      Q.   If you were tried and found guilty, you have
4  a right to what?
5      A.   To appeal.
6  BY DR. LOTT:
7      Q.   Very good.  But there's another one.  And
8  that is the right to avoid self-incrimination.  If you
9  accepted the plea of guilt, you're basically giving up
10  your right not to incriminate yourself.
11      A.   To the Fifth Amendment.
12  BY UNIDENTIFIED MALE SPEAKER:
13      Q.   I know you know this.  But if they offer you
14  a deal and you take it and you don't have a trial?
15      A.   My rights cause I plead guilty.
16  BY UNIDENTIFIED MALE SPEAKER:
17      Q.   I think Dr. Lott had asked you if you were
18  hearing voices on the day of the alleged offense.
19  And, I think, you said I hear them every day.  And
20  then later he asked you about that again.  I just want
21  to see if, for the second time, just to be clear.
22  Were you or were you not hearing any voices in your
23  mind on the day the alleged offense occurred?
24      A.   Yes, sir.
25      Q.   You were?

App.0564

0154

1      A.   Yes, sir.

2      Q.   And what specifically were the voices saying

3  to you?

4      A.   They were saying a whole bunch of things, go

5  hurt somebody, go do this, go do that.

6      Q.   Were they telling you to rob a store?

7      A.   They were telling me -- I don't know.

8      Q.   Were they telling you to shoot somebody?

9      A.   I mean, yeah, if somebody did me wrong.  If

10  somebody do something wrong or something.

11      Q.   Is that what the voices were telling you, to

12  shoot somebody?

13      A.   I don't know about that.

14      Q.   Okay.  Let me ask you something else.  And

15  you may not want to answer.  In your statement,

16  according to the information that we have, you said

17  something about your codefendants threatened you and

18  (inaudible) pointing a gun at you.  And Ms. O'Clarity

19  is here.  You don't have to tell us any of this stuff.

20  One of the things that they have asked us about is

21  mitigation, is there anything from a mental health

22  point of view that might help you.  Is there anything

23  -- and you've previously consulted with Ms.

24  O'Clarity -- that you want to tell us about what

25  happened to you that morning that was affecting you

154

0155

1    mentally like somebody threatened you?  It didn't
2    happen or you don't want to talk about it?
3         A.   I mean ain't nobody threatened me.
4         Q.   Did you tell somebody that somebody
5    threatened you?
6         A.   I mean yeah, I told the detective that.
7         Q.   You did?
8         A.   Yes, sir.
9         Q.   But that wasn't true?
10        A.   No, that whole big statement is a lie.
11        Q.   So nobody threatened you?
12        A.   No, sir.
13   BY DR. LOTT:
14        Q.   Do you understand --
15        A.   Like he said, he told me that was just a way
16   that I could get off, you know what I'm saying.  He
17   basically told me what to say in that statement
18   himself.  He didn't tell me to say it like we sitting
19   up here talking and I'm sitting here, this and this.
20   I mean he didn't say it like that.  But he told me, he
21   put the fragment out there and told me, you know what
22   I'm saying, how it was going and stuff like that.  He
23   told me that if I do, just like you in here saying, it
24   will help me.
25        Q.   So the officer told you that Mr. (inaudible)

0156

1   had threatened you?

2       A.   He told me to act like I was shooting down

3   at the ground.  He said (inaudible) that your gun had

4   rat pellets in it.  He said to act like I didn't want

5   to do it and when he threatened me or whatever I felt

6   like my life was in danger and that I just shot down

7   at the ground, not trying to hurt nobody.

8       Q.   That's what the officer told you?

9            DR. LOTT:  This is tape 4, side A.

10  BY DR. LOTT:

11      Q.   Now, they were just asking you about your

12  statement and who said what.  Tell us again what you

13  just told us.

14      A.   Detective James, well, she came in the

15  office.  And after I told them I wanted to (inaudible)

16  and stuff like that, she told (inaudible) to get out

17  of the office.  And that's when he started telling me

18  what the police had on me, what this and that.  Told

19  me that the gun had rat pellets in it.  Told me, you

20  know, that there's a person said that you did it.

21  Said that but I know a way I can get off of it.  Said

22  to say that, you know what I'm saying, where he said

23  if I said that he was trying to threaten me, that he

24  threatened like pointing the gun at me.  And you know

25  what I'm saying, I said man, I ain't going to do this,

0157

1    you know what I'm saying.  You know, you going to have
2    to go down with me or something like that.  He said,
3    you know, to say that I shot down at the floor with
4    the rat pellet.  I knew the gun had rat pellets and
5    that I, you know what I'm saying, that I wasn't trying
6    to hurt nobody and stuff like that.  It would be
7    something like in self-defense or something like that
8    and I would get, you know, I wouldn't get as much time
9    as they were trying to give me.
10        Q.   Okay.  Were you worried about any multiple
11   statements that weren't consistent with each other
12   after you'd done that or did that thought come in your
13   mind?
14        A.   No, I didn't think about that.
15        Q.   Did you think that the police officer and
16   the detective and investigator, they were trying to
17   help you?
18        A.   At first I thought, you know what I'm
19   saying, at first I thought they were, you know, until
20   come to find out, you know what I'm saying, they
21   weren't trying to help me, you know, they done had it
22   set on me.  They (inaudible) set on trying to get
23   nobody.
24   BY UNIDENTIFIED MALE SPEAKER:
25        Q.   I've got a couple of background questions,

0158

```
 1   just to clear up some things I didn't understand in
 2   the beginning.  And you don't have to answer any of
 3   this.  Is Quincy Bolands the same as Eric Bolands?
 4        A.   No, sir.
 5        Q.   Are they brothers?
 6        A.   They're cousins.
 7        Q.   They're cousins.  Who is the older?
 8        A.   Quincy.
 9        Q.   Quincy is older than Eric?
10        A.   Yes, sir.
11        Q.   How old is Eric?
12        A.   About 17.
13        Q.   Is it Bolands with an S, or Boland without
14   an S?
15        A.   I don't know.  I think it's with an S.
16        Q.   Okay.  Who is (inaudible).
17        A.   Eric's brother.
18        Q.   Who is (inaudible)?
19        A.   DeMarcus Westwood.
20        Q.   Say again?
21        A.   DeMarcus Westwood.
22        Q.   Is he indicated on the conspiracy thing?
23        A.   Conspiracy.
24        Q.   Okay.  But not on the murder?
25        A.   No, sir.
```

158

0159

1       Q.    One of the other things they asked for in
2   the order was mitigation.  And we've been asking you a
3   lot about your history.  We've been asking you
4   questions about your mental state at the time of the
5   alleged offense.
6           Now, as Dr. Lott has said, they're not going
7   to ask us, hopefully, whether you did anything wrong,
8   they're going to ask us about your mental state.
9   Mitigation would mean anything that your defense team
10  can use to help you.  It is not limited to just the
11  time of the alleged offense, it's anything.  Can you
12  think of anything in your past, starting when you were
13  a little kid, up through school?  It can be around the
14  time of the alleged offense but it can be anything
15  that you think would be helpful for us to know,
16  understanding that this is going to the judge and the
17  D.A., as well as your defense team, from a mental
18  health or emotional or psychological point of view
19  that they can use to help you?
20      A.    Do you mean like something bad in my past?
21      Q.    Something bad in your past.  Like trouble
22  with your step-dad, anybody who abused you at any
23  point in the past, physically, emotionally, sexually?
24      A.    Yeah, I used to see my step-daddy whip my
25  mama.

159

0160

1       Q.   How old were you then?

2       A.   About 11, 12.

3       Q.   How did that affect you emotionally?

4       A.   I couldn't do nothing, you know what I'm

5   saying.  That was my step-daddy, you know.

6       Q.   And how did that make you feel?

7       A.   Bad.

8   BY DR. LOTT:

9       Q.   How often did that happen?

10      A.   Every weekend.

11      Q.   Every weekend.  Was your stepfather

12  drinking?

13      A.   Yes, sir.

14      Q.   So when he started drinking he would become

15  abusive to your mom?

16      A.   Yes, sir.

17      Q.   What was the worst thing you witnessed of

18  your stepfather's abuse toward your mom?

19      A.   He hit her all the time.  One time he chased

20  her out of the house with a shotgun.

21      Q.   He chased her through the house with a

22  shotgun?

23           UNIDENTIFIED MALE SPEAKER:  Out of the

24      house.

25      A.   Out of the house with it.

160

0161

```
 1        Q.   Did he abuse your brother at all or you or
 2   did you see any of that?
 3        A.   I mean I know he wanted to but, you know, we
 4   boys.
 5        Q.   Yeah.
 6        A.   And I jumped on him one time when I got old
 7   enough when he tried to hit on me.
 8        Q.   How old were you when you jumped on him?
 9        A.   About 16, 17.
10        Q.   How do you think his drinking affected you
11   besides how he treated your mama?
12        A.   I just didn't want to be around when he was
13   drinking.
14        Q.   How did it affect you when your father
15   passed?
16        A.   It made me sad.
17        Q.   How?
18        A.   I was sad.  I was just sad.
19        Q.   That was when you were 10 or 11?
20        A.   Ten or eleven.
21        Q.   Ten or eleven?
22        A.   Ten or eleven.
23        Q.   Anything else like that?  Anything when you
24   were a little kid, anything particularly stressful to
25   you around the time of the alleged offense, not
```

App.0572

0162

1   getting along with your mom, not getting along with
2   your baby's mom, things that were worrying you,
3   weighing on your mind?
4       A.   At the time me and my baby's mama, we was
5   separated.  We weren't separated, you know, just
6   started doing other things, you know.
7       Q.   You were seeing other folks, other ladies.
8   Was she seeing other guys?
9       A.   Yes, sir.
10      Q.   How was that affecting you?
11      A.   I mean I wouldn't never try to hurt her or
12  anything like that.  I wasn't mad.
13      Q.   Anything else you want us to know about?
14      A.   There's not anything I can really just think
15  of, you know.
16      Q.   Well, there may be things that you want to
17  talk with your defense team about that you don't want
18  to talk to us about.  Because as we keep reminding
19  you, we're also reporting to the judge and the D.A.
20  They could put us on the stand and make us tell them
21  anything you tell us.  Knowing all of that, can you
22  think of anything else that you want to tell us about?
23      A.   Yeah, I need to get out of this mess.
24  BY DR. LOTT:
25      Q.   I just want to underscore something,

0163

1  Mr. Pitchford.  You certainly don't have to say
2  anything to us that can hurt you.  But if, at the time
3  of the crime, some things were going on -- and I'm not
4  asking you to respond to this question, I just want
5  you -- I'm going to make a statement.
6          If some things were going on then that might
7  have certainly affected your behavior that day,
8  whether it was doing some strange drug for the first
9  time or whether or not someone was threatening you at
10  gunpoint to do something or threatening you in general
11  to do something, that's mitigating.  Okay.
12          Now, you need to think about those issues.
13  Because we can't use it in our report, obviously, if
14  you don't -- if you say it didn't happen unless we
15  have some other significant sources to substantiate
16  it.
17          Now, I'm not asking you to respond to that.
18  But that it's important for you to realize.
19     A.  Yes, sir.
20     Q.  We can't argue for mitigation if you're
21  saying it didn't happen.  Okay.  So I just want you to
22  think about that and be aware of that fact.
23  BY UNIDENTIFIED MALE SPEAKER:
24     Q.  Were you ever picked on in school?
25     A.  No, I wasn't never picked on.

App.0574

0164

1      Q.   You mentioned before something about

2  teachers telling you you had a short attention span

3  when you were in school?

4      A.   No, I used to think that.

5      Q.   You used to think that yourself or were you

6  told that?

7      A.   I used to think that myself.

8  BY DR. LOTT:

9      Q.   But you were never told that?

10      A.   I never let nobody know what was going on

11  with me.

12        DR. LOTT:  Ms. O'Clarity, anything else we

13      need to explore?

14        UNIDENTIFIED MALE SPEAKER:  Now, one

15      positive of this mitigation (inaudible).

16        DR. LOTT:  Do you have any questions for us?

17      We've asked you lots and lots of questions today.

18      Anything for us?

19        MR. PITCHFORD:  No, not really.

20        DR. LOTT:  Okay.  Anybody else?

21        UNIDENTIFIED MALE SPEAKER:  We're going to

22      take a break and going to give you some lunch.

23  BY DR. LOTT:

24        We have discussed our opinion and we are

25      unanimous that Mr. Pitchford has the sufficient

0165

```
1       capability to confer with his attorney with a
2       reasonable degree of rational understanding and
3       has a factual and (inaudible) understanding of
4       the charges against him.
5            We also are unanimous in our opinion that
6       Mr. Pitchford was not suffering from a severe
7       mental illness at the time of the alleged
8       offenses and therefore he would have been able to
9       understand the nature and (inaudible) of his
10      alleged actions and would have been able to
11      understand the difference between right and wrong
12      for his alleged actions at that time.
13           We are also unanimous in our opinion that
14      Mr. Pitchford currently understands his
15      constitutional rights.
16           Doctors Lott and McMichael agree that he
17      would have been able to understand his rights at
18      the time that he made his statements.  And
19      Dr. McMarr is of the opinion that his ability at
20      that time may have been questionable.
21           We are also unanimous in our opinion that
22      Mr. Pitchford was not suffering an extreme and
23      mental or emotional disturbance at the time of
24      the alleged offenses and his ability to conform
25      his conduct to the (inaudible) of the law and to
```

165

0166

1     appreciate the criminality of his conduct was not
2     substantially impaired at that time.
3          We are deferring diagnoses regarding mental
4     retardation and anti-social personality disorder
5     and malingering until further testing is
6     completed.
7          Mr. Pitchford will be returned to the
8     custody of the Grenada County Sheriff's
9     Department.
10          We will discuss further the protocol for
11     testing and completing the evaluation.
12          Thank you.
13
14
15
16
17
18
19
20
21
22
23
24
25

