UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

TERRY PITCHFORD,
PLAINTIFF,

NO. 4:18-CV-00002-MPM

v.

CAPITAL HABEAS CORPUS

BURL CAIN, COMMISSIONER,
MISSISSIPPI DEP'T OF CORRECTIONS, AND
LYNN FITCH, ATTORNEY GENERAL OF THE STATE
OF MISSISSIPPI,
DEFENDANT.

*************************************************

DEPOSITION OF DOUGLAS EVANS

*************************************************

HELD AT THE LAW OFFICES OF WATKINS & EAGER, PLLC
400 EAST CAPITOL STREET
JACKSON, MISSISSIPPI

MARCH 23, 2022,
BEGINNING AT APPROXIMATELY 9:35 A.M.

APPEARANCES NOTED HEREIN

REPORTED BY:

EMM, INC. REPORTING
ELISA M. McKINION, BCR, CCR #1670
POST OFFICE BOX 1439
BRANDON, MISSISSIPPI 39043
EMMREPORTING@GMAIL.COM

APPEARANCES:

JOSEPH PERKOVICH, ESQUIRE
PHILLIPS BLACK, INC.
POST OFFICE BOX 4544
NEW YORK, NEW YORK 10163
J.PERKOVICH@PHILLIPSBLACK.ORG
J.WELLING@PHILLIPSBLACK.ORG
888.532.0897

JOSEPH C. WELLING, ESQUIRE
PHILLIPS BLACK, INC.
100 NORTH TUCKER, SUITE 750
ST. LOUIS, MISSOURI 63101
J.WELLING@PHILLIPSBLACK.ORG
314.629.2492

JENNY W.L. OSBORNE, ESQUIRE (VIA ZOOM)
PHILLIPS BLACK, INC.
1901 S 9th St Ste 510
PHILADELPHIA, PENNSYLVANIA 19148-2391
J.OSBORNE@PHILLIPSBLACK.ORG
888.532.0987

J. SCOTT GILBERT, ESQUIRE
SYDNEY LAMPTON, ESQUIRE
WATKINS & EAGER, PLLC
POST OFFICE BOX 650
JACKSON, MISSISSIPPI 39205
SGILBERT@WATKINSEAGER.COM
SLAMPTON@WATKINSEAGER.COM
601.965.1900

COUNSEL FOR THE PLAINTIFF

CANDICE L. RUCKER, ESQUIRE
ALLISON K. HARTMAN, ESQUIRE
GERALD KUCIA, ESQUIRE
OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
DEPUTY DIRECTOR
POST OFFICE BOX 220
JACKSON, MISSISSIPPI 39205
CANDICE.RUCKER@AGO.MS.GOV
ALLISON.HARTMAN@AGO.MS.GOV
GERALD.KUCIA@AGO.MS.GOV
601.359.3871

COUNSEL FOR THE DEFENDANT

**APPEARANCES:** (Continued)

ALSO PRESENT:

KELLY LEBLANC, PARALEGAL
WATKINS & EAGER

CHAZZ NAPPER, INTERN
WATKINS & EAGER

I N D E X

Style and Appearances...................... 1-3
Index...................................... 4
Exhibits.................................. 5-6
Examination by:
Mr. Perkovich.......................... 7
Certificate of Reporter.................... 289

The formality of READING AND SIGNING is specifically WAIVED.

E X H I B I T S

Exhibit 1............................... 13
Exhibit 2............................... 48
Exhibit 3............................... 50
Exhibit 4............................... 54
Exhibit 5............................... 57
Exhibit 6............................... 62
Exhibit 7............................... 69
Exhibit 8............................... 73
Exhibit 9............................... 82
Exhibit 10.............................. 83
Exhibit 11.............................. 85
Exhibit 12.............................. 85
Exhibit 13.............................. 86
Exhibit 14.............................. 87
Exhibit 15.............................. 89
Exhibit 16.............................. 93
Exhibit 17.............................. 94
Exhibit 18.............................. 99
Exhibit 19.............................. 104
Exhibit 20.............................. 111
Exhibit 21.............................. 114
Exhibit 22.............................. 120
Exhibit 23.............................. 130
Exhibit 24.............................. 135

E X H I B I T S

Exhibit 25............................. 144
Exhibit 26............................. 145
Exhibit 27............................. 146
Exhibit 28............................. 150
Exhibit 29............................. 161
Exhibit 30............................. 168
Exhibit 31............................. 183

DOUGLAS EVANS,

having first been duly sworn, was examined and testified, as follows:

EXAMINATION

BY MR. PERKOVICH:

**Q.** State your name for the record, please.

**A.** Charles Douglas Evans is my full name. I go by Doug Evans.

**Q.** Thank you. Good morning, Mr. Evans.

**A.** How you doing?

**Q.** Fine, thanks.

Some preliminaries before we get started. We're here today in the federal habeas corpus case of Pitchford versus Cain, et al., and this is an action emanating from a prosecution from your office, conviction and sentence entered in 2006. For the Petitioner's side, myself, Joseph, Perkovich, Joe Welling is here, Scott Gilbert, and then by video, our co-counsel, Jenny Osborne. This is a Zoom video interface to permit her to attend. We're also recording by video. We have the stenographer to your left, Elisa McKinion, who's obviously transcribing the proceedings today. For the

State, we have Candice Rucker, Allison Hartman, Chazz Napper -- this is like a quiz since I've just met two of these people -- and -- and --

**A.** You're doing good.

**Q.** Thank you, sir.

**MR. PERKOVICH:** And was it Mr. Shu?

**MR. KUCIA:** Gerald Kucia.

**MR. PERKOVICH:** Kucia. Sorry. I -- well, 80 percent.

BY MR. PERKOVICH:

**Q.** And, also --

**MR. GILBERT:** This is Sydney, one of my associates.

**MR. PERKOVICH:** Very good.

BY MR. PERKOVICH:

**Q.** So it's a full house today. In addition, I believe, while we're going to conduct this investigation, Kelly LeBlanc from Watson [sic] & Eager is anticipated to be here for some of that. Just want to have everything stated on the record. You understand?

**A.** I understand.

**Q.** This is a civil proceeding, of course, as it is habeas corpus. It's an action that we commenced in 2018. We have been in the

discovery process in this litigation for several years now or a few years now, and I believe that you provided a declaration in connection with the effort to obtain materials from your office and -- via your office from the Grenada County Sheriff's Office during these -- this discovery process.

Before we filed our petition, I believe with my investigator Robert Tressel, we met in your office and were given access to a file and other materials. We will touch on some of that history here. We will try to minimize rehashing things unnecessarily because we could spend weeks and weeks discu- -- in the discovery process. We're trying to be efficient here but also complete, so that's a -- a balance we'll try to strike.

So to begin with, I -- I'd like to just get your background and your current position.

**A.** How far back do you want to go?

**Q.** Well, we don't have to go too far back. Why don't we talk about your current position and how long you've held it.

**A.** Okay. I've been district attorney for

the last 30 years for the Fifth Circuit Court District. We have seven counties in that district.

**Q.** And so you took that position --

**A.** In '92.

**Q.** -- precisely -- 1992. Okay.

**A.** (Nods head affirmatively.)

**Q.** And before that?

**A.** Before that, I was in private practice in Grenada, and I was a justice court judge there. And before that, I was the assistant DA for a year. And then before that, I was a detective in law enforcement in Grenada.

**Q.** And so you were a detective, and did you attend law school after that and then --

**A.** Yes.

**Q.** -- become an assistant DA?

**A.** Yes.

**Q.** And then you were in private practice?

**A.** Yes.

**Q.** How many years were you in law enforcement before law school?

**A.** About nine.

**Q.** All right. And can you sketch the career path while you were in law enforcement.

**A.** I started out as a deputy sheriff. I -- well, I had a bachelor's degree in criminal justice. I started out as a deputy sheriff, worked there for a while. Then I went to Grenada Police Department, rose to the rank of detective, and I was actually handling most of the criminal investigations at that point when I decided to go to law school.

**Q.** All right. And then after law school, you were an assistant district attorney?

**A.** I was assistant district attorney in the same district for a year. Then I went in private practice. After I'd been in private practice for a few year, I ran for Justice Court judge in Grenada and got elected. So I was doing that plus my private practice.

**Q.** I see.

And how -- how long were you a Justice Court judge?

**A.** Three and a half years, approximately that, because as -- when I qualified to run for district attorney, I had to resign as Justice Court judge.

**Q.** Uh-huh (affirmative). And there's a qualification process for that? Did you say you

qualified?

**A.** Well, you have to run for office.

**Q.** Okay. I see.

And so that campaign was in 1991. You were elected for a term in 1992; is that --

**A.** Correct.

**Q.** Okay.

**A.** The term started January of '92.

**Q.** Okay. So you've just celebrated your 30th anniversary in that position?

**A.** Yes.

**Q.** How many reelections has that entailed?

**A.** Oh, gosh. Every four --

**Q.** We can --

**A.** -- years.

**Q.** -- divide it by something. Right. Okay. Very good.

So I want to also just touch on ground rules of this type of examination. Have you been deposed before in a civil proceeding?

**A.** Yes, I have.

**Q.** And -- and what matter was that?

**A.** That was over a rental house.

**Q.** Okay. Was that in federal or state

court?

**A.** State court.

**Q.** All right. Have you been deposed in a federal matter before?

**A.** No.

**Q.** So the overarching rule here is Federal Rules of Civil Procedure 30, and the State may object to form or for whatever other reason to a question I pose. That objection's in the record, but you're to answer the question to the best of your ability.

**A.** (Nods head affirmatively.)

**Q.** And so in that regard, there's no referee function for a judge here, obviously.

**MR. PERKOVICH:** So what I'd like to do is mark as the first exhibit the declaration that you submitted -- or, rather, the State submitted from you on March 4th of 2020. That is, I think, your one engagement in the case to date, and this goes back a couple of years, of course, and about a year into this whole discovery effort.

(Off the record.)

(Exhibit No. 1 was marked for

identification.)

**MR. KUCIA:** Let me see it first.

(Off the record.)

**MR. PERKOVICH:** Yeah, if we could just proceed as we've done in the normal course, which is --

**MR. KUCIA:** Okay.

**MR. PERKOVICH:** -- I'm going to mark the exhibit. You'll get a copy.

**MR. KUCIA:** Thank you.

**A.** (Witness reviewing document.) Yeah. Okay.

BY MR. PERKOVICH:

**Q.** So you're familiar with this document?

**A.** Yes.

**Q.** And, you know, just sort of jumping into the middle of the discussion, and I will back up, and -- and I want to get a sense of what you've done in preparation for today, and we'll try and situate your testimony with the benefit of the record that we have here. I recognize that we're talking about work that started in late 2004, ran through 2005, concluded in early 2006. Been many cases since then --

**A.** Yes.

**Q.** -- and we understand that to be precise at this juncture is a challenging exercise, so we want to do everything in our power to position you to have the fullest and most complete and most accurate recollection in response to the questions that I'll pose.

So in that vein, first, when we contact- -- or when the -- counsel for Respondents contacted you in relation to the discovery process, what do you recall and when do you recall your office or you individually receiving communication from counsel for the State?

**A.** When I have no idea.

**Q.** Uh-huh (affirmative). Do you have correspondence with the attorneys for the attorney general's office in relation to this matter?

**A.** Not that I'm aware of. I think the only times we've talked has been on the phone.

**Q.** And would associates in your office or assistant district attorneys have communications with Respondents in that vein?

**A.** Not that I know of.

**Q.** But if we were to request that material, that would not be difficult for your office to supply?

**A.** Well, we don't keep a record of our phone calls.

**Q.** No. To be clear, I'm talking about e-mail correspondence or other transactions of that kind.

**A.** Yeah. That should be easy to check on, but I'm not aware of any.

**Q.** And so at the time of this affidavit, what do you recall the steps being in preparing this affidavit for the filing that the State made in March of 2020?

**A.** All I remember is I had some questions, I think, that some of y'all were asking that I tried to answer.

**Q.** And did you have assistance in preparing the affidavit?

**A.** No.

**Q.** So you spoke with, perhaps, an attorney in this room on the phone or a predecessor --

**A.** Yeah, I don't remember --

**Q.** -- attorney?

**A.** -- who it was, and I don't know if it was your office or someone else, but somebody had asked that I answer some of these questions, so I did.

**Q.** Okay. So you don't recall whether it was Mr. Pitchford's counsel, namely me or my colleagues, versus attorneys for the attorney general's office?

**A.** I don't think it was the attorney general's office, but I can't say for sure. I think it was somebody on Pitchford's behalf. Most of the folks during that time that I had any contact with were either investigators or attorneys, I think, that were representing Pitchford and were wanting to see different items and ask different questions.

**Q.** I'll try and help you orient to the timeline. We filed a petition for Mr. Pitchford in the fall of 2018. Leading up to that, as I mentioned earlier, I had the benefit of meeting you in your office with my investigator, Mr. Tressel -- that's T-R-E-S-S-E-L -- in pursuit of an open file review.

In connection with that, there was coordination or at least the attempt to

coordinate with the Grenada County Sheriff's Office with respect to their file. Since, there has been a fair amount of uncertainty as to the completeness of the productions from the sheriff's office, from the district attorney's office, and that is really the crux of this discovery effort that has culminated with a series of depositions in- -- including yours today.

**A.** If -- if I can add to that, that is part of why we did what we did with the file, because we furnished everything that we had in discovery to the defense. We furnished everything that we did to two or three other folks that were wanting it. So finally, so there would be no question of whether we furnished everything or not, we just got the AG's office to come pick up our whole file.

**Q.** Uh-huh (affirmative).

**A.** So we don't even have a file anymore.

**Q.** You mentioned two or three other folks. Can you elaborate?

**A.** Folks that were representing Pitchford. I -- I can't tell you who.

**Q.** Okay.

**A.** It was people that were accusing us of not discovering everything, not giving everything, so we just gave the whole file to the AG's office, said, If we have it, it's here.

**Q.** Uh-huh (affirmative). So -- and to be clear, Exhibit 1 is attached to a filing by Respondents by the attorney general's office, and that was provided at their behest, not Petitioner's behest, so --

**A.** I can't remember who asked for it.

**Q.** And to place us on the timeline, your affidavit here is about two year -- or a year and a half after what we were just discussing in terms of the fall of 2018. And, again, with something that was provided in the midst of this overall discovery process that's about three years now in progress.

The year of 2019 where this discovery process started in earnest after our petition was filed, as you alluded to, there have been repeated requests for the production of information, the proverbial files, the district attorney's file, which, to some degree, is a product of the sheriff's office's provision of its material, and I submit that in connection

with the deposition testimony of officers and the sheriff himself of the Grenada County Sheriff's Office.

**A.** And I don't know if there's a question in that, but let me explain how we get our file.

**Q.** We were getting there, but please explain.

**A.** Our office has approximately, oh, I don't know, 20-something different agencies that we prosecute for. They investigate the cases, they work up their files, and they turn them over to us for us to present them to the grand jury. One thing that's probably hard for a big law firm like this to understand is some of our agencies have two or three officers that work there. Some of them have one person that does all the investigative work. We may get a file on a murder case that's four pages long, and that may be all we get. A lot of times, we may ask them if they have other things. If they do, they'll supplement them to the file. But our policy is always that everything that we have in our file we give to the defense attorneys. May not be much there. A lot of times, defense attorneys through their clients come up with as

much stuff as we do. Of course, we don't ever get that, but it's hard to get complete files in a small district. We have to beg for them, and when we get them, we get everything we can.

**Q.** So when you say complete files, you're referring to -- in this case, this was a -- a Grenada County Sheriff's Office case. It wasn't within the -- the -- the crime itself did not occur within the city bounds. It was not a Grenada Police Department --

**A.** Correct. It was --

**Q.** -- jurisdiction.

**A.** -- the sheriff's department.

**Q.** So we're talking about the sheriff's office, which, of course, is, you know, a short walk from your office in Grenada, if I'm not mistaken --

**A.** Uh-huh (affirmative). Sure.

**Q.** -- and -- and at the time was that.

And you referred a moment ago to defense counsel in cases often coming up with more material than --

**A.** From their clients --

**Q.** Yeah, from their --

**A.** -- because the clients know what

happened at the scene.

**Q.** Well, we're talking about perhaps different things when we talk about material. When it comes to information, indeed, a defendant may have a greater range of information than law enforcement. What we're trying to focus on today largely is the materials collected in the form of interviews, custodial interviews, evidence, the handling of evidence, testing of evidence, and the provision of that material to the prosecutorial function.

**A.** And -- and everything that they send to us we put in a file, we give it to the defense, and we use it at court. And everything that was in that file has been furnished to the defense attorneys, to everybody that's asked for them.

**Q.** So in full disclosure, one of the challenges that we're facing in this process is that there are differing accounts as to who's been provided what, who possesses what, who has possessed what at different times along the process, certainly during the context of this litigation, the federal litigation we're here today on, and predating that.

And so this discovery pursuit overall is to try and surmise from the best recollections of the various witnesses and the documents that have been produced courtesy of the Respondents' counsel the actual fact of the matter.

This is an extraordinary proceeding in the sense that civil discovery in federal habeas corpus is unusual, and that's a function of some of the large gaps that we are struggling to get to the bottom of. So we understand the -- the position you've expressed a couple times this morning that the provision of -- of materials has been complete to date. The record in these proceedings also re- -- reflects repeated efforts and repeated assurances of completeness that have been topped up with further information, further materials.

So not to belabor that, but we will get into some of those details in a moment. What I'd like to do for the sake of orientation also is -- is to get more background in terms of your preparation for today in terms of receiving the subpoena and communications and discussions you've had in connection with the subpoena for

your appearance and testimony today.

**A.** My preparation for today is driving down here. I don't even have a file to review.

**Q.** I had the impression that a file was provided to you at your request.

**A.** No. I have not seen the file since it went to the AG's office.

**MR. PERKOVICH:** I -- I had the understanding that he had requested the file. Was that a misunderstanding of mine?

**MS. RUCKER:** He requested that from us, but we did not provide it.

**MR. PERKOVICH:** Oh, you didn't provide it?

**MS. RUCKER:** Right.

**MR. PERKOVICH:** Okay. And we can take a -- a -- a timeline of that -- the determination of that, but I trust that you have your file in terms of chronology of -- of sequences?

**MS. RUCKER:** Uh-huh (affirmative).

**MR. PERKOVICH:** Very good.

**A.** But it shouldn't be any problem because if there's anything in the file you want to ask me about, I'll do my best to answer it.

BY MR. PERKOVICH:

**Q.** Well, and I'll refer to our filings in this case and specifically a declaration by Robert Tressel, who I mentioned earlier is an investigator fro the district attorney's office of Cobb County, Georgia, formally and accompanied me in the visit in your office in, I believe, August or September 2018.

At that time, we were provided a Redweld file according to Mr. Tressel's declaration with 371 Bates-marked pages. Immediately subsequent to the view- -- viewing of that material and a recording also, a cassette recording, of one custodial statement of Mr. Pitchford, we requested -- I believe it was Assistant District Attorney Hopper whom I spoke with or left messages repeatedly aff- -- re- -- reaffirming my request orally to him on the day of our viewing a copy of the 371 pages.

Subsequently, we received production from predecessor counsel at the attorney general's office -- she's no longer with the office -- Ms. Benton, of less than 200 pages of Bates numbered that seemed to comport with what we were permitted to view but was not complete.

And, again, that's reflected in the contemporaneous declaration of -- or affidavit of Mr. Tressel that is part of our filings in this litigation. So there's an open question as to, you know, where that file is and its contours, and -- and I'm only referring to the Redweld that we were permitted to see in your office.

Beyond that, we've received additional productions serially in the course of 2019 and beyond. And, again, we're not here to go over all those documents, but we are trying to get a -- our bearings, if you will, with respect to your preparation for today. And so given that you have not been able to review material in this case, I'm glad that we have a copy of the trial transcript.

**A.** Uh-huh (affirmative).

**Q.** And in addition to that, we have a portion of the appellate report in the State Supreme Court that concerns the juror questionnaires. That's a topic that we will get to relatively shortly. The two binders to your right comprise those materials, and we will be able to make use of them more specifically as it

is appropriate.

So for the sake of reorienting before we get into some of the ins and outs and particulars in this case involving multiple defendants, as you probably recall, beyond Mr. Pitchford, I'd like you to take a look at the transcript, that binder closest to you. And so the record there of course, includes the table of contents for the proceedings, and that's lowercase iii through ix.

**MS. RUCKER:** Joe, and just for clarify of the record, you're talking about the trial transcript?

**MR. PERKOVICH:** Yes.

**MS. RUCKER:** Thank you.

**MR. PERKOVICH:** The trial transcript.

BY MR. PERKOVICH:

**Q.** So if you could just take a moment to scan pages iii through ix, and hopefully this will refresh your recollection of these proceedings in 2006. And I'll call your attention to some specific things in a moment.

**A.** (Witness reviewing document.) Okay. Do you want me to read those pages?

**Q.** Just take a moment to review them.

Yeah. Again, obviously, this lists the witnesses involved. Hopefully that will help you refresh some of your recall, and I will follow up on that in a moment.

**A.** And you're referring to just when they pulled the special venire?

**Q.** Well, no.

**A.** That's what I'm looking at as far as pages 3, 4, and that --

**Q.** Sure. And then beyond that, 4 through 9 and 11 -- all the way to 11 concern the witnesses who testified and were examined by you or Mr. Hill or the one witness the defendant called in the liability phase.

Again, I just -- my hope is that by reviewing the totality of this through the table of contents, you'll see the names that will have some familiarity. And we'll return to specific questions about several of these witnesses, and, obviously, as you mention, the selection of the jury will be addressed, too.

So the State's witnesses, of course, include a number of individuals who you examined directly.

**A.** All right. I'm not even on testimony.

I'm still on jury questionnaires and voir dire. Am I at the wrong place here?

**Q.** No. You know what, I will stop talking and give you undistracted time to review the index because that is very much what I'd like you to --

**A.** But I am at --

**Q.** Take your time --

**A.** -- the right area you want me to look at?

**Q.** You're right where you should be. Just page through the table of contents.

**A.** All right. Now, this isn't table of contents. I thought you said start reading at page 3.

**Q.** I said page lower case iii.

**A.** Okay. I'm not at that part. I'm on page 3.

**Q.** Okay. Right. The Roman numerals, I think, threw us. So, again, the table of contents is really -- we -- we would be here for probably a week for you to thoroughly review this binder --

**A.** I can imagine.

**Q.** -- but we're certainly not asking that

much of your time today.

**A.** (Witness reviewing document.) Okay. I'm down to the motions. Is that as far -- is that where you wanted me to go to?

**Q.** So are you on page iii?

**A.** No, I'm on page ix now.

**Q.** ix? Okay. I'm sorry.

So the -- right. The -- you're referring to the motion exhibits?

**A.** Yes.

**Q.** And then the trial exhibits are at the bottom of that page?

**A.** Yes.

**Q.** Very good. Thank you for taking the time to review this. And as you can see from the table of contents, the first date in this trial record is January 9, 2006. Mr. Pitchford was apparently advised of his court date on that date. On January 19, ten days later, there was an unfinished guilty plea, so there's several pages devoted to that proceeding, motion hearing on February 2nd. There's a motion to suppress that was adjudicated in that event and then, of course, jury selection on February 6th. And as reflected later in the record, Mr. Pitchford was

convicted, and then there was a pen- -- penalty phase on February 9th where he was sentenced to death.

In reviewing the table of contents and, obviously, identifying the State's witnesses and the defendant's witness in the liability phase, does this help you recall the proceedings and your role in the prosecution in 2006?

**A.** I remember the general trial and the general facts of the case.

**Q.** All right. And so the specific facts begin with a -- a homicide, a murder of the storekeeper, Rueben Britt, at the Crossroads store, on November 7th, 2004. And much of the discovery process has concerned law enforcement personnel involved directly in the investigation of that crime and the interrogations and interviews of subjects and witnesses, also the involvement of the Mississippi Crime Lab.

What do you recall about learning of this homicide investigation?

**A.** In this particular case, I don't know if it was the next day or a couple of days later that I finally got a call that we had had a

murder in Grenada because that's where I live. A lot of times, they call me at the time that they have one, and I like to go to the scene just so I can personally see what happened because it's easier to explain to a jury if you've actually seen it.

This case, I did not get a call. By time I had gotten a call, I was in- -- I think at that point, I was informed that there had been a murder. They had called the crime scene unit in, and I think they already had Terry Pitchford in custody and had a weapon recovered out of his car. I think that's about the point that I got involved.

**Q.** And so you received this call, and do you recall being provided other information than what you've just --

**A.** At that point, no.

**Q.** All right. And who made that call?

**A.** I don't remember. I don't remember if it was the sheriff, Greg Conley, or -- it was somebody from the sheriff's department.

**Q.** All right. And --

**A.** May have even been a dispatcher. I'm not sure.

**Q.** -- so when you were alerted to this developing case, what was the next step for -- for you and --

**A.** At that point, wasn't anything I could do because they had already done their phases, so I was just waiting to get a report from them.

**Q.** And -- and so what kind of report came to you next?

**A.** Nothing for a pretty good while.

**Q.** And -- and that brings a chuckle. What are your thoughts about that?

**A.** Well, I mean, that's not unusual. These small departments, it takes a while to get them to -- to do their reports and get them to us. You know, they may be busy taking statements. They may be busy taking stuff to the crime lab. Probably the last thing on their mind is getting us anything. They're more interested in just working their case.

**Q.** And on this case, at trial, Clyde Hill is the second chair for the record, and we had the benefit of examining him yesterday. William Phillips appeared from your office at -- early in this trial. Do you recall other assistants helping on the case?

**A.** Of course, we've got a small office, but, you know, at different times on a major case, everybody may be in and out on different parts. It's -- it's hard to tell. As far as actually working the case, me and Clyde would have been the two ones that were primarily handling everything.

**Q.** And as you probably noticed from the table of contents of the trial transcript, Robert Jennings was examined by you.

**A.** Rob -- Robert was an investigator that worked for the district attorney's office.

**Q.** And what do you recall of his role in the investigation of this case?

**A.** I don't know who called. Robert was a expert polygraph examiner, and he had a long career in law enforcement. I think before he came to work for me, he had retired from the Greenville Police Department as assistant chief. He had been an investigator. I don't know if before -- during that time that he was there, I think, is when he got his polygraph training, and right before I hired him, he was running the drug task force out of Starkville, which that task force went into some of my counties. So I

knew him pretty well. Either Greg or someone from the sheriff's department requested that he run a polygraph on Terry Pitchford, so he went to see if he could assist them.

**Q.** And do you understand when that request was made?

**A.** I think the day he was arrested or the day after he was arrested.

**Q.** And to situate this on the calendar, the homicide took place on a Sunday morning. And we can get into the records, but your recollection about the polygraph element of the --

**A.** It was fairly soon after --

**Q.** Okay.

**A.** -- the arrest. I'm not sure how soon.

**Q.** Would -- so would -- is -- is it conceivable that Mr. Jennings would have been contacted by the sheriff's office before you were given word of the homicide?

**A.** That, I can't answer. I would say probably not, but it's no -- wouldn't be unusual because he worked closely with all the agencies, and they knew all they had to do if they needed his help was give him a call.

**Q.** And you referred to Mr. Jennings' interviewing of Mr. Pitchford. The record doesn't reflect a polygraph being taken of Mr. Pitchford.

**A.** I don't know whether he gave him one or not.

**Q.** Right.

**A.** A lot of times, with a good polygraph examiner, they have to be good examiners, period. They have to be good at interviewing to be good polygraph examiners, and I would say at least half of the times that you have someone set up for a polygraph, in the initial discussion, they end up admitting what they have done, which I understand he did in this case.

**Q.** There were multiple statements given to -- or there were statements transcribed or recorded and rendered to type -- over a span of several hours culminating in a fourth and fifth statement from Mr. Pitchford. Mr. Jennings was involved at that juncture --

**A.** Uh-huh (affirmative).

**Q.** -- after Investigator Greg Conley had interviewed him repeatedly.

**A.** And that's pretty normal.

**Q.** So you're correct, a -- a polygraph was not undertaken.

And you're referring to the interviewing process in anticipation of a potential polygraph conducted by Mr. Jennings and that there is a recording of that statement. We received an audio recording of some of that communication between Jennings and Pitchford.

