## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**TERRY PITCHFORD**,                 :
    *Petitioner,*                        :
                                         :
    v.                                   :      NO. 4:18-cv-0002-MPM
                                         :
**BURL CAIN**, Commissioner,         :      **Capital Habeas Corpus**
Mississippi Dept. of Corrections, and  :
**LYNN FITCH**, Attorney General     :
of the State of Mississippi          :
    *Respondents.*                       :

## MEMORANDUM BRIEF IN SUPPORT OF PETITIONER'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.    INTRODUCTION.

The State's racial discrimination in the selection of Petitioner's petit jury is established on the record, although the Mississippi Supreme Court denied the claim and affirmed the judgment on direct review. *Pitchford v. State,* 45 So.3d 216, 224-28 (Miss. 2010). Under *Batson v. Kentucky*, 476 U.S. 79 (1986), the resulting violation of Mr. Pitchford's rights warrants summary judgment granting relief in these federal proceedings.

In addition, from the discovery this Court ordered pursuant to Rule 6 of the Rules Governing Section 2254 Cases ("Habeas Rules") (Docs. 60, 95), the State's production of documents and deposition testimony further adduces the prosecution's

discriminatory intent and resulting Equal Protection Clause violations pursuant to

*Foster v. Chatman*, 578 U.S. 488 (2016). Doc. 203 at 28-34.[1]

Presently, Petitioner pursues relief via partial summary judgment under

*Batson*'s application to the existing state court record, doing so, inter alia, to obviate

further proceedings on his federal pleadings' numerous other meritorious claims,

claims that would variously require determinations on complex questions of, inter

alia, (i) state procedural default, (ii) prospective abeyance of federal proceedings for

---

[1] Pursuant to the Rule 6 discovery, Respondents produced two heavily annotated copies of the venire list from Mr. Pitchford's trial, later confirmed to have been the copies that District Attorney Evans and Assistant District Attorney Hill used in striking the jury. These documents facially demonstrate, through "[t]he sheer number of references to race" and the heavy coincidence of stock negative denotations, the prosecution's "persistent focus on race." *Foster*, 578 U.S. at 513. In his March 23, 2022, discovery deposition, District Attorney Evans testified that, in Mr. Pitchford's case and generally, he denoted the race and gender of each member on a venire list due to an unspecified requirement imposed by "[t]he judges in the Fifth Circuit Court District," which started because "[j]udges just wanted to make sure that there was a record that the clerks knew." App.5353-54 (Doc. 201-10 at 415-16). In response to questioning about statistical analyses reflecting historically that Mr. Evans had been six to seven times more likely to strike a black venire member than a white one, the District Attorney testified that such information would have no implication for jury discrimination:

> Just to give you an example, and this is – this is facts, there are more black jurors that do not believe in the death penalty than there are white jurors, and you're going to have a vast – huge number more of your black panel that is going to say, I can't be fair and impartial because I don't believe in the death penalty.

App.5210 (Doc. 201-10 at 272).

Furthermore, for example, with respect to venire member Carlos Ward, the District Attorney repeatedly insisted his strike was due to Ward's responses in voir dire, yet the record shows Mr. Ward was never questioned and said literally nothing during voir dire. *Id*. at 34. Further, Mr. Evans insisted that another reason he used a peremptory on Ward was because he and Mr. Pitchford "live in the same community." App.5419 (Doc. 201-10 at 481). When asked, however, Mr. Evans admitted he had no idea where Ward lived. App.5421 (Doc. 201-10 at 483).

exhaustion in state court, and (iii) which "claims fall outside the opening clause" of 28 U.S.C. § 2254(e)(2). *Michael Williams v. Taylor*, 529 U.S. 420, 430 (2000) (explaining that (e)(2) "applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.'").[2]

Pursuant to the current scheduling order in Mr. Pitchford's action, should this motion for partial summary judgment fail, he will then have thirty days, under *Rhines v. Weber*, 544 U.S. 269 (2005), "to move to stay and hold in abeyance this cause to permit Petitioner to seek available state court remedies." Doc. 206 at 1.