166

0167

```
 1                    CERTIFICATE
 2          I, Debbie G. Williams, Court Reporter and
 3  Notary Public, in and for the State of Mississippi,
 4  hereby certify that I transcribed the foregoing tape
 5  recorded evaluation of TERRY PITCHFORD.
 6          This the 11th day of  July, 2011.
 7
 8
 9                              _____
                                DEBBIE G. WILLIAMS
10                              CVR, CSR
    My Commission Expires:
11  January 7, 2015
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

167



**The Mississippi Office of
Capital Post-Conviction Counsel**

*Glenn S. Swartzfager, ESQ*
*Director*

*Louwlynn Vanzetta Williams*
*Staff Attorney*

*Pamela Hannah*
*Investigator*

*Jackie E. Johnson*
*Paralegal Specialist*

*Amy Strickland*
*Paralegal*

November 29, 2010

Mississippi State Hospital
**ATTN: Health Records**
PO Box 157-A
Whitfield, MS 39193

Re:   **Terry Pitchford**
      **MDOC #:**   117778
      **SS#:**      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
      **DOB:**      12/30/1985

Dear Health Records Clerk:

I am in receipt of your October 29, 2010 invoice letter attached. Enclosed you will find check numbered 1207 in the amount of $37.40.

Please mail the certified records to:

The Mississippi Office of Capital Post-Conviction Office
*c/o Jackie E. Johnson, Paralegal Specialist*
239 North Lamar Street, Suite 404
Jackson, MS 39201

Thank you for your assistance in this matter. Should you have any questions, concerns, or need additional information, please do not hesitate to contact me at 601.359.5687.

Sincerely,

**CAPITAL POST-CONVICTION**

Jackie E. Johnson,
Paralegal Specialist

Enclosures

Pitchford-MSH001



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

...us information has been disclosed to you from records whose confidentiality is protected. State rules/regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2).

CASE NO: _____

NAME: **Pitchford, Terry** _____
       **Last**     **First**     **Middle**

| | |
|---|---|
| **OUTPATIENT EVALUATION:** | **TERRY PITCHFORD** |
| **DATE OF EVALUATION:** | **11 JANUARY 2006** |
| **DATE OF DICTATION:** | **11 JANUARY 2006** |

## IDENTIFICATION:

This was the first Mississippi State Hospital contact, the first known forensic mental evaluation regarding the instant offenses and the first known mental health contact of any kind for this 20 year old, never married, African-American man from Grenada County.

## PURPOSE OF EVALUATION:

Mr. Pitchford was sent to this Service on a Grenada County Circuit Court Order, cause number 2005-009-CR, on a motion *Ore Tenus* of the parties, for Mr. Pitchford to undergo a:

> "... psychiatric examination at the State Hospital at Whitfield to determine his competency to stand trial in the above styled and numbered cause, to determine whether or not the defendant is capable of assisting his counsel and assisting in his own defense, to determine his capacity to understand the legal process and possible consequences flowing therefrom, to determine his capacity to understand the nature of the charges against him and to determine his degree of criminal culpability in his ability to know right from wrong at the time of the commission of the crime charged against him and/or understand the nature and quality of his acts, to determine his capacity to understand and to knowingly waive or assert his constitutional rights; and further to be tested to determine whether or not he is considered retarded under the standards set forth by the Atkins case and to determine any mitigating circumstances; especially whether the offense with which the defendant is charged was committed while he was under the influence of extreme mental or emotional disturbance; and whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired."

This Order also states:

> "IT IS FURTHER ORDERED that the State Hospital promptly report to this Court, the Defendant's Counsel and to the District Attorney the results of

Pitchford-MSH002
App.0580



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

as information has been disclosed to you from records whose confidentiality is protected. State regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

CASE NO: _____

NAME: **Pitchford, Terry** _____
      Last     First     Middle

their examination and their recommendations, if any; and further that the State Hospital is hereby authorized to discuss this case with both Counsel for the Defendant and Counsel for the State and further may release any requested information on this case received by the State Hospital for the purpose of evaluation to defense counsel or to the District Attorney at their request."

## CHARGES:

Mr. Pitchford is charged with one codefendant (Eric Bullin) with one count of capital murder with an underlying alleged offense of armed robbery occurring on or about 7 November 04. He also is charged with two codefendants (Quincy Bullin and Demarques Westmoreland) with one count of conspiracy to commit armed robbery. He is accused of conspiring to rob, and subsequently of robbing, a convenience store and of shooting and killing Reuben Britt, a clerk in that store.

## INFORMATION REVIEWED:

1. Circuit Court Order, Cause No. 2005-009-CR, Judge Loper, 8 Sept. 05;
2. Patient Information Form, two different copies;
3. Motion for Mental Evaluation, Raymond M. Baum, 31 January 05;
4. Indictment, Capital Murder, January Term, 2005;
5. Grenada County Detention Center, Information Sheet, undated;
6. Indictment, Capital Murder, January Term, 2005 (for Eric Bullin);
7. Grenada County Detention Center, Information Sheet, (for Eric Bullin);
8. Indictment, Conspiracy to Commit a Crime (armed robbery), January Term, 2005, for Terry Pitchford, Quincy Bullin and Demarcus Westmoreland;
9. Grenada County Sheriff's Department Offense Report, Officer Carver Conley, 7 Nov 04;
10. Grenada County Sheriff's Department Offense Report, Supplemental Report, Officer Carver Conley, 7 Nov 04;
11. Grenada County Sheriff's Department, Underlying Facts Sheet Regarding Armed Robbery and Murder, unsigned, undated;
12. Offense Report, Officer Robert C. Jennings;
13. Waiver of Rights form, signed by defendant, 7 Nov 04, 2:38p.m.;
14. "First Statement of Terry Pitchford," 7 Nov 04, time not specified;
15. "Second Statement of Terry Pitchford," 7 Nov 04, time not specified;
16. "Third Statement of Terry Pitchford," 7 Nov 04, time not specified;
17. "Fourth Statement of Terry Pitchford," 9 Nov 04, 0943;

Pitchford-MSH003
App.0581



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

s information has been disclosed to you from records whose confidentiality is protected. State regulations prohibit you from making further disclosure of it without the or is otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules prohibit any alcohol or drug patient (42 CFR Part 2)

CASE NO: _____

NAME: <u>Pitchford, Terry</u>
      Last     First     Middle

18. Fifth Statement of Terry Pitchford," 8 Nov 04, 10:20a.m.;
19. Statement of Paul Hubbard and Henry Ross, Jr., 7 Nov 04;
20. School records, first grade – 2 Dec 05;
21. Statement of Quincy Bullins, 7 Nov 04;
22. Statement of Demarcus Westmoreland, 7 Nov 04;
23. Offense Report, unsigned, undated;
24. Report of Death Investigation, Richard Crenshaw, Coroner, 8 Nov 04;
25. Provisional Report of Autopsy, AME# 11-D1-04, Steven T. Hayne, M.D., 8 Nov 04;
26. Final Report of Autopsy, AME#11-D1-04, Steven T. Hayne, M.D., 8 Nov 04;
27. Photographs of crime scene and decedent;
28. Time line, Capital Murder of Reuben Britt, Grenada County, 7 Nov 04;
29. Order Setting Amount of Bail, submitted Pro Se by Mr. Pitchford, Terry Pitchford, 25 May 05;
30. Grenada Central Communications, Incident No. 2004110323, 7 Nov 04;
31. Subjects Present on Scene;
32. Photo Lineup, 8 across view, ?Henry Ross?, 2 Dec 04;
33. Photo Lineup, 8 across view, Paul Hubbard, 2 Dec 04;
34. Time and route from Crossroad Grocery to Eric Bullin's house;
35. Crime scene sketches and inventory;
36. Evidence Recovery Log, 8 Nov 04;
37. Schematic of crime scene;
38. Waiver of Rights Form, signed by Defendant, 8 Nov 04, 0915;
39. Waiver and Consent to Undergo Polygraph Testing, unsigned, undated;
40. Waiver of Rights, Eric Bullin, 8 Nov 04, 10:35;
41. Polygraph questions and results, Eric Bullin;
42. Handwritten notes re: alleged offense, unsigned, undated;
43. DNA Request Form, Greg Conley, 7 Jan 05;
44. Notice of Hearing to Appoint Court Expert for DNA Analysis, Clyde V. Hill, 3 Dec 04;
45. Motion to Appoint Court Expert for DNA Analysis, Clyde V. Hill, 3 Dec 04;
46. Order Appointing Gina Pineda as Court's Expert Witness for DNA Analysis and Testimony, Judge Loper, 14 Dec 04;
47. MS Crime Laboratory, Certified Report, Amanda G. Lieb and Deedra Hughes, 7 Jan 05;
48. MS Crime Laboratory, Certified Report, Paul S. Wilkerson and Jamie Bush, 26 Jan 05;
49. MS Crime Laboratory, Certified Report, Steve Berd and Starks Hathcock, 7 Feb 05;
50. MS Crime Laboratory, Evidence Submission Form, Clyde Hill, 18 Feb 05;
51. Consent to Search Vehicle, Shirley Jackson, undated;
52. Handwritten statement, illegible signature, 7 Nov 04;
53. Handwritten statement of John Seals, undated;

Pitchford-MSH004
App.0582



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry** _____
      Last      First      Middle

54. Statement of Dantron Mitchell, 2 Dec 04;
55. Subpoena Duces Tecum, for Telephone Records, 2 Dec 04;
56. Telephone records for telephone number (662) 226-00123, 23 Oct 04 – 22 Nov 04;
57. Additional photographs of crime scene, items of clothing, an automobile (license no. 927GNN);
58. Handwritten note re: movements of an automobile near the crime scene, unsigned, 7 Nov 04;
59. Handwritten Note, "Eric," undated;
60. Waiver of Rights Form, Demarques Westmoreland, 7 Nov 04, 1509;
61. E-mail from Mr. Carter's Office re: contact information for Mr. Pitchford's mother and maternal half sister, 21 Sept 05;
62. Information from Jail, Maj. Stewart and Peggy Ragsdale, LPN, 20 Sept 05;
63. On 26 January 06, we received from Mr. Carter, medical records regarding Mr. Pitchford, from the Grenada Lake Medical Center, 22 September 04, 14 May 04, 10 May 04, 22 April 04, 9 August 03, 18 February 02, 2 October 01, 18 November 00, and 19 October 99.

Dr. McMichael also spoke with Mrs. Shirley Jackson, Mr. Pitchford's mother; with Perry Pitchford, Mr. Pitchford's twin brother; and with Peggy Ragsdale, LPN, and Captain Evans at the Grenada County Jail; to obtain further background information concerning Mr. Pitchford.

## NATURE OF EVALUATION:

After reviewing the information provided to us, we interviewed Mr. Pitchford for approximately three hours and twenty minutes on 11 January 06. On 25 January 06, Mr. Pitchford was returned to this Service and received psychological testing.

## CHIEF COMPLAINT:

"… this charge."

## HISTORY OF PRESENT ILLNESS:

Mr. Pitchford was arrested on 7 Nov 04, the day of the alleged offense. He has remained incarcerated since that date.

According to a note by Major Edna M. Stewart from the Grenada County Jail, dated 20 Sept 05:

"Offender has given no prior indication by behavior, acts or characterization of
having any kind of mental impairments. He has been incarcerated at this location

MSH - 5A             Page 4 of 19             Whitfield, Mississippi 39193

Pitchford-MSH005
App.0583



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: <u>Pitchford, Terry</u>
     Last      First      Middle

since November 7, 2004. He have been involved in several disciplinary incidents. He has no prior medical history and has taken no meds since his incarceration."

According to Nurse Ragsdale in a conversation with Dr. McMichael on 10 January 06, "Security mostly manages him... nothing from medical... ." According to Captain Evans at the jail, "He's fine... no problems... not mental... not slower than the average inmate... ."

When we asked Mr. Pitchford about any unusual experiences he may have had while incarcerated, he stated, "I hear voices in my head... all the time... different ideas... just a whole bunch of stuff... telling me to do different things... ." Mr. Pitchford endorsed hearing voices telling him to, "... slap people for no reason," but said that he had learned not to respond to this. On further questioning, he again said that he heard voices, "all the time," and that he was hearing them at the time of our evaluation of him.

Mr. Pitchford denied experiencing any visual hallucinations while incarcerated.

Mr. Pitchford endorsed feeling "sad" while incarcerated, but denied he had experienced any suicidal ideation.

He acknowledged having engaged in several physical altercations while incarcerated, but denied experiencing any homicidal ideation.

## PAST PSYCHIATRIC HISTORY:

Mr. Pitchford reported taking an overdose of medications prescribed for someone else when he was 14 or 15 years old. He said, "I used to have a bad temper... I was mad at everybody... my baby mama... my mama... everybody... I took a whole bottle of pain pills... got dizzy... they took me to the hospital... ."

Although he reported being taken to an Emergency Department at the time of this overdose, he denied that he received any mental health evaluation or treatment at that time. Medical records which we received indicated that Mr. Pitchford was seen in the Emergency Department of the Grenada Lake Medical Center on 9 August 03 for an overdose. According to those records, he took approximately six Naproxen, 220mg tablets. A urine toxicology screen obtained at that time reportedly was positive for the presence of marijuana.



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

its information has been disclosed to you from records whose confidentiality is protected. Statutes/regulations prohibit you from making further disclosures of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of **Addressograph** to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

CASE NO: _____

NAME: <u>Pitchford, Terry</u>_____
      Last        First        Middle

Mr. Pitchford also reported having deliberately cut his left arm on one occasion when he was staying with an older sister in the Jackson area. He declined to say what events may have preceded this incident of self-injurious behavior. He said, "I just didn't have anything else to do."

Mr. Pitchford reported experiencing emotional difficulties when his father died when he was 10 or 11 years old. He also reported seeing his deceased father on one occasion approximately two years after he died.

Mr. Pitchford reported experiencing emotional difficulties when his mother was married to an alcoholic man whom he witnesses physically abusing her after his biological father died.

Mr. Pitchford denied that he ever received any kind of mental health evaluation or treatment.

He said that the only evaluations he received in the school system were the achievement tests administered to all of the students.

## ALCOHOL AND OTHER SUBSTANCE ABUSE HISTORY:

Mr. Pitchford reported, "My Daddy used to give us beer when we was little kids." He reported occasionally drinking beer and other beverage alcohol as an adult.

Mr. Pitchford reported that he began smoking marijuana when he was approximately 15 years old. He said that prior to his arrest for the instant alleged offenses he was smoking, "20 blunts a day." He estimated that he personally consumed approximately "one ounce" of marijuana per day. He said that on two occasions, he "dipped" his marijuana in some prescription cough preparation. He otherwise denied adulterating his marijuana with other substances. As mentioned previously, a urine toxicology screen obtained on 9 August 03 reportedly was positive for the presence of marijuana.

Mr. Pitchford reported "huffing" some inhalant on one or two occasions as a child.

He reported "popping (unknown) pills," on approximately four occasions while he was in Job Corp.

Mr. Pitchford denied the use of cocaine, methamphetamine, narcotics, or any substance by injection.

Mr. Pitchford denied that he had ever received treatment for substance abuse.

Pitchford-MSH007
App.0585



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry** _____
      Last      First      Middle

## SOCIAL HISTORY:

Mr. Pitchford reportedly completed the seventh grade in regular classes. He reportedly repeated the second and fourth grades. Mr. Pitchford stated, "I made F's all the way through school… or D's… I believe I had a short attention span."

According to school records which we received, Mr. Pitchford scored in the average range in reading and mathematics when he was in the sixth grade. His grades in the eighth grade in regular classes ranged between 72 and 77.

**(See Attachment 1 for copies of Mr. Pitchford's school records.)**

Mr. Pitchford reportedly was expelled from the Grenada Public Schools in April 02 for destroying school property and threatening to bring a gun to school and to kill people. He reported that he attended Alternative School in Hinds County for several months but, "just quit going." Records indicate that he was expelled again from the Grenada Public Schools in December 03 for threatening a teacher. After initially denying that he had been expelled a second time from the Grenada Public Schools, Mr. Pitchford said that he had been attending G.E.D. at the Grenada Public Schools and was expelled from that program. He said that he also was expelled from Job Corp., "for having sex with a girl."

Mr. Pitchford reportedly had a valid driver's license. He said that he passed the written examination on his second attempt.

Mr. Pitchford reported being employed briefly at Heathcraft on an assembly line and briefly at Taco Bell. He said that he had been employed at Grenada Wholesale Lumber Company for seven or eight months prior to his incarceration on the instant offenses.

Mr. Pitchford has never married but has a one-year-old child with a young woman whom he has known for approximately six years. He reported that he had a good relationship with this child, but that both he and the child's mother were seeing other people shortly prior to the alleged offenses.

Mr. Pitchford has no military history. He reportedly previously received a disability income based upon his father's disability, but has never applied for a disability income for any mental health or medical problems of his own.

Pitchford-MSH008
App.0586



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

**CASE NO:** _____

**NAME:** <u>Pitchford, Terry</u> _____
      Last     First     Middle

## FORENSIC HISTORY:

Mr. Pitchford reported being involved with his local Youth Court when he was approximately fourteen years old. He said that he traded with another student at school for what turned out to be a stolen cell phone. He said that he was placed briefly on probation by the Youth Court.

Mr. Pitchford reported several other interactions with the police, but denied any other arrests either as a juvenile or as an adult prior to the instant alleged offenses.

Asked if he had engaged in any activities for which he could have been arrested, had these activities been discovered by the police, Mr. Pitchford declined to answer this.

## FAMILY HISTORY:

Mr. Pitchford reported that his biological father died of "kidney cancer," when he was approximately ten years old. He reported that the man whom his mother subsequently married was an alcoholic who physically abused her. He reported that a maternal uncle had significant substance abuse problems and that his maternal grandfather, "… died from drinking too much."

Mr. Pitchford reported that he had, "fourteen or fifteen" paternal half-siblings. He said that one of these individuals had been treated here at the State Hospital at Whitfield and that one had been incarcerated. He reported that, "most of them," abused substances to some degree.

Mr. Pitchford's mother reported that one maternal first cousin is mentally retarded.

## SIGNIFICANT MEDICAL/SURGICAL HISTORY:

Mr. Pitchford's mother reported that he and his twin brother were delivered by cesarean section. She denied that Mr. Pitchford experienced any perinatal or early developmental problems. She reported that he had experienced several motor vehicle accidents which resulted in brief losses of consciousness. She denied any history of seizures.

Mr. Pitchford reported that he was "knocked out" briefly on one occasion during a football practice, and that he had sustained brief losses of consciousness in several motor vehicle accidents. According to medical records which we received, Mr. Pitchford was involved in a motor vehicle accident on 10 May 04. He reportedly called 911 from his residence and reportedly had a "dizzy spell" prior to the arrival of the EMT's. He had no reported loss of consciousness or mental status changes.

Pitchford-MSH009
App.0587



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

**CASE NO:** _____

**NAME:** Pitchford, Terry _____

　　　　　Last　　　　First　　　　Middle

On 14 May 04, Mr. Pitchford had a non-contrast CT head scan which was reported to be within normal limits.

On 18 February 02, Mr. Pitchford was seen in his local Emergency Department for a, "very small swollen area at his hairline in the center of his forehead." He reported that he had been hit in the head either with a bottle or with a ball approximately two years prior to this.

On 19 October 99, Mr. Pitchford was seen in his local Emergency Department with a 2.5cm laceration of his forehead. He reportedly was hit in the head with a can of spray starch. He reportedly had a "normal" neurological exam.

Mr. Pitchford reported that he experienced a period of elevated blood pressure when he was approximately 11 years old.

Mr. Pitchford and his mother both reported that he had surgery on his testicles when he was approximately 14 or 15 years old.

Mr. Pitchford denied that he had ever taken any psychiatric medications for hyperactivity, attention deficit disorder, or any other mental health indication.

Mr. Pitchford denied that he was allergic to any medication.

## CURRENT MEDICATIONS:

Mr. Pitchford reportedly has not taken any medications while he has been incarcerated.

## REVIEW OF SYSTEMS:

Mr. Pitchford reported that he had lost a considerable amount of weight while incarcerated, although he reported that his appetite has been good.

At the time of this evaluation, Mr. Pitchford reported that his legs were, "… sore… from working out." He denied any other physical complaints at the time of this evaluation.

## NOTIFICATION:

Mr. Pitchford was advised of the purpose and limited confidentiality of this evaluation. He was

Pitchford-MSH0010
App.0588



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: <u>Pitchford, Terry</u>
      Last     First     Middle

advised that we would be sending a summary report to the Judge, to the office of the District Attorney, and to his defense attorneys.

Mr. Pitchford was specifically advised that information from this evaluation potentially could be used for him, or against him, in the sentencing phase of a capital trial.

Mr. Pitchford was reminded on several occasions of his right not to say anything during this evaluation which he thought could be used against him in his legal situation.

Asked his understanding of his right not to incriminate himself during the course of this evaluation, Mr. Pitchford said, "If I don't want to say something concerning my case, I don't have to."

Mr. Pitchford invoked his right not to answer our questions and incriminate himself when we asked him about any activities for which he could have been arrested prior to the alleged offenses, and when we asked him how he was obtaining as much marijuana as he reported consuming.

## INTERVIEW/OBSERVATIONS:

Mr. Pitchford presented as a well developed, well nourished, young adult, African-American man who appeared somewhat younger than his stated age of 20 years. He was neatly groomed with a small mustache and "chin patch." He had script tattoos on both wrists which he said were his son's names. No abnormal motor movements were observed.