In the ordinary course, when a statement's given and it's provided to your office from the sheriff's office of Grenada, what do you receive from the sheriff's office?

**A.** It depends on what they did.

**Q.** Uh-huh (affirmative).

**A.** We always asked them to give us anything and everything that they have. If it's notes from a statement, if it's an oral statement, if it's typed, if it's videoed, we ask them to give us everything that they've got, and we'd have to hope that we got everything. Most of the time, I think we do. They are pretty good at giving us discovery.

**Q.** And so with a statement that's transcribed or rendered to just typed pages, the underlying recording that's transcribed,

ordinarily, would that be supplied with the typed transcription?

**A.** Usually.

**Q.** And --

**A.** And I know in this case, there were a pretty good many little, small taped statements.

**Q.** And so what do you recall about those small taped statements?

**A.** They're still in the box with our file, the ones that we got.

**Q.** And has that file -- and this is the file you're referring to that had been turned over entirely to the attorney general's office?

**A.** Yes. And it was turned over entirely to the defense before that.

**Q.** Okay. So you're clear that you would not -- your office or anybody in your office would not possess any recordings at this point -- at this date?

**A.** No. And we furnish -- I mean, it's not just policy; it's just the way we operate. We furnish everything that's in our file when we receive discovery requests. We have nothing that was not furnished in discovery.

**Q.** Okay. With respect to the interview

process that Mr. Jennings would conduct in anticipation of or in conducting a polygraph, you referred earlier to his interviewing acumen and the -- the high percentage of cases that lead to a confession of some sort that obviates conducting a polygraph. Is that fair to say?

**A.** That's the way I understand it.

**Q.** And so in Mr. Jennings conducting these investigations and interviews, the interview before the polygraph is something that is typically highly important to --

**A.** It -- it depends. I -- of course, I don't sit in on them. I -- I can't. But the way I understand it and what he had explained to me plenty of times in how he conducts them, that premeeting may be nothing more than introducing everybody. It kind of depends on what they want to go into. If he starts introducing them, telling them that he's fixing to hook them up to the machine, and they start just admitting what they've done, he's going to sit there and listen to it. If they do -- you know, it -- it all depends on the interaction with the person that's being polygraphed.

**Q.** So in a situation where there is a

substantive exchange before the polygraph process properly is carried out, Mr. Jennings would me memorialize that, record that in some fashion especially if it were --

**A.** I would say it would probably depend on what the intent of that was. If it was just for the purpose of interviewing -- I mean, of introducing everybody, they may or may not. I can't answer --

**Q.** And that's --

**A.** -- that.

**Q.** -- why I sort of used substantive in there, to --

**A.** Yeah.

**Q.** -- make that distinction.

So in a --

**A.** Yeah.

**Q.** -- situation where there's -- there's a substantive discussion about the case and a subject who may be subjected to a polygraph is discussing substantively the case, Mr. Jennings would capture that information especially if it were to obviate the polygraph, correct?

**A.** I would say that he should. Now, whether he did or every occasion, I -- that, I

can't answer. But, you know, part of that initial -- you can say, interview, discussion, or whatever, but part of that is making sure that the defendant or -- it doesn't have to be a defendant -- whoever's being polygraphed understands what's taking place, that they understand that they're fixing to be asked to take a polygraph, how the polygraph would be administered, what they would be hooked up to, what it would monitor, and making sure they understood and agreed to take one. So just that part can take a while.

**Q.** And -- and, again, as you said, and -- and, frankly, is in some sense common knowledge with regard to this kind of undertaking, often subjects or -- or witnesses render a polygraph unnecessary --

**A.** Correct.

**Q.** -- because of a statement they offer to an investigator like Mr. Jennings?

**A.** Yes.

**Q.** And in Mr. Jennings' own experience and track record repeatedly to him, some polygraphs are not even done --

**A.** Right.

**Q.** -- is that correct?

And -- and so in a situation where a polygraph is done, what is -- what -- what's the protocol or was the protocol at this time with Mr. Jennings in terms of capturing the content of the polygraph? And -- and I -- I mean not only sort of the polygraph reading, the graphic representation of the polygraph, but the question and answer and responses.

**A.** It -- during that time, I think, to the best of my memory, he was just using a cassette recorder and getting a taped --

**Q.** Uh-huh (affirmative).

**A.** -- copy of what was being done. Some of our departments and places now have the ability for us to have them videotape them, but at that point, I can't remember that we had any -- any of -- places that we could videotape.

**Q.** And given that you have seven counties that you're responsible for, I imagine Mr. Jennings' sort of physical setting and operation may vary from case to case depending on the jurisdiction.

So with Grenada County in a situation where it's a sheriff's case as opposed to a

Grenada Police Department case, how would and how did, to the best of your recollection, Mr. Jennings conduct his custodial interviews in this case, in the Pitchford case?

**A.** I don't understand what you mean about how would he.

**Q.** So where was he? You referred to recordings --

**A.** Oh, that, I don't know.

**Q.** Uh-huh (affirmative).

**A.** I don't know if they did it at the sheriff's department, the courthouse, the jail. I have no idea.

**Q.** Because it's not self-evident in some respects in terms of exactly where things are being conducted at different times here.

**A.** And -- and we don't --

**Q.** Would it be unusual for him to go to the sheriff's office?

**A.** I'm sorry. Would --

**Q.** Would it be unusual for him to go to the sheriff's office?

**A.** No. No. Even when it's highway patrol polygraph examiners that do it, it depends on where there's some space available.

**Q.** Right.

**A.** What you want is a quiet place that's not going to have somebody banging on the door and opening the door every two seconds, that they won't be interrupted. It may be a room at the courthouse. It may be a room at the jail. It may be a room at the police department or sheriff's department. It's just wherever they have -- have that ability.

**Q.** In this case -- and -- and, you know, you've had a chance to look at the witnesses who were called, and you're helping us recall your office's engagement by the sheriff's office and their investigation in the early days of the investigation.

You mentioned earlier that there was some sort of gap between the crime itself and you being called --

**A.** Not as much as most cases. Out of the seven counties, just to kind of give you a picture of what we do, we have two terms of court a year in each county. A month before each term of court in each county, we have a grand jury. We are lucky a lot of times if we ever see a file before a week before the grand

jury. So Grenada is one of the ones that is a lot better than some as far as contacting us earlier on in the case.

So in this case, really, we got information on it, I would say, fast.

**Q.** And so after that initial call, we discussed Mr. Jennings becoming involved early. What do you recall occurring next in the sheriff's office work and your office's engagement in the case?

**A.** I don't remember anything until we start putting our file together by what information was coming in.

**Q.** Can you describe that process of putting your file together.

**A.** Well, what we'll do, we'll take everything that comes in from -- like, in this case, from Robert Jennings, from the sheriff's department, from the crime lab. If it's MBI involved, we'll take their file, and we'll put everything in one file so it'll all be in one place.

**Q.** And as this was unfolding and as reflected in the table of contents in terms of various witnesses, do you recall multiple

subjects in the investigation?

**A.** From what I remember, the information that I was given is that there was a planned or attempted robbery before this incident. I think there were three people involved in it. Some business owners and different folks out there scared them off, so they did not rob the store that day. So there's actually two separate crimes involved, one on a different day and then the robbery/murder on the day of the crime.

**Q.** And the -- the determination of two separate crimes as opposed to sort of one crime with a broader timeline, what do you recall about surmising that distinction?

**A.** Well, just that there were people involved on an earlier day that did not go through with the crime.

**Q.** And so that's a -- a legal determination based on the -- what you're getting from the investigation?

**A.** That's what I'm hearing from them.

**Q.** And so reviewing the table of contents, do you recall who some of the actors were in this narrative that you're explaining?

**A.** Not really. I remember Terry

Pitchford was the main one. I couldn't tell you the names of the two that were with him that first day, but I'm sure it's in the -- it's in the file.

**Q.** Okay. You referred to materials and information flowing to your office from the investigation from law enforcement, and we've talked about the -- the crime lab's involvement. There were photographs taken also, and many of these photographs, copies of which were in your office, and I -- I reviewed them at the time, we have duplications of that.

Do you recall -- since you already stated you hadn't been alerted to this homicide when it occurred, you did not go to the crime scene the day of it, do you recall reviewing those photographs?

**A.** I recall viewing them. At what point, that, I don't recall.

**Q.** Did you have cause to go to the -- the scene of the homicide at a later point?

**A.** I don't think I ever went to the scene of this one.

**Q.** And with regard to the handling of that crime scene, are you familiar with the

reporting and documentation relating to that part of the investigation?

**A.** The reporting? What are you referring to?

**Q.** Well, the sheriff's office report making, crime lab report making.

**A.** Yeah, I -- I remember that the sheriff's department was the first that arrived after a person had notified them, and then after they were on the scene, the crime lab was notified, and they came and worked the scene.

**Q.** Do you recall the sequence of events in terms of the crime lab's request to come to the scene?

**A.** No.

**Q.** Okay. I have some documents that are probably things that you were at least previously familiar with that can help us orient to really the initial hours of the investigation.

**MR. PERKOVICH:** So I'd like to mark as Exhibit 2...

(Exhibit No. 2 was marked for identification.)

BY MR. PERKOVICH:

**Q.** Mr. Evans, you have the Grenada County Sheriff's Department Offense Report dated 7 November 2004 in front of you; is that correct?

**A.** Yes.

**Q.** Okay. Please take your time and review details on that first page and -- and the basic narrative.

**MS. RUCKER:** We'll object to questions on this exhibit being outside the scope of discovery. Just a -- a standing objection, if that's all right with everyone.

**A.** (Witness reviewing document.) Did you say just the first page?

**MR. WELLING:** Joe.

BY MR. PERKOVICH:

**Q.** Oh, no, the -- the narrative as well.

**A.** Okay. (Witness reviewing document.) Okay.

**Q.** And does that help refresh your recollection of the outset of the investigation there?

**A.** Well, it -- as far as what they gave me, it does.

**Q.** Okay. What impressions do you have from reviewing that today?

**A.** What do you mean by impressions?

**Q.** Just -- it's an opportunity to -- to share any insight you gather from the initial steps in the investigation.

**A.** This is just -- my impression is this just shows how they were starting their investigation.

**Q.** And so what time were they called to the scene there?

**A.** Let's see. Looks like 7:35.

**Q.** In the morning?

**A.** In the morning.

**Q.** Right. Okay.

**MR. PERKOVICH:** I want to mark as Exhibit 3 a document from the Mississippi Crime Lab.

(Exhibit No. 3 was marked for identification.)

**MS. RUCKER:** Same objection, please.

**MR. PERKOVICH:** This is a -- a continuing objection, correct?

**MS. RUCKER:** To this exhibit, but, yeah.

**MR. PERKOVICH:** Fair enough.

BY MR. PERKOVICH:

**Q.** So if you could, just review this document, and if I could ask you to flip to -- after the thumbnail photos, it's Bates No. 298, and it says, Technical Assistance Section, Notes Page.

**A.** Okay.

**Q.** And the analyst entry near the heading there, do you see that where it says, C. Nethery and D. Zeliff?

**A.** Yes.

**Q.** Are you familiar with those names?

**A.** Yes.

**Q.** And how so?

**A.** They were crime scene analysts that worked out of Batesville.

**Q.** And Ms. Nethery testified at trial, correct?

**A.** I can't remember who testified, but if she -- if -- if you say she did, she did.

**Q.** That's right. She's on the index here reflected as one of the witnesses Mr. Hill examined.

And do you see the initial notification time entry a little bit lower?

**A.** Arrived on Scene: 2040.

**Q.** And above that, so the first line below analyst names, it says, Initial Notification, and it says, Time.

**A.** 1800.

**Q.** So that would be 6 p.m.?

**A.** Correct.

**Q.** And the Notified by, the name is Adam Eubanks. Do you see that?

**A.** Correct. He was a deputy at the Grenada Sheriff's Department at that time.

**Q.** So as you mentioned earlier, the initial report from the sheriff's office that we looked at as Exhibit 2 reflects that dispatch communicated to the sheriff's office the occurrence, and they arrived at the scene before 8 a.m. As you noted, the crime lab individuals, the agents for the Technical Assistance Section, arrived on the scene at 8:40 p.m. and had been called by the sheriff's office at 6 p.m.

Do you recall that basic timeline in the investigation in this case?

**A.** Do I recall it?

**Q.** Yes, sir.

**A.** I mean, I see it on the report.

**Q.** But it doesn't jog a recollection as

to how the store's crime scene had been handled on the day of the murder?

**A.** No. I wasn't there, so I can't answer that.

**Q.** In your preparation for the trial, were you familiar with the timeline in terms of the investigation and the relationship with the sheriff's office to the crime lab's work on the investigation?

**A.** Not really. The best that I can remember, I was told that they had initially worked the crime scene, and then I don't know if it was the sheriff or Greg or who decided that they should call the crime scene unit in, so they did. Of course, the best policy is get them there as quick as possible. We've had some cases that it's been days before they were called in.

**Q.** Uh-huh (affirmative). You mentioned earlier that you recalled a weapon being taken from the car of --

**A.** Correct.

**Q.** -- Mr. Pitchford. And do you recall that that was put into evidence at trial?

**A.** Yes.

**Q.** All right.

**MR. PERKOVICH:** I'm going to mark as Exhibit 4 another crime lab document.

(Exhibit No. 4 was marked for identification.)

BY MR. PERKOVICH:

**Q.** So, Mr. Evans, if I could ask you to rev- -- review the recovery log, the typed version on the third page, and you can also compare it to the handwritten version on the fourth page of this document. Just -- just scan it, if you would.

**MS. RUCKER:** Same objection on this exhibit.

**A.** (Witness reviewing document.) Okay.

BY MR. PERKOVICH:

**Q.** And I call your attention to the first item. It says, 38 Special Revolver, with a serial number. Do you see that?

**A.** I do.

**Q.** Could you review the rest of this list and let me know if you identify another firearm.

**A.** (Witness reviewing document.) No, I don't.

**Q.** Okay. Moving ahead in this document,

near the back, the pagination's all over the place on this. I apologize. It's the best document we have. It's a notes page, and it's indicated as page 4 of 4.

**A.** Hold on just a second. Let me find it.

**Q.** It's also page 10 of 12 on the same page. It's got a lot of page numbers, which is a -- something that we'll encounter a lot today.

**A.** Well, you say it's 4 of 4?

**Q.** Yeah. It's -- it's about the third from the last page in that stapled document.

**A.** I've got 10 of 12 is the --

**Q.** That, too, yeah. That's at the bottom.

**A.** Okay. I see 4 of 4 at --

**Q.** Right.

**A.** -- the top.

**Q.** That -- yeah. So we've got all sorts of page numbers.

**A.** I understand.

**Q.** So this notes page concerns a vehicle, a 1949 Mercury Grand Marquis. Do you --

**A.** Yes.

**Q.** -- see that?

**A.** Yes.

**Q.** And then the next page provides a narrative with respect to the Technical Assistance Section's work in relation to impounding the vehicle pursuant to a search warrant. And can you review this and -- and let me know if you see any indication that in impounding the vehicle, a firearm or other weapon was collected by the agents for the Technical Assistance Section.

**A.** Best of my knowledge, the weapon had already been recovered before they were called in, but I'm not sure.

**Q.** What do you recall about that?

**A.** The deputies had been given a description of a car, and I'm not sure what all other information they had, but it led them to Pitchford's mother's house where the car was located. And she gave them permission to search the car, and they found this weapon in the car.

**Q.** And -- and so is your recollection of the timeline that a warrant was later effected, and the car was then impounded, and the Technical Assistance Section were able to gather evidence from the car at that stage?

**A.** That's my recollection.

**Q.** Okay.

**MR. PERKOVICH:** I'm marking as Exhibit 5 a photograph of State's Exhibit 32 at the trial of Pitchford.

(Exhibit No. 5 was marked for identification.)

BY MR. PERKOVICH:

**Q.** Mr. Evans, do you see the tag tied to the -- the handle of the -- or the firearm --

**A.** Yes.

**Q.** -- itself?

**A.** Yes.

**Q.** And does this appear to be the firearm that was entered into evidence at trial?

**A.** It appears to be.

**Q.** And -- and generally, what -- and we will look at, you know, more information about this as needed, but generally, what do you recall about this piece of evidence and the State's theory of its case against Mr. Pitchford?

**A.** I remember that this gun that was found in Terry Pitchford's car had belonged at the store. It was loaded with what I call rat

shot and that the victim was shot with rat shot, and this pistol was found in possession of Terry Pitchford in the car that he was in. I also remember that while his mother was telling the officers that they could search the car, Terry was making comments, There's something in there they don't need to get out.

**Q.** And does -- that's your recollection of the event?

**A.** Yes.

**Q.** And that's from your work on the case; it's not from anything recently in preparation for today's deposition?

**A.** Uh-uh (negative). It's from remembering --

**Q.** Okay.

**A.** -- the case itself.

**Q.** Right. And, you know, just one of the sort of tensions we have in handling a complex matter like this with all the ins and outs trying to address just what we need to address -- and we could spend a lot of today going over the material, but I appreciate the response to that, and --

**A.** Well, I'm trying to answer what I

think you're asking.

**Q.** And -- and -- and I'm applauding that. I'm also just flagging that we could get into more details, and refreshing your recollection might refine certain points, and -- and we're -- really, we'll just do that as it's essential for our purposes today.

**A.** All right.

**Q.** So do you recall any other firearm being entered into evidence?

**A.** There was a .22 involved. Whether or not that weapon was introduced, I don't -- I can't remember.

**Q.** Okay. And -- and we can tell you that there -- to date, there is no indication of the recovery of a .22. As you may have noticed in your review -- your quick review of the evidence log from the crime lab, there were some casings from a discharged .22.

**A.** Correct.

**Q.** You may recall that the autopsy reflects that the mortal wounds of Mr. Britt were occasioned by a .22 --

**A.** Yes.

**Q.** -- chiefly through his aorta.

So the .22 was not recovered. Do you recall what caliber the firearm that you're looking at right now was?

**A.** To the best of my memory, it was a .38.

**Q.** Do you recall the technician, Steve Byrd of the then Mississippi Crime Lab?

**A.** Yes. We used him a lot.

**Q.** And he, you may have noted, was examined by Mr. Hill at Mr. Pitchford's trial. Do you recall his testimony and his work on this case?

**A.** As far as being exact, I'd either have to look at his report or his trial transcript. Best I can remember, he said that Mr. Britt was shot with rat shot and a .22 caliber and that the -- I think the rat shot casings that were recovered at the scene were consistent with what was in that weapon.

**Q.** You mentioned a -- a moment ago that the State's understanding had been that the revolver admitted as State's Exhibit 32 had belonged to Mr. Britt, and it was collected from Mr. Pitchford's car --

**A.** Correct.

**Q.** -- during the investigation.

Do you recall the evidence that established the possession of the firearm by Mr. Britt prior to that firearm being collected by GCSO officers?

**A.** You talking about as far as how the store got it?

**Q.** Well, just how you -- it was established that this was Mr. Britt's gun.

**A.** Well, Ms. Britt was one of the ones that testified, and, also, the gentleman that he had gotten the gun from testified that he had given him the gun. So they were both able to identify the weapon.

**Q.** And --

**A.** They also, you know -- and I don't want to go too deep, but they -- they even explained why he kept rat shot in it instead of regular ammunition.

**Q.** Uh-huh (affirmative). And you referred to a gentleman who had supplied the gun to Mr. Britt, and I believe that's a Marvin Fulwood, and he, you know, testified at trial.

And do you recall interviewing him and his testimony?

**A.** I don't recall. I just remember that he could identify the weapon.

**Q.** Okay.

**MR. PERKOVICH:** I'm going to mark as Exhibit 6 a one-page document with what appears to be a Xerox depicting a plastic with ammunition.

(Exhibit No. 6 was marked for identification.)

**A.** Okay.

BY MR. PERKOVICH:

**Q.** And it -- it has a typed caption on that. You've read that?

**A.** (Witness reviewing document.)

**MS. RUCKER:** Same objection to this and for the record.

**A.** I have read it.

BY MR. PERKOVICH:

**Q.** Okay. Do you recall this element of the investigation in the case?

**A.** I remember that the gun -- that weapon was loaded with this type ammunition, again, what I call rat shot, it's just pellet shot, and that the one had -- person that had given him the gun identified the gun and that this is the

type ammunition that was in it when he gave it to him.

**Q.** And -- and so that would be Marvin Fulwood?

**A.** Correct.

**Q.** Uh-huh (affirmative). Do you recall any handling of this ammunition that it appears Mr. Fulwood supplied to Greg Conley?

**A.** What do you mean by handling?

**Q.** Testing to --

**A.** I -- I don't remember.

**Q.** Okay.

**A.** May have not been because a lot of times, if something is obvious what it is, the crime lab's not going to test it. And ballistics wouldn't be able to help on the case because it was not fired, so it's not going to have a firing pin mark or an ejector mark or anything like that.

**Q.** And -- and, you know, with respect to the relevance of this ammunition as being of the same kind as the ammunition found in the retrieved .38 and the discharge retrieved from the crime scene in terms of the rat shot pellets, wadding, and other material from the

capsules, would the ballistics or firearms expert be the authority in terms of the -- the nature of the work and the procedures that he would undertake --

**A.** Not in --

**Q.** -- to see if they match?

**A.** Not in my opinion on this. This is something that any common person can look at and tell what it is. If you look at a Remington .38 shell, then you know it's a Remington .38 shell. And in this particular case, it -- kind of like anything else. You see the flag over there, you don't have an ex- -- have to have an expert to say that that's a flag.

**Q.** Right. So to the extent it's evidence, it would be something that the -- the jury could --

**A.** Be a jury --

**Q.** -- conceivably look at --

**A.** -- jury question.

**Q.** Uh-huh (affirmative). All right. So in lieu of the jury being presented with such evidence to make a conclusion or a determination as to its relationship to other physical evidence concerning the .38 and the shot -- the

rat shot, absent the jury having the ability to review that, would it be incumbent on the ballistics expert to make an examination and proffer his view as to the connection or lack of connection between the ammunition in, say, this bag versus the discharged capsules and --

**A.** In my experience, if we asked the crime lab to do that, they would laugh at us and say, You're wasting our time. Any idiot can look at it and tell what it is. There's nothing scientific for them to test.

**Q.** And you mentioned earlier that your officer and you individually had worked with Steve Byrd on -- on many occasions; is that correct?

**A.** Yes.

**Q.** If you were to estimate how many cases that has been, what would it be?

**A.** I couldn't even estimate. It's been a lot of cases.

**Q.** Quite a lot. Uh-huh (affirmative).

And -- and you have used him repeatedly, I'm presuming, because he's a reliable expert?

**A.** Yes.

**Q.** Uh-huh (affirmative). And his judgment is deferred to in terms of his area of expertise; is that fair to say?

**A.** It is. And, of course, you have to understand that we're not like a big law firm like y'all. We don't go out and hire whoever we want. We have access to the state crime lab, and that's it. We don't have money to go out and hire somebody.

**Q.** Right.

**A.** So it's not that I choose him. I like him. I think he's competent.

**Q.** Uh-huh (affirmative).

**A.** But I don't go out and choose him. He's who is furnished by the State for us to use.

**Q.** Well, I -- I do want to correct the record. We're fortunate to be in the Watkins & Eager office and enjoy the trappings of this fine conference room, but my nonprofit organization is a very humble organization that suffers the same sort of burdens that the prosecution has with regard to resources.

**A.** Well, not -- not -- not you then, but the -- we don't have the benefit of law -- big

law firms.

**Q.** Well, thank God for big law firms, but in this case, we're dependent on the Court's resources for what we're able to do, and -- and sometimes we face similar concerns. Again, that's a digression.

At bottom, Mr. Byrd is more than a competent expert and one that you've repeatedly used with confidence. Is that fair to say?

**A.** Yes.

**Q.** Okay.

**A.** I have had cases where other experts gave us stronger indications than he did --

**Q.** Uh-huh (affirmative).

**A.** -- but I trust his opinion.

**Q.** Uh-huh (affirmative).

**A.** He's not -- I -- I would say that I -- I would never question his truthfulness.

**Q.** So you recall that -- that this evidence itself pictured here was not submitted to the jury?

**A.** I don't recall.

**Q.** Okay. Do you recall receiving this document, this one-page Xerox picture of this evidence, or do you recall --

**A.** No.

**Q.** -- receiving this evidence itself?

**A.** I can't recall.

**Q.** So you don't recall re- -- receiving the physical object that's depicted in this --

**A.** I don't.

**Q.** -- Xerox? Okay.

For the record, in our discovery pursuits, this has not been provided --

**A.** It --

**Q.** -- to us.

**A.** May be that all we got was this photograph.

**Q.** Right. And also, just to clarify the record, we -- from our efforts in obtaining materials from prior counsel for Mr. Pitchford at different stages, we have not gotten any indication of this evidence. Mr. Byrd --

**A.** I --

**Q.** Mr. Byrd was deposed in this federal action, and we were able to indicate this evidence had been provided to the sheriff's office. We asked his opinion as to its relevance in terms of making a comparison with respect to the assertions of Mr. Fulwood as to

the pedigree of the ammunition, the history of the .38 entered into evidence. He expressed that he would very much have liked to have the benefit of evaluing this -- evaluating this evidence to make such a comparison. It seems that Mr. Fulwood's averments, of course, given that he was a State's witness, were material to establishing a connection of the .38 to Mr. Britt and, of course, later to Mr. Pitchford with respect to the State's theory of the case against Mr. Pitchford.

**A.** I would say it was very minor, him. Just being able to say that it was the gun was, in my opinion, the main evidence.

**Q.** Very good.

**MR. PERKOVICH:** I want to mark as our Exhibit 7 a photograph of a -- a photograph of a photograph that was State's Exhibit 45.

(Exhibit No. 7 was marked for identification.)

(Off the record.)

BY MR. PERKOVICH:

**Q.** Mr. Evans, this was an exhibit that the State marked while you were examining Greg

Conley. And if I could ask you to refer to the transcript --

**MS. RUCKER:** Same objection to this exhibit.

BY MR. PERKOVICH:

**Q.** -- page 498 in the binder there.

**MS. RUCKER:** Joe, when it's convenient with you after this exhibit, can we take a --

**MR. PERKOVICH:** Certainly.

**MS. RUCKER:** -- break?

**MR. PERKOVICH:** Yeah.

**A.** All right. I'm on 498.

BY MR. PERKOVICH:

**Q.** Okay. So if you could review near the bottom there, and feel free to review more fully than this, but I just want you to see where you're marking it and entering it into evidence as Exhibit 45 and asking a couple of questions of Mr. Conley.

**A.** (Witness reviewing document.) Okay.

**Q.** Do you recall presenting this exhibit at trial and Mr. Conley's testimony then?

**A.** I -- I just read it. I don't recall the exact part of it, but I did, yes.

**Q.** Okay. And the photograph, do you see a revolver there on the store counter?

**A.** Yes. It's not a real clear picture, but I do.

**Q.** And from what you can make of that picture -- and we have several incarnations of, basically, that photograph, different print quality. We're happy to provide those to help --

**A.** I remember there being a -- a weapon that was found there.

**Q.** Uh-huh (affirmative). And is that a different weapon or the same one compared to the State's Exhibit 32 that we've just looked at?

**A.** It's a different weapon.

**Q.** Okay. And we looked at the evidence log that reflects the sheriff's office transfer of evidence and the crime lab's collection of evidence, and we noted that there is a single firearm that was collected.

**A.** Correct.

**Q.** And do you recall in preparing the case consideration of this second weapon and its absence?

**A.** The only thing that I can remember is

that when I saw this, I asked someone, I don't know if it was crime scene unit, the sheriff's department, or what, and they said that they did not recover this one because it was not connected to the case. Now, why or how they knew that I can't elaborate on, but they were able to make a determination that this had nothing to do with the case.

**Q.** And -- and you would only be speculating if you were to get into how they could make that determination?

**A.** I would. I can't remember if this weapon was broken or what was going on, but there was -- there was something that they had that they knew that it could not be connected to the case.

**Q.** And do you recall any further inquiry on the part of your office with respect to that --

**A.** I don't.

**Q.** -- determination? Okay.

**A.** Of course, we did furnish this picture to defense so that they would know that it was another weapon there.

**Q.** Okay.

**MR. PERKOVICH:** I think we wanted to take a -- what, five-, ten- --

**MS. RUCKER:** Correct. Yeah.

**MR. PERKOVICH:** Yeah.

**MS. RUCKER:** Five minutes.

**THE WITNESS:** Okay.

(A recess was taken.)