At that juncture, the application of *Rhines* would simultaneously invoke the diligence analysis under § 2254(e)(2)'s "failed to develop" clause in discerning which claims this Court may adjudicate without state court exhaustion and which ones would indeed necessitate Petitioner's pursuit of state court remedies first. *See generally Rose v. Lundy*, 455 U.S. 509 (1982) (cited in *Shinn*, 142 S. Ct. at 1732).

Petitioner thus seeks partial summary judgment on his exhausted record of jury discrimination under *Batson* in order to expeditiously secure the relief to which

---

[2] Recently, *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), revisited *Williams* and the availability of § 2254(e)(2). *Shinn* considerably modified the capacity of federal district courts, under *Martinez v. Ryan*, 566 U.S. 1 (2012), to entertain trial counsel ineffective assistance claims defaulted due to deficient state post-conviction counsel, establishing that "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record," *id.* at 1735, and thus harboring substantial practical consequences for federal habeas corpus litigation concerning trial counsel ineffectiveness claims.

But with respect to the operation of § 2254(e)(2), *Shinn* merely restated the *Williams* holding, reiterating that "[t]he Court concluded that this language [*viz.*, 'failed to develop',] imposes a fault-based standard, meaning that it erects a bar only to those who bear some responsibility for a lack of evidentiary development in state-court proceedings." *Id*. at 1745.

he is entitled and to obviate extensive proceedings, unfolding over the span of years, to arrive at the same result concerning these Equal Protection Clause violations and other claims.[3]

## II.    BACKGROUND.

On September 17, 2018, Petitioner timely filed his initial habeas corpus petition in this Court. Doc. 36. Prior to that filing, Petitioner repeatedly, unsuccessfully sought access to basic case materials from the State, including trial-admitted evidence and review of the District Attorney and Sheriff's files. *See generally* Doc. 37-1. On November 14, 2018, after extensive failure in self-help efforts to access this essential material, Petitioner moved for leave to conduct discovery pursuant to Rule 6, specifically seeking suppressed materials pursuant, inter alia, to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). Doc. 51. Over the course of the following year, Respondents provided four disclosures and facilitated one in-person review in Grenada. Docs. 73, 74, 75, and 77.

On January 21, 2020, based upon information emanating from these productions and, pointedly, conspicuous absences from the disclosures to that point, Petitioner renewed and supplemented his request for discovery. Doc. 83. On March

---

[3] Mr. Pitchford's claims related to prosecutorial misconduct, particularly for suppressed or destroyed evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972), *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Agurs*, 427 U.S. 97, 103 (1976), *California v. Trombetta*, 467 U.S. 479, 488-89 (1984), also raise complex procedural and evidentiary issues.

18, 2020, the Court entered an order permitting various depositions (Doc. 93), ultimately leading to the depositions of eleven individuals directly involved in local and state law enforcement engaged in the investigation and prosecution of Mr. Pitchford. These depositions occurred intermittently, during episodic and prolonged disruptions due to COVID-19 lockdowns and outbreaks, between November 11, 2020, and March 23, 2022.

On April 6, 2022, Respondents successfully moved the Court for an order designating their compliance with the Court's discovery order (Doc. 168), which the Court, over objections from Petitioner, ultimately entered on August 3, 2022. Doc. 191. Thereafter, Petitioner filed his first amended petition on February 13, 2023. Doc. 203. Prior to that amendment, Petitioner filed a consented motion to revise the scheduling order on October 28, 2022 (Doc. 194), contemplating the presently applicable scheduling sequence, which the Court granted (Doc. 195). After extensions of time and further amendment to the schedule, Petitioner has timely filed this motion for partial summary judgment. Doc. 206.

## III. LEGAL STANDARDS.

### A. Rule 56 Applies with "Equal Force" in § 2254 Litigation.

A district "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this rule, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986). The standard equates to that for a directed verdict following presentation of evidence. *Id.* at 251-52.