Mr. Pitchford was generally soft-spoken and fairly articulate. His speech was relevant, well organized, and responsive to our questions. It was not accelerated or slowed in rate. There was no loosening of associations or flight of ideas.

Mr. Pitchford initially appeared somewhat anxious, but subsequently appeared more relaxed as the interview progressed. He occasionally smiled appropriately. His expression of emotion was not constricted or bizarre.

Asked to describe his mood, he initially replied, "sad, really," but subsequently said, "I'm doing alright."

Mr. Pitchford reported, "I hear voices in my head… all the time… different ideas… just a whole bunch of stuff… telling me to do different things… ."

Pitchford-MSH0011
App.0589



## Mississippi State Hospital
### DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry**
     Last     First     Middle

Mr. Pitchford endorsed hearing voices telling him to, "slap people for no reason." He said that he had learned not to do this.

Asked what he thought these voices were, Mr. Pitchford said, "I used to think it was Satan and God having a battle."

Mr. Pitchford said that he was hearing these voices at the time that we were evaluating him. Asked what they were saying, he said that they were asking him, "How long this gonna take? What y'all thinking? (and) What kind of car y'all drive?"

Asked if the voices could ever force him to do things, Mr. Pitchford replied, "… when I get upset… when I get a temper… it don't be me… ."

Mr. Pitchford said that he had been hearing these voices since he was, "… about seven years old." Asked when he first learned not to respond to what the voices were directing him to do, he said that he was, "about 16 or 17." Prior to this, Mr. Pitchford said the voices had told him to jump out of a moving vehicle and that he had done that. Subsequent to his learning not to respond to them, he said that the voices had told him to jump off of a balcony in the jail, and that he did not do that.

Mr. Pitchford said that the voices were always male and said repeatedly that he heard them, "all the time."

Mr. Pitchford said that sometimes he could say to himself, "I rebuke you, Satan, in the name of Jesus," and that the voices would stop briefly.

Mr. Pitchford said that he saw his biological father's ghost on one occasion approximately two years after he died.

Mr. Pitchford denied believing that he had any special powers or unusual abilities.

Mr. Pitchford was fully awake, alert, and attentive throughout this lengthy interview. He did not appear to be distractible or internally stimulated.

Mr. Pitchford was precisely oriented in all spheres, including the precise date. He appeared to understand the nature and purpose of this evaluation.

Mr. Pitchford's memory appeared to be unimpaired for either recent or remote events. He could recall

Pitchford-MSH0012
App.0590



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry**
  Last   First   Middle

three of three unrelated items after approximately ten minutes and after approximately one hour.

His intelligence was clinically estimated to be in the low average range.

Mr. Pitchford spontaneously and appropriately used words and phrases such as, "deceased, apostrophe, corporal punishment, expelled, intimidated, favoritism, lunatic, endanger, predicament, statute of limitations, and adapting," in responding to our questions.

(Please see **Attachment 2** for an additional list of words and phrases used correctly by Mr. Pitchford during this interview.)

Asked the meaning of the phrase, "Don't judge a book by its cover," Mr. Pitchford replied, "Don't judge me by what you see."

Mr. Pitchford's judgment appeared to be impaired by history and at present, as indicated by his describing what sounded like his own thoughts as "voices."

Asked if he thought of himself as having trouble with his nerves or emotions, Mr. Pitchford replied, "No, sir."

Although Mr. Pitchford reported experiencing suicidal ideation in the remote past, and reported engaging in physical altercations in the jail, he denied experiencing any suicidal or homicidal ideation since the alleged offenses. In Dr. McMichael's opinion, he appeared to be at relatively low risk of harming himself or others in the jail population.

## RESULTS OF PSYCHOLOGICAL TESTING:

Mr. Pitchford was administered the following instruments:

- Wechsler Adult Intelligence Scale – 3rd Edition (WAIS-III)
- Wide Range Achievement Test – Revision 3 (WRAT-3) Reading & Arithmetic subtests
- Wechsler Memory Scale – Third Edition (WMS-III)
- Green Word Memory Test (WMT)
- Test of Memory Malingering (TOMM)
- Rey Fifteen Item Test (FIT)
- Pegboard Test
- Finger Tapping Test (FTT)

Pitchford-MSH0013
App.0591



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry** _____
      Last      First      Middle

- Trail Making Test A & B
- Rey Complex Figure Test
- Wisconsin Card Sorting Test
- Stroop Color and Word Test
- Miller Forensic Assessment of Symptoms Test
- Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-II)

The results of the psychometric testing appear valid. Mr. Pitchford appeared to put forth genuine effort during the administration of all tests. The results of the intellectual testing revealed scores falling in the Average range. No significant difference was noted between the verbal and nonverbal domains. Results of the achievement testing revealed scores falling in the low average range (and were consistent with the intellectual testing and with his educational history). The results of the memory assessment revealed visual and verbal memory scores falling in the Average to High Average range, which were consistent with the results of the intellectual testing. Results of tests assessing executive functioning were in the Average to Low Average range. Results of psychomotor testing revealed scores falling in the Average to Low Average range, and these scores reflected intact motor abilities bilaterally. There was no evidence of attempts to malinger cognitive deficits. Overall, Mr. Pitchford's cognitive abilities appear intact and appear consistent with his history and background. Finally, results of personality testing (as well as another measure designed to detect feigned symptoms of psychosis) indicated that Mr. Pitchford may have attempted to over claim symptoms of mental illness in order to present himself as more psychologically disturbed than is actually the case.

## KNOWLEDGE OF COURT:

Mr. Pitchford said that he was charged with, "capital murder… conspiracy." He said that the maximum penalty he would be facing should he be convicted of these charges would be, "death." Asked if he thought that this was a serious legal situation, he replied, "Yes."

Asked to identify his defense attorneys, Mr. Pitchford replied, "Ray Baum and Ray Carter." Asked what these individuals would be trying to do for him, Mr. Pitchford initially said, "… get me to take a plea," and then said, "… win the case."

Asked if he thought that he would be able to work with his defense team, Mr. Pitchford replied, "Yeah." Asked if he trusted his defense attorneys, Mr. Pitchford again replied, "Yeah." Asked if he could think of any reason why he could not trust his defense team, he said, "… 'cause they ain't paid."

Asked his understanding of how he could best assist his attorneys in the preparation of his defense, Mr.

Pitchford-MSH0014
App.0592

# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry**
     Last     First     Middle

said that he would, "… tell my lawyer." Asked what might happen if he began shouting at a witness or behaving disruptively in the courtroom, Mr. Pitchford said, "… contempt of court."

Asked his understanding of whether or not his testimony could be compelled at his trial, Mr. Pitchford said, "No, 'cause I'm the defendant… Fifth Amendment… ."
Asked his understanding of whether he could be prevented from testifying at his own trial, if he were not behaving disruptively there, Mr. Pitchford replied, "No."

Asked to describe a plea bargain, Mr. Pitchford said, "… something they want you to jump on… give you some time." He appeared to understand that he could not legally be compelled to accept such an arrangement and that if he voluntarily chose to enter into such an agreement, he would be expected to plead, "Guilty."

Asked the potential advantage of such an agreement to a defendant, Mr. Pitchford replied, "You don't get the max."

Asked the potential advantage of plea agreements to the State, Mr. Pitchford said, "… so they won't have to crank up that jury… go to court… save money… ."

Asked the potential risk to a defendant who refused a plea agreement, Mr. Pitchford replied, "death penalty."

Asked the potential risk to the State of not offering a plea agreement, Mr. Pitchford replied, "I could win."

Mr. Pitchford appeared to understand that if he voluntarily entered into a plea agreement, he would be giving up his rights to a trial and to an appeal.

Asked his understanding of whether or not the Judge would have to agree with a sentencing recommendation made by a District Attorney in a plea agreement, Mr. Pitchford replied, "No… he can lower it… or raise it… (but) he can't give you the death penalty."

Asked what factors he would want to consider in deciding whether or not to accept a plea offer, Mr. Pitchford replied, "… how much time… where am I going to go… will I have to do the whole time… what kind of evidence they got against me… ."

Asked what he would do if there were something in a legal proceeding which he did not understand,

Pitchford-MSH0016
App.0594



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: **Pitchford, Terry** _____
      **Last**      **First**      **Middle**

Mr. Pitchford said that he would, "... tell them to break it down for me." Asked specifically who he would ask to explain this to him, Mr. Pitchford replied, "my lawyer."

## MENTAL STATE AT THE TIME OF THE ALLEGED OFFENSES:

Mr. Pitchford reportedly was living at home with his mother, twin brother, and older half sister prior to the time of the alleged offenses. He reportedly was working full time at a local lumber supply company. He reportedly was not receiving any mental health treatment and not exhibiting any unusual behaviors.

In our interview of him, Mr. Pitchford initially said that he believed that the alleged offenses occurred on, "November 11, 04... Sunday." He then agreed with us that the alleged offenses occurred on the 7th of November 2004.

Mr. Pitchford said that he was living with his mother, "down the street," from the crime scene. He said that he was working at, "Grenada Wholesale," loading and delivering lumber.

Asked to describe his activities on the day of the alleged offenses, Mr. Pitchford said that he, "... got up at about 5:30 to take my partner to his house... went to the store... took my partner home... went to my baby mama's house... got there about 7 o'clock... went and got my car detailed... went to Wal Mart... bought a cell phone... got some gas... went back to my house... was getting dressed... when they came and put the cuffs on me... ."

Asked specifically if he was experiencing any auditory hallucinations at the time of the alleged offenses, Mr. Pitchford said, "I hear 'em every day... telling me to hurt somebody." Asked if the voices ever told him to rob a store or kill someone, he replied, "No, sir."

Asked if he was using any substances at the time of the alleged offenses, Mr. Pitchford said, "Yeah, I was high... smoked weed." He denied putting any adulterants in his marijuana around the time of the alleged offenses.

Asked if he knew at the time of this evaluation that it would be wrong to rob a store and kill someone, Mr. Pitchford replied, "Yes."

Asked if he would have known at the time of the alleged offenses that it would be wrong to rob a store and kill someone, Mr. Pitchford also replied, "Yes, sir."

Pitchford-MSH0017
App.0595



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: <u>Pitchford, Terry</u>
    <u>Last        First        Middle</u>

Asked if he could think of any mental or emotional factor which would have prevented him from knowing at the time of the alleged offenses that it would be wrong to rob a store and kill someone, Mr. Pitchford replied, "No, sir."

Asked specifically about his reported fifth voluntary statement to the police in which he described feeling threatened by his codefendant, Mr. Pitchford said that this was not true. He said that the information in this statement essentially was provided to him by the person who was questioning him, and that it was not factual.

Asked if he understood his right not to incriminate himself and his right to have an attorney present at the times of his voluntary statements, Mr. Pitchford said that at the times of these statements he believed that the right to remain silent meant that he should "shut up," and that the right to have an attorney present meant that he could have an attorney present only if he had a private attorney, which he did not.

Mr. Pitchford said that he did not understand his rights until after he was in the jail, had access to the law library there, and had studied this information.

## SUMMARY OF ALLEGED OFFENSES:

Please see **Attachment 3** for an offense report by Robert C. Jennings.
Please see **Attachments 4 – 8** for transcripts of Mr. Pitchford's five statements regarding the alleged offenses.

## PROVISIONAL DIAGNOSES:

Axis I:     1. Rule Out Malingering (fabricating or exaggerating symptoms of
                psychosis);
            2. Cannabis Abuse;
            3. Conduct Disorder, Prior History.
Axis II:    Deferred.
Axis III:   No Diagnosis.
Axis IV:    Problems related to interaction with the legal system; facing possible death penalty.
Axis V:     GAF at the time of this evaluation: 81.

Pitchford-MSH0018
App.0596



# Mississippi State Hospital
## DIAGNOSTIC SUMMARY

CASE NO: _____

NAME: Pitchford, Terry _____
     Last     First     Middle

is information has been disclosed to you from records whose confidentiality is protected ... bit ... you from making further disclosure without ... specific written consent ... or as otherwise permitted ... thori... for the release of medi... is not sufficient for this purpose. The ... any use ... information ... prose... or drug patient (42 CFR Part 2)

## FORENSIC OPINIONS:

We are unanimous in our opinion that Mr. Pitchford has the sufficient present ability to consult with an attorney with a reasonable degree of rational understanding in the preparation of his defense, and that he has a rational as well as factual understanding of the nature and object of the legal proceedings against him.

We also are unanimous in our opinion that Mr. Pitchford has the ability presently to understand and knowingly, intelligently and voluntarily to waive or assert his constitutional rights; particularly his right to a trial and his right not to incriminate himself.

Dr. Lott and Dr. McMichael also are of the opinion that Mr. Pitchford had the ability to waive or assert these constitutional rights at the times of his voluntary statements. Dr. Macvaugh is of the opinion that Mr. Pitchford's ability to waive or assert his constitutional rights at the times of his voluntary statements was "questionable," because of Mr. Pitchford's report that he did not understand his rights at those times and his report that his fifth statement essentially was dictated to him by the person who was questioning him.

We are unanimous in our opinion that Mr. Pitchford would have known the nature and quality of his alleged acts at the times of the alleged offenses, and that he would have known at both of those times that those alleged acts would be wrong.

We are unanimous in our opinion that Mr. Pitchford was not experiencing any extreme mental or emotional disturbance at the times of the alleged offenses and that his capacity to appreciate the criminality of his alleged conduct or to conform his conduct to the requirements of the law was not substantially impaired at those times.

We have listed the following non-statutory mental health mitigating circumstances for Mr. Pitchford:

1. Mr. Pitchford's father reported died when he was 10 or 11 years old;
2. Mr. Pitchford's step-father reportedly was an alcoholic who physically abused his mother in his presence;
3. Mr. Pitchford has a history of conduct problems;
4. Mr. Pitchford has a history of head injuries;
5. Mr. Pitchford has a family history of substance abuse;
6. Mr. Pitchford has a personal history of substance abuse;

Pitchford-MSH0019
App.0597

# Mississippi State Hospital
## DIAGNOSTIC SUMMARY



Addressograph

CASE NO: _____

NAME: <u>Pitchford, Terry</u>
      Last      First      Middle

7. Mr. Pitchford reported that his child's mother was seeing other men shortly prior to the times of the alleged offenses and reported that this was upsetting to him;

8. Mr. Pitchford reported that he was abusing large amounts of cannabis around the times of the alleged offenses;

9. Mr. Pitchford reportedly has a positive relationship with his son.

Finally, we are unanimous in our opinion that Mr. Pitchford is not mentally retarded.

## DISCUSSION:

Although Mr. Pitchford reported that he has been hearing "voices" since he was approximately seven years old, he has no documented history known to us of any major mental disorder. Mr. Pitchford also reported that he was hearing "voices" almost continuously when we were interviewing him; although, he did not appear to be internally stimulated or distracted. He appeared to have no difficulty understanding and responding to our questions during this very lengthy interview. Psychological and neuropsychological test results indicated that overall, Mr. Pitchford's cognitive abilities appear intact and are consistent with his history and educational background. However, there was evidence based on the results of psychological testing that Mr. Pitchford was attempting to malinger symptoms of mental illness (which was consistent with our clinical observations during our interview of him).

## DISPOSITION:

Mr. Pitchford has been returned to the custody of the Sheriff of Grenada County to await further legal proceedings.

_R. J. Michael, M.D._
R. McMichael, M.D.
Service Chief, Forensic Services

_27 Jan 06_
Date of Signature

RMcM:lh

Pitchford-MSH0020
App.0598



# MISSISSIPPI STATE HOSPITAL

P.O. BOX 157-A, WHITFIELD, MS 39193     (601) 351-8000     WWW.MSH.STATE.MS.US

## PSYCHOLOGICAL EVALUATION

*JAMES G. CHASTAIN, DIRECTOR*

| | |
|---|---|
| **PATIENT NAME:** | Terry Pitchford |
| **DATE OF TESTING:** | 01/25/06 |
| **DATE OF REPORT:** | 01/26/06 |
| **EXAMINER(S):** | Gilbert S. Macvaugh III, Psy.D. & W. Criss Lott, Ph.D. |

**IDENTIFYING INFORMATION:** Mr. Terry Pitchford is a 20 year old, never married, African-American man from Grenada County. He was transferred to Mississippi State Hospital (MSH) from the Grenada County Jail, per order of the Circuit Court of Grenada County, to undergo a forensic mental health evaluation.

Mr. Pitchford is charged (with one codefendant) with one count of capital murder with an underlying alleged offense of armed robbery, which allegedly occurred on 11/07/04. He is also charged (with two codefendants) with one count of conspiracy to commit armed robbery. It is alleged that he and his codefendants conspired to rob, robbed a convenience store, and shot and killed the store clerk.

**REASON FOR REFERRAL:** Mr. Pitchford was referred for psychological testing for the purpose of diagnostic clarification and to assist in his forensic evaluation. He received approximately eight hours of psychological and neuropsychological testing over the course of a one day period (he was returned to the MSH Forensic Service two weeks after his forensic interview regarding the alleged index offense in order to complete the testing).

**WARNING REGARDING THE LIMITS OF CONFIDENTIALITY:** Prior to the outset of the psychological testing, Mr. Pitchford was informed of the limits of confidentiality associated with this evaluation, and that the results would be used to assist in his evaluation for the Court. He also was asked to read the *Appraisal of Rights* Form describing the various parties that would have access to the information we obtained from him. When asked to read this form, he was able to do so without assistance.

Mr. Pitchford was later asked to paraphrase the substance of the warning described above to be sure he understood it. When asked if the test results would be held confidential or private, Mr. Pitchford replied, "No sir" and further explained, "... because y'all sending it to my lawyer, the D.A., and the Judge." When asked if he was required to participate in the testing, he replied, "No sir." When asked if he could stop the evaluation at any time, he replied, "Yes sir." When asked if he wished to participate in the testing, he responded, "Yes sir."

A FACILITY OF THE MISSISSIPPI DEPARTMENT OF MENTAL HEALTH

*ACCREDITED BY THE JOINT COMMISSION ON ACCREDITATION OF HEALTHCARE ORGANIZATIONS*

Psychological Testing
Pitchford, Terry

**ASSESSMENT MEASURES:** Mr. Pitchford was administered the following instruments (measures denoted with an asterisk were administered by Dr. Lott; the remaining tests were administered by Dr. Macvaugh):

- Green Word Memory Test (WMT)*
- Test of Memory Malingering (TOMM)
- Rey Fifteen Item Test*
- Miller Forensic Assessment of Symptoms Test (M-FAST)
- Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-II)
- Wechsler Adult Intelligence Scale – 3rd Edition (WAIS-III)
- Wechsler Memory Scale – Third Edition (WMS-III)*
- Wide Range Achievement Test – Revision 3 (WRAT-3)*
- Pegboard Test*
- Finger Tapping Test (FTT)*
- Trail Making Test A & B*
- Rey Osterreith Complex Figure Test*
- Wisconsin Card Sorting Test (WCST)*
- Stroop Color and Word Test*

**RELEVANT HISTORY:** The following historical information is a summary of relevant background information that was extracted from Mr. Pitchford's outpatient forensic mental health evaluation at MSH. For a more complete history, please see the full outpatient evaluation report by Reb McMichael, M.D., dated 01/11/06.

Mr. Pitchford's mother reported that he and his twin brother were delivered by cesarean section. She denied that Mr. Pitchford experienced any perinatal or early developmental problems. He reportedly has "fourteen or fifteen" paternal half siblings. He stated that one of his half siblings had been treated at MSH in the past and that another had been incarcerated. He also reported that "most of them" have histories of substance abuse. Mr. Pitchford's mother reported that Mr. Pitchford has a maternal first cousin who is mentally retarded.

Mr. Pitchford's father died of "kidney cancer" when Mr. Pitchford was 10 years old. Mr. Pitchford reported that he began to experience emotional difficulties shortly thereafter. He reported that a couple of years later, he saw his deceased father. He also recalled experiencing emotional difficulties when his mother married an alcoholic man after his biological father died. Mr. Pitchford recalled that his step-father was physically abusive toward his mother. Mr. Pitchford also reportedly witnessed this abuse as a child.

Mr. Pitchford reportedly completed the seventh grade in regular classes (although he reported to one of these examiners that he completed the eighth grade). He stated he repeated the second and fourth grades and made F's and D's because he had "… a short attention span." According to school records, Mr. Pitchford scored in the average range in reading and mathematics when he was in the sixth grade. His grades in the eighth grade in regular classes ranged between 72 and 77. He has no history of prior testing in school other than achievement tests that were administered to all students. He was expelled from the Grenada Public Schools in April of 2002 for destroying school property and threatening to bring a gun