(Mr. Napper left the deposition.)

**MR. PERKOVICH:** I want to mark as Exhibit 8 a motion.

(Exhibit No. 8 was marked for identification.)

BY MR. PERKOVICH:

**Q.** So, Mr. Evans, before you, if I'm correct, is -- a Certificate of Service/Notice of Hearing is the top page for a case, State of Missippi -- Mississippi versus Terry Pitchford and Eric Bullins. And just to get this out of the way, we'll see the rendering of Mr. Bullin or Bullins's name with an S or without an S on some of these documents.

Is it your recollection that when we talk about Eric Bullins or Quincy Bullins or Shawn Bullins and we see Shawn Bullin, Quincy Bullin, Eric Bullin, we're referring to the same

individuals?

**A.** Yes. I'm not sure how it's really spelled.

**Q.** Yeah, I -- it's one of those mysteries we'll never solve in this case.

So the motion itself on the second -- beginning on the second page is to appoint a court expert for DNA analysis. Have you been able to peruse this?

**A.** Yes.

**Q.** Do you recall the filing of this motion on December 3rd of 2004?

**A.** No.

**MS. RUCKER:** Same objection to this exhibit.

**A.** I -- I don't recall it being filed. I remember that there was one, but as far as when or who did it, I -- that, I don't remember. And I think -- and it's probably not relevant, but I think the reason this was done is our state crime lab didn't have a DNA analyst at that time.

BY MR. PERKOVICH:

**Q.** Do you recall any results, positive, negative, or otherwise, from the DNA testing?

**A.** I don't.

**Q.** And that caption indicates two defendants, correct?

**A.** Correct.

**Q.** And do you recall indicting both defendants for capital murder?

**A.** I can't remember.

**Q.** Uh-huh (affirmative). Documents reflect that both defendants were indicted for capital murder.

**A.** Yeah. I know we on- -- only had to try one.

**Q.** And -- and when you say, We only had to try one, what do you mean?

**A.** Leon Johnson was one of Terry Pitchford's attorneys. He came to me at least four different times asking if I would let him plead to life without parole. Every occasion I had to get family members in from two different states that would come in. We would meet. I would discuss the benefits and -- the pros and cons of letting him plead to life without parole. They would accept it. I'd go back to Leon and say, Okay, he can plead. According to Leon, and this is secondhand information, every

time Ray Charles Carter would get involved in it, Pitchford would back out of the pleading.

So Leon would call me in -- a week or two later and say, Look, Ray Charles is not up here. He wants to plea. Can we go ahead and do it? I said, I don't know. I'll have to get back up with the family because I'm not going to do it on my own.

I'd get back up with the family, and every time they agreed, Yes, he can plea. As long as he's gone for life, we don't care whether it's the death penalty or not. Every time he would get up and -- either get up in court or before it ever even got to the judge, he'd back out.

So we attempted to settle this case without a trial on numerous occasions, and his attorney -- one of his attorneys attempted to try to settle it without a trial several occasions, but apparently, the defense attorneys weren't getting along very well at that point.

**Q.** And so this is -- you're going from recollection as to this pretrial history of the case?

**A.** Yes.

**Q.** You referred to contacting, I'm surmising, survivors of Mr. Britt?

**A.** Yes, his wife and other family members. And that's -- just so you'll understand, that's -- on something as serious as a capital murder case, that's -- one thing that I always do is before I make a decision of whether we're going to seek the death penalty or how we're going to handle a case like that, I will discuss it with the family of the victim, and I will discuss it with law enforcement. And after getting vary [sic] input in it, then I'll make the decision of which way we're going to go.

**Q.** And so the communication with Mr. Britt's survivors, what do you recall about that? What do you recall you being involved in having those conferences? It sounds like it was repeated.

**A.** The first time, it was -- went pretty smooth. To be honest with you, they were getting pretty pissed with him playing games with them. And by the last time, they made the comment that if he doesn't go through with it this time, to hell with him. That's basically

what they said.

**Q.** And were these meetings in your office?

**A.** Lord, I don't remember.

**Q.** Would your diary reflect these meetings?

**A.** No.

**Q.** Why not?

**A.** That wasn't something worth writing down. It was just something for my benefit to make a deci- -- to help me make my decision of whether we were going to let him plea or not.

**Q.** Well, it seems like it was extremely important in the -- in the exercise of your discretion, and so it didn't warrant a -- a -- a notation even in your calendar?

**A.** No.

**Q.** Okay. And --

**A.** It's not something that I -- that I would note because it's not something relevant to the case. It's just something to help me make a decision.

**Q.** Well, I would say seeking a death penalty would be relevant to this capital case.

**MR. KUCIA:** Objection. Argumentative.

BY MR. PERKOVICH:

**Q.** It's not relevant in your opinion?

**A.** Well, at that point, it wasn't because at that point, we were trying to settle it without the death penalty. So, no, the death penalty wasn't that relevant at that point. We gave him every opportunity in the world to keep from getting the death penalty, and it was his choice to go to trial and take a chance on it.

**Q.** Okay. So would the file information that was turned over by your office, leaving aside what was disclosed to defense counsel or state postconviction counsel but just with respect to what's been disclosed or provided to counsel for Respondents in the federal action, would that information reflect the discussion and the deliberation with the family of Mr. Britt and --

**A.** No, because that's --

**Q.** -- the determination --

**A.** -- not something that is discoverable. That is just strictly my conversations with the family on their opinions. Now, any written victim impact information, that goes in the file, but this was not victim impact. This was

just a discussion to let them know that he was willing to do it. Part of it is to see -- because to a lot of these family members, it's important for them to be able -- if a defendant pleads to be in the courtroom and actually watch him admit that he did what he's charged with. So I try my best to make sure that any family members that desire to be there know what's going on and can be.

**Q.** And -- and Mr. Johnson, Leon Johnson, the attorney you mentioned, have you had dealings with him prior to this --

**A.** On many -- many cases.

**Q.** Uh-huh (affirmative). So you have a long-existing --

**A.** Yes.

**Q.** -- communication with him?

**A.** I've known him, for, at that point, probably 30 years.

**Q.** Uh-huh (affirmative). Earlier, we talked about various defendants associated with this overall investigation and the prosecutions of your office. The record hasn't reflected Leon Johnson representing Mr. Pitchford. It does reflect him -- Mr. Johnson representing

other defendants involved in this. Does this help refresh your recollection?

**A.** I know he was involved in talking with him. Whether he was officially one of the attorneys or not, I don't remember, but I do remember that he was involved with talking with Pitchford and his family.

**Q.** Okay. So that's your recollection?

**A.** Yes.

**Q.** Okay.

**A.** And Ray Baum was also involved some in --

**Q.** Mr. --

**A.** -- the case.

**Q.** Mr. Baum was one of Pitchford's attorneys?

**A.** And it -- it may be -- and this is not unusual. Ray was not from Grenada. He's from Winona, which is real close. But a lot of times on a major case when we have someone that's defending a case, they'll get one of the more prominent local attorneys to come in and help them even -- even if they're not officially one of the attorneys of record. Leon is well-respected in the community, and that may be

why he was involved. I can't say for sure.

**Q.** Do you recall discussions with the family in relation to the culpability of other defendants in this case?

**A.** No.

**Q.** And if it were the case that Mr. Johnson represented other defendants in this case, would that clarify your recollection of his involvement and your communication with him vis-à-vis Mr. Britt's family?

**A.** No.

**Q.** Tow -- so to return to the last document we marked, again, Eric Bullins is captioned in it.

**MR. PERKOVICH:** I wanted to mark as Exhibit 9 a -- a one-page document.

(Exhibit No. 9 was marked for identification.)

**A.** Okay.

BY MR. PERKOVICH:

**Q.** And this is an indictment for capital murder of Eric Bullin, correct?

**A.** Correct.

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** And the cause number is 2005-010CR?
**A.** Correct.
**Q.** This was filed on January 11, 2005?
**A.** That's correct.
**Q.** Do you recall this indictment from your office?
**A.** I -- I see it. It -- it is a true indictment.
**Q.** And so our timeline here, again, Mr. Britt was murdered on November 7, 2004, and this indictment is on Jan. 11, 2005.
**A.** That would have been the next grand jury after the crime was committed.
**Q.** And so does this help your recollection in terms of Mr. Eric Bullin's involvement in the case?
**A.** This doesn't. I remember that there were two people involved, but as far as whether they were indicted together, separately, or how it was handled there, I couldn't remember.
**MR. PERKOVICH:** I'm going to mark as Exhibit 10 another one-page document.
(Exhibit No. 10 was marked for identification.)
**A.** (Witness reviewing document.) Okay.

BY MR. PERKOVICH:

**Q.** And this is a Order Setting Trial adjudged on May 17, 2005, setting a trial of August 10 of 2005 --

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** -- for the Cause No. 2005-010 CR; is that correct?

**A.** That's correct.

**Q.** So that's setting a trial date for Eric Bullin; is that --

**A.** That's --

**Q.** -- what --

**A.** -- what this document is.

**Q.** Okay. And that's on the cause number for capital murder, correct?

**A.** I -- I'm assuming that's the cause number. It doesn't state the cause -- the charge on this document.

**Q.** To return to the prior exhibit, the indictment has that same cause number.

**A.** You are correct.

**Q.** Okay.

**MR. PERKOVICH:** I'm marking as Exhibit 11...

(Exhibit No. 11 was marked for identification.)

BY MR. PERKOVICH:

**Q.** And this is a document titled, Subpoena Request, with a Cause No. 2005-012-CR.

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** Do you see that?

**A.** I do.

**Q.** And it enumerates 11 individuals for subpoenas and it seems at the behest of Clyde Hill, who we've established was an assistant district attorney in your office?

**A.** I don't know who requested it. Margie Scruggs -- yeah, it does say Clyde.

**Q.** Okay.

**A.** Margie Scruggs was the victim assistance coordinator at that time.

**Q.** Okay.

**MR. PERKOVICH:** I'm marking as Exhibit 12...

(Exhibit No. 12 was marked for identification.)

BY MR. PERKOVICH:

**Q.** And this is State's Supplemental

Disco- -- Discovery Disclosure, and it identifies a witness, Agent Anthony Jones, care of the North Central Narcotics Task Force.

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** Does -- do the documents concerning Cause No. 2005-012-CR reflect a different criminal proceeding against Eric Bullin?

**A.** I don't know. It doesn't say what the charge is on here. Hold on just a second. I'm as- -- I assuming -- well, it -- it's got to be a different indictment at least because it's a different cause number, but that -- it may be the same case, and it may be another case. I don't know.

**MR. PERKOVICH:** Marking as 13...

(Exhibit No. 13 was marked for identification.)

**A.** (Witness reviewing document.) Okay.

BY MR. PERKOVICH:

**Q.** Do you see this Cause No. 2005-198CR?

**A.** Yes.

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** And it has three counts relating to

narcotics --

**A.** Yes.

**Q.** -- is that correct?

**A.** This is definitely a different case than the murder case.

**Q.** Do you recall your office handling this case in relation to Eric Bullin --

**A.** No.

**Q.** -- while he was a capital murder defendant?

**A.** I don't recall when this was handled. I see that we did have a case on him, which is not unusual.

**MR. PERKOVICH:** Marking as Exhibit 14 a document titled, Judgment.

(Exhibit No. 14 was marked for identification.)

BY MR. PERKOVICH:

**Q.** And this relates to Cause No. 2005-198-CR; is that correct?

**MS. RUCKER:** Same objection.

**A.** That's the cause number on it.

BY MR. PERKOVICH:

**Q.** And it's a judgment ordered by Joseph Loper on January 5, 2006?

**A.** It is.

**Q.** Filed on January 9?

**A.** It is.

**Q.** And it concerns several -- or a few sentences here?

**A.** Yes, on drug charges.

**Q.** Right. And so this case and its disposition are separate from Mr. Bullin's capital murder case that we've looked at?

**A.** Correct. On this case, he ended up basically getting a 30-year sentence.

**Q.** And so as we looked at earlier this morning, that -- that filed date is January 9th. That was the date Mr. Pitchford appeared in court for his trial as well.

**A.** For his trial?

**Q.** For Mr. Pitchford's trial.

**A.** Okay.

**Q.** Yeah. The -- and the -- the trial date was ordered on that appearance.

Do you recall any correlation between the disposition of Eric Bullin's matter and the proceeding with Mr. Pitchford?

**A.** No, I don't.

**Q.** Okay.

**MR. PERKOVICH:** Marking as Exhibit 15...

(Exhibit No. 15 was marked for identification.)

(Off the record.)

BY MR. PERKOVICH:

**Q.** So 15 is an indictment with Cause No. 2005-117CR(A) and (B). Do you see that?

**A.** I do.

**Q.** And can you read the defendants in that indictment.

**A.** I can. Eric Bullin is one, and Antonio Conley is the other one.

**MS. RUCKER:** Objection.

BY MR. PERKOVICH:

**Q.** And this concerns, according to the indictment, a -- a murder of one Kenneth Kendall --

**A.** That's correct.

**Q.** -- on or --

**A.** This is not the same murder case that Pitchford was tried on.

**Q.** And on or about March 20, 2005?

**A.** That's correct. If I can -- if I remember correctly, this was killing an inmate

in the jail.

**Q.** I believe that's correct.

**MS. HARTMAN:** Hang on, Joe. We have two Exhibit 5s --

**MS. RUCKER:** 15.

**MR. PERKOVICH:** 15?

**MS. HARTMAN:** -- 15s. Sorry. So -- I think --

**MS. RUCKER:** Are they --

**MS. HARTMAN:** -- they're identical.

**MS. RUCKER:** -- the same?

**MS. HARTMAN:** Yeah, they're --

**MR. PERKOVICH:** Oh, I gave you --

**MS. HARTMAN:** I don't know if we just --

**UNIDENTIFIED SPEAKER:** Gave them a copy --

**MS. HARTMAN:** Did you --

**MR. PERKOVICH:** Yeah.

**MS. HARTMAN:** -- accidentally give us your copy?

**MR. PERKOVICH:** Right.

**MS. HARTMAN:** Okay. Are we still on Exhibit 15?

**MR. PERKOVICH:** We are.

**MS. HARTMAN:** Okay.

BY MR. PERKOVICH:

**Q.** Do you recall this event occurring a few months after Eric Bullin had been arrested and a couple months after his charge for capital murder in the murder of Mr. Britt?

**A.** I do.

**Q.** What bearing did that development have on your office's handling of this defendant in the Britt case?

**A.** None. That's a completely separate case.

**Q.** Uh-huh (affirmative). So in weighing prosecutorial discretion with respect to the disposition of the capital murder case, the charging of the case, did it have any effect on the calculus?

**A.** No.

**Q.** And why -- why would that not --

**A.** Each case sits on itself. Just like the drug case that you showed me, he got 30 years on that because of the severity of the crime. This was a complete separate case, so whatever punishment he received on it, whether it be an open plea or a trial, would be based on

this case. The Pitchford case, it would depend on each of them's involvement and to what degree they were involved.

**Q.** And so in exercising the -- the discretion to seek a death sentence for a defendant, do other crimes not factor into that determination?

**A.** Well, this isn't even a defen- -- same defendant.

**Q.** I'm referring to with respect to Mr. Bullin.

**A.** No, that wouldn't.

**Q.** It wouldn't?

**A.** It would depend on his involvement in that particular case.

**Q.** So --

**A.** We may have somebody that's a habitual offender, and depending on their involvement in the case, it doesn't matter what their record is. It's not going to affect whether we go for the death penalty or not. That really wouldn't be relevant.

**Q.** So the analysis is silent to the particular case?

**A.** Yeah. What involvement each person

had -- we've had cases to different extremes. We've had different cases where one defendant may have begged the other one not to commit the crime. Those are going to be held differently than if both of them go in with a gun and both shoot. So you just have to look at each case and try to make that determination. Sometimes it's not easy.

**MR. PERKOVICH:** Marking as Exhibit 16...

(Exhibit No. 16 was marked for identification.)

BY MR. PERKOVICH:

**Q.** This is a judgment in the case we just looked at for the March 20, 2005 -- -5 homicide of Kenneth Kendall.

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** And this is, correct me if I'm wrong, a judgment entered on July 29, 2005, for a reduced charge and lesser charge of felony crime of manslaughter --

**A.** Uh-huh (affirmative).

**Q.** -- for Mr. Eric Bullin.

**A.** I see it.

**Q.** Do you recall this?

**A.** I recall after seeing this that -- he was sentenced to that. I'm trying to see -- yeah, it was a guilty plea, and he was offered manslaughter and 20 years, which is the maximum for manslaughter.

(Exhibit No. 17 was marked for identification.)

BY MR. PERKOVICH:

**Q.** Do you recall discussion about the disposition of this particular action for Mr. Bullin?

**A.** No. I'm sure that we bounced back and forth with defense attorneys on the offer, but as far as anything else, no. Most of the defense attorneys on something like this that's charged with murder are going to try their best to get a manslaughter plea. And this, I think, was back before we had a second-degree murder, so it was either murder or manslaughter. Murder carried life; manslaughter carried anywhere up to 20 years.

**MR. PERKOVICH:** Mark as Exhibit 17 a document entitled Petition to Enter Plea of Guilty.

**MS. RUCKER:** Same objection.

BY MR. PERKOVICH:

**Q.** And this is for Cause No. 2005-010 CR concerning Eric Bullin and a guilty plea of manslaughter; is that correct?

**A.** That's correct.

**Q.** And this was entered on January 26th, 2007; is that correct?

**A.** That is correct.

**Q.** And as we've looked at today, Mr. Pitchford was tried in February of 2006, correct?

**A.** I think that's correct.

**Q.** Do you recall disposing of this case for Mr. Bullin?

**A.** I do not recall it, but this -- I see that it was and how it was disposed of. He -- he pled on both the drug charges, and he also pled on this charge.

**Q.** Do you recall Mr. Bullin's role in the murder of Mr. Britt?

**A.** I do not. I know there were two or three people in the cell with the victim. As far as -- and, basically, the victim was stomped to death.

**Q.** Oh, I'm sorry. I'm -- it's confusing because there are several cases here. I'm actually going back to Mr. Britt's case and Eric Bullin's role in the murder of Mr. Britt.

**A.** I don't. I'd have to go back and look at the testimony and statements to tell you.

**Q.** All right. If you look at the table of contents and the transcript on page vi, Dantron Mitchell --

**A.** Hold on just a second. Let me --

**Q.** Uh-huh (affirmative).

**A.** -- get there. vi?

**Q.** Right. And -- and there on line 16 is Dantron Mitchell, who --

**A.** I got you.

**Q.** -- is a witness.

Do you recall Mr. Mitchell testifying in this case?

**A.** No, I don't. I can't even remember who he is without looking.

**Q.** Uh-huh (affirmative). Okay. And if you could just briefly consult starting at page 562 of the transcript his examination.

**A.** (Witness reviewing document.) All right.

**Q.** Does this help you recall Mr. Mitchell's testimony?

**A.** It does. He was an inmate in the jail that Terry Pitchford admitted he committed this crime to.

**Q.** That's your recollection?

**A.** Yes.

**Q.** If -- if it were the case that he were not incarcerated at the relevant time, would that affect your recollection of his testimony here at Mr. Pitchford's trial?

**A.** I don't understand your question.

**Q.** I don't believe he was incarcerated at the time.

**A.** I think he was incarcerated at the time that Pitchford told him that.

**Q.** There's another witness that we'll consider in a moment who was in the county jail at the time, so we can turn to that shortly.

You probably saw the redirect examination of yours.

**A.** No. You just asked me to read --

**Q.** My apologies. If you could just consult 56 and 56 -- or 568 and 567.

**A.** (Witness reviewing document.) Okay.

What was your question?

**Q.** Yes. So the record reflects your question at trial to Mr. Mitchell. Did anybody make any promises to you to get you to give a statement? And he answered, No, sir.

Do you recall anything that would make you question that testimony today?

**A.** That testimony?

**Q.** His answer, yes, sir.

**A.** No.

**Q.** Okay. And you probably saw that Mr. Johnson's referenced in this --

**A.** No, I don't --

**Q.** -- as to Mr. Pitchford --

**A.** -- I don't know what you're referring to.

**Q.** Well, on line 21 of 567...

**A.** 567?

**Q.** Okay.

**A.** I still don't understand your question.

**Q.** I'm just confirming that Leon Johnson was Mr. Mitchell's attorney in relation to -- well, it's unclear exactly what Mr. Johnson was Mr. -- was providing counsel to Mr. Mitchell

for, but at the time of Mr. Mitchell's trial testimony, he was represented by Mr. Johnson in connection with some potential exposure for liability. And in that connection of confirming that he was counseled at that time, you posed your question of whether any promises were made in exchange for Mr. Mitchell's testimony in this trial.

**A.** I don't remember exactly what Leon's involvement was, but my point was to make sure that it was clear that we had not made any promises to anybody.

**Q.** Right. I'm just trying to --

**A.** Yeah.

**Q.** -- pin that down. And, also, just with respect to Leon Johnson as an attorney involved generally in this case --

**A.** I don't know if he was co-counsel in this or if he was in something else. That, I can't answer.

**Q.** Right.

**MR. PERKOVICH:** I'll mark as Exhibit 18, a one-page document.

(Exhibit No. 18 was marked for identification.)

**THE WITNESS:** Thank you, ma'am.

**THE STENOGRAPHIC REPORTER:** Yes, sir.

BY MR. PERKOVICH:

**Q.** Mr. Evans, are you familiar with this type of form?

**A.** Yes. It's what's normally referred to as a rights form.

**Q.** Uh-huh (affirmative). And what kind of rights are contemplated here?

**A.** Miranda rights.

**Q.** And --

**MS. RUCKER:** Same objection.

**MR. PERKOVICH:** I don't want to object to objections, but this -- I don't think this is controversial in terms of its being within the scope of the discovery in this case.

BY MR. PERKOVICH:

**Q.** So who signed this so far as you can read it?

**A.** Looks like Demarquis -- I don't know if that's Westmoreland or what.

**Q.** I believe it is, and I think this will be clearer in a second. And then the witness to that?

**A.** Greg Conley and Carver Conley, who were both deputy sheriffs.

**Q.** Uh-huh (affirmative).

**A.** I think Carver was also a police officer at that time, too.

**Q.** Uh-huh (affirmative). And the date of this waiver?

**A.** 7th of November, '04.

**Q.** So that's the date of Mr. Britt's murder, correct?

**A.** I -- I can't remember the exact date. If you say it is --

**Q.** It -- it is.

**A.** If you say it is, it is.

**Q.** It is. That -- that's something I think we all can agree on. But it's the same day, and what time of day are we looking at based on this form?

**A.** 3:09 a.m.

**Q.** I think that's a p.m., but --

**A.** Oh. Looks like an A. It could be --

**Q.** It --

**A.** -- either one.

**Q.** It's -- it could -- it's a -- we could file that under chicken scratch.

The -- this -- the time stamp at the -- near the very end of the form perhaps helps us out with a 1510 p.m. --

**A.** Where is --

**Q.** -- military time. The --

**A.** Oh. Okay. I got you. I got you. Yes.

**Q.** So this appears to have been transacted in the afternoon. We established earlier that the homicide took place in the morning?

**A.** Yes.

**Q.** Okay. Mr. Westmoreland testified at trial. We glanced at that. And all the information we've been asking you to -- to look at this morning, do you recall Mr. Westmoreland?

**A.** What do you -- I -- I recall him. What are you --

**Q.** You recall --

**A.** -- referring to.

**Q.** -- him as a witness. Do you have any recollection of -- of examining him, or --

**A.** No. I'd have to look at the transcript to see because I do not.

**Q.** And in relation to the disposition of

a criminal case of his concerning this case overall, do you recall dealing with him or dealing with his counsel?

**A.** I can tell you how I always do what you're -- I'm assuming you're asking. You're asking if I made any offers to him; is that correct?

**Q.** We're not there yet, sir.

**A.** Okay.

**Q.** All right.

**A.** Well, I can tell you what our -- my normal policy is if that's what you're wanting, but as far as do I remember exactly when and where we talked and what was said, no.

**Q.** And I have a transcribed statement, I have a handwritten briefer statement. Would those help recollection with regard to this?

**A.** Sure. Anything that's written down would help some.

**Q.** Okay. I'm -- I'm happy to supply that. Here's a typed statement with the same date, and you can see for yourself in terms of the individuals here, but it seems to -- well, to be clear, there's no time indication as to this statement, so as far as matching it with

the waiver we just looked at in terms of the time of day, imprecise from what we have to work with, but it does identify Carver Conley, Greg Conley, and Mr. Westmoreland.

**MR. PERKOVICH:** So I'm marking as Exhibit 19 this typed statement.

(Exhibit No. 19 was marked for identification.)

**A.** All right. Would you like for me to read it, or --

BY MR. PERKOVICH:

**Q.** Just review it, please, for the sake of your recollection of Mr. Westmoreland's role in this case.

**A.** (Witness reviewing document.) All right.

**Q.** Okay. Does this help you recall Mr. Westmoreland and his role in this overall case?

**A.** Yes.

**Q.** And do you recall his testimony at trial in relation to Mr. Pitchford?

**A.** No.

**Q.** Okay.

**A.** I'd have to read it, too. But

basically, his involvement was that he was involved in the prior plan to rob the store which they backed out of. And best I can remember, he testified to that effect at trial, that they had gone there to rob it before with Terry and backed out because some people that lived and worked in the area told them that, basically, they needed -- better get out of there.

**Q.** And so the -- the statement, the transcription that we just reviewed as Exhibit 19, does that appear to be a transcription of a -- of a recording of some form?

**A.** I can't answer that. It's a transcript of ans- -- questions and answers is all I can say.

**Q.** There's no indication of a reporter or a stenographer --

**A.** I didn't notice -- I didn't notice one.

**Q.** Uh-huh (affirmative). And so absent any explicit indication in the document itself, would it appear that this is a transcription rendered from some recording, either audio or -- or video?

**A.** I can't answer that.

**Q.** Okay.

**A.** All I can answer is what I see.

**Q.** Uh-huh (affirmative). If -- if the sheriff's office were to have recorded this interview and had it transcribed, would you expect that the sheriff's office would supply you with both the recording, the source of the recording, and the written transcription?

**A.** I would hope so.

**Q.** And you would hope that -- and expect -- that that would be in the file of -- that they would supply to your office?

**A.** Yes.

**Q.** In connection with Mr. Westmoreland's testimony at trial, and his cooperation as a State's witness, what, if anything, did your office offer in exchange?

**A.** Nothing. We don't make offers in advance, and any of the defense attorneys in our area can tell you, if you have a client and you want your client to cooperate, we will tell you up front. We'd appreciate it if you'd cooperate. We will look at his cooperation, see if it's honest, either present it to the judge,

tell the judge what he did, or we may make a recommendation based on his involvement and his cooperation. But we do not make offers up front of what we're going to give.

**Q.** Do you recall the resolution of Mr. Westmoreland's --

**A.** I don't.

**Q.** -- case?

**A.** I do remember that his involvement basically was nonexistent because the crime that they were going to commit they withdrew from before it was ever committed.

**Q.** And just to be clear, his case was disposed of, and it was a conspiracy case concerning the prior event you've referred to prior to the day of the murder of Mr. Britt on November 7th --

**A.** Yes.

**Q.** -- 2004. His guilty plea was entered on January 4, 2007, so that's about 11 months or so after the Pitchford --

**A.** Yeah.

**Q.** -- trial.

**A.** And -- and the way I interpret the criminal laws, he could not be convicted of

attempted robbery because they withdrew from the act. So the absolute most that he could be guilty of is the conspiracy or planning it.

**Q.** So in communication with his counsel at the time anticipating his testimony as a State's witness against Mr. Pitchford, do you specifically recall that communication?

**A.** No.

**Q.** And the -- the nature of his cooperative testimony, do you recall contemplation with his counsel as to how that would beneficially affect his --

**A.** Oh, they -- counsel always asks --

**Q.** Uh-huh (affirmative).

**A.** -- How's it going to help him, what will it do --

**Q.** Uh-huh (affirmative).

**A.** -- and we routinely tell them, We're not going to make you an offer. It just depends on how everything turns out, what his involvement is and his cooperation at trial.

**Q.** And, obviously, if there were any kind of departure from that, your office is clear as to the constitutional obligations in disclosing that?