"As a general principle, Rule 56 . . . applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). But in the event of a conflict between the Federal Rules and the provisions comprising the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, April 24, 1996, 110 Stat 1214 ("AEDPA"), AEDPA controls. *Austin v. Davis*, 647 F.App'x 477, 484 (5th Cir. 2016) (citing *Clark*, 202 F.3d at 764). Absent a conflict—as is the case here, where the non-moving party is defending a state court adjudication— Rule 56 generally applies. *Clark*, 202 F.3d at 764.

## B. Partial Summary Judgment May Further Interests in Justice and Judicial Efficiency.

Piecemeal litigation of some, but not all, claims is generally disfavored in § 2254 litigation. *E.g., Lucio v. Lumpkin*, 987 F.3d 451, 480 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 404 (2021) (citing *Rose*, 455 U.S. at 510 for observation that the total exhaustion rule is meant to reduce piecemeal litigation). This policy, including disfavoring "[t]he filing of multiple, piecemeal motions for summary judgment," is meant to serve judicial economy. *Collins v. Easynews,* No. A-06-CA-451 LY, 2008 WL 11404949, at *4 (W.D. Tex. Feb. 20, 2008). However, that policy and rationale is not always applicable to partial summary judgment in § 2254 cases. In *Wilson v. Beard*, the Third Circuit affirmed the grant of summary judgment to the habeas petitioner on a *Brady* claim. *Wilson v. Beard*, 589 F.3d 651, 655 and 657 n.1 (3rd

Cir. 2009). The district court, while "sensitive to the policy considerations" disfavoring piecemeal litigation, had

> f[ound], in this case, that allowing Petitioner to proceed on summary judgment with respect to what he considers to be his strongest claim will promote judicial efficiency by allowing him to obtain the relief he seeks without burdening the court system with the evidentiary hearings and briefing which would be required for the determination of his twelve remaining claims.

*Wilson v. Beard*, 2006 WL 2346277, *4 n3 (E.D. Pa. Aug. 9, 2006).

Other examples of grants of partial summary judgment in favor of petitioners include: *United States v. Scruggs*, 2011 WL 1832769 (N.D. Miss. May 13, 2011); *Pierce v. Quarterman*, 823 F. Supp. 2d 1254 (S.D. Tex. 2008); *Rickman v. Dutton*, 854 F. Supp. 1305, 1308-09 (M.D. Tenn. 1994)); *Judge v. Beard*, 611 F.Supp. 2d 415, 419-20 (E.D. Pa. 2009); *Wessinger v. Vannoy*, NO. 04-637-JWD-EWD, 2022 WL 17824426 (M.D. La. Dec. 20, 2022). Habeas petitioners have also won summary judgment on *Batson* claims in particular. In *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1266 n.6 (S.D. Ala. 2011), the Southern District of Alabama agreed that the undisputed record showed the State had discriminated against black prospective jurors in the seating of the petitioner's jury.

**C. AEDPA Deference Standard Is Not Insatiable.**

AEDPA prohibits granting a habeas corpus writ unless the state court adjudication is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or the state adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).

Although state court fact findings are presumed correct, clear and convincing evidence may rebut the presumption. §2254(e)(1). "The standard is demanding but not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (granting writ on *Batson* grounds). "Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### D. Underlying *Batson* Analysis.

In *Flowers v. Mississippi*, the United States Supreme Court reversed the Mississippi Supreme Court's decision affirming District Attorney Evans's conviction from the sixth capital trial of Mr. Curtis Flowers, issuing an opinion that "simply enforce[d] and reinforce[d] *Batson* by applying it to the extraordinary facts of this case." 139 S. Ct. 2228, 2235 (2019).

As *Flowers* explained, freedom from racial discrimination was "[a] primary objective of the Equal Protection Clause" of the Fourteenth Amendment. *Id.* at 2238. In the aftermath of Reconstruction, "many jurisdictions employed various discriminatory tools to prevent black persons from being called for jury service. And when those tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in individual cases to remove most or all black prospective jurors." *Id.* at 2239 (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)). Eighty-five years following *Strauder*, *Swain v. Alabama*, 380 U.S. 202 (1965), "held that a defendant could make out a case of racial discrimination by showing the State 'in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be,' had been responsible for the removal of qualified

black prospective jurors so that no black jurors 'ever serve on petit juries.'" *Flowers*, 139 S. Ct. at 2240 (quoting *Swain*, 380 U.S. at 223). Twenty-one years following *Swain*, *Batson* replaced its unduly onerous threshold by establishing "that a criminal defendant could show 'purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges *at the defendant's trial*." 139 S. Ct. at 2241 (emphasis in original) (quoting *Batson*, 476 U.S. at 96).