2

Psychological Testing
Pitchford, Terry

to school and kill people. He reported that he attended Alternative School in Hinds County for several months but "... just quit going." Records indicate that he was expelled again in December of 2003 for threatening a teacher (which he denied in the forensic interview, stating that he was expelled from a G.E.D. program). He said that he also was expelled from Job Corp., "... for having sex with a girl." Mr. Pitchford denied that he had ever been previously diagnosed with attention deficit hyperactivity disorder or prescribed psychostimulant medication.

Mr. Pitchford reported a long history of alcohol and substance abuse. He stated that he was first given alcohol as a child by his father. He reported occasionally drinking beer and other beverage alcohol as an adult. He reported that he began smoking marijuana when he was about 15 years old. He said that prior to his arrest for the index offenses, he was smoking "20 blunts a day" and estimated that he was consuming approximately "one ounce" of marijuana per day at that time. He said that on two occasions, he "dipped" his marijuana in prescription cough medicine. He also recalled "huffing" an unknown inhalant on one or two occasions as a child. He reported "popping pills" on approximately four occasions while he was in Job Corp. He denied any prior use of cocaine, methamphetamine, or use of intravenous drugs. He denied that he had ever received treatment for substance abuse. ✗

Mr. Pitchford reported a history of Youth Court involvement at the age of fourteen 14 for what appeared to be an incident regarding a stolen cell phone. He said that he was placed briefly on probation by the Youth Court. He described several other interactions with the  police but denied any other arrests either as a juvenile or as an adult prior to the alleged index offenses.

Mr. Pitchford reported being briefly employed on an assembly line, as well as at Taco Bell He said that he had been employed by a lumber company for seven or eight months prior to his arrest on the instant offenses. He reportedly had a valid driver's license and said that he passed the written examination on his second attempt. He has no military history. He stated that he previously received disability income (based upon his father's disability), but he has never applied for disability income for any mental health or medical problems of his own.

Mr. Pitchford reported an overdose on medications prescribed for someone else when he was 14 or 15 years old. Although he was reportedly treated at a local emergency department at the time of this overdose, he denied that he received any mental health evaluation or treatment at that time. He also reportedly deliberately cut his left arm on one occasion when he was staying with an older sister and explained, "I just didn't have anything else to do." He denied any history of psychiatric hospitalizations or treatment.

Mr. Pitchford's mother reported that he has in the past been in several motor vehicle accidents which resulted in brief losses of consciousness. Mr. Pitchford reported that he was "knocked out" briefly on one occasion during a football practice, and that he had sustained brief losses of consciousness in several motor vehicle accidents. According to medical records, he was seen in an emergency room several times for injuries (i.e., in 1999 for a 2.5cm laceration of his forehead after he was reportedly hit in the head with a can of spray starch (following which he had a "normal" neurological exam); in 2002 for a "very small

3

App.0601

swollen area at his hairline in the center of his forehead" after he was reportedly hit in the head with either a bottle or with a ball). He was also reportedly in a motor vehicle accident in 2004, following which he reportedly called 911 and had a "dizzy spell" but no reported loss of consciousness or mental status changes. Results of a prior CT head scan performed shortly thereafter were considered to be within normal limits.

Mr. Pitchford denied any history of other significant childhood illnesses or diseases. He did receive testicular surgery at age 14 or 15 and reportedly had a period of elevated blood pressure at age 11. He has no known mediation allergies. He has no known history of seizures. He reported no other current medical problems.

**BEHAVIORAL OBSERVATIONS:** Mr. Pitchford presented wearing blue scrubs. He appeared his chronological age of 20 years. His physical appearance was clean and neat. His interview behavior was friendly and cooperative. Rapport was easily maintained throughout the evaluation. During the administration of all tests, Mr. Pitchford remained alert and fully aware of his surroundings. He exhibited direct eye contact. He did not exhibit any bizarre behaviors during testing. Due to the lengthy nature of the testing process, he was provided with several breaks (i.e., to stand up, stretch, go outside for fresh air, to eat lunch, etc.).

Over the course of testing, Mr. Pitchford demonstrated no signs of distractibility. He appeared to put forth his best effort on all measures, even when confronted with difficult situations. His pattern of speech was within normal limits for rate, volume, and tone. There was no indication of pressured speech. His thought processes were logical organized and coherent, as there was no sign of formal thought disorder. His thought content did not contain any overt indications of paranoid, grandiose or other bizarre delusional ideas. At times during the testing, he asked the examiner questions (unrelated to the task at hand) mostly having to do with his curiosity about "how long" people are hospitalized on the Forensic Service at MSH once they are found "insane by the court." He reported no thoughts of harming himself or others. He did not appear to be experiencing perceptual disturbances of any kind, such as auditory or visual hallucinations. He was taking no medications at the time of the testing.

**TEST RESULTS:** The following test results should be viewed in consultation with a clinical psychologist.

EFFORT & MALINGERING: Mr. Pitchford was administered the Rey 15-Item Memory Test, which is a visual memory test which screens for feigned memory impairment. The respondent is first informed of the difficult nature of the test, is then shown an array of 15 letters, numbers, and shapes (five rows and three items each) for ten seconds. The respondent is then asked to reproduce on a blank sheet of paper all of the symbols he or she can remember. A score of less than seven on this measure is indicative of sub-optimal effort and possible malingering of memory deficits. On the Rey 15-Item Test, Mr. Pitchford produced a score of 15 out of 15, which was suggestive of no overt attempts to feign memory deficits.

The Word Memory Test (WMT) is a visual, verbal memory test in which the respondent is asked to recall a list of words with both immediate and delayed presentations, as well as recognition. The respondent's scores are compared to norms for a number of different groups

4

Psychological Testing
Pitchford, Terry

ranging from compensation-seeking claimants to neurological patients with brain tumors, strokes, depressed adults, both mild and severe traumatically brain injured adults, children with neurological diseases, and others. Based on his performance on the WMT, Mr. Pitchford made passing scores on both immediate and delayed subtests, which suggest that he put forth good effort on this measure.

Mr. Pitchford was administered the Test of Memory Malingering (TOMM), which is a 50-item recognition test for adults that includes two learning trials and a retention trial. During the two learning trials, the respondent is shown 50 target pictures of common objects for 3 seconds each, at 1 second intervals. The respondent is then shown 50 more pictures of objects one at a time, containing one of the previously presented target pictures along with a new distracter picture and is asked to select the correct picture (the picture shown during the learning trial). The respondent is shown two learning trials (and an optional retention trial). Scores of less than 50% correct (i.e., less than 25 correct) on any trial indicates malingering. A score lower than 45 out of 50 on Trial 2 or the Retention Trial indicates possible malingering of memory impairments. On Trial 1 and Trial 2, Mr. Pitchford obtained a perfect score of 50 out of 50, which was suggestive of no attempts to malinger memory deficits. *no malingering* Given his perfect score on the first two trials, the retention trial was not administered.

Mr. Pitchford was administered the Miller Assessment of Forensic Symptoms Test (M-FAST), which is structured, a 25-item screening instrument, designed to provide information regarding the probability that the respondent is malingering symptoms of psychiatric disorders. The M-FAST contains seven scales that measure malingering based on empirically validated strategies for detecting faked psychiatric symptoms (i.e., questions about rare symptom combinations, unusual symptom course, unusual hallucinations, etc.). Scores of greater than 6 on this measure are indicative of malingering. Mr. Pitchford produced a total score of 5 on this measure, which suggests that he may have attempted to malinger symptoms of psychosis, but his score was below the level needed for significance.

ACHIEVEMENT: Mr. Pitchford was administered the Wide Range Achievement Test – Revision 3 (WRAT-3), on which he obtained a Reading Standard Score of 88 (8th grade equivalent), a Spelling Standard Score of 84 (7th grade equivalent), and an Arithmetic standard Score of 89 (7th grade equivalent).

INTELLIGENCE: Mr. Pitchford was administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), which is an individually administered standardized test of adult intelligence that assesses problem solving ability based on a variety of tasks. About half of the subtests require a motor response. Subtests can be further categorized into those that assess verbal comprehension, those that measure perceptual organization, those that assess working memory, and those that measure processing speed abilities. The average score on global indices (i.e., IQ scores) in the general population is 100; the average score on a subtest is 10. Global scales have a standard deviation of 15; subtest scores have a standard deviation of 3. All test scores may be affected by situational factors and the operating characteristics of the measures themselves. Most tests involve multiple functions and are not pure measures of any single ability. Scores, therefore, should not be used in isolation without reference to the overall context of the evaluation.

5

Psychological Testing
Pitchford, Terry

Research regarding what is known as the "Flynn Effect" suggests that IQ scores are rising as much as 1 point every three years (for every year following the time period in which the test was standardized). Given that the normative data were collected for the WAIS-III in 1995, it is possible that Mr. Pitchford's global IQ score noted below may be artificially increased by as much as three full IQ points, irrespective of any measurement error associated with the scores themselves. Finally, although "practice effects" are generally produced when an intelligence test is re-administered in a short period of time, this is considered not applicable to the present test administration since Mr. Pitchford has not, to our knowledge, previously been tested on the WAIS-III.

Based on Mr. Pitchford's test behavior, his scores on the WAIS-III are considered a valid estimate of his true intellectual ability. Throughout the administration of the intelligence testing, he appeared motivated to put forth his best effort and demonstrated a genuine interest in performing to the best of his ability, even when confronted with difficult situations. Mr. Pitchford's IQ scores, Index scores, and Subtest Scaled scores are as follows:

Verbal IQ: 91 (Average Range)          Performance IQ: 91 (Average Range)

Full Scale IQ: 90 (Average Range)

| Verbal Subtests | | Performance Subtests | |
|---|---|---|---|
| Vocabulary | 7 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol-Coding | 7 |
| Arithmetic | 9 | Block Design | 7 |
| Digit Span | 9 | Matrix Reasoning | 11 |
| Information | 9 | Picture Arrangement | 12 |
| Comprehension | 10 | Symbol Search | 6 |
| L/N Sequencing | 9 | Object Assembly | N/A |

Verbal Comprehension Index Score:      88 (21st Percentile)
Perceptual Organization Index Score:   91 (27th percentile)
Working Memory Index Score:            94 (34th percentile)
Processing Speed Index Score:          79 (8th percentile)

Based on the results of the WAIS-III, Mr. Pitchford obtained a Full Scale IQ Score (FSIQ) of 90, which suggests that overall, he is functioning in the Average Range (25th percentile) of intellectual ability. Given test error (at a ".05 confidence interval"), there is a 95% chance that his "true" FSIQ score would fall somewhere between 86 and 94. Mr. Pitchford obtained a Verbal IQ Score (VIQ) of 91 (27th percentile; confidence interval = 86 to 96) and a Performance IQ Score (PIQ) of 91 (27th percentile; confidence interval = 85 to 98), both of which were also in the Average Range. There was no difference between his VIQ and PIQ scores, which suggest that his FSIQ score is considered the best estimate of his overall intellectual ability.

App.0604

<u>MEMORY</u>: Mr. Pitchford was administered Wechsler Memory Scale, Third Edition (WMS-III), which is a widely used, individually administered, standardized memory test, which consists of 11 subtests that measure a range of different types of memory functions such as working memory, picture recognition, and serial list learning. Comparisons are made between recognition and free recall to assess retrieval deficits. The WMS-III yields six Primary Index Scores and four Composite Scores (which measure differences between tasks of immediate versus delayed recall, between delayed recognition and delayed recall).

As with IQ scores, the average score on global indices in the general population is 100 for Primary Index Scores on the WMS-III; the average score on a subtest is 10. Global scales have a standard deviation of 15; subtest scores have a standard deviation of 3. Mr. Pitchford's WMS-III Primary Index and Subtest Scores are as follows:

<u>WMS-III Primary Index Scores</u>

| | |
|---|---|
| Auditory Immediate | 108 (70th percentile; Average range) |
| Visual Immediate | 115 (84th percentile; High Average range) |
| Immediate Memory | 114 (82nd percentile; High Average range) |
| Auditory Delayed | 114 (82nd percentile; High Average range) |
| Visual Delayed | 118 (88th percentile; High Average range) |
| Auditory Recog. Delayed | 110 (75th percentile; High Average range |

<u>WMS-III Primary Subtest Scores</u>

| | |
|---|---|
| Logical Memory I | 11 |
| Faces I – Recognition | 10 |
| Verbal Paired Associates I – Recall | 12 |
| Family Pictures I – Recall | 15 |
| Letter-Number Sequencing | 9 |
| Spatial Span | 8 |
| Logical Memory II – Recall | 13 |
| Faces II – Recognition | 13 |
| Verbal Paired Associates II – Recall | 13 |
| Family Pictures II – Recall | 15 |
| Auditory Recognition – Delayed | 12 |

<u>Auditory Process Composite Scores</u>

| | |
|---|---|
| Single Trial Learning | 67th percentile |
| Learning Slope | 44th percentile |
| Retention | 91st percentile |
| Retrieval | 34th percentile |

Psychological Testing
Pitchford, Terry

The Rey Osterreith Complex Figure (Rey-O) is a test of complex visual organization abilities. Memory for the figure yields information regarding the extent to which the individual can encode visual information that exceeds normal span limitations. The individual copies the complex figure without knowledge that memory will be examined; initial recall is a measure of incidental learning. On the Rey-O, Mr. Pitchford produced a score of 36 (copy) and 32 (delay).

EXECUTIVE FUNCTIONING: Based on measures administered to assess executive functioning, Mr. Pitchford showed no indication of marked deficits. For example, his score on the Trail Making Part A was in the average range (0 errors; 34 seconds), and his score on Trail Making Part B was in the Low Average Range (0 errors; 69 seconds). On the Wisconsin Card Sorting Test, Mr. Pitchford's scores were in the Average to Above Average Range, as he completed six out of six trials. On the Stroop Color and Word Test, which is a test that measures vulnerability to distraction, Mr. Pitchford's scores fell into the Average to Low Average Range using Golden's norms (Word = 40; Color = 42; Color/Word = 40), and he showed no difficulty maintaining set.

PSYCHOMOTOR FUNCTIONING: Mr. Pitchford's psychomotor abilities appeared intact. For example, his scores on Pegboard were Right = 74 seconds and Left = 84 seconds (average to low average depending on the norms used). His scores on Finger Tapping also were in the Average Range (dominant hand = 53; non-dominant = 49).

PERSONALITY: Mr. Pitchford was administered the MMPI-2, which is a 567 item, true-false, self-report inventory, designed to assess adult psychopathology and personality traits. Scores are reported as T Scores, which have a mean of 50 and a standard deviation of 10. Scores at or above 65 are considered significant. Based on the configuration of his scores on the validity scales of this test, Mr. Pitchford appeared to over-claim symptoms of mental illness in an attempt to appear more psychologically disturbed than is actually the case. Due to the significantly elevated scores on the validity scales of this test, Mr. Pitchford's basic clinical scales were considered invalid and were therefore not interpreted. Mr. Pitchford's validity scale and clinical scale scores, in descending order, were as follows:

| Validity Scales (T Scores) | | Clinical Scales (T Scores) | | |
|---|---|---|---|---|
| F | 89 | 8 | (Sc) | 96 |
| Fb | 87 | 4 | (Pd) | 87 |
| VRIN | 61 | 9 | (Ma) | 85 |
| TRIN | 57F | 7 | (Pt) | 77 |
| L | 52 | 6 | (Pa) | 75 |
| K | 39 | 0 | (Si) | 73 |
| Cannot Say | 0 | 2 | (D) | 64 |
| | | 1 | (Hs) | 62 |
| | | 3 | (Hy) | 50 |
| | | 5 | (Mf) | 46 |

8

Psychological Testing
Pitchford, Terry

**SUMMARY:** The results of the psychological and neuropsychological testing appear valid. Mr. Pitchford appeared to put forth genuine effort during the administration of all tests. The results of the intellectual testing revealed scores falling in the Average range. No significant difference was noted between the verbal and nonverbal domains. Results of the achievement testing revealed scores falling in the low average range (and were consistent with the intellectual testing and with his educational history).

The results of the memory assessment revealed visual and verbal memory scores falling in the Average to High Average range, which were consistent with the results of the intellectual testing. Results of tests assessing executive functioning were in the Average to Low Average range. Results of psychomotor testing revealed scores falling in the Average to Low Average range, and these scores reflected intact motor abilities bilaterally. There was no evidence of attempts to malinger cognitive deficits.

Overall, Mr. Pitchford's cognitive abilities appear intact and appear consistent with his history and background. The results of personality testing (as well as another measure designed to detect feigned symptoms of psychosis) indicated that Mr. Pitchford may have attempted to over claim symptoms of mental illness in order to present himself as more psychologically disturbed than is actually the case.

Gilbert S. Macvaugh III, Psy.D.
Forensic Psychologist

W. Criss Lott, Ph.D.
Licensed Clinical Psychologist

9

## RAHN K. BAILEY PSYCHIATRIC ASSOCIATES

614 W. Main, Suite D-101
League City, TX 77573
(B) 281.554.7188
(F) 281.554.9058
rahnbailey@yahoo.com

Rahn K. Bailey
Board Certified in
General and Forensic Psychiatry

## FORENSIC PSYCHIATRIC EVALUATION

**Name:**                          **Terry Pitchford**
**DOB/Age/Race/Sex:**              **012.35.85; 20 years African American Male**
**Social Security No:**            587.53.2189
**Date of Evaluations:**           02.04.06
**Date of Report:**                02.06.06
**Charge:**                        Murder/Armed Robbery
**Cause Number:**                  2005-009-CR

### I.      PURPOSE OF EVALUATION

Pursuant to your request for a forensic evaluation on Terry Pitchford, I performed such an evaluation on February 4, 2006. The evaluation lasted approximately three hours. I was asked by the defendant's attorney Ray Carter to assess Mr. Pitchford's competency to stand trial, criminal responsibility, and to determine if there was evidence of significant cognitive impairment.

### II.     CONFIDENTIALITY PLEDGE

Prior to the evaluation, Terry Pitchford was notified that this would be a non-confidential assessment. Mr. Pitchford was made aware that I, as the physician, would be required to document my findings in writing and submit a report to the Mississippi Department of Criminal Justice, and possibly testify in court. He understood the nature of the evaluation.

### III.    COLLATERAL DATA

Records reviewed are listed below.

**A.** Information sources include the following:

1. Shirley Jackson (mother) (h) 662.226.6806
2. Veronica Brown Dorsey ( sister) (h) 662.226.6806, ( c) 662.832.2548
3. Perry Pitchford (twin) (c ) 662.414.5843, (H) 662.226.6806

Page 2 of 13
Terry Pickford
587.53.2189

## IV.    ITEMIZED RECORDS (315 pages)

1. Statements by Terry Pitchford to Greg Conley, Grenada Sheriff's Dept.
   - a. First 11/07/04 (6 pages)
   - b. Second 11/07/04 (10 pages)
   - c. Third 11/07/04 (11 pages)
   - d. Fourth 11/08/04 (9 pages)
   - e. Fifth 11/08/04 (5 pages)
2. Notes by Sheila O'Flaherty (10 pages)
3. Narrative by Sheila O'Flaherty (10 pages)
4. School Records
   - a. Cover sheet of OCDC (1 page)
   - b. Explanatory letter (1 page)
   - c. Grenada Middle School (13 pages)
   - d. Jackson Public Schools (2 pages)
   - e. Tie Plant Alternative School (7 pages)
5. Additional Educational Records from State Hospital (11 pages)
6. Emergency Room Medical Records (87 pages)
7. Family Physician Records (15 pages)
8. Job Corp (24 pages)
9. Ray Carter meeting with Pitchford (notes by Sheila O' Flaherty)
   - a. March 1, 2005 (2 pages)
   - b. May 12, 2005 (6 pages)
   - c. May 18, 2005 (3 pages)
   - d. May 26, 2005 (1 page)
   - e. July 8, 2005 (3 pages)
   - f.  September 14, 2005 (2 pages)
   - g. November 22, 2005 (1 page)
   - h. December 21, 2005 (2 pages)
10. Pitchfork's siblings
    - a. Perry Pitchford, twin brother (3 pages)
    - b. De Shawn Burnett, maternal half-brother (4 pages)
11. Terry Pitchford girlfriend (1 page)
12. Pitchford School personnel
    - a. Dr. Randle D. Ross & Ms. Diane Washington (3 pages)
    - b. Mr. Paul Porter & Ms. Sherrie Taylor (2 pages)
    - c. Coach Robert M. Wade, Mrs. Hoffman & Mrs. Teresa Roberts Jackson (3 pages)
    - d. Mr. Samuel M. Kursar, Ms. Gardner & Mrs. Burkett (2 pages)
    - e. Mrs. Brinson (1 pages)
13. Pitchford's employer
    - a. Wesley Thomas (1 page)
    - b. Vernon Doss (1 page)
14. Mississippi State Hospital Diagnostic Summary by R. McMichael, M.D. (19 pages)

## V.    DESCRIPTION OF INCIDENT

Page 3 of 13
Terry Pickford
587.53.2189

According to the police report, Mr. Pitchford describes the incident as, "they found a pistol in my car. They said that I robbed the store and killed Reuben Britt in Grenada, Mississippi on November 7, 2004." When asked in detail of the events which led to the current charges, he replied, "everything started getting hard that morning. I got up, went to my baby mama's house, Dominique". I was supposed to drive to Jackson that day to shop, eat, and visit relatives. We (Dominique and I) had been on bad terms. I wanted to get back together with her. Then the police came and asked questions. "Why was I down here?" "I did not understand my rights." A Mr. Jennings said, "he was here to help me. I did what he wanted me to do." "I thought that I was helping myself".