**A.** The only thing that we ask of them is to tell the truth. We don't want them to add anything to it, and we don't want them to hold anything back. We want the whole truth.

**Q.** And your office is aware of the constitutional strictures with respect to disclosing to defense counsel inducements, incentives for a witness --

**A.** Well, there were none made. If I had made an offer for a specific amount of time or anything like that -- but there's not an attorney out there that doesn't understand that they want their client to be the one to cooperate and hope they get a better deal than the one that pulled the trigger.

**Q.** Uh-huh (affirmative).

**A.** But there were no offers. There were no, You're going to get X number of years if you'll cooperate or if you'll say this. It's just, Tell the truth, and we'll see where it goes.

**Q.** And I don't mean to belabor it, but in a scenario where anything cognizable as an offer were put forward, your office, your ADAs, obviously you yourself were clear at that time

in terms of the disclosure obligations to defense counsel?

**A.** Yes.

**Q.** Okay.

**A.** There were none.

**Q.** There were no offers?

**A.** There were no offers.

**Q.** All right. Not there were no obligations, right, just --

**A.** There -- there --

**Q.** -- to be clear?

**A.** There were no -- (shakes head negatively.)

**Q.** So we were not too far away from page 426 in the transcript. There is a direct examination by Mr. Hill of a James Hathcock. If I could ask you to just take a look at that. And I'll supply you with some documents about Mr. Hathcock to refresh your recollection, but if you can just review his testimony.

**A.** (Witness reviewing document.) All right.

**Q.** Okay. You've been able to review the trial testimony of Mr. Hathcock?

**A.** Yes.

**Q.** Do you recall Mr. Hathcock individually?

**A.** No. I remember that he was a witness. That's about it.

**Q.** And in terms of remembering him, do you have a -- an image of him on the stand, what he looked like?

**A.** No.

**Q.** Yeah. It's listen a long time.

**A.** (Nods head affirmatively.)

**MR. PERKOVICH:** I'm going to mark as Exhibit 20 a criminal history summary document and a Grenada County -- County Detention Center document for Mr. Hathcock.

(Exhibit No. 20 was marked for identification.)

BY MR. PERKOVICH:

**Q.** If you could review that, including the picture of Mr. Hathcock.

**A.** (Witness reviewing document.) All right.

**Q.** Does this help you recall Mr. Hathcock?

**A.** I remember his picture. I remember seeing him.

**Q.** You do?

**A.** Yeah, I remember.

**Q.** Okay. And do you recall communicating with Mr. Hathcock or an attorney for Mr. Hathcock about other cases --

**A.** No.

**Q.** -- in Grenada County, Montgomery County?

**A.** I don't think we ever did. I'm not sure. To the best of my memory, those cases never were presented to us because it was handled at the lower court. I could be wrong, but I think that's what happened.

**Q.** And -- and you refer to those cases. What are you recalling?

**A.** I don't remember if it was a larceny case or what -- what they had him charged on, but it sounds like from reading this -- this transcript that him and someone else had stolen something from another boy's father or something, and he dropped the charges against them.

**Q.** And -- and when you say he dropped the charges, who do you mean?

**A.** The father.

**Q.** The father dropped the charges?

**A.** Yes.

**Q.** Okay. And before you -- your office determined to call Mr. Hathcock as a witness in this case for -- against Pitchford, what was the discussion with the sheriff's office as to his statements concerning what was --

**A.** I --

**Q.** -- ultimately testified to here?

**A.** I don't remember. It's -- in some form or fashion, sheriff's department notified us that he had this information and that he was a potential witness.

**Q.** And in terms of some form or fashion, do you recall a transcription or recordings?

**A.** I don't know if it was a phone call or what it was.

**Q.** From -- from the sheriff's office to you, is that what you're referring to --

**A.** Well, from the sheriff's --

**Q.** -- when you say, phone call?

**A.** -- office to my office. It -- it may have not been to me.

**Q.** Uh-huh (affirmative). And, again, in a situation where a statement's taken and it's

recorded by some means other than just written down, your expectation is that the sheriff's office would provide that along with other information about the witness, potentially used at trial?

**A.** Well, I mean, just to put it simple, we request that they give us everything that they have.

**Q.** Uh-huh (affirmative).

**A.** And, yes, that would be part -- if it's a statement, that would be part of what they have if they've got it, and we would want it in any form that they have it.

**MR. PERKOVICH:** I'm going to mark as Exhibit 21 a handwritten statement with the title, James Hathcock [sic], on the top.

(Exhibit No. 21 was marked for identification.)

BY MR. PERKOVICH:

**Q.** It doesn't have a date, unfortunately, on the face of the document, and if you can just review this relatively shorthand written note.

**A.** (Witness reviewing document.) All right.

**Q.** Does -- are -- are you familiar with

this note or statement?

**A.** I -- I don't remember it, but I'm reading it. It appears to be notes from maybe a deputy. It does not appear to actually be a statement to me because -- like, on here, it starts out, Told him that he robbed [sic] him. So it sounds like maybe a deputy memorializing what Mr. Hathcock told him.

**Q.** Uh-huh (affirmative). Okay. And in this memorializing, whether by Mr. Hathcock or a deputy, so I'm clear on the face of it, is there an indication that any firearm had been taken from Mr. Britt or his store?

**A.** (Witness reviewing document.) It doesn't say anything about what was taken from the store. It just says basically what happened. It does say the register was taken.

**Q.** Uh-huh (affirmative). What does it say about that?

**A.** Said that he threw the register in a ditch out by little Texas.

**Q.** Is Little Texas a place that you're familiar with?

**A.** No.

**Q.** So you don't -- you don't know what

that's referring to?

**A.** No.

**Q.** All right. The last line -- or the last couple lines there, can you read that.

**A.** (As read:) Said that he told her at 9:00 a.m. that morning -- let's see -- .22 ruger Auto, shot him 8 or 9 times twice in face and more in the chest. Got rid of register, cleaned 22 pistol and gave it to Tron.

**Q.** Do you know who Tron refers to?

**A.** I don't, but I do remember that they interviewed -- and I don't even know who interviewed him. Somebody interviewed whoever this Tron is, and he denied that he gave him the gun, but far as I know, they followed it up to the point that it appeared to be a dead end.

**Q.** The documents seem to establish clearly that Tron is Dantron Mitchell, the witness we were looking at --

**A.** That's probably correct.

**Q.** Uh-huh (affirmative).

-- who was represented by Mr. Johnson. And in connection with this initial, it appears, provisional statement from Mr. Hathcock or either taken down by an officer or written by

Mr. Hathcock that this implicates Mr. Dantron Mitchell in a substantial way.

**A.** How?

**Q.** By receiving a firearm used in a murder.

**A.** Well, to start with, he would have to know that that firearm was used in a murder for him to be involved in it in any way. If -- if you commit a murder and sell me the gun later and I don't know it was used in a murder, I hadn't committed a crime.

**Q.** Would that be material if he were aware of such a -- a -- a pedigree, let's put it that way, of -- of a .22 pistol that he received on the heels of a murder in a small town?

**A.** It would be important to know, but it may or -- it probably would still not be a crime.

**Q.** And if he had received that and not turned that over at a later date --

**A.** We don't fall under the laws like the Feds do. It's not a crime to lie to the officers, which they do all the time, and it's also not a crime to tell about things that you know. We can have 40 witnesses to a murder, and

if they all refuse to cooperate, we can't charge them with anything.

**Q.** In a situation where one witness, perhaps more witnesses, would give testimony that the murder weapon was given to somebody else other than an individual firing that weapon causing death, and the person receiving that murder weapon, let's say a .22 here, failed to turn over or give evidence about possession or knowing of the whereabouts of the murder weapon, would that become a crime for that individual?

**A.** To start with, you're speculating that he even got a weapon. There's no indication that he ever did.

**Q.** Well, there is indication here by a witness that you put forward as a State's witness against Mr. Pitchford.

**A.** Which is that is not evidence. What we have to go on is what we can prove, and from the investigation, I don't remember any indication that he ever received the weapon.

**Q.** Well, there are multiple indications that Mr. Mitchell supplied a .22 and then received the same gun after the homicide, but I'm just asking the --

**A.** Yeah.

**Q.** -- question under this premise that if -- if Mr. Mitchell has been implicated in this way --

**A.** Unless you -- you --

**Q.** Please let me finish my question.

**A.** All right.

**Q.** -- given that Mr. Mitchell has been implicated in this way, that would potentially provide some criminal jeopardy for him that would necessitate counsel.

**A.** Not that I see.

**Q.** Okay. If Mr. Leon Johnson was his attorney in connection with this matter in relation to his exposure as a potential subject of criminal proceedings, he would have his own set of concerns as to his criminal liability.

**A.** You're speculating so much that I can't even --

**Q.** Okay.

**A.** -- give you an answer.

**Q.** Fair enough.

I'm just establishing that Mr. Mitchell has --

**A.** And -- and --

**Q.** -- concerns emanating from a witness who ultimately --

**A.** Well, you know if we had --

**Q.** -- had enough credibility to be called at -- at trial against Mr. Pitchford?

**A.** We have cases all the time where people may own a gun that's used in a crime, but unless they help plan it, help commit the crime -- the fact that they own the weapon or had the weapon doesn't make any difference.

**Q.** Would it make a difference in this situation where the murder weapon was returned to the individual who supplied the murder weapon and then fail- -- that individual failed to produce his knowledge or the possession of that weapon subsequently?

**A.** No --

**Q.** Okay.

**A.** -- not legally.

**MR. PERKOVICH:** I want to mark as Exhibit 22 what's labeled State's Supplemental Discovery Disclosure, in the Eric Bullin capital murder case.

(Exhibit No. 22 was marked for identification.)

BY MR. PERKOVICH:

**Q.** And if you could just take a moment to review that.

**A.** (Witness reviewing document.)

**MS. RUCKER:** Same objection to this exhibit.

**MR. PERKOVICH:** It's concerning James Hathcock.

**MS. RUCKER:** That's fine. Just let us make our record.

**MR. PERKOVICH:** I'm pointing to the discovery order.

**A.** Okay.

BY MR. PERKOVICH:

**Q.** And this is a statement that is not dated on its own terms, but it's filed --

**A.** It's not a statement.

**Q.** Sorry. It's a discovery disclosure.

**A.** (Nods head affirmatively.)

**Q.** And correct me if I'm wrong. It's characterizing prospective testimony --

**A.** It --

**Q.** -- by Mr. Hathcock?

**A.** It appears to be where maybe Clyde Hill or someone else at the office typed up what

they expected Mr. Hathcock to testify to and furnished it in discovery.

**Q.** And this has a filed date of October 21, 2005?

**A.** That's correct.

**Q.** And, again, as reflected here and elsewhere, Mr. Hathcock's role in this case is that he was incarcerated in the county jail at the time Mr. -- Messrs. Pitchford and Bullin were there.

**A.** That was our information, that he was in jail in November of '04.

**Q.** And we looked at the statement, and, again, on the face of it, it's a handwritten statement. It's not signed.

**A.** And which statement are you referring to?

**Q.** The one we just considered, the handwritten one a couple of exhibits ago that says, James Hathcock, at the top.

**A.** Yeah. I don't think that's a statement. I think it's really just notes from --

**Q.** Notes.

**A.** -- a statement that a deputy took, but

I can't say for sure.

**Q.** Okay. In any event, that has an account --

**A.** Yes.

**Q.** -- of some events, and there is overlap between that account and this disclosure. Is that fair to say to some extent?

**A.** I don't know which -- what you're referring to in it.

**Q.** Well, it's concerning the same subject matter. Can we agree on that?

**A.** It -- it's -- it's an attempt by whoever furnished this in discovery to convey whatever they expected him to testify to.

**Q.** And the handwritten notes concerning -- or labeled, Mr. Hathcoo- -- Hathcock [sic], at the top seems to be some manifestation of a similar such attempt to relay Mr. Hathcock's knowledge concerning the cases for Pitchford and Bullin?

**A.** Yeah, appears to be basically the same thing to me.

**Q.** Okay. In the discovery disclosure document, Exhibit 22 that you're looking at, do you see where kind of in the middle of that

text, it's -- it begins (as written:) He had borrowed Trons' .22 caliber pistol. He and Bullin went into -- in the store together and initially Pitchford had the .22 which he pointed at the old man and demanded the old man's pistol and his money. The man gave Pitchford his .38 which Pitford -- Pitchford soon discovered was loaded with rat shot. Pitchford then gave Bullin the .22?

**A.** I see that.

**Q.** Okay. I'd like you to review the handwritten document that we just considered and compare the accounts.

**A.** Well, these are not the same person putting these out there. I don't know what information this person had when they did this (indicating) and what -- what information this person had (indicating).

**Q.** And I appreciate your point. Obviously --

**A.** I'm not --

**Q.** -- we're talking --

**A.** They're not going to be exact because it's not a duplicate.

**Q.** Understood. Understood. I'm just

asking you to consider these things concerning the witness.

**A.** I -- I still don't understand what you say concerning the witness. Concerning what witness?

**Q.** Mr. Hathcock, the person called by your office in the prosecution at Mr. Pitchford's trial.

**A.** Okay. This (indicating) is what appears to be a deputy's summary --

**Q.** Uh-huh (affirmative).

**A.** -- of basically what he said.

**Q.** Uh-huh (affirmative).

**A.** This (indicating) appears to be a summary from our office to the defense attorney of basically what we expect him to testify to.

**Q.** And there are differences.

**A.** There always are going to be --

**Q.** I understand.

**A.** -- any time you --

**Q.** I --

**A.** -- have different --

**Q.** I understand.

**A.** They're not perfect. They're not exactly the same, but they basically say the

same thing.

**Q.** Okay. And so your position is they basically say the same thing?

**A.** Yes.

**Q.** Okay. And with respect to the reference to Tron that I read from the discovery disclosure, does our revisiting his profile in this respect refresh your recollection as to Mr. Mitchell's role in relation to this overall story concerning the initial robbery conspiracy for which Mr. Westmoreland and another was charged and the ultimate robbery and murder for which Mr. Pitchford and Mr. Bullin was charged?

**A.** To what extent? I don't understand what you're asking.

**Q.** To the extent that he is attributed repeatedly as having supplied the murder weapon in this case that was never recovered.

**A.** He supplied a weapon. If it had been recovered, we might have been able to determine if it was a murder weapon. At this point, we still don't know if whatever weapon he had was used in this crime. It probably was, but we can't prove it, so I don't know. I don't know where that gun is, I don't know what happened to

it, and without having the gun and being able to have Steve Byrd or someone examine it, we can't say whether his gun was used or not.

**Q.** And I'm trying to refresh your recollection about Mr. Mitchell's relationship to this prosecution in terms of --

**A.** He's no angel.

**Q.** Well, we can stipulate that.

-- in terms of the evidence that's coming forward about his im- -- the implications for his conduct both before the murder and after the murder, the enduring the question of where this murder weapon has gone.

Do you recall dealings either with him directly through representatives of the sheriff's office or an investigator in your office or attorneys with your office with Mr. Mitchell or his counsel concerning the whereabouts and Mr. Mitchell's knowledge of the firearm and of these crimes that we've spoken of, the conspiracy to commit burglary and the burglary and murder?

**A.** If I understand your question, no. Uh-uh (negative).

**Q.** With Mr. Hathcock, again, we -- we

discussed that you don't recall other criminal cases for him in your county or ano- -- or in Grenada County or Montgomery County or other counties in your jurisdiction.

**A.** At that time, I didn't even know who he was. Now, going back and looking at things, it appears that he was just a young man with no criminal record, that he was in jail on a minor felony charge, that the victim dropped the charges before the case ever got to us.

**Q.** Uh-huh (affirmative).

**A.** So I -- I had never had any involvement with him and have had none since then that I know of.

**Q.** And in the context of his apparently coming forward while in the jail and according to him speaking to Sheriff Strider, to Investigator Conley about what he was told --

**A.** Uh-huh (affirmative).

**Q.** -- by Mr. Pitchford, Mr. Bullin, are you aware of the formal disposition of his charging in the jail for that case beyond what you've just relayed to us?

**A.** I'm not.

**Q.** Okay. And if --

**A.** Our office didn't have anything to do with his case as far as I know.

**Q.** So you don't recall any communication between you and/or your office and the sheriff's office culminating in his release at that time?

**A.** I don't remember any.

**MR. PERKOVICH:** All right. I'd like to -- for us to take a lunch break unless we've got some resistance to that. For the sake of moving things along, if we can aspire for 30 minutes. That's -- that's truncated, but hopefully, we can have enough of a break with that.

So I have about 20 till, so if we can aim to -- to resume at 10 past.

(A lunch break was taken.)

BY MR. PERKOVICH:

**Q.** We took a lunch break. We're back from lunch.

Mr. Evans, we were, I'm sure you recall, talking about a witness, James Hathcock.

**A.** Yes.

**Q.** And you had answered several questions about the content, in essence, of his testimony based on a couple of documents. We discussed

some of his dealings with law enforcement at the time of the purported statements from Mr. Bullins and Mr. Pitchford in the county jail.

I have one more document that I want to put into evidence. It's Exhibit 23.

(Exhibit No. 23 was marked for identification.)

BY MR. PERKOVICH:

**Q.** If you can just review this individual information sheet. And, generally, are you familiar with this kind of document?

**A.** Not in this form, but I -- I know what you -- what it is.

**Q.** Okay. And there are some thumbnail photographs from apparent mugshots for Mr. Hathcock down the right side of the pages and personal information like the personal information in the prior sheet we looked at before the break. There's also a booking history that begins near the bottom of the first page. I'd like you to review that for a moment and the six entries in it.

**A.** Okay. (Witness reviewing document.) I've looked at it.

**Q.** All right. And so this reflects a booking history between August 17, 2004, and March 12th, 2009; is that correct?

**A.** That's what it looks like.

**Q.** And there is a variety of charges here -- reflected here, and on the -- the second entry at the bottom of that first page, it has a date of November 2, 2004. It lists, Grand Larceny.

**A.** Hold on just a minute.

**Q.** Uh-huh (affirmative).

**A.** On the second page?

**Q.** I'm sorry. The first page, the second entry at the bottom there.

**A.** Okay.

**Q.** And it says, November 2, 2004, grand larceny is the charge.

**A.** Correct.

**Q.** Does that seem to match the timeline we have here?

**A.** It appears to.

**Q.** Uh-huh (affirmative). And then carrying over to the next page is a -- another No. 2 entry, same date -- same exact date in terms of time, Receiving/Selling Stolen

Merchandise. Is that what I'm --

**A.** Yes, that's what --

**Q.** -- seeing there?

**A.** -- it looks like.

**Q.** And it seems it notes Montgomery County?

**A.** Yes.

**Q.** Okay. So he was in the Grenada County jail at the time of his coming forward to the sheriff. Is that what we gathered?

**A.** Yes.

**Q.** What do you make of the two entries here?

**A.** Apparently, he had those charges on him when he was in there.

**Q.** Uh-huh (affirmative). And so he could be charged for a crime in Montgomery County and also a Grenada County com- -- crime and jailed in Grenada County?

**A.** Apparently, he was charged in Montgomery County. Montgomery County doesn't have its own jail.

**Q.** Uh-huh (affirmative).

**A.** Right now, they are sharing the jail in Vaiden with Carroll County, but at that time,

I don't think they were. I'm not sure. They were probably just using Grenada jail at that time and paying Grenada to house their inmates.

**Q.** Uh-huh (affirmative). And -- and so that's information that should be available from either/or both sheriff's offices or jails in terms of the arrangements that Montgomery County had with --

**A.** I have no idea who handles all that.

**Q.** Uh-huh (affirmative). And the current status, though, you just indicated is that Carroll County is taking --

**A.** That's my understand- --

**Q.** -- that outsourcing --

**A.** That's my understanding that right now, the Vaiden jail is hou- -- well, I say that. I'm not sure. It's bounced back and forth a couple of times. I know the Carroll inmates are housed in Vaiden. I'm not sure about the Montgomery County ones now.

**Q.** I see.

So Vaiden County is -- is taking --

**A.** Yeah, Vaiden is in Carroll County.

**Q.** Okay. I -- I apologize for my -- my --

**A.** The jail --

**Q.** -- ignorance of the geography.

**A.** That -- there was a lot of controversy between the two counties. I don't know what it was over, but Montgomery County was paying Carroll County so much per inmate to house their inmates there. They had some kind of falling out. They quit housing any there. I think they started back. Now, whether they're still doing it, I don't know. See, we don't ever know what jail somebody's in.

**Q.** Uh-huh (affirmative).

**A.** And, like, these booking sheets, we don't see these.

**Q.** Right. But you have no reason to doubt the specific information on his booking history reflected here?

**A.** Oh, I have no reason to deny it or, you know, say it's true. I don't -- I don't know.

**Q.** Right. It roughly comports with our timeline, of course.

**A.** It does.

**Q.** And does this information, including the photographs as grainy as they are, help you

recall Mr. Hathcock further and with respect to whether your office had dealt with him subsequent to the Pitchford case?

**A.** It doesn't.

**Q.** Okay.

**A.** As far as I'm aware, we have never dealt with him on a criminal case.

**Q.** All right.

**MR. PERKOVICH:** We'll mark as Exhibit 24 a one-page document titled, Criminal History Names and Addresses.

(Exhibit No. 24 was marked for identification.)

**A.** (Witness reviewing document.) Okay.

BY MR. PERKOVICH:

**Q.** And do you recognize this document?

**A.** I can tell you what it is. I don't recognize it --

**Q.** All right.

**A.** -- but I know what it is.

**Q.** Please --

**A.** It's just a criminal history on different people involved.

**Q.** Is that something that your office produces typically?

**A.** Yes.

**Q.** And in what context and for what purpose?

**A.** Just to let the defense counsel know of any convictions on witnesses.

**Q.** And so this appears to relate to the case we're here today about.

**A.** It looks like it does.

**Q.** And it identifies DeMarcus Westmoreland, Dantron Mitchell, James Hathcock, three individuals we've spent some time discussing today.

**A.** Uh-huh (affirmative).

**Q.** And under -- under No. 1, Mr. Westmoreland, it identifies his charge, conspiracy to committed robbery.

**A.** That's correct.

**Q.** And that is also listed for Mr. Bullins; is that correct?

**A.** That's correct.

**Q.** To the best of your recollection, is this pertaining to the event prior to the November 7, 2004, case?

**A.** I feel pretty sure that it is.

**Q.** Okay. And with respect to Mr. Dantron

Mitchell, whom we've spoken of, it indicates, Charged with sale of cocaine and sale of marijuana. Do you see that?

**A.** Uh-huh (affirmative).

**Q.** Does that information help you recall Mr. Mitchell further?

**A.** No.

**Q.** Okay. Mr. Hathcock is listed as, Convicted of selling stolen merchandise with a misdemeanor value under $500. Do you see that?

**A.** I do.

**Q.** And so this document does not have a date on it, correct?

**A.** That's correct.

**Q.** So we're not certain when this was compiled and when that information was ascertained by your office?

**A.** That's correct.

**Q.** Judging from the bookings sheet that we just looked at, Exhibit 23, if I could ask you to toggle back to that. So we see subsequent entries of July 9, 2005, possession of paraphernalia, and then September 12, 2006, contempt of court.

So this reference to the convicted of

stolen merchandise and a misdemeanor value of under $500, it seems that his case was disposed of.

**A.** I don't know what case that is.

**Q.** Well, judging from the booking history, if we're limited to this as the universe of charges against him --

**A.** Now, that's not charges.

**Q.** Well --

**A.** What -- what --

**Q.** -- sir, I'm just pointing to the charge column in the document, but, please, you can explain.

**A.** What we furnish in discovery normally is any prior convictions that we know of.

**Q.** Uh-huh (affirmative).

**A.** In this case, apparently whoever furnished this since they knew about it went ahead and put down that DeMarcus and Quincy and Dantron were currently charged on some charges there in Grenada.

**Q.** Uh-huh (affirmative).

**A.** So more than likely, it's whoever was handling the Grenada cases.

**Q.** Uh-huh (affirmative).

**A.** But normally, what we furnish is not charges, it's prior convictions.

**Q.** And what's -- what's the basis for disclosing convictions?

**A.** The rules of discovery.

**Q.** Uh-huh (affirmative).

**A.** They say that we are supposed to discover any prior convictions.

**Q.** Uh-huh (affirmative). And within the scope of discovery, in the normal course, charging without a conviction is not necessarily in that scope?

**A.** That's correct.

**Q.** And that's -- that's a legal determination --

**A.** Yes.

**Q.** -- from your office?

Okay. So with respect --

**A.** Well, it's from the courts. The courts have ruled that before.

**Q.** Well, your interpretation of what the --

**A.** Yes.

**Q.** -- courts have ruled, of course.

The information sheet reflects

burglary in 2004 and then, of course, is grand larceny that he was charged with right around the time of the arrest of Mr. Bullins and Mr. Pitchford. And so the disposition here in the criminal history document, Exhibit 24, noting a conviction and presenting a misdemeanor value, it would seem to be reflecting that Montgomery County, which is one of your counties, I believe, in your jurisdiction, disposed of this case for a -- a misdemeanor value rather than under a grand larceny charge.

**A.** I can't say whether that's even the same case or not because, see, if -- if cases are handled as misdemeanors, they never get to us. We never even know about them.

**Q.** If it were charged as a grand larceny, would that be within your purview?

**A.** It wouldn't get to us until after it went to the preliminary hearing. If the judge, City judge or Justice Court judge, reduced one to a misdemeanor, it would never get to us.

**Q.** Uh-huh (affirmative). And in the experience of your office and your individual experience, have there been instances where you have -- and I say you meaning your office but

including you individually -- consulted with or intervened or been involved in those preliminary proceedings with respect to the posture of an accused and prospective defendant to obtain a lesser charging?

**A.** I don't ever remember one.

**Q.** Okay. Moving down the list, at the bottom is, Stephanie Gray (as written) --

**A.** Uh-huh (affirmative).

**Q.** -- and there is an identification of, No felony charges or convictions found. Do you see that?

**A.** I do.

**Q.** Okay. Are you familiar with Ms. Grey?

**A.** I am now. I did not know her at the time.

**Q.** And you say you are now. On what basis?

**A.** She was a witness in this case.

**Q.** Uh-huh (affirmative). And so you're saying, at the time. At what time when you say at the time just a moment ago? At the time of this document's creation?

**A.** At the time that the crime was committed, I had never met her.

**Q.** I see.

And so in the course of her involvement culminating in giving testimony at trial, that is the basis for your familiarity?

**A.** Yes.

**Q.** All right. And you examined her at trial; do you recall that?

**A.** I think I did.

**Q.** Uh-huh (affirmative). And, of course, as with everything in the trial, we have the -- the transcript here and we can consult that. Do you have a recollection of what she testified to?

**A.** She basically testified that she had seen -- and she described the car that was parked there at the store that morning. She testified, best I can remember, that she -- when she went in the store, she noticed that the cash register was gone, and I think she had given them that cash register when she worked there at that store. And she --

**Q.** She had given the store the cash register?

**A.** I think so.

**Q.** What brings that recollection forward?

**A.** I -- I don't know. It's just something that I remember.

**Q.** Okay.

**A.** She lived in a trailer that was right beside the store. I don't know who owned the trailer or if it was actually connected with the store or not, but, I mean, it was just right at the store.

**Q.** Uh-huh (affirmative).

**A.** And she, I think, later identified Bullin's car as the vehicle that she had seen at the store.

**Q.** You said Bullin's car?

**A.** The one he was driving, his mother's car.

**Q.** That might -- you might be referring to Mr. Pitchford.

**A.** I mean Pitchford, yes.

**Q.** Okay.

**A.** Thank you.

**Q.** You know, I'm not trying to help you too much, but --

**A.** Well --

**Q.** -- I want us to be clear.

**A.** -- I can use a little help every once

in a while.

**Q.** Well, there you go. That's -- that would be the quota for this afternoon, I suspect.

And -- and so that's your recollection as you sit here of her testimony?

**A.** Right. And as far as exactly everything --

**Q.** Uh-huh (affirmative).

**A.** -- she testified to, I can't remember.

**Q.** Of course.

And -- and we can revisit that, but you have a basic sense of her role in the case --

**A.** Yes.

**Q.** -- and why the State put her forward?

**A.** Yes.

**MR. PERKOVICH:** I'm going to mark as Exhibit 25 a document relating to Ms. Grey.

(Exhibit No. 25 was marked for identification.)