      *Batson* adopted a system of burden shifting in challenges for discrimination in the use of peremptories: the defendant first has a very low burden of making the prima facie case of racial discrimination; once that burden is discharged, the prosecution must provide race-neutral explanations for the strikes. *Flowers*, 139 S. Ct. at 2243. Thereafter, the defense must be afforded the opportunity to present evidence rebutting these explanations, and finally, "[t]he trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Id.* In making this assessment, the court should treat the prima facie case raised by the defendant in the first step as establishing a presumption of discrimination: "'the totality of the relevant facts [in the prima facie case] gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. Additionally, a determination of racial discrimination thus often hinges on an "evaluation of credibility" of the prosecutor.

*Flowers*, 139 S. Ct. at 2244.[4] While this means review of the trial court's determination is "highly deferential," it also makes clear that evidence relevant to the prosecutor's credibility, including his history of race-based peremptory strikes, is relevant to the determination. *Id*. at 2244-46.

In *Flowers*, District Attorney Evans's history of abusing peremptories "to remove as many black prospective jurors as possible" possessed the utmost relevance: "We cannot ignore that history. We cannot take that history out of the case." *Id*. at 2246.

Such history is highly apposite for the evaluation of the District Attorney's strikes in the selection of Mr. Pitchford's jury in February 2006, especially given the result in the same state circuit court district (the Fifth), two years earlier, in Mr. Flowers's third trial. As the Mississippi Supreme Court observed while reversing that judgment, "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge." *Flowers v. State*, 947 So. 2d 910, 935 (Miss. 2007).

---

[4] The Court previously noted that the analysis is intended to pierce through pretextual "race neutral" explanations to discern discriminatory intent:

> If any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than *Swain*. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence *Batson*'s explanation that a defendant may rely on "all relevant circumstances" to raise an inference of purposeful discrimination.

*Miller-El*, 545 U.S. at 239-40 (citing *Batson*, 476 U.S. at 96-97).

The most typical evidence showing intentional racial discrimination is disparate treatment: the prosecution's proffered race-neutral explanation for striking a black juror would also encompass white jurors who, in contrast, were seated. *Flowers*, 139 S. Ct. at 2249 (noting that black jurors were struck under the purportedly race-neutral explanation of relatively remote connections to the defendant even though seated white jurors in the small town of Winona inevitably had the same connections although disparate questioning and investigation largely kept them out of the record). *Flowers* recognized that disparate questioning and investigation of jurors betrays discriminatory intent. *Id*. at 2246-47. The disparate questioning established in Mr. Pitchford's trial record plainly establishes, once again, the District Attorney's discriminatory intent.

## IV. THE UNDISPUTED TRIAL RECORD ESTABLISHED THE PROSECUTION'S PURPOSEFUL RACIAL DISCRIMINATION IN JURY SELECTION.

### A. The Mississippi Supreme Court Misapplied the *Batson* Jurisprudence.

Both the trial court and appellate court found that Mr. Pitchford had made a prima facie case of discriminatory motive. On direct review, the Mississippi Supreme Court discredited Mr. Pitchford's marshalling of the trial record in demonstration of the baldly pretextual questioning and disparate treatment of the four black venire members, against whom the District Attorney exercised peremptory strikes, vis-à-vis the venire's white members:

> Although Pitchford devoted a considerable portion of his brief and oral argument before this Court to his pretext argument, he did not present

these arguments to the trial court during the voir dire process or during post-trial motions.