According to Terry Pitchford, "me and Eric Bullin went into the store. Eric shot him with the twenty-two (22). It killed him. I had the thirty-eight (38). It had rat bullets in it", it didn't kill him". "The police came to my house later that day". They asked to search to my car. I just told him what he wanted me to say". "I could get death to life". "They could kill me".

Mr. Pitchford has been in jail since August 2004.

## VI.    COMPETENCY CRITERIA

### A.    UNDERSTANDING OF PROCEEDINGS

#### 1.    Aware of the Charges

The client is aware of the current charge of murder/armed robbery. He said, "I am charged with capital murder."

#### 2.    Aware of the Basic Roles of Common Court Personnel

##### a.    Judge

He is able to define the role of the judge. He defines it as, "He makes sure everything ran right". "He gives people time. He judges a person".

##### b.    Defense Attorney

He is able to define the role of defense attorney. He defines it as, "My lawyer." He added, "he helps me get off the case."

##### c.    Prosecutor

He is able to define the role of prosecutor. He defines it as, "He tries to convict me of the charge".

##### d.    Jury

Page 4 of 13
Terry Pickford
587.53.2189

He is able to define the role of jury.  He defines it as, "Twelve people that judge you during the trial."  "They find you guilty or not guilty".

## 3.  Aware of the Basic Court Terminology

### a.  Witness

He is able to define a witness.   He defines it as, "Testify for you or against you, either one".

### b.  Evidence

He is able to define evidence.  He defines it as, "Something they got against you.  Like a pistol, against me."

### c.  Testimony

He is able to define evidence.  He defines it as, "When a person gets up to tell something".

## 1.  Aware of Various Courtroom Legal Defenses

### a.  Alibi

He is able to define alibi.  He responded with, "You got an excuse."

### b.  Entrapment

He is able to define entrapment with prompting.  He defines it, after explanation, as "Somebody set you up."

### c.  Self Defense

He is able to define self defense.  He defines it as, "You protect yourself".

### d.  Necessity

He is able to define necessity after prompting.  He defined it as, "You had to do it, because you would die or something."

### e.  Insanity

He is able to define insanity.  He defines it as, "mentally retarded, you didn't know what you were doing."

App.0611

Page 5 of 13
Terry Pickford
587.53.2189

    **f.**    **Automatism**

He is able to define automatism. After prompting, he defines it as, "You reacted upon a reflex".

**5.**    **Aware of Basic Legal Rights**

    **a.**    **5th Amendment: The right against self incrimination.**

He is aware of the 5th Amendment. He defines it as, "The right not to incriminate yourself". "You ain't got to tell on yourself."

    **b.**    **6th Amendment: The right to an attorney.**

He is aware of the 6th Amendment. He defines it as, "The right to an attorney".

**6.**    **Able to Define Routine Pleas in a Court of Law**

    **a.**    **Guilty**

He is able to define guilty. He defines it as, "You did it".

    **b.**    **Not Guilty**

He is able to define not guilty. He defines it as, "You didn't do it".

    **c.**    **Not guilty by reason of insanity**

He is able to define not guilty by reason of insanity. He defines it as, "You're crazy, and they can't find you're guilty."

    **d.**    **No contest**

He is able to define no contest. After prompting, he defines it as, "You don't want to plead guilty or not guilty."

**B.**    **Assist in His Defense**

    **1.**    **Able to collaborate with attorney.**

He is able to generally communicate with his attorney. Mental illness does inhibit his ability to communicate fully.

    **2.**    **Able to identify potential witnesses.**

Page 6 of 13
Terry Pickford
587.53.2189

He is able to assist in locating and examining witnesses. He is able to distinguish between friendly and unfriendly witnesses. He recognizes that he would support himself and Mr. Bullin, his co-defendant, would likely be against him.

**3.    Able to assist the attorney in the courtroom process.**

He is unable to maintain a consistent defense. He is also unable to inform his attorney of distortions or misstatements. He does exhibit confusion, paranoia, and suspicious of the legal system. He also displays a high level of cognitive impairment.

**4.    Able to make good decisions in own behalf**

He is able to understand the term of plea bargain; however, he is not able to make good decisions on his own behalf. I clearly explained to him the process. He defined it as, "A deal with the District Attorney." "The District Attorney comes to you, then you plead guilty to a lesser charge and they get the time or you get the max."

**5.    Able to testify in own defense**

He is unable to rationally discuss his side of the incident. He is not consistent with a courtroom presentation. He is unable to understand questions satisfactorily.

**6.    Able to refrain from irrational behavior during the courtroom.**

He is able to refrain from excessive talking and/or irrational acts. He is able to control impulsive outbursts in court.

**7.    Able to tolerate the stress of a trial.**

He has a psychiatric impairment that will exacerbate during the stress of the trial.

## VII.    PERTINENT BACKGROUND HISTORY

All information herein was obtained during an interview with Terry Pitchford, review of itemized available records, and discussions with collateral sources.

### A. BIRTH/DEVELOPMENT

Mr. Pitchford was born on December 30, 1985 in Greenwood, Mississippi.

Page 7 of 13
Terry Pickford
587.53.2189

He has twin brother named Perry. He has fourteen partial siblings. His biological father died of kidney cancer when he was ten years old. His parents were married at the time of his birth. After his parents divorced, the mother remarried. The man that his mother married was an alcoholic who physically abused her. In addition, he reports that his brother Michael was in and out of prison since he was younger.

### B. FAMILY/MARITAL HISTORY

Mr. Pitchford has never been married but has a one year-old child. He reports a good relationship with his child. Both he and the child's mother may have been romantically involved with others prior to the alleged offenses.

### C. EDUCATIONAL HISTORY

He has a very sporadic academic history. He attended Wilson Elementary School in Grenada. He was retained and forced to repeat the second and fourth grades. He did attend Forrest Hills High School in Jackson, Mississippi. He was expelled from the Grenada Public School system twice for behavioral problems. In addition, he attended class for a General Equivalency Diploma and was expelled from that program.

### D. WORK HISTORY

Mr. Pitchford has no substantial prior vocational history. He was employed by Taco Bell for a couple of weeks. He later was employed by Healthcraft on an assembly line briefly. In addition, he was employed at Grenada Wholesale Lumber Company for eight months. This was his longest period of employment. This occurred immediately prior to his incarceration.

### E. MILITARY HISTORY

Mr. Pitchford has no military history.

### F. SUBSTANCE ABUSE HISTORY

He has an extensive personal history of substance abuse. He began smoking marijuana at the age of fifteen (15). He reports that he had been abusing large amounts of cannabis around the time of the alleged offenses. In the past, Mr. Pitchford reports being intoxicated or under the influence of drugs while at work. In addition, he has a family history of substance abuse.

### G. LEGAL HISTORY

Similarly, he has experienced a problematic past legal history. He was involved with the local Youth Court for stealing a cell phone for which he was placed on probation. He acknowledged that sometimes he would steal; however, he was never caught or charged with an offense.

Page 8 of 13
Terry Pickford
587.53.2189

## H.  PAST MEDICAL HISTORY

Mr. Pitchford does not have any serious medical conditions. He has been noted to
have an upper respiratory tract infection.  He was involved in several motor
vehicle accidents. A recent one occurred in May 2004.  He had no reported
loss of consciousness.  There was no hospital admission associated with this
accident.  Mr. Pitchford does admit to one previous surgery, a repair of an
inguinal hernia.

## I.  PAST PSYCHIATRIC HISTORY

Mr. Pitchford does have a past history of psychiatric illness.  He tried to commit
suicide one time at the age of sixteen (16). He and each collateral source readily
acknowledge a significant period of undiagnosed clinical depressive illness after
the untimely death of his biological father when he was age ten (10).

In addition, there is a past family psychiatric history concerning his siblings and a
maternal uncle.

Mr. Pitchford has no history of psychiatric treatment and is not currently under
treatment.

## VIII.   CURRENT PSYCHIATRIC HISTORY (within the last thirty days)

### A.  MANIA

Mr. Pitchford does present manic symptoms such as racing thoughts, risk taking
behavior, poor judgment, mood lability, and slurred speech.

 He does not present with any symptoms of, gambling or excessive spending
sprees, grandiosity or hyper-religiosity.

### B.  DEPRESSION

He does endorse symptoms of dysphoria, crying spells, memory loss,
decreased attention span, guilt, loss of appetite and previous suicidal attempts.

He does not acknowledge any anhedonia, fatigue/lack of energy, hopelessness,
helplessness, worthlessness, or insomnia.  In addition, he does not present with
any suicidal or homicidal ideation or plan.

### C.  PSYCHOSIS

Terry Pitchford, does indicate the presence of paranoia.  He does indicate that he
is afraid of the variety of concerns. He notes being threatened by his co-
conspirator while in jail currently. He is also afraid of his environment, as well as

those around him. In fact, he refuses to accept a plea bargain offer from the district attorney whom he does not trust.

He has not experienced hallucinations, catatonia, or delusions.

### D. ANXIETY

He currently experiences frequent worrying and nervousness. In addition, he experiences occasional nausea. In addition, he endorses obsessive/compulsive ideas.

He does not present any irritability, impulsivity, tremors, vomiting, or diarrhea.

### E. POST TRAUMATIC STRESS

Mr. Pitchford is clearly suffering from some overt psychological effects of post-traumatic stress. He does have evidence of reliving events, recollections and flashbacks. He can re-experience the day of the shooting as if it were yesterday. He has developed a near startle reaction by report when near others whom he previously associated with. In addition, he overtly admits to being frankly afraid of this entire event.

## IX. MENTAL STATUS EXAMINATION

### A. General Appearance

Mr. Pitchford stands five feet seven inches (5' 7"), weighing one-hundred and forty pounds (140). He appears younger than his stated age. His personal hygiene was intact. There was no substantial body odor present. He did not appear particularly imposing, threatening, or hostile.

### B. Mood, Affect, Behavior, Psychomotor Activity

He was cooperative with the interview and engageable. Initially, he was distant, isolatory, and responded with monosyllabic answers. However, in fair time, he became more responsive to the line of questioning. His answers grew in depth and content. Similarly, he began to share a reasonable approach to his thinking both during the assessment as well as during the time of the criminal act.

His speech was not a normal rate. The tone was monotone and the volume was low. He exhibited some signs of psychomotor retardation.

Mr. Pitchford's mood is depressed. His affect is constricted and blunted.

### C. Sensorium and Orientation

He was fully oriented to person, place, date, time, situation and circumstance.

### D.   Thought Processes

During the evaluation, Mr. Pitchford exhibited some psychotic thinking in the form of thought blocking.  He also expressed some unusual aspects of speech, such as well as tangentiality and circumstantialitiy.

He does not exhibit any signs of perseveration, flight of ideas, or loose associations.

### E.   Thought Content

He does show signs of obsessions and thought broadcasting.

He did not exhibit active auditory hallucinations. In addition, he did not display signs of delusional thought content such as paranoia or command hallucinations. Furthermore, he does not present direct evidence of suicidal or homicidal ideations.

### F.   Memory and Cognition

His immediate memory is intact.  When given a three word triad he was able to repeat it immediately.  His recent memory is impaired on standard testing.  When asked what he had for breakfast, he was not able to accurately respond.

His remote memory is fair on standard testing.  When asked to name his fifth grade teacher, he was not able to accurately respond.

### G.   Concentration

Mr. Pitchford's concentration is poor on standard testing.  He is not able to perform the serial seven examinations.  In addition, he was not able to perform the serial three examinations without errors.  On routine occasions throughout the interview, Mr. Pitchford could not remain on task. This concern presents particular difficulty as he could not seem to adequately develop a reasonable mind set around the issue of accepting a plea bargain as offered. He would typically become somewhat confused. In addition, during these discussions he would frequently revert to very immature, limited, childlike thought process and behavior. Overall, his concentration was markedly impaired.

### H.   Abstracting Ability

His abstracting ability is poor on standard testing.  He was unable to complete the responses to the following proverbs:
                    "Don't count your chickens before they hatch."
                    "An eye for an eye"
                    Even monkeys fall from trees"
                    People who live in glass houses shouldn't throw stones."
He is very concrete in describing similarities between items such as fruit,

furniture, and transportation.

**I. Judgment**

His judgment was intact.  When asked what to do if he were to find a letter that
was stamped, sealed and addressed, he responded, "place it in the mailbox."  In
addition, when asked what he would do if he noted smoke in a crowded theater,
he said, "get up and get out."

## X.  DIAGNOSIS

**Axis I:**    Mood Disorder NOS
Marijuana and Alcohol Dependence; in remission due to
  incarceration

**Axis II:**    Cognitive Impairment; Rule out mental retardation

**Axis III:**    head trauma

**Axis VI:**    Extreme Stressors, 6; pending capital punishment, educational,
family
Financial, social and vocational.

**Axis V:**    GAF current <u>25;</u> Highest in the past year <u>25</u>

## XI.  FORMULATION

Terry Pitchford is a twenty year old African American Male who is charged
with murder and armed robbery.  Prior to this criminal setting, he has had no
significant psychiatric history.  However, he has had multiple motor vehicle
accidents, a documented history of head trauma, substantial chemical
dependency, and limited educational/ vocational achievement.  My assessment
includes a review of all available data concerning his competency, criminal
responsibility, and cognitive status.

Concerning the competency criteria, Terry Pitchford was able to understand
the basic roles of the common court personnel, basic court terminology,
courtroom legal defenses, identity pertinent witnesses and routine pleas in a court
of law and potential consequences; therefore, he is clearly able to meet the
cognitive standard of competency.  However, he is unable to fully collaborate
with his attorney or show appropriate judgment in making good decisions in his
own behalf.  This was evident by his poor ability to describe his rationale to
accept the plea bargain offered by the district attorney.  He was unable to identify
a likely alibi.  He was unable to disassociate himself from the pertinent elements
of the crime.  Finally, he was unable to describe a thought process consistent with
insanity.  Therefore, this is an individual who should have been able to appreciate
the value of a plea bargain offer. Further, his inability to even verbalize a fair

alternative option in these matters makes one consider the possibility of a limited cognitive/insightful/or perceptual perspective.

Concerning criminal responsibility, Mr. Pitchford could appreciate the wrongfulness of his actions. He readily acknowledged that he was wrongful in this action that ultimately took the life of Mr. Britt. Mr. Pitchford, at all times during this event, was in control of his actions. It is my belief that he was able to have conformed his behavior within the constraints of the law.

Concerning cognitive impairment, Mr. Pitchford exhibited early signs that would cause concern. He had to repeat the 2nd and the 4th grade. According to his records, he possible would have had to repeat the 5th grade if not due to a social promotion. This severe degree of functional under achievement points strongly towards a baseline level of early cognitive impairment. Furthermore, the defendant has had a documented history of multiple motor vehicle accidents, any or all which could have potentially lead to direct neurological damage. In addition, he has acknowledged that he has an extensive history of chemical dependency, most notably alcohol and marijuana. Both of these substances can impair cell development and promote neuronal death. Throughout his life, Mr. Pitchford has failed to maintain any form of relationship in his life. There is not a steady vocational history, supported by the claim that his longest period of employment was eight months. There was also a documented early dismissal from Job Corp. He has also failed to maintain appropriate social relationships outside of his immediate family. He has not maintained a successful romantic relationship, a long-term friendship other than with relatives, or a vocational association with mutually beneficial engagements.

When assessing the above clinical determinants of Mr. Pitchford's current psychological status, it is important to first assess his background before reviewing his progression. He had early deficits which clearly led to functional demise in meting age appropriate expectations. Once his progression towards adolescence and even early adulthood began in earnest, he experienced multiple consistent failures throughout the entire cognitive and emotional growth curve. This is a frequently witnessed pattern in the profile of an impaired, deficient individual. My assessment identifies these concerns in a linear fashion. It is my consideration that these concerns are generally amenable to professional care and treatment intervention when began early, and in full robust effect. Certainly, the addition of toxic psychoactive substances has further clouded the situation. All of these factors significantly impair this individual at the present time.

## XII   CONCLUSION

Therefore, in my professional opinion, based on reasonable medical certainty, Terry Pitchford is not competent to fully assist his attorney adequately at the current time. He has pertinent residual cognitive impairment which may limit his decision making capacity.

Page 13 of 13
Terry Pickford
587.53.2189

## XIII. SIGNATURE

_____

Rahn K. Bailey, M. D., F. A. P. A.
Board Certified in General and Forensic Psychiatry

### *RAHN K. BAILEY, M. D., F. A. P. A.*

Board Certified in Psychiatry and Neurology
Board Certified in Forensic Psychiatry

614 W. Main, Suite D-101
League City, Texas 77573

| | | | |
|---|---|---|---|
| TO: *Sheila O'Flaherty* | FROM: | Bailey Psychiatric Associates | |
| FAX: *1-662-226-0786* | FAX: | 218.554.9058 | |
| PHONE: | PHONE: | 281.554.7188 | |
| SUBJECT: | DATE: | | |

**HIPAA STATEMENT:**
The document(s) included in this fax contains confidential health information that is legally privileged.
This information is intended only for the use of the individual or entity named above.  The authorized
recipient of this information is prohibited from disclosing this information to any other party unless
required to do so by law, and is required to destroy the information after its stated need has been
fulfilled.

If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution,
or action taken in reliance on the contents of these documents is strictly prohibited.  If you have
received this information in error, please notify the sender and arrange for the return or destruction of
these documents.

App.0621

## RAHN K. BAILEY PSYCHIATRIC ASSOCIATES

Rahn K. Bailey
Board Certified in
General and Forensic Psychiatry

614 W. Main, Suite D-101
League City, TX 77573
(B) 281.554.7188
(F) 281.554.9058
rahnbailey@yahoo.com

## FORENSIC PSYCHIATRIC EVALUATION

| | |
|---|---|
| **Name:** | **Terry Pitchford** |
| **DOB/Age/Race/Sex:** | **012.35.85; 20 years African American Male** |
| **Social Security No:** | **587.53.2189** |
| **Date of Evaluations:** | **02.04.06** |
| **Date of Report:** | **02.06.06** |
| **Charge:** | **Murder/Armed Robbery** |
| **Cause Number:** | **2005-009-CR** |

### I. PURPOSE OF EVALUATION

Pursuant to your request for a forensic evaluation on Terry Pitchford, I performed such an evaluation on February 4, 2006. The evaluation lasted approximately three hours. I was asked by the defendant's attorney Ray Carter to assess Mr. Pitchford's competency to stand trial, criminal responsibility, and to determine if there was evidence of significant cognitive impairment.

### II. CONFIDENTIALITY PLEDGE

Prior to the evaluation, Terry Pitchford was notified that this would be a non-confidential assessment. Mr. Pitchford was made aware that I, as the physician, would be required to document my findings in writing and submit a report to the Mississippi Department of Criminal Justice, and possibly testify in court. He understood the nature of the evaluation.

### III. COLLATERAL DATA

Records reviewed are listed below.

**A.** Information sources include the following:

1. Shirley Jackson (mother) (h) 662.226.6806
2. Veronica Brown Dorsey ( sister) (h) 662.226.6806, ( c) 662.832.2548
3. Perry Pitchford (twin) (c ) 662.414.5843, (H) 662.226.6806

Page 2 of 13
Terry Pitchford
587.53.2189

## IV. ITEMIZED RECORDS (315 pages)

1. Statements by Terry Pitchford to Greg Conley, Grenada Sheriff's Dept.
   - a. First 11/07/04 (6 pages)
   - b. Second 11/07/04 (10 pages)
   - c. Third 11/07/04 (11 pages)
   - d. Fourth 11/08/04 (9 pages)
2. Statement by Terry Pitchford to Investigator Robert Jennings (5 pages)
3. Notes by Sheila O'Flaherty (10 pages)
4. Narrative by Sheila O'Flaherty (10 pages)
5. School Records
   - a. Cover sheet of OCDC (1 page)
   - b. Explanatory letter (1 page)
   - c. Grenada Middle School (13 pages)
   - d. Jackson Public Schools (2 pages)
   - e. Tie Plant Alternative School (7 pages)
6. Additional Educational Records from State Hospital (11 pages)
7. Emergency Room Medical Records (87 pages)
8. Family Physician Records (15 pages)
9. Job Corp (24 pages)
10. Ray Carter meeting with Pitchford
    - a. March 1, 2005 (2 pages)
    - b. May 18, 2005 (3 pages)
    - c. May 12, 2005 (6 pages)
11. Sheila O' Flaherty meetings with Pitchford
    - d. May 26, 2005 (1 page)
    - e. July 8, 2005 (3 pages)
    - f. September 14, 2005 (2 pages)
    - g. November 22, 2005 (1 page)
    - h. December 21, 2005 (2 pages)
12. Pitchford's siblings
    - a. Perry Pitchford, twin brother (3 pages)