BY MR. PERKOVICH:

**Q.** And if you can just review this printout.

**A.** (Witness reviewing document.) Okay.

**MR. PERKOVICH:** And I'm going to mark as Exhibit 30 [sic] a booking sheet.

(Off the record.)

(Exhibit No. 26 was marked for identification.)

**A.** (Witness reviewing document.)

BY MR. PERKOVICH:

**Q.** Again, it's a poor quality photograph of Ms. Grey, but perhaps that will help you recall her.

**A.** No.

**Q.** All right.

**A.** Is that supposed to be her in this --

**Q.** I believe it is. Yeah, that -- that's my best understanding of this document.

**A.** And I can't even tell by the name who -- who it's referring to.

**Q.** Uh-huh (affirmative). It does have, it appears, three surnames, McDonald, Gray-Whitten, Stephanie Lynn -- yes, and identifies a charge in Circuit Court around August 16, '18, it would appear. But the hope was that the picture might help bring us back to her role in the case. So --

**A.** And this -- this is -- yeah, like I

say, the date on this one is August of '18, 2018.

**Q.** Uh-huh (affirmative).

**A.** I -- I can't tell from this document who that is.

**Q.** Uh-huh (affirmative). And beyond what we've discussed in terms of her testimony at trial and, obviously, what she was able to relay to law enforcement generally prior to being called as a witness -- since then, do you have a recollection of -- of Ms. Grey in regard to other matters?

**A.** Not that I can recall.

**MR. PERKOVICH:** We're going to mark as Exhibit 27 a -- an indictment document from Grenada County.

(Exhibit No. 27 was marked for identification.)

BY MR. PERKOVICH:

**Q.** It's got a title page as an exhibit from this federal case. It's a large document, and I'd like you to take a moment to review it.

**A.** All right. (Witness reviewing document.)

(Off the record.)

**A.** All right.

BY MR. PERKOVICH:

**Q.** So you've been able to at least to some extent review this 23-page document with the Cause No. CR-2010-001 and then an indictment document at the beginning of it; is that correct?

**A.** Yes.

**Q.** Do you see the filed stamp on that first page of June 22nd, 2006? The first page of the indictment, apologies, the second page of the actual --

**A.** Okay.

**Q.** -- paper in front of you.

**A.** Yes, I do.

**Q.** All right. And Count 1 refers to a check passed on June 1st, 2005?

**A.** It is.

**Q.** All right. And then Count 2 concerns a check passed on May 23rd, 2005?

**A.** That's correct.

**Q.** All right. And Count 3 relates to a check on September 3, 2005?

**A.** That is correct.

**Q.** Okay. And we've seen -- as we page to

the fifth and sixth and seventh pages, we see the actual checks?

**A.** Yes.

**Q.** And can you determine the account on which these checks are written?

**A.** The checks are Crossroads Grocery.

**Q.** And that's the store that Mr. Britt had run?

**A.** I don't know who was running it at this time.

**Q.** Well --

**A.** She at some point had been running the store because I know she -- I think she testified that she gave him the cash register that was in there.

**Q.** And --

**A.** Now, who --

**Q.** But to -- to be clear, this is the same store we're talking about in terms of where --

**A.** Yes.

**Q.** -- Mr. Britt was murdered?

**A.** Crossroads Grocery.

**Q.** All right. And so these are checks that she's passed on Crossroads Grocery's

account?

**A.** That's correct. It's business checks.

**Q.** Uh-huh (affirmative). And you stated earlier that you didn't recall as we sit here today other matters involving your jurisdiction and Ms. Grey. So did you have --

**A.** I don't.

**Q.** -- any personal knowledge of this?

**A.** No. The -- matter of fact, we don't even basically have a check unit anymore, but what we had and what we're still trying to do, if someone comes in with a bad check, we will try to collect it. The receptionist in the office writes letters trying to get them to come in and take care of them. If they don't, then at some point, they file -- draw up affidavits, and it goes forward. I don't think out of the whole time I've been in office we've ever had but one check case that ever went to trial. They all enter into restitution agreements and eventually pay their checks off.

**Q.** And you just mentioned that within your jurisdiction, within your office, the -- the division that handles these things is part of the district --

**A.** Well, it's --

**Q.** -- attorney's office?

**A.** We don't even have a division for it. We just -- we've got some people that will -- will do it to try to help victims.

**Q.** Okay. Right.

**MR. PERKOVICH:** I'm going to mark as, I believe, Exhibit 28 another document.

(Exhibit No. 28 was marked for identification.)

BY MR. PERKOVICH:

**Q.** And I'd like you to turn to page 15 of it.

**A.** 15?

**Q.** 15, yes, the blue text on the top.

**A.** All right.

**Q.** And this reflects, it appears, a letter with your office's letterhead and you identified there.

**A.** Hold on. I must be on the wrong page. Mine -- this is showing 2615?

**Q.** It should say right up here (indicating), 15 of 46.

**A.** I don't see any stamps like that. I may have the wrong document.

**Q.** Yeah. The page ID is 2623, the last -- but --

**A.** I must not have what you've got.

**Q.** Let me see if I can get you to the right page.

**A.** Thank you.

**Q.** Yep.

This appears to be a letter from the Office of the District Attorney identifying you as the district attorney, correct?

**A.** That's correct. This is just a standard collection letter on bad checks.

**Q.** Uh-huh (affirmative). And it has a February 24, 2006, date on it?

**A.** Let's see. It does.

**Q.** Uh-huh (affirmative). Move to the next page.

**A.** Uh-huh (affirmative).

**Q.** You've got a similar letter with a date of October 26, 2005?

**A.** Yes.

**Q.** And we've looked at these checks that were passed in 2005, and, of course, Mr. Pitchford's trial was in February 2006. And the two documents before you comprise a file

from your office concerning Ms. Grey and a crime involving dishonesty concerning the site of the murder in this case.

Do you believe that this was disclosed to defense counsel?

**A.** I doubt it because I didn't know about it.

**Q.** And is that the analysis in your office as to disclosures with respect to --

**A.** We disclose --

**Q.** -- obligations pretrial?

**A.** We disclose all felonies, felony convictions. This is not a conviction. The law on bad checks is basically once they receive -- when -- when she wrote the check, she hadn't committed a crime. The way the law is in Mississippi, to commit a -- the crime of writing bad checks, once they get this notice, it is presumed at that time that they wrote it with the intent to defraud unless they take care of it. So if they come in and take care of it, then that presumption's gone, and it's over. So unless somebody goes to trial on a bad check and is found guilty, there is no evidence there that they ever intended to defraud anyone. That's

why they do it like they do, and we're required to give these notices, because it's not a crime unless we have some proof that they intended to defraud someone.

**Q.** So --

**A.** These basically are handled more as civil issues than they are criminal.

**Q.** And -- and so in your view, this is not something that you had an obligation to disclose?

**A.** No, and didn't know about it either.

**Q.** In your recollection as to the timeline for restitution in a situation like this upon the passing of a check before that burden or the inference shifts to an intent to commit fraud, what is that time frame?

**A.** It's not a time frame. They vary drastically. Some of them -- we've had a couple that have gone, actually, in front of the judge, and they will basically ask them how long they need. So it's not a time frame. It's just that they try to pay some on it. Even at our office, and I don't know about this case, but if someone had, say, a $500 check, and they come in and paid $10 a month on it, we can't do anything

with them because they're trying to take care of it. So it's -- it's just every case is different.

**Q.** And -- and to -- to back up, you just stated that you did not have knowledge of this being --

**A.** Correct.

**Q.** -- in the office while she was a witness and preparing to testify. I think I know your answer to this question, but was there a discussion with her about the posture of that case of hers and its ultimate resolution?

**A.** No, because we didn't even know about it --

**Q.** And --

**A.** -- or I didn't.

**Q.** Right. And if you had known about it, would you have disclosed the --

**A.** If I'd have known about it --

**Q.** -- case?

**A.** -- I -- I would have disclosed it even though I don't think I had to. But I did not know about it, and it wouldn't have made any difference in the case because we wouldn't have done any -- her any favor on a bad check case

about getting her to testify.
**Q.** And the subject matter of the bad checks being the operation of the store or the appearances of the operation of the store after Mr. Britt's death, would that be considered --
**A.** I --
**Q.** -- relevant?
**A.** I don't know what you're saying.
**Q.** Well, he -- she -- these checks are written in 2005, and Mr. Britt was murdered in November 2004.
**A.** I don't know what her connection was with the store at that time.
**Q.** Uh-huh (affirmative).
**A.** I -- I can't answer that.
**Q.** Right. All right. We're going to shift gears to jury selection, and we discussed earlier that portion of the trial before, of course, opening statements and your calling witnesses. And the record reflects that you selected the jury and you were doing individual questioning and speaking for the State with regard to cause challenges and strikes.
We -- we have the venire list from the disclosures in this case I believe from your

office's file, and we intend to review those with you today. As we do that, it would be helpful to understand the information that you draw from in making determinations in the process of selecting a jury.

**A.** Every case is different. The ideal situation, while we are picking the jury, we will have family members -- say it's a murder case. Will have family members of the victim sitting in the courtroom. We'll have officers hopefully sitting in the courtroom. We will go through the voir dire. If the judge gives us enough time, we will have a meeting with everyone in a room real quick, go down through the list. If anyone has an objection, say it's a family member or a police officer or deputy, they will state what they know about that person and why they don't think they would be a good juror.

**Q.** Within -- within your meeting?

**A.** Yes.

**Q.** Right.

**A.** And when we get through with the meeting, we'll go back in and pick the jury.

**Q.** Beyond what is transpiring in the

courtroom and in the -- conferring with the people you've mentioned, what other sources of information do you draw from in that process?

**A.** That's basically it.

**Q.** Uh-huh (affirmative).

**A.** That's a normal trial.

**Q.** And -- and so juror questionnaires that are circulated prior to that --

**A.** Questionnaires don't answer much. I know you've seen plenty of them, too. You can't tell a whole lot about a juror from the questionnaire. You can -- you can get more out of a juror by their actual answers in court than you can questionnaires and their demeanor.

**Q.** In- -- information supplied in questionnaires that is not supplied by a potential juror in the questioning process, that still is information that you would use at times?

**A.** Basically, everything that's in it, one of the attorneys or the judge is going to ask.

**Q.** Uh-huh (affirmative).

**A.** And in our district, the judges ask most of the questions.

**Q.** Right.

**A.** And over --

**Q.** I've noticed.

**A.** -- over the years, they have increased their questions. If -- if either I or a defense attorney asks a question that they hadn't been asking, they'll add it to their list to try to cut us shorter.

**Q.** Uh-huh (affirmative). I see.

And the cards that the jury pool are to complete and return, is that information that would be of assistance in --

**A.** Usually, we don't ever get to see the cards.

**Q.** Okay.

**A.** We usually get a jury list --

**Q.** Uh-huh (affirmative).

**A.** -- from the clerk's office. If we have time, we can go and sit down and look at the questionnaires, but we usually don't have time to. And, like I say, it's not -- most of the time, they're not that relevant, but if we have time, I like to look at them and see what they have answered on those things.

**Q.** And, of course, you've been talking

kind of generally about --

**A.** Yes.

**Q.** -- your experience. With this case, do you recall the time that you and presumably Mr. Hill had to spend with the questionnaires?

**A.** No.

**Q.** And when questionnaires are returned, are copies provided to the defense and to the State in addition to the clerk's copy?

**A.** I think they're only provided to the clerk, and then if one or the other wants to see them, they can go request a copy.

**Q.** Okay. So your recollection is that you would need to request a copy in order to have the copy to work with?

**A.** That's what we normally do.

**Q.** Uh-huh (affirmative). And if you were to request a copy, that would become part of your file for the trial?

**A.** No, wouldn't be part of the file. That would just be something we would look at in trying to pick a jury.

**Q.** So what would --

**A.** It'd be part of the court file.

**Q.** But if it -- you received your own

copy to work with, annotate, consider, share with, you know, your office, what would become of the copy of the juror questionnaires returned by the --

**A.** Probably just end up getting thrown away when we got through picking a jury because the original copy is in the court file, so there's no need in us keeping a copy.

**Q.** Would --

**A.** It's not something we generate.

**Q.** It is not something you generate. The work product in relation to reviewing and making determinations from information supplied in that, what category would that fall into?

**A.** What work product?

**Q.** Notes, any sort of markings to help identify information of importance in making the decisions.

**A.** I guess it would depend on each attorney as to what they do and if they do anything other than just try to remember, but as far -- I don't know if you've ever sat in on a trial in our district or not, but the voir dire goes so fast, you don't have time to take notes.

**Q.** Well, fortunately, we do have some

notes from the list.

**A.** It's -- it's not much.

**Q.** Right. And -- and that will be an opportunity for us to kind of reconstruct the process, if you will.

**A.** Yeah.

**MR. PERKOVICH:** So I want to mark as -- I think we're on 29 -- a document that's already in our federal record here.

(Exhibit No. 29 was marked for identification.)

**A.** Okay. I can tell you what this document is if you --

BY MR. PERKOVICH:

**Q.** Please do.

**A.** This is the list that the court reporter types up of the names that the judge has qualified that are there to sit on a jury panel, and when we get ready to sit down and announce ready, the clerk will furnish me or one of the prosecutors a copy of this list and the defense attorney a copy of this list, and then we'll start voir dire based on the -- this will be the order that the judge has all of these jurors seated in the courtroom.

**Q.** And this particular copy of that list with the handwritten notates and highlights, do you recognize it?

**A.** I do. This is my copy or a copy of my copy.

**Q.** Right. Okay. I was hoping you would be able to confirm that, so we're on the same page. Great.

What I'd like us to do is to try to get an interpretation of the these marks. Obviously, you're using a shorthand in various ways and highlighting and you've got some textual notations, it appears, to the right of many of the names on the list. And there are several markings that are seen throughout the document such as to the far left, we see C's, we see S, dash, and a numeral.

**A.** Uh-huh (affirmative).

**Q.** We see, Death. We see D's and things of that sort. Perhaps we can sort of move left to right in terms of your basic reckoning for us of what the notations reflect.

**A.** Well, just starting at the top, the C are jurors that the Court struck for cause after voir dire, that neither side asked for, but the

Court found that there was reason to strike them for cause. The S, like S-1, that would be the State's first strike. Anytime you see a D with a number after it, that is a defense strike. Where you have, Death, written out there, you've got somebody that their opinion of the death penalty is such that they could not serve and be a fair juror.

**Q.** And so that notation, to the best of your recollection, would that be put down in the process of the Court's questioning of the witness?

**A.** No. This is done during all three, the Court's, mine, and the defense.

**Q.** I see.

And so to -- to sort of try to reconstruct this somewhat, in a cause strike where you have noted a C by name and there is a, Death, indication, is it a good indication that before the judge struck the individual for cause, you had made that analysis?

**A.** No. It's that the judge struck them because of their view on the death penalty.

**Q.** And so your -- as you're looking at this, your assessment is that that reason was

articulated by the Court as the Court put forward the number -- or the -- the number of the juror?

**A.** Yes.

**Q.** Okay.

**A.** These are jotted down real quick, as you can tell. We've got cause ones that gave plenty of reasons they couldn't be fair that I didn't even have time to write anything down by. But what this is is just a brief summary of what I had time to document.

**Q.** Uh-huh (affirmative). And so -- and we'll kind of move back and forth in terms of scouring this information. Looking at Mr. Crawford on No. 3, there are some notes to the right there. So would those notes be taken before the action on his status?

**A.** They would be taken during voir dire. While either the Court or myself or the defense was asking questions, that's when those would be done.

**Q.** Uh-huh (affirmative). And so as you mentioned, sometimes it's moving faster. Then you can put notes in or you're choosing -- or you're finding that it's not necessary for you

to make a note with respect to an individual, but to the extent you want to capture something for your recall as the process moves forward as you are expected to make decisions like tendering a witness or using a strike, these notes assist in that process?

**A.** Hopefully.

**Q.** All right. And to the left -- immediate left of the numbers, we see letters and a -- and a slash and -- or -- and another letter.

**A.** Yes --

**Q.** Where we --

**A.** -- like --

**Q.** -- see them --

**A.** -- white female, white female, black male, white male, black female. The courts now require us on voir dire to document whether the juror is black or white, male or female. So as the Court calls the person's name out, what I do in my record is mark on it so we'll know.

**Q.** Uh-huh (affirmative). And so, you know, you're just -- you're in the room, and you -- you've got this, and as the proceedings go, you're able to note this information?

**A.** Yes.

**Q.** And you say that the Court now requires that --

**A.** Our courts do.

**Q.** Your courts.

In February 2006, was that, to your knowledge, a requirement?

**A.** Yes.

**Q.** It was at that time.

And you say our courts. Specifically, what courts --

**A.** The judges in the Fifth Circuit Court District.

**Q.** Okay. And do you understand the genesis of that requirement?

**A.** Yes. Because of Batson rules, the Supreme Court wants to know whether the jurors are black or white, male or female for their record because before the Supreme Court started asking for it, the case would get down there, and nobody would know.

**Q.** And so this requirement in your jurisdiction, how was that communicated or promulgated?

**A.** Judges just wanted to make sure that

there was a record that the clerks knew.

**Q.** So they would convey this on the record in a given case, or was there some sort of dictate --

**A.** No.

**Q.** -- communicated?

**A.** No.

**Q.** So how would that re- -- requirement be communicated in connection with the proceeding or just the overall work of the Court?

**A.** I don't know. The courts just said they wanted it.

**Q.** And when you said they said it, I'm just trying to pin down --

**A.** It wasn't in a court hearing or anything --

**Q.** Uh-huh (affirmative).

**A.** -- like that. They just advised us that they wanted it.

**Q.** So this is something that was communicated informally?

**A.** Yes.

**Q.** Uh-huh (affirmative). And --

**A.** And I'm pretty sure the defense

attorneys were doing the exact same thing.

**Q.** Making notations --

**A.** Yes.

**Q.** -- at this time?

**A.** So that there'd be a record.

**Q.** All right.

**MR. PERKOVICH:** So I want to mark as Exhibit 30 a pretty thick document.

(Exhibit No. 30 was marked for identification.)

**A.** All right.

BY MR. PERKOVICH:

**Q.** Do you recognize -- do you recognize the material in this document generally?

**A.** This is juror information cards that the clerk sends out to prospective jurors.

**Q.** Uh-huh (affirmative). And you were explaining earlier that typically, you don't expect to draw information from this source?

**A.** This doesn't really tell a lot about people. Basically, what it is is their name, their phone number, their address, and maybe where they work, and that's about it.

**Q.** Uh-huh (affirmative). Okay. And apart from questionnaires, apart from cards, and

apart from, as you've underscored, what transpires in the actual proceedings --

**A.** In voir dire?

**Q.** Yes.

-- is there -- and -- and also, obviously, your description of the observation process that the individuals you are consulting in the selection process -- and I want to return to that briefly in a moment. Is there anything further that would supply information in the decisions you'll make with regard to tendering versus striking an individual?

**A.** Like what?

**Q.** I don't know.

**A.** Oh, okay.

**Q.** That's --

**A.** Nothing I --

**Q.** That was -- that was -- yeah.

**A.** Nothing I can think of.

**Q.** I just want to be -- I -- I just want to -- us to be clear that kind of the universe of -- of information is here.

**A.** Well, and, you know, this is very general and understood by everybody, but the purpose of voir dire is to get a fair jury. And

by the way that supposably is done, the judge starts out asking the questions. He will ask questions about who knows the defendant, who knows the victim, would that affect their decision. He's ask questions like in a case like this that get very important, Do you believe in the death penalty? If you were selected on this jury, could you consider the death penalty? It -- the majority of the questions are asked by the judge, and by time the judge gets through, both attorneys have a pretty good feeling at that point what kind of juror they're looking at. How that person reacts to the judge makes a difference. You know, frankly, if the judge asks a serious question and one of the jurors snicker or something like that, you notice it. Once the judge gets through, they'll tender the panel to the State. We'll ask questions. Normally, I'll want to know things like, Have you or any of your family ever been convicted of anything? Because we end up with a lot of people that don't answer to the clerk about having prior felonies, and we have to make sure that they don't because I had one one time that I ended up

with a convicted felon on there and got reversed because of it. So it's up to us to make sure the jury does not fail to answer questions like that. We'll cover those things.

I'll go in -- in a lot of depth about, Are you related to the defendant or any member of his family? From that point, it gets -- you know, breaks down depending on their answers as to what you go into. If they've had family members that have been convicted of anything, we'll want to know what family member and would that affect you. I've had a lot of people and I believe were telling me the truth that have family members that were convicted and said that would not affect it, but then you'll have others that'll flat come out and say, Yes, it would. There's a lot of jurors that will actually answer that they couldn't be fair on a jury, period, because they just don't think they can sit in judgment of anyone.

And then the defense on the other side's going to get up there, and they're going to start the line of questioning, Well, could you just at least consider the death penalty? You know, try to get them rehabilitated on the

death penalty issue. Or are there any of y'all that would just -- looking at my client over here would automatically vote guilty? And then when we get through with all of that, it's just a lot of times a matter of guesswork as to who the best jurors are.

**Q.** Uh-huh (affirmative). And you describe a process where typically, the Court gives a break for the parties to essentially caucus around how to --

**A.** A -- a normal case like this, which is a very important case, we usually have 30 minutes to go pick a jury, which isn't much time.

**Q.** And you say 30 minutes. That's after the conclusion of the voir dire?

**A.** That's after voir dire before we actually come back in the courtroom and tell the judge who we're willing to accept, so it's a very rushed process.

**Q.** Indeed.

And you describe who you typically consult in making those decisions, and you mentioned law enforcement. And is that typically -- and, again, I -- I'm asking typical

questions, but we, of course, want to zoom in on what you can recall specifically about our case. Does that typically and here specifically involve law enforcement personnel who had worked on the case?

**A.** Oh, not necessarily. It's any law enforcement officers that are in the courthouse that day.

**Q.** And --

**A.** We'll get as many of them as we can piled in there and see what they know.

**Q.** And when you say, what they know, what is germane to that?

**A.** It's up to them, and we don't sit there and just ask questions about them. But say -- say you were the defendant, and the officer was sitting over here (indicating). If that officer has answered 14 calls to your house, they may tell us that --

**Q.** Uh-huh (affirmative).

**A.** -- say, That's -- that -- every time we go over there, there's a problem. You know, anything that they think is relevant they will tell us.

**Q.** And -- and, obviously, you have the

other attorney or attorneys prosecuting the case with you in the room making --

**A.** Yes.

**Q.** -- decision, and --

**A.** And sometimes we'll even have some of our investigators or some of the other attorneys that aren't participating in a case in there that may have sat in on voir dire and may have picked up on something a juror said that we didn't even notice.

**Q.** And -- and so the information they're tracking, the information they have beyond the process of a particular prospective juror is something you would expect that they would volunteer, and that could factor into --

**A.** Hopefully --

**Q.** -- your decision?

**A.** -- they will.

**Q.** Right. And it seems like there's a -- sort of an understanding as to what would be relevant in terms of the reliability, the honesty, the integrity of a given prospective juror?

**A.** I don't know that you could actually say that. It's just that we try in a quick

manner to find out whatever we can.

**Q.** Uh-huh (affirmative).

**A.** I've even had deputies sit up there and tell me -- because the juror might have said that they were related to, say, a deputy. The deputy might say, Yeah, I'm related to them, but you don't want them on there because they hate law enforcement.

**Q.** Right.

**A.** You know, things like that are important.

**Q.** Sure. Sure.

**A.** I can't say how much it helps having people in there, but from my perspective, not only does it help us, but it makes the law enforcement officers and the victims feel like they're getting to play a larger part in it than just being left out.

**Q.** And you referred to the victims. So typically, you are taking feedback from the victims in going through this list?

**A.** Yes. If there's a juror in there that one of them might have got in a fistfight with last night, I want to know it.

**Q.** Uh-huh (affirmative). Yeah. Could

you explain more of, like, the -- the thinking in terms of having a victim's family members participate with you.

**A.** A lot of times, especially if it -- you know, we have small communities. A lot of times, you're going to know a good number of the jurors. You may have some of the -- like Ms. Britt. She could probably tell you -- have told us, Well, this juror, this one, and this one are frequent customers of the store. They're real good people. You need to try to keep them on there if you can. Or, This one owed us $500 and cussed us out when we tried to get the money from them.

**Q.** Uh-huh (affirmative).

**A.** You know, those things sound immaterial, but when it comes down to how the jury's going to think when it gets back there, you have to consider it.

**Q.** Is there anything else you can think of that kind of factors into that compressed period where you have to essentially compile your approach and return to court?

**A.** What it boils down to is trying your best to make a gut call of which jurors will be

fair to your side and which ones you don't want because you think they're automatically going to vote against you.

**Q.** Uh-huh (affirmative). Returning to the list and the notations, beyond this understanding that there's an expectation or requirement around this time of 2006, what sort of information is that communicating in this process of selecting or preparing to strike jurors when you have to return to court and take the cause strikes in this process, seems generally and specifically in this case with Judge Loper, and then from that, choose the jury?

**A.** None other than one factor. Because of Batson, if I strike a white juror, I am not required to give any reason. I can strike a white juror just because I don't like the way they blew their nose, but if it's a black juror, I have to give race-neutral reasons. So if it's a -- say I strike juror No. 1. I don't have to give reasons. If I strike juror No. 3, I do. So I have to have at least something written down to remind me what reasons that I would have.

**Q.** Uh-huh (affirmative). That's helpful.
If we could return to the document, and -- and I'd like to try to go down this list a bit. So --
**A.** This one (indicating)?
**Q.** Yes --
**A.** Okay.
**Q.** -- Exhibit 29. So the first one, again, the C in red reflects that there was a cause strike. That's your understanding of the document?
**A.** Yes.
**Q.** And so with regard to the race and gender of No. 1, it's noted that white female is -- is there, W/F; is that correct?
**A.** Yes.
**Q.** All right. And there -- there's no notation next to this witness, and --
**A.** Best I remember, and I -- I may be bad off, but I think she was one of the ones that didn't believe in the death penalty.
**Q.** And -- and that recollection that -- you're just sort of able to remember this facet of --
**A.** There --

**Q.** -- the proceeding?

**A.** There -- there were a pretty good -- it -- it's routine in any death penalty case that the majority of the Court strikes are going to be on the death penalty issue.

**Q.** Uh-huh (affirmative). And so moving to the -- the next witness -- or, sorry --

**A.** Ms. Jones.

**Q.** -- Ms. Jones, the prospective juror, white female again. There is no notation next to her name. There to the far left is an S-1.

**A.** Yes. That was --

**Q.** And what does that mean?

**A.** -- my first strike.

**Q.** Your first strike.

And so you didn't know why --

**A.** I -- I had started writing, it looks like, Could.

**Q.** Okay.

**A.** I'm assuming that there was a question of whether she could or couldn't give the death penalty. And I can't say for sure, but that's -- for whatever reason, she gave some answers that I didn't think she could be fair and impartial, so I struck her.

**Q.** Uh-huh (affirmative). And so the next was Mr. Crawford, and we spoke about him earlier. It seems that there is a C that's written in black and then over that the red.

**A.** There's no significance in that.

**Q.** Okay.

**A.** I had written some down, and I went back and put a -- a red color over all the Cs.

**Q.** Uh-huh (affirmative). And so can you try to read the notes next to his name.

**A.** Apparently, he worked at Atmos, lived at 210 Shelby drive. He said that he could not judge anyone, he could not be fair.

**Q.** And you took down his address. What significance might that have?

**A.** I don't remember.

**Q.** Could that contribute to a quick check on him in some fashion?

**A.** I don't know. I -- I did not strike him. He was already struck for cause.

**Q.** Right. And the next --

**A.** But normally, I would say with him working at Atmos, he would have been a good juror for us.

**Q.** Uh-huh (affirmative). And why is

that?

**A.** Usually folks that work for Atmos, Mississippi Power & Light, those places, they're usually pretty good jurors.

**Q.** And over your tenure, do you have a -- a sense why?

**A.** No.

**Q.** You just have a correlation?

**A.** It's just kind of like how you get to feeling about teachers and doctors and different ones, that some tend to just be good jurors.

**Q.** Moving to the next one, Artman, it appears that there's a cause strike and white male. There's some notes next to him.