*Pitchford*, 45 So.3d at 227. The state supreme court continued: "This Court has held that, '[i]f the defendant fails to rebut, the trial judge must base his [or her] decision on the reasons given by the State.'" *Id.* at 227 n. 16 (citing, *Berry v. State*, 802 So.2d 1033, 1037(Miss. 2001); *Manning v. State*, 735 So.2d 323, 339 (Miss. 1999); *Woodward v. State*, 726 So.2d 524, 533 (Miss. 1997)).[5]

By not considering "all relevant circumstances," the state court, in contravention of § 2254(d)(1), plainly misapplied the clearly established *Batson* jurisprudence set forth, inter alia, in *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). *Miller-El* recognized that evaluation of trial court's exercise of discretion in denying a challenged peremptory strike is subject to facial scrutiny from the totality of the record:

> A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

---

[5] The dissenting opinion pointed out this major error, in contravention of clearly established Supreme Court jurisprudence: "Pitchford may rebut the State's evidence, but there is no requirement under *Batson* that Pitchford *must* then rebut the rebuttal before the trial court. Pursuant to *Batson*, once the State offered race-neutral reasons to rebut the prima facie showing, the trial court then made a determination that Pitchford had not established purposeful discrimination. This Court is reviewing the trial court's decision to determine whether it is clearly erroneous or contrary to the overwhelming weight of the evidence." *Pitchford*, 45 So.3d at 267 (Graves, P.J., dissenting) (citing *Flowers v. State*, 947 So.2d 910, 917 (Miss. 2007).

*Id.; cf. Miller-El*, 545 U.S. at 278 (Thomas, J., dissenting) ("Miller-El did not even attempt to rebut the State's racially neutral reasons at the hearing. He presented no evidence and made no arguments.").

In this vein, the Southern District of Alabama granted partial summary judgment in favor of petitioner on a *Batson* claim, holding that "the Alabama Court of Criminal Appeals' adjudication failed to follow clearly established law when it did not consider 'all relevant circumstances' in its analysis of the trial court's ruling." *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1272 (S.D. Ala. 2011) (quoting *Batson*, 476 U.S. at 96). Summarizing the state court's failure to follow clearly established law, *Stephens* held,

> one of the State's proffered reasons for striking a black potential juror is unsupported by the record, thus the fact that the State did not investigate its "information" in voir dire should have been included in the state court's analysis of the third step of Batson, where all relevant circumstances must be examined to determine whether the State had struck any of the jurors based on their race.

*Id.* at 1273.

## B. The State Court Decision Resulted from an Unreasonable Determination of the Facts.

Compounding its grossly unreasonable application of the *Batson* line of cases, the state supreme court's treatment of the record constituted, in violation of § 2254(d)(2), "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." While a petitioner must overcome a "presumption of correctness [of fact findings] by clear and convincing evidence," § 2254(e)(1), *Miller-El* emphasized that, "The standard is demanding but not

insatiable; as we said the last time this case was here, '[d]eference does not by definition preclude relief.'" *Miller-El*, 545 U.S. at 240 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Mr. Pitchford's state appellate record deeply set forth the disparate treatment between the four black venire members in question and the white members of the venire.

### 1. *The District Attorney's Disparate Questioning Betrayed his Pretext in Disguising Racial Discrimination.*

Grenada County summoned a special venire of approximately 350 registered voters for Mr. Pitchford's February 2006 trial. African-Americans comprised forty of the 122 individuals—*viz.*, 33% of the venire—returning jury questionnaires and appearing upon their summonses. Following excusals and cause-related strikes, 35 of the remaining 96 venire members—*viz.*, 36% of the venire—were African-American. R. 349-862, R. 1107. By the end of the selection process, one of the fourteen empaneled jurors was African-American.

The State achieved this composition of the jury by accepting 16 of the first 18 white venire members tendered to the District Attorney while using four consecutive strikes in order to eliminate four of the five black venire members in this process, citing reasons that did not apply to the white members. Tr. 321-22.[6] The State then accepted nine of the next ten whites on the panel. Tr. 326-29; R. 1104-09; R. 395-401, 471-74, 479-80, 515-18, 631-34, and 715-18.

---

[6] For convenience, the voir dire transcript, February 6, 2006, pages 166 though 331, is attached to the Motion as Exhibit 1.