    - b. De Shawn Burnett, maternal half-brother (4 pages)
13. Terry Pitchford girlfriend (1 page)
14. Pitchford School personnel
    - a. Dr. Randle D. Poss & Ms. Diane Washington (3 pages)
    - b. Mr. Paul Portera & Ms. Sherrie Taylor (2 pages)
    - c. Coach Robert M. Wade, Mrs. Hoffman & Mrs. Teresa Roberts Jackson (3 pages)
    - d. Mr. Samuel M. Kursar, Ms. Gardner & Mrs. Burkett (2 pages)
    - e. Mrs. Brinson (1 pages)
15. Pitchford's employer
    - a. Wesley Thomas (1 page)
    - b. Vernon Doss (1 page)
16. Mississippi State Hospital Diagnostic Summary by R. McMichael, M.D. (19 pages)

Page 3 of 13
Terry Pitchford
587.53.2189

## V.    DESCRIPTION OF INCIDENT

Accordingly to the police report, Mr. Pitchford describes the incident as, "they found a pistol in my car. They said that I robbed the store and killed Reuben Britt in Grenada, Mississippi on November 7, 2004." When asked in detail of the events which led to the current charges, he replied, "everything started getting hard that morning. I got up, went to my baby mama's house, Dominique". I was supposed to drive to Jackson that day to shop, eat, and visit relatives. We (Dominique and I) had been on bad terms. I wanted to get back together with her. Then the police came and asked questions. "Why was I down here?" "I did not understand my rights." A Mr. Jennings said, "he was here to help me. I did what he wanted me to do." "I thought that I was helping myself".

According to Terry Pitchford, "me and Eric Bullin went into the store. Eric shot him with the twenty-two (22). It killed him. I had the thirty-eight (38). "It had rat bullets in it", "it didn't kill him". "The police came to my house later that day". They asked to search my car. I just told him what he wanted me to say". "I could get death to life". "They could kill me".

Mr. Pitchford has been in jail since November 2004.

## VI.    COMPETENCY CRITERIA

### A.   UNDERSTANDING OF PROCEEDINGS

#### 1.   Aware of the Charges

The client is aware of the current charge of murder/armed robbery. He said, "I am charged with capital murder."

#### 2.   Aware of the Basic Roles of Common Court Personnel

##### a.   Judge

He is able to define the role of the judge. He defines it as, "He makes sure everything ran right". "He gives people time. He judges a person".

##### b.   Defense Attorney

He is able to define the role of defense attorney. He defines it as, "My lawyer." He added, "he helps me get off the case."

##### c.   Prosecutor

He is able to define the role of prosecutor. He defines it as, "He tries to convict me of the charge".

App.0624

Page 4 of 13
Terry Pitchford
587.53.2189

    d.  **Jury**

He is able to define the role of jury. He defines it as, "Twelve people that judge you during the trial." "They find you guilty or not guilty".

### 3. Aware of the Basic Court Terminology

    a.  **Witness**

He is able to define a witness. He defines it as, "Testify for you or against you, either one".

    b.  **Evidence**

He is able to define evidence. He defines it as, "Something they got against you. Like a pistol, against me."

    c.  **Testimony**

He is able to define evidence. He defines it as, "When a person gets up to tell something".

### 1. Aware of Various Courtroom Legal Defenses

    a.  **Alibi**

He is able to define alibi. He responded with, "You got an excuse."

    b.  **Entrapment**

He is able to define entrapment with prompting. He defines it, after explanation, as "Somebody set you up."

    c.  **Self Defense**

He is able to define self defense. He defines it as, "You protect yourself".

    d.  **Necessity**

He is able to define necessity after prompting. He defined it as, "You had to do it, because you would die or something."

    e.  **Insanity**

He is able to define insanity. He defines it as, "mentally retarded,

you didn't know what you were doing."

    **f.**    **Automatism**

He is able to define automatism. After prompting, he defines it as, "You reacted upon a reflex".

**5.**    **Aware of Basic Legal Rights**

    **a.**    **5th Amendment: The right against self incrimination.**

He is aware of the 5th Amendment. He defines it as, "The right not to incriminate yourself". "You ain't got to tell on yourself."

    **b.**    **6th Amendment: The right to an attorney.**

He is aware of the 6th Amendment. He defines it as, "The right to an attorney".

**6.**    **Able to Define Routine Pleas in a Court of Law**

    **a.**    **Guilty**

He is able to define guilty. He defines it as, "You did it".

    **b.**    **Not Guilty**

He is able to define not guilty. He defines it as, "You didn't do it".

    **c.**    **Not guilty by reason of insanity**

He is able to define not guilty by reason of insanity. He defines it as, "You're crazy, and they can't find you're guilty."

    **d.**    **No contest**

He is able to define no contest. After prompting, he defines it as, "You don't want to plead guilty or not guilty."

**B.**    **Assist in His Defense**

    **1.**    **Able to collaborate with attorney.**

He is able to communicate with his attorney. Mental illness does not inhibit his ability to communicate. He was not psychotic

App.0626

Page 6 of 13
Terry Pitchford
587.53.2189

during the session.

**2.   Able to identify potential witnesses.**

He is able to assist in locating and examining witnesses. He is able to distinguish between friendly and unfriendly witnesses. He recognizes that he would support himself and Mr. Bullin, his co-defendant, would likely be against him.

**3.   Able to assist the attorney in the courtroom process.**

He is unable to maintain a consistent defense. He is also unable to inform his attorney of distortions or misstatements. He does exhibit confusion, paranoia, and is suspicious of the legal system. He also displays a high level of cognitive impairment.

**4.   Able to make good decisions in own behalf**

He is able to understand the term of plea bargain; however, he is not able to make good decisions on his own behalf. I clearly explained to him the process. He defined it as, "A deal with the District Attorney." "The District Attorney comes to you, then you plead guilty to a lesser charge and they get the time or you get the max."

**5.   Able to testify in own defense**

He is unable to rationally discuss his side of the incident. He is not consistent with a courtroom presentation. He is unable to understand questions satisfactorily.

**6.   Able to refrain from irrational behavior during the courtroom.**

He is able to refrain from excessive talking and/or irrational acts. He is able to control impulsive outbursts in court.

**7.   Able to tolerate the stress of a trial.**

He has a psychiatric impairment that will exacerbate during the stress of the trial.

## VII.   PERTINENT BACKGROUND HISTORY

All information herein was obtained during an interview with Terry Pitchford, review of itemized available records, and discussions with collateral sources.

App.0627

Page 7 of 13
Terry Pitchford
587.53.2189

## A.  BIRTH/DEVELOPMENT

Mr. Pitchford was born on December 30, 1985 in Greenwood, Mississippi.
He has a twin brother named Perry. He has fourteen partial siblings. His
biological father died of kidney cancer when he was ten years old. His parents
were not married at the time of his birth. After his father died, the mother
remarried. The man that his mother married was an alcoholic who physically
abused her. In addition, he reports that his brother Michael was in and out of
prison since he was younger.

## B.  FAMILY/MARITAL HISTORY

Mr. Pitchford has never been married but has a one year-old child. He reports
a good relationship with his child.   Both he and the child's mother may have been
romantically involved with others prior to the alleged offenses.

## C.  EDUCATIONAL HISTORY

He has a very sporadic academic history. He attended Wilson Elementary School
in Grenada. He was retained and forced to repeat the second and fourth grades.
He did attend Forrest Hill High School in Jackson, Mississippi. He was expelled
from the Grenada Public School system for behavioral problems. He attended
class for a General Equivalency Diploma and was expelled from that program.

## D.  WORK HISTORY

Mr. Pitchford has no substantial prior vocational history. He was employed by
Taco Bell for a couple of weeks. He later was employed by Healthcraft on an
assembly line briefly. In addition, he was employed at Grenada Wholesale
Lumber Company for eight months. This was his longest period of
employment.   This occurred immediately prior to his incarceration.

## E.  MILITARY HISTORY

Mr. Pitchford has no military history.

## F.  SUBSTANCE ABUSE HISTORY

He has an extensive personal history of substance abuse. He began smoking
marijuana at the age of fifteen (15). He reports that he had been abusing large
amounts of cannabis around the time of the alleged offenses. In the past, Mr.
Pitchford reports being intoxicated or under the influence of drugs while at work.
In addition, he has a family history of substance abuse.

## G.  LEGAL HISTORY

Similarly, he has experienced a problematic past legal history. He was involved with the local Youth Court for stealing a cell phone for which he was placed on probation. He acknowledged that sometimes he would steal; however, he was never caught or charged with an offense.

## H. PAST MEDICAL HISTORY

Mr. Pitchford does not have any serious medical conditions. He has been noted to have an upper respiratory tract infection. He was involved in several motor vehicle accidents. A recent one occurred in May 2004. He had no reported loss of consciousness. There was no hospital admission associated with this accident. Mr. Pitchford does admit to one previous surgery, a repair of an inguinal hernia.

## I. PAST PSYCHIATRIC HISTORY

Mr. Pitchford does have a past history of psychiatric illness. He tried to commit suicide one time at the age of sixteen (16). He and each collateral source readily acknowledge a significant period of undiagnosed clinical depressive illness after the untimely death of his biological father when he was age ten (10).

In addition, there is a past family psychiatric history concerning his siblings and a maternal uncle.

Mr. Pitchford has no history of psychiatric treatment and is not currently under treatment.

## VIII. CURRENT PSYCHIATRIC HISTORY (within the last thirty days)

### A. MANIA

Mr. Pitchford does present manic symptoms such as racing thoughts, risk taking behavior, poor judgment, mood lability, and slurred speech.

He does not present with any symptoms of, gambling or excessive spending sprees, grandiosity or hyper-religiosity.

## B. DEPRESSION

He does endorse symptoms of dysphoria, crying spells, memory loss, decreased attention span, guilt, loss of appetite and previous suicidal attempts.

He does not acknowledge any anhedonia, fatigue/lack of energy, hopelessness, helplessness, worthlessness, or insomnia. In addition, he does not present with any suicidal or homicidal ideation or plan.

Page 9 of 13
Terry Pitchford
587.53.2189

### C. PSYCHOSIS

Terry Pitchford, does indicate the presence of paranoia. He does indicate that he is afraid of the variety of concerns. He notes being threatened by his co-conspirator while in jail currently. He is also afraid of his environment, as well as those around him. In fact, he refuses to accept a plea bargain offer from the district attorney whom he does not trust.

He has not experienced hallucinations, catatonia, or delusions.

### D. ANXIETY

He currently experiences frequent worrying and nervousness. In addition, he experiences occasional nausea. In addition, he endorses obsessive/compulsive ideas.

He does not present any irritability, impulsivity, tremors, vomiting, or diarrhea.

### E. POST TRAUMATIC STRESS

Mr. Pitchford is clearly suffering from some overt psychological effects of post-traumatic stress. He does have evidence of reliving events, recollections and flashbacks. He can re-experience the day of the shooting as if it were yesterday. He has developed a near startle reaction by report when near others whom he previously associated with. In addition, he overtly admits to being frankly afraid of this entire event.

## IX. MENTAL STATUS EXAMINATION

### A. General Appearance

Mr. Pitchford stands five feet seven inches (5' 7"), weighing one-hundred and forty pounds (140). He appears younger than his stated age. His personal hygiene was intact. There was no substantial body odor present. He did not appear particularly imposing, threatening, or hostile.

### B. Mood, Affect, Behavior, Psychomotor Activity

He was cooperative with the interview and engageable. Initially, he was distant, isolatory, and responded with monosyllabic answers. However, in fair time, he became more responsive to the line of questioning. His answers grew in depth and content. Similarly, he began to share a reasonable approach to his thinking both during the assessment as well as during the time of the criminal act.

His speech was not a normal rate. The tone was monotone and the volume was low. He exhibited some signs of psychomotor retardation.

App.0630

Page 10 of 13
Terry Pitchford
587.53.2189

Mr. Pitchford's mood is depressed. His affect is constricted and blunted.

**C. Sensorium and Orientation**

He was fully oriented to person, place, date, time, situation and circumstance.

**D. Thought Processes**

During the evaluation, Mr. Pitchford exhibited some psychotic thinking in the form of thought blocking. He also expressed some unusual aspects of speech, such as well as tangentiality and circumstantialitiy.

He does not exhibit any signs of perseveration, flight of ideas, or loose associations.

**E. Thought Content**

He does show signs of obsessions and thought broadcasting.

He did not exhibit active auditory hallucinations. In addition, he did not display signs of delusional thought content such as paranoia or command hallucinations. Furthermore, he does not present direct evidence of suicidal or homicidal ideations.

**F. Memory and Cognition**

His immediate memory is intact. When given a three word triad he was able to repeat it immediately. His recent memory is impaired on standard testing. When asked what he had for breakfast, he was not able to accurately respond.

His remote memory is fair on standard testing. When asked to name his fifth grade teacher, he was not able to accurately respond.

**G. Concentration**

Mr. Pitchford's concentration is poor on standard testing. He is not able to perform the serial seven examinations. In addition, he was not able to perform the serial three examinations without errors. On routine occasions throughout the interview, Mr. Pitchford could not remain on task. This concern presents particular difficulty as he could not seem to adequately develop a reasonable mind set around the issue of accepting a plea bargain as offered. He would typically become somewhat confused. In addition, during these discussions he would frequently revert to very immature, limited, childlike thought process and behavior. Overall, his concentration was markedly impaired.

App.0631

### H.  Abstracting Ability

His abstracting ability is poor on standard testing.  He was unable to complete the responses to the following proverbs:

> "Don't count your chickens before they hatch."
> "An eye for an eye"
> Even monkeys fall from trees"
> People who live in glass houses shouldn't throw stones."

He is very concrete in describing similarities between items such as fruit, furniture, and transportation.

### I.  Judgment

His judgment was intact.  When asked what to do if he were to find a letter that was stamped, sealed and addressed, he responded, "place it in the mailbox."  In addition, when asked what he would do if he noted smoke in a crowded theater, he said, "get up and get out."

## X.  DIAGNOSIS

| | |
|---|---|
| **Axis I:** | Mood Disorder NOS |
| | Marijuana and Alcohol Dependence; in remission due to incarceration |
| **Axis II:** | Cognitive Impairment; Rule out mental retardation |
| **Axis III:** | head trauma |
| **Axis VI:** | Extreme Stressors, 6; pending capital punishment, educational, family |
| | Financial, social and vocational. |
| **Axis V:** | GAF current <u>25</u>; Highest in the past year <u>25</u> |

## XI.  FORMULATION

Terry Pitchford is a twenty year old African American Male who is charged with murder and armed robbery.  Prior to this criminal setting, he has had no significant psychiatric history.  However, he has had multiple motor vehicle accidents, a documented history of head trauma, substantial chemical dependency, and limited educational/ vocational achievement.  My assessment includes a review of all available data concerning his competency, criminal responsibility, and cognitive status.

Concerning the competency criteria, Terry Pitchford was able to understand the basic roles of the common court personnel, basic court terminology, courtroom legal defenses, identify pertinent witnesses and routine pleas in a court

App.0632

of law and potential consequences; therefore, he is clearly able to meet the cognitive standard of competency. However, he is unable to fully collaborate with his attorney or show appropriate judgment in making good decisions in his own behalf. This was evident by his poor ability to describe his rationale to accept the plea bargain offered by the district attorney. He was unable to identify a likely alibi. He was unable to disassociate himself from the pertinent elements of the crime. Finally, he was unable to describe a thought process consistent with insanity. Therefore, this is an individual who should have been able to appreciate the value of a plea bargain offer. Further, his inability to even verbalize a fair alternative option in these matters makes one consider the possibility of a limited cognitive/insightful/or perceptual perspective.

Concerning criminal responsibility, Mr. Pitchford could appreciate the wrongfulness of his actions. He readily acknowledged that he was wrongful in this action that ultimately took the life of Mr. Britt. Mr. Pitchford, at all times during this event, was in control of his actions. It is my belief that he was able to have conformed his behavior within the constraints of the law.

Concerning cognitive impairment, Mr. Pitchford exhibited early signs that would cause concern. He had to repeat the 2nd and the 4th grade. According to his records, he possible would have had to repeat the 5th grade if not due to a social promotion. This severe degree of functional under achievement points strongly towards a baseline level of early cognitive impairment. Furthermore, the defendant has had a documented history of multiple motor vehicle accidents, any or all which could have potentially lead to direct neurological damage. In addition, he has acknowledged that he has an extensive history of chemical dependency, most notably alcohol and marijuana. Both of these substances can impair cell development and promote neuronal death. Throughout his life, Mr. Pitchford has failed to maintain any form of relationship in his life. There is not a steady vocational history, supported by the claim that his longest period of employment was eight months. There was also a documented early dismissal from Job Corp. He has also failed to maintain appropriate social relationships outside of his immediate family. He has not maintained a successful romantic relationship, a long-term friendship other than with relatives, or a vocational association with mutually beneficial engagements.

When assessing the above clinical determinants of Mr. Pitchford's current psychological status, it is important to first assess his background before reviewing his progression. He had early deficits which clearly led to functional demise in meting age appropriate expectations. Once his progression towards adolescence and even early adulthood began in earnest, he experienced multiple consistent failures throughout the entire cognitive and emotional growth curve. This is a frequently witnessed pattern in the profile of an impaired, deficient individual. My assessment identifies these concerns in a linear fashion. It is my consideration that these concerns are generally amenable to professional care and treatment intervention when began early, and in full robust effect. Certainly, the addition of toxic psychoactive substances has further clouded the situation. All of these factors significantly impair this individual at the present time.

App.0633

Page 13 of 13
Terry Pitchford
587.53.2189

**XII  CONCLUSION**

Therefore, in my professional opinion, based on reasonable medical certainty, Terry Pitchford is not competent to fully assist his attorney adequately at the current time. He has pertinent residual cognitive impairment which may limit his decision making capacity.

**XIII. SIGNATURE**

Rahn K. Bailey, M. D., F. A. P. A.
Board Certified in General and Forensic Psychiatry

App.0634

AFFIDAVIT OF RAHN K. BAILEY, M.D.

STATE OF TEXAS

COUNTY OF   HARRIS

      Rahn K. Bailey, M.D., an adult resident of Harris County, Texas, fully competent to make this affidavit, being first duly sworn, deposes and says as follows:

1. I am a double board certified forensic psychiatrist. I was retained by the Mississippi Office of Capital Defense Counsel to perform a forensic psychiatric evaluation of their client Terry Pitchford and to offer testimony concerning that evaluation at the capital murder trial of Mr. Pitchford.

2. I made the requested forensic psychiatric evaluation of Mr. Pitchford on or about February 4, 2006, prepared a report concerning it and returned to Texas with the understanding that I would come to back to Mississippi to provide testimony as a mitigation witness for Mr. Pitchford in the event he were convicted of capital murder in the trial scheduled to commence the following week. I kept in touch with Mr. Pitchford's defense team by telephone over the course of that week and was ultimately told my testimony would be required on February 9, 2006.

3. On February 8, 2006 I appeared and testified pursuant to subpoena in a trial in Jackson County, Texas at a trial presided over by Hon. Joseph Patrick Kelly, Judge of the 24th Judicial District of Texas. I testified on February 8, but was not released from the subpoena at that time and was directed by Judge Kelly to return to Judge Kelly's court the following day February 9, 2006 pursuant to said subpoena.

4. I immediately made contact with Mr. Pitchford's defense team to notify them of this turn of events and that I would therefore be unavailable to testify in Mississippi as arranged on February 9, 2006. I spoke several times that afternoon and evening with members of Mr. Pitchford's defense team regarding either getting me temporarily released from Judge Kelly's subpoena or delaying the

Page 2 of 2

testimony in Mississippi for a day but was ultimately informed by the Pitchford defense team, reaffirmed by the Judge in Texas when I appeared the next day, that neither of these things had happened.

5. At no time was I told by the Pitchford defense team that it did not desire to present my testimony. Indeed, our discussions during the evening of February 8 were almost entirely devoted to discussing ways that I could come to Mississippi to testify if I was for some reason unexpectedly released from my obligation to appear in Judge Kelly's court because the Pitchford case penalty phase trial would be proceeding on February 9, 2006 and my testimony was needed in it.

6. Because no release from the Texas subpoena was able to be arranged, I was, in attendance at Judge Kelly's court in Texas on February 9, 2006 pursuant to that subpoena and was therefore at all times, in fact, unavailable to appear and testify in Mississippi on that date.