**A.** Yeah. He already had an opinion on the case that he -- he said he could lay it aside, but the judge struck him anyway.

**Q.** Uh-huh (affirmative).

**A.** That's one that the judge probably didn't have to strike for cause --

**Q.** Uh-huh (affirmative).

**A.** -- but he did.

**Q.** I see.

The next one, it's got a blue highlight under -- or on the name Nadine

Coleman. What would the blue highlighting indicate?

**A.** I don't know. I don't remember.

**Q.** Can you take a moment, and, you know, at this point, it would probably make sense to -- to review the whole document and -- and the blue highlighting and just make your best effort to try to interpret that with how you would handle things at -- around this time in 2006.

**A.** All right. Based on the others, it looks like the blue ones are the ones that could not consider the death penalty. And I note that all of the ones that I had marked in blue, the judge struck for cause. I'm -- I'm pretty confident that's what it is.

**Q.** There are some names circled in red. Do you have a sense of --

**A.** Yes. That's the jurors that were picked.

**Q.** Uh-huh (affirmative). Next to Nos. 9 and 11, there is a D indication.

**A.** Yes. That is jurors that the defense struck. Their -- defense's first strike was D-1. D-2 was their second strike and on down

the line.

**Q.** Just to return to some of the notations, you know, there are many individuals that were struck for cause, and as you're going through the process, you're taking notes. Is your thought process that that assists you in the event that they're not struck for cause and you have to take a position on them?

**A.** It -- it depends. Some of them are so obvious when the judge is asking a question, you don't even have to waste your time writing anything down --

**Q.** Uh-huh (affirmative).

**A.** -- because you know from knowing the judge they're already gone.

**MR. PERKOVICH:** We're going to mark as -- is it 31?

**THE STENOGRAPHIC REPORTER:** Yes.

**MR. PERKOVICH:** Yeah.

-- another copy of this list, but...

(Exhibit No. 31 was marked for identification.)

**A.** What happened to 30? Oh, here it is. There's the...

BY MR. PERKOVICH:

**Q.** And this is a copy of the same list, but it's --

**A.** Yeah, it's --

**Q.** -- marked up --

**A.** -- not my list.

**Q.** Yes. It's marked up by Clyde Hill.

**A.** Okay.

**Q.** We established that with him. And I'll give you a chance to review that. We may return to it, but talked about the process in terms of selecting a jury and identifying prospective jurors to strike and the brief period that you're afforded typically and judging from the record here in this case to make those decisions and the discussion to that end.

(Off the record.)

BY MR. PERKOVICH:

**Q.** All right. So Exhibit 31, as mentioned, we reviewed this with Mr. Hill, and he has identified that this is his handwriting. And we were discussing earlier the process of making decisions and the information you draw on and just to try to encapsulate Mr. Hill's testimony in terms of not being the person

actually selecting the jury, that fell to you, his supporting role as second chair in terms of taking notes and then being able to caucus with you and whomever else.

Mr. Hill was an experienced litigator in your office?

**A.** Yes.

**Q.** And you had conducted capital jury selection with him prior to this?

**A.** Yes, on several occasions.

**Q.** How would you characterize your working relationship, your collaboration in this element of the process?

**A.** In everything, the -- all the folks in our office worked well together.

**Q.** Uh-huh (affirmative). And so in this pressured situation, you're relying on him to sort of compare notes literally --

**A.** You have --

**Q.** -- to --

**A.** -- to try to because -- say everybody in this room were taking notes from jurors in the same trial. We're not going to have the same notes.

**Q.** Uh-huh (affirmative).

**A.** I may write something down that Juror 32 said, and your notes may say that Juror 33 said it. So you try to make sure that you've got everything together. I may miss something very important, what a juror said, and he may pick up on something that the juror said, so that's why it's so important to have more than one person doing it.

**Q.** Uh-huh (affirmative). Okay. So to return to your notes, and you just indicated earlier the prospective jurors that you tendered after coming back to court, the judge going through the cause/strike process -- and, you know, why don't -- why don't I give you a second to refresh your recollection of that from the record. It goes pretty quickly.

If you turn to the transcript, and I think we pick up at page 321, line 6 where -- well, actually, let's back up, I'm sorry, a little bit to the cause challenges beginning, again coming from Judge Loper in this case, on page 307.

**A.** All right.

**Q.** And if you can just sort of peruse that, it's a -- appears to be a succession of

the judge identifying numbers from --

**A.** Yeah. He just basically tells us who he's striking for cause and wants to know if either side has any objection to it.

**Q.** And I think you alluded to being aware that that's not universal in terms of how a capital jury is struck.

**A.** Every -- every state, every district is different. It just depends on how the judge handles it.

**Q.** And -- and feel free to review the record, but it seems that both sides are essentially acquiescent to the Court in terms of that cause process.

**A.** Well, you don't have to. If -- say the judge struck a juror because he thought that juror said something particular. May have said that they automatically or wouldn't consider the death penalty, just say that. And, say, my notes said just the opposite, and when I made a comment about that, the defense may speak up and say, Well, my notes say the same thing that Doug's notes say. Well, then the judge would go back and look at it and make a determination. So basically, what he's doing at -- a lot of it

is trying to speed the system up, which hurts us sometimes because it gets to rolling too fast. But a lot of this is the judge just saying, Okay. Based on what I've heard, this is the ones that I think need to be struck for cause. If either one of you disagree with me, let me know.

**Q.** Okay.

**A.** And most of the time, both sides are going to agree with him because he takes good notes, and he knows what he's talking about, either one of them.

**Q.** Thank you.

And with the transcript in this particular record, if you could just sort of flip through the pages so that you're fully refreshed on --

**A.** Any place in particular?

**Q.** Just picking up on 307, I believe it is, as he starts to go down the list, and just -- these next several pages concern the cause/strike, and there's a little bit of back and forth beyond that before we get to --

**A.** What -- what --

**Q.** -- your --

**A.** -- page is that on?

**Q.** -- your tendering the -- the jury. So 307 through 3012 -- 312, rather, is probably where we can pause, but it's just confirming what you explained.

**A.** Okay.

**Q.** And I just want, you know, your review of this in relation to the particular case.

**A.** (Witness reviewing document.)

(Off the record.)

**A.** Okay. I think I've gone over what you've wanted me to.

BY MR. PERKOVICH:

**Q.** Okay. And so what you explained before you had the benefit of looking at this seems to characterize the experience in this particular case?

**A.** Yes.

**Q.** And so at that juncture, what's the sequence of responsibilities for selecting the jury?

**A.** Well, once the judge does his cause ones, if either one of us have what we think is a cause reason, we can ask the judge to give that one also. He may or he may not. He may

say, Okay. I agree with you, that one does need to be struck for cause, or he may say, Well, I don't think it's close enough for cause. You can use one of your strikes on him. So it just goes from that point. Once we do that, we have our short meeting to where we can kind of go over the ones that are left. We go down through it. We come back in. I have to tender 12 to the judge, and then the defense comes back, and, say they strike four. They have to offer four more -- or I have to offer four more once they strike those four, and we keep going until we have a jury.

**Q.** Okay. Thank you for explaining that, and that's a good foundation for us to look specifically at how this unfolded. And we can use your -- your list, which is, I believe, Exhibit 29. And to help clarify that, it's got a -- that top -- first page has a page ID of 2505 so that we're all literally on the same page, I hope.

Okay. And a moment ago, you indicated that the prospective jurors that the State determined to tender were circled in this document.

**A.** No. The jurors that the Court accepted --

**Q.** Okay.

**A.** -- are the ones that are circled.

**Q.** And that --

**A.** That --

**Q.** -- that's an important distinction. All right. Please explain.

**A.** Well, we -- we would start off, and we would tender -- when -- and it depends. We would tender the 12 jurors. And we may use one strike, we may use 12 strikes on the first group --

**Q.** Uh-huh (affirmative).

**A.** -- but we have to tender 12. Then the Court asks the defense -- they will come back. They will say, Okay -- say we -- say we accepted No. 1, and the defense accepted No. 1. Then the Court would say, Okay, that juror No. 1 is on the jury. At that point, I would circle that one because that one's already on the jury. And we would keep going until 12 are circled, and then depending on how many alternates, we'd go over them.

**Q.** Okay. That's helpful to parse the

process, and we'll look at how this was carried out here. You a moment ago alluded to after the judge would go through and identify in his determination those who should be stuck -- struck for cause, he would -- there was a call in response on this where it was put to the State and to the defense if there was agreement. And --

**A.** Right.

**Q.** -- pretty consistently, there had been. Then there's sort of a follow-up where either side can put forward another prospective juror and make an argument for cause, and it -- if you flip the pages of 319, 320, we see that argument for Mr. Pitchford. His counsel, Ms. Steiner (phonetic), raises a couple of juror numbers, and that's hashed out, spilling over into the next page of 321.

**A.** Okay.

**Q.** And so by 321, the Court states, Now the State will tender a panel. And so you describe what comes next.

**A.** Yes. At that point, we will go down through them, and taking out the ones that are struck for cause, I'll have to go down the line

in order, and I'll say, The next juror we'll tender, the next juror we'll strike, and just go down like that.

**Q.** Okay. And so if we move to line 20 --

**A.** On...?

**Q.** On the same page, 32- -- on page 321, it says --

**A.** All right.

**Q.** The judge says, And so the State will now proceed, and it's turned over to you. If you can just read that first paragraph, and then I'll have some --

**A.** Juror No. 2 will be S-1. State will tender Juror No. 6. State will tender Juror No. 9. State will tender No. 10. State will tender No. 11. State will tender No. 13. State will tender No. 17. State will tender No. 19. State will tender No. 20. State will tender No. 26. State will tender No. 27. State will tender No. 28. State will tender No. 29. So out of the first group of jurors, I only used one strike, and that was for Juror No. 2.

**Q.** And that is Pat- -- Patsy Jones, correct?

**A.** That's correct.

**Q.** All right. And we've discussed her briefly, and there's not a notation as to -- to why you wanted her not on the jury.

**A.** No. It's not in my notes.

**Q.** Uh-huh (affirmative). And -- and you explain that your analysis is that there isn't a concern about a race-neutral reason for striking her because of her identity as a white --

**A.** That's correct. So I don't have to actually have it written out to articulate to the Court.

**Q.** Okay. And so looking at the list, the first five are handled here. You've got four cause strikes and the State's strike of No. 2. And so No. 6 is Andrea Richardson. Judging from the list and, again, collating this with the record that you just read into our record, and -- Ms. Richardson's identified as a white female?

**A.** That's correct. And both sides accepted her.

**Q.** And -- right. To cut to the chase for Ms. Richardson, correct, that both sides accepted her and, hence, she has a red circle around her name; is that correct?

**A.** Correct.

**Q.** So moving down to No. 10, that's the next -- well, actually, I misspoke.

**A.** The --

**Q.** No. 9 --

**A.** Yeah. The defense struck Juror No. 9, Ronald Ray Branscome.

**Q.** And so you in the passage we just had you read indicated that you tendered No. 9 --

**A.** Correct.

**Q.** -- Mr. Branscome, a white male, correct?

**A.** Yes. The defense did not want him.

**Q.** That's right.

And so he's not on the jury because the defense exercised its first peremptory, and that's noted in your notes as D-1?

**A.** Right. And I didn't have anything written down in my notes about him either.

**Q.** Right. And so moving to No. 10, that's Chad Eskridge. The -- as indicated by your red circle around his name, the defense accepted him?

**A.** Yes. Both sides accepted him.

**Q.** So you tendered him as a white male

and the -- and the defense accepted him, correct?

**A.** Well, I -- I tendered him.

**Q.** Well, you tendered him --

**A.** I didn't tender him --

**Q.** He is a white male --

**A.** --- as a white male.

**Q.** -- judging from the notes on your -- on your document here. I appreciate you parsing the language. It is, obviously, important?

**A.** Yes.

**Q.** We wouldn't be here today if it were not.

Moving to No. 11, it appears that -- again, judging from the transcript and the notes, it would seem to indicate he had been tendered by you --

**A.** The defense --

**Q.** -- and then --

**A.** -- struck him.

**Q.** -- and the -- and the defense struck him as D-2? Mr. Marter is reflected here as a white male. There's a note at -- next to his name. Can you read that?

**A.** My note?

**Q.** Yes.

**A.** He stated that he had heard about the case.

**Q.** Uh-huh (affirmative). And so this note allows you to kind of travel back, and you can recall that?

**A.** Yes. And it also -- the ju- -- that's one of the main questions the judge asks on any of the case is, Have you heard anything about the case? And, of course, the judge doesn't go into what they've heard, but he goes into how they heard it. Was it word of mouth? Was it radio? Was it television? And then the important question, Was anything -- did anything about what you heard influence whether you could be a fair and impartial juror? And for both sides, we have quite a few answer that it would affect them --

**Q.** Right.

**A.** -- some that would be in favor of the State, some that would be in favor of the defense. So that -- that's an area that both sides are real interested in.

**Q.** And so Mr. Marter's not a slam dunk to use a -- a -- a euphemism. He -- it's not out

of the question that his testimony that he had heard about the case could have been a reason for striking him for cause?

**A.** If he had said something that would indicate that. Apparently, from both sides accepting him, he -- he was pretty positive that it wouldn't affect him.

**Q.** Well, no, actually, Mr. Marter --

**A.** Well, that's right. The --

**Q.** Yeah.

**A.** The defense did strike him.

**Q.** Right.

**A.** I don't remember him stating anything about what he had heard, but I can't say for sure.

**Q.** Okay. Moving down the list --

**A.** 13?

**Q.** -- that's Morgan James, and you had tendered him, and the defense used its third peremptory, correct?

**A.** Yes. And the only thing that I marked by him is that he knew the victim, and more than likely, that's why the defense struck him, but I can't say -- now, I can't speak for them.

**Q.** And -- and Mr. James is a white male

according to this?

**A.** It -- it's James Morgan.

**Q.** Sorry. I was a little too familiar for me to call him Mr. James. Mr. Morgan. Thank you.

And, again, to sort of look at the notes, you've got the red underline that would seem to denote your intention to tender him, and then what happens next can be either a circle around that because the defense doesn't use a strike or the notation that the defense uses a strike?

**A.** Yeah. I think the ones that were underlined were the -- and it -- they're not all done. Like, apparently, I didn't underline No. 4, but apparently, that's what I was trying to do was underline the ones that I was tendering so that I could keep up with them. No, the underlined are the defense strikes. The red underlined are the defense strikes.

**Q.** Whoa. Well, I don't know because if you look at -- if you go back to -- up the list a little bit to 10, Eskridge was tendered and accepted, and he 's got that red underline, and Richardson, she has the red underline and the

circle reflecting that she did make it on the jury.

**A.** I'm not sure then.

**Q.** Well --

**A.** It may be -- I'm -- I'd be guessing. It -- it may be that those were the ones that I was wanting to tender or -- I don't know.

**Q.** Okay. We'll see --

**A.** I can't --

**Q.** -- as we -- we move along. The pattern might establish itself.

Moving to No. 17, again, with the -- what you read into the record from the trial record, No. 17 was tendered, and that's Michael Sherman, correct?

**A.** Right.

**Q.** There's no notes next to him.

**A.** I didn't have any.

**Q.** Right. And --

**A.** And I don't know -- I'm not looking at Clyde's list. I don't know if he had any on those or not.

**Q.** Yeah. He -- he tended to have the opportunity to put notes in.

**A.** See, he was sitting at the table --

**Q.** Exactly.

**A.** -- while I was standing up doing voir dire --

**Q.** That's why I --

**A.** -- so --

**Q.** -- said opportunity. Right.

And so with Mr. Sherman, No. 17, the defense used another strike, its fourth; is that --

**A.** Correct.

**Q.** -- correct?

**A.** Correct.

**Q.** Okay. And, again, Mr. Sherman's a white male.

Moving to No. 19, Brantley Clark --

**A.** Yes.

**Q.** -- is identified as a white female and was the seventh, I believe, tender that you made. Another strike from the defense, its fifth. Is that --

**A.** That's correct.

**Q.** -- reflected there?

And, again, with respect to Ms. Clark, there is not a notation in -- in your copy of the list.

**A.** Not in my copy.

**Q.** Right. And then moving to 20, there is Lovey Britt, and you have the notation of, 3 children; is --

**A.** Yes.

**Q.** -- that correct? All right.

**A.** It was something about -- you know, a lot of times, people will say things, and it's something about the way they say it that you -- it kind of strikes you. So it was something about the fact that she had the three children that I thought was important, and I wrote that down.

**Q.** Any idea what -- which way that might go?

**A.** No.

**Q.** All right. And so she's a -- a white female. The defense uses its sixth strike on her, but, again, that's that red underline that we were talking about.

Moving on to the next page, I believe, and down to No. 26, we have Johnny Stewart, and the State tendered Mr. Stewart, a white male. The defense did not strike him. They accepted him, so he became a juror, hence the red

circle --

**A.** Correct.

**Q.** -- correct?

And for the very next entry, Ms. Mary McCluney, No. 27, again, you tendered her. She's noted as a white female. There is not a notation or discussion of her as a -- as a prospective witness in your notes. The State -- or the defense, excuse me, accepted her; they did not strike her.

The very next entry, No. 28, is Lisa Parker. Your notes indicate a white female. The defense did use another strike on Ms. Parker; is that correct?

**A.** Yes.

**Q.** And then by the time we reach No. 29, the State tendered Laura Ward, who is a white female. Seems that she has the same notation of, 3 children.

**A.** 3 children.

**Q.** It's a refrain. And the defense accepted her?

**A.** Correct.

**Q.** So that gets us to sort of the bottom of page 321 in these proceedings according to

our trial transcript, correct?

**A.** Right.

**Q.** And you described what happens next in this context. Can you --

**A.** Well, we have to tender enough more jurors to fill in the blanks of what the defense has struck.

**Q.** Uh-huh (affirmative). And so if my math is correct, that's another seven because the defense has used seven strikes?

**A.** Yes.

**Q.** Okay. And at this point, you've used one strike --

**A.** Right.

**Q.** -- and that was the second on the list, Ms. Jones.

So if we can look at page 322 of the transcript, and what you've described follows after we've looked at these strikes from the defense, at the top of the page that --

**A.** 322?

**Q.** 322, right.

**A.** Okay.

**Q.** And so you see Mr. Baum -- mainly at lines 9 through 12, he's going through the

different strikes. Well, and before that, 4 through 6. And so that gets us to the seven strikes that the defense used against the individuals you tendered. So it picks up on line 15, and if you could read that paragraph into our record.

**A.** Okay. 30 will be S-2. 31 will be S-3. We tender 37. Tender 38. 43 will be S-4. Tender 44. 48 will be S-5. Tender 51. 54 will be S-6. Tender 59. Tender No. 60. And tender No. 61.

**Q.** Okay. So the next prospective juror in this list is No. 30, and so the ball's put back in your court. As you explained after the seven strikes were used by the defense, you have to either tender or use strikes --

**A.** Correct.

**Q.** -- for the next run of prospective jurors who have not been eliminated in this process for cause. And so the very next juror is No. 30, and that is Linda Lee, and you exercised your second strike for her, correct?

**A.** I did.

**Q.** And then the following juror, No. -- No. 31, is Christopher Tillmon --

**A.** That's correct.

**Q.** -- and you exercised the third strike on him?

**A.** Yes.

**Q.** And then the next several have been struck for cause already, and so the next available prospective juror is No. 37. And you offered your first subsequent tender, we'll say, your 13th tender in this overall process for Mr. Durham?

**A.** Correct.

**Q.** And Mr. Durham is a white male; is that --

**A.** He is.

**Q.** -- correct?

What are the notes next to his name?

**A.** His brother is a federal game warden.

**Q.** Uh-huh (affirmative). And it seems from your notes that the eighth defense strike was used against Mr. Durham?

**A.** It was. They didn't particularly like that he had a law enforcement relative.

**Q.** That's your conclusion, I suspect, right, from your years of experience?

**A.** Yes.

**Q.** Fair enough.

Moving to 38, you tendered Ms. Brewer?

**A.** Yes.

**Q.** She is a white female?

**A.** (Nods head affirmatively.)

**Q.** And the defense accepted her?

**A.** Yes. And I --

**Q.** And --

**A.** -- didn't have any notes on her.

**Q.** No notes on her, and she has a red circle around her name?

**A.** Yes.

**Q.** And let's see. The next several have been struck for cause bringing us to No. 43, and that's Patricia Tidwell?

**A.** Yes.

**Q.** And you exercised the State's fourth strike with respect to Ms. Tidwell, correct?

**A.** Yes.

**Q.** All right. The very next individual is No. 44, and that is Devotie Brister, who is identified as a white male?

**A.** Correct.

**Q.** And was tendered as the 15th tender for the State, upon which tender the defense

used its ninth strike?

**A.** Correct.

**Q.** And then moving to the next available member of the venire, No. 48, and the State's fifth strike was exercised against Mr. Carlos Ward; is that correct?

**A.** I'm sorry?

**Q.** The -- the State used its fifth strike on No. 48, Mr. Ward?

**A.** Yes. Yes.

**Q.** Okay.

**A.** I lost my place.

**Q.** It's understandable. So moving down the list here -- we're on the third page of this document -- to the next available juror who had not already been already eliminated for cause, and that is the State's 16th tender in this process, Charles Griffith?

**A.** Yes.

**Q.** And Mr. Griffith is a white male?

**A.** Yes.

**Q.** And there's a note next to his name. What do you read that to say?

**A.** When he was asked by the defense -- by -- or it could have been the Court. When he

was asked if he had any family members that had ever been victims of a crime, he stated, yes, that his wife had been beaten and robbed.

**Q.** Uh-huh (affirmative). And do you recall anything further about that testimony?

**A.** No. Just the fact that I'm assuming the defense did not want him on there because of that.

**Q.** Uh-huh (affirmative). And -- and to that point, you see the defense using its tenth strike on --

**A.** Yes.

**Q.** -- on Mr. Griffith?

Okay. And then the next two have been struck for cause. No. 54 is Brandi Smith, and the State used its sixth strike on Ms. Smith, who is noted as a white female. Do you see the notes next to her name?

**A.** Yeah. She had a cousin that was murdered in Arkansas, and best I can remember, she was not happy with the outcome of it and said that that would affect her being able to sit as a juror.

**Q.** Uh-huh (affirmative). And so it seems like that would be a basis for a cause strike

for her.

**A.** Not unless she told the Court that --

**Q.** I see.

**A.** -- that she couldn't be fair and impartial. We have a lot of them that we end up having to strike for cause that could have been struck -- I mean, that we have to strike for our strikes that could have been struck for cause, but the Court out of precaution, I think, only strikes the ones for cause that there's definitely no question about.

**Q.** All right. So moving ahead, we have several on the list struck for cause. And the next available prospective juror is No. 59, and that's the State's 17th tender, Sidney Hendricks, a white man; is that correct?

**A.** That's correct.

**Q.** And he was accepted by the defense?

**A.** Yes.

**Q.** So he's red circled?

**A.** Uh-huh (affirmative).

**Q.** And the next is Mr. Leonard Jones --

**A.** Yes.

**Q.** -- No. 60, and denoted as a black man, correct?

**A.** Yes. And I had no notes on him. He didn't state anything in voir dire that would indicate that he would not be a good juror.

**Q.** And -- and so this process is helping you recall specifically --

**A.** Yes.

**Q.** -- his -- his role?

Okay. The very next is No. 61, Gloria Howell, who's indicated as a white female, and she was the 19th tender also accepted by the State?

**A.** Right. And like -- like Mr. Jones, I had no notes by her, so apparently, she stated no reason that I didn't feel she could be a good juror.

**Q.** Okay. Then moving down -- well, and before we do that, so in this next round, of course, we've already addressed the defense's use of some strikes, so we kind of repeat this process a little bit further.

Before that, though, Ms. Steiner for the defense lodges an objection, and near the bottom of that page invokes Batson versus Kentucky. And we'll address those issues in -- in a little bit. I just want to get through the

selection of the jury, and we're almost there.

So if we move ahead to No. 64, we see William Johnston, and he's indicated as a white man. He was the 20th tender, and he, too, was accepted by the defense?

**A.** Correct.

**Q.** And moving down the page to Charles Pyron, he is indicated as a white male --

**A.** Before him, No. 65 --

**Q.** Oh, right.

**A.** -- was Defense 11.

**Q.** Thank you -- yes. Thank you for catching that. So No. 65 is Mr. Benreuter [sic], a white man. The State tendered him, and defense used its 11th strike.

And then moving two more down to the next available juror, that's Mr. Pyron, a white man. The State tendered him as the 22nd [sic], and the defense used its 12th strike?

**A.** Correct.

**Q.** Moving to the next page, we see the next available juror -- prospective juror is No. 70, and her name is Sandra Penn, a white female?

**A.** Correct.

**Q.** And the State exercised its seventh strike against her?

**A.** Correct.

**Q.** There's not a notation here. Do you have a recollection about her?

**A.** I don't. I know that I have prosecuted several Penns for drug charges, and I don't remember if they were in her family or not. There was some -- some -- something about her that I didn't think she could be fair.

**Q.** Okay. And then moving to No. 73, the next available individual on the list, David Little, the State tendered him, the 22nd. And out of strikes, at least at this point, the defense had no action to take on it.

The next entry is No. 74, Jeffrey Counts. Like Mr. David Little, a white man, was also tendered.

And then the matter of selecting alternates came to the next in line who had not been struck for cause, and that's Michael Curry and Nathalie Tramel. Ms. Tramel's notes, can you try to interpret those.

**A.** Did not answer the death issue.

**Q.** Uh-huh (affirmative).

**A.** In other words, she -- she would not state one way or the other whether she could or couldn't be fair and impartial, but she never said anything that would really be reason to strike her. And I don't remember if that was -- that -- that's all I wrote, so that's all I really remember about it.

**Q.** Okay. So with No. 77, to back up, Mr. Curry, the -- the defense uses strike for -- an alternate strike on him, and that pushed this process down the list to the next available juror, who was No. 82, Lisa Wilbourn. And Ms. Wilbourn is a white female and identified as the second alternate; is that correct?

**A.** That's correct.

**Q.** So at this point, there's a -- there's a jury and two alternates?

**A.** That's correct.

**Q.** All right.

**MR. PERKOVICH:** How about a break?

**THE WITNESS:** All right.

(A recess was taken.)

BY MR. PERKOVICH:

**Q.** So we left off -- we walked through the list after identifying who had been struck

through the process led by the Court, and we then walked through the tendering and peremptory strike process that ultimately yielded the jury and panel for Mr. Pitchford plus the two alternates. And I believe in that process, the -- this entailed the State tendering 25 individuals. That's the count I have. And your notes, Mr. Evans, are helpful in terms of tracking the process with regard to the underlining of the number and the circling of the name when a -- a juror was ultimately accepted.

And I believe that our record reflects that 25 -- out of these 25 tenders, 24 were white individuals, and Mr. Leonard Jones, No. 60, is the sole black individual tendered by the State in the process. Does that comport with your review of the materials we've gone through?

**A.** That's what it looks like.

**Q.** Do you recall Mr. Jones?

**A.** No, I don't.

**Q.** Uh-huh (affirmative). And he is another individual where your notes are not -- you do not have notes next to his name, you

know --

**A.** So apparently --

**Q.** -- contemporaneous notes.

**A.** -- he didn't say anything that I thought would keep him from being a good juror.

**Q.** Do you -- do you recall what he looked like?

**A.** No. Couldn't tell you if he was young, old, or anything else.

**Q.** And if we could consult Mr. Hill's list. That's Exhibit 31 here, and you see his notation. Having had the benefit of working with Mr. Hill for -- for many years, can you interpret his notes on --

**A.** What line -- what number?

**Q.** That's No. 60, Mr. Jones.

**A.** All he's got is SO-1, so SO-1 must have said something about whether he thought he would be a good or a bad juror.

**Q.** Uh-huh (affirmative).

**A.** That's the sheriff.

**Q.** Uh-huh (affirmative). And so that would be Sheriff Strider at this time?

**A.** Yes.

**Q.** Uh-huh (affirmative). And do you

recall Mr. Strider being in the process?