Throughout, defense counsel objected as the District Attorney exercised these strikes and renewed them prior to the jury's seating and in counsel's motion for new trial. At every turn, the trial court failed to conduct the requisite third step inquiry under *Batson*. Tr. 322-32; R. 1250, 1262. The pretextual quality of the reasons the State advanced for each of the foregoing four discriminatory strikes substantiate individual *Batson* violations and, in totality, further violate *Batson*.

As set forth below, District Attorney Evans exercised four peremptories in order to eliminate from the venire all but one African-American who were subject to the State's decision to keep or strike.[7] This 80% strike rate for black venire members contrasts with the State's use of three strikes across 35 white venire members, or an 8.5% strike rate for whites. Tr. 321-29.

### 2. *The Record Reflects Starkly Disparate Treatment.*

<u>Mr. Ward, Venire Member 48</u>

The State sought to justify its use of a peremptory on Carlos F. Ward (No. 48), with a facially discriminatory reason. Tr. 322. The record here provides:

> MR. EVANS: Juror number 5 is juror number 48 on the list, a black male, Carlos Ward. We have several reasons. One, he had no opinion on the death penalty. He has a two year old child. He has never been married. He has numerous speeding violations that we are aware of. The reason that I do not want him as a juror is he is too closely related to the defendant. He is approximately the age of the defendant. They both have children about the same age. They both have never been married. In my opinion he will not be able to not be thinking about these issues, especially on the second phase. And I don't think he would be a good juror because of that.

---

[7] *See Pitchford*, 45 So.3d at 225 n.10.

THE COURT: The Court finds that to be race neutral as well. So now we will go back and have the defense starting at 37.

Tr. 325-26.

District Attorney Evans's reasoning behind striking Mr. Ward was facially demographic—the espoused rationale was that Mr. Ward was "too closely related to" Mr. Pitchford. This relation, of course, was not familial, as there is no suggestion of there being any such relationship between the two men. Further, the pretextual quality of the stated reasons is plain when assessed with reference to numerous white venire members who possessed at least one of the characteristics the State invoked in justifying his strike of Mr. Ward. Direct comparisons with 11 white venire members accepted by the State illuminates District Attorney Evans's pretext here.[8]

---

[8] *Whites with young children*:
Sherman, Michael (tendered by State, Tr. 321), daughter 2½ years old, son 3 months; R. 763;
Wilbourn, Lisa (Alternate 2, R. 1104), son 23 months old, R. 837;
Parker, Lisa (tendered by State, Tr. 321), 6-year-old child, R. 701;
Tramel, Nathalie Drake (Alternate 1, R. 1104), 4-year-old daughter, 5-year-old son, R. 808;
Ward, Laura Candida (Juror 5, R. 1104), 6-year-old daughter, R. 817;
Marter, Stephen Abel, Jr. (tendered by State, Tr. 321), 4-year-old daughter, 5-year-old son, R. 808;
Curry, Michael (tendered by State, Tr. 328), 5-year-old son, R. 497.

*Unmarried whites*:
Eskridge, Chad (Juror 2, R. 1104), never married, R. 527;
Denham, Kenton (tendered by State, Tr. 322), divorced, R. 525;
Counts, Jeffrey S. (Juror 12, R. 1104), divorced, R. 481;
Brewer, Mary W. (Juror 6, R. 1104), widowed, R. 421.

*Whites of similar age*:
Clark, Brantley (tendered by State, Tr. 321), age 22, R. 417;
Eskrdige, Chad (Juror 2, R. 1104), age 25, R. 527;
Sherman, Michael (tendered by State, Tr. 321), age 27, R. 761;

The District Attorney's use of Mr. Ward's speeding traffic violations and expression of no opinion on the death penalty were spurious. The juror questionnaire inquired about criminal charges and convictions but specifically excluded, with the State's assent, traffic violations. R. 352-53, Tr. 4. If the State researched Mr. Ward's driving record, the record suggests it was not interested in the entire panel in that regard. Further, there is no indication at all of any record establishing the existence of such driving violations. Concerning the absence of opinion on capital punishment, the State used this attitude to justify striking Mr. Ward despite failing to employ the criterion in striking whites with a commensurable view on the question. The State accepted two white venire members despite indistinguishable questionnaire answers from Mr. Ward's.[9]

### Linda Ruth Lee, Venire Member 30

District Attorney Evans struck Linda Ruth Lee, a 27-year-old African-American woman and the first black venire member presented to the State. R. 635,

---

Wilbourn, Lisa (Alternate 2, R. 1104), age 28, R. 835;
Parker, Lisa (tendered by State, Tr. 321), age 29, R. 699.