7. At no time after being informed that I was required to be in attendance in Texas on February 9, 2006 did I represent to anyone connected with the Pitchford matter that I was available to testify in Mississippi on February 9, 2006. Indeed so far as I know the only communications from either myself or Judge Kelly to anyone involved in the Pitchford matter was that I was not available to do so due to my being under subpoena in Texas.

FURTHER AFFIANT SAYETH NAUGHT.

Rahn K. Bailey, M.D.

SWORN AND SUBSCRIBED BEFORE ME, this the _8th_ day of _November_, 2007.

NOTARY PUBLIC

RACHEL MARQUETTE WATSON
Notary Public, State of Texas
My Commission Expires
December 01, 2010

**FILED**

NOV 1 2 2007

LINDA BARNETTE, CIRCUIT CLERK
BY_____ D.C.

Page 2 of 2

App.0636

STATE OF TENNESSEE
COUNTY OF _____

### AFFIDAVIT OF RAHN K. BAILEY, M.D.

Personally appeared before me, the undersigned authority in and for the county and state aforesaid, Rahn K. Bailey, M.D. who after having been duly sworn, started as follows:

1. I am licensed as a psychiatrist by the State of Tennessee and the State of Texas. I am the Chair of Psychiatry and Behavioral Sciences at Meharry Medical College School of Medicine; Executive Director, Lloyd C. Elam Mental Health Center, Meharry Medical College School of Medicine; and Adjunct Associate Professor, Department of Psychiatry, School of Medicine, Vanderbilt University.

2. I hold certification from the American Board of Psychiatry & Neurology in psychiatry and forensic psychiatry. I am also a Fellow of the American Psychiatric Association. Additional details about my training, experience, and education are included in my curriculum vitae attached to this affidavit as Exhibit A.

3. In February 2006, I was asked by Mr. Ray Carter to evaluate Terry Pitchford and to testify in the sentencing portion of his capital murder trial. I performed the evaluation on February 4, 2006. I returned to Texas after the evaluation expecting to return to Mississippi in order to provide testimony as a mitigation witness for Mr. Pitchford in the event he was convicted of capital murder the following week.

4. While I was in Mississippi, I was never served with a subpoena for Terry Pitchford's case.

5. I was ultimately informed by Mr. Pitchford's defense team that my testimony would be needed on February 9, 2006.

6. I was at all times unavailable to testify on February 9, 2006 on behalf of Mr. Pitchford. I had appeared and testified pursuant to a subpoena on February 8, 2006, in a trial in Jackson County, Texas which was presided over by Judge Joseph Patrick Kelly. After I testified on February 8, 2006, I was not released from the subpoena. I was ordered by Judge Kelly to return to his court the following day, February 9, 2006 pursuant to the subpoena, and I in fact did return to Judge Kelly's court in Texas on February 9, 2006 in compliance with the subpoena and Judge Kelly's order.

7. I had several conversations with Mr. Pitchford's defense team to try and arrange for me to be able to appear and testify on Mr. Pitchford's behalf at the sentencing portion of his trial. At no time was I told by any member of Mr. Pitchford's defense team that it did not desire to present my testimony on Mr. Pitchford's behalf, nor did I ever represent to any member of Mr. Pitchford's defense team or anyone else that I would be available to testify in Mississippi on Mr. Pitchford's behalf on February 9, 2006.

8.      Based on my examination of Mr. Pitchford, I prepared a written report. A copy of that report is attached to this affidavit as Exhibit B. The findings and conclusions in my written report are based on a reasonable degree of medical certainty.

9.      Had I testified on Mr. Pitchford's behalf, my testimony would have been consistent with the findings and conclusions contained in my report, and my testimony would have been based on a reasonable degree of medical certainty.

        Further affiant sayeth not.

                                  RAHN K. BAILEY, M.D.

SWORN TO AND SUBSCRIBED before me, this the ___22___ day of September, 2011.

NOTARY PUBLIC

My Commission Expires:

May 23, 2012

STATE
OF
TENNESSEE
NOTARY
PUBLIC
DEMETRA PULLEY
DAVIDSON COUNTY, TENN.

Page 2 of 2

STATE OF TENNESSEE
COUNTY OF KNOX

### AFFIDAVIT OF D. MALCOLM SPICA, PH.D.

Personally appeared before me, the undersigned authority in and for the county and state aforesaid, D. Malcolm Spica, Ph.D., who after having been duly sworn, started as follows:

1.  I am licensed as a psychologist by the State of Tennessee and the State of Michigan. I maintain a private practice in Knoxville, Tennessee where I provide services to adults and adolescents with a variety of neurological and psychiatric conditions.

2.  I am also a consulting neuropsychologist for the UnumProvident Insurance Corporation and the Catholic Diocese of Knoxville, Tennessee.

3.  I have over twenty years of clinical and neuropsychological experience. Additional details about my training, experience, and education are included in my curriculum vitae attached to this affidavit.

4.  I was asked by attorneys for Terry Pitchford to perform neuropsychological testing and to offer a professional assessment as to those findings. I have discussed the case with Mr. Pitchford's attorneys and reviewed the following documents:

    a.  Records and evaluation generated by the Mississippi State Hospital at Whitfield
    b.  Medical records from
        i.   Grenada Family Medical Clinic
        ii.  Grenada Lake Medical Center
        iii. Mississippi Department of Corrections
    c.  Mississippi Department of Corrections Pen Pack
    d.  Report of Rahn K. Bailey
    e.  School records
    f.  Grenada School District
    g.  Jackson Public School District
    h.  Batesville Job Corp Center
    i.  Selected portions of the trial transcript
    j.  Terry Pitchford's statements obtained by the Grenada Sherriff's Department
    k.  Social history notes

5.  I examined Mr. Pitchford on June 16, 2011 for a total of four and one half hours. The measures included the following:
    21-Item Word Memory Test
    Beck Anxiety Inventory
    Beck Depression Inventory-II
    Color-Word Interference Test
    Design Fluency Test
    Finger Tapping Test

Grooved Pegboard Test
Judgment of Line Orientation Test
Rey-Osterrieth Complex Figure Test
Symptom Checklist - 90 - Revised
Test of Memory Malingering
Tower Test
Trail making test
Verbal Fluency Test
Wechsler Adult Intelligence Scale - IV
Wechsler Memory Scale - III - Select Subtests
Wechsler Test of Adult Reading
Wide Range Achievement Test - 3
Wisconsin Card Sorting Test

6. Testing of motivation/effort via both dedicated and embedded measures indicated that Mr. Pitchford gave normal effort, was not malingering, and the examination data was valid.

7. The results indicated that Mr. Pitchford has a generalized deficit in overall information processing speed.

8. Mr. Pitchford demonstrated difficulty on tasks mediated by right cerebral hemisphere functioning. He demonstrated a distinct disparity between his skills in verbal-linguistic processing and those in visuospatial analysis.

9. He obtained scores as low as the impaired range on skills requiring appreciation of angles/spatial relationships, or other nonverbal concepts.

10. Based on a reasonable degree of psychological certainty, these findings, taken together, indicate right hemisphere deficits that are likely long-standing and developmental in nature. In other words, based on a reasonable degree of psychological certainty, these findings suggest that Terry Pitchford suffers from long-standing organic brain dysfunction.

11. Persons with deficits in right hemisphere processing typically have difficulty quickly processing novel information and appreciating subtle cause-effect relationships between interdependent factors (such as people), especially under unfamiliar circumstances.

12. Based on a reasonable degree of psychological certainty, these findings give me no confidence that Terry Pitchford would be able to make important decisions under emotional circumstances, time pressure, or when dealing with abstract concepts. As a result of these deficiencies, it is further my opinion, based on a reasonable degree of psychological certainty that Mr. Pitchford's decision-making capacity was sufficiently impaired from the time of his arrest through the completion of his trial that his capability to stand trial was at the very best fluid. In other words, Terry Pitchford's capacity to make the rationale decisions required of him before and during trial varied from moment to moment, and it is doubtful that he remained capable throughout the entirety of the pre-trial and trial proceedings as a result of these deficiencies.

App.0640

13. It is my further opinion, based on a reasonable degree of psychological certainty that additional opinions should be sought regarding Mr. Pitchford's ability to understand his Miranda rights as a result of these deficiencies.

14. It also my opinion based on a reasonable degree of psychological certainty that a qualified mental health professional could have identified and explained Mr. Pitchford's organic brain dysfunction and other deficiencies set forth above at the time of his trial. Additionally, I was able and willing to testify to the opinions set forth in this affidavit at the time of Terry Pitchford's trial.

Further affiant sayeth not.

D. MALCOLM SPICA, PH.D.

SWORN TO AND SUBSCRIBED before me, this the _13th_ day of September, 2011.

NOTARY PUBLIC

My Commission Expires:

July 1, 2012

D. M A L C O L M   S P I C A, PH. D.
Licensed Clinical Psychologist
Neuropsychologist

NEUROPSYCHOLOGICAL CONSULTATION

September 7, 2011

Louwlynn Vanzetta Williams, Esq.
Mississippi Office of Capital Post-Conviction Counsel
239 North Lamar Street, Suite 404
Jackson, MS 39201

**RE:**   **Terry PITCHFORD**
Date of Birth: 12/30/85
Laboratory Number: 211125

Dear Ms. Williams:

This letter is intended to serve as a summary of my findings regarding my examination of Terry Pitchford. As you know, I examined Mr. Pitchford on 6/16/11 for a total of 4.5 hours. Testing of motivation/effort via both dedicated and embedded measures indicated Mr. Pitchford gave normal effort and the examination data was valid.

The results indicated that Mr. Pitchford has a generalized deficit in overall information processing speed. In addition, Mr. Pitchford demonstrated difficulty on tasks mediated by right cerebral hemisphere functioning; for example, he demonstrated a distinct disparity between his skills in verbal-linguistic processing and those in visuospatial analysis. Whereas his verbal skills ranked in the Average range or even as high as this Superior range, he obtained scores as low as the Impaired range on skills requiring appreciation of angles/spatial relationships, or other nonverbal concepts. Taken together, these findings suggest right hemisphere deficits that are probably long-standing and developmental nature. Persons with deficits in right hemisphere processing typically have difficulty quickly processing novel information and appreciating subtle cause-effect relationships between interdependent factors (such as people), especially under unfamiliar circumstances.

Considering these neuropsychological findings, I recommend you consider seeking expert opinion regarding Mr. Pitchford's ability to understand his Miranda rights, as these findings give me no confidence that he would be able to make important decisions under emotional circumstances, time pressure, or when dealing with abstract concepts.

A full report of my findings will be forthcoming. If I can be of any further assistance to you or Mr. Pitchford, please do not hesitate to contact me.

Sincerely,

D. Malcolm Spica, Ph.D.
Licensed Clinical Psychologist

# RICHARD G. DUDLEY, JR., M.D.

210 WEST 101ST STREET, SUITE 11K, NEW YORK, NEW YORK 10025
212-222-5122

MESSAGE FOR: _VAN WILLIAMS_____

_____

_____

SENT BY: _RGD_____

_____

DATE: _14 SEPT 2011_____ TIME: _____

TOTAL NUMBER OF PAGES INCLUDING THIS PAGE: _____ †7_____

## AFFIDAVIT OF RICHARD G. DUDLEY, JR., M.D.

STATE OF NEW YORK
COUNTY OF NEW YORK

My name is Richard G. Dudley, Jr. I am over the age of eighteen (18) and fully competent to give this affidavit. The information set forth in this Affidavit is based on my personal knowledge and belief.

I am a psychiatrist licensed in the State of New York, and I am a Diplomate, American Board of Psychiatry and Neurology. A true copy of my curriculum vitae is attached as Exhibit A. I have been asked to conduct a psychiatric evaluation of Terry Pitchford by his post-conviction attorneys. This affidavit summarizes and explains my conclusions regarding Mr. Pitchford.

In reaching my conclusions, I have reviewed the following:

Records, documents, and discovery related to the 7 November 2004 murder of Reuben Britt and associated armed robbery, including statements made by Terry Pitchford;

A social history of Terry Pitchford and document sources for that history, including school records, his GED transcript, Job Corps records, available medical records, and information obtained from family members and others that have known Terry Pitchford, including affidavits from some of these individuals;

Reports of prior mental health evaluations performed in connection with this matter at the time of Terry Pitchford's trial which include the reports of evaluations performed by the Mississippi State Hospital and Dr. Rahn K. Bailey;

The transcript of the sentencing phase from Mr. Pitchford's trial, and the direct appeal opinion in Mr. Pitchford's case from the Mississippi Supreme Court.

I also consulted with D. Malcolm Spica, Ph.D., who has more recently performed neuropsychological testing of Terry Pitchford.

In addition, I performed a psychiatric examination of Mr. Pitchford on 21 and 22 June 2011 at the Mississippi State Penitentiary at Parchman, Mississippi. A mental status examination of Mr. Pitchford revealed that he was a 26-year-old (DOB 30 December 1985) African-American male of about average height and slightly above average weight, who appeared somewhat younger than his stated years. He was neatly dressed in the prison uniform, and he appeared to be physically healthy. His speech was clear, coherent and goal-directed, and he appeared to be open and extremely cooperative with the examination process. He was oriented to person, place and time. His memory for short and long-term events appeared to be good.

There was a clinically significant depression of his mood, mixed with clinically significant anxiety, and his affect was appropriate to his depressed mood. His intellectual capacity appears to be within the average range, his insight fair, and his judgment good.

Terry Pitchford and his twin brother, Perry, were born to Shirley Brown Burnett (then 31 years old) and James Pitchford (then 57 years old) on 30 December 1985, after which Mr. Pitchford's parents married. Mr. Pitchford's mother (born 23 August 1954) already had two children: her daughter Veronica (born 1 May 1973), who was born when she was about 20 years old, and her son DeShawn (born 13 October 1975), who was the product of her first marriage (to Burnett). Mr. Pitchford's father (born 28 December 1928) had been married 3 times before becoming involved with Mr. Pitchford's mother and reportedly had about 10 children from those prior marriages. By the time that Terry and Perry were born, their father was disabled and no

2

longer working outside of the home. Therefore, their father assumed the responsibility for taking care of the family home and the twin boys while their mother worked outside of the home.

When Terry Pitchford met with this psychiatrist he described his father in ideal terms, reported that he was extremely close to his father, and noted that his father was the only person who ever took the time to understand him. Terry reported that then when he was about 10 years old, his father died shortly after being diagnosed with kidney cancer. He further report that just prior to his death his father had gotten so sick and was in so much pain that he was crawling on his knees, and he noted that then when his father died it was "like something inside of him broke," and "he was lost and he didn't have anyone to talk to." All family members confirmed Terry's report about his extremely close bond with his father. They also confirmed that Terry was obviously devastated by his father's death. But in retrospect, some family members have come to realize that Terry was obviously so depressed after the death of his father that he should have been taken for professional help.

In contrast, when Terry Pitchford met with this psychiatrist, he described his relationship with his mother as always having been extremely difficult for him. He noted that she always favored his twin, Perry, and always blamed him/Terry for everything, including things that Perry clearly did. She was always emotionally/psychologically abusive, constantly saying things like "you can't do this/that" or "you aren't going to be shit." She was also physically abusive and would hit him with whatever she could put her hands on. On at least one occasion when Terry was about 13 years old she hit him in the head so hard that his head was busted open and he had to be rushed to the hospital. All family members confirmed Terry's reports about his mother, their relationship, and the psychological and physical abuse he endured. It was further noted that

3

Terry's mother obviously had problems of her own, likely including cognitive difficulties. She abused all of her kids and often instigated conflicts or fights with her partners or husbands, but for some reason, Terry was clearly more abused and victimized by his mother than his siblings were.

Mr. Pitchford reported that since being incarcerated in connection with this matter, he has learned that his father wasn't as perfect as he had always thought. For example, although he remembers that his parents used to argue, as a child he was unaware of any fights between them which resulted in the police being called. And although he remembers his father introducing him to women who were always particularly nice to him/Terry, he was unaware of the fact that his father had affairs with other women while married to his mother. Mr. Pitchford noted that maybe he really didn't know his father, and although for years he thought that his life would have been different had his father still been alive, maybe that isn't the case. He then added that he now suspects that there were all sorts of things he didn't know during his childhood years. For example, only since becoming an adult he realized that Jessica (who was born on 13 October 1987, and grew up in the home with Terry) is not his sister but is actually his niece (his sister Veronica's daughter).

On 12 January 1998, when Terry was 12 years old, his mother married Louis Jackson, who Terry described as an alcoholic who physically abused his mother. Terry was upset by his step-father's physical abuse of his mother. Reports of family members and Jackson's criminal history records confirm Terry's reports about Jackson's drinking and the domestic violence. Terry's mother reported that Terry used to call 911 when the domestic violence would occur until she stopped him because the fines against Jackson got to be too excessive.

4

Mr. Pitchford reported that since childhood/for as long as he can remember, he has "heard voices" which he then later described as really more like "having thoughts" -- thoughts that are "messed up," "thoughts that can hurt him," and thoughts that are often confusing because there are often many different conflicting thoughts at the same time. Mr. Pitchford reported that the thoughts keep coming and won't stop until he acts on them and that as a child he used to hit his head to try to make them go away which did not work. But then when he acts on them, the thoughts and the associated tension goes away. He noted that these thoughts are very distracting and often make it very difficult for him to focus on other things, even things that he enjoys. Family members reported remembering Terry telling them that he heard voices back when he was a child, but again, there is no indication that anyone felt that this was a matter that needed to be addressed. Upon further exploration, Terry gave numerous examples of experiencing these thoughts. One of the earliest examples given was from when he was about 8 or 9 years old. The compelling thought was to jump out of a moving vehicle, and when he finally did jump out, he busted his head. Upon further exploration, Mr. Pitchford acknowledged that in addition to this head injury and the above noted head injury that occurred when his mother hit him over the head, there were other head injuries. He reported, for example, a tree branch falling on his head when he was about 7 years old, another vehicle accident and head injury when he was about 12 years old, and a football-related head injury when he was about 15 years old.

Mr. Pitchford also reported that there have been times when he has had nightmares about being chased by someone who intended to cause him harm. Terry Pitchford reported that he was also always nervous around people, especially people that he didn't know; that he always thought that people were wondering what was wrong with him; and that he was always trying to

5

figure out why they thought something was wrong with him. He noted that as a child he was "way over weight" which always bothered him and he tried to cover up his size by wearing bagging clothing. Upon further exploration, he reported that he doesn't think that he ate more or was less active than his twin, but his twin never had a problem with his weight. Terry noted that despite this, he doesn't know why he always felt that everyone thinks there is something wrong with him, and among the above noted "thoughts" that he has are thoughts that are very, very negative about him.

In addition, Terry reported other incidences of self-harm. He described a couple incidences of cutting himself. For example, he cut himself with a piece of glass following a problem with his brother. And in a separate incident, he cut himself with a razor when he was about 13 years old. With these incidences of cutting, he reported being upset and that the cutting brought relief, but he also noted that the "thoughts" told him that cutting would bring such relief. He similarly explained other incidences of cutting (which occurred between the ages of about 10 and about 14) and why he put a cigarette out on his arm when he was about 15 years old.

When asked about taking an overdose of pills in 2002 when he was 16 years old, Mr. Pitchford acknowledged that it had happened. He reported that it happened following a conflict with his child's mother which had then been followed by a conflict with his own mother, and that he just took all the pills. He noted that he is not certain that he actually wanted to die. He reports that he begged his mother not to allow him to be hospitalized for suicide, but then he really doesn't know why he took the pills—only that he just took the pills. Upon further exploration, Mr. Pitchford acknowledged having had thoughts of suicide since then, even more

6

so since incarcerated in connection with this matter. And he noted that while on death row he has such thoughts on an almost daily basis.

Mr. Pitchford also reported that back when he was in school, he always had some problems learning, things the teachers were talking about just didn't make sense to him, and he felt that the teachers thought that this was somehow his fault. He felt like the teachers reacted negatively to him, and in turn, he eventually started reacting negatively to them. He knows that there were some real underlying learning problems there (as opposed to the notion that he just wasn't trying) at least in part because he had the same problems learning even with subjects he really liked. He also had the same problems when he was doing things like trying to learn to play football, which is also something that he really liked and really wanted to do.