**A.** I don't remember.

**Q.** Uh-huh (affirmative). And -- and so spe- -- specific recollection as to who was in the room helping you --

**A.** I couldn't --

**Q.** -- or Mr. Hill --

**A.** -- even tell you for sure what family members were in the room.

**Q.** Uh-huh (affirmative). Okay. And so, obviously, in selecting the jury, both sides exercised strikes. We looked at this process in its different stages in terms of the tendering of the initial 12, the use -- and also simultaneously the first strike that you tendered, and then the defense's strike, and the impetus was put on you at that point to tender replacements --

**A.** Uh-huh (affirmative).

**Q.** -- another seven. And, of course, as this process works, you're literally going down the list as they are numbered. And in that sort of second stage of the process, the fir- -- the next two peremptory strikes were exercised for No. 30 and No. 31, so I'd like us to -- to look

at your notes for those two.

And No. 30 is -- is Linda Lee, and she's reflected as a black female; is that correct?

**A.** She is.

**Q.** And can you interpret the notes?

**A.** Yes. The first note that I wrote down and underlined is that she was late coming back after lunch. The second one is that according to Carver Conley -- and I -- I put who gave me that information. He was one of the deputies involved in the case that was also a captain at the police department at that time. He told me that she was mentally incompetent. And then some of the others there said that they had had plenty of police calls and contact at her house regularly.

**Q.** And so that's your recollection that there were plenty of police calls according to --

**A.** That's of what I wrote down.

**Q.** All right.

**A.** Now, what else was on there, I can't remember. I -- that's just what I jotted down.

**Q.** Okay. And if you'd like to consult

page 324 and 325 of the transcript, Ms. Steiner raised a -- a challenge under Batson at the trial, and the Court asked you to provide an explanation for the strike in -- I believe starting at line 27.

**A.** Okay. You want me to read starting there?

**Q.** Yeah, just so that we capture what was put in the record at this point and to the extent it may help us --

**A.** All right. Yes, sir. S-2 is a black female, Juror No. 30. She is the one that was 15 minutes late. She also, according to police officers, Police Captain Carver Conley, has mental problems. They have had numerous calls to her house and said she obviously has mental problems, which is consistent with what my notes had by her.

**Q.** And in an instance where the reason it's put forward is coming from law enforcement's contact with an individual, what is your sense of what needs to be submitted in that response in the challenge to establish that justification?

**A.** What I have. That's what I base it on

is what the officer told me.

**Q.** Uh-huh (affirmative).

**A.** And I have no reason to believe that the officer's going to lie to me about a juror.

**Q.** And you have no reason to believe that because...?

**A.** Because of what? I don't get the question.

**Q.** So --

**A.** They're -- they're there for the sole purpose of what we are, to get a fair jury, and that's why I get their input. They know a lot more people in the community especially in some of the other counties than I'm going to know, so I need their input in what type person this is.

In this particular case, I've got a reputable officer that's telling me in front of all these other people she's got severe mental problems --

**Q.** Uh-huh (affirmative).

**A.** -- and I don't want somebody on the jury with severe mental problems. I don't think the defense does either.

**Q.** Uh-huh (affirmative). And so the inquiry in this situation is, that's the extent

of it.

**A.** That's all I have opportunity to get.

**Q.** Okay.

**A.** I can't send them to the State Hospital and get them examined.

**Q.** That would be a real can of worms if you could, right?

**A.** Might keep most of them.

**Q.** And so have you experienced a situation where, obviously, that did not occur -- this did not occur in this particular case but where a raisin -- a reason of that kind is put forward, and there's further questioning of the prospective --

**A.** I have.

**Q.** -- juror?

**A.** If the defense does not think that that's satisfactory --

**Q.** Uh-huh (affirmative).

**A.** -- the defense can even ask questions.

**Q.** Uh-huh (affirmative).

**A.** Apparently, the defense had no reason to question what the officer was saying, so they accepted that.

**Q.** And do you recall anything else about

Ms. Lee?

**A.** No.

**Q.** And the next in line was No. 31, Christopher Tillmon. And can you reflect on your notes for him?

**A.** Hold on just a second. He had a brother that was convicted of manslaughter in my district.

**Q.** And -- and if you'd like, you can consult -- well, actually, I -- I would like you to just take a look at it. You don't have to read into the record, but you provide a reason here on page 325 beginning at line 7.

**A.** Let's see. Yeah. Basically, what I just said, he has a brother convicted of manslaughter, and I don't want any juror that has family members that are convicted of a murder since this is a murder case.

**Q.** Uh-huh (affirmative). And -- well, obviously, there's a -- a legal distinction in -- in manslaughter and murder --

**A.** Well, they're both killing --

**Q.** -- which is intent- --

**A.** -- somebody.

**Q.** -- intentional homicide. Yeah.

**A.** A lot of murder cases end up leading to manslaughter.

**Q.** Uh-huh (affirmative). And are there other crimes that you would imagine would give you that kind of concern?

**A.** Sure. Depends on what the crime was.

**Q.** Uh-huh (affirmative).

**A.** If a juror has a family member convicted of armed robbery or, you know, aggravated assault, anything like that --

**Q.** Uh-huh (affirmative).

**A.** -- that's going to probably -- and -- well, let me say this, too: Usually -- and I can't remember all the voir dire on these cases.

**Q.** Uh-huh (affirmative).

**A.** Usually, we go further and ask them if that would affect them.

**Q.** Uh-huh (affirmative).

**A.** Or if the Court has asked them, the Court will ask them if that would affect them. Part of it, you go by if you can remember the case, how bad a case was it? If you can't remember it, then you just have to go by what's said in the courtroom, and in there, you've got both their reaction and their comments, how they

react. It -- it's just so much you have to look at to try to judge whether that's going to be a good juror or not.

**Q.** Uh-huh (affirmative).

**A.** You know, I've -- I've had some before flat come out and say, Yeah, he's the SOB that convicted him, and I ain't going to vote for him on nothing.

**Q.** Uh-huh (affirmative).

**A.** So, you know, you -- you pay attention to what they're saying.

**Q.** Do you recall other members of the venire providing information about criminal background or convictions relating to family members?

**A.** None that stayed on the jury.

**Q.** If I could have you back up a bit on our list here. So moving down -- I think -- yeah, we're on the same page, actually -- to No. 43, Ms. Tidwell, and that's the State's fourth strike. It's the -- and that was made in the second stage of the process after two strikes we've spoken of already followed by the tendering of Mary Brewer. The next -- No. 38. The next venire member is No. 43, Patricia

Tidwell. Can you review your notes.

**A.** Uh-huh (affirmative). Her brother was David Tidwell, who I tried. It was a pretty violent sexual assault case. Carver Conley said that I think she was involved in some shooting, and I can't -- I'm not sure what that other note is --

**Q.** Uh-huh (affirmative).

**A.** -- C/S abuser or something like that. But I knew David Tidwell very well.

**Q.** Were you surprised that she wasn't struck for cause?

**A.** No, because she would not say definitely that that would affect her.

**Q.** Okay.

**A.** I would have liked for her to have been struck for cause, but, you know -- and not being critical of the Court, the Court I -- has to be cautious of how they use their cause strikes, and I understand that.

**Q.** Uh-huh (affirmative).

**A.** There's times that I would love to see them strike some that I think should be struck for cause that they don't, but I understand why.

**Q.** And the next, as we discussed, number

on the list, venire member No. 44, was -- it's Ms. Brister -- or, sorry --

**A.** That was the defense strike.

**Q.** -- Mr. Brister. Yeah.

And -- and so he was tendered, and the defense struck him.

The next is No. 48, Carlos Ward, and that is the fifth strike. Can you consult your notes on the sheet here and help us --

**A.** I'm not --

**Q.** -- understand the re- -- thinking --

**A.** -- sure if I can read all my notes on that one.

**Q.** All right.

**A.** He had no opinion on the death penalty, wouldn't give one. Two-year-old child, not married, about the same age as the defendant, numerous speeding violations, student at Holmes College. That's all that's written down.

**Q.** I'll ask you to -- to take a look at Exhibit 31, and -- and, again, that's Mr. Hill's version of this list, and to refer to his notes for No. 48.

**A.** He didn't put any notes down on him

apparently other than his age --

**Q.** Uh-huh (affirmative).

**A.** -- 22.

**Q.** And so your recollection as to your process for striking Mr. Ward?

**A.** I don't recall without looking at the record of why I struck him.

**Q.** Uh-huh (affirmative). So if we go to page 325 and 326, we can take a look at starting at page 28 reasons that were put forward.

**A.** He had no opinion on the death penalty. He has a two-year-old child. He's never been married. He has numerous speeding violations that we're aware of. The reason that I do not want him as a juror, he is too closely related to the defendant. He is approximately the same age as the defendant. They both have children about the same age. They both have never been married. In my opinion, he will not be able to be thinking about these iss- -- kept from thinking about these issues especially on the second phase, and I don't think he would be a good juror.

**Q.** So do you have any further thoughts on -- on that?

**A.** No. All I can do at this point is go back and look at what was on there.

**Q.** Uh-huh (affirmative).

**A.** But I -- I would -- I would say the same thing, that it appears that he would be too closely connected to distinguish himself.

**Q.** And there was an emphasis on the small child. Can you amplify that point a little bit.

**A.** Just the fact that they both fall in the same category. They both have small children. They're both about the same age. They both live in the same community. They -- they are so much alike that I'm afraid that he would have associated himself with the defendant more than he should have at the trial.

**Q.** And do you recall in the process that we're focusing on here identification of individuals who also had small children like Mr. Ward?

**A.** I don't remember any that had small children that were around his age and from the same general community that fit those criteria. I don't remember any.

**Q.** Uh-huh (affirmative). So we -- we looked at No. 17, Michael Sherman, who was

tendered and then the defense struck. What do you recall about Mr. Sherman?

**A.** Nothing. I don't have anything written down.

**Q.** Okay. So one place we can begin to look is in his questionnaire. So in your binder, that's going to be about three-quarters of the way into it, and there's a -- there's Bates numbering from the Supreme Court record. And you'll see that on the bottom of the page, and I'd ask you to try to get to page 1656.

**A.** In this binder (indicating)?

**Q.** The -- sorry. The -- the -- the other one we haven't consulted yet.

**A.** Oh.

**Q.** Yeah. If you can reach it.

**A.** And what page?

**Q.** So there are a couple of sets of page numbers. We're working with the bottom one. It says, MSSC-Pitchford. We're looking for page 1656.

**A.** Okay. All right.

**Q.** And do you see his age?

**A.** Twenty-seven.

**Q.** Right. And so we -- we pointed to

Mr. Ward being 22. Are you seeing a major distinction between those?

**A.** Yeah.

**Q.** Okay.

**A.** Several of them. One, he lives close to me. I know the area that he lives in. He has a B.S. degree in mechanical engineering from Mississippi State University. He works at Advanced Distributor Products, and he's a manufacturing engineer. I would see a pretty good bit of distinction in there.

**Q.** And --

**A.** I don't think he's going to associate himself as being basically the -- in the same category as the defendant.

**Q.** And, you know, the record reflects that Mr. Sherman had a daughter of two and a half years and a son of three months at this time. Would that information...

**A.** I don't know where you're getting that from, but that by itself wouldn't make any difference.

**Q.** Uh-huh (affirmative). Can you amplify a little bit on that?

**A.** No more than I just said.

**Q.** Okay. And moving down our list in -- in terms of those tendered, Ms. Wilbourn, she was the second alternate in our list.

**A.** I don't think --

**Q.** The record --

**A.** -- think I used any strikes on the alternates.

**Q.** No. You put forward two, and then the defense struck one, and then there was a third. I -- I'm referring to Ms. Wilbourn because she had a son of -- of 23 months.

**A.** Well, I don't think she's going to be one of his buddies out on the street. It's a female, and she's in a complete different category than him.

**Q.** And when you buddies, what -- what do you mean? Who's buddies?

**A.** If me and you were the same age --

**Q.** Uh-huh (affirmative).

**A.** -- we were both unmarried, we both had two-year-old or three-year-old kids that are living in the same neighborhood, we're going to have a lot in common. And if I'm on trial, and you're sitting over there, and you're looking at me and say, That's me over there because I'm in

the exact same situation he's in, I feel sorry for him --

**Q.** Uh-huh (affirmative).

**A.** -- then that is going to be different than somebody that works a factory or lives on the other side of town, goes to different community club, has no connections at all than me and you would have.

**Q.** Uh-huh (affirmative).

**A.** So that's what I'm talking about. I'm talking about a situation where two people are so closely alike that it's going to be hard for that juror to sit there and not in the back of their mind say, That could be me sitting there.

**Q.** And -- and so the closeness for Mr. Ward in respect to Mr. Pitchford as you see it would be what?

**A.** They were approximately the same age. They had approximately the same-aged children. They were not married. They lived in the same community. They lived close to each other. I mean, it was just so much that it was just too overwhelming to take a chance on it.

**Q.** And in the same community. Where did Mr. Ward live?

**A.** I don't remember. I couldn't tell you now where either one of them lived.

**Q.** And Mr. Pitchford lived in Coffeeville near the --

**A.** No. He lived in Grenada County.

**Q.** Mr. Pitchford?

**A.** Yes, he did.

**Q.** No. I mean, I'm not trying to be argumentative.

**A.** The house that he lived in with his mother was right behind Crossroads Grocery.

**Q.** Well, it's Grenada County, but that --

**A.** That's Grenada County.

**Q.** And that's Coffeeville, if I'm not mistaken.

**A.** No, it's Grenada. They may have a Coffeeville address, but it's in Grenada.

**Q.** The county as opposed to the city. It's not within the city limits, correct?

**A.** Correct.

**Q.** Okay. And --

**A.** But it's a big difference in Coffeeville and Grenada.

**Q.** Can you explain that difference?

**A.** Complete different towns that are

about 30 miles apart.

**Q.** Okay. And so Mr. Ward, do you know where he lived?

**A.** I don't now.

**Q.** But --

**A.** I'm -- I'm assuming there was enough to know that at that time, but now, I don't. I can't remember.

**Q.** Uh-huh (affirmative). The numerous speeding violations that you noted in the -- what was the source of that information?

**A.** Police department.

**Q.** And -- and --

**A.** They said they had had a lot of problems with him, and it -- it wasn't just that he had been stopped a time or two for speeding, that they had numerous occasions that they had had -- had run-ins with him.

**Q.** Could I ask you to take a look at Exhibit 30 and page 40.

**A.** Okay.

**Q.** And at the -- the bottom card there is for Carlos Ward --

**A.** Okay.

**Q.** -- and it has a home address. Do you

see that?

**A.** 151 Tallahoma Drive, Grenada.

**Q.** Would that be in the city limits of Grenada?

**A.** Probably not. That's probably out in the county.

**Q.** You said earlier that there -- the cards -- the juror information forms generally didn't have much information and weren't --

**A.** Correct.

**Q.** -- generally relied on. Do you recall relying on this information in assessing --

**A.** I don't recall ever even seeing these cards.

**Q.** Okay. That's helpful.

**A.** And a lot of times, we don't get them in trials.

**Q.** Uh-huh (affirmative). So Mr. Ward's youth was an important factor in --

**A.** It was a factor.

**Q.** Uh-huh (affirmative).

**A.** You look at all of those, plus the fact that he would not give any opinion on how he stood on the death penalty. Most of the time, when somebody refuses to give any opinion

on it, they are pretty adamantly against the death penalty.

**Q.** Can you explain that.

**A.** I thought I just did. Most --

**Q.** Well --

**A.** -- of the time -- if folks refuse to give any opinion on how they stand on the death penalty, most of the time, they do not believe in the death penalty and would not vote for it.

**Q.** And -- and so that's a professional observation?

**A.** That's from experience.

**Q.** Okay. No. 19 on the list is a Mr. Brantley, and he was tendered -- sorry. Pardon me. Brantley Clark is a female, pardon me, that the State tendered and was struck by the defense. So the record reflects her age of 22. I understand that we're talking about a female versus a male. Does that make a meaningful difference for you?

**A.** Nobody was struck because they were 22 years old.

**Q.** Uh-huh (affirmative).

**A.** You're looking at a combination of all the factors in there.

**Q.** And so it's the crystallization of these specific factors that lead to this --

**A.** Well, there's -- there's no perfect science to picking a jury.

**Q.** Uh-huh (affirmative).

**A.** You could hire -- some states have hired specialists to come in and pick jurors. All we can do is try to use our judgment, look at each juror and what we know about them, which is very little of their life, and try to make a determination from these factors is this a good juror for this case or is this a juror that would not be fair and impartial. And both sides basically have to use their guts to tell them if they're right or not based on what answers they give and what comments they get from people in the community that they can rely on. And frankly, if I have an officer that tells me that we have had numerous stops on this person, we've had a lot of problems out of them, in addition to the fact that they will not give an opinion on how they would vote on the death penalty, plus them fitting in the same category as far as age, family, and things like that as the defendant, I'd be an idiot if I left them on a

jury.

**Q.** You've emphasized a -- the absence of an opinion on the death penalty. That's been helpful in terms of explaining your understanding of that, your experience of that. With respect to Laura Ward, not Carlos Ward, and that is Juror No. 29, who ended up being juror 5, she was seated. You tendered her as the 12th tender, and the defense obviously accepted her. She had no opinion on the death penalty according to the record, and --

**A.** Not according to my record.

**Q.** And what do you have?

**A.** All I've got down on her is that she had three children.

**Q.** Uh-huh (affirmative). Well, that's all you have, but that doesn't foreclose that she failed to take an opinion on the death penalty --

**A.** Well, I'm saying --

**Q.** -- from your notes.

**A.** -- what I -- what I noticed that she said.

**Q.** Understood.

**A.** She may have said something different.

**Q.** Uh-huh (affirmative). Her questionnaire explicitly identified not having an opinion on the death penalty.

**A.** Okay. And like I say, I don't think we ever had access to the questionnaires. If we did, I never saw them.

**Q.** Well, obviously, I -- you know, you're more than welcome to consult the questionnaires --

**A.** No, I'm not -- I'm not doubting what you're saying.

**Q.** Uh-huh (affirmative).

**A.** What I'm saying is what I had to rely on.

**Q.** Uh-huh (affirmative).

**A.** I can't rely on something that I don't have access to.

**Q.** Uh-huh (affirmative). And -- and so to return to Carlos Ward, the information you had access to was --

**A.** His -- his statements he made during voir dire.

**Q.** Uh-huh (affirmative). So in addition to Laura Ward explicitly not having an opinion, the alternate Nathalie Tramel also explicitly

had no opinion on the death penalty.

**A.** Which number are we talking about?

**Q.** She was 78.

**A.** 78. All I've got on her is that she did not answer the death issue.

**Q.** So can you unpack that a little bit?

**A.** Not without sitting back there and remembering, but it's a difference in just not answering and stating -- specifically stating that they did not have an opinion.

**Q.** Okay.

**A.** Basically, to me, if someone tells me that they don't have an opinion, they're not wanting me to know what that opinion is.

**Q.** And to refer to the -- the questionnaire -- and I think that there was some uncertainty about being able to access that in this process. It seems that, you know -- and obviously, Mr. Hill is in a different position literally from you in the selection process, and he's had the bene- -- he has the benefit of being at the desk and -- and being able to access additional materials while you're representing the State on the record.

On page 69 in the motions section, if

we back up a little bit --

**A.** Which book are we in?

**Q.** Sorry. The -- the actual record, the --

**A.** All right.

**Q.** -- transcript.

**A.** Okay.

**Q.** There's a discussion about the questionnaire here and information that was put on it. Does this help your recollection about the questionnaire?

**A.** No. And I don't know what we're talking about, two people from the defense talking to her --

**Q.** Uh-huh (affirmative).

**A.** -- unless defense attorneys were trying to talk to a juror. I -- I can't remember what -- who on behalf of the defense was talking to that juror.

**Q.** Okay.

**A.** They must have been talking about the defense attorneys because I said specifically in here I'm not accusing the defense of doing anything wrong, that she had talked with two people from the defense. So apparently, either

the defense attorneys or people representing the defense attorneys were talking to one of the jurors.

**Q.** So going back to -- to Mr. Ward and the information available about him, do you recall direct questioning of Mr. Ward?

**A.** No. I don't remember the direct questioning of any of them.

**Q.** And -- and I don't think the record -- the transcript contains the questioning of him. And so the basis of -- for information would be, as we discussed, kind of the materials we're looking at, the questionnaire and -- and the card --

**A.** A lot of it is probably coming from the police officers.

**Q.** And -- and so his age would be coming from the police officers?

**A.** Yeah, they knew him.

**Q.** Okay. Well --

**A.** Two of the police off- -- two of the officers there, I know Carver Conley and one of the others, knew him real well --

**Q.** Uh-huh (affirmative).

**A.** -- and they specifically said that he

would not be a good juror.

**Q.** That -- that may be true when you consult his questionnaire. It does certainly confirm the age of 22, and --

**MR. PERKOVICH:** Joe, do you know offhand the page number for that?

(Off the record.)

BY MR. PERKOVICH:

**Q.** It's page 1716 on the Bates number in the other binder. Right.

**A.** 1716?

**Q.** Yes. It near the back of the --

**A.** I got it.

**Q.** All right. And -- and so he lists his address there, phone number, age of 22, identifies some college and employer Heatcraft and lists a son of two years old and provides no opinion. And it appears that this information that was relied on for your response in the Batson challenge, at least it's consistent with the information in the questionnaire as far as your --

**A.** Well, they said they knew him --

**Q.** Yeah.

**A.** -- so it would have been.

**Q.** What's also interesting is -- is in -- on the other venire list, Mr. Hill's venire list, the single note he had about Mr. Ward was his age. And I don't believe I heard you refer to Mr. Hill having prior knowledge of Mr. Ward --

**A.** No. He wouldn't have had prior -- that knowledge. It would have been from somebody giving him that information.

**Q.** I mean, could it have come from the questionnaire, consulting --

**A.** Oh, I can't --

**Q.** -- the questionnaire?

**A.** -- answer that.

**Q.** All right.

**A.** I don't know if he ever saw any of the questionnaires or not.

**Q.** Uh-huh (affirmative). And so, you know, the reasons reflected, to return to your notes, provide no opinion, which is exactly the category on item 29 of the questionnaire which is circled by Mr. Ward, reflects a two-year-old child, which, again, is in answer No. 28 for Mr. Ward, and his age of 22, which has been invoked, also reflected on the questionnaire.

**A.** And numerous --

**Q.** You can't rule out --

**A.** -- numerous --

**Q.** -- consulting the questionnaire --

**A.** -- speeding violations with the police.

**Q.** Right. And numerous speeding violations added also in those notes. So it's certainly possible that his questionnaire had been consulted. Is that fair to say?

**A.** This came from the officers best of my knowledge, and I don't think the officers had access to any questionnaires.

**Q.** I think --

**A.** Whether -- whether Clyde looked at any of them, you'd have to ask him. I don't know on that.

**Q.** But you cannot rule out that you --

**A.** All I can answer --

**Q.** -- consulted the question- --

**A.** -- is what I know.

**Q.** I'm just asking a different question, which is: You cannot rule out that you consulted the questionnaire in preparing for the tendering and the striking of the jury; is that

true?

**A.** I don't think I can answer that question. All I can answer is I don't remember ever seeing any of the questionnaires.

**Q.** Okay. And with respect to the no opinion position taken by others, it seemed like that's -- that would be a -- a largely disqualifying --

**A.** It depend --

**Q.** -- feature --

**A.** It depends on how it's used. Same thing with folks' opinion about the death -- just having an opinion about the death penalty. What they -- it's not just that they say, I don't believe in the death penalty, or, I do believe in the death penalty. You look at everything they say, and based on everything that they've answered, do you think that they could consider the death penalty as one of the possible sentences? A lot of people bounce back and forth on their views. Some based on their comments scare me. I'm afraid that they would not vote for the death penalty on any circumstance. And some I feel like, well, yeah, they're probably really battling it back and

forth, and on the right case and the right circumstances, they probably could do it. So you don't just go by any one certain answer; you go by everything. You go by how they're answering the questions. You go by what they're answering. You go by how they respond to follow-up questions, things like that.

In this particular case, the only thing that I can tell you that I could remember is this is one that I did not think would vote for the death penalty under any circumstance because of the way he was answering the questions. I did not think he was going to make a good juror, and that's all I can do is rely on -- on what I feel after talking with these jurors.

**Q.** And -- and, again, you just are referring to Carlos Ward just now in that regard?

**A.** On some of it, and some of it is just in general.

**Q.** Okay. You know, obviously, the job here is to belabor some of these issues until we --

**A.** Oh, I understand.

**Q.** -- extricate them from --

**A.** And -- and the whole system is skewed to one side. For example, the courts don't even care who the defense strike --

**Q.** Uh-huh (affirmative).

**A.** -- and to me, that's just as important as who we strike. We try to be fair, and I'll have defense attorneys laugh at me and say, Well, we don't have to be.

**Q.** When you say -- yeah. If you could amplify the -- sort of that one-sidedness that you just described in terms of --

**A.** I have even --

**Q.** -- the Court not --

**A.** -- had -- when I have asked for reverse Batson in cases, I have had defense attorneys make comments, Well, I didn't like that juror because they were sitting next to another juror I didn't like. And the Court would say, Okay. That's good enough.

**Q.** The record doesn't reflect a reverse Batson challenge here.

**A.** I'm talking about in general. You were --

**Q.** Understood.

**A.** -- talking about in general.

**Q.** I understand, and I'm -- I'm just asking a specific question here. Do you -- do you recall --

**A.** We waste --

**Q.** -- whether --

**A.** We waste our time in asking for it, so I don't ask for it.

**Q.** So would the defense striking 13 whites, did you consider --

**A.** It wouldn't do me any good to ask for it.

**Q.** I -- I'm trying to get my question out. Do you recall considering or entertaining --

**A.** Oh, sure --

**Q.** -- the stri- --

**A.** -- but I knew it would be a waste of time.

**Q.** And I know she's going to tell us in a second that we can't talk over each other, so we'll both try and abide by that, all right?

So you do -- you do recall that as this transpired and the defense exercised its 13 strikes with regard to whites the -- the

question in your mind or collectively in consultation raising that issue, but you declined to do it?

**A.** Sure. When you -- when you're looking to the panel, and they're striking white jurors that have not answered one question during the whole voir dire, it makes you wonder, but it's a waste of time to try to raise it, so all we can do is try to protect the record as far as we're concerned.

**Q.** And with respect to the -- the strikes and the courts not, in your estimation, taking an interest in the basis for defense strikes, what are the implications of that? What are the consequences of that?

**A.** Well, the Court's not going to get reversed for messing over the State. They will get reversed the other way.

**Q.** Uh-huh (affirmative). And -- and with respect to -- to Batson challenges specifically you're referring to.

And, you know, in terms of reversal with regard to a Batson error and having to retry cases, what sort of conversation goes into the selection process out of concern about the

prospect of review and reversal on a -- a jury issue?

**A.** Just trying to make sure that we know who's on the jury and know what we can about them, try to ask enough questions to get a feel of how we think they will vote, and make a record of it.

**Q.** Uh-huh (affirmative). And in your experience, of course, you've encountered reversals on Batson challenges --

**A.** Uh-huh (affirmative).

**Q.** -- on direct appeal?

How has that process -- well, first, before Mr. Pitchford's trial in 2006, have you encountered reversal on such a violation?

**A.** I -- we're talking dates. I'm not sure what point, but I -- I've been reversed on Batson. Improperly I think, but I have been.

**Q.** And when the State Supreme Court has reversed you, have -- and -- and your conclusion on -- in retrospect and on analysis is that they were incorrect in their evaluation of the case?

**A.** I think they were because they were not relying on what I had in my notes and reasons for striking a juror. And when you --

when I strike a juror -- and the Court's notes -- well, I don't know which one you're talking about. But we all rely on our notes. My notes may say one thing; the defense notes may say something else. All we can do is rely on what's there. And that's all I ever did is look at what's there and try to be fair and rely on what the jurors say.

**Q.** Uh-huh (affirmative). And -- and so, obviously, there -- Batson articulates a process where a challenge is made, the court deems a response is needed with a race-neutral reason. And you've referred to the note process, and, obviously, it's important here in our case, and we're relying on it heavily with regard to the individuals who were struck in Mr. Pitchford's case.

Is it your understanding that those reasons need to be explained and submitted to the trial court?

**A.** They need to be in as much detail as we can within as much time frame as we're allowed.

**Q.** Uh-huh (affirmative).

**A.** I think you have seen enough just in

this today to tell how rushed we are in this process, and it's hard to get everything done in this time frame.