*Whites sharing more than one of the D.A.'s posited traits*:
Eskridge, Chad (Juror 2, R. 1104), age, unmarried, R. 527-29;
Ward, Laura C. (Juror 5, R. 1104), young children, no opinion on D.P., R. 817-18;
Tramel, Nathalie D. (Alt. 1, R. 1104), young children, no opinion on D.P., R. 805-06, Tr. 255;
Parker, Lisa (tendered by State, Tr. 321), age, young children, R. 699-701;
Wilbourn, Lisa (Alt. 2, R. 1104), age, young children, R. 835-37;
Sherman, Michael (tendered by State, Tr. 321), age, young children, R. 761-63.

[9]    *Whites lacking opinion on death penalty*:
Ward, Laura C. (Juror 5, R. 1104), R. 818;
Tramel, Nathalie D. (Alt. 1, R. 1104), R. 806, Tr. 255.

Tr. 324-25. In her questionnaire, Ms. Lee answered that she "generally" though not "strongly" favored the death penalty. R. 638. Among the white venire members the State found acceptable, half gave that same response. But in striking Ms. Lee, Mr. Evans could offer only these reasons:

> MR. EVANS: Yes, sir. S-2 is black female, juror number 30. She is the one that was 15 minutes late. She also, according to police officer, police captain, Carver Conley, has mental problems. They have had numerous calls to her house and said she obviously has mental problems. Juror Number S-3—

> THE COURT: That would be race neutral as to – as to that juror.

Tr. 324-25. As with Mr. Ward (*supra*), the trial court conducted no further inquiry and accepted wholesale that purported rationale.

The District Attorney's conjecture that Ms. Lee had a history of mental problems purportedly came from Carver Conley, one of the officers who investigated the Britt murder. This basis remained entirely unsubstantiated, untested, and would have been, were it not for the legal nature of the proceedings, libelous. This was so, even though Investigator Conley happened to be under subpoena and thus could have been made to answer questions concerning District Attorney Evans's attribution to him about Ms. Lee. R. 215. In this instance, the State's election not to attempt to make a record of the factual premise for striking Ms. Lee taken from the factual claim the State attributed to Investigator Conley betrays the fact that that rationale was a mere pretext—and a thinly disguised one, at that.

Neither Ms. Lee's juror questionnaire responses nor answers to voir dire suggested any mental health issues. Yet the State did not opt to question, nor did

the court instruct the District Attorney to voir dire, the panel collectively or Ms. Lee, or any other venire member, individually with regard to mental illness or health issues. Tr. 239-62.

The record does reflect that Ms. Lee was late in returning from lunch. It also reflects disparate treatment on lateness. Several other jurors apparently failed to return from lunch on time, thus delaying resumption of the proceedings. Tr. 238-39. However, the District Attorney made no attempt to remove any venire member for that reason other than Ms. Lee. Tr. 307-18. The initial thrust of the State's defense of its facially pretextual basis for striking Ms. Lee hinged on her innocuous and explained lateness in returning to the courthouse. Initially, while seeking to strike her for cause, District Attorney Evans did not even mention Ms. Lee's purported, and never substantiated, mental problems. Tr. 318. After the court rejected her lateness as an acceptable reason for striking Ms. Lee, District Attorney Evans secured additional time for preparation of his peremptory challenge. Tr. 319. About a half-hour later, Mr. Evans then injected the specter of Ms. Lee's mental instability into the record in his effort to justify this plainly race-based strike. *Id.*

<u>Christopher L. Tillmon, Venire Member 31</u>

Mr. Tillmon's questionnaire reflected he was 27 years old and "strongly favor[ed]" the death penalty. R. 799-802. The State accepted two similarly situated white males from the venire.[10] It also reflected Mr. Tillmon had worked in law

---

[10] Brantley Clark, Venire Member 19, R. 417-20; Michael Sherman, Venire Member 17, R. 761-64.

enforcement, *id.*, another highly coveted characteristic in the prosecution's typical selection of a capital jury. Nonetheless, District Attorney Evans used a peremptory strike against him:

> MR. EVANS: S-3 is a black male, number 31, Christopher Lamont Tillmon. He has a brother that has been convicted of manslaughter. And considering that this is a murder case, I don't want anyone on the jury that has relatives convicted of similar offenses.
>
> THE COURT: What was his brother's name?
>
> MR. EVANS: I don't even remember his brother. He said that he had a brother convicted of manslaughter.

Tr. 325.

The State's disparate treatment of two similarly situated white venire members betrays the illegitimate reasons for striking Mr. Tillmon. Mr. Jeffrey Counts, Venire Member 74, 37 years old, was seated as Juror 12 despite disclosure in his questionnaire that his uncle was a convicted felon. Tr. 328, R. 479-90, 1104. Also, the State accepted Henry Bernreuter, Venire Member 65, despite disclosure that his son and his stepson had been convicted of serious felonies (burglary and forgery, respectively). Tr. 326, R. 399-400. The State failed to question Messrs. Tillmon, Counts, and Bernreuter about the convictions of certain family members that each had identified in his questionnaire. In striking Mr. Tillmon, and not striking the others, the State conducted no voir dire on the topic of this purported reason. The lack of questioning betrayed District Attorney Evans's lack of familiarity with the venire member's brother, much less any particulars concerning the underlying issue prextextually relied on in striking Mr. Tillmon.

<u>Patricia Anne Tidwell, Venire Member 18</u>

Ms. Patricia Tidwell generally favored the death penalty. R. 787-90. A 37-year-old African-American woman, District Attorney Evans used his fourth strike against her:

> MR. EVANS: S-4 is juror number 43, a black female, Patricia Anne Tidwell. Her brother, David Tidwell, was convicted in this court of sexual battery. And her brother is now charged in a shooting case that is a pending case here in Grenada. And also, according to police officers, she is a known drug user.

> THE COURT: During voir dire, in fact, I made a notation on my notes about her being kin to this individual. I find that to be race neutral.

Tr. 325.

The State failed to make any record substantiating that Ms. Tidwell was "a known drug user." A large segment of the Sheriff's Department was under subpoena at that time and thus these officers were available to make an actual record of this drug use, which was belied by the lack of any indication of arrests, let alone convictions, of Ms. Tidwell for such behavior. Even a specific assertion concerning such purported grounds for striking someone should precipitate a third step hearing, but the court failed to proceed in that manner despite the vague quality of this claimed reason for striking Ms. Tidwell.

Further, the State's invocation of Ms. Tidwell's brother's conviction also suffered from the aforementioned disparate treatment, whereas District Attorney Evans did not question the panel nor voir dire other venire members individually concerning any criminal prosecutions of family members. Further, Mr. Evans seemed to consolidate into one person issues relating to two separate people (David

Tidwell and an unnamed brother), betraying no familiarity with cases that his office would have prosecuted, calling into question the actual impetus for his use of a strike and underscoring the four strikes made in succession against African-Americans.

## V.    CONCLUSION

WHEREFORE, Petitioner respectfully requests the Court to grant summary judgment and the writ of habeas corpus, obviating the need for further litigation of his petition.

Respectfully submitted, this the 12th day of June, 2023,

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH
Phillips Black, Inc.
PO Box 4544
New York, NY 10163-4544
(212) 400-1660

*/s/ J. Scott Gilbert*
J. SCOTT GILBERT
Watkins & Eager PLLC
The Emporium Building
400 East Capitol Street
Jackson, MS 39201
(601) 965-1922

*Counsel for Petitioner*, Terry Pitchford

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2023, the foregoing was served upon all counsel of record in this case via the ECF filing system, pursuant to the Federal Rules of Civil Procedure.

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH
Counsel for Petitioner, Terry Pitchford