Terry noted that he has thought that his learning difficulties were due to his being so distracted by the thoughts and/or that he otherwise just couldn't figure out things quickly enough. But he has more recently thought that maybe he just had a different way of learning that no one ever spent enough time with him to figure out. When asked what he meant by "a different way of learning," he explained that he has to go over things multiple times to really get them. He reported that in the same way that he finally just gave up trying to please his mother, he gave up on school because he was just so, so frustrated and that no one was trying to help him. When asked when this occurred, he reported that it was in the couple years following his father's death. He then noted that in addition, based on his not always listening in school, talking in class, and his always being so distracted, it got to the point where everyone expected him to be bad, which also contributed to him finally just giving up on trying to do well in school.

7

Mr. Pitchford also described the various major incidences that resulted in his being suspended from school during his early teenage years. With most of these incidences, he noted that there was another side to the story/his side to the story that no one was willing to listen to. He thinks that some of this was due to the fact that everyone had already decided that he was bad, but he also thinks that some of this was a product of racism (he noted that he was in a predominately white school where there was race-related tensions). Terry reported that there was an incident where he was falsely accused of selling marijuana. While he was stripped and patted down, he just flipped out (cursed at everyone, turned over a chair and ran out the room). Following that incident, there was an incident with a teacher where he got so upset that he threatened the teacher. This incident resulted in him finally being kicked out of the school system all together. He noted that although the threatening behavior on his part was wrong, he stated that it had just gotten to the point where he couldn't deal with things at school anymore.

Mr. Pitchford also described his experiences in the Job Corp and then in the alternative school. He acknowledged that there were problems with his behavior in both settings. But he noted that in his view, he was severely mistreated in both settings and suggested that his behavioral difficulties were a response to the way that he was being treated.

Upon further exploration, Terry acknowledged that he often just reacts without thinking. He stated that even when has tried to think first he has never been one to fully think things through or sufficiently think about or weigh options. He also acknowledged that he doesn't really plan very far ahead. He always thinks he can just figure out things/make up what to do next as he goes along, but upon further exploration and reflection, he noted that while there have

8

been times when that has worked, most times it really hasn't worked. Despite the difficulties that he has thinking on his feet, he still can't seem to manage to think/plan ahead.

Mr. Pitchford further reported that the first time he tried marijuana was when he was about 11 years old while visiting one of his father's other/older children in California. He tried it again about a year later with another one of his father's other/older children, and then when he was about 13 years old he met a kid in school who always had marijuana from his uncle who used to sell it. He reported that once he had this regular source of marijuana he quickly became a regular user of marijuana. He quickly developed this sense that he wanted it all the time. Then, he progressed to the point where he couldn't go out in the streets without it, that he couldn't go out without being high. Terry went on to explain that initially, he enjoyed the fact that smoking marijuana made him feel good, and made him laugh and made him hungry. He then realized that an important part of the "good feeling" was that it put him at ease. He didn't worry about the thoughts that he was having. He wasn't so totally focused on, distracted by, and made tense by those thoughts. And he was just generally so much more relaxed. Eventually, the marijuana started to take away his appetite and he stopped laughing all the time. But it continued to make him calm and relaxed, so he continued to use it and rely on it for that purpose.

Upon further exploration, Mr. Pitchford explained that he was convinced that if he stopped smoking marijuana all of those stupid, confusing, and distracting thoughts would return; he just didn't want to deal with that again; and although there were still times when he had those thoughts, those times were much less frequent than they were before he started smoking marijuana. He reported that he smoked marijuana every day until he was incarcerated in connection with this matter. He even smoked it when he was working. Over the years he spent

9

lots of money on marijuana because he needed increasingly more and more potent marijuana. Upon further exploration, Terry acknowledged that there were some other problems (disadvantages) associated with his use of marijuana. He noted, for example, that "it gets to the point where you don't care about much of anything because nothing really bothers you." He also noted, for example, that "it gets to the point where you are so flat during the day that you are just moving, nothing seems particularly significant or important, and you are hardly even recording time." He noted however that the benefits he felt he was getting from marijuana were much more important to him than the problems, and so he continued to smoke marijuana despite those problems.

Mr. Pitchford denied the use of any other substances. He reported that he did try alcohol when he was about 13 or 14 years old, but it made him really sick and he didn't like the high at all. So, he quickly decided that alcohol wasn't for him. He reported that everyone knows that he doesn't do alcohol. He noted that this seems strange to him given all of the alcoholics he grew up around, including members of his family.

The information currently available to this psychiatrist indicates that Mr. Pitchford had an extremely difficult childhood and early adolescence. More specifically, although as a young child he felt extremely close to and loved by his primary caretaker father, there were other, much more negative influences that ultimately had a stronger/more significant impact on his development. For example, he was repeatedly both psychologically and physically abused by his mother; he experienced her as both demeaning of him and rejecting of him; and although she reportedly abused all of her children, he and others noted that he was a particular target/victim of her abuse. He also had difficulties in school; he was frustrated by academic/learning difficulties,

10

and didn't at all feel supported in his efforts to learn; and he had social difficulties, which he felt were at least in part attributable to his being overweight and later also attributable to racism. When he was about 10 years old his father was diagnosed with cancer, became extremely ill, and then died, leaving Terry in the full custody and care of his mother. His mother then married his step-father, at which point Terry was repeatedly exposed to his step-father's violent physical abuse of his mother.

The information currently available to this psychiatrist indicates that Terry Pitchford has evidenced clinically significant symptoms of major psychiatric difficulty for virtually all of his life. These symptoms are of the type seen in persons who were subjected to the types of difficulties Terry experienced during this childhood and early adolescent years. More specifically, he has evidenced considerable anxiety and avoidance behavior of the type seen in severely traumatized children, including, for example, nightmares about being harmed, constricted affect, hyper-vigilance when around others, irritability and outbursts of anger. He has also evidenced clinically significant and ongoing instability around attachment (i.e., wanting it so severely, but fearing it, and being overwhelmed by fears of abandonment, all resulting in instability of interpersonal relationships), severe instability of self-image/sense of self, self-mutilating behavior, suicidal behavior, mood instability/marked reactivity of mood, inappropriate intense anger that is difficult to control, and more general impulsivity. Any cognitive difficulties that he might have, especially with regard to being able to quickly comprehend and respond to a new/different situation, would further impact on his capacity to respond in a thoughtful and appropriate manner. Although his use of marijuana appears to be in large part self-medication, it rises to the level of abuse in that over time he required an increased quantity and an increased

11

App.0654

potency of marijuana, and he continued to use the marijuana despite its recognized negative effects on him.

As noted above, the "voices" or "thoughts" that Terry describes and his responses are clearly evidence of other additional major psychiatric illness and require further examination and evaluation by this psychiatrist to clarify. On the one hand, the possibility that these are best described as obsessions and compulsions is suggested by the ego-dystonic nature of the experiences, the tension associated with the experiences, and the relief from that tension once he acts on the voices or thoughts. On the other hand, the possibility that these are best described as psychotic in nature is suggested by their content and the absence of classic ritualistic behaviors focused on warding them off, with the possible exception of hitting his head.

It is anticipated that further exploration will help clarify whether these symptoms are best described as Obsessive-Compulsive Disorder or some type of Psychotic Disorder. It is important to note however that in either case, these difficulties have also caused him significant distress and have had a significant impact on his ability to function. I presently anticipate further evaluating Mr. Pitchford in the near future in order to clarify the nature of these thoughts or voices, and this affidavit will be supplemented with my additional findings.

The above need for clarification about the voices or thoughts not withstanding, it is clear that Mr. Pitchford suffers from multiple major psychiatric disorders that have had a significant impact on his level of distress and ability to function in important areas of his life.

It is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Terry Pitchford suffers from an Anxiety Disorder, Not Otherwise Specified with many of the above noted symptoms seen in persons with Post-traumatic Stress Disorder. In other words, as a

App.0655

result of the traumas he endured during his childhood and early adolescent years, he has been hyper-vigilant, possibly at times to the point of being paranoid, and then over-reactive to perceived mistreatment.

It is also the opinion of this psychiatrist within a reasonable degree of medical certainty that Terry Pitchford also suffers from an underlying Borderline Personality Disorder, characterized by instability of interpersonal relationships, self-image, and affects, with marked impulsivity. In other words, as a result of his extremely difficult childhood and early adolescence, he has this broad-based instability in important and critical areas of functioning. With this disorder, there is associated self-damaging behavior, including chronic suicidality, which Mr. Pitchford displays. This disorder is among the most severe personality disorders in that it is also associated with transient paranoid ideation, as well as dissociative symptoms.

Clinically significant depression is often associated with each of the above noted psychiatric disorders, and this is the case with Terry Pitchford. It is the opinion of this psychiatrist to a reasonable degree of medical certainty that Terry Pitchford's chronically depressed mood is severe enough to warrant the additional diagnosis of Depressive Disorder, Not Otherwise Specified, and that such severe and chronic depression has had a significant impact on how he views the world, his decision-making capacity, and in turn, his level of distress and ability to function.

It is further the opinion of this psychiatrist within a reasonable degree of medical certainty that although Terry Pitchford's heavy use of and reliance on marijuana began as self-medication for some of his above noted difficulties, it can best be described as Cannabis (marijuana) Abuse. This diagnosis is supported by Mr. Pitchford's reports that he required an

13

increased quantity and an increase in the potency of the drug over time, and his reports that he continued to use the drug despite recognized significant adverse effects.

Some of Mr. Pitchford's reports to this psychiatrist are strongly suggestive of additional cognitive difficulties, especially with regard to being able to quickly comprehend and respond to a new/different situation -- the precise nature and extent of any such problem is best established by the neuropsychological testing which was performed by Dr. Malcolm Spica. To the extent that such difficulties exist, they further complicate the above described clinical picture, especially with regard to Mr. Pitchford's impulsivity and impaired decision-making capacity.

Clearly, the combination of Terry Pitchford's above noted major psychiatric disorders, and how each has potentiated the other has caused him considerable emotional distress and has had a significant impact on his ability to function. He knows that something is seriously wrong with him, but he doesn't understand what it is or know why something is wrong with him. He views himself as extremely vulnerable to harm by others, likely at times to the point of being paranoid, and he is always expecting something horrible to happen to him which causes him to impulsively overreact in an attempt to protect or defend himself against such perceived threats of harm. These mental states and the difficulties that he experiences cause him enormous emotional distress, resulting in chronic and unrelenting depression, associated with episodes of self-harm, and despite his past efforts to self-medicate some of this with marijuana, he continues to suffer from these difficulties, along with the above noted added difficulties associated with his use of marijuana.

It is the opinion of this psychiatrist that armed with an adequate and well documented social history, a qualified mental health professional could have identified and explained Mr.

14

Pitchford's above-described major psychiatric difficulties at the time of his trial. Additionally, this psychiatrist was available to examine him and willing to testify to the opinions set forth in this affidavit at the time of Terry Pitchford's trial.

Finally, it should also be noted that when Terry met with this psychiatrist his reports about what happened at the time of his arrest raise additional concern and questions that might have merited mental health exploration and possibly testimony. More specifically, based on Mr. Pitchford's reports, it appears that he did not adequately understand his Miranda rights which in turn significantly impaired his ability to make the decision to waive those rights. These difficulties described are what one might expect given his above-described psychiatric difficulties. In addition, based on Mr. Pitchford's reports, it appears that he was particularly vulnerable to coercion (or perceived coercion) with regard to statements that he reportedly made to the police, and again, the difficulties that he described are what one might expect given his above described psychiatric difficulties.

Furthermore, given Terry Pitchford's above-described major psychiatric difficulties, it is the opinion of this psychiatrist within a reasonable degree of medical certainty that his decision-making capacity was sufficiently impaired from the time of his arrest through the completion of his trial that his competency to stand trial was at least fluid. The stressors, changes, and new and unfamiliar information presented to Terry during the pre-trial and trial process were novel stimuli which he was unable to process in a rationale manner. In other words, Terry Pitchford's competency to make the rationale decisions required of him before and during trial varied from moment to moment, and should have been a matter of ongoing concern, as it is doubtful that Terry Pitchford remained competent throughout the entirety of the pre-trial and trial proceedings.

15

FURTHER AFFIANT SAYETH NOT.

RICHARD G. DUDLEY, JR., M.D.

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this ____14

day of September, 2011.

State of New York
County of New York

MOHINDER S. GU NOTARY PUBLIC
Notary Public, State of New York
No. 01GU4659357
Qualified in New York County
Commission Expires Nov. 30, 2014

My Commission Expires: _____

16

# RICHARD G. DUDLEY, JR., M.D.

210 WEST 101ST STREET, SUITE 11K, NEW YORK, NEW YORK 10025
212-222-5122

MESSAGE FOR: _____ VAN WILLIAMS _____

_____

_____

SENT BY: _____

DATE: __ 14 NOVEMBER 2011 __ TIME: _____

TOTAL NUMBER OF PAGES INCLUDING THIS PAGE: _____ 3 _____

TELECOPIER TRANSMISSION
TELECOPIER NUMBER (212) 222-5532

App.0660

<u>SUPPLEMENTAL AFFIDAVIT OF RICHARD G. DUDLEY, JR., M.D.</u>

STATE OF NEW YORK
COUNTY OF NEW YORK

  I, Richard G. Dudley, Jr., am a psychiatrist, licensed to practice medicine in the State of New York, and board certified in psychiatry by the American Board of Psychiatry & Neurology.

  I was asked by post-conviction attorneys for Terry Pitchford to perform a psychiatric evaluation of him in connection with his application for post-conviction relief. I did perform that evaluation, and I previously submitted an affidavit dated 14 September 2011 which summarized and explained my conclusions. In that affidavit I opined that Mr. Pitchford suffers from an Anxiety Disorder Not Otherwise Specified with many of the symptoms seen in persons with Post-traumatic Stress Disorder, an underlying Borderline Personality Disorder, a Depressive Disorder Not Otherwise Specified, and Cannabis (marijuana) Abuse, and I noted that he also appeared to suffer from cognitive difficulties that were being further explored and would be described by Dr. Malcolm Spica (a neuropsychologist). In addition, I noted that Mr. Pitchford also reported a history of what was variously described as "voices" or "thoughts" that required further evaluation. I noted that I would meet with him again for such further evaluation and then supplement my original affidavit, and this current affidavit is that supplement.

  I performed an additional psychiatric examination of Mr. Pitchford on 18 October 2011. Upon further exploration, Mr. Pitchford reported that since childhood, he has heard a male voice as clearly as he hears this psychiatrist's voice. For a long time he thought the voice was a spirit, because when he would tell his mother about it she would tell him to pray or to read the bible. Then when he was a little older, he spoke to his god-father about it. His god-father told him that it was all in his head, which at the time seemed to make sense since he never saw anyone there when he heard the voice, and that is when he started hitting his head when he heard the voice, in an effort to get the voice out of his head. However, neither praying, reading the bible or hitting his head ever stopped the voice.

  Mr. Pitchford reported that the voice is usually negative – for example, when he wanted to do something, the voice would call him stupid and tell him to do something else, or the voice would tell him to hurt himself or say that he was better off dead, or it would say other negative things about him or someone else, or it would push him to fight, despite the fact that he doesn't even like to argue. However, occasionally (albeit rarely) the voice is positive – i.e., the voice has helped him to do things that he would otherwise be unable to do such as write poetry or socialize with females. Mr. Pitchford reported that sometimes the voice is more constant/more nagging than at other times, such more constant/nagging times have been when he is most likely to respond/do what the voice is telling him to do, and when he finally gives into the voice, it goes away. Mr. Pitchford reported that he is always nervous and sad, but then when he is pressured by the voice he becomes really afraid, and then as the voice takes over, he doesn't really feel anything anymore, except for those rare occasions when the voice is more positive or "uplifting".

1

Mr. Pitchford reported that although smoking marijuana never made the voice go away, the marijuana made it so he didn't care so much about what the voice was saying; therefore, with marijuana, he was less likely to respond to the voice, and in time, he just came to accept the voice. Mr. Pitchford noted that it has only been since his incarceration that he has discovered that he can actually "outlast" the voice. He explained that after he was arrested the voice was really trying to get him to kill himself; he was trying hard to fight that; and then he discovered that if he held out long enough the voice finally stopped or at least got weaker again/more easy to control. He noted that discovery has made a big difference for him in that it has allowed him much more control over his behavior. He noted however that it must still be apparent when he is having such problems because one or two of the guys that know him well will at times ask him if he is okay.

Given this much clearer understanding of what Mr. Pitchford is describing, the history and course of the symptoms, and the associated symptoms, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Pitchford has also been experiencing auditory hallucinations. Mr. Pitchford is not suffering from an additional psychiatric illness but the auditory hallucinations represent another symptom which is consistent with the other previously diagnosed disorders. It is also the opinion of this psychiatrist that his auditory hallucinations are an indication of the severity of his other, previously diagnosed psychiatric disorders that resulted at least in part from his very difficult and often traumatic childhood.

The addition of auditory hallucinations to Mr. Pitchford's other previously described symptoms make the severity of the distress and dysfunction caused by his psychiatric disorders easier to understand and appreciate. For example, the previously described anxiety and fear, at times to the level of paranoia, along with the depression, impulsivity, etc. made it extremely difficult for Mr. Pitchford to consistently trust and cooperate with his trial attorney. He further noted there were times when he was meeting with his trial attorney when the voice would be saying "full of shit", at which point he would withdraw/become quiet.

Finally, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Pitchford's auditory hallucinations could have been identified and their impact/significance could have been appreciated at the time of his trial, and this certainly should have been a critical piece of any mental health testimony given at his trial.

FURTHER AFFIANT SAYETH NOT.

RICHARD G. DUDLEY, JR., M.D.

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this 14 day of November, 2011.

State of New York
County of New York

NOTARY PUBLIC

My Commission Expires: _____

MOHINDER S. GULATI
Notary Public, State of New York
No. 01GU4659357
Qualified in New York County
Commission Expires Nov. 30, 2014

2

App.0662