**Q.** And -- and so with the time pressures as you've explained, and, you know, we were last speaking about Carlos Ward, you're distilling the information you've got. I believe you stated, if I'm not mistaken, that relying on the answers that Mr. Ward gave during voir dire would be the basis for the notes that you then are required to crystallize and articulate on the record?

**A.** That's part of it. It's his answers, his responses, his attitude, the officer's comments, the victim's comments. If I have an officer -- and this happens on every trial. We'll have officers that know some of these jurors well. They go to their house every night on fights or they go and arrest them every other night on something. And when an officer tells me that, We have had frequent contact with this person, you don't want him on the jury, I have to pay attention to that because they're telling me that for a reason. They know that this person does not believe in law and order. They

know that this person is going to be trouble, and I can't afford to have somebody on the jury that's automatically going to vote against us as soon as they sit on the jury. So I have to depend on those officers to tell me the truth.

**Q.** And the institutional concern beyond having a successful trial -- and -- and, I guess, it's fair to encapsulate much of what you've said today that success if a fair process, that you have to be mindful of issues that are going to arise on direct appeal.

And the record with regard to this particular issue is one that is, as I've heard you explain, challenging for many reasons, including the time pressure, but it's incumbent on you to distill that information, make the best record to -- and, of course, in the first instance to achieve the ruling from the trial judge to allow you to carry forward with how you're wanting to select and compose the jury.

I'm also hearing you explain the sort of downstream concerns with regard to needing a retrial if something's reversed. So of course, it's a very substantial part of the prosecution, and obviously, a capital prosecution is all the

more important and has yet more com- -- complexities with regard to death qualification and the other constitutional elements of that.

What factor is the prospect of reversal playing in the jury selection process and, in that regard, the prospect of retrying a case? What implications does that have in the jury selection process as you're undertaking it and using strikes?

**A.** I don't know that I understand your question. That's not something we think about at that point. At that point, we're thinking about what that person says, what people are saying about them, and who we need on that jury. We don't think about an appeal at that point.

**Q.** Well, I mean, you are certainly trying to avoid reversal --

**A.** Well, we think about following the law. We don't worry about appeals because at that point, we know we're trying to do everything right.

**Q.** And consequences in terms of having reversal on a jury issue and needing to retry a case, does that present complexities for your office? Does that present concerns in terms of

your ability to do justice in any given case?

**A.** No.

**Q.** Are you familiar with a state senator Chassaniol -- I apologize the pronunciation -- C-H-A-S-S- --

**A.** Chassaniol.

**Q.** -- A-N-I-O-L?

**THE STENOGRAPHIC REPORTER:** Start over. I'm sorry.

BY MR. PERKOVICH:

**Q.** C-H-A-S-S-A-N-I-O-L.

**A.** Lydia Chassaniol.

**Q.** Okay. And have you consulted with her in the past in connection with submitted legislation to -- to the State --

**A.** No.

**Q.** -- assem- --

**A.** But I know what you're talking about.

**Q.** If you can elaborate.

**A.** She attempted to file a bill where the State would be entitled to a fair trial and be able to ask for a change of venue if it was obvious that the State could not get a fair trial in a certain venue, and it did not pass. It didn't go anywhere. Right now, the way the

law is, the defense can ask for a change in venue. We can't under any circumstance, the judge can't under any circumstance, only the defense.

And in this case that she did that on, the Flowers case, we had had several jury panels that -- out of Montgomery County that probably 80 percent of the jury panel knew the family in the case -- one family or the other, either the victim's or the defendant, and every one of them said that they could not be fair and impartial. The defense admitted to the Court that there could not be a fair jury picked from Montgomery County, but when the judge said, Well, do you want a change of venue, they laughed and said, We sure as hell don't. This is where we want it tried.

So we are stuck. The defense can ask for a change of venue, but the State is not entitled to a fair venue. That is what she was trying to change.

**Q.** In your familiarity with that effort, did she consult you --

**A.** No.

**Q.** -- about that?

What do you understand was the genesis of her preparing that --

**A.** I have no --

**Q.** -- legislation?

**A.** -- idea. She probably knew some of the family members. I don't get involved in the legislative end of it.

**Q.** So you don't --

**A.** Other than pay raises.

**Q.** The record should reflect that certainly in boldface.

So you don't recall conferring with her about her legislation --

**A.** No, I don't.

**Q.** Okay. And your understanding, though, is that the impetus for that legislation is the serial relitigations in the Flowers case?

**MS. RUCKER:** Objection.

**A.** The -- the reason for it as far as I understand is because it was clear that the State is not entitled to get a fair trial, and she was trying to have the law changed to where we could. There are states where the prosecutors can ask for a change of venue, or the judge can ask for a change of venue, but in

Mississippi, we are limited. We cannot under any circumstances. We could have 100 percent of the jurors stand up there and say that they could not be fair and impartial, and we still can't ask for a change of venue.

BY MR. PERKOVICH:

**Q.** I -- I believe that you said earlier, though, that your sense of her motivation for seeking the change of law was an outgrowth of what was encountered in the Flowers litigations.

**MS. RUCKER:** Objection.

**A.** It's my understanding that she -- I'm sorry. Did I interrupt somebody?

**MS. RUCKER:** Oh, no --

BY MR. PERKOVICH:

**Q.** No, you're --

**MS. RUCKER:** -- you're fine.

BY MR. PERKOVICH:

**Q.** -- you're fine.

**A.** It's my understanding that she was close friends with some of the family members of the victims.

**Q.** Uh-huh (affirmative).

**A.** Now, what they discussed, what they did, I don't know, but I was not involved in

that.

**Q.** And so obviously, you -- you mentioned the Flowers case, and I referred to State Supreme Court reversal on jury discrimination. And more recently, there was the Supreme Court of the United States reversal on that ground --

**A.** Which was completely wrong. They even basically -- if you read the opinion, they found that nothing I did was wrong, but they assumed that it might have been race -- based on racial reasons, which was the most unusual decision that I have ever seen in my life where they can say looking at the record, We don't see anything that this prosecutor did wrong, but we're still going to reverse it.

**Q.** And you're referring to Justice Kavanaugh's opinion in that?

**A.** I am.

**Q.** All right. And in that opinion, the tabulation of the use of strikes across that case and the other cases was right on --

**A.** That was the biggest crock of mess I have ever seen in my life to start with that our Supreme Court, which I highly admire, would stoop to the level of letting the defense trick

them into using a podcast with bogus information, and they used that as part of their opinion. That, to me, was the worst part of that decision. And there are several judges up there I still respect, but I -- it shocked me that they would fall for that kind of mess. That podcast came up with some of the most ridiculous crap you could find. They talked to plenty of people that gave them true facts of the case that they would not use. All they were interested in was one side of the case, and that bogus group that went around to some of the courthouses trying to get records, I talked to the clerks on what they were looking for and what they were trying to find. They weren't interested in getting records. They were interested in just finding some cases to try to make a point that they wanted to make.

**Q.** Uh-huh (affirmative).

**A.** If they had gone into everything, it would have been completely different, but they -- that wasn't what they were looking at. They weren't one bit interested in the truth.

**Q.** In this litigation, in the motion practice and the effort to be able to question

you today about this strike list, we had also requested jury files from your office with respect to, obviously, this case, and one could say that this came from such a file and other cases.

What is the practice of maintaining a file with regard to jury selection with whatever goes into that preparation and the process within the trial?

**A.** Normally, we don't keep any of it because it's not part of the file.

**Q.** Can you explain that distinction.

**A.** What we keep is what we need for court.

**Q.** Uh-huh (affirmative).

**A.** Anything other than what is evidence or we need for court we don't keep in our files. We don't have -- we don't have room to store anything. We don't have room for what we have to store.

**Q.** I -- I can empathize with space constraints let me tell you without digressing, but in -- in this instance, there were some materials within a jury file. So what I'm hearing you say, and correct me if I'm wrong, is

that as a matter of policy, institutionally, there is not a protocol for keeping, maintaining in the file the jury --

**A.** There --

**Q.** -- materials?

**A.** Well, there's no policy, but there's no reason for us to keep something that the Court keeps. The clerk's office keeps the questionnaires, things like that, so there's no sense in us keeping duplicates of it --

**Q.** And --

**A.** -- and --

**Q.** -- the distinction I'm returning to is -- for instance, this is a very good example, I think. This is a list that obviously is maintained in the record. The clerk keeps it. I believe Judge Loper had his own list, a copy of this same list. And here, there's work product on it, and it's been illuminating to explore that with you, and calling Mr. Hill. Similarly, questionnaires that would have denotations and other work product on the documents, we see a distinction between a document that is possessed in the record by the clerk and a copy of the same document that has

some manner of work product indicating some thinking process in the work of the State.

So it seems that on some occasions, materials are kept in the file, and -- but I'm hearing you articulate that it's not a protocol or a rule to retain that information for the prosecutions from your office.

**A.** No. It may -- may get in there, and it may not --

**Q.** All right.

**A.** -- but there's no -- no rule either way.

**Q.** So that would be kind of a case-to-case determination as to the existence of such material?

**A.** Frankly, it'd be what ends up getting thrown back in the file after the trial because when we get through with a trial, we may have a notebook like this (indicating).

**Q.** Uh-huh (affirmative).

**A.** And when we get through, every one of these pages may be scattered out on the desk separate. When we get through with the trial, we'll rake it all up and stick it back in, so we don't know what gets in there and what doesn't

most of the times.

**Q.** And as a general matter, there may be some materials of the kind I just described from case to case, but it's not a matter of course that such a material would be collected and preserved and maintained?

**A.** Normally, it wouldn't be.

**Q.** All right. I also referred to, you know, this list of -- of cases that your office prosecuted during your tenure, and you've mentioned the journalist responsible for the In the Dark podcast and specifically their work at clerk's offices within your jurisdiction.

Can you describe a little bit more of what you meant by their approach and the method of what they were collecting from the clerks.

**A.** Just from --

**MS. RUCKER:** Objection.

**MR. KUCIA:** Yes.

**A.** Just from what I got from the different clerks, they went in with the attitude of what they wanted to find, and that's all they were looking for.

BY MR. PERKOVICH:

**Q.** And -- and what sort of material could

be found from the clerk's record --

**A.** Nothing, I don't think.

**Q.** Uh-huh (affirmative).

**A.** I got a feeling that most of what they put on there was strictly made up because I know they didn't look at a fraction of the cases we've tried. I don't know what they got or where they got it or if they actually got anything, but...

**Q.** And so have you been able to look at the empirical evidence that they have put forward --

**A.** I --

**Q.** -- for --

**A.** I never looked at --

**Q.** -- statistical analysis --

**A.** -- the podcast.

**Q.** No, just -- if I can carry on, the empirical evidence that they have organized under their effort to produce that podcast as sort of additional materials. They have at least represented that they have collected source material from the clerk's records with regard to these cases and have conducted statistical analysis about that, so I just want

to make sure we're on the same page. Is that what you're --

**A.** They --

**Q.** -- speaking to?

**A.** -- represented a lot of stuff in that podcast that was flat lies, so I don't believe anything that's in it.

**Q.** Have you been able to consult the materials that have been identified, again, as a sort of ancillary part of the podcast but what is being represented by the producers of that as primary source information collected from clerk's offices concerning dockets and cases you prosecuted?

**A.** I never saw anything.

**Q.** Okay.

**A.** But to my opinion, that would be like the Supreme Court relying on some -- one of these newspaper articles that you see in the grocery stores to -- to base evidence of a case on.

**Q.** Uh-huh (affirmative).

**A.** And just the fact that they allowed themselves to even consider something like that that wasn't in the record, it -- it's just a

complete change of the law.

**Q.** With respect to it not being in the record, what particularly are you concerning?

**A.** A made-up podcast.

**Q.** Oh.

**A.** I mean, how can you rely on some bogus news source to say this is what happened when the trial transcript clearly says what happened?

**Q.** Uh-huh (affirmative). And your view of -- of the decision reversing you in that case was that it -- it was relying on that --

**A.** Definitely. You could --

**Q.** -- extra-record evidence?

**A.** You could read it, and you could tell. I respect Justice Kavanaugh. I think he's a great justice, but if he had gotten the same treatment in his confirmation hearing I got in this, he wouldn't be on the Supreme Court. So that's my opinion.

**Q.** That's a very topical observation while that process is going on anew while we're conducting this deposition.

**A.** But, you know, the Senate did not rely on bogus news sources. They just listened to the evidence and made their determination. They

did not do that on this case. They looked at all of these ancillary things that were being thrown at them and put out in the public, and unfortunately, it appears that they relied on that instead of the facts.

**Q.** And to return to some of what I'm referring to in information that was collected or documents that, I'll put it that way, were collected by the producers of that podcast and then made publically available and, I understand, have been empirically analyzed by researchers where they've done statistical analysis -- are you familiar with some of the statistical analysis of that information?

**A.** I'm familiar --

**MS. RUCKER:** Objection.

**A.** -- that these folks don't know what they're doing. I was told that they had done one survey on some kind of weird thing before, and that was it.

BY MR. PERKOVICH:

**Q.** Okay. And with respect to the statistical evidence that has been cited to in -- well, to start with the Flowers case, your view of that is that it -- it is not accurate?

What is your --

**A.** It's not accurate.

**Q.** Okay.

**A.** I had the podcast folks come to me I can't tell you how many times wanting an interview, and I told them I was not interested in giving them an interview, but if they wanted to sit down off the record, I would answer any questions they had, and I would explain to them what they had in there that was wrong. And they said, Oh, we're not interested in that.

**Q.** Did they say that?

**A.** They said that.

**Q.** That's shocking, yeah.

And what else did they say?

**A.** That was about it. I slammed --

**Q.** Yeah?

**A.** -- the door after that.

**Q.** Okay. It sounds like that's how that was going.

And so, you know, with respect to the findings, the statistical findings, it seems like you're finding a major fault in --

**A.** Well, to --

**Q.** -- how that was done.

**A.** -- to start with, I don't believe that that survey was even done right. Even if it had been, you can't base how many jurors of a certain age or a certain race sat on a certain number of trials. You have to look at every case, what the jurors said in that case, and who's there. Like in -- if you try a case in Montgomery County, there are going to be more people that are related probably than there are in other counties because it's such a close community. To start with, you look at how many on the jury know about the case, is it a very popular case, how many on the jury are related to the defendant, how many are related to the victims. You don't look at how many jurors are there or how many are white or how many are black. You try to look at who is going to be fair, and that's -- the Court's responsibility more so than ours is to make sure that that procedure is followed. And when everybody does that and the Court and both attorneys agree on the jury, supposably, you've got a fair jury. It doesn't matter how many of any race or color or age or anything else is on there.

**Q.** And -- and do you have a view with --

just a hypothetical here because you've established your view of the predicate in question, which is the underlying research is not reliable from your estimation. In a scenario where such stati- -- statistical analysis is reliable and there's a determination that a black venire member is six to seven times more likely to be struck than a white venire member, what implication would that have for jury discrimination --

**A.** None unless you know why they were struck. Just to give you an example, and this is -- this is facts, there are more black jurors that do not believe in the death penalty than there are white jurors, and you're going to have a vast -- huge number more of your black panel that is going to say, I can't be fair and impartial because I don't believe in the death penalty. Same thing with religions, and it depends on what area you're in. I found out that if you're in Laurel -- is it Laurel County? Hattiesburg. If you're in Hattiesburg --

**MS. RUCKER:** That's --

**MR. KUCIA:** Forrest.

**MS. RUCKER:** -- Forrest.

**A.** -- the -- if you're Catholic, you don't believe in the death penalty, and you won't vote for it. That's what 99 percent of them are going to answer. If you're in Grenada County and you're Catholic, I'll take you in a minute because they have a complete different view of the death penalty.

So you don't look at how many. You look at why. Why are they not serving? How many of them out there said that they didn't want to serve? How many of them said that they couldn't be fair and impartial? How many did the judge strike for cause? Why did he strike them for cause?

BY MR. PERKOVICH:

**Q.** I'd like to talk a little bit more about the cause aspect because you highlighted something that I think is really striking, pardon the pun, in our record with regard to the cause challenges and death qualification, which, obviously, you're more than familiar with.

And so the cause strikes that Judge Loper put forward and both sides agreed to, vast majority of the strikes he submitted, many of those concerned black venire members and in some

fashion a -- an indication of a, let's say, resistance to death sentencing.

**A.** Uh-huh (affirmative).

**Q.** And so that seems to speak to the number one consideration, and it seems like the number one differentiation between racial groups in terms of a potential jury pool.

**A.** It's a huge difference. I'd -- I'm serious. There are -- I can't give you statistics because I don't try to keep up with them, but there are a lot higher percentage of black jurors that would be great jurors, but they do not believe in the death penalty and wouldn't consider it as any penalty. Now, on a regular trial, they would be a wonderful juror, but if they say they don't believe in the death penalty, they're not qualified to sit on a death penalty case.

**Q.** And in this process in -- in this case and -- and, frankly, generally -- well, in Judge Loper's court to begin with, it seems that his attentiveness to that as a high-order reason for cause strike is thorough --

**A.** Well, it --

**Q.** -- would you say?

**A.** And it -- on a -- he follows what I understand the Supreme Court to have said that judges are supposed to do, and if it doesn't get to that level, he's not going to strike them for cause. If they come back on the defense and equivocate and say, Well, I might could in some cases, he's not going to strike them for cause. But if they say, I don't believe in the death penalty, I couldn't vote for the death penalty under any circumstance, they're gone.

**Q.** And we spoke earlier of the sort of mandate or promulgation in your courts and specifically Grenada County around the time of this proceeding for tracking the information of --

**A.** Yeah. I don't -- I don't know what case it was, but we had some case that the -- wasn't the defense counsel, but on appeal, the attorneys that were handing the appeal tried to raise Batson, and nobody had a record of who the jurors were, whether they were black, white, male, female, or anything else. And so from that point on, the judges said, Well, make sure we've got a record of the racial makeup of the jury so that the Supreme Court won't ever have

that issue come up again.

**Q.** So hopeful -- helpfully -- hopefully you can clarify with respect to using the venire list to track this information, potentially, it's done for the purpose of a subsequent record for some kind of a review?

**A.** That part of it is.

**Q.** Uh-huh (affirmative). I'm trying to reconcile --

**A.** And, usually -- let me -- let me try to explain --

**Q.** Please.

**A.** -- this.

**Q.** Please.

**A.** A lot of things that we try to follow up on the clerk is supposed to do. They should in their record have the distinctions between male/female, black/white/Asian, whatever they have in there, but, you know, in case they don't, that's a backup. And I think the judge does the same thing in his -- on his notes.

**Q.** But it also seems the case that as a matter of course, your practice is -- is not to maintain or to instruct your staff to ensure that information like this -- tracking this

information, supplementing the clerk's information is maintained in the event that it may be needed for record purposes on some sort of review.

**A.** It's already -- I mean, everything is in the transcript. What the jurors say and why, we don't -- there's no need in our notes that may not even be right --

**Q.** Uh-huh (affirmative).

**A.** -- being in there when what's right is actually what's in the transcript.

**Q.** And we've talked about the Flowers decision in 2019. I've referred to prior State Supreme Court review. And I take it you're familiar with the -- the Supreme Court decision in 2016 by the chief justice in Foster versus Chapman?

**MS. RUCKER:** Objection.

**A.** Which issue? I'm not --

BY MR. PERKOVICH:

**Q.** The --

**A.** I can't remember --

**Q.** It's a -- it's a --

**A.** -- by name.

**Q.** -- Bat- -- it's a Batson issue in

relation to jury lists and notations -- contemporaneous notations by the prosecution in selecting the jury.

**A.** I can't say that I know which one you're talking about, but --

**Q.** Okay. That's fine.

**MR. PERKOVICH:** If we could take a -- a five-minute break.

(A recess was taken.)

BY MR. PERKOVICH:

**Q.** You know, one -- one thing I did want to return to, when we were talking a bit about death qualification and cause strikes in connection with that, and you explained a -- a major difference when it comes to black prospective jurors and white prospective jurors with respect to that broad question and, obviously, a -- a -- a first-order question, I was hoping you could explain the genesis of that as far as you can gather -- you know, in this case, it seemed really pervasive in the venire and certainly struck out to -- stood out to me, and it seems like it's a -- a key feature of understanding our record. What sense do you make of that?

**A.** I don't know. And it depends on the community, really, but some communities are more than others, but there are -- it's getting to where the -- the split is not like it used to be. It used to be you either were for the death penalty, you could consider the death penalty, or you were against it. Now you're -- it's pretty much you're either against it or you're for it, and we're seeing more jurors that are getting excused from both angles. They have a strong opinion that they're either for the death penalty and they think everybody ought to get it --

**Q.** Uh-huh (affirmative).

**A.** -- or they're not for the death penalty and they don't think anybody should get it. So it's -- it's making it tough to get jurors. I mean, we go through a lot of prospective jurors that either the Court has to strike or one side or the other of us has to strike because we don't think they can be fair.

**Q.** Do you sense a residual kind of factor beyond when jurors are identified by taking a polar position that excludes them?

**A.** I'm not sure I know what you're

asking.

**Q.** Well, so the -- you've characterized kind of the -- the situation, and we see that play out, and we've seen it in this record with respect to witnesses who say, Under no circumstances can I give the death sentence, or, I give the death sentence for jaywalking.

**A.** Uh-huh (affirmative).

**Q.** And -- and we've been discussing this in terms of the apparent sort of disproportionate allocation of black prospective in that way. The cause strikes seem to have expressly addressed that with the individuals, but is there something more complex than what's taken care of in the cause strikes?

**A.** I -- I can't answer that. I don't know why it's like it is, but one question, the first time I ever asked it, Judge Sumner was Circuit judge, and he thought I was an idiot for asking it. But I asked how many people on there didn't think they could sit in judgment of anyone, period, and five or six people raised their hand. And from asking them questions like, Are you saying that you just couldn't judge anybody no matter what they did or what

the crime was? Yes. And then other jurors would hear that and say, Well, I couldn't either. You've got a large percentage of people out there, black and white, that just don't think they should judge anybody. Then on the other hand, you've got people that just don't want to waste their time being up there, and they'll say one thing or the other thinking it'll get them off the jury. So it -- it's hard to tell.

**Q.** And I'd like to briefly return to sort of the -- the noncommittal segment of the pool, those who would circle C, no opinion. Seems like that's a smaller sliver, and it's one that you spoke about as being an important factor in weighing --

**A.** It is. And you can't go by just on that one thing. You have to go by on how they answer the questions in courtroom, too, and see -- like, I've had some that would put on their questionnaire that they were -- could not give the death penalty on any case that -- when we would go through them. Get in court, and they'd say, Yeah, that's what I put, but, yeah, I could -- I could vote for the death penalty.

So I don't know. I don't know why jurors do what they do. I could make a million dollars if I could figure that out.

**Q.** That -- that's a --

**A.** But --

**Q.** -- rich industry, yeah.

**A.** But you can't go by one answer. You have to look at everything. I've -- I've had family members of defendants sitting on the jury, just to give you an example, say, Yes, that's my first cousin. I've known him all his life. I love him to death, wouldn't believe he could do anything wrong, but I can be fair and impartial, and they kind of grin at you.

**Q.** Uh-huh (affirmative).

**A.** You kind of believe you don't want that juror.

**Q.** Uh-huh (affirmative).

**A.** But that's why I say you have to go by more than what's in the record. And, frankly, for appeal purposes, I wish we had videotapes of picking the jury so you could actually see the responses and not just have what's written down on cold paper.

**Q.** Uh-huh (affirmative).

**A.** I've had them look at the judge before and just make outlandish gestures, and, of course, there's no record of it because the court reporter can't pick that up and doesn't see it.

**Q.** And -- and -- and sometimes it's so outlandish that you put that in the record and --

**A.** Sometimes.

**Q.** Yes.

**A.** And sometimes it's -- I'm not saying just toward the State. We'll have them do it toward the defense, too, and, of course, they're not going to leave anybody on the jury that does something like that, and I don't blame them.

**Q.** And so these sort of broader observations of understanding what you're getting into when a pool of prospective jurors are there and you have to go through them and -- there is -- a lot of it's uncertain to say the least. That's probably the biggest understatement there is in terms --

**A.** Uh-huh (affirmative).

**Q.** -- of this process, that you only can vet them, for lack of a better word, so much,

and it's in a very compressed time frame.

You've pointed to these important observations of, you know, one of the large reasons why the jury pool demographically really shrunk in this case and in other cases and that death qualification was a very substantial factor; is that correct? You're not --

**A.** It -- it makes a big difference.

**Q.** And then so in understanding kind of subsequent steps and the exercise of your discretion in striking a juror in your aim to empanel a jury that can be fair and hear the evidence, what kind of residual factors are there in the judgment calls that you have to make on the fly?

**A.** You just have to take everything in consideration and -- and try to figure out, you know -- and you can't say one factor. Like, normally, if I've got -- say I'm trying a murder case, and I've got a juror that's got a family member that was convicted of murder. Normally, I would say, yes, that person's got to be struck, but I may know that juror, and I may know them personally and know that that didn't affect them. That's something I have to take

into consideration. It -- it's just so much. But a lot of it is in how they answer the question, what they answer, and what you can find out in -- in a short meeting with everybody you can get together. And like I've said before, to a certain ex- -- large extent, we have to rely on the law enforcement officers in the area to tell us as quick as they can what they know about the person and why they think they would or won't be a good juror.

**Q.** And there are intangible factors I -- I hear you referring to in terms of just being in the space with these individuals and -- and, for lack of a better term, having a feel about them?

**A.** Yeah.

**Q.** Can that really sort of tip the -- the balance in the decision you make?

**A.** It can make a difference. I mean, you could be asking me questions and me sitting up here cussing you out on every answer. You're going to think one thing. If I'm sitting up here and politely trying to answer the questions, you're going to think something else, I mean. So how you observe somebody makes a big

difference. If -- if it appears they're trying to be nice and honest, that's one thing. If it appears from what you may know or been told that they're not telling the truth, that's something else. So it's -- it would be nice to have a month to pick a jury --

**Q.** Indeed.

**A.** -- but...

**Q.** And -- and apart from just your sense that you're getting an answer that's untruthful based on other information you know, you're also judging the truthfulness absent information but just on how the person's communicating and how they present to you?

**A.** Yes.

**Q.** And seems like that would be a real challenging factor --

**A.** Well --

**Q.** -- in this.

**A.** -- picking just is challenging, period --

**Q.** Uh-huh (affirmative).

**A.** -- right. We could go -- me and you could go in to pick a jury today, and by the time we get that jury picked, neither one of us

are going to know if we've got the jury we really wanted or not. All we can do is base it on our experience and gut instinct as who we need on that jury and who we don't. You're not going to leave anybody on the jury that you think is not going to vote for your side. I'm not going to leave anybody on the jury that I think is not going to vote for my side. And that's where the supposed fairness comes in. By the time both of us have struck who we think the other one wants, we've probably got a fair jury.

**Q.** It sounds like rough justice, but -- roughly some sort of justice.

And so in a -- in a case like this where you have a white victim and a black defendant and a jurisdiction that has a jury pool, obviously, consisting of both races at least, what sensitivity does that put into the process in assessing the prospective jurors?

**A.** All I look at is who's going to be fair. I don't look at how many -- I don't try to get a certain number of white jurors, certain number of black jurors. All I'm interested in is having 12 fair jurors up there, and the first 12 that I come to that I think can be fair is

who I'm going to have, and it's up to the defense then to strike whoever they want to.

**Q.** Uh-huh (affirmative). Okay.

**MR. PERKOVICH:** Well, on that note, I think we can call it a day, a long one. Thank you for your time.

**THE WITNESS:** All right. Thank you.

**MR. PERKOVICH:** Thanks, everybody.

**MS. RUCKER:** Uh-huh (affirmative). We're good.

**THE WITNESS:** All right.

**MS. RUCKER:** Thank you.

(Off the record.)

**THE STENOGRAPHIC REPORTER:** Do y'all want copies of yesterday and today?

**MS. HARTMAN:** Yes.

(Deposition concluded at 4:59 p.m.)

CERTIFICATE OF COURT REPORTER

I, ELISA M. McKINION, BCR, CCR, Court Reporter and Notary Public, in and for the County of Rankin, State of Mississippi, hereby certify that the foregoing pages contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision, to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the 24th day of April, 2022.

s/ E. McKinion

Elisa M. McKinion, BCR, CCR
My Commission Expires April 7, 2